**FOLEY & LARDNER LLP**
Jeffrey R. Blease (CA Bar. No. 134933)
Tel: (617) 226-3155; jblease@foley.com
Thomas F. Carlucci (CA Bar No. 135767)
Tel: (415) 984-9824; tcarlucci@foley.com
Shane J. Moses (CA Bar No. 250533)
Tel: (415) 438-6404; smoses@foley.com
Emil P. Khatchatourian (CA Bar No. 265290)
Tel: (312) 832-5156; ekhatchatourian@foley.com
Ann Marie Uetz (pro hac vice application pending)
Tel: (313) 234-7114; auetz@foley.com
Matthew D. Lee (pro hac vice application pending)
Tel: (608) 258-4203; mdlee@foley.com
555 California Street, Suite 1700
San Francisco, CA 94104-1520

*Proposed Counsel for the Debtor
and Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole,<br><br>Debtor. | Case No. 23-40523<br><br>Chapter 11<br><br>**DECLARATION OF CHARLES MOORE, MANAGING DIRECTOR OF ALVAREZ & MARSAL NORTH AMERICA, LLC, PROPOSED RESTRUCTURING ADVISOR TO THE ROMAN CATHOLIC BISHOP OF OAKLAND, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**<br><br>Judge:   Hon. William J. Lafferty<br><br>Date:    TBD<br>Time:    TBD<br>Place:   United States Bankruptcy Court<br>          1300 Clay Street<br>          Courtroom 220<br>          Oakland, CA 94612 |

4886-1261-5266.2

I, Charles Moore, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1. I am a Managing Director within the Restructuring & Turnaround division of Alvarez & Marsal North America, LLC ("A&M"), a professional services firm specializing in turnaround management and performance improvement. I serve as an advisor to The Roman Catholic Bishop of Oakland ("RCBO" or the "Debtor"). I have over twenty-five years of experience in operational and financial restructuring, turnaround consulting, performance improvement, and interim management.

2. On the date hereof (the "Petition Date"), the Debtor caused its attorneys to file a voluntary petition for chapter 11 bankruptcy relief under title 11 of the United States Code (the "Bankruptcy Code") in this Court (the "Bankruptcy Court"). The filing of the petition commenced the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case" or the "Chapter 11 Case"). The Debtor continues to operate as a debtor in possession.

3. I submit this declaration (the "Declaration") pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) to explain to the Court and interested parties the circumstances that compelled the Debtor to seek relief under chapter 11 of the Bankruptcy Code and (b) in support of the relief requested in the First Day Motions (as defined below).

4. This Declaration provides background on the Debtor relevant to this Chapter 11 Case. It also provides factual information relevant to and in support of the First Day Motions. In particular, Part I of this Declaration provides information regarding the Debtor, its mission and its operations. Part II provides information regarding other charitable, educational, and religious-service affiliates that are critical to the ministry of the Roman Catholic Church (the "Catholic Church") within the diocese and that are supported and sometimes administered by the Debtor (the "Non-Debtor Catholic Entities"). Part III provides information about the clergy sexual abuse crisis and the Debtor's mission to effect reconciliation and compensation for victim-survivors of clergy sexual abuse (the "Abuse Survivors"). Part IV provides information regarding events that precipitated commencement of this Chapter 11 Case and the objectives of the filing. Part V provides a summary of the First Day Motions.

5. As the lead Managing Director at A&M responsible for this engagement, I have become familiar with the Debtor's day-to-day operations, financial affairs, and books and records through review

of certain financial documents, discussions with the Debtor's management, and discussions with the Debtor's other professionals. Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by others associated with the Debtor and/or colleagues of mine at A&M, my review of relevant documents or my opinion based on my experience with and knowledge of the Debtor's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized by the Debtor to submit this Declaration.

## I.
## BACKGROUND

### A. <u>Organization and Central Mission of the Catholic Church</u>

6. The Catholic Church follows an episcopal governance structure led by bishops who preside over formal jurisdictions, or geographic areas, known as dioceses. The Pope, who serves as the Bishop of Rome, is the global, spiritual leader of the Catholic Church whose jurisdiction is called the Holy See.

7. Each diocese is led by a bishop or archbishop who is responsible for reporting to the Holy See regarding the diocese's religious and administrative functions. A diocese provides administrative functions to, supports, and serves, among others: (i) local churches, commonly known as parishes; and (ii) various Non-Debtor Catholic Entities.[1] Bishops perform their canonical duties in accord with the Code of Canon Law ("<u>Canon Law</u>"), which is the ecclesiastical law of the Catholic Church.

8. Canon Law is the oldest continual legal system in the western world. Under Canon Law, a diocese is "a portion of the people of God which is entrusted to a bishop for him to shepherd with the cooperation of the presbyterium…." (c. 369). As such, each diocese within the Catholic Church is inherently *territorial*, comprised of a specific geographic area and the faithful within it. A diocese conducts its civil affairs for the practice of the Catholic Church within that geographic area and for the faithful within the area.

---

[1] In addition to those listed in Part II of this declaration, there is another type of organization within the Catholic community known as a religious order. Religious orders are largely autonomous and governed by the statutes and constitutions of the particular order. The priests, religious women and brothers of religious orders do not normally report directly to or take ultimate direction from diocesan bishops. The principal authority for supervising, reassigning or punishing members of religious orders are the superiors of those orders.

DECL. OF C. MOORE ISO FIRST DAY MOTIONS

4886-1261-5266.2

9. Also under Canon Law, every diocese is divided into distinct parts, known as parishes, which are ecclesiastical entities consisting of communities of the faithful whose pastoral care is entrusted to a pastor (i.e., a priest) whom the bishop appoints to serve the parish to which he is assigned. (cc. 374 §1, 515 §1).

10. Each diocese, and each parish within a diocese, is a separate public juridic person. (cc. 573, 515 §3). The administration of property belonging to a juridic person pertains to its administrator, such as the diocesan bishop over the property of a diocese, and the priest over the property of a parish. (cc. 393, 532). Each such administrator is obligated to acquire, hold, administer, and/or alienate such property in accordance with Canon Law (c. 1257), which requires that property held by any juridic person—diocese, parish, or otherwise—must be used for the purposes of the Catholic Church. The bishop is responsible for administering the property belonging to the diocese, and each pastor is responsible for being the exclusive administrator of the property belonging to his parish. Similarly, the pastoral care of the faithful across the entire diocese is entrusted to the bishop, whereas the pastoral care of the faithful within each particular parish is entrusted to the pastor for the parish.

11. Clergy (or ordained clerics of the diocese) carry out the diocese's spiritual mission through celebration of the sacraments, provision of pastoral services to the laity (the non-ordained faithful of the diocese), and performance of works of mercy for not only the laity but also for the larger public. There are three levels of clergy within the Catholic Church: the episcopate, composed of bishops; the presbyterate, composed of priests ordained by bishops; and the diaconate, composed of deacons who assist bishops and priests in a variety of ministerial roles.

12. The mission of the Catholic Church is to share God's love and mercy with all people. The Catholic Church does this through its charitable operations, as well as in the countless churches where Catholics come together to worship across the world. The Catholic Church also engages diplomatic institutions like the United Nations in defense of human dignity for all people and in pursuit of the common good.

Case: 23-40523   Doc# 19   Filed: 05/08/23   Entered: 05/08/23 11:41:17   Page 4 of 41

4886-1261-5266.2

**B.** **History of the Diocese of Oakland**

13.     The Holy See established the Diocese of Oakland in 1962 from the eastern territory of the Archdiocese of San Francisco.   The territory of the diocese spans roughly 1,467 square miles and encompasses two counties, Alameda and Contra Costa. The diocese is situated along the eastern shore of the San Francisco Bay and the Debtor estimates it serves nearly 550,000 resident Catholics and assists approximately 260,000 people through its ministry and charitable services.

14.     On January 27, 1962, the Most Rev. Floyd Lawrence Begin, auxiliary bishop of the Diocese of Cleveland, Ohio, was named the first Bishop of Oakland.  His installation took place on April 28, 1962.  RCBO has had four other bishops, with its incumbent and fifth bishop, Most Reverend Michael C. Barber, SJ ("Bishop Barber" or the "Bishop") being appointed on May 25, 2013.

15.     The charitable history of the Debtor is born out of missionary origins.  In 1772, Franciscan Friar Juan Crespí celebrated Mass with Spanish explorers next to a swamp in what would become downtown Oakland. Almost 25 years after that first Mass, Franciscan Fermín de Francisco Lasuén de Arasqueta founded Mission San José.  The mission was the only parish on the coast opposing San Francisco for the next 64 years. In 1861, the now amalgamated parish of St. Mary of the Immaculate Conception opened. In 1869, St. Paul's parish in San Pablo was the second to open in the present diocese and was the first parish in what is now Contra Costa County.

16.     In 1840, the Holy See erected the "Diocese of the Two Californias" to recognize the growth of the provinces of Alta and Baja California.  In 1848, Alta California was ceded to the United States and the Holy See split the Diocese of the Two Californias into American and Mexican sections, and the American section was renamed the Diocese of Monterey.

17.     In 1853, the Holy See established the Archdiocese of San Francisco from the northern territory of the Diocese of Monterey. The territory that would eventually become the Diocese of Oakland was, at that time, situated within the eastern part of the Archdiocese of San Francisco.

## C.  Governance and Structure of the Diocese of Oakland

18.     The Debtor is a corporation sole organized under the laws of the State of California. The Debtor conducts its civil affairs under the laws of the State of California and the United States of America, and in accordance with Canon Law.

19.     None of the parish churches (the "Churches") within the diocese are separately incorporated entities under California law.  To the extent that the Bishop holds goods belonging to a parish—including, for example, real and personal property—he does so in trust for the benefit of the applicable Church.

20.     Bishop Barber has led RCBO since he was ordained to the episcopacy and installed as Bishop of Oakland on May 25, 2013.  Bishop Barber has been an ordained priest for almost 40 years and has served as a missionary abroad, a professor of theology, a seminary spiritual director and, from 1991-2018, as a chaplain and officer in the U.S. Navy.

21.     Bishop Barber is assisted in the management of the Debtor by both clergy and lay administrators and staff, including the Diocesan Chancellor, Vicar General and Chief Financial Officer. As of the Petition Date, the Debtor employs approximately 30 full-time and 42 part-time employees at the Debtor's central services office – which is also known as the Chancery.  The Chancery is located in downtown Oakland.

22.     The diocese has 82 parishes and missions and is home to 159 diocesan priests, 160 religious priests, 35 extern priests, and 118 permanent deacons.

23.     The Churches play a central role in the lives of Catholics living within the diocese by administering key aspects of the Catholic Faith, including: baptism, education, communion, Mass, confirmation, marriage, and bereavement, including last rites, funeral services and grief support.  In this way, the Churches provide the critical connection between the Debtor and the faithful from the beginning of life to the end.

24.     The Debtor serves one of the most ethnically diverse areas in the nation, where approximately 70% of residents of Alameda County and approximately 59% of residents of Contra Costa County identify as non-White. Alameda County, in particular, is home to more Asian residents than any

other race or ethnicity. The Debtor runs ethnic pastoral centers that serve communities from Brazil, China, Eritrea, Ethiopia, Fiji, India, Indonesia, Kenya, Korea, Laos, Nigeria, Poland, Tonga and Vietnam. For some new arrivals in Alameda and Contra Costa counties, the Catholic Church is their community focal point, a place they can find support and oftentimes necessary resources to begin their lives in the United States.

25. Sunday celebrations within the Churches are celebrated in approximately 17 languages, with the most common being English, Spanish, and Vietnamese. A number of Churches celebrate Mass using multiple languages.

26. The Debtor provides resources, programming, spiritual leadership, and other key services and support to local Catholics and the East Bay community at large, including substantial support for the poor and for minority communities. The ministry of the Debtor is therefore critical to not only the faithful within the diocese, but also to the public-at-large, including non-Catholics.

27. Most of the Churches in the diocese provide some sort of lay outreach to the poor in their local community, e.g., St. Vincent de Paul, food pantries, temporary shelters and ministry to the sick. Lay associations have also formed to engage on issues of immigrant rights, economic development, peace building, and restorative justice.

28. Over one third of the Churches in the diocese are involved in some sort of grassroots faith-based community organizing. This collaboration is most evident in the Debtor's work for affordable and emergency housing and community organizing. In Contra Costa, eight Churches actively participate with the Interfaith Council of Contra Costa (I4C), which is an interfaith coalition of congregations joining together to promote social justice in their community. I4C member congregations also provide shelter and social services to homeless families on a rotating basis. For instance, Christ the King in Pleasant Hill provides shelter, food, and volunteer counselors to homeless families every winter. West Contra Costa County and South Alameda County have similar interfaith coalitions that involve many Churches.

29. Chaplains serve five hospitals in the diocese. The remaining hospitals without assigned chaplains are served by the Churches that include the hospitals within the geographic boundaries of their respective parish. Most of those have established programs involving laity who visit Catholic patients on

a daily basis and who also visit shut-ins and individuals in convalescent facilities. There are 101 nursing homes and similarly licensed care facilities that are served by the diocese.

30. Each Church is encouraged to have a committee whose specific task is outreach to the sick and housebound within the parish. Training for these individuals is provided at the parish level. Pastoral care for doctors and nurses and other health care workers is ordinarily provided through the chaplains who service the institutions where those individuals are working.

### D. The Debtor's Operations

31. The Debtor's revenue streams include parish assessment revenue, which is dependent on donations by parishioners through their respective Church; and the Bishop's Ministries Appeal ("BMA"), an annual fundraising campaign that supports the Churches and diocesan ministries and programs. Funds raised through the BMA (collectively, the "BMA Gifts") are solicited specifically and restricted to fund the particular ministries and programs that the BMA was designed to support and facilitate, including faith formation and evangelization, Catholic Youth Organization (CYO) sports, formation of priests to serve parishioners, care of the retired priests, and meeting the unexpected needs of schools and Churches. In the ordinary course of business, the Debtor also receives, among other revenue, rental revenue, events/programming revenue, management fees, and unrestricted gifts, grants, and bequests (collectively, "Other Chancery Revenues").

32. RCBO provides support and sometimes administers, among others: (i) local Churches and parish schools; and (ii) other charitable, educational, and religious-service affiliates critical to the ministry of the Catholic Church within the diocese.

33. RCBO has a December 31st year end. On an unaudited based, RCBO had for fiscal year 2022, ended December 31, 2022, total revenue of approximately $21.1 million. Of this amount, approximately $5.5 million was from parish assessments, $2.7 million was from the BMA and $2.3 million was from other gifts, grants and bequests. Other revenue totaled approximately $10.6 million, consisting of rental income, insurance revenue, program revenue and income and dividends, among other sources. RCBO had total operating expenses of $20.0 million, resulting in income from operations of $1.1 million before other non-operating income and expenses.

4886-1261-5266.2

### E. **Mission Alignment Process**

34.     In November 2020, Bishop Barber called for the formulation of a task force to assess how to meet the challenges of declining Mass attendance, underutilized parish facilities and the declining number of priests in the diocese.  The priests of the diocese were asked to recommend candidates to contribute to this task force, and in March 2021 the task force was introduced as the Mission Alignment Process (MAP) Commission. The Commission is composed of 15 members representing laity and clergy of the diocese.

35.     The Commission commenced meeting in April 2021 to evaluate and guide the diocese in a process of self-reflection and renewal. Data from the Churches, parishioners, schools, priests, and diocesan demographics were analyzed and a presentation was developed for the presbyterate of the diocese. This data included facts about parish-by-parish Mass attendance, the historical decline in priests serving in parish ministry, and projections of a decline in the number of future priests under 70 years old for parish ministry. Over a period of 14 months, a series of additional meetings with clergy and parish and school lay leadership at the region and deanery level were held and input was sought for dealing with these challenges and to increase focus on Bishop Barber's three priorities – emphasizing the Sunday experience of the Holy Eucharist; practicing the corporal and spiritual works of mercy; and forming missionary disciples.

36.     In November 2022 Bishop Barber arranged 14 meetings of priests to discuss the feedback from the region and deanery consultative meetings and to deliberate on a path forward for each deanery. This path forward included consideration of clustering, merging, or closing of Churches. A cluster is where two or more Churches remain separate and retain their names but share one or more priests and one administration.  A merger is where two or more parishes are combined to form one new parish while consolidating membership, property and finances.  Closures include selling, renting or using parish properties for other purposes.

37.     The work of the MAP Commission continues.  The Debtor believes the information gained through MAP will help serve the Debtor through its Chapter 11 Case as it evaluates resources to settle

claims and so that the Catholic Church in the diocese may become an even more vibrant and faith-filled community.

## II.
## AFFILIATED NON-DEBTOR CATHOLIC ENTITIES

38. Through common missions, the Debtor is affiliated with certain entities separately incorporated under California law and which are not debtors in this Chapter 11 Case (each such affiliated incorporated entity a "Non-Debtor Catholic Entity," and collectively, the "Non-Debtor Catholic Entities").

39. The Debtor provides administrative services (centralized human resources, accounting, and financial management) and programmatic support services to certain Non-Debtor Catholic Entities in support of their religious, educational and charitable missions. Each Non-Debtor Catholic Entity operates independently and accounts for its operations separately.

### A.    The Roman Catholic Welfare Corporation of Oakland

40. The Roman Catholic Welfare Corporation of Oakland ("RCWC") is a nonprofit religious corporation that oversees 32 elementary schools and two high schools. The Catholic schools fulfill the threefold mission of Catholic education to (1) proclaim the Gospel, (2) build community, and (3) serve the faithful and non-believers alike. RCWC initiates, administers, and supervises the educational program in the Catholic schools located in the diocese for which it has oversight responsibility. RCWC also coordinates accreditation, policy development, curriculum, testing, and training for the approximately 1,400 teachers serving in those schools. All the RCWC schools' real property is owned by RCWC.

41. . All schools are accredited by the Western Association of Schools and Colleges, and Catholic schools generally have separate administration from the Churches. Each school collects revenues, pays expenses, and conducts other operational and financial matters of the school.

42. RCWC has its own board and has at all times maintained its own, separate bank accounts and had its own financial statements. RCWC participates in the Benefit and Insurance Plans. RCWC relies upon the Oakland Parochial Fund to manage its investments.

### B.    Lumen Christi Academies of the Roman Catholic Diocese of Oakland

43. Formally established in 2018 by Bishop Michael C. Barber, the Lumen Christi Academies ("LCA") were formed with the goal of creating an independent network of modern Catholic schools. It is

LCA's charter to establish new governance models and pursue academic innovation, efficient operations, and sustained investment in the professional development of teachers and principals, all while delivering the highest quality Catholic education to all students across the Bay Area. At present, LCA is comprised of six culturally diverse elementary schools (i.e., preschool through 8th grade) across the Oakland and Contra Costa County area.

44.     LCA participates in the Benefit and Insurance Plans.  It has at all times maintained its own, separate bank accounts and had its own financial statements.

### C.    The Roman Catholic Cemeteries of the Diocese of Oakland

45.     The Roman Catholic Cemeteries of the Diocese of Oakland ("RCC"), a California corporation, operates and administers all cemetery, mausoleum and mortuary services in the diocese. RCC operates and administers six diocesan cemeteries, five diocesan mortuaries, two mausoleums and one crematory. RCC owns no real property and all real property necessary to carry out its activities (burial, entombment, and related services) are leased from RCBO pursuant to ground leases or other appropriate lease forms. RCC is obligated to provide for Catholic burial of the deceased, and to provide "perpetual care." This obligation is central to the operating structure of the RCC cemeteries and is part of the contractual arrangements for every interment.

46.     Funds from every interment are set aside for a permanent maintenance fund to be held, invested, and used to provide perpetual care. RCC has at all times segregated its funds from those of the Debtor and has at all times maintained separate accounts. RCC holds and invests such segregated funds, and also bears the related obligation to provide perpetual care for the deceased.

47.     RCC has its own board and audited financial statements. RCC participates in the Benefit and Insurance Plans. RCC relies upon the Oakland Parochial Fund to manage its investments.

### D.    The Oakland Parochial Fund, Inc.

48.     The Oakland Parochial Fund, Inc. ("OPF") is a separately incorporated, non-regulated investment fund organized for the purpose of offering the Churches and certain Affiliated Non-Debtor Catholic Entities the opportunity, but not the obligation, to invest their funds. OPF serves as a non-profit

DECL. OF C. MOORE ISO FIRST DAY MOTIONS

fund manager for investments of the Churches and RCWC (through its component schools), to the extent they choose to participate.

49. OPF has its own board and audited financial statements. It has at all times maintained its own, separate investment accounts, and has its own bank account. OPF relies on the Debtor for finance and accounting services related to the closing of books and maintaining its accounting records.

### E. The Catholic Cathedral Corporation of the East Bay

50. The Catholic Cathedral Corporation of the East Bay ("CCCEB") was formed, along with Christ the Light Cathedral Corporation ("CLCC"), to conduct activities related to replacing the prior diocesan cathedral which was rendered seismically unsound by the 1989 Loma Prieta earthquake and ultimately demolished. CLCC's purpose was to raise funds necessary for the costs of construction of the Cathedral Center and land acquisition in connection therewith. All monies and properties gifted to CLCC have been and are restricted by the donors for use only in connection with the Cathedral Center. These monies and properties are to be used only for this purpose by either CLCC or CCCEB.

51. Construction of the new cathedral, known as Cathedral of Christ the Light ("Cathedral") commenced in May 2005. The Cathedral project included a mausoleum, a chancery to serve administrative offices, rectory, other administrative and services offices, conference facilities, and an open plaza (collectively, with the Cathedral, the "Cathedral Center").

52. CCCEB holds legal title to the land and improvements constituting the Cathedral Center and will continue to do so and to operate and maintain it.

53. The Debtor leases space in the administrative offices from CCCEB and provides finance and accounting services and support for CCCEB.

54. CCCEB has at all times maintained its own, separate bank accounts and had its own financial statements.

### F. The Oakland Society for the Propagation of the Faith

55. The Oakland Society for the Propagation of the Faith ("SPOF") provides support for Catholic missionaries. SPOF is one of the four Pontifical Mission Societies, known in some countries as Missio. This group of Catholic Missionary Societies is under the canonical jurisdiction of the

Congregation for the Evangelization of Peoples (Rome, Italy) and the Bishop of Rome (the Pope). Since 1922, the Pontifical Mission Societies (Missio) has been the Catholic Church's official support organization for overseas mission. The Society for the Propagation of the Faith seeks to foster an even deeper spirit of universal mission. SPFO strives to inform Catholics of the life and the needs of the Catholic Church in the Missions and to encourage prayer and financial help for those mission churches.

56. Through the offerings from Catholics worldwide, the Society for the Propagation of the Faith provides ongoing support for the pastoral and evangelizing programs of the Catholic Church in Africa, Asia, the Pacific Islands and remote regions of Latin America. This includes aid for religious communities in education, evangelization, seminarians and catechist formation, catechetical work and the construction of churches and chapels. Support is also provided for health care, social services, communication and transportation needs for disaster and emergency relief when necessary.

57. SPOF relies on the Debtor for finance and accounting services related to the closing of books and maintaining its accounting records. SPOF has at all times maintained its own, separate bank accounts and had its own financial statements.

**G. Catholic Charities of the Diocese of Oakland, Inc.**

58. Catholic Charities of the Diocese of Oakland, Inc., dba Catholic Charities of the East Bay ("CCEB") is a not-for-profit corporation. CCEB is the social service arm of the diocese. CCEB helps vulnerable communities within Alameda and Contra Costa Counties by supporting children, youth, families, and seniors from crisis to stability to well-being.

59. Founded in 1935, CCEB provides hope and healing to vulnerable children, youth and families in Alameda and Contra Costa Counties through compassionate services that transform lives and foster self-sufficiency. CCEB works deeply to address the root causes of poverty and issues of social justice. CCEB heeds the call of the Pope to serve the vulnerable and services people in need regardless of religious belief, race, national origin, gender or sexual orientation.

60. As the social service arm of RCBO, CCEB is a national recognized leader in healing trauma and providing evidence-based mental health services and restorative practices. CCEB is also nationally accredited through the New York-based Council on Accreditation, demonstrating the implementation of

best practice standards in the field of human services in all aspects of CCEB's programs, services, management and administration.

61.    CCEB has at all times maintained its own, separate bank accounts and had its own financial statements.

**H.    Catholic Church Support Services (dba Catholic Management Services)**

62.    Catholic Church Support Services ("CCSS"), established January 1, 2014, is a California nonprofit religious corporation previously headquartered in Pleasanton California, which operates under the trade name of Catholic Management Services ("CMS").

63.    CCSS provides management services to Catholic dioceses throughout the United States, including Puerto Rico, generally regarding their funeral and cemetery enterprises. CCSS provides general managerial administration of the day-to-day operations of cemeteries, including marketing and branding support, business development, and process and systems reviews under management services agreements.

64.    CCSS has its own board and audited financial statements and has at all times maintained its own, separate bank accounts. CCSS participates in the Benefit and Insurance Plans.

**I.    Furrer Properties Inc.**

65.    Furrer Properties Inc., a California corporation and wholly-owned subsidiary of RCBO, is used by the Debtor to hold title in its real estate. Furrer holds select real estate assets that derive rental property income from cemeteries, a four (4)-unit rental property, and parking lot in Oakland.

66.    Furrer Properties Inc. financials are consolidated in the audited financials of RCBO. Furrer Properties Inc. maintains a separate bank account which is administered by its agent, a property management company.

**J.    Adventus**

67.    Adventus, a California corporation, is used by the Debtor to hold title in some limited real estate. Adventus' financials are consolidated into the audited financials of RCBO. Adventus has always maintained a separate bank account.

Case: 23-40523    Doc# 19    Filed: 05/08/23    Entered: 05/08/23 11:41:17    Page 14 of 41
4886-1261-5266.2

### K. Catholic Foundation for the Diocese of Oakland

68.     Catholic Foundation for the Diocese of Oakland ("<u>Foundation</u>") was formed in 2014 for the purpose of fundraising for the diocese's one and only diocesan-wide capital campaign initiated that year. It is currently in the process of being wound down as the campaign concluded and funds raised and collected have nearly all been distributed.

### III.
### THE DEBTOR'S MISSION TO EFFECT RECONCILIATION AND COMPENSATION

### A. Child Protection, Reconciliation and Healing for Abuse Survivors

69.     The needs of Abuse Survivors, and the protection of children, have long been priorities of the Debtor. Since the 1990s, the Debtor has provided counseling, therapy, support and outreach to Abuse Survivors.

70.     More than a decade before the U.S. Conference of Catholic Bishops adopted in the Spring of 2002 the *Charter for the Protection of Children and Young People* (the "<u>Charter</u>"), the Debtor established a "Sensitive Issues Committee" to assist the bishop in reviewing and handling allegations of sexual abuse by persons acting in the name of the Catholic Church. During that time, the Sensitive Issues Committee assisted in the evaluation of the credibility of claims and made recommendations to the bishop regarding assistance to Abuse Survivors, including monetary assistance, counseling and pastoral care.

71.     Following the Charter's adoption, the Sensitive Issues Committee was renamed the Diocesan Review Board in 2003 and again updated to the Minor Diocesan Review Board in 2022 (the "<u>MDRB</u>"). The MDRB actively functions today. Its five lay members (including an Abuse Survivor and business consultant, a former district attorney, a social worker, a retired educational administrator, and a lay pastoral associate) and three clergy members meet at least quarterly to assess allegations and make recommendations on the handling of those allegations of sexual abuse of children and vulnerable adults by clergy. This consultative body is critical to the work of the Debtor to address crimes against children and vulnerable adults. As with the Sensitive Issues Committee, the MDRB works with the bishop to analyze and properly respond to claims so credibility can be determined and acted upon in the best interest of the Abuse Survivor.

72.     In line with the Charter and the mission and teachings of the Catholic Church, the Debtor offers (i) counseling, treatment, and programming for those who both claim to have been and have been credibly found to be survivors of abuse by members of the clergy along with (ii) safe environment scanning, training and classes for prevention.  These programs (collectively, the "Abuse Survivors' Assistance and Safe Environment Programs") are important and necessary to the Debtor's ongoing obligations, and to its moral and ethical responsibility to support Abuse Survivors.

73.     In 2004, the Debtor began developing specific training and background check programs that provide a safe environment for parishioners and visitors to diocesan facilities ("Safe Environment"). Through its Safe Environment programs, the Debtor ensures and requires the training of all adults – whether volunteer or employed – who serve in the diocese. The Debtor gives rigorous attention to training materials and teaches adult parish and school leaders to facilitate the training program. Processes are also in place to refer anyone with claims regarding clergy sexual abuse to law enforcement and Debtor representatives for assistance.

74.     All volunteers and employees over age 18 in any parish, school, or other diocesan site, regardless of ministry, must be trained every three years in safe environment. All children in Catholic school or parish faith formation programs must also be trained annually to recognize and report abuse. As part of this process, the Office of Safe Environment conducts annual statistical audits of each location in the diocese and trains the coordinators annually to ensure the policies are met and followed.

75.     The Office of Safe Environment has continually improved the content of its trainings and, as online platforms became available, former Bishop Cummins approved their use. In 2016, Bishop Barber moved the training program to an online synchronous platform provided by The National Catholic Risk Retention group known as Virtus, an international leader in abuse awareness training. The Debtor now has local safe environment coordinators in every parish and school.

76.     The Debtor also operates an Office for Victims Assistance ("OVA") and employs a Victims Assistance Coordinator ("VAC") to directly address the needs of Abuse Survivors and coordinate support services for them. The goals of the OVA, as administered by the VAC, are to support Abuse Survivors and their families through counseling, spiritual direction, and support groups. The OVA also arms Church

leaders with the tools to develop support, promote healing, and empower Abuse Survivors in the diocesan community.

77. Through the OVA, and the hotline established by the Debtor, counseling and spiritual direction are offered to Abuse Survivors of clergy abuse and their families and the Debtor is committed to reporting, investigating, and responding to such claims. The Debtor also pays for Abuse Survivors to receive psychological counseling and related medical treatment, including medications where appropriate ("Abuse Survivors' Assistance").

78. Abuse Survivors' Assistance is available for any requesting individual who makes an allegation of abuse by clergy or non-clergy affiliated with the Debtor. In some cases, the Debtor makes these programs available to family members who have been affected by the abuse of a loved one.

79. Abuse Survivors' Assistance is administered by psychologists, psychiatrists, licensed clinical social workers, and licensed marriage and family therapists selected by the recipient (each a "Counselor"). Before engaging a Counselor, the Debtor requires the Counselor to provide evidence that he or she is a state-licensed mental health professional with at least a master's degree in a relevant field. The Debtor recommends Counselors who have a background in trauma therapy but does not require that background. The Counselors are not employed by or otherwise affiliated with the Debtor.

80. Education on the issue of clergy sexual abuse is also a cornerstone of the Debtor's mission to address and eradicate this problem. The Debtor actively educates clergy, Church employees and the community around the realities of clergy sexual abuse through workshops and presentations aimed at bringing awareness to the problem. This forum also provides opportunities for Abuse Survivors to tell their stories to help effect change regarding clergy sexual abuse. The Debtor's ministry also includes Abuse Survivors working together with priests and deacons regarding what it means to be sexually abused by a member of the clergy.

81. Ultimately, the Debtor understands that in order to address the problem of clergy sexual abuse, it must amplify the voice of Abuse Survivors and provide necessary resources to the public to understand when and how to report incidents of abuse. The Debtor's website (www.oakdiocese.org) has five main sections: Diocese, Bishop, Ministries, Giving and Survivors. The Survivors section contains

Case: 23-40523    Doc# 19    Filed: 05/08/23    Entered: 05/08/23 11:41:17    Page 17 of 41

five pages full of resources, information and links to policies and procedures to further the cause of identifying, addressing, reporting and responding to clergy sexual abuse. The website contains, among other things:

a. Contact information for the VAC, Chancellor and the number/email for the dedicated Survivor Advocacy Hotline;

b. Information regarding the Debtor's Minor Diocesan Review Board and steps for reporting abuse;

c. A parish infographic detailing the steps the Debtor will take to respond to and investigate a claim of clergy sexual abuse;

d. Access to the Virtus registration and login in both English and Spanish, as well as retraining instructions, so that safe environment training can be easily accomplished;

e. Policies related to *Background Screening and Training*, *Sexual Misconduct*, and *Minors Volunteering or Working with Younger Children*

f. Links to the *Code of Conduct Involving Interactions with Minors and Vulnerable Adults* (in both Spanish and English), *Live Scan Requests* (for both employees and volunteers), *Approved Safe Environment Curriculum for Children and Youth*, the forms for both schools and churches regarding their *Safe Environment Reporting*, the *USCCB Charter for the Protection of Children and Young People* and the *On Site Safe Environment Training Schedule*.

g. The "Credibly Accused List" of diocesan priests, religious order priests, deacons and brothers (as well as some priests from other dioceses who had worked in the diocese) who have been credibly accused of the sexual abuse of minors.

82. The Debtor, through its programs, offices, coordinators and trainings, is committed to serving those affected by historical clergy sexual abuse and to prevent future abuse from occurring.

**IV.**
**EVENTS LEADING TO THE CHAPTER 11 FILING**

83. In the State of California, there have been two "open window" periods allowing individuals under civil law to bring claims for childhood sexual abuse which otherwise were barred due to the

expiration of the statute of limitations (prescription). In 2002, the California Legislature permitted certain expired claims of childhood sexual abuse not only against the perpetrators but also against third-party defendants (like the Churches) for a one-year period starting January 1, 2003 (the "First Legislation"). The Debtor paid approximately $56,000,000 to 52 plaintiffs in settlement of claims brought as part of the First Legislation.

84. On October 13, 2019, Governor Gavin Newsom signed into law California Assembly Bill No. 218 ("AB 218"). AB 218 revived the statute of limitations for individuals to file civil lawsuits for childhood sexual abuse. The passage of AB 218 allowed certain individuals to bring what had been time-barred claims against individuals and entities for such claims through and including December 31, 2022. As of May 4, 2023, there were approximately 332 separate, active lawsuits or mediation demands pending against the Debtor filed by plaintiffs alleging sexual abuse by clergy or others associated with the Debtor.[2]

85. The Debtor has neither the financial means nor the practical ability to litigate all of the abuse claims in state court. This Bankruptcy Case will allow all of the claims to be filed and decided in a single forum – the Bankruptcy Court – and will ensure that all meritorious abuse claims be paid on a fair and equitable basis pursuant to an approved plan.

86. In this Chapter 11 Case, the Debtor will pursue a plan of reorganization that will fairly and equitably compensate abuse survivors and will also enable the Debtor to continue its mission to serve the needs of the faithful within the diocese, and to continue to provide social services to numerous underserved people and groups in the East Bay, regardless of their religious faith.

87. The Debtor is and will remain committed to transparency, openness, and truth during this Bankruptcy Case. It will take responsibility for the suffering of Abuse Survivors and ensure that credible claims of abuse are compensated through an expedited, uniform claims process. The Debtor will also endeavor to move through the Bankruptcy Case quickly in order to preserve assets and to hasten the payment of compensation to victim-survivors.

---

[2] It is the Debtor's understanding that there is a backlog associated with the processing of these cases in the Clerk's Office for Alameda County, and it is possible that other timely filed claims will be processed after the filing of this case of which the Debtor is not currently aware.

DECL. OF C. MOORE ISO FIRST DAY MOTIONS

88.     One of the Debtor's most significant assets is its portfolio of insurance policies from which it will pursue coverage to help pay abuse claims.  Some of these policies date back to the first days of the diocese and are described in more detail below.

89.     The Debtor has worked to identify and preserve insurance policies in effect when clergy sexual abuse allegedly occurred, including, at various points, primary and excess insurance policies.  The Debtor has made substantial effort to pull together insurance policies and secondary evidence of insurance coverage from the early 1960's to the present. Due to the passage of time and the ordinary course of the Debtor's business, some documents regarding insurance coverage could not be located, and in some cases, evidence of insurance policies were pulled together from various documents.

90.     The Debtor has maintained insurance coverage through a series of primary, excess and umbrella insurers from the early 1960's through the present.

91.     Relevant to coverage of claims for alleged clergy sexual abuse, the Debtor has investigated and continues to investigate available insurance policies in existence since the Debtor's inception.  The Debtor has identified at a minimum the following primary insurance policies:

- Policy No.: LAC127792 for the period March 12, 1962 to October 25, 1963, issued by Pacific Indemnity (Chubb) ("Pacific");

- Policy No.: LAC 155598 for the period October 25, 1963 to October 25, 1966, issued by Pacific;

- Policy No.:  CP 25231 for the period October 25, 1966 to October 25, 1969, issued by Insurance Company of America ("ICA");

- Policy No.: CP267867 for the period October 25, 1969 to October 25, 1970, issued by ICA;

- Policy No.: EF 9334-001 for the period October 25, 1970 to October 26, 1972, issued by Commercial Union Assurance Company ("Commercial Union");

- Policy No.: EF 9334-003 for the period October 26, 1972 to October 26, 1973, issued by Commercial Union;

- Policy No.: EF 9334-008 for the period October 26, 1973 to December 1, 1975, issued by Commercial Union;

- Policy No. 05 AL 802025 CMA for the period December 1, 1975 to December 1, 1978, issued by Aetna Insurance Company (obligations later assumed by Travelers Insurance Company) ("Aetna/Travelers");

- Policy No. 05 SM90296 FCA for the period December 1, 1978 to December 1, 1979, issued by Aetna/Travelers;

- Policy No. 05 SM 99094 FCA for the period December 1, 1979 to December 1, 1980, issued by Aetna/Travelers;

- Policy No. 05 SM 107459 FCA for the period December 1, 1980 to December 1, 1981, issued by Aetna/Travelers; and

- Policy No. 291-70-49-99 for the period December 1, 1981 to December 1, 1984, issued by Centennial Insurance Company (n/k/a Atlantic Mutual Insurance Company) ("Centennial/Atlantic Mutual");

- Policy No. 287-00-46-36 for the period December 1, 1984 to December 1, 1987, issued by Centennial/Atlantic Mutual;

- Policy No. CGAL 005-87 for the period July 1, 1987 to July 1, 1988, issued by Ordinary Mutual Insurance Company ("Ordinary Mutual");

- Policy No. CGAL 005-88 for the period July 1, 1988 to July 1, 1994, issued by Ordinary Mutual; and

- Policy No. CGAL 005-94 for the period July 1, 1994 to July 1, 1997, issued by Ordinary Mutual.

92. The Debtor has identified, at a minimum, the following excess insurance policies:

- Policy No. CU 1001 for the period March 12, 1962 to October 25, 1963, issued by Lloyd's of London ("Lloyd's");

- Policy No. K 78138 for the period October 25, 1963 to October 25, 1966, issued by Lloyd's;

- Policy No. XBC 24312 for the period October 25, 1966 to October 25, 1970, issued by Insurance Company of North America (obligations later assumed by Ace Insurance Company) ("INA/ACE");

- Policy No.: DCL 53 9820 for the period October 25, 1970 to October 25, 1971, issued by United States Fire Insurance ("US Fire");

- Policy No.: U10255 for the period October 26, 1971 to October 26, 1974, issued by Employers Reinsurance ("Employers Re");

- Policy No.: RDU 146 74 50 for the period October 26, 1974 to December 1, 1977, issued by CNA Insurance Company ("CAN");

- Policy No.: UMB 006 46 71 53 for the period December 1, 1977 to December 1, 1980, issued by CNA;

- Policy No.: JU 8312510 for the period December 1, 1980 to December 1, 1981, issued by Industrial Indemnity (West Chester Fire) ("Industrial Indemnity");

- Policy No. 291-70-49-99 for the period December 1, 1981 to December 1, 1984, issued by Centennial/Atlantic Mutual; and

- Policy No. 287-00-46-36 for the period December 1, 1984 to December 1, 1987, issued by Centennial/Atlantic Mutual.

93. The Debtor has identified, at a minimum, the following umbrella insurance policies:

- Policy No. K 66034 for the period March 12, 1962 to October 25, 1963, issued by Lloyd's;

- Policy No. CU 3061 for the period October 25, 1963 to October 25, 1966, issued by Lloyd's;

- Policy No.: CE 35-60-94 from November 15, 1971 to October 26, 1974, issued by American Home Insurance ("American Home");

- Policy No.: PLE20430 for the period October 16, 1974 to October 16, 1977, issued by Employers Re;

- Policy No.: 05 XN 55 WCA for the period December 1, 1978 to December 1, 1981, issued by Aetna/Travelers;

- Policy No.: 005 FF 1390 BCA for the period December 1, 1981 to December 1, 1987, issued by Aetna/Travelers; and

- Policy No.: XCC 01 2405 for the period March 13, 1985 to December 1, 1985, issued by Pacific Employers Insurance ("Pacific Employers").

94. Among its historical insurers, RCBO is informed and believes that some insurers are insolvent including Commercial Union/Armour (primary layer 1970-1975) and Centennial/Atlantic Mutual (primary and excess layers 1981-1987). RCBO has also engaged with the California Insurance Guarantee Association ("CIGA") regarding potential recovery related to insolvent insurers.

95. The Debtor has tendered through its broker both the Debtor's defense and indemnity of the claims asserted against the Debtor under the applicable insurance policies to the associated carriers that issued those policies (the "Defendant Carriers").

96. Those Defendant Carriers that issued primary insurance policies received tender on behalf of the Debtor but have failed to confirm coverage and/or provide defense and/or indemnity to the Debtor. Those Defendants Carriers that issued excess or umbrella policies received the tender on behalf of the Debtor but have improperly denied or failed to confirm coverage (including, without limitation, failure to provide both defense and/or indemnity) including failure to recognize the exhaustion of underlying insurance through payment, liquidation or other means and thereby requiring the excess insurance to drop down and provide defense and indemnity to the Debtor.

4886-1261-5266.2

97. As of the filing of this Chapter 11 Case, despite the Debtor's continuing efforts to obtain coverage from the Defendant Carriers, the Defendant Carriers have reserved their rights and have not agreed to indemnify the Debtor for any liability determinations. While some of the Defendant Carriers have in some cases agreed to reimburse some of the Debtor's defense costs, these reimbursements are very far below the amounts to which the Debtor is entitled under the policies.

98. Because the Debtor and the Defendant Carriers have not reached a resolution regarding coverage, the Debtor will file an adversary proceeding in this Bankruptcy Case against the Debtor's insurers seeking, among other things, a declaratory judgment with respect to the Debtor's rights and the insurers' obligations under such insurance policies for the benefit of the Abuse Survivors.

99. The Debtor believes there is substantial value in the insurance policies that it purchased over many decades. These assets are an important resource to further the Debtor's goals of compensating and reconciling with Abuse Survivors.

## V.
## SUMMARY OF FIRST DAY MOTIONS[3]

100. To enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 Case on its operations, the Debtor has requested various types of relief in its first-day motions (collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things: facilitating a smooth transition to this Chapter 11 Case to allow the Debtor to work with other stakeholders to achieve a plan of reorganization that will fairly and equitably compensate abuse survivors and will also enable the Debtor to continue its mission to serve the needs of the faithful within the diocese; preserving the confidentiality of abuse survivors through special noticing procedures; continuing the ministry of the Catholic Church to the nearly 550,000 Catholics in the diocese; maintaining employee compensation; maintaining the good will and morale of the priests, lay employees and others who work on the programs and services provided by the Debtor; preserving and maximizing the Debtor's insurance assets to help provide fair and equitable compensation to abuse survivors; and maintaining services for those Catholics and non-Catholics alike who benefit from the many critical services provided by the charitable,

---

[3] Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

DECL. OF C. MOORE ISO FIRST DAY MOTIONS

educational and other service organizations affiliated with the Debtor. All of the First Day Motions are vital to the Debtor's reorganization efforts, and expedited approval of the First Day Motions is important to achieving a confirmed plan of reorganization in this Chapter 11 Case.

101. In connection with preparing for this Chapter 11 Case, I have reviewed each of the First Day Motions referenced below. The First Day Motions were prepared with my input and assistance, or the input and assistance of employees working under my supervision. The information contained in the First Day Motions is accurate and correct to the best of my knowledge. I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtor's ability to preserve the value of its estate, succeed in its reorganization efforts, and continue to provide ministry to the faithful, Catholic education to children and charity to the community.

A. **Debtor's Motion for an Order Authorizing and Approving Special Noticing and Confidentiality Procedures (the "Notice and Confidentiality Motion")**

102. The Debtor filed the Notice and Confidentiality Motion to require that all schedules, statements of financial affairs, creditor matrix, motions, pleadings, and any other entry into the record to be filed under seal or redacted to the extent they contain (a) non-public names of abuse claimants, potential abuse claimants, or those accused of committing or covering up abuse, (b) the private contact information of the Debtor's current or former employees, or (c) personally identifying information of workers' compensation claimants or minors.

103. It is important to the Debtor that individuals who have filed lawsuits or otherwise asserted claims against the Debtor arising out of alleged sexual abuse by clergy or other Debtor-affiliated persons continue to have anonymity and privacy.

104. Abuse claimants may prefer to not have their names associated with making claims of abuse. For example, virtually all of the lawsuits filed against the Debtor alleging sexual abuse by clergy or others associated with the Debtor (the "Abuse Lawsuits") are filed in the name of a Doe plaintiff, indicating to the Debtor that the plaintiffs in the Abuse Lawsuits designated their identities as confidential and want them to remain that way.

4886-1261-5266.2

105.     Due to the nature of the allegations in the Abuse Lawsuits, the redaction of the identities and identifying information of both the claimants and the accused from all documents filed in this Bankruptcy Case will aid in protecting those persons against the disclosure of a deeply personal matter in publicly-filed court documents.

106.     The Debtor makes its request in the Notice and Confidentiality Motion out of respect for the confidentiality of the claimants, and in light of the unusually public nature of bankruptcy proceedings.

107.     Additionally, the Debtor is required to list its current and former employees in the creditor matrix, among other submissions.  In order to protect against the risk of identity theft and the disclosure of personal identifying information of its employees and former employees, the Debtor also requests authority to redact the home addresses and other personal contact information for these individuals.  That information could be used to perpetrate identity theft or to harass those individuals.  The threat of identity theft or harassment is of particular importance in these proceedings, which the Debtor expects to garner substantial media publicity.

108.     Additionally, the Debtor requests that all documents containing the identities of minor persons or containing personally identifying information of workers' compensation claimants be required to be redacted or sealed.

109.     Documents related to workers' compensation claims may contain personally identifying information (PII), the disclosure of which is prohibited by the Health Insurance Portability and Accountability Act of 1996 (HIPAA).  Any such PII should be redacted or sealed from public view.

110.     There is no compelling public interest to have the identities of minors made public in these proceedings.  All PII relating to minors should likewise be redacted or sealed.

111.     The Debtor also filed the Notice and Confidentiality Motion to streamline the process, and reduce the cost, of providing notice of filings in the Bankruptcy Case.  An estimated 1,800 creditors and parties-in-interest, and possibly more, may be technically entitled to notice in this Chapter 11 Case.  To require the Debtor to provide notice of all pleadings and other papers filed in this Chapter 11 Case to all parties-in-interest, no matter how limited their interest may be in a particular matter, would be burdensome

4886-1261-5266.2

and costly to the estate in light of the photocopying, postage, and other expenses associated with large mailings.

**B.** **Debtor's Motion for Interim and Final Orders Authorizing the Debtor to (I)(A) Continue Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related to the Use Thereof, (C) Continue Intercompany Arrangements, (D) Maintain Existing Bank Accounts and Business Forms, and (E) Continue Use of Existing Credit Card Accounts; and (II) Waive Certain Requirements of 11 U.S.C. 345(b) (the "Cash Management Motion")**

112. The Debtor's maintains a centralized and integrated cash management system (the "Cash Management System") consisting of a network of 14 bank accounts (each, a "Bank Account" and collectively, the "Bank Accounts") and one investment account, each used by the Debtor in the ordinary course of operations. The Debtor's Cash Management System is typical of those employed by other dioceses.

113. The Cash Management System is comprised of (a) Bank Accounts into which unrestricted receipts and other receivables generated are collected and from which funds are subsequently disbursed to pay the general operating expenses of the Chancery and other ordinary course obligations of the Debtor (collectively, the "Unrestricted Bank Accounts"), (b) Bank Accounts into which restricted, entrusted, and/or insurance-related pass-through funds are collected and from which funds are subsequently disbursed or otherwise transferred to the intended beneficiaries or recipients (collectively, the "Restricted Bank Accounts"), and (c) a single investment account. A diagram illustrating the general movement of cash throughout the Cash Management System, as it exists on the Petition Date, is attached as **Exhibit C** to the Cash Management Motion.

114. Thirteen (13) of the Bank Accounts are maintained at either Union Bank, N.A. or U.S. Bank, N.A. ("U.S. Bank") and one (1) is maintained at Citibank, N.A. ("Citi"). The investment account is maintained at Charles Schwab & Co., Inc. ("Schwab"). A list of the Debtor's accounts is attached as **Exhibit D** to the Cash Management Motion.

Case: 23-40523   Doc# 19   Filed: 05/08/23   Entered: 05/08/23 11:41:17   Page 26 of 41

4886-1261-5266.2

115.    The Cash Management System is managed by employees of the Debtor who work in the Chancery.  The Chancery oversees certain accounting, business development and strategic planning, human resources, information systems, property management services, education services, and key operations for the Debtor.  The Chancery also oversees the ministry, mission, and social service activities of the Debtor and the Churches, and provides training, resources, and leadership for those activities.

116.    In the ordinary course of operations, the Chancery processes deposits, payments, transfers, and disbursements in support of the Debtor's mission, ministries, and day-to-day operation of the Chancery.

117.    The Debtor, Churches, and Non-Debtor Catholic Entities each maintain separate banking and accounting systems.  However, the Debtor's Cash Management System serves as a centralized "clearing house" operated and managed solely by the Debtor, to facilitate and fulfill key administrative functions of the Chancery and to handle certain cash management needs of the Churches and Non-Debtor Catholic Entities.

118.    Payments and transfers flow through the Cash Management System in order to satisfy the Debtor's obligations relating to, among other things, payroll, withholding taxes, employee benefits, insurance programs (*e.g.*, general liability, automobile, earthquake, real property, worker's compensation, and health insurance), vendors and service providers, and restricted gifts and donations.  In addition, these payments and transfers are necessary to fund and facilitate the diocese's ministries and day-to-day operations of the Chancery.

119.    The Debtor routinely deposits, withdraws, disburses, and otherwise transfers money to, from, and between the Bank Accounts by various methods, including checks, drafts, automated clearing house ("ACH") transfers, and other electronic funds transfers.

120.    The Debtor maintains robust controls relating to the Cash Management System.  It is administered by personnel in the Financial Services Department of the Debtor's Division of Resources (the "Financial Services Department").  The Financial Services Department manages all aspects of the Cash Management System, including managing and accounting for cash collection, cash reconciliation,

wire transfers, ACH transfers, payroll, and insurance-related payments. It also manages receipts, transfers, and disbursements relating to the Churches and Non-Debtor Catholic Entities.

121. The Financial Services Department also maintains the Debtor's accounting and financial records. These are updated and reconciled on a monthly basis. Under the oversight of the Debtor's Chief Financial Officer, the Financial Services Department reconciles all Bank Account balances against the Debtor's books and records. Although some recurring electronic payments are made automatically, disbursements by wire transfer require dual approval, and disbursements by check are reconciled before they clear. Depending on the size and type of the disbursement, advance authorization is required for the release of certain disbursements.

122. A detailed description of each of the Bank Accounts and the investment account at Schwab, the purpose of each account, and the nature of the funds – restricted vs. unrestricted – held in each account is set forth in paragraphs 34 to 64 of the Cash Management Motion. I have reviewed those descriptions and have determined that they are correct to the best of my knowledge and based on my review of the Debtor's business records and discussions with the Debtor's management.

123. The Debtor's business relationships with the Churches and Non-Debtor Catholic Entities results in frequent intercompany receivables and payables, including, without limitation, Church Assessments, Other Chancery Revenues, BMA, Employee Benefit Plans, Insurance Program, Workers' Compensation Program, SIR Payments, and Retirement Plans (collectively, the "Intercompany Transactions").

124. The Debtor maintains records of all transfers and, therefore, can identify, trace, and account for all Intercompany Transactions. It will continue to do so during this Chapter 11 Case.

125. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtor, its estate, and all parties in interest. In particular, it would become harder for the Debtor to calculate, account for, and receive reimbursements from the Churches and Non-Debtor Catholic Entities where appropriate.

126. Certain Churches and schools maintain funds in separate accounts with The Oakland Parochial Fund, Inc. (the "Oakland Parochial Fund"), an independent Non-Debtor Catholic Entity within

4886-1261-5266.2

the diocese. The Oakland Parochial Fund was established in 2014 and operationalized before the Petition Date to manage and oversee deposits and investments belonging to certain of the Churches and schools (collectively, "Diocesan Investment Management Services"). The Debtor itself does not maintain any deposits or investments with the Oakland Parochial Fund.

127. Historically, the Debtor provided Diocesan Investment Management Services to the participants pursuant to its Chancery functions. The Debtor recently transitioned Diocesan Investment Management Services to The Oakland Parochial Fund. Consistent with the Debtor's prior practices, the Oakland Parochial Fund employs the services of (a) an investment advisory firm, Beacon Pointe Advisors ("Beacon Pointe"), to assist the Oakland Parochial Fund with the management of investments, and (b) a professional custodian and transfer agent, Principal Financial Group ("PFG"), to maintain appropriate account and bookkeeping records of the long-term investment assets held at the Oakland Parochial Fund.

128. Deposits belonging to participating churches are maintained in the Church PFG Account xx9100. Investment assets belonging to participating churches are maintained in the Church PFG Account xx9101. Deposits belonging to participating schools are maintained in the RCWC PFG Account xx9102. Investment assets belonging to participating schools are maintained in the RCWC PFG Account xx9103.

129. To the extent the Debtor comes into possession of any donation, stock investment, or other gift or funds that the Debtor either holds in trust for a Church or Non-Debtor Catholic Entity or that is otherwise restricted for use by a Church or Non-Debtor Catholic Entity, the Debtor transfers such donation, stock investment, or other gift or funds to the appropriate Church PFG Account or to such other account as is directed by the Church or Non-Debtor Catholic Entity.

130. As of the Petition Date, the Debtor no longer maintains any unrestricted funds for long-term investment in any investment accounts held by the Debtor. Instead, the Debtor's long-term investments subject to donor restrictions are held in the Restricted Held-In-Trust Money Market Account.

131. In the ordinary course of business, the Debtor maintains eight (8) credit card accounts (the "Credit Card Accounts") to provide credit cards for employees of the Debtor to use in making business purchases.

132.     The Debtor generally pays the balance for each of the Credit Card Accounts in full on a monthly basis with funds from the General Unrestricted Operating Account. Debt incurred under each of the Credit Card Accounts is unsecured. As of the Petition Date, the aggregate balance of the Credit Card Accounts was approximately $25,000, and the Debtor generally incurs approximately $17,000 per month in aggregate charges and fees on account of the Credit Card Accounts.

133.     *American Express Corporate Card*. The Debtor maintains one American Express corporate credit card.  The Bishop uses this credit card for general travel and general business expenses.  The bill on this credit card is paid with funds held in the Unrestricted General Operating Account.

134.     *U.S. Bank Corporate Cards*. The Debtor maintains three (3) additional corporate credit cards issued by U.S. Bank on the Visa network used by employees of the Debtor for general business expenses.  The bill on this credit card is paid with funds held in the Unrestricted General Operating Account.

135.     *Home Depot Credit Card*. The Debtor maintains one (1) credit card issued by Home Depot Credit Services. Certain of the Debtor's employees use this credit card to purchase construction and property-maintenance products from The Home Depot for the Diocese's Retreat Center located in Lafayette, California (the "Retreat Center").  The bill on this credit card is paid with funds held in the Unrestricted General Operating Account.

136.     *Sherwin Williams Credit Card*. The Debtor maintains one (1) credit card issued by Sherwin Williams. Certain of the Debtor's employees use this credit card to purchase construction and property-maintenance products from Sherwin Williams for the Retreat Center.  The bill on this credit card is paid with funds held in the Unrestricted General Operating Account.

137.     *Safeway/Albertsons Credit Card*. The Debtor maintains one (1) credit card issued by Safeway. Certain employees of the Debtor use this credit card to purchase groceries and meals that are served at various diocesan locations in conjunction with workshops, events, and the like from time to time. The bill on this credit card is paid with funds held in the Unrestricted General Operating Account.

138.     *Chase Credit Card*. The Debtor maintains one (1) credit card issued by Chase. The director of the Catholic Youth Organization, an employee of the Debtor, uses this credit card to purchase supplies

Case: 23-40523    Doc# 19    Filed: 05/08/23    Entered: 05/08/23 11:41:17    Page 30 of 41

4886-1261-5266.2

for catholic youth events organized by the Chancery from time to time. The bill on this credit card is paid with funds held in the Unrestricted General Operating Account.

139. In the ordinary course of business, the Debtor incurs and pays, honors, or allows to be deducted from the appropriate Bank Accounts, certain service charges, repayments on account of ordinary course ACH credit extensions, and other related fees, costs, and expenses charged by the Banks (collectively, the "Bank Fees").

140. To the extent the balance in the applicable Bank Account decreases below a threshold amount established by the applicable Bank, the Debtor may incur additional fees for sending and receiving wire transfers, clearing checks, ACH transfers, and other transactions. In addition, the Debtor pays certain payment processing fees to third parties relating to payment support and processing for parishioners that make gifts through the Online Offertory and BMA (collectively, the "Payment Processing Fees").

141. The Debtor currently pays approximately $4,000 per month on account of Bank Fees and approximately $5,000 per month on account of Payment Processing Fees. The Debtor also pays approximately $30,000 per year on account of Payment Processing Fees to maintain and facilitate the Online Offertory and BMA payment portals.

142. As of the Petition Date, the Debtor estimates that approximately $6,000 in Bank Fees and $5,000 in Payment Processing Fees are accrued and unpaid and will become due in the first thirty (30) days after the Petition Date.

**C.** **Debtor's Motion for Interim and Final Orders Authorizing the Debtor to (I) Pay Certain Prepetition Invoices for Abuse Survivors' Assistance and Safe Environment Programs, (II) Continuation of its Prepetition Practice of Paying for Abuse Survivors' Assistance and Safe Environment Programs, and (III) Related Relief (the "Abuse Survivor Assistance Motion")**

143. The Debtor pays for survivors to receive Abuse Survivors' Assistance.

144. The Debtor's Ministry for Survivors of Clergy Sexual Abuse oversees the Debtor's Abuse Survivors' Assistance programs. The Debtor also employs a Victims Assistance Coordinator to ensure

that the aims of the Abuse Survivors' Assistance programs are met and that the program's needs are satisfied.

145. Abuse Survivors' Assistance is available for any requesting individual who makes a credible allegation of abuse by clergy or non-clergy affiliated with the Debtor. In some cases, the Debtor makes these programs available to family members who have been affected by the abuse of a loved one.

146. Counselors generally invoice the Debtor on a monthly basis. The Debtor pays the Counselors directly and in arrears. Some Counselors do not invoice the Debtor until well after they have performed services. Depending on a Counselor's billing practices, there can be a lag of up to six months between the date of service and payment to the Counselor.

147. The Debtor requests updates from the Counselors on the goals of the therapy and the progress toward those goals.

148. As part of Abuse Survivors' Assistance, the Debtor reimburses the cost of medications and medication management services for recipients of Abuse Survivors' Assistance who require medication as a result of abuse. Other costs of Abuse Survivors' Assistance include, for example, renting space at neutral locations for individual and group therapy sessions for survivors and their families, and advertising the existence and accessibility of Abuse Survivors' Assistance therapy opportunities.

149. No written settlement agreement or court order legally obligates the Debtor to pay for any Abuse Survivors' Assistance.

150. The Debtor also incurs expenses in the ordinary course of its business in connection with its Safe Environment programs.

151. The Debtor requires that all employees, clergy, and volunteers with direct, ongoing contact with children be live-scan fingerprinted and cleared by law enforcement before performing ministry in the diocese.

152. The Debtor continues to require training programs for all adult volunteers and employees whose ministry within the diocese involves direct, ongoing contact with children. The training focuses on, among other things, the nature of child sexual abuse, how it is perpetrated, how to report it, and strategies for prevention.

DECL. OF C. MOORE ISO FIRST DAY MOTIONS

Case: 23-40523    Doc# 19    Filed: 05/08/23    Entered: 05/08/23 11:41:17    Page 32 of 41

4886-1261-5266.2

153.    As stated above, in 2016, the Debtor adopted the online synchronous platform called "Virtus," which is sponsored by The National Catholic Risk Retention Group and is used nationwide by Catholic entities like the Debtor.  Training through Virtus and other platforms is mandatory, even for a parent volunteering in their child's school.  In addition to this initial training, the Debtor also requires its volunteers and employees to renew the training no less than every three years thereafter.

154.    Safe Environment costs include fees for live-scan fingerprinting, background checks performed through the assistance of the U.S. Department of Justice, and the cost of the training programs such as licensing fees for the Virtus software and amounts paid to trainers.  The Debtor also pays for periodic audits (both location-specific and diocese-wide) overseen by the Office of Safe Environment, which allow the Debtor to assess compliance with Safe Environment policies and address any shortfalls.

155.    The Debtor pays approximately $250,000 per year in costs for the Abuse Survivors' Assistance and Safe Environment Programs.  In addition, the Debtor estimates that approximately $67,000 in prepetition expenses are accrued but unpaid as of the Petition Date.

D.      **Debtor's Motion for Interim and Final Orders Authorizing the Debtor to (I) Pay Prepetition Employee Wages, Salaries, Benefits and Other Related Items; (II) Reimburse Prepetition Employee Business Expenses; (III) Continue Employee Benefit Programs; and (IV) Pay All Costs and Expenses Incident to the Foregoing (the "Wages Motion")**

156.    As of the Petition Date (as defined herein), the Debtor employed approximately 30 full-time and 42 part-time employees at the Debtor's central services office – which is also known as the Chancery (each an "Employee" and collectively, the "Employees").  Approximately 33 of the Employees are non-exempt and approximately 39 are exempt.

157.    The Debtor also contracts for employee services with independent contractors and temporary employees (collectively, the "Contractors").  The number of Contractors fluctuates based on the Debtor's needs; however, as of the Petition Date, the Debtor utilizes approximately 40 Contractors in critical and recurring roles to supplement its workforce and provide support to the Employees.  The stated number of Employees does not include Contractors, retired priests, seminarians, or split-time priests.

158.    The Employees and Contractors perform critical functions for the Debtor.  This includes administration of programs essential to the Debtor's charitable, religious and educational mission.  It also includes services related to finance, legal, corporate governance and human resources.

159.    The Contractors also provide administrative services to Churches and Non-Debtor Catholic Entities.  To the extent the Debtor pays a Contractor for services the Contractor provides to a Church or Non-Debtor Catholic Entity, the applicable Church or Non-Debtor Catholic Entity is required to reimburse the Debtor.

160.    The Employees' and Contractors' skills and knowledge and understanding of the Debtor's operations makes the Debtor operate effectively and efficiently.  Many of these individuals are highly trained and have an essential working knowledge of the Debtor's operations that cannot be easily replaced.

161.    As of the Petition Date, many Employees and Contractors are owed or have accrued 1) wages, salaries, contractual compensation and other accrued compensation and related costs and expenses, have certain amounts withheld on their behalf by the Debtor, associated taxes payable by the Debtor (such compensation, withholdings, and taxes being, collectively, the "<u>Prepetition Employee Compensation</u>"), 2) unreimbursed and unpaid prepetition Business Expenses (the "<u>Prepetition Business Expenses</u>"), and 3) certain processing and administrative costs related to the foregoing ("<u>Prepetition Payroll Costs</u>"), all as described in more detail below.

162.    The Debtor also has obligations due and owing for its share of prepetition employee benefits and related programs (the "<u>Prepetition Benefit Obligations</u>," and with the Prepetition Employee Compensation, Prepetition Business Expenses, and Prepetition Payroll Costs, the "<u>Prepetition Employee Obligations</u>"), also set forth in more detail below.

163.    Detailed descriptions of the Debtor's Prepetition Employee Obligations and the process by which they are calculated and paid are set forth in paragraphs 35 to 107 of the Wages Motion.  I have reviewed those descriptions and have determined that they are correct to the best of my knowledge and based on my review of the Debtor's business records and discussions with the Debtor's management.

**E.**    <u>**Debtor's Motion for Interim and Final Orders Authorizing the Debtor to (i)
Continue Existing Insurance Coverage and Satisfy Obligations Related Thereto;**</u>

4886-1261-5266.2

**and (ii) Renew, Amend, Supplement, Extend or Purchase Insurance Policies in the Ordinary Course of Business (the "Insurance Motion")**

164.     The Debtor maintains a comprehensive insurance program as part of the ordinary course of its operations.  This program includes more than twenty insurance policies issued by a number of carriers (the "Program Policies") and a self-insurance program covering losses within the deductible and self-insured retention amounts of the policies (the "Self-Insured Coverages", and together with the Program Policies, the "Insurance Program").

*The Program Policies*

165.     The Program Policies maintained by the Debtor provide for, among other things, (a) real property coverage for all properties including those owned by the Churches and Non-Debtor Catholic Entities, including general real property coverage and additional earthquake and difference-in-conditions coverages, (b) liability coverage including general liability, auto, employment practices, errors & omissions, directors & officers, and sexual misconduct (c) cyber liability, including privacy and regulatory response, (d) fiduciary liability and employed lawyers errors & omissions coverage, (e) losses as a result of crime, (f) equipment breakdown coverage, and (g) excess liability coverages.  A listing of the Program Policies is attached as **Exhibit C** to the Insurance Motion (the "Package Insurance Schedule").

166.     In addition to the Debtor, certain Churches and Non-Debtor Catholic Entities are named as insureds under the Program Policies and contribute a portion of the cost of coverage to the Debtor.  As part of the Debtor's overall Insurance Program, the Debtor pays the Insurance Obligations, and is reimbursed by the Churches and covered Non-Debtor Catholic Entities for their proportional share of the Insurance Obligations.

167.     The inclusion of the Churches and Non-Debtor Catholic Entities as insureds under the Program Policies benefits the Debtor.  Centralized purchasing of the Policies allows the Debtor to take advantage of the combined market power of the collective diocesan entities, obtaining better rates than would otherwise be available if the individual Churches and Non-Debtor Catholic Entities had to purchase coverage on an individual basis.  In other words, because the Debtor is one of many insureds under the Program Policies, the Debtor is required to bear a lower percentage of the cost of the Program Policies

than it would if the other insureds were not included in the program. If the Debtor failed to maintain the Program Policies, other insureds may withdraw from the Program Policies, and the Debtor's insurance costs would increase. Further, centralized insurance purchasing ensures that all of the diocese operations have adequate and uniform coverage. Indeed, it is likely that in some cases individual Churches would struggle to obtain coverage at all if it were not provided on a unified basis.

168. Generally, each of the Program Policies runs for a one-year term. Most renew on July 1 of each year.[4] The costs of coverage, including both premiums and premium finance payments, are paid directly by the Debtor. The Churches and Non-Debtor Catholic Entities are invoiced and reimburse the Debtor for their allocated share of the costs pursuant to reimbursement arrangements by and between the Debtor and the individual Churches and Non-Debtor Catholic Entities. Allocation and invoicing services are provided to the Debtor pursuant to a services agreement (the "Allocation Services Agreement") with the Debtor's Insurance Broker (as defined below). A true and correct copy of the Allocation Services Agreement is attached as **Exhibit D** to the Insurance Motion.

### *Premiums and the Premium Finance Agreement*

169. The Debtor finances the premiums for the majority of the Program Policies (collectively, the "Financed Policies") because it is not economically advantageous for the Debtor to pay the premiums on the Financed Policies, in full, on a lump-sum basis. In the ordinary course of business, the Debtor finances the premiums for the Financed Policies that provide excess property coverage and liability coverage pursuant to a premium financing agreement, signed on July 14, 2022 (the "Premium Financing Agreement"), with Bank Direct Capital Finance ("Bank Direct"). The Premium Financing Agreement allows the Debtor to pay the cost of the Premiums for the Financed Policies spread over a down-payment and eleven subsequent monthly payments, for a total financing charge of approximately $52,000, which includes the monthly payments.

170. In consideration for Bank Direct's obligations to pay the Debtor's Premiums on account of the Financed Policies, the Premium Financing Agreement requires the Debtor to pay approximately $290,000 on the second day of each month. As of the Petition Date, one premium financing payment

---

[4] The renewal periods are reflected on the attached Package Insurance Schedule.

4886-1261-5266.2

remained under the current Premium Financing Agreement. The Debtor pays Bank Direct directly for all amounts owed under the Premium Financing Agreement.

171.     The Debtor's obligations under the Premium Financing Agreement are secured by all of the Debtor's right, title, and interest in and to each Financed Policy and all sums payable to the Debtor thereunder, including, among other things, any gross unearned premiums, dividend payments, and any payment on account of loss that results in a reduction of unearned premiums in accordance with the terms of the Financed Policies.

172.     The Debtor would likely face great hardship and increased costs if required to obtain replacement insurance and pay a lump-sum premium in advance.  Even if the Financed Policies were not terminated, any interruption in the Debtor's payments could have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

173.     The Debtor also directly pays the premiums for certain other Program Policies.   These include (1) Debtor's real and personal property casualty coverage provided by Church Mutual Insurance Company has premiums of approximately $900,000 annually, which are billed and paid on a monthly basis; (2) the Debtor's crime insurance, which is accrued on a three-year basis, paid in a lump sum every three years, and has a premium cost of approximately $32,000; and (3) two policies providing accident insurance coverage.

### *Deductibles and Self-Insured Retention*

174.     Some of the Program Policies provide for either a self-insured retention amount (each a "SIR") or a deductible (each a "Deductible") that must be paid by the Debtor as a condition of coverage. For instance, the Debtor's Insurance Policy covering real property damage provides for a deductible amount of $100,000 per occurrence as to most covered losses, with coverage provided for losses above that amount, and the Debtor's general liability policy provides for coverage above an SIR retained amount of $250,000 per loss as to most covered losses.

175.     Depending on the type of claim and the applicable Insurance Policy, the Debtor must ultimately pay up to the applicable Deductible threshold for each successful or settled claim against these particular Program Policies.  Likewise, for the Program Policies with SIR amounts, the Insurance Carrier

provides coverage for losses in excess of the retained SIR amount for each occurrence. Generally, any claim amounts due in excess of the Deductible or SIR threshold for any given claim are the Insurance Carrier's responsibility.

176. The Debtor does not believe that there are any Insurance Obligations for Deductibles on account of prepetition claims under the Program Policies. In the ordinary course of business, however, the Debtor will need to continue paying the Deductibles as they arise to preserve the coverage under certain Program Policies. Because the amount of Deductibles varies from month to month, the monthly (or aggregate) liability on account of Deductibles during the pendency of this chapter 11 case cannot be ascertained as of the Petition Date.

*Self-Insured Coverages*

177. Property losses and liability claims in excess of $5,000 but below the property and general liability Deductible and SIR amounts for the Program Policies are covered through the Self-Insured Coverages. Self-insurance in the general form of the Self-Insured Coverages is common in organizations of similar size to the Debtor. It provides a material cost savings compared to contracting with an Insurance Carrier for coverage within the self-insurance limits.

178. The Self-Insured Coverages are administered by Gallagher Bassett Services, Inc., as a third-party administrator (the "Third Party Administrator") pursuant to a claims processing services agreement (the "TPA Agreement"). The Third Party Administrator assists in verifying, negotiating and processing and reimbursement of claim amounts within the Self-Insured Coverages.

179. The Debtor operates a separate bank account for Self-Insured Coverages claims processing (the "SIR Imprest Account"). The Third Party Administrator disburses payments from the SIR Imprest Account to pay covered losses suffered by participating Churches and Non-Debtor Catholic Entities that are below the self-insured retention or deductible limits of the relevant Package Insurance Policy. The costs of the Self-Insured Coverages are allocated between the Debtor, the Churches, and the covered Non-Debtor Catholic Entities.

180. Maintaining the Self-Insured Coverages is necessary for the Debtor to continue uninterrupted coverage within the self-insurance amounts. Further, it is an express condition of coverage

Case: 23-40523    Doc# 19    Filed: 05/08/23    Entered: 05/08/23 11:41:17    Page 38 of 41

under the Debtor's liability Program Policies that the Debtor employ or contract with a qualified self-insurance provided to administer its Self-Insured Coverages.

181.    The current TPA Agreement has a term of July 1, 2022, through July 1, 2023.  Fees under the TPA Agreement ("TPA Fees") include per-occurrence fees and other administrative fees.  The TPA Fees under the current TPA Agreement are approximately $50,000 annually.  Accrued TPA Fees are typically paid every three to four months, in arrears.  As of the Petition Date, the Debtor owes approximately $13,000 on account of TPA Fees, and estimates that approximately $13,000 of those TPA Fees will become due within thirty days after the Petition Date.

*Brokerage and Related Fees*

182.    For decades, the Debtor has utilized the services of an insurance broker, Arthur J. Gallagher Risk Management Services, LLC (the "Insurance Broker"), or its predecessors, to obtain its Program Policies.  The Insurance Broker assists the Debtor with obtaining comprehensive coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtor with claims, and providing ongoing support throughout the applicable policy periods.  Given the size and complexity of the Debtor's insurance program, the assistance of the Insurance Broker is essential.

183.    The Debtor pays the Insurance Broker fees for brokerage and related services (the "Brokerage Fees") in the ordinary course of business.  This includes a Brokerage Fee of approximately $125,000 paid in January of each year for the upcoming year, which fee covers administration of the Insurance Program, and a placement fee for the worker's compensation program.  The Debtor also pays the Insurance Broker a yearly Brokerage Fee in approximately September of each year, of approximately $20,000, in connection with the Allocation Services Agreement.

184.    All other Brokerage Fees due to the Insurance Broker for placement of all other Program Policies (other than those noted in the immediately preceding paragraph) are paid as commissions and included in the premiums paid on account of the Program Policies.

185.    The Debtor does not believe that any Brokerage Fees are due and owing as of the Petition Date, other than those included as a commission is premium payments to the Insurance Carriers.

*Renewal*

186.    The Program Policies are generally purchased on a twelve-month term, running from July 1 to July 1.  Most of the current Program Policies therefore have a twelve-month term with an effective date of July 1, 2022, and therefore expire on July 1, 2023.

187.    The Premium Financing Agreement is for the term of the current Program Policies. Renewal of the Program Policies will require renewal of the Premium Financing Agreement or the execution of a similar finance agreement.

188.    The TPA Agreement and Allocation Services Agreement are essential parts of the Insurance Program.

**F.**    **Debtor's Motion for An Order Establishing Adequate Assurance Procedures With Respect To The Debtor's Utility Providers (the "Utilities Motion")**

189.    In the ordinary course of business, the Debtor incurs expenses for electricity, natural gas, water, sewer, waste management, telecommunications, internet/wifi, and other utility services (collectively, the "Utility Services").  A nonexclusive list (the "Utility Service List") of the utility companies or brokers (collectively, the "Utility Providers") that provide the Utility Services to the Debtor as of the Petition Date is attached as **Exhibit C** to the Utilities Motion.  The Debtor has made an extensive and good-faith effort to identify all of its Utility Providers and include them on the Utility Service List.

190.    Based on the average cost of Utility Services from January 1, 2022 through December 31, 2022, the Debtor incurs approximately $8,357 per month in the aggregate for the Utility Services.  As of the Petition Date, the Debtor does not believe that any Utility Provider holds a prepetition security deposit.

191.    The Debtor intends to pay all postpetition obligations owed to the Utility Providers in a timely manner and expects to have sufficient funds to do so.  The Debtor's cash on hand and cash generated from its operation is adequate to fund its day-to-day expenses, including postpetition amounts for Utility Services.

192.    Nevertheless, the Debtor proposes to deposit into an interest-bearing bank account designated by the Debtor for holding deposits a sum equal to the cost of two (2) weeks of Utility Services, calculated based on the average of the Debtor's monthly utility expenses during the twelve-month period

before the Petition Date (the "<u>Adequate Assurance Deposit</u>").  The Debtor utilized a twelve-month period from January 1, 2022 through December 31, 2022 to calculate the Adequate Assurance Deposit.  This period was utilized because it reflects any fluctuations in costs resulting from seasonality or other potential factors.

193.    Based on the foregoing calculation, the Debtor estimates that the total amount of the Adequate Assurance Deposit will be $3,857.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on May 8, 2023, at Oakland, California.


_____*/s/ Charles Moore*_____
Charles Moore
Managing Director of Alvarez & Marsal North
America, LLC, proposed restructuring advisor to
The Roman Catholic Bishop of Oakland

Case: 23-40523    Doc# 19    Filed: 05/08/23    Entered: 05/08/23 11:41:17    Page 41 of 41

4886-1261-5266.2