# EXHIBIT 2

1           UNITED STATES BANKRUPTCY COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                     -oOo-

4   In Re:                    ) Case No. 4:23-Bk-40523
                              ) Chapter 13
5   THE ROMAN CATHOLIC BISHOP OF )
    OAKLAND                   ) Oakland, California
6                             ) Tuesday, November 14, 2023
                    Debtor.   ) 9:00 AM
7   _____
                              ADV#: 23-04028
8                             THE ROMAN CATHOLIC BISHOP OF
                              OAKLAND, ET AL. v. PACIFIC
9                             INDEMNITY, ET AL.

10                            1. SCHEDULING CONFERENCE

11                            2. MOTION FOR PROTECTIVE
                              ORDER FILED BY PLAINTIFF THE
12                            ROMAN CATHOLIC BISHOP OF
                              OAKLAND. (DOC. 124)

13
                              1. STATUS CONFERENCE. CONT'D
14                            FROM 10/18/23, 11/17/23

15                            2. MOTION FOR 2004
                              EXAMINATION OF INSURERS FILED
16                            BY CREDITOR COMMITTEE (DOC.
                              502). CONT'D FROM 11/17/23

17
                              3. MOTION FOR PROTECTIVE
18                            ORDER RE SURVIVOR CLAIMS
                              FILED BY CREDITOR COMMITTEE
19                            (DOC. 517). CONT'D FROM
                              11/17/23

20
                              4. MOVING INSURERS' MOTION
21                            FOR ENTRY OF AN ORDER
                              PERMITTING INSURER EXPERTS
22                            AND/OR CONSULTANTS TO HAVE
                              ACCESS TO SEXUAL ABUSE PROOFS
23                            OF CLAIMS AND SUPPLEMENTS
                              FILED BY CREDITOR PACIFIC
24                            INDEMNITY COMPANY, INSURANCE
                              COMPANY OF NORTH AMERICA, AND
25                            PACIFIC EMPLOYERS INSURANCE

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 2
of 209

1                                COMPANY (DOC. 522). CONT'D
                                 FROM 11/17/23
2
                                 5. MOVING INSURERS' MOTION
3                                FOR COURT'S APPROVAL OF
                                 CONFIDENTIALITY AND
4                                PROTECTIVE ORDER FILED BY
                                 CREDITOR PACIFIC INDEMNITY
5                                COMPANY, INSURANCE COMPANY OF
                                 NORTH AMERICA, AND PACIFIC
6                                EMPLOYERS INSURANCE COMPANY
                                 (DOC. 523). CONT'D FROM
7                                11/17/23

8                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE WILLIAM J. LAFFERTY
9                UNITED STATES BANKRUPTCY JUDGE

10   APPEARANCES:
     For the Debtor-Plaintiff:  SHANE J. MOSES, ESQ.
11                              EILEEN R. RIDLEY, ESQ.
                                (Via Zoom)
12                              ANN MARIE UETZ, ESQ.
                                (Via Zoom)
13                              Foley & Lardner LLP
                                555 California Street
14                              Suite 1700
                                San Francisco, CA 94104
15                              (415)434-4484

16                              MATTHEW D. LEE, ESQ.
                                (Via Zoom)
17                              Foley & Lardner LLP
                                150 East Gilman Street
18                              Suite 5000
                                Madison, WI 53703
19                              (608) 258-4203

20   For California Insurance   MICHAEL D. COMPEAN, ESQ.
     Guarantee Association:     (Via Zoom)
21                              Black, Compean & Hall, LLP
                                275 East Hillcrest Drive
22                              Suite 160-1021
                                Thousand Oaks, CA 91360
23                              818-883-9500

24

25

**eScribers, LLC**

```
 1  For Official Committee of   GABRIELLE ALBERT, ESQ.
    Unsecured Creditors:        Keller Benvenutti Kim LLP
 2                               650 California Street
                                 Suite 1900
 3                               San Francisco, CA 94108
                                 (415)796-0709
 4
                                JESSE J. BAIR, ESQ.
 5                               TIMOTHY W. BURNS, ESQ.
                                 Burns Bair LLP
 6                               10 East Doty Street
                                 Suite 600
 7                               Madison, WI 53703
                                 (608)286-2302
 8
                                MICHAEL A. KAPLAN, ESQ.
 9                               COLLEEN M. RESTEL, ESQ.
                                 Lowenstein Sandler LLP
10                               One Lowenstein Drive
                                 Roseland, NJ 07068
11                               (973)597-2490

12  For Westport Insurance      TODD C. JACOBS, ESQ.
    Corporation:                (Via Zoom)
13                               Parker, Hudson, Rainer & Dobbs
                                 LLP
14                               Two North Riverside Plaza
                                 Suite 1850
15                               Chicago, IL 60606
                                 (312) 477-3306
16
                                MATTHEW M. WEISS, ESQ.
17                               (Via Zoom)
                                 Parker Hudson Rainer & Dobbs LLP
18                               303 Peachtree Street, Northeast
                                 Suite 3600
19                               Atlanta, GA 30308
                                 (404)523-6988
20
                                BLAISE S. CURET, ESQ.
21                               (Via Zoom)
                                 Sinnott Puebla Campagne & Curet
22                               2000 Powell Street
                                 Suite 830
23                               Emeryville, CA 94608
                                 (415)352-6200
24

25
```

```
 1   For Pacific Indemnity        TANCRED V. SCHIAVONI, ESQ.
     Company, Insurance Company   O'Melveny & Myers LLP
 2   of North America, Pacific    7 Times Square
     Employers Insurance          New York, NY 10036
 3   Company, and Westchester     (212)326-2000
     Fire Insurance Company:
 4                                JUSTINE DANIELS, ESQ.
                                   O'Melveny & Myers LLP
 5                                 400 South Hope Street
                                   18th Floor
 6                                 Los Angeles, CA 90071
                                   (213)430-6000
 7
     For Continental Casualty     MARK D. PLEVIN, ESQ.
 8   Company:                     Crowell & Moring LLP
                                   3 Embarcadero Center
 9                                 26th Floor
                                   San Francisco, CA 94111
10                                 (415)365-7446

11   For London Market            CLINTON E. CAMERON, ESQ.
     Insurers:                    BRADLEY PUKLIN, ESQ.
12                                 (Via Zoom)
                                   Clyde & Co US LLP
13                                 55 West Monroe Street
                                   Suite 3000
14                                 Chicago, IL 60603
                                   (312)635-6917
15
     For United States Fire       GEORGE R. CALHOUN, ESQ.
16   Insurance Company:           (Via Zoom)
                                   Ifrah Law
17                                 1717 Pennsylvania Avenue,
                                   Northwest
18                                 Suite 650
                                   Washington, DC 20006
19                                 (202)524-4140

20

21

22

23

24

25
```

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 5
of 209

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    Court Recorder:              P.L. WRIGHT
                                   United States Bankruptcy Court
19                                 1300 Clay Street
                                   Oakland, CA 94612
20

21    Transcriber:                 MICHAEL DRAKE
                                   eScribers, LLC
22                                 7227 N. 16th Street
                                   Suite #207
23                                 Phoenix, AZ 85020
                                   (800) 257-0885
24

25    Proceedings recorded by electronic sound recording;
      transcript provided by transcription service.

1          OAKLAND, CALIFORNIA, TUESDAY, NOVEMBER 14, 2023, 9:01 AM

2                              -oOo-

3      (Call to order of the Court.)

4          THE CLERK:  All rise.  The court is in session.  This

5  is the United States Bankruptcy Court, Northern District,

6  California, the Honorable William J. Lafferty presiding.

7          THE COURT:  Okay.  Please be seated.

8          This is a specially set matter, so let's go ahead and

9  just call the matter.

10         THE CLERK:  Yes, Your Honor.  Would Your Honor like me

11 to call the adversary along with the bankruptcy?

12         THE COURT:  Yeah.  Let's just do that, then we'll see

13 where we proceed.  Okay.

14         THE CLERK:  Yes, Your Honor.  Calling line items

15 number 1 and 2 jointly.  Line item number 1 is for the Roman

16 Catholic Bishop of Oakland, et al., v. Pacific Indemnity, et

17 al., case number 22-04028.  And line item number 2 is the Roman

18 Catholic Bishop of Oakland bankruptcy, case number 23-40523.

19         Moving the parties over now from Zoom, Your Honor.

20         THE COURT:  Okay.  Why don't we start out with

21 appearances in the courtroom.

22         MR. MOSES:  Good morning, Your Honor.  Shane Moses,

23 Foley & Lardner, for the debtor Roman Catholic Bishop of

24 Oakland.

25         THE COURT:  Okay.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 7
of 209

1          MR. MOSES:  And I believe Mr. Lee and Ms. Uetz are on

2     the line on Zoom.

3          THE COURT:  Okay.  All right.  Well, we'll get to them

4     in a minute or two.

5          MS. ALBERT:  Good morning, Your Honor.  Gabrielle

6     Albert, Keller Benvenutti Kim, on behalf of the unsecured

7     creditors committee.

8          THE COURT:  Okay.

9          MS. ALBERT:  And with me, we have counsel from

10    Lowenstein and Burns Bair, who will introduce themselves.

11         THE COURT:  Okay.  Go ahead.

12         MR. KAPLAN:  Good morning, Your Honor.  Michael Kaplan

13    from Lowenstein Sandler on behalf of the committee, along with

14    my colleague Colleen Restel, who is in the gallery for now.

15         THE COURT:  Okay.

16         MS. RESTEL:  Good morning, Your Honor.

17         MR. BURNS:  So --

18         THE COURT:  Yeah, get up to a microphone so we don't

19    Ms. a beat.

20         MR. BURNS:  Good morning, Your Honor.  Tim Burns,

21    special insurance counsel for the committee.  And with me is my

22    partner Jesse Bair.

23         THE COURT:  Great.  Nice to see you.  Okay.

24         MR. BURNS:  Thank you, Your Honor.

25         THE COURT:  All right.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 8
of 209

1        MR. PLEVIN:  Good morning, Your Honor.  Mark Plevin

2   for Continental Casualty Company.

3        THE COURT:  Okay.  Good morning.

4        MR. SCHIAVONI:  Good morning, Your Honor.  Tancred

5   Schiavoni from O'Melveny for Pacific Indemnity and the I name

6   Pacific Employers and maybe even Westchester, too, I think, in

7   this case.  Okay.

8        THE COURT:  Okay.

9        MR. SCHIAVONI:  And Your Honor, I'm proud to just

10   introduce you to Justine Daniels from my office also.  Thank

11   you.

12        THE COURT:  Great.  Nice to see you.  Okay.

13        All right.  On the screen, why don't we start with --

14        MS. UETZ:  Good morning, Your Honor.

15        THE COURT:  Yeah, we'll start with other debtors'

16   counsel.  Go ahead, Ms. Uetz.

17        MS. UETZ:  Thanks, Your Honor.  Nice to see you.  Ann

18   Marie Uetz from Foley & Lardner on behalf of the debtor.

19        THE COURT:  Okay.

20        MR. LEE:  Good morning, Your --

21        MS. RIDLEY:  Good morning, Your --

22        MR. LEE:  Matthew Lee of Foley & Lardner on behalf of

23   the debtor.

24        THE COURT:  Okay.

25        MS. RIDLEY:  And good morning, Your Honor.  Eileen

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 9
of 209

1   Ridley on behalf of the debtor, specifically on the adversary
2   proceeding.
3           THE COURT:  Right.  Okay.  Anybody else for the
4   debtor?
5           MS. UETZ:  Not today.
6           THE COURT:  How about anybody on screen for the
7   committee?
8           MR. KAPLAN:  No, Your Honor.
9           THE COURT:  Okay.  Then let's go ahead and just pick
10  up the other folks on screen.  I'm assuming they're all
11  insurance company counsel.
12          MR. CALHOUN:  Good morning, Your Honor.  George
13  Calhoun for United States Fire Insurance Company.
14          THE COURT:  Okay.  Good morning.
15          MR. WEISS:  Morning, Your Honor.  Matt Weiss of
16  Westport Insurance Corporation.
17          THE COURT:  Okay.
18          MR. WEISS:  And Todd Jacobs and Blaise Curet --
19          THE COURT:  Okay.
20          MR. WEISS:  -- on as well.
21          THE COURT:  Good morning.
22          UNIDENTIFIED SPEAKER:  Good morning.
23          UNIDENTIFIED SPEAKER:  Good morning, Your Honor.
24          MR. CAMERON:  Good morning, Your Honor.  Clinton
25  Cameron on behalf of the London Market insurers.

1          THE COURT:  Okay.  Good morning.

2          MR. PUKLIN:  Morning, Your Honor.  Bradley Puklin for

3    the London Market insurers as well.

4          THE COURT:  Okay.  Now, that connection is not so

5    great.  I don't know if you're able to hear me well.

6          MR. PUKLIN:  I am.  I apologize.

7          THE COURT:  That's a little better.  That's a little

8    better.  Thank you.

9          Okay.  Anybody else?  That's all the appearances?

10          MR. COMPEAN:  On behalf of the defendant in the

11   adversary proceeding California Insurance Carrier Association.

12          THE COURT:  Right.  You're here to see if I do the

13   same thing as I did last week, right?

14          MR. COMPEAN:  That's right, Your Honor.

15          THE COURT:  Okay.  All right.  Well, that's a good

16   question.

17          All right.  Anybody else on screen?  Got everybody?

18          Okay.  We have a lot that's on today.  So who has a

19   suggestion re the order of procedure.

20          MS. UETZ:  Your Honor, it's Ann Marie Uetz for the

21   debtor.  Maybe we could just set the table to confirm that

22   we're all on the same page with respect to what's on --

23          THE COURT:  Yeah, sure.

24          MS. UETZ:  -- (Indiscernible).

25          THE COURT:  Sure, sure, sure.

1          MS. UETZ:  Thank you.  Our understanding is there are

2   cross-motions for entry of a protective order --

3          THE COURT:  Um-hum.

4          MS. UETZ:  -- regarding the discovery to be produced

5   to the insurers.  The committee has also filed a further motion

6   for protective order in respect of the proofs of claim.

7          THE COURT:  Um-hum.

8          MS. UETZ:  I believe there is a status or case

9   management conference set generally.

10         THE COURT:  Um-hum.

11         MS. UETZ:  And we did just want to at the foot of this

12  mention Alvarez & Marsal's fee application, which is out there

13  without decision and just check on that.

14         THE COURT:  Yeah, I'm thinking about it.

15         MS. UETZ:  Okay.  Thank you, Your Honor.  That's why I

16  have --

17         THE COURT:  Well, let me -- well, let me tell you --

18  since you mentioned, let me tell you what I'm thinking about.

19  Okay.

20         MR. SCHIAVONI:  Your Honor, there is one motion

21  missing from that list.

22         MR. KAPLAN:  Yes.

23         THE COURT:  Okay.  Can we get to it in one second?

24         MR. SCHIAVONI:  Sure.  I'm sorry.

25         THE COURT:  All right.  Appreciate it.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 12
of 209

1        MR. SCHIAVONI:  I'm sorry, Your Honor.

2        THE COURT:  What I tried to indicate during the fee

3    app hearings, and I probably didn't do it as directly as I

4    should, was a concern, both with the relative brevity of the

5    descriptions of what Alvarez & Marsal were doing and particular

6    tasks, but also my concern -- and I might have said it in a way

7    that came across somewhat archly.  I didn't mean it to be arch.

8    I meant it to be quite literal.

9        I was concerned that it -- I mean, I don't know -- if

10   A&M is doing everything they say they're doing, I don't know

11   who else is doing anything with respect to any financial or

12   accounting or business advisory or other functions that are

13   within the diocese.  And I didn't really expect through the

14   order that I entered to have A&M totally supplant the diocese.

15   It kind of looks like that's what's happened.  And that was the

16   other concern I had.

17       The additional descriptions were better.  I could

18   probably find a way to live with them on the theory that

19   everything is interim until it isn't, in the same way that

20   baseball season is very long until suddenly it's very short.

21   And similarly here, everything's --

22       MS. UETZ:  I've never heard that one, Your Honor.

23       THE COURT:  Yeah, well --

24       MS. UETZ:  That's a good one.

25       THE COURT:  Okay.  So but my concern was just to

1    figure out really who's doing what here because the numbers are

2    very large.  I'm not suggesting that they aren't performing

3    wonderfully important services.  But if they've basically just

4    taken over all these functions from the debtor, I'd like to

5    know that because I think that's something I need to -- I need

6    to chat about with them possibly.  Okay.

7           MS. UETZ:  And Your Honor, I do believe that Charles

8    Moore from Alvarez is here today.  I think raises as --

9           THE COURT:  Okay.

10          MS. UETZ:  -- point of procedure because we don't have

11   anything on calendar.  So --

12          THE COURT:  No, no.  But I just, I've been kind of

13   going back and forth on this one in my head, and I wanted you

14   to know why because I did indicate I would try to --

15          MS. UETZ:  Yeah.

16          THE COURT:  -- I'd try to enter an order promptly.

17   And I've been struggling with whether I do that or not.  So

18   that's the second -- that's the other half of my concern.

19   Okay.

20          MS. UETZ:  If it's helpful to either have him

21   available or set it for a hearing, whatever you suggest, we'll

22   take your direction on it.

23          THE COURT:  We'll come back --

24          MS. UETZ:  I think we can answer those questions --

25          THE COURT:  Yeah, we'll come back to that at the end

1   if that's --

2           MS. UETZ:  -- when the time's right.

3           THE COURT:  Yeah, we'll come back to that --

4           MS. UETZ:  Sure.

5           THE COURT:  -- at the end.  Okay.  In the meantime,

6   I --

7           MS. UETZ:  Okay.  And then --

8           THE COURT:  Okay.  You want to go ahead and see if Mr.

9   Schiavoni thinks that you forgot something?

10          MS. UETZ:  Well, the ruling on the motions to dismiss

11  maybe what he's suggesting, or maybe I've --

12          THE COURT:  Yeah.

13          MS. UETZ:  -- completely forgotten something else.

14  But we do have on our radar that you were going to issue --

15          THE COURT:  Right.

16          MS. UETZ:  -- a ruling on this motion.

17          THE COURT:  Right.  Right.  And there's a 2004 exam.

18          MR. KAPLAN:  Yeah.  Your Honor, that's the other

19  piece.

20          MS. UETZ:  Oh, thank you.

21          THE COURT:  That's on too?

22          MR. KAPLAN:  The committee's 2004 of the insurers,

23  yes, Your Honor.

24          THE COURT:  Right.  Okay.  And the insurer's response

25  to that?

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 15
of 209

1          MS. ALBERT:  Yes, Your Honor.

2          THE COURT:  All right.  Which I think it was really

3    primarily Mr. Levin's pleading, right?

4          UNIDENTIFIED SPEAKER:  Okay.

5          THE COURT:  Okay.

6          UNIDENTIFIED SPEAKER:  Yep.

7          THE COURT:  I'm sorry, Mr. Plevin.  Excuse me.

8          Okay.  Well, anybody have a suggestion where we start?

9          MR. KAPLAN:  Your Honor, if I might, the committee's

10   protective motion seems rather uncontroverted with except for a

11   couple of clarifications.  Maybe we could start off on

12   agreement or we could start off on the most --

13         THE COURT:  Well, are you talking about the motion

14   that would restrict certain information from, example, ISO?

15         MR. KAPLAN:  Yes, Your Honor.

16         THE COURT:  Well, I don't know that -- I think I read

17   the response a little differently, as in shouldn't it be dealt

18   with in the context of the disagreement about the form of a

19   protective order; is that fair?

20         MR. SCHIAVONI:  We think it's moot, Your Honor,

21   because the protective orders we've proposed specifically --

22         THE COURT:  Okay.

23         MR. SCHIAVONI:  -- exclude ISO from --

24         THE COURT:  Okay.

25         MR. SCHIAVONI:  -- authorized party, and I explained

1   the reasons for that.

2           THE COURT:  Okay.

3           MR. SCHIAVONI:  Judge, there is one motion missing

4   still.

5           THE COURT:  Okay.  All right.

6           MR. SCHIAVONI:  Okay.  And I'm sorry to interrupt you

7   before.  I think I had too much coffee this morning.  Okay.

8   So --

9           THE COURT:  Look, don't ever worry about that.  That's

10  okay.

11          MR. SCHIAVONI:  No disrespect was intended.  It's

12  there is this package, so to speak, of protective order

13  motions.  We have a motion that so we can use experts --

14          THE COURT:  Uh-huh.

15          MR. SCHIAVONI:  -- and consultants.  It's really

16  essential to us.  So that's another motion in that little

17  package.

18          THE COURT:  Okay.

19          MR. SCHIAVONI:  I have no objection to starting with

20  this ISO issue if that's what is --

21          THE COURT:  Okay.

22          MR. SCHIAVONI:  -- the pleasure of Your Honor.

23          THE COURT:  Well, I mean, if it's essentially moot

24  because through one protective order or the other, we're all

25  going to agree that absent some other agreement or development,

1 information is not going to be shared with them, it's fine with

2 me.

3           MR. KAPLAN:  Well, might I, Your Honor, just --

4           THE COURT:  Yeah.

5           MR. KAPLAN:  Yeah.

6           THE COURT:  Come on up.

7           MR. KAPLAN:  Just for record purposes, good morning,

8 Your Honor, again.  Michael Kaplan from Lowenstein on behalf of

9 the committee.  We don't agree with Mr. Schiavoni's assessment

10 that it's moot because of the protective order.  We'll save the

11 argument on which protective order should apply, but --

12           THE COURT:  Um-hum.

13           MR. KAPLAN:  -- very clearly, our view is is that the

14 bar date order that Your Honor already entered and we heard

15 argument about and Your Honor made balls and strikes calls,

16 just to keep the baseball analogy going today, governs --

17           THE COURT:  Um-hum.

18           MR. KAPLAN:  -- the proofs of claim in this case.  It

19 was the bar date order in four other diocesan bankruptcy cases

20 that one insurer who is not in this particular case violated by

21 sharing data with this third-party ISO.  So our view is is it

22 is not a matter of questions of the protective orders is our

23 motion seeks to clarify and ensure that the protections

24 afforded in the bar date order are crystal clear --

25           THE COURT:  Um-hum.

1      MR. KAPLAN:  -- that you cannot share this data with

2  ISO because what happened in these other cases, Your Honor, is

3  is the insurer filed a the letter, same letter, four separate

4  cases on September 28th, attempting to justify the disclosure

5  ISO under the bar date order.  We don't want to get to that

6  point.

7      THE COURT:  Um-hum.

8      MR. KAPLAN:  And so when I said it was uncontroverted,

9  it seems to me that everyone agrees that we should not be

10  sharing the data with ISO.  We're not talking about publicly

11  available information.  We're talking about strictly proof of

12  claims.  We would just like the protective order entered to

13  ensure that there is clarity that the bar date order Your Honor

14  entered does not permit that data to be shared with ISO.

15      THE COURT:  Um-hum.

16      MR. KAPLAN:  This is separate and apart from the

17  conversations of the protective order because none of the

18  motions as I read them -- I'd be happy to be corrected if I'm

19  wrong -- modify Your Honor's bar date order.

20      THE COURT:  Okay.

21      MR. KAPLAN:  So that's why I think that it is -- it

22  should be uncontroverted and should be a fairly simple way to

23  get started.

24      THE COURT:  Okay.

25      MR. KAPLAN:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Let me invite response.

3          MR. SCHIAVONI:  So Tancred Schiavoni from O'Melveny

4     for Pacific Indemnity.  Your Honor, this issue is moot

5     because -- and I'm glad I brought up this expert motion,

6     right --

7          THE COURT:  Um-hum.

8          MR. SCHIAVONI:  -- because the limitation -- `what

9     we've done is under the bar date order, there's a mechanism to

10    sort of -- it's unclear to me whether experts were intended to

11    be excluded for us.  I mean, it seems inconsistent with a lot

12    of things for that to be the case.  But just jumping beyond

13    that, there's a provision that allows us to seek court approval

14    to have another party made part of the bar date protection, so

15    to speak.

16         So we have that motion before you.  We ask for experts

17    and consultants.  And what we do in that is specifically the

18    order that defines what an expert is says -- like, it says ISO

19    is not an expert.  ISO is not an authorized party.  It says it

20    right there.  So that would moot any perceived ambiguity that

21    maybe ISO is an expert under the bar date order.

22         THE COURT:  Um-hum.

23         MR. SCHIAVONI:  To the extent they're saying that

24    experts aren't even permitted, there's not even really an issue

25    about ISO, so to speak, under that.  But that would cure that.

1 That would address that.

2          And on the protective orders, we have no problem with

3 a line in those orders.  In fact, we proposed it.  It's in

4 our -- it's in our protective order that says ISO is not a

5 authorized party.

6          And to be clear, I think it's inadvertent, but this

7 separate order that they're seeking, it kind of hits -- it hits

8 a nail with a sledgehammer instead of a hammer because it goes

9 beyond just saying they're not an authorized party.  It

10 reinvokes all sorts of confidentiality, and it does it one-

11 sidedly, just for insureds.  It doesn't say nobody can use ISO

12 or nobody can use claims database people or what have you.

13          And we lay that in our brief.  I could explain it to

14 you further.  But I think, if you've read it, Your Honor, I

15 won't --

16          THE COURT:  Um-hum.

17          MR. SCHIAVONI:  -- go through it any further.  The

18 cleanest way to deal with this is just to say ISO is not an

19 authorized party.  And we're prepared to do that.  We did it in

20 our two protective orders.  When they contacted us, we wrote

21 them back right away, saying that's the way to deal with this.

22 It's like, and we have no problem with that.

23          And to be clear about this, like, much has made ado

24 about ISO and Interstate here.  But if you read the fine print

25 of what their accusations are against ISO, it says they shared

1  it with them.  But it says that, like, in five instances, maybe

2  someone else looked at it, okay, other than ISO.  When I read

3  the ISO website to this, it says it's an anti-fraud mechanism.

4  In other words, it looks like you put a name in and it would

5  tell you whether somebody has submitted fifty other claims,

6  okay, for the same thing.

7          So we don't need to get into a huge debate about

8  whether that's proper or not proper.  But it doesn't seem to me

9  there was some evil motive --

10         THE COURT:  Um-hum.

11         MR. SCHIAVONI:  -- behind the whole thing.  And

12  Interstate, as far as I read the record, self-reported.

13  They've done everything they can to sort of cure.  They've been

14  punished with having to pay all of Lowenstein's fees.  They

15  have a bill already of a hundred-and-some-odd-thousand dollars

16  for them --

17         THE COURT:  Um-hum.

18         MR. SCHIAVONI:  -- examining them, et cetera, about

19  it.  So we all want to be careful about this.  But it's like,

20  let's not to try to cure this problem make a bigger problem --

21         THE COURT:  Um-hum.

22         MR. SCHIAVONI:  -- okay, so to speak.  It's like, I

23  would just take them out of the definition of authorized party,

24  and we're fully prepared to do that, Your Honor.

25         THE COURT:  Okay.  Let me ask Mr. Kaplan a question.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 22
of 209

1           MR. KAPLAN:  Yes, Your Honor.

2           THE COURT:  Come on up.

3           MR. KAPLAN:  Yes.

4           THE COURT:  I'll tell you what my instinct here is.

5    It may be that this is a sledgehammer hitting a nail, but there

6    are some things that are sensitive, and it doesn't hurt to have

7    a sledgehammer.  So I want you to address what you heard Mr.

8    Schiavoni suggest is some overreach here, or it's maybe some

9    unintended consequences.  But the point of this is simply to

10   say that there would be a protective order.  ISO will not be --

11   nobody will share the following information with ISO, and

12   that's it.  That doesn't sound like a problem.

13          MR. KAPLAN:  Well, it's not a problem, Your Honor.

14   But we've put ISO, and we tried to define as best we could

15   because I am not an expert in the --

16          THE COURT:  Sure.

17          MR. KAPLAN:  -- insurance world.

18          THE COURT:  Yeah.

19          MR. KAPLAN:  I disagree with most everything Mr.

20   Schiavoni said about the sensitivity, but I'll get to that.  We

21   want to make sure exactly that, Your Honor, that that we're not

22   going to get a letter on September 28th of 2024, which says,

23   oops, we shared it with --

24          THE COURT:  Yeah.

25          MR. KAPLAN:  -- SFO and it's okay and we did it.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 23
of 209

1    So --

2              THE COURT:  Yeah.

3              MR. KAPLAN:  -- we definitely want that clarity.  I

4    don't want to conflate the other motion that the insurers

5    filed, Your Honor, with the extra disclosure pieces with the

6    experts because we are prepared to address that.  But we don't

7    think it's hitting a -- I mean, is it a sledgehammer?

8    Possibly.  But keep in mind, Your Honor, the survivor's

9    information, only talking about information from the proofs of

10   claim, only exists because of the debtor filing bankruptcy.

11             THE COURT:  Um-hum.

12             MR. KAPLAN:  And they did so under the guise of filing

13   these proofs of claim that the information would be kept

14   confidential.

15             THE COURT:  Um-hum.

16             MR. KAPLAN:  So that's pretty important, I think.  So

17   if it's a sledgehammer or a jackhammer or --

18             THE COURT:  Well, the only question is what are the

19   implications, other than if any, ISO is not going to have this

20   information?  I mean, is this one-sided, the way Mr. Schiavoni

21   suggests?  Then it should be -- it should be -- the order

22   should be modified to make it clear that the restrictions work

23   both ways.

24             MR. KAPLAN:  Well, Your Honor, I don't think it needs

25   to be.  And this actually goes to the second sort of motion out

1   there, which is --

2            THE COURT:  Um-hum.

3            MR. KAPLAN:   -- neither the debtor nor the committee

4   is able to retain anybody without Your Honor's approval, which

5   is specifically provided for in the bar date order.  It's the

6   same for everyone else.  So we can't go out and retain a third-

7   party service provider of any kind unless we tell Your Honor

8   why, what we're planning to do, how we're going to pay for it,

9   and the list goes on.

10           THE COURT:  Um-hum.

11           MR. KAPLAN:  The insurers are in the unique position,

12  and they're the only ones in this position, who do not have to

13  tell you necessarily who they're retaining and for what.

14           THE COURT:  Um-hum.

15           MR. KAPLAN:  So it is, in fact, one-sided, absolutely,

16  because there are already additional protections built in place

17  in the bankruptcy and the bar date order for that.  But to the

18  extent, Your Honor, to make clear, I'm happy for the order to

19  say that nobody can share the proofs of claim information with

20  any third-party without court intervention.  We want -- right.

21           THE COURT:  Look, and that would just confirm

22  something that's already the case as to the debtor and other

23  authorized professionals.  Right.  I think that's a good idea.

24           MR. KAPLAN:  With pleasure.  And we will --

25           THE COURT:  Okay.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 25
of 209

1           MR. KAPLAN:  -- circulate a revised language --

2           THE COURT:  Okay.

3           MR. KAPLAN:  -- to that regard.

4           THE COURT:  Okay.

5           MR. KAPLAN:  And --

6           THE COURT:  Thank you.

7           MR. KAPLAN:  -- thank you, Your Honor.

8           THE COURT:  And on that basis, the motion is granted.

9    Okay.

10          MR. KAPLAN:  Thank you, Your Honor.

11          THE COURT:  Thank you.  Where do we go next?

12          MR. KAPLAN:  Shall we continue onto Mr. Schiavoni's

13   motion on the experts on the bar date order if the --

14          THE COURT:  Would you like to do that, Mr. Schiavoni?

15          MR. SCHIAVONI:  Sure, Your Honor.

16          THE COURT:  Okay.  It's your motion.  Come on up.

17          MR. SCHIAVONI:  Your Honor, again, Tanc Schiavoni for

18   Pacific.

19          THE COURT:  Um-hum.

20          MR. SCHIAVONI:  In some ways, I'm sorry that we had to

21   burden you with a series of motions on this, but I don't want

22   you to -- like, this is collectively of enormous importance to

23   us --

24          THE COURT:  Um-hum.

25          MR. SCHIAVONI:  -- because we need to have experts.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 26
of 209

1　We need to have consultants.  We need to have the ability to

2　question adverse witnesses.  We need to be able to have the

3　ability to present evidence to a jury at some point here.

4　　　　　　And like, the maze of, like, whatever is done with

5　these confidentiality provisions throughout the day, and we'll

6　talk about them, has to be done in a way that's consistent with

7　107 and it doesn't take away our basic rights under the Seventh

8　Amendment to basically try a case.  Okay.  And that's all said

9　with we have no problem with protecting the names and the

10　identities of the claimants --

11　　　　　　THE COURT:  Um-hum.

12　　　　　　MR. SCHIAVONI:  -- and other reasonable protections.

13　But we can't be boxed into a position where we're giving up --

14　like, we're being forced to sign an agreement that says we

15　consent to giving up our right under Rule 26 to have an expert

16　or a consultant.  We can't even function that way as a

17　practical matter to get through these proofs of claim.

18　　　　　　In Camden, in Boy Scouts, in Buffalo, and I could go

19　on, the ability to kind of look at these things and analyze

20　them from an aggregate basis and an individual basis -- like,

21　we've given you citations to experts who were experts in the

22　field of sexual abuse, who reviewed proofs of claim and reached

23　conclusions and gave opinions to the court about them that were

24　picked up in Boy Scouts about manners in which protective

25　measures would be adopted, et cetera.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 27
of 209

1    We had other experts look at them and give views about

2 where there were issues about deficient claims and how to deal

3 with them.  In Boy Scouts, a court has adopted anti-fraud

4 provisions as a result.  This was salutary.  It was positive in

5 a sense for everybody.

6    So what is it at issue with the bar date order, it

7 specifically provides as we set out.  It says that the debtor

8 and the committee can use experts.  The Camden order and other

9 orders then went on to say the insurers -- like, it mirrored

10 it.  It used the same language.  Here, it says the insurers are

11 a "authorized party", and then it goes on to list, I don't

12 know, a series of other, like, related entities, successors,

13 reinsurers, et cetera, but it doesn't include a specific

14 designation for experts.

15    On Thursday, there was argument in the San Francisco

16 case about the specific terms.  And there, the term

17 "professional" is used.  And I don't want to get into a huge

18 debate about what happened at a hearing that I don't have a

19 record for yet, a transcript.  But Your Honor, in a matter of

20 days, I believe you'll see a proposed order go in that will

21 have professionals in it which incorporates experts.  Okay.

22    Now, there was some big debate about whether or not

23 each person at a professional had to sign --

24    THE COURT:  Um-hum.

25    MR. SCHIAVONI:  -- the acknowledgment --

1          THE COURT:  Um-hum.

2          MR. SCHIAVONI:  -- there or whether the entity itself

3    could itself cover it.

4          THE COURT:  Yeah.

5          MR. SCHIAVONI:  And that was a matter of some debate.

6    I don't know how that's going to resolve itself, to be candid.

7    But I don't think there was any debate that, like, parties get

8    to use experts and consultants.  Everybody benefits from it.

9          So the order here, again, by oversight or whatnot,

10   it's not explicit about this.  And we want to be cautious.  We

11   don't want a repeat of the thing that's been made out of this

12   ISO thing.  So we came to the Court under a provision of the

13   order.  It's, I think, 14 Romanette (iii)(J) that allows a

14   moving party with the authority of the Court to share with

15   someone else.

16         And we've asked for that authority to share it with

17   our experts and consultants.  We would only share it with them

18   if they signed the appropriate agreements, acknowledgment that

19   that applies in this case so that they're being bound to the --

20   they're agreeing to be bound to the order.  We do that candidly

21   for our own protection, but also, obviously --

22         THE COURT:  Um-hum.

23         MR. SCHIAVONI:  -- we want to comply with the order to

24   the letter.  But --

25         THE COURT:  Is this a request to amend the order or to

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 29
of 209

1  clarify or what's the --

2          MR. SCHIAVONI:  I don't think it's -- that's not

3  how --

4          THE COURT:  What's the relief?

5          MR. SCHIAVONI:  Okay.  We have not presented it as a

6  motion to amend or clarify.

7          THE COURT:  I mean, I'm not saying that's wrong, but

8  I'm just curious.

9          MR. SCHIAVONI:  Okay.  And we've presented it to Your

10 Honor in the first instance as the order itself provides, it

11 says, here are the authorized parts.

12         THE COURT:  Um-hum.

13         MR. SCHIAVONI:  And then under Romanette 14(iii)(J) --

14 Um-hum.

15         MR. SCHIAVONI:  -- it says that any other person can

16 be added, but we've got to come to you.  We've got to --

17         THE COURT:  Okay.

18         MR. SCHIAVONI:  -- give notice to everybody.

19         THE COURT:  So it's under that --

20         MR. SCHIAVONI:  Yes.

21         THE COURT:  -- rubric?  Okay.

22         MR. SCHIAVONI:  So we're invoking that provision --

23         THE COURT:  Okay.

24         MR. SCHIAVONI:  -- to say that we're asking for

25 that -- we're moving, asking for authority.  We've actually

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 30
of 209

1  identified two specific experts that we proposed to use.  Like,

2  nobody can help themselves at throwing stones at them, whether

3  they're good or bad.  That's the litigation world.  People do

4  that.  But it's like, they're very legitimate enterprises, let

5  me put it that way.

6          THE COURT:  Um-hum.

7          MR. SCHIAVONI:  I mean, they're big consulting

8  entities.  Okay.  They're not people we pulled off the street,

9  the Brattle Group and NERA (phonetic).  We may not use both of

10  them.  Okay.

11          THE COURT:  Um-hum.

12          MR. SCHIAVONI:  But I wanted to have their names in

13  there so that, like, we weren't just dealing with this totally

14  in the abstract.

15          THE COURT:  Um-hum.

16          MR. SCHIAVONI:  But yeah, we may need another

17  consultant or two in there, and we give that right.  So the

18  issue here -- I'm sorry, Your Honor.  I (indiscernible)--

19          THE COURT:  No, I just, I have a question.  And I

20  apologize.  Remind me whether the relief requested is in the

21  abstract, as in we want a -- we want an understanding that we

22  can consult with -- let's just use the word "professionals"

23  because it is fairly broad and probably helpful here.  And that

24  doesn't require you particularly to disclose who they are to

25  the other side; is that the idea?  I mean, you happen to be

1 disclosing to folks here because they're known entities.

2         MR. SCHIAVONI: Well, we do qualify it in this

3 respect, Your Honor.

4         THE COURT: Um-hum.

5         MR. SCHIAVONI: I think it does say in the specific

6 order, and God forbid I've remembered it wrong, we want it this

7 way. It said, these are people who would be specifically

8 hired --

9         THE COURT: Um-hum.

10         MR. SCHIAVONI: -- for this engagement.

11         THE COURT: Um-hum.

12         MR. SCHIAVONI: Okay. It would not -- it would be

13 someone we've retained for this very engagement, not --

14         THE COURT: Um-hum.

15         MR. SCHIAVONI: -- somebody like -- like the ISO

16 instance that came up, okay, I guess nobody knew about. Right.

17 It's like, here, it'd be someone we specifically engaged --

18         THE COURT: Um-hum.

19         MR. SCHIAVONI: -- for the engagement. And in a

20 sense, the proposed order in San Francisco, I think it's

21 constructed that way. It says professionals, and parties then

22 are able to get them. Now, look, it is true that there is, in

23 effect, sort of disclosure --

24         THE COURT: Um-hum.

25         MR. SCHIAVONI: -- by professionals that are

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 32
of 209

1  retained --

2          THE COURT:  Well, they have to sign something.

3          MR. SCHIAVONI:  -- for -- well, we would have to sign

4  them.

5          THE COURT:  Um-hum.

6          MR. SCHIAVONI:  And we would ask Your Honor that we

7  get to -- like, we don't have to -- we would ask that we

8  follow, in essence, the Federal Rules and we not have to

9  disclose a nontestifying expert who we consult with to get

10  advice, maybe advice to try to resolve the case --

11          THE COURT:  Um-hum.

12          MR. SCHIAVONI:   -- okay, that we're not putting up as

13  a testifying expert.

14          THE COURT:  Um-hum.

15          MR. SCHIAVONI:  That is how it -- that is how Congress

16  envisioned the distinction being testifying and nontestifying

17  experts.

18          THE COURT:  Um-hum.

19          MR. SCHIAVONI:  And we would hold the agreement to be

20  bound by the order.

21          THE COURT:  Um-hum.

22          MR. SCHIAVONI:  And we'd obviously be in peril, like

23  if there was -- if we didn't get it and there was some

24  violation because we didn't get it, we'd have that in hand.

25  But --

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 33
of 209

1          THE COURT:  But whoever that is, whether they're

2    testifying or nontestifying, they're signing that --

3          MR. SCHIAVONI:  Absolutely.

4          THE COURT:  -- Exhibit A, right?

5          MR. SCHIAVONI:  Absolutely.  That would --

6          THE COURT:  But you wouldn't have to disclose they had

7    done -- I mean, you would be responsible for that --

8          MR. SCHIAVONI:  Yes.

9          THE COURT:  -- and you wouldn't necessarily have to

10   disclose that to the debtor or the committee, right?

11         MR. SCHIAVONI:  That's the proposal, Your Honor.

12         THE COURT:  Okay.  All right.

13         MR. SCHIAVONI:  Okay.  You can reject that.  Okay.

14         THE COURT:  Uh-huh.

15         MR. SCHIAVONI:  You'll hear from the other side that

16   they feel that because there's a different set of rules that

17   apply in a sense to a professional who's getting paid from the

18   estate.  It's like, they have to make an application here.

19         THE COURT:  Um-hum.

20         MR. SCHIAVONI:  Okay.  But I think that's really

21   different -- that's just a different -- that applies for a

22   different reason.  Okay.  And it's not, I don't think, right to

23   rob us of what the rules are under Rule 26 for disclosing

24   nontestifying experts.

25         THE COURT:  Um-hum.

1          MR. SCHIAVONI:  I also don't think it's helpful.  I
2    think we ought to be encouraged to have nontestifying experts
3    who help us better understand the situation here.  And I think
4    that ought to be frankly encouraged.  I think that's why
5    Congress wrote it that way.
6          THE COURT:  Um-hum.
7          MR. SCHIAVONI:  But it's here.  It has particular
8    rationale and benefit.  But that's why we -- that's the
9    request --
10         THE COURT:  Okay.
11         MR. SCHIAVONI:  -- so to speak.
12         THE COURT:  Okay.
13         MR. SCHIAVONI:  Okay.  And the other thing, just the
14   other point on this, is there's some issue here about, well,
15   have we followed the provision by the letter of the rule, okay,
16   and it says we're supposed to serve the claimants, comma, if
17   known.  All right.  And Your Honor, what we did was we served
18   the -- I forget what they call it, the core service list.
19         THE COURT:  Um-hum.
20         MR. SCHIAVONI:  I think that's what it's called.
21         THE COURT:  Um-hum.
22         MR. SCHIAVONI:  And that does include counsel of
23   record for plaintiffs' lawyers.  And it does include a number
24   of plaintiffs' lawyers.  I'd be the first to say it probably
25   doesn't include every plaintiffs' lawyer.

1          THE COURT:  Um-hum.

2          MR. SCHIAVONI:  Okay.  But it's if known.  We're

3  literally in the situation where we don't know who the

4  plaintiffs -- like, we don't know who the claimants are.

5          THE COURT:  Um-hum.

6          MR. SCHIAVONI:  We know from the complaints who some

7  of them are.  Right.  But we don't have a full list.  It's

8  like, it's impossible for us to serve all of the individual

9  claimants, Your Honor.  And I submit that that can't be, like,

10 a reasoned interpretation of what Your Honor meant when you

11 signed the order that we would have to go out and individually

12 serve all the claimants.  It seems inconsistent with everything

13 that the protective order was trying to achieve, that all of a

14 sudden, they'd be getting notices from, like, an insurance

15 company, saying, we're going to use the Brattle Group.  Right.

16          It's like, they are represented here in a fiduciary

17 capacity by the TCC, by the committee, and they're certainly in

18 the best position, if they felt any additional service was

19 necessary, to provide that service.  They may have the list of

20 all the plaintiffs' lawyers and whatnot in the case.  And I

21 think certainly they're in contact with them.  They're in the

22 best position to sort of do that, Your Honor.  And so I think

23 we've done everything to kind of comply.  Okay.

24          If the order is construed in this sort of literalistic

25 way, it makes the terms of the order.  And this is sort of like

1   a rule of construction for interpreting contracts, but also

2   orders and statutes. Right. It makes the statute, or here,

3   like, the order, it's not a reasoned interpretation because it

4   makes it illusory. There's no way to use this provision if you

5   have to serve people and you don't know who they are or you

6   don't know who their counsel are. We've made service of the

7   folks that we know who are on this by the mechanism provided

8   through ECF service and through the service list. So Your

9   Honor, we submit that that's good service.

10          To the extent, Your Honor, there's some literalistic

11  sort of other analysis of this, we're not moving for

12  reconsideration. But the Court always has the power to

13  interpret its own orders and to tweak them and to sort of leave

14  us in a position where we don't get to use experts or we are

15  left with months of litigation over whether we can use an

16  expert. It's not productive to -- like, where we're going to

17  go on this. It's like, it makes it impossible for us to sort

18  of -- to function on a going-forward basis.

19          THE COURT: Okay.

20          MR. SCHIAVONI: Thank you, Your Honor.

21          THE COURT: Thank you very much.

22          Yeah. Come on up.

23          MR. KAPLAN: Okay. Good morning again, Your Honor.

24  Michael Kaplan from Lowenstein. A lot to unpack there. I'm

25  going to do my best to sort of follow it.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 37
of 209

1            THE COURT:  Um-hum.

2            MR. KAPLAN:  Let's start with a couple of points.  The

3    service argument that you just heard Counsel argue about is

4    it's just not right.  The service argument that was made is is

5    that the goods we're talking about proofs of claim.  So let's

6    just make sure we ground ourselves in this argument.

7            This is to do with proofs of claim.  And it really is,

8    Your Honor, a motion for reconsideration of the bar date order,

9    which was already litigated once before.  And then 0.25 this

10   morning, we did another round on it.  But this is all about the

11   bar order.  So procedurally, I would argue that the motion is

12   not properly before you to do it, but let's set the sort of

13   form over substance aside here.

14           The issue we have, Your Honor, with this proposed

15   modification is a couple things.  Number one, we have the main

16   case, then we have the adversary proceeding.  There is no

17   contested matter currently in the main case for application of

18   Rule 26.  Depending what Your Honor says in about half an hour

19   or maybe a little bit more about the adversary proceeding,

20   there might not be any discovery going on yet in the adversary

21   proceeding.  But admittedly, at some point, we would hope that

22   discovery ensues in the adversary, at which time Rule 26

23   through 7026 and otherwise would apply.

24           So the whole notion about disclosure of nontestifying

25   and consulting experts under Rule 26, that is a red herring,

1  Your Honor.  It has no application here.  That has to do with

2  the adversary proceeding.  But that is actually part of where

3  we have the problem because if you look at the insurers'

4  proposed order, which broadly defines the term.

5          "Expert shall mean any entity or person with

6  specialized knowledge or experience in a matter pertinent to

7  the Chapter 11 case and/or adversary proceeding who has been

8  retained by an authorized party or its counsel to serve as an

9  expert witness or as a consultant in connection with the

10  Chapter 11 case and/or the adversary," including, he goes on,

11  Mr. Schiavoni lists the Brattle Group and NERA.

12          I'm not going to get into the Brattle Group and NERA,

13  Your Honor.  The citations that were made to Your Honor in the

14  moving brief about their utility is not true.  The citations we

15  provided you in the transcript about their utility, that's the

16  record.

17          THE COURT:  I think that's neither here nor there.

18          MR. KAPLAN:  Yeah.

19          THE COURT:  Yeah.

20          MR. KAPLAN:  And that's the point.

21          THE COURT:  I mean, it's we'll see.

22          MR. KAPLAN:  We may come a fine -- and I think that's

23  exactly the point, Your Honor, is is --

24          THE COURT:  Um-hum.

25          MR. KAPLAN:  -- we are not in a contested matter yet

1   in the main case.  There is nothing in which the parties are

2   about to take depositions.  There is nothing in which there is

3   that type of formal discovery occurring.

4           And what the bar date order provides is again, we're

5   only talking about proofs of claim.  We're not talking about

6   any documents the debtor provides otherwise.  We are talking

7   about only proofs of claim.  Says that if you want to show that

8   proof of claim to someone, you have to follow the procedures in

9   the bar date order, which means you have to disclose who they

10  are under Exhibit A, you have to give the parties ten days to

11  do it, and you have to provide the specific survivor whose

12  claims information it is with notice.

13          Those are the protections, Your Honor, that we

14  litigated extensively before you.  I can't remember the date

15  exactly, but I think it was sometime this summer when we went

16  through all of this.  And it's exactly what Your Honor entered.

17  And again, we only have this situation -- it's not because

18  we're trying to single out the insurers.  It's because the

19  folks sitting on this side of the courtroom can't retain

20  experts without the Court approving it and knowing it and

21  disclosing it.  And those experts are still subject to sign the

22  authorized party agreement and otherwise.

23          So all we're asking for here, Your Honor, is we are

24  not trying to limit anybody that the insurers want to retain.

25  We can argue about the utility of that retention at a different

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 40
of 209

1   time.  But what we're simply saying is is if you want to show

2   them a proof of claim or the information in the sort of

3   supplement to the proof of claim, you need to follow the bar

4   date, which says you have to provide notice, you have to sign

5   the agreement, and you have to give the parties a chance to

6   object.

7           We should not have endless lists.  I lost count, Your

8   Honor.  I think there are nine separate insurers here, but I

9   might be off by a digit here or there, so forgive me.  We

10  should not have a world where nine separate parties have a

11  right to retain anyone that they deem pertinent and that the

12  universe of people who have access to proof-of-claim

13  information is twenty-five, thirty, forty-five, fifty.  That's

14  not what the proof of claim information is.

15          Again, nothing to do with discovery that provided

16  pursuant to 2004 in the main case.  This is only proof-of-claim

17  information.  If you get the information somewhere else, share

18  it as you see fit.  But I don't think it's really onerous, Your

19  Honor, and burdensome for the main case to limit who sees the

20  proofs of claim and to have to follow the procedures that Your

21  Honor carefully thought about and implied.

22          No one's being limited.  We're simply just saying you

23  have to disclose it.  This isn't the adversary proceeding.

24  There's a separate procedure there.  And it really goes, Your

25  Honor, to the argument of whether or not the proofs of claim

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 41
of 209

1  belong in the adversary proceeding.  But we will get to that at

2  the appropriate time in the adversary proceeding.

3         I don't see really how it's more complicated than

4  that.  But this broad definition of expert, that they don't

5  have to tell -- that the insurers don't have to disclose who

6  they're showing proofs of claim to, in the committee's mind,

7  that is unacceptable and that is inconsistent with the

8  confidentiality that is provided in the bar date order.  And

9  there is no way to police that, and there is no way to check

10 that because the Exhibit A has to be signed by both the debtor

11 and committee, Your Honor.

12        So I'm not sure what we're getting at here.  If

13 they're willing to sign Exhibit A, it's got to be signed by

14 both of us, and there's still a disclosure and a period for us

15 to object and say, no, you shouldn't give the proof of claim

16 information to those people.  Your Honor would have to call it.

17 I've never objected to a name yet when these have come through.

18 I'm not sure who we're talking about.  But there are no

19 depositions.  There are no document demands.  There is no

20 discovery.  I'm not sure why we're really back here.

21        THE COURT:  Yeah Let me give you one reaction to that.

22        MR. KAPLAN:  Okay.

23        THE COURT:  And this is not a ruling.  It's an

24 observation.  Okay.  The challenge of these kinds of cases is

25 so many things are happening in parallel.  And I take your

1    point that there's technically no contested matter here.

2         But for the same reason that I'm going to look

3    somewhat askance at the insurers' position re the motions to

4    dismiss, although not as askance as you might like me to, but

5    the same reason that I question anybody's puzzlement as to why

6    we're here, we know where we're going here.  Okay.  I mean,

7    they're going to have to look at these things.  And it's just a

8    question of what should be the impediments and what should be

9    the barriers.  Right.  So the fact that there is or isn't a

10   contested matter right now, I agree with you, but we have to

11   sort of get past that.  Right.

12        MR. KAPLAN:  Fully agree with Your Honor.

13        THE COURT:  Okay.

14        MR. KAPLAN:  And that is why if they wanted to -- if

15   the insurers would like to disclose all the folks they want to

16   use now -- again, it's not a matter of --

17        THE COURT:  Right.

18        MR. KAPLAN:  -- it's not a matter of telling us every

19   person at the Brattle Group so we can go back through and sit

20   down and search through everyone's name, although I certainly

21   know Mr. Hinton and some of the other experts well.

22        THE COURT:  Yeah.

23        MR. KAPLAN:  And we may get to see them again on

24   Monday on the other side of the country.  This is simply

25   just --

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 43
of 209

```
 1              THE COURT:  In Camden?

 2              MR. KAPLAN:  In Camden, yes, Your Honor.

 3              THE COURT:  Okay.

 4              MR. KAPLAN:  They're a proposed -- Mr. Hinton's

 5   proposed to testify again.

 6              THE COURT:  Okay.

 7              MR. KAPLAN:  But nevertheless, the point is simply to

 8   have a disclosure at a level -- for instance, Your Honor, we

 9   retained Stout (phonetic).

10              THE COURT:  Um-hum.

11              MR. KAPLAN:  Your Honor saw the application.  You

12   approved it.  Stout signed the authorized party agreement.  And

13   everybody knows Stout is in the case.

14              I don't think it is particularly onerous or burdensome

15   to simply say that the Brattle Group is in the case.  They are

16   going to be looking at proofs of claim.  I don't think it's

17   onerous to say NERA is in the case.  They're looking at proofs

18   of claim.  But I will say that had we known in this procedure

19   we're followed in another case, we probably would not have been

20   in the position we're in in some of those talking about ISO and

21   others.

22              So I'm not sure what the impediment is.  I don't think

23   Your Honor would look kindly on us over0objecting to everyone

24   the insurers wanted to retain, and I'm not sure that I would

25   personally come argue that.  I might bring one of my colleagues
```

1  to stand in front of the proverbial firing line if we chose to

2  do that.

3       But specifically for the proof of claim information,

4  Your Honor, the disclosure required and the notice, to simply

5  give the individual survivors, whose rights have been violated

6  many, many times, an opportunity to be told your information

7  that you submitted confidentially in the bankruptcy is going to

8  be shared with people who you may not have known.  Ten days,

9  Your Honor, for them to give the opportunity to do that, I'm

10 hard-pressed to understand how that's slowing anything down in

11 this particular case.  But that's what -- I mean, we --

12       THE COURT:  Let me just ask you this.  And if you

13 don't know, that's fine.  I mean, is this aberrational in the

14 sense that this bar date order is different from others that

15 have been entered around the country?  This issue has never

16 come up before, versus in what sense is this typical?

17       MR. KAPLAN:  Your Honor, I can represent to you that

18 this is not an issue that I have litigated in other --

19       THE COURT:  Okay.

20       MR. KAPLAN:  -- cases previously.

21       THE COURT:  Okay.

22       MR. KAPLAN:  This has become a specific issue, I

23 think, because of the additional disclosures that occurred in

24 the Rochester, Rockville, Camden, and Syracuse cases.  But in

25 the other diocesan cases, there are provisions that allow the

1  insurers to get access to all the proofs of claim.  They still
2  had to sign the authorized party agreement.  And I do not
3  recall -- Mr. Schiavoni has a far better memory than me in some
4  respects.
5          THE COURT:  Um-hum.
6          MR. KAPLAN:  I do not recall this similar motion being
7  presented in the Camden case, of which I litigated virtually
8  every motion that was before the court, and I do not recall
9  this being presented in any other case.  The provision to share
10 strictly the proofs of claim, I believe, is nearly identical.
11 I could certainly check it, Your Honor, but I know there's an
12 authorized party agreement --
13         THE COURT:  Um-hum.
14         MR. KAPLAN:  -- that requires parties to be signed.
15 It has to be cosigned by the debtor and the committee.  And I
16 believe there's a notice provision there.  There's a
17 (indiscernible).
18         THE COURT:  Okay.  Appreciate it.  Thank you.
19         MR. KAPLAN:  Okay.
20         THE COURT:  Okay.
21         MR. SCHIAVONI:  Your Honor, if I could just --
22         THE COURT:  Yeah.  Come on up.
23         MR. SCHIAVONI:  So I have a proposal, okay, which,
24 like --
25         THE COURT:  Always happy to hear a proposal.

1          MR. SCHIAVONI:  -- that may, like, get us where we
2    need to be.  But --

3          THE COURT:  Okay.

4          MR. SCHIAVONI:  -- let me just quickly just cover a
5    couple of points.

6          THE COURT:  Yeah.

7          MR. SCHIAVONI:  So the Camden order says -- and I'm
8    reading -- it's in footnote 7 of our moving brief.

9          THE COURT:  Yeah.  Um-hum.

10          MR. SCHIAVONI:  And exhibit and whatnot.  It says in
11   Section 15(iii), then (iv), it provides that authorized party
12   shall include, "any insurance company ... together with their
13   respective successors, reinsurance counsel, experts, and
14   consultants."  So --

15          THE COURT:  And that was the similar order that was
16   the --

17          MR. SCHIAVONI:  Mr. Kaplan's right.  It's like, he
18   didn't come up there because it was specifically in the order.

19          THE COURT:  Okay.  But is that the bar date order in
20   that case?

21          MR. SCHIAVONI:  Yes.

22          THE COURT:  Okay.

23          MR. SCHIAVONI:  Yes.

24          THE COURT:  Thanks.  Appreciate it.  Thanks.

25          MR. SCHIAVONI:  It's not really come -- as I

1 understand, it's not really coming up before Judge Montali

2 whether or not experts are permitted. It's just a matter of

3 who exactly signs it because professionals is right in the

4 form. That's how --

5          THE COURT: Um-hum.

6          MR. SCHIAVONI: -- almost all of these are set up.

7          THE COURT: Okay.

8          MR. SCHIAVONI: What happened here was whether -- I

9 don't know whether we missed it. I don't know. But like,

10 there was a lot before --

11          THE COURT: Right. I missed it. Okay.

12          MR. SCHIAVONI: -- assigned to protect -- there was

13 a --

14          THE COURT: So nobody has a -- nobody has any

15 concerns. Okay.

16          MR. SCHIAVONI: There was a lot before us on the

17 protective order.

18          THE COURT: Okay.

19          MR. SCHIAVONI: And if I'm at fault for not bringing

20 that to your attention --

21          THE COURT: That's all right.

22          MR. SCHIAVONI: -- I take the fault.

23          THE COURT: Okay.

24          MR. SCHIAVONI: But I can't believe Your Honor really,

25 like, meant to, like, limit us in that way. So --

1              THE COURT:  I appreciate it.

2              MR. SCHIAVONI:  -- just two other quick things.  All

3      right.

4              THE COURT:  Yeah.  Okay.

5              MR. SCHIAVONI:   So this notion of there is not really

6      a contested matter now, it's like, look, we're not waiting

7      until the eve of a confirmation hearing or the beginning of --

8              THE COURT:  Um-hum.

9              MR. SCHIAVONI:  -- the claims allowance process --

10             THE COURT:  Um-hum.

11             MR. SCHIAVONI:  -- to then present you with an expert

12     and then have them start his work.

13             THE COURT:  Yeah, I get it.

14             MR. SCHIAVONI:  Okay.

15             THE COURT:  I get it.

16             MR. SCHIAVONI:  There is a contested matter here.

17             THE COURT:  Yeah.

18             MR. SCHIAVONI:  And whether whatever happens with the

19     adversary, I suspecting it's not going away entirely, okay, we

20     need to be prepared for both things and --

21             THE COURT:  Um-hum.

22             MR. SCHIAVONI:  -- we need one set of experts looking

23     for it.

24             THE COURT:  Okay.

25             MR. SCHIAVONI:  But also, like, we like to try to get

1   a handle on this.  Okay.

2              THE COURT:  Um-hum.

3              MR. SCHIAVONI:  And Rule 26 does allow for

4   nontestifying experts for a very good reason.  And we should be

5   encouraged in that regard, Your Honor.  Thank you.

6              THE COURT:  You bet.  Okay.

7              MR. SCHIAVONI:  Oh, so I had a proposal.  Okay.

8              THE COURT:  Yeah.

9              MR. SCHIAVONI:  If Your Honor is really concerned

10  about us complying with the letter of whatever it is,

11  14(3)(ii)(J) --

12             THE COURT:  Um-hum.

13             MR. SCHIAVONI:  -- giving notice to all of the

14  claimants on ten days for this proposal we have before Your

15  Honor, this request for relief, you could either enter the

16  order on negative notice and then have the committee notice it

17  out to -- I don't have -- I noticed the claimants I know of.

18  Those are, like, their counsel, the ones on the 2002 service

19  list.

20             THE COURT:  Okay.

21             MR. SCHIAVONI:  So the committee could notice out --

22  if they haven't probably have already done it, but like, if

23  they haven't, it's like, they could notice it out and the order

24  wouldn't be effective for ten days if any of them come in to

25  object to experts being permitted to review this, the order

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 50
of 209

1  wouldn't go into effect within ten days.

2        THE COURT:  Well, it's just funny because at the risk

3  of parsing this too fine, which is the last thing we need in

4  this case, are there two issues?  I mean, one is with respect

5  to this motion to whom it should have been noticed.  And the

6  second is the issue that's underneath it.

7        Is it with respect to any particular instance in which

8  you're going to get a proof of claim that that particular

9  claimant -- I mean, are those two different things?  Or are you

10 suggesting that because of the effect of the relief that you're

11 requesting here, the question is whether the notice of this was

12 sufficient, and that's all?

13        MR. SCHIAVONI:  The motion before Your Honor is to ask

14 under J --

15        THE COURT:  Yeah.

16        MR. SCHIAVONI:  -- let me just call it that --

17        THE COURT:  Yeah.

18        MR. SCHIAVONI:  -- is that authorized parties -- that

19 the Court include, among authorized parties, experts and

20 consultants, exactly as the order did in Camden --

21        THE COURT:  Okay.

22        MR. SCHIAVONI:  -- and similar to the order in San

23 Francisco.

24        THE COURT:  Okay, as opposed to a further notice

25 issue?

1          MR. SCHIAVONI:  That's the request.

2          THE COURT:  Uh-huh.

3          MR. SCHIAVONI:  The objection to that request is that

4    somehow we haven't complied with the notice procedure because

5    even though the notice procedure says that we serve claimants

6    if known, that we didn't serve the ones we don't know --

7          THE COURT:  Yeah, yeah.  Okay.

8          MR. SCHIAVONI:  -- who they are.

9          THE COURT:  Okay.

10         MR. SCHIAVONI:  Okay.  It's like, if -- like, I don't

11   think that's a reasoned analysis, and I don't think we should

12   have to --

13         THE COURT:  Okay.

14         MR. SCHIAVONI:  -- provide other notice.  But if Your

15   Honor wants more notice --

16         THE COURT:  Okay.

17         MR. SCHIAVONI:  -- give them ten days to give it.

18         THE COURT:  Okay.  Thank you.  Appreciate it.

19         Okay.  Submitted?

20         MR. KAPLAN:  Unless Your Honor has further questions.

21         THE COURT:  No.  No.  I want to think about this for

22   literally a day or two.

23         MR. KAPLAN:  Okay.  Sure.

24         THE COURT:  Okay.

25         MR. KAPLAN:  Just to be clear, Your Honor, we did not

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 52
of 209

1  raise the service of the actual motion.

2          THE COURT:  Yeah, I wasn't sure --

3          MR. KAPLAN:  Yeah.

4          THE COURT:  -- you had.  I'm sorry.  I mangled my

5  question to Mr. Schiavoni.

6          MR. KAPLAN:  That's okay.

7          THE COURT:  -- but I think you got -- but you saw what

8  I was asking.

9          MR. KAPLAN:  I saw where you were go --

10          THE COURT:  Yeah.

11          MR. KAPLAN:  We didn't raise it.

12          THE COURT:  Okay.

13          MR. KAPLAN:  It's not an issue.

14          THE COURT:  All right.  I'm going to get back to you

15  promptly on this.  Okay.  I'm thinking end of the week or

16  Monday.  All right.

17          Okay.  Where do we go next?

18          MR. KAPLAN:  Shall we stay on the theme of protective

19  orders, or should we move to 2004?

20          THE COURT:  Well, you can.  I mean, when would it be

21  appropriate to hear my thinking about the motion to dismiss?

22          MR. KAPLAN:  Right now.

23          THE COURT:  Okay.  So it's good enough?  Okay.  All

24  right.  And look, there's going to be overlap here in several

25  different ways.  Okay.

 1          So we had a fairly lengthy argument about a couple of
 2   motions to dismiss back on October 18.  And I want to thank the
 3   parties for doing really a wonderful job of illuminating their
 4   views of the subjects.  And again, this is another one of those
 5   situations where I think we're proceeding in some ways in
 6   parallel in terms of what's going on in the main case and
 7   what's going on in the AP.
 8          And apropos of absolutely nothing, I'm struck by what
 9   I understand to be all the different ways that these kinds of
10   APs are dealt with in different cases.  There seem to be cases
11   where they just get filed and they kind of sit there and
12   they're just a vehicle to do something someday but it's not
13   really urgent or necessarily joined in battle initially.  And
14   there are other situations where I think they're more
15   immediately sort of a means to advance all kinds of important
16   questions.
17          This one has provoked a couple of 12(b)(6) and 12(e)
18   motions, which is fine because I think at the end of the day,
19   my ruling is going to suggest how I think we need to clarify a
20   few things here.  So let me go back to the beginning.
21          So on June 22nd, the plaintiff in this case, the Roman
22   Catholic Bishop of Oakland, filed a complaint, later amended,
23   breach of contract and declaratory judgment against certain
24   primary access and umbrella insurers.  Plaintiffs allege
25   jurisdiction under 28 U.S.C. 1334.  They also allege that all

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 54
of 209

1    these matters are core under 28 U.S.C. 157(b), but there's not

2    much elaboration as to what little part of 157(b) might render

3    these things core.  Plaintiffs also consent to this Court

4    entering final orders, judgments, or decrees.

5           Certain of the defendants have filed demands for jury

6    trials.  The defendants also assert that these matters are

7    state law causes of action that are not core.  And they don't

8    consent to this Court entering final orders, judgments, or

9    decrees.

10          Clearly, this Court would have no ability to conduct a

11   jury trial on the matter as presently set, I believe.  Okay.

12   certain of the insurers have also indicated a desire to file a

13   motion to withdraw the reference, but I don't think that's been

14   filed yet.  And at some point, we'll circle back to that

15   because that's going to implicate some timing questions on a

16   couple of different matters here.  Okay.

17          And let me just say as an aside, whether something is

18   core or isn't is initially theoretically my call, but it's not

19   ultimately my call.  So the fact that somebody alleges that

20   something isn't core or I shouldn't be entering final orders of

21   the motion -- the reference should be withdrawn.  The only

22   thing I care about is certainty, not that I am never offended

23   when anybody tells me I shouldn't be doing a thing.  Congress

24   has told me that, and I have to interpret it.  But somebody

25   else may interpret it differently, so I don't want anybody ever

1  to think that that is problematic.

2         The problem occurs when in all too many APs people

3  don't say what they think about that and you get to the eve of

4  a trial and suddenly somebody thinks that there's a problem.

5  So I appreciate the fact this has come up early.  That helps

6  the process.  Okay.

7         And the curious thing about this is although it's

8  reasonably clear to me that even at this 12(b)(6), 12(e) stage,

9  there are some factual disputes about fundamental aspects of

10 these issues.  I don't think any factual disputes have to be

11 resolved here.  So in the sense that if purely from a related

12 to jurisdiction core, noncore matter, if I'm not resolving a

13 factual dispute, I don't think that there's any Constitutional

14 implications or problems because if what I do were to be

15 reviewed, it would be reviewed de novo in any event, in which

16 case the Stern issue just isn't a problem.  So I intend to go

17 ahead and rule on these motions.  Okay.

18        So the amended complaint alleges that -- and here, I'm

19 going to do sort of a laundry list.  Don't take notes because

20 it's going to -- don't feel the need to jot down every thought.

21 Okay.

22        The complaint alleges that the defendant Pacific

23 Indemnity on information and belief issued primary insurance

24 policies to the plaintiff under various policy numbers for a

25 period from roughly 1963 to 1966.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 56
of 209

1    The Insurance Company of America information and

2  belief issued primary insurance policies to plaintiff under

3  various policy numbers as set forth in the complaint for

4  periods 1966 to '69 and '69 to 1970.

5    Defendant Aetna Travelers issued written primary

6  policies of insurance to the plaintiff under various policies

7  for different periods of time commencing in 1975 and running

8  through 1981.

9    Certain Underwriters of Lloyd's wrote primary -- I'm

10  sorry, wrote excess policies under certain policy numbers for

11  periods allegedly beginning 1962 and running through 1966.

12    Oh, I think I skipped somebody here.  Yeah.

13  Commercial Union/Armour Insurance Company obligations were

14  later assumed by California Insurance Guaranty Association,

15  allegedly issued written policies of insurance, various numbers

16  from periods allegedly from 1970 to 1975.  And those we dealt

17  with last week.  Okay.

18    Insurance Company of North America issued a written

19  excess policy of insurance allegedly under a policy for the

20  period of 1966 to 1970.

21    United States Fire Insurance issued a written policy

22  of excess insurance, allegedly, for a period 1970 to 1971.

23    The Employer's for the Insurance written policy of

24  excess insurance allegedly in 1971 to 1974.

25    CNA Insurance Company allegedly wrote a written policy

1   of excess insurance, various policy numbers from a period
2   beginning 1974 running through 1980.
3           Industrial Indemnity issued a written policy of excess
4   insurance, allegedly, again during 1980 and 1981.
5           And Lloyd's Underwriters allegedly issued written
6   umbrella policies of insurance for a period 1963 to -- I'm
7   sorry, 1962 to '63 and then '63 to '66.
8           Employers re issued a written umbrella policy of
9   insurance to plaintiff under a policy number for a period 1974
10  to 1977.
11          Aetna Travelers allegedly issued written umbrella
12  policies of insurance from periods 1978 to 1981 and then 1981
13  to 1987.
14          Pacific Employer's Insurance allegedly issued a
15  written umbrella policy for a period 1985 -- I'm sorry, March
16  1985 through December 1985.
17          So attached to the amended complaint is Exhibit A is a
18  chart listing the pending lawsuits filed in the (indiscernible)
19  County Superior Court against plaintiff for alleged negligent
20  supervision and hiring of certain clerical and ministerial
21  personnel.  The list underlies most of the claims that need to
22  be resolved.
23          In this adversary proceeding, the plaintiff alleges
24  generally that the primary and excess insurers have a duty to
25  defend and indemnify the plaintiff through the state court

1  actions and further alleges that the insurers have either

2  denied or failed to confirm coverage and/or provide defense

3  and/or indemnity.  As a result, the plaintiffs claim they have

4  been damaged because one, the plaintiffs' been denied the

5  benefits of the insurance policies that it purchased, despite

6  having complied with all of the requirements under the

7  policies.  And two, plaintiff has been forced to defend itself

8  against the lawsuits without the appropriate defense and

9  indemnity from the insurers.

10        Plaintiff believes that the foregoing demonstrates a

11 need for declaratory relief because there appears to be a

12 dispute regarding coverage, and plaintiff believes some or all

13 of the insurers breached their contracts because of their

14 deficient response.  Primary insurers contend that they did not

15 breach any contract for failure to furnish a defense because

16 they provided plaintiff a qualified defense under a reservation

17 of rights.  And the primary insurers who filed a 12(b)(6)

18 motion further argue that they are not obligated to indemnify

19 the plaintiff because the duty to indemnify only arises after

20 the primary insurers' liability is established, which they

21 argue has not yet happened.

22        Primary insurers contend that because the plaintiff

23 has failed to allege or provide any evidence of the existence

24 of any judgment or settlement in any underlying state court

25 proceedings, primary insurers have no duty to indemnify the

1   plaintiff.  Therefore, the primary insurers moved the Court to
2   either dismiss this adversary proceeding or require plaintiff
3   to provide a more definite statement.
4          So let me take a step back here.  As background, the
5   Court has made a comment few hearings ago that it finds it a
6   little bit unusual to approach the issue of insurance coverage
7   through this adversary proceeding, considering the fact that
8   most of the questions related to the coverage can be resolved
9   through comprehensive 2004 exams and through the parties'
10  extensive discussions that are under way.  That's neither here
11  nor there.  I mean, there's clearly two paths here.  It's
12  curious to me that we're on both, but there we are.  Okay.
13  This dichotomy persists and is going to be addressed in several
14  applications today, small way applications.
15         With that and thinking about the motion to dismiss or
16  a motion for a more definite statement, this dispute plays out
17  sort of on two strata, one, a sort of meta conceptual level,
18  what's this case about, and on a more particularized level,
19  what are the duties allegedly implicated and have they been
20  breached.  And those are really two different questions.
21         To the extent that the insurers are basically taking
22  the position, at least thematically, that they are uncertain as
23  to what the plaintiff is seeking here at large.  That argument
24  generally lacks credibility with me.  It's clear to me that the
25  plaintiff is alleging that there is coverage, which is hardly a

1    surprise in this case or in any other disease case.  Thus, for

2    the insurers to claim they're uncertain how to respond is on

3    that meta level unpersuasive.

4         However, we're talking about a complaint here, which

5    is a much more particularized form of request for relief, and

6    it needs to be precise in its allegations and assertions of

7    duties and breaches.  So the Court agrees with the insurers

8    that for them to respond to the complaint, the plaintiff should

9    amend the complaint to clarify at least the following points.

10        One, to the extent that the plaintiff believes that

11   the obligation to indemnify has been triggered, the plaintiff

12   should clarify the reasons why it believes that's the case.

13        Two, to the extent the plaintiff believes that the

14   duty to defend has been breached, the plaintiff should provide

15   further details concerning the instances of the alleged breach,

16   including but not necessarily limited to, one, the dates the

17   plaintiff tendered the claims to the insurers, two, the dates

18   of the -- I'm sorry, I lost my place here -- dates of the

19   insurers' responses, if any, and three, the reasons why the

20   plaintiff asserts that the insurers' responses, if there was a

21   response, were unsatisfactory or deficient under California

22   law.  I think we have to have that to understand that we have a

23   breach or don't have a breach.

24        Further, to the extent that the insurance companies

25   are asking for more particulars about the individual policies

1  or why the policies may or may not be in effect or exclusions

2  may or may not apply, the Court believes that and agrees with

3  Ms. Ridley.  Those are really merits issues, but I don't think

4  we need to get into it at pleading stage.  So to the extent

5  there was a request for that kind of information, I'm not

6  granting the motion to dismiss.

7          But the primary motions, primary insurers' motions to

8  dismiss, a motion for a more definite statement, are granted.

9  And the plaintiff is directed and shall be permitted to amend

10  its complaint consistent with the concerns described above.

11          With respect to the excess insurers, the excess

12  insurers replicate many of the primary insurers' arguments

13  regarding indemnity and defense.  In addition, they argue that

14  under Iolab Corp. v. Seaboard Surety Company, which is 15 F.3d

15  1500 (9th Cir. 1994), they have no duty whatsoever to an

16  insured until the insured can demonstrate that the primary

17  insurance has been exhausted and that the excess has been

18  accessed.

19          Let me take a minute with respect to Iolab because

20  it's clearly a very important case.  In Iolab, Iolab was sued

21  in the Central District of California for allegedly infringing

22  the patent for an optical device owned by Dr. Jenson.  The

23  trial was bifurcated between liability and damages.  And at

24  trial, Iolab was found liable for patent infringement, and the

25  parties subsequently settled.  Iolab agreed to pay 13.5 million

1  dollars to Dr. Jenson.

2          Iolab then filed an action seeking indemnification

3  from its insurers, both primary and excess insurers, for 13.5

4  million dollars, together with costs estimated at 1 million

5  dollars, for a total of 14.5 million.  Iolab's aggregate

6  primary coverage during the infringing period amounted to

7  thirty-six million dollars.

8          Further, the excess policy specifically provided that

9  their liability does not attach until the underlying jurors

10  have paid or have been held liable to pay.  The district court

11  dismissed on the pleadings the actions against four insurers,

12  dismissing a fifth based on the complaint alone, and granted

13  summary judgment, dismissing the remaining ten causes of action

14  Iolab appealed.

15          The Ninth Circuit found that under California law, as

16  they were interpreting California law, primary insurance must

17  be exhausted before liability attaches under a secondary

18  policy.  This is true even if the total amount of primary

19  insurance exceeds the amount contemplated in the secondary

20  policy.  So the Ninth Circuit affirmed the trial court finding

21  the Iolab could not have sued for excess -- I'm sorry, could

22  not exclude the excess policyholders for breach of contract

23  until the legal obligations of the primary insurers have been

24  determined and the excess policies had been triggered.

25          Now, the argument was raised at the oral argument in

1    the papers that there is other pertinent law in California with

2    respect to declaratory relief actions in particular.  And the

3    case that was cited to the Court was Ludgate Insurance Company

4    v. Lockheed Martin Corp., which is 82 Cal. App. 4th 592 (2008).

5           In looking at this case, my instinct is that there is

6    greater flexibility under California law, specifically with

7    respect to declaratory relief actions than I think was

8    necessarily contemplated by Iolab.  I think Ludgate stands for

9    the proposition.  And again, that's more of a pleading case.

10   And they pointed out in Ludgate that Iolab was largely a

11   summary judgment case.

12          But what I think Ludgate stands for is the proposition

13   that at a pleading stage, it's sufficient, at least plausibly,

14   to allege a likelihood that the excess can be implicated.  In

15   fact, the actual pleading in Ludgate might have gone beyond

16   that and might have alleged on the numbers presented that the

17   excess would be implicated.  But I think that the point of

18   Ludgate, in my view, is that there should be greater

19   flexibility in looking at these issues through the prism of

20   declaratory relief and that what needs to demonstrate through

21   declaratory relief is an actual, plausible controversy and that

22   that can be done even in this excess insurance concept.

23          I think that's particularly relevant here, and I think

24   it's particularly relevant to a diocese case at this stage,

25   because unlike Iolab, where the damages were set and everybody

1  knew what the numbers were, we may have ideas what numbers are

2  likely to be based on other cases here, but we just don't know.

3  I think that, as I look at the complaint, I don't believe that

4  the plaintiff has yet alleged anything with respect to any kind

5  of likelihood that there's going to be a likely invasion of the

6  excess policies. I think they should be required to do that

7  and have some basis for doing it.

8          So I think I'm going to grant the excess insurers

9  motion to that extent. I think there needs to be some

10  statement consistent with Ludgate where the reasonable

11  possibility or reasonable plausibility they're looking to get

12  to something implicating the excess policies, I don't think

13  that has to be necessarily down to the penny. But I do think

14  that Ludgate suggests that there can be a declaratory relief

15  action, but it does require some pleading beyond what we have

16  here.

17          So I'm going to grant the excess insurers' policy as

18  well and permit the debtor, the plaintiff, to amend the

19  complaint with respect to statements with respect to a

20  plausibility under a Ludgate analysis that we're going to -- we

21  are going to or are likely to implicate the excess policies as

22  well.

23          So we talked about a deadline for amendment last week.

24  The plaintiff suggests on November 28th. I don't know if Ms.

25  Ridley wants to comment on whether in light of these rulings,

1  November 28th still make sense for one amended complaint or

2  whether something else should be considered.

3       MS. RIDLEY:  Thank you, Your Honor.  This is Eileen

4  Ridley for the debtor in the adversary proceeding.  Given the

5  information, and I understand the Court's ruling, I would ask

6  for a bit more time --

7       THE COURT:  Okay.

8       MS. RIDLEY:  -- because we're going to combine this

9  with the amendments --

10       THE COURT:  Yeah.

11       MS. RIDLEY:  -- that the Court granted and amended for

12  CIGA.

13       THE COURT:  Okay.

14       MS. RIDLEY:  And so I would ask for a little

15  leniency --

16       THE COURT:  Okay.

17       MS. RIDLEY:  -- for time in the holidays.

18       THE COURT:  All right.  Well, let me give you one

19  other thought, too.  I mean, the argument primarily went to the

20  dec relief aspect of this.  I don't know if you want to allege

21  that there's some immediate breach, other than what you're

22  suggesting in the dec relief, failure to respond.  If you have

23  that in mind, I don't think that's been pled yet.  And I think

24  that you would need to do so.  If you want to simply rely on

25  what I think is my interpretation of Ludgate, here, re a dec

1  relief action, that's fine.  And then you might get another

2  12(b)(6) motion.

3         But if you have something else to say about a breach

4  of a current duty, I think the complaint needs to be amended to

5  say that because I don't think it -- it doesn't say it clearly

6  to me right now.  Okay.

7         MS. RIDLEY:  Understood.

8         THE COURT:  All right.

9         MS. RIDLEY:  Understood.

10        THE COURT:  All right.  You want to suggest a amended

11 date?

12        MS. RIDLEY:  I'm sorry.  I couldn't --

13        THE COURT:  I'm sorry.  Do you want --

14        MS. RIDLEY:  -- tell if that was -- I'm assuming

15 that's directed to me.

16        THE COURT:  Do you want to suggest a different date

17 for amending?

18        MS. RIDLEY:  I do.  Could I suggest -- I'm looking at

19 a calendar right now.  Could I suggest by the 18th of December?

20        THE COURT:  Anybody want to comment?

21        MR. PLEVIN:  Your Honor, Mark Plevin for Continental.

22 18th of December sort of puts us in a hole if we are responding

23 to the complaint, either by motion or answer.  So if Ms. Ridley

24 wants that much time, that's great.  I think we would need more

25 than the amount of time --

```
 1              THE COURT:  Well, maybe you get to January 10th or
 2    something to file, for example.
 3              MR. PLEVIN:  Yes.  Yeah.
 4              THE COURT:  That's the idea?
 5              MR. PLEVIN:  Right.
 6              THE COURT:  Okay.  All right.  Ms. Ridley.  I mean, I
 7    pulled --
 8              MS. RIDLEY:  I'm happy to say so --
 9              THE COURT:  -- that out of my head, so I don't know
10    what -- if we're looking at December 18, that is --
11              THE CLERK:  It's the Monday, Your Honor.
12              THE COURT:  It's a Monday?  Okay.
13              THE CLERK:  The 10th would be a Wednesday, Your Honor.
14              THE COURT:  Okay.  Well, I just pulled January 10th
15    out of thin air.  So if you want to make a different
16    suggestion, let me know.
17              MR. PLEVIN:  So assuming people are taking off the
18    Christmas holiday and New Years', we're back in the office on
19    the 2nd --
20              THE COURT:  Um-hum.
21              MR. PLEVIN:  -- I would say two weeks from that is the
22    16th of January.
23              THE COURT:  Ms. Ridley, any comments on that?
24              MS. RIDLEY:  I think what Counsel said is probably
25    right, and I don't object to the 16th.
```

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 68
of 209

1          THE COURT:  Okay.  So January 16 for a response date

2   to the amended complaint, okay, assuming it's filed on December

3   18.  Okay.  Okay.

4          MS. RIDLEY:  Thank you, Your Honor.

5          THE COURT:  All right.  Is it appropriate to -- should

6   we take the case management issues last, or given that we're

7   now talking about timing on amended complaints, is it

8   appropriate to take that up to some degree now?  I mean, part

9   of the response to what the insurers believe is a fairly

10  aggressive schedule by the plaintiff was we're not even sure

11  where we are with the pleadings yet, which is now truer than it

12  was twenty minutes ago.  I mean, I have two thoughts I'll just

13  give you, and then we can get into the conversation.

14          It doesn't surprise me that the insurers have in mind

15  a motion to withdraw the reference, and that is something that

16  the reasons for that potentially go way beyond this isn't core.

17  And I'm of two minds about that.  In my experience, the

18  experience has been party files that motion with the district

19  court, the bankruptcy court under our Local Rules has the

20  ability to "comment thereon".  I've done that in a number of

21  instances.

22          I will just tell you from my perspective in this

23  instance, were I do comment on a motion to withdraw the

24  reference in this instance, it would be probably not much more

25  than I stand ready to do whatever the district court tells me I

1  should do.  And there are plenty of instances where the

2  district court says, just, Lafferty, you do all the grunt work.

3  When we're ready to try this thing to a jury, then come see me.

4  But whatever the district court suggests, obviously we will do.

5        I doubt that my comment would go much beyond tell me

6  what you'd like me to do, District Court Judge.  So I don't

7  think I'm going to take issue necessarily with the motion to

8  withdraw the reference in this circumstance.  I mean, when I

9  see it, I'll respond more precisely.  But I suspect that's

10  really all I'm going to say.

11        My experience has been, without meaning to be arch,

12  that motions to withdraw the reference are presented to the

13  district court.  They are rarely argued.  District court simply

14  decides what it wants to do when it decides it wants to do it

15  and does it.  And we all go forward from there.

16        Which really is a bit of a dilemma for deadlines

17  because on the one hand we can set all the deadlines we want

18  here.  If the reference were withdrawn, the district court

19  would simply rethink all of them, and I don't think it would --

20  unless deadlines were to be coming up and being adhered to

21  prior to the time the district court would decide a motion to

22  withdraw the reference, and they have been known to linger up

23  there for a period of weeks to months, if we're talking about

24  simply things that the parties are going to be doing, it's

25  maybe not such a big deal.  If we're talking about things a

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 70
of 209

1    judge is going to be asked to do, I mean, we have to hold those

2    for a while until we know what the district court's up to.

3            So those are just some general comments on scheduling.

4    If anybody wants to come to the podium and give me your

5    thoughts, I'm all ears, including Ms. Uetz, I can see.

6            MS. UETZ:  Thanks, Your Honor.  I can follow Mr.

7    Schiavoni and others in the courtroom.

8            THE COURT:  Okay.

9            MS. UETZ:  I just wanted to let you know that I had a

10   couple of comments for --

11           THE COURT:  Okay.

12           MS. UETZ:  -- to record on this.

13           THE COURT:  Okay.

14           MS. UETZ:  Thank you.

15           MR. SCHIAVONI:  Tancred Schiavoni for Pacific.

16           THE COURT:  Pacific.  Uh-huh.

17           MR. SCHIAVONI:  Your Honor, this is an occasion where

18   it's sort of maybe less said is better, right, which maybe

19   that's warmly received right off.  But I do think that -- so we

20   were -- I was flying here yesterday, and I did receive an email

21   from Ms. Uetz that I just only read this morning.

22           THE COURT:  Okay.

23           MR. SCHIAVONI:  I didn't want to get into that email

24   because I don't know whether it, like, is a privileged email,

25   like, in a sense.  Right.  But it might make sense, given your

1    ruling for -- in a sense for us to be able to now use this
2    opportunity to meet-and-confer --
3            THE COURT:  Sure.
4            MR. SCHIAVONI:  -- on what's the next best step --
5            THE COURT:  Sure.
6            MR. SCHIAVONI:  -- for the case.  Okay.  I will say,
7    Your Honor, it's like, these cases -- like, I have two kids in
8    Catholic schools, and I have eight years at Georgetown.
9            THE COURT:  Um-hum.
10           MR. SCHIAVONI:  I would like to bring this case to a
11   soft landing personally.
12           THE COURT:  Um-hum.
13           MR. SCHIAVONI:  Okay.  And I commit to work as hard as
14   humanly possible.  It is enormous challenges here.  But I'm
15   very committed to that.  I'm a good litigator, and I can fight
16   too, if, like, I'm put in an unreasonable position.  But that's
17   where I'd like to see the case go.
18           THE COURT:  Okay.
19           MR. SCHIAVONI:  So like, I think, rather than getting
20   into a whole thing about what our competing schedules are, I
21   don't --
22           THE COURT:  I kind of thought we'd go this tact.
23           MR. SCHIAVONI:  I don't think it's --
24           THE COURT:  That's fine.
25           MR. SCHIAVONI:  You've looked at the Rule 26

1  statements.  For me, on a personal level --

2         THE COURT:  Um-hum.

3         MR. SCHIAVONI:  -- it's not a win to go off and

4  litigate this thing in a district court or have jury trials.

5  And that's not what I personally want to see happen.

6         THE COURT:  Um-hum.

7         MR. SCHIAVONI:  Okay.  I will protect my clients

8  rights and they want to do everything.  But to the extent I can

9  bring about a different outcome, then I'm committed to that.

10  So that's one thing.  Okay.

11         THE COURT:  Um-hum.

12         MR. SCHIAVONI:  The second thing is on the motion to

13  withdraw the reference, I appreciate Your Honor's comments

14  about it.  One of the main issue, there's two sort of issues

15  that you'll see when you get -- if we have to bring the

16  motion --

17         THE COURT:  Um-hum.

18         MR. SCHIAVONI:  -- okay, like, you'll see sort of,

19  like, there is an issue about -- like, we think, and I know

20  this may be disputed, but that this is very much a jury-trial

21  issue.  And in a jury trial case, it's like, very important for

22  a judge, I think, to have the case early on.  Okay.  And that

23  is no -- you are the great.

24         THE COURT:  No, no.  Look, look --

25         MR. SCHIAVONI:  All right.  All right.  But anyway,

1  that's --

2        THE COURT:  The district judge will decide that --

3        MR. SCHIAVONI:  Right.

4        THE COURT:  -- and I mean, I couldn't be offended by

5  that because they know something I don't know.  Absolutely.  No

6  problem.

7        MR. SCHIAVONI:  Mainly in some respects because the

8  way every district court judge and every judge tries a jury

9  trial --

10       THE COURT:  Um-hum.

11       MR. SCHIAVONI:  -- I have found in my experience

12 trying jury trials, everybody, it's a very personal thing --

13       THE COURT:  Um-hum.

14       MR. SCHIAVONI:  -- I mean, how they interact with the

15 jury and how they want --

16       THE COURT:  Um-hum.

17       MR. SCHIAVONI:  -- to do things.

18       THE COURT:  Um-hum.

19       MR. SCHIAVONI:  And it's just very individualized.

20 Right.

21       THE COURT:  Um-hum.

22       MR. SCHIAVONI:  So I think it's sort of different than

23 ninety-nine percent of the cases that --

24       THE COURT:  Not a problem.

25       MR. PLEVIN:  -- that arise -- when I'm representing,

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 74
of 209

1  like, a commercial party in a commercial bankruptcy --

2          THE COURT:  Um-hum.

3          MR. SCHIAVONI:  -- look, it's like, disputes about

4  bond indentures, it's theoretically possible we could have a

5  jury trial and a bond indenture.  But I have yet to try that

6  case.

7          THE COURT:  Um-hum.

8          MR. SCHIAVONI:  Okay.

9          THE COURT:  Um-hum.

10          MR. SCHIAVONI:  They normally resolve, frankly, with

11  the very good advice of a judge in a bankruptcy court is

12  extremely experienced in commercial matters.  But --

13          THE COURT:  Um-hum.

14          MR. SCHIAVONI:  -- this is sort of a different animal.

15  That's one thing.

16          The second thing, Your Honor, is it just as far as the

17  precise timing, I would like the benefit of just -- like, I

18  think the motion is best presented to the Court with the

19  complaint attached, so to speak.  Okay.  But honestly, I'd like

20  to do a little extra research on that because I'm not trying to

21  slow things down or whatnot.  It's like --

22          THE COURT:  Um-hum.

23          MR. SCHIAVONI:  -- I'm happy to sort of look into that

24  a little bit further.

25          THE COURT:  Um-hum.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 75
of 209

1          MR. SCHIAVONI:  But I'm embarrassed to say that's not

2   an issue I've particularly studied.

3          THE COURT:  Yeah.

4          MR. SCHIAVONI:  So I benefit from a little time

5   looking at that.

6          THE COURT:  Okay.  Well, if we're -- on the current

7   schedule, we'd be here roughly the middle of -- if we're in

8   12(b)(6) land again, we're here in the middle of February,

9   right?  I think.  Something like that.

10          MR. SCHIAVONI:  Okay.  Right.

11          THE COURT:  Okay.

12          MR. SCHIAVONI:  So like, we'd be -- like, if the cases

13   suggest that I really should have that right after the motion

14   to --

15          THE COURT:  Um-hum.

16          MR. SCHIAVONI:  -- right after the amendment, like,

17   we'd be looking like very reasonable time shortly thereafter of

18   that.

19          THE COURT:  Yeah, that's fine.

20          MR. SCHIAVONI:  Okay.

21          THE COURT:  That's fine.

22          MR. SCHIAVONI:  But if my research shows that we could

23   do it sooner, I'm happy to entertain that.

24          THE COURT:  Okay.  All right.

25          MR. SCHIAVONI:  But I would like to meet-and-confer

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 76
of 209

1  first.

2          THE COURT:  No, I asked the question thinking somebody

3  would tell me this is a pause moment or something along those

4  lines.  That's fine.  Appreciate it.

5          MR. SCHIAVONI:  Thank you, Your Honor.

6          THE COURT:  Okay.  Thank you very much.  Appreciate

7  it.

8          Okay.  Ms. Uetz.

9          MS. UETZ:  Thanks, Your Honor.

10          THE COURT:  Unless you want to defer to your insurance

11  counsel, who is --

12          MS. UETZ:  (Indiscernible).

13          MR. KAPLAN:  He's my insurance counsel.

14          THE COURT:  I'm sorry.  The committee's -- well, we're

15  all sharing here, right?  I mean, clearly.  Okay.  All right.

16          MR. KAPLAN:  Sharing is good.

17          THE COURT:  I apologize.  Okay.  Ms. Uetz, you had

18  your hand up first.

19          MS. UETZ:  Yeah.  Thanks, Your Honor.  Ann Marie

20  Uetz --

21          THE COURT:  Okay.

22          MS. UETZ:  -- for the debtor.  Try to lower my hands.

23  There we are.  A couple of comments, Your Honor.  And I think

24  as Your Honor was observe, we, as on behalf of the debtor, are

25  intent on proceeding down a path of pursuing the adversary,

1 proceeding against the insurers while also inviting and try to

2 work toward resolution. I think to a great degree the insurers

3 hold a little bit of the keys to some of the timeline here in

4 the following sense, Your Honor.

5 And let me just -- let me just emphasize, it is the

6 debtors' belief that the best way to get to a resolution with

7 the insurers, the most effective way to get to a resolution

8 with the insurers in this Chapter 11 case, is to pursue the

9 adversary proceeding as well. Mr. Schiavoni noted that he's a

10 real good litigator, but he also likes to settle. I'm lucky.

11 I have a really good litigator. I have Eileen Ridley. And as

12 the debtor lead lawyer, I like to settle. So we are very much

13 trying to work down that parallel path.

14 And when we talk about timing -- and that's the reason

15 I raised my hand. When we talk about timing here for the

16 adversary proceeding case, Your Honor, I think the reason I

17 said that the insurers hold a little bit of the keys to the

18 timing for resolution discussions with me is the following.

19 They have identified that they want to file a motion to

20 withdraw the reference. We just talked a minute ago about

21 maybe even returning in mid-February for 12(b)(6) motions.

22 There are some gating issues which we believe the

23 insurers will raise, negating coverage. So those actions by

24 the insurers, whether it's to bring the 12(b)(6) after the next

25 complaint is amended or whether it's to bring the motion to

1  withdraw the reference, that timing is a little bit in their

2  camp, right.

3       As well, and Mr. Schiavoni alluded to it and I don't

4  think it's -- I didn't intend it to be a secret, we have

5  reached out to counsel for the insurers, and we asked them to

6  consider who they might want to mediate the insurer issues in

7  this case.  And we're trying to move forward on really what is

8  it they're allowed to have.  Again, based on the firm belief by

9  the debtor, right or wrong, hopefully I'm right, hopefully

10 we're right, that by pursuing the adversary proceeding, we are

11 moving the parties closer to a potential resolution.

12      So all of that, Your Honor, is to say that in light of

13 the Court's ruling today and the intended amendment date, we

14 have made clear to the parties and hopefully to the Court in

15 the statement that we filed this week, we had intended to

16 address the date for the adversary proceeding anew after the

17 Court ruled on the motions to dismiss because we know those

18 would be (indiscernible).

19      THE COURT:  Got it.  Got it.  Got it.  Got it.  Okay.

20      MS. UETZ:  So from the debtors' perspective, what I'm

21 hoping to do is to meet-and-confer with counsel for the

22 insurers regarding some schedule or timing on the motion to

23 withdraw the reference.  And then Mr. Schiavoni maybe say that

24 the timing for that motion, in his view, is more appropriate

25 after amendment.  I don't actually agree with that, but that's

1   their motion and it's their motion to bring.

2           But as well, I'm happy to state we will continue to

3   pursue mediation, having just started to (indiscernible)

4   yesterday and I acknowledge that.

5           THE COURT:  Yeah.

6           MS. UETZ:  We reached out, and I'm hoping to have

7   those discussions with counsel for the insurers and then return

8   to this court on that subject as well.

9           THE COURT:  Okay.

10          MS. UETZ:  So I'll pause there.  Ask if you have any

11  questions for me.

12          THE COURT:  No, I don't.  Thank you.

13          MS. UETZ:  Thank you.

14          THE COURT:  Okay.  Mr. Burns wanted to be heard.

15          MR. BURNS:  Good morning again, Your Honor.  So the

16  committee agrees with the debtor.

17          THE COURT:  Um-hum.

18          MR. BURNS:  We believe that an aggressive litigation

19  schedule in the adversary will help the resolution --

20          THE COURT:  Okay.

21          MR. BURNS:  -- of this case.  Frankly, when I looked

22  at the case management proposals of the debtor and of the

23  insurers --

24          THE COURT:  Um-hum.

25          MR. BURNS:  -- there were things I liked in both.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 80
of 209

1  Neither was wholly - neither was correctly -- what I'd call

2  perfect.

3           THE COURT:  Um-hum.

4           MR. BURNS:  But there were things that the committee

5  liked in both.  Given the withdrawing the reference issue, it

6  probably does make sense to me to meet-and-confer about the

7  filing of that motion.

8           THE COURT:  Um-hum.

9           MR. BURNS:  But I didn't rise to speak --

10          THE COURT:  Um-hum.

11          MR. BURNS:  -- to talk specifically about those

12 things.  I thought it was important to get --

13          THE COURT:  Okay.

14          MR. BURNS:  -- the committee's position out there.

15 But --

16          THE COURT:  Um-hum.

17          MR. BURNS:  -- I do want to say one word about how

18 this impacts the 2004 motion that the committee's brought.

19          THE COURT:  Um-hum.

20          MR. BURNS:  I think the Court is correctly looking at

21 this case, meta-level look at the case, plus an adversary-

22 proceeding-level look at the case.

23          THE COURT:  Um-hum.

24          MR. BURNS:  If we're going to be waiting two to four

25 months before this, the motions even filed at the adversary

1  proceeding level, I think it very much heightens the need for

2  the 2004 examination to begin, as we discuss in our papers.

3          THE COURT:  Okay.

4          MR. BURNS:  The 2004.  So I wanted to make that point.

5  The meta will impact the litigation.

6          THE COURT:  Um-hum.

7          MR. BURNS:  And by proceeding down the road with the

8  2004, I think everyone benefits.

9          THE COURT:  Okay.  I appreciate that.  Thank you.

10          MR. PLEVIN:  Your Honor, Mark Plevin for Continental.

11  I'm not going to respond now to what Mr. Burns just said about

12  the Rule 2004 motion.  I'll save that for later.

13          THE COURT:  Um-hum.

14          MR. PLEVIN:  I just wanted to say a word because I had

15  understand that Your Honor wanted to rule on the motions to

16  dismiss last week, and many of us on the insurers' side were

17  not in attendance.  And I wanted to explain that the --

18          THE COURT:  You don't need to.  I mean --

19          MR. PLEVIN:  Well --

20          THE COURT:  -- I'm happy to hear it, but you don't

21  need to.

22          MR. PLEVIN:  Yeah.  Well, I wanted to explain that the

23  reason was that the communication didn't come to us.

24          THE COURT:  Okay.

25          MR. PLEVIN:  And I've spoken with Ms. Ridley about

1  coordinating on providing the Court with a --

2          THE COURT:  Uh-huh.

3          MR. PLEVIN:  -- email distribution list for the --

4          THE COURT:  Okay.

5          MR. PLEVIN:  -- adversary proceeding --

6          THE COURT:  Okay.

7          MR. PLEVIN:  -- so that the next time the Court wants

8  to --

9          THE COURT:  Okay.

10         MR. PLEVIN:  -- reach out to everybody will have an

11 up-to-date list --

12         THE COURT:  Yeah.

13         MR. PLEVIN:  -- in order to do that.

14         THE COURT:  Okay.  Well, I mean, I missed you, but I

15 was I was okay.

16         MR. PLEVIN:  Right.  Okay.

17         THE COURT:  I will learn to love again.  It's okay.

18         MR. PLEVIN:  All right.

19         THE COURT:  Okay.

20         MR. PLEVIN:  Thank you.

21         THE COURT:  Thank you very much.  Okay.  But no, look,

22 that's a good point.  There are a lot of people to keep

23 apprized about things.  And if we need to come up with a better

24 system to do that, we'll certainly work with all of you to do

25 that.  So thank you.  Thank you for raising that point.  I

1  appreciate it.

2         Okay.  Well, is this a time to sort of put on hold

3  further discussion re case management while the parties chat, I

4  think?

5         MS. UETZ:  Your Honor, if I may, Ann Marie Uetz for

6  the debtor.  I would suggest that's appropriate.  And I would

7  just like to mention in respect to the schedule for the hearing

8  this morning --

9         THE COURT:  Yeah.

10         MS. UETZ:  -- and Ms. Ridley was here for the

11  insurance ruling and the insurance matters.  She needs to get

12  on a plane soon.  So --

13         THE COURT:  Okay.

14         MS. UETZ:  -- we're going to ask if she can be

15  excused --

16         THE COURT:  Yeah.  Thank you.

17         MS. UETZ:  -- as Mr. Lee and I will handle the balance

18  of the hearing.

19         THE COURT:  All right.  Thank you very much.  Nice to

20  see you, Ms. Ridley.  Safe travels.

21         MS. RIDLEY:  Thank you, Your Honor.

22         THE COURT:  Okay.  Thank you.

23         MS. RIDLEY:  Okay.  Thank you.

24         THE COURT:  Okay.  I would ask where we go next and

25  then wonder whether people want a five-minute break.

1          MR. KAPLAN:  Would love the five minute break.

2          THE COURT:  Okay.

3          MR. KAPLAN:  That's the second question.

4          Mr. Burns, before Mr. Burns previewed the 2004, Mr.

5     Plevin --

6          THE COURT:  Should we go to 2004 next?

7          MR. SCHIAVONI:  Your Honor, I think we ought to maybe

8     close out on the protective order motions while that's fresh in

9     your mind, or if you want to change of pace, so to speak, we

10    can move to --

11         THE COURT:  I think I'm okay either way.  Whatever you

12    guys believe is the better --

13         MR. SCHIAVONI:  Then I would suggest we close out on

14    the protective orders.

15         THE COURT:  Which is the -- which is the cross-

16    motions, right?

17         MR. SCHIAVONI:  Yeah.

18         THE COURT:  Okay.  Ten minutes?

19         MR. SCHIAVONI:  Excellent.

20         THE COURT:  Okay.  Thank you.

21       (Whereupon a recess was taken.)

22         THE COURT:  Okay.  So protective orders?

23         MR. LEE:  Yes, Your Honor.  Matt Lee for the debtor.

24    I'll be arguing these motions on behalf of the debtor.

25         THE COURT:  Okay.  Do we start one place or the other?

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 85
of 209

1   Anybody with Mr. Lee starting off?

2         MR. LEE:  I haven't got to speak yet of this hearing,

3   so I thought I'd jump in but --

4         THE COURT:  Okay.

5         MR. LEE:  However you'd prefer.

6         THE COURT:  No, no.  No, no, that's fine.  Go ahead.

7         MR. LEE:  Thank you, Your Honor.  So we're here on

8   the -- I guess I'd call them dueling protective order motions,

9   one technically filed in case --

10         THE COURT:  Yeah.

11         MR. LEE:  -- one in the adversary proceeding.

12         Your Honor, in the six months that have passed since

13   this case was filed, I think the debtors demonstrated, or at

14   least I hope the debtors demonstrated, that it's willing to

15   work hard to reach consensus with any party on just about any

16   issue.  And the debtor will obviously abide by whatever

17   protective order or orders end up governing this case.

18         There are two primary reasons -- all that said,

19   there's two primary reasons why the debtor submits that the

20   Court should enter the debtor's proposed order governing the

21   adversary proceeding and then reject the insurer's proposed

22   order governing everything.  The first reason is that the

23   debtor absolutely -- and I think the case absolutely needs a

24   two-tiered level of confidentiality here.  Not all confidential

25   documents are created equal.  And as the Northern District's

1   model form in patent cases recognizes, it's appropriate in the

2   patent context and the trade secret context.  And it's no

3   different here.  I mean, these aren't trade secrets, but this

4   is -- I mean, there's a dramatic difference between who should

5   be allowed to see things like the debtor's retirement plans and

6   trust agreements or like nonpublic corporate documents versus

7   who should be allowed to see really any document detailing

8   allegations of sexual abuse and the things that, from the

9   debtors standpoint, people stand accused of.

10          And as the Court knows and has been argued ad nauseam

11  in this case, California law requires the information to stay

12  private and nonpublic the most sensitive information in the

13  case,  It may be the most sensitive information under

14  California law at this point.  And what the debtor's proposed

15  order effectively does is make information regarding

16  allegations of sexual abuse attorneys' eyes only with specific

17  exceptions for, for example, lay and expert witnesses, people

18  who were authors or recipients of the document, and anyone else

19  the parties consent.  In each case, all those people have to do

20  in order to get access to the information is sign a form

21  declaration indicating that they've read the protective order

22  and that they agree to be bound by it.

23          And the insurers, in their motion and in any of their

24  briefing, never explain why this is unwarranted, why the two

25  levels of confidentiality is unwarranted, or why they shouldn't

1    be held to the same standard that thus far the debtor and the
2    committee are held to in this case.  What they allege, and they
3    never really support this, is that somehow the debtor's
4    proposed order, and by extension the order that has already
5    been entered in this case because that's exactly what the
6    debtors proposed order is modeled off of, doesn't adequately
7    account for California law.

8            And what -- the law that they point to is called the
9    Silenced No More Act which limits the scope of confidentiality
10   provisions in settlement agreements between employers and
11   employees or former employees relating to harassment,
12   discrimination, or retaliation at work.  It has nothing to do
13   with the subject matter in this case.  And even if it did, the
14   insurers don't explain how their proposed order adequately
15   accounts for it or how the debtor's proposed disorder doesn't.
16   So that's the first reason.  And the second reason is and we
17   briefed this extensively.  And so I don't want to belabor the
18   point, but to adopt the insurer's proposed order quite simply
19   changes everything about how confidential information is
20   treated in this case.  And it's going to require enormous time
21   and expense burdens on the part of the estate to comply with
22   either two orders simultaneously or to redo everything that
23   they've done before up to this point under the existing main
24   case protective order.

25           And I got to say that this wasn't the premise under

1   which the insurers brought their rule 2004 motion.  The premise

2   was that the debtor would be making the same production to the

3   insurers that they made to the committee, that the debtor made

4   to the committee.  And if insurer's proposed order is granted,

5   that won't the case.  That debtor is going to have to

6   redesignate, reproduce everything that's been produced.  But

7   more importantly, it's going to have to reassess the

8   confidentiality of every document that it's already produced

9   and all the documents that it's going to produce going forward.

10  This is going to slow down discovery.  It'll slow down the work

11  of the case, and again, require a redo of work that's already

12  done at tremendous expense to the estate.

13          This is just -- I submit that this is the opposite of

14  what nature has promised.  There's no reason to start over and

15  really for what amounts to the reason that the insurers just

16  don't like our order.  The only issue that -- of any substance

17  that they actually point to in objection to the debtor's

18  proposed order is whether their witnesses, lay and expert

19  witnesses, will have to sign a declaration saying that they'll

20  be bound by whatever protective order is entered.

21          And if you look at the Northern District's model that

22  they claim to have based their proposed order off of, it

23  includes a provision that does exactly that.  It's section 7.2F

24  of the model order.  And it says that witnesses who are being

25  prepped for deposition or who are having their deposition

1   taken, all they've got to do is sign the form declaration
2   saying they'll agree to be bound by the order.  It cures that
3   provision, that protection out for only that category of
4   people.
5          But then they want you to say, well, the moral order
6   from the Northern District should govern on all fronts,
7   notwithstanding all the issues I mentioned before,
8   notwithstanding the inconvenience and the cost of the estate,
9   notwithstanding the fact that for three months, more than three
10  months now, almost four months, the parties have been operating
11  under a protective order that complies with Section 107 of the
12  Bankruptcy Code, complies with and allows for the application
13  of the bankruptcy rules, the Federal Rules of Bankruptcy
14  Procedure and the Federal Rules of Civil Procedure, and that
15  the Court has already acknowledged there's nothing untoward or
16  surprising about any of the provisions of that order.
17         So but getting back to getting back to the witness
18  question, I don't know why that would be the one category of
19  people that the insurers think should not have to comply with
20  the protective order.  And their proposed order, all it does is
21  says that the witness has to simply acknowledge it, not that
22  they have to be bound by it.  And I don't know -- there's no
23  justification for that carveout.
24         I think the -- there's also a concern, although again,
25  it's not explained, that the debtor's proposed order somehow

1  hamstrings the insurers or anyone from trying the case,

2  adequately preparing the case.  Neither the debtor nor the

3  committee would have agreed to anything like that.  And all

4  this order does is control who sees the -- who gets to see the

5  confidential information and says anybody who gets to see the

6  confidential information, all they have to do is sign a

7  declaration saying, yes, I agree to be bound by the protective

8  order.  And that's it.  There's no limitation on anybody's

9  ability to prepare a case or prosecute this case.

10         And we're talking about nondebtors through the Court

11  doesn't otherwise have jurisdiction over.  So this is literally

12  the only way to control not only the dissemination of

13  information, but also to compel people who get to see the

14  highly confidential information to maintain the level of

15  secrecy that the parties have to maintain.

16         I can address specific points in the motions.  Those

17  are the primary reasons why the motion that the debtors filed

18  should be granted and why the motion the insurers filed should

19  be denied.

20         THE COURT:  Okay.  Thanks very much.  Appreciate it.

21         MR. LEE:  Thank you.

22         THE COURT:  Thank you.  Who's going next to you?

23         MS. RESTEL:  That's up to you, Your Honor.  Your

24  Honor, if you'd like, the committee supports the debtors

25  position.  So if you want to hear all in favor of that and then

1  the opposing or --

2          THE COURT:  Yeah, why don't you do that?  Okay.

3          MS. RESTEL:  Thank you, Your Honor.  Colleen Restel

4  from Lowenstein Sandler on behalf of the committee.

5          There are a few things that can't be disputed in terms

6  of the dueling motions.  The Court entered a protective order

7  in the main case back in August.  The insurers objected at that

8  time.  And you, as we discussed earlier, called balls and

9  strikes and entered the order.  No party filed a motion for

10  reconsideration of that order.  And documents have already been

11  produced pursuant to those procedures.

12          The debtors filed their proposed protective order and

13  the adversary proceeding which is at least under the

14  committee's interpretation, what Your Honor meant when you said

15  that we would involve the insurers later on at the August

16  hearing.

17          The proposed protective order by the debtors is

18  substantially similar.  All parties agree, and the procedures

19  are the same as what was entered in the main case.  And the

20  insurers now want to replace the protective order with a

21  completely new protective order with different procedures, and

22  as we mentioned, only one layer of protection.

23          The insurers primary argument for the brand new

24  protective order is that they want to use the District Court's

25  form.  Just want to note that the District Court website is

1 very clear that the form is optional. And it says, and I

2 quote, "The local rules do not require the parties to use any

3 of the model protective orders, and counsel may stipulate or

4 move for any other form of protective order."

5          As Mr. Lee mentioned, the most problematic portion of

6 the protective order is the difference between the one tier and

7 the two tiers. And I will note that the model form does

8 contemplate for a highly sensitive confidential information, a

9 two-tier system, but the insurers didn't elect to use that

10 model form.

11          THE COURT: Well, what if they did? I mean, what if

12 they said, okay, we'll modify our order to have the two tiers

13 that you'd would have in patent or other matters? Would that

14 alleviate the problem?

15          MS. RESTEL: I think it would alleviate that one

16 problem. But I think we would need to compare the highly

17 sensitive information and who's able to see it under the

18 current protective order versus the new protective order. And

19 it would be up to the debtors because it's their sensitive

20 information to determine who needs to -- if any revisions need

21 to be made. And as Mr. Lee mentioned, that will set things

22 back probably several months. It would be costly to the

23 estate. And it would really just cause delay.

24          The one thing I will note for the committee as we --

25 it was a theme this morning is, as I mentioned, the information

1    that we're receiving from the debtor is the debtor's sensitive

2    information.  And I just want to be clear that the proofs of

3    claim and the supplements to the proofs of claim are governed

4    by the bar date order and not by the current protective order,

5    the debtor's proposed protective order.  It's very clear in

6    both of those orders that the bar did order controls for proofs

7    of claim and supplements.  And I haven't seen that in the

8    insurer's.  It might be there and I just missed it somehow, so

9    I'd be happy to be wrong.  But in any -- if a new protective

10   order is to be entered, we would just request that those

11   protections are also very clear.

12           THE COURT:  Okay.

13           MS. RESTEL:  Thank you.

14           THE COURT:  Thank you very much.

15           MR. SCHIAVONI:  Tancred Schiavoni for Pacific, Judge.

16       As we are here at this very moment, there's a hearing

17   going on in New Orleans, in the Diocese of New Orleans case,

18   with a courtroom full of the press and individual plaintiffs

19   lawyers trying to put into evidence documents that are about

20   the abuse of the church in that case and a dispute about

21   whether the press should have access and whether the judge

22   engaged in a cover up with the church about preventing things.

23       In the Diocese of Buffalo, as we sit here, there is a

24   action pending that the Buffalo News has intervened to try to

25   get from the attorney general documents that were produced

1    about the abuse of the church in that case.  And the church

2    proceeding in an Article 78 unique to New York about whether

3    those documents and the method to keep them confidential is in

4    place.  There will be hearing on that another week or so.

5         The point here is that we need here a form of order

6    that has been appellate tested and has the backing of the Ninth

7    Circuit.  This is not a situation where we ought to have

8    two-party agreements that all of us, everyone here, is going to

9    be subject to attack and claiming and allegations about the

10   underlying claim here by the plaintiffs lawyers are replete

11   with allegations of cover-up and this and that.  I'm not giving

12   merit or credit to any of that.  The point here is that what

13   we've suggested -- and I know I -- like, before the day is out,

14   so I'm going to say Tanc is Greeks bearing gifts, but it's like

15   we all need a form of order that is as consistent with what the

16   circuit has approved as possible.  There's very good reasons

17   for that.

18        So what's on the table with the, quote, competing

19   orders?  In the first instance, Your Honor, what the debtor,

20   the TCC, the committee keeps referring to them as having a

21   protective order, but it's not a protective order what they've

22   put in place.  What they presented you with in July was a

23   nondisclosure agreement, the two-party agreement between two

24   parties which Bankruptcy Courts see and approve all the time.

25   It would say it's a confidentiality agreement, a nondisclosure

1  agreement, for which they ask the Court to authorize them to

2  enter, into which the Court did.  And the Court, when it did

3  that, made very clear -- it said on the transcript on page 48

4  that the insurance companies will have their say down the road

5  on a different form of agreement.  That's a nondisclosure

6  agreement.  It's perfectly appropriate and used all the time

7  for due diligence.  It's used all the time in bankruptcies in

8  connection with sales.  It's used on basic things about how

9  among commercial parties to put together a plan, those sorts of

10 things.

11         What it's not is it's not the form of order that's

12 used by District Courts to deal with litigated matters, matters

13 that involve presenting evidence to juries or extended

14 proceedings in the court, precisely because those courts are --

15 the Court is bound and has limited authority about exactly what

16 sealing can be done with respect to locking the doors of a

17 court when a hearing takes place or in presenting evidence to a

18 jury or in keeping its docket sealed.

19         THE COURT:  Can I ask you a couple of questions?

20         MR. SCHIAVONI:  Yes.

21         THE COURT:  Thanks to both of you.  I think this is

22 incredibly important.  The point that at least up to now, a

23 couple of important constituents in the case have been acting

24 with respect to a two-level confidentiality regimen.  Is that

25 something that could, in your view, be imported into the form

1  that you would like to use?

2          MR. SCHIAVONI:  Your Honor, we're definitely open to

3  it.  It's like what we did -- I want you to understand --

4          THE COURT:  Yeah.

5          MR. SCHIAVONI:  -- is we took precisely the official

6  form that's used.  And did mark it up and we gave you a black

7  line because the whole point of the District using an official

8  form is, I think, to minimize relitigation of the form.  So a

9  court could see -- and I've seen many proceedings where the

10 judge said I want to see -- I want to see who's diverting in

11 what way.  Okay?  So you have that in front of you.  I don't

12 believe that form --

13         THE COURT:  I actually read it.

14         MR. SCHIAVONI:  Yeah.  I don't think the form has a

15 two tier --

16         THE COURT:  So I --

17         MR. SCHIAVONI:  But I think maybe Montali might have

18 done an order where he had to two tiers.  Okay?  My biggest

19 concern --

20         THE COURT:  Well, let me -- can I just pose it back --

21         MR. SCHIAVONI:  Yes.  I'm sorry, Your Honor.

22         THE COURT:  -- and see if I'm thinking the same way

23 you are?

24         MR. SCHIAVONI:  Yeah.

25         THE COURT:  Do you have a concern that either the mere

1  fact of creating two tiers or doing it along the lines that

2  they've been -- the debtor and the committee have been working

3  so far would be so far out of whack with what the District

4  Court does that it would be -- there would be different issues

5  on appeal than you would expect or different outcomes on appeal

6  because of that, or do you know?

7         MR. SCHIAVONI:  My biggest concern -- first of all, I

8  think it's essentially having an order because it's the way to

9  bind a third party who doesn't have to -- who doesn't consent

10  to it, okay?  So without that, there's not a vehicle.  I mean,

11  this is sort of a false analysis to say, oh, why can't I have

12  my own expert sign a confidentiality agreement.  Well, if he's

13  an employee of the company, he's going to -- he's probably

14  going to sign it, okay?  Not getting into a lot of details on

15  how that sausage is cut.  It's like that will sign it.

16         But it's like most of the witnesses normally in a

17  trial, a third-party witnesses, right?  You call them, you

18  subpoena them, they come.  It's like -- I'm a persuasive guy,

19  but it's like who's going to say -- who's going to say, yeah,

20  I'm happy to come to the deposition, I'll sign your copy,

21  right?  They won't come.  That's that.  Right?  So it's an

22  actual real impediment.  So having an order is very important,

23  right?

24         As far as the two tiers, Your Honor, it's like -- my

25  biggest -- like, maybe this is a wordsmithing issue, but my

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 98
of 209

1  biggest concern would just be that the so-called exception or

2  doesn't swallow the rule, it's like what I hear is sort of --

3  and our concern about signing a private agreement, right, it's

4  that if anything about sexual abuse gets subject to the higher

5  tier, what's actually left for the lower tier, right?  I mean,

6  that's sort of what the case is about, so to speak, right?  I

7  mean, so everything would be subject to the higher tier.

8           THE COURT:  Well, I think one -- off the top of my

9  head, one possible distinction that I think this side of the

10 room was alluding to is it's one thing to protect at the

11 highest level of sensitivity the information of a third person

12 who alleges they were abused.  It might be a very different

13 thing for the church to make available their private files

14 about what they did about it.  Those might be -- I mean, that's

15 just an example.  Those might be two different things.  And

16 that would be -- that would be a possibly a significant

17 difference.

18          What I'm really trying to figure out is, is there a

19 way to meld these things so that we can have the certainty of

20 what you're telling me -- and I've used this.  I've modified

21 it.  I've used it.  I've not used it.  So I'm open to lots of

22 different possibilities here.  But is there something about the

23 way that the debtor and the committee have structured their

24 definitions of confidential and highly confidential that's

25 going to be a problem in this order that it just wouldn't work

1   in some fashion other than what you've told me so far?  Because

2   I think there could be more to the confidential world than your

3   creditor.

4           MR. SCHIAVONI:  So if the issue is whether in

5   importing into the official form the second tier, Your Honor,

6   we'd work with that.  Okay?  And I just would want --

7           THE COURT:  Okay.  Is it definitional that you think

8   there's a definition -- I mean, for the patent and other

9   proprietary, is there a definition there that just doesn't work

10  for what they're suggesting?

11          MR. SCHIAVONI:  Well, I think what's in the -- what's

12  in the official form are the actual definitions are the ones

13  that in a sense are tested.  And there's provision for if

14  something doesn't really -- like, if somebody designates

15  everything at the highest tier or at a tier and it really

16  shouldn't be, there is a mechanism to resolve that with the

17  Court.

18          THE COURT:  Can I tell you?  If that happens, come see

19  me?  I mean, I've been through this before and I'm hearing you,

20  okay?

21          MR. SCHIAVONI:  But that's -- the point is having an

22  order instead of -- like, the problem with a two-party

23  agreement is once I sign it, I'm -- like, I now have a contract

24  that I'm bound by that.  The Court arguably maybe loses even

25  power over that.  You've just heard this argument about the --

1　somehow under the bar date you've lost control over experts and

2　whatnot.  It's like if I signed an agreement, they're going

3　to -- it's the whole reason it's presented that way, to be

4　honest.  Right?  It's like normally it'd be presented as a

5　protective order.  The Court would be ordering us to do

6　something.  And maybe we would consent or stipulate to the of

7　order.

8　　　　　THE COURT:  Yeah.

9　　　　　MR. SCHIAVONI:  But that the confidentiality

10　provisions are in the order.  They're not in a private

11　contract.  We have a contract with the debtor.  It's called an

12　insurance policy.  We don't normally deal with this in the real

13　world.  It's just like we submitted a declaration here showing

14　that in the actual underlying cases, in most of them, the

15　claimants actually have their names right on the complaints.

16　They're filed on the public docket.  You can access them and

17　see that information.  It's all there.

18　　　　　It's like this creates a whole mechanism that makes it

19　impossible to investigate the claims and impossible present

20　evidence about them.  And that's a concern.

21　　　　　So could the official form be modified to have a

22　second tier?  Yes.  Would we cooperate with that?  Yes.

23　　　　　THE COURT:  And does that -- I mean, the fact that it

24　is presented as an order as opposed to, as you're suggesting to

25　me, an agreement between two parties, does that implicate how

1   the parties designate the level of confidentiality?

2           MR. SCHIAVONI:  I don't -- I think what would happen

3   is in this again, I think Montali might have entered a form of

4   order with a second tier on it.  So we could look at that.  But

5   it's like there would be -- there's typically like a definition

6   of what sort of would qualify for that.  And a party would

7   designate that way.  And then there'd be if there's a

8   disagreement, it could be brought to the Court and the Court

9   could address it.  That's typically how that's set up.  If it's

10  a private contract, well, then, it's like -- you're going to

11  hear how's of like, well, I'm stuck with that.  It's like,

12  that's what I agreed to.  That's my contract now.

13          And we're also going to hear -- or I don't I don't

14  want to hear this.  My wife says I go around and I only think

15  about what could go wrong.  Okay.  And maybe -- I say, well,

16  that's a good trait for a lawyer.  And she said, well, it's a

17  bad trait for a husband.  But I don't want to see whatever it

18  is, the San Francisco news in here saying that we entered into

19  a private contract and that we're --

20          THE COURT:  Your view of protective order will help --

21          MR. SCHIAVONI:  It like, hey, we --

22          THE COURT:  -- is the safeguard with respect to that.

23          MR. SCHIAVONI:  We did an order that the Ninth Circuit

24  and the -- it's the official order of the District.  It's like

25  there's nobody up to any bad business here.  It's like this is

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 102
of 209

1 straightforward, consistent with what happens in this District.

2 And if some newspaper takes it, brings a challenge, I'm not

3 facing -- it's fine for counsel to say the Silence No More Act,

4 oh, that wouldn't really bring about a private cause of action

5 against us. But hey, this is California. We have very good

6 plaintiffs lawyers here. This gentlemen right here is

7 excellent, right? I don't want to see collateral lawsuits

8 against -- in Superior Court in Alameda County like addressing

9 why I signed a private contract.

10        THE COURT: So if I can -- can I summarize where I

11 think we are so far? And you correct me. Okay?

12        MR. SCHIAVONI: Sorry, Your Honor.

13        THE COURT: No, no, no. We're having a good

14 conversation. I appreciate it. You believe that a protective

15 order in the form that you're proposing is protective of the

16 process and protective of the parties and protective of the

17 Court in a way that, as you're conceiving what the other side

18 has done so far, which is a contract that the courts approved,

19 you're conceiving a material difference between those two?

20        MR. SCHIAVONI: I am, Your Honor.

21        THE COURT: Okay. That's number 1. Number 2, to the

22 extent that they have a concern that, look, we've lived with a

23 regiment of confidential and highly confidential, and to change

24 that, you're saying we can accommodate that?

25        MR. SCHIAVONI: I think we could, Your Honor.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 103
of 209

1        THE COURT:  Is there a reason why I think you can't?

2        MR. SCHIAVONI:  Well, it's always a little bit of we

3   don't want the exception to swallow the rule.  But it's a sort

4   of -- we pick up whatever Montali did, two tiers if he did --

5   if my memory does serve me, it would be within the ballpark of

6   the --

7        THE COURT:  Okay.  And then I guess the other question

8   I have you haven't quite got to yet, or maybe you have and I

9   just don't remember it, is whether there's any difference here

10  dealing with true third parties and what they're going to.

11       MR. SCHIAVONI:  With third parties?

12       THE COURT:  With third parties, yeah.

13       MR. SCHIAVONI:  Here's the real -- the rub there, so

14  to speak, okay?  The way -- the structure right now that the

15  debtors put in place is a nondisclosure agreement with a

16  cooperating party on due diligence.  Okay?  And I don't -- just

17  respectfully, I don't think it really contemplates actual

18  litigation, right?  It contemplates the sharing of financial

19  information, et cetera, et cetera.  It doesn't really

20  contemplate a contested kind of environment.  They can say it

21  applies to that sort of thing.

22       But in a situation where we have -- you know, in Boy

23  Scouts we had a whistleblower witness, okay --

24       THE COURT:  Yeah.

25       MR. SCHIAVONI:  -- who was not -- came from one of

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 104
of 209

1  these claims aggregator shops, was not necessarily totally

2  cooperative and whatnot, but there was no way that person is

3  going to sign -- like bringing an agreement to sign.  And we

4  had other such witnesses.  We need a mechanism.  And what we

5  proposed in there was that, look -- and it doesn't even suggest

6  that like in the -- that we could share documents with a

7  hostile witness on the streets of San Francisco and question

8  him about it.

9           It says in a deposition where everybody is there if we

10 need to and we have good reason to.  And people could come and

11 complain that somehow we put a pile of eighty-seven privileged

12 documents.  If we had good reason to, we could use an exhibit

13 with that witness.  And first the witness would be advised it

14 would be an exhibit to the deposition that there is a

15 protective order from this Court holding this stuff -- this

16 document is confidential.  The transcript is confidential.  And

17 you don't get to keep -- you don't get to keep the exhibit.

18 You can see it for purposes of this examination, but that's it.

19          And if you're a trial witness on the stand, the same

20 thing.  It's like it's like you're bound by the order.  You

21 don't have to sign it.  But the courts enter those forms of

22 order, and they're tested in the appellate courts.  Right now

23 we have testing of it, in a sense, with our former president,

24 with these quote -- they call them gag orders, right?  But it's

25 like they're not asking Mr. Trump to sign a confi, right?

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 105
of 209

1   Imagine the circus about that, right?  It's like the judge

2   issues an order.  He's advised of it.  And the penalty is

3   contempt if he doesn't honor it.  Right?  That's how you would

4   deal with this problem otherwise.

5           The problem otherwise is we're actually -- like, by

6   signing the agreement, we are giving up our right -- and this

7   is why I'm going to have a problem getting authority to sign an

8   agreement like this.  Right?  It's like we're giving up a right

9   to present a hostile -- like, to question a hostile witness.  I

10  mean, my colleagues told me, don't even raise this because the

11  judge will say you're -- like, he'll think you're completely in

12  La La Land.  But if you read this, it actually prevents us from

13  presenting exhibits in court with a jury.  We'd have to get the

14  jury members to sign it.  Now, that's not going to happen.

15  Okay?

16          But what would happen is I would be told that I sign

17  the agreement.  I can't present an exhibit or information about

18  an exhibit in court because I'm bound by the agreement.  Okay?

19  That can't be.  It's like that would be -- that'd be an

20  enormous problem for us.  The same thing with having to like,

21  closing a courtroom because of concerns that we signed an --

22  but I don't -- actually, I think the way it would manifest

23  itself is we would get (indiscernible) that we can't use a

24  range of documents or exhibits, because if we do, we'd be

25  violating the agreement and subject to suit.  So it would

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 106
of 209

1 hamstring us in actually presenting a case, okay?

2    Courts deal with all the time -- and I can't tell you

3 that the District Court judges relish it, right?  But that they

4 deal with cases with lots of confidential information.  And

5 they find mechanisms.  I tried years ago the first Microsoft

6 antitrust case where I actually had like the Windows program on

7 a disk.  And I had a little suitcase with like a chain on it.

8 It's like, there were -- we had various levels of protection.

9 But at the end of the day, that judge didn't lock the courtroom

10 with the press outside.  That just doesn't fly when in a --

11 that's not -- 107 doesn't offer us that.  But we found ways to

12 deal with it.  But we didn't sign an agreement saying, oh, no,

13 we won't present any evidence about the Microsoft code.  It's

14 like it would -- like, that would have bound us in a way that

15 that would have just really hamstrung us.

16    So let me just deal with a couple of what I think are

17 conundrums here or maybe things that might give some ease.

18 We're not suggesting that by entering the official form of a

19 site modification of it, we're modifying the protective -- the

20 bar date order.  And if so be it, we need some sort of just a

21 little statement to that effect --

22    THE COURT:  You've asked me for relief on that

23 already.

24    MR. SCHIAVONI:  We've asked for specific relief in

25 that regard.  But the entry of the protective order wouldn't

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 107
of 209

1  override the existing bar date order, okay, first of all.

2        Secondly, this notion that, like, somehow we'll be

3  dealing with this incredible complication, it's like documents

4  have been produced to the committee under an NDA for their due

5  diligence in preparing a plan. Those include a lot of

6  financial documents which are not being given to us. Like, to

7  be clear, under our -- we just are getting the ones that were

8  subject of the TCCs 2004.

9        So it's like I think this is sort of a nonissue.

10  Whatever documents are in that that are in there that they want

11  to use as part of the main case, they can just reproduce them.

12  The ones that they're going to produce to us, they can produce

13  to the committee the same way. And there's not some weird

14  overcomplication. On the financial documents, they can keep

15  them under their NDA if they want it, but there wouldn't be

16  this sort of tremendous burden at all, I don't think, in this

17  respect. And if you added a second tier, that might not even

18  be much of a sort of difference in the practical application of

19  it.

20        And there is sort of the secondary issue of like just

21  because the TCC -- the committee and the debtor entered into a

22  private agreement and the Court blessed it, it doesn't -- it

23  shouldn't like, have us give up our Seventh Amendment rights

24  thereafter. Okay?

25        It's like, so I don't think it's in any way

1    complicates the case.  They just have to reproduce those

2    documents that they're going to produce to us to the committee.

3    And they can do it -- again, they can add the second tier under

4    an actual protective order, not a private agreement.

5         The second thing, Judge, is not only does this not add

6    complications, but what we're proposing, it's just that this

7    one protective order cover both the adversary and the main

8    case.  Because, look, I mean, the documents about like the

9    claims and whatnot, they're going to come from that source.

10   It's like they would apply in both.  And we wouldn't have

11   competing separate little orders complicating things.  There'd

12   just be one order that applies to both the adversary and the

13   main case.  And it would be a form of order that would be

14   tested by the circuit and everything else.

15        There's nothing -- this whole notion of, like -- we're

16   all in favor of protecting the names of the claimants.  And we

17   have some -- some of the documents have been coded with -- so

18   their names are redacted and there's codes on them, sort of as

19   a day-to-day manner adds extra efforts -- extra protections.

20        Our ability to use experts is another vehicle,

21   frankly, that eliminates somewhat the need to actually put

22   individual documents into evidence.  As a practical matter how

23   that how the Boy Scouts confirmation trial in the Camden trial

24   went forward, there weren't a lot of proofs of claims being

25   offered in evidence because the experts have reviewed them and

1 were able to talk about them in an aggregate way without

2 getting into people's names, et cetera. It was salutary. It

3 was beneficial to have experts in that regard and counsel found

4 ways around it. But we weren't hamstrung by an agreement, a

5 private agreement that would be alleged that we'd be breaching

6 if we presented evidence.

7     The other two points is as far as how this is handled

8 in the State system, it's like, again, most of the complaints

9 have the claimants' names on them, not all of them to be clear.

10 And when there's a trial, different courts handle it

11 differently. Oftentimes the name of the claimant is protected.

12 I will say if there's actually a child victim involved, like

13 who is a child at the time of a trial, there are extra

14 protections as there might be there. Right? But when they're

15 adults, the names are protected. But the regular process of --

16 like, these courts are not generally shutting their doors and

17 having secret star chamber trials. That's just not sort of

18 what's happening. Right? It's like everyone is -- the

19 identities are protected.

20     And the main concern sort of in those proceedings is

21 to make sure that if there's an active perpetrator loose and

22 there's a case against him, that we're not setting up a

23 situation where the perpetrator is like in a position where

24 he's able to commit violence against the defendant. That's not

25 really -- like, this would be for the trial court handling

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 110
of 209

1  this, sort of how it would play out ultimately.  But that's not

2  really, I think, how this case presents itself fundamentally,

3  because it's a -- it's a case against us and against -- it's

4  like there's not -- I don't think there's going to be a big

5  parade of perpetrators involved here.  All right?

6          So just the last point I'd make about the use of the

7  official form is the touchstone here -- I see it -and cited in

8  some of these papers is that you're entering a protective order

9  under Rule 26 which is a protective order for the production

10 of -- when somebody moves to produce documents and they want an

11 order limiting what gets produced because it's too burdensome

12 or what have you, that's not the rule that applies.

13         It's like in Bankruptcy Courts, it's Rule 107.  That's

14 the rule.  It starts off with that.  This is an open proceeding

15 and it sets a very high standard for what -- and a very

16 specific standard about what can be held confidential.  All

17 right?  It talks very specifically about trade secrets, et

18 cetera.  It is not that all your records about how you handled

19 something are confidential.  This notion of like, oh, in sexual

20 abuse, everything is confidential and we've already presented

21 that to you.  Your Honor, we presented the -- it's like -- we

22 presented a case to you on -- coming out of the clergy 3 cases

23 involving one of the Catholic orders where the plaintiffs had

24 moved to produce the medical that were the sort of internal

25 records of the brothers of that entity and have them produced.

1 And the District Court -- or not the -- it was a superior court
2 found that like those should be -- that was public.  Okay?
3       I'm not -- we're not really advocating necessarily for
4 any of that.  Right?  But it's like to invoke 107 to -- it's
5 like -- and they're very crafty about it because they're not
6 presenting an order where you set out here all the things you
7 must do.  You must give up your right to question witnesses,
8 because I think they know that's not permissible, okay?  that's
9 not supported.  There is no support offered.  There's no
10 declarations or analysis or anything else explaining why it is
11 that, like all of the material that that the church is going to
12 produce is subject to 107.  There's just no explanation for
13 that.  And there's no citation to why these other cases
14 wouldn't apply.  They don't meet -- they don't do anything to
15 offer their burden on those things at all.  They really just
16 sort of fall back on, well, an order was previously entered as
17 if it's res adjudicata, but that was expressly not the ruling
18 of the Court when it entered the order.
19       We have a completely different situation here.  We're
20 totally supportive of having the names of the people, the
21 highest level of confidentiality who are alleging abuse.  And
22 the other stuff can be under an order as long as Your Honor --
23 as long as whoever the judge is has got -- and you are the
24 judge.  I'm sorry.  I didn't mean to suggest otherwise.  But
25 it's like whoever tries the case or whatever it goes, it's like

1    should have full flexibility in in how the proceeding then goes

2    forward.  You shouldn't be faced later with, well, well, they

3    signed this agreement.  There's an expectation among claimants

4    that the insurance companies have given up their Seventh

5    Amendment right.  In fact, they can't put on any evidence at

6    all.

7            It's like -- it's like what's going to happen here is

8    there's going to be a problem with whether or not we can get

9    authority to sign that agreement.  It's like we might end up

10   suggesting that, well, jeez, why don't we present that with the

11   motion, withdraw the reference to the District court, and maybe

12   he can -- we can sort of get a sense of how a jury trial.  But

13   I think we've tried to come up with something that's very

14   reasonable.

15           I heard before like this statement about, well, this

16   definition of experts like that we used, and we're like, where

17   did that come from, like it's very tricky how we put it

18   together.  You know here it comes from?  It comes right out of

19   the standard official order.  That's how experts are defined

20   there.  We put it right -- we use the official form's

21   definition of experts and consultants.

22           So I would suggest, Your Honor, that the way to deal

23   with this is to use the official form and the parties have a

24   dispute, you can just look at the black line between wherever

25   we have the dispute against the official form and call balls

1 and strikes on what is the benchmark for the District.  Thank
2 you, Your Honor.

3          THE COURT:  Thank you.

4          Before I let Mr. Lee talk again, anybody else want to
5 weigh in?

6          Okay.  Mr. Lee, go ahead.

7          MR. LEE:  Thank you, Your Honor.  I'm just going to
8 start by saying that the form order, as far as we can tell, has
9 never been tested in the appellate courts.  I'm not sure -- the
10 insurers cited PG&E and two other cases as support for that
11 argument.  We looked at all three of the cases they cited.  Not
12 a single appeal was taken from any order that had anything to
13 do with protective orders in those cases.  So I think we can
14 discount that.

15          As to the point about the committee and the debtor's
16 stipulated protective order, which was then approved by an
17 order of this Court being a two-party private agreement, the
18 stipulation and then the order literally say protective order.
19 And the proposed protective order for the adversary proceeding
20 literally says protective order that would govern all discovery
21 requests in the adversary proceeding.  And the one that you
22 entered in the main case, Your Honor, says that it covers all
23 disputes, contested matters, et cetera, in the main case, and
24 that it applies to anybody who is bound by the protective
25 order.

1          As most protective orders go, there's a stipulation

2   and then an order entered by the Court.  There is no risk of

3   anybody being hamstrung in or accused of entering some kind of

4   private agreement that they didn't approve.  And when Attorney

5   Schiavoni goes to his client, if you enter our proposed order

6   and say -- he's not going to say, well, you know, I have to get

7   into this private agreement that I didn't negotiate in order to

8   get the documents, that's not what he's going to say.  He's

9   going to say, well, the judge has ordered X, Y, and Z; do you

10  want the documents or not?  The answer is going to be yes.

11  They're going to sign the agreement.  And that's going to be

12  the end of it.

13          As far as the issue of how a document is designated,

14  if you look at paragraphs 24 and 25 of both the main case order

15  that you've already entered and the proposed order for the

16  adversary proceeding that the debtor submitted, it provides a

17  specific procedure for contesting any designation that anybody

18  wants to contest.  So that that built-in protection is there.

19  And as Attorney Restel pointed out, it encourages the parties

20  to reach consensus so that we don't have to go in front of the

21  Court and justify extreme positions.  So -- and that's the

22  case -- that's the case for the other issue that the insurers

23  are worried about, and that's whether witnesses being prepped

24  or being actually deposed have to sign a declaration.

25          I'm going to, again, point out that the model form

1    that the insurers are saying is the Bible of protective orders,

2    and that absolutely has to be applied in this case reads as

3    follows:    7.2, Section F.  "Unless otherwise ordered by the

4    court or permitted in writing by the designating party, a

5    receiving party may disclose any information or item designated

6    confidential only to F, during their depositions, witnesses in

7    the action to whom disclosure is reasonably necessary and who

8    have signed the acknowledgment and agreement to be bound,

9    Exhibit, A unless otherwise agreed by the designated party

10   designating party or ordered by the court."

11           That is the one provision that the insurers took out

12   of Section 7.2, the one category of people that they don't --

13           THE COURT:  Do they take it out or just modify it?

14           MR. LEE:  No, they removed it.  Their version of the

15   order says during their depositions, witnesses in the Chapter

16   11 case, to whom disclosure is reasonably -- do you see that,

17   Your Honor?  You don't need me to read it?

18           THE COURT:  No, I'm with you.  I'm just -- okay.

19           MR. LEE:  And they're saying who have been -- they can

20   see it if they have been advised of and provided a copy of this

21   order.  So the model form, which again isn't mandatory, has not

22   been tested on appeal, the model form says those people should

23   have to sign a declaration agreeing and acknowledging that

24   they're bound by the protective order.  The insurers don't want

25   them to be bound by your protective order.  They don't want

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 116
of 209

1    them to be bound by the protective order in this case.  And
2    they don't want them to be bound by the rule that everybody
3    else in the case sees this information is going to -- is going
4    to be bound by.
5          I don't want to speculate as to their motivations, but
6    that might be a question that's worth asking them, Your Honor.
7    And again, this this this idea that this somehow is going to
8    make trial impossible, the order doesn't even address trial.
9    What the order addresses is discovery.  And it addresses the
10   use -- I'm sorry, it addresses the production, the use, and the
11   dissemination of documents and information that are designated
12   either confidential or highly confidential.  And again, the
13   stipulated protective order from the main case is almost
14   verbatim exactly what's been proposed for the adversary
15   proceeding.  The only tailors that we proposed were to specify
16   that, okay, this governs this adversary proceeding.  We're not
17   talking about contested matters.  We're not talking about rule
18   2004 motions.  We're talking about discovery requests in this
19   adversary proceeding, not stuff going back and forth between
20   the committee, stuff going back and forth between -- discovery
21   requests, going back and forth between the parties to the
22   adversary proceeding like any protective order would.
23         It doesn't get into trial.  I think it would be
24   premature to get into the trial.  The one thing that -- and
25   procedures for trial because who knows if we're ever even going

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 117
of 209

1    to have a trial in this matter.  With press, with witnesses,

2    with multiple parties-in-interest beyond who's in the courtroom

3    right now, we don't know that.  And so the order consciously

4    leaves that out.  And frankly, so does the insurer's proposed

5    order, because that's not what we're dealing with.  We're

6    dealing with discovery.

7            So I guess in closing, I would just add that the

8    insurers are just utterly dismissive and seem to take the too

9    bad, so sad attitude toward the debtor's arguments about the

10   burden and the cost to the estate.  I can't tell you how

11   difficult it is, Your Honor, to keep track of just two

12   constantly evolving lists of email addresses.  That one for the

13   insurers and their people and another for the committee and

14   their people, because at this point they have different levels

15   of access so I have to keep them separate.

16           And just the -- just the job of doing that takes a lot

17   of time and it takes a lot of administrative effort.  And the

18   cost of the debtor of screwing up, getting it wrong, sending

19   information to somebody who doesn't have permission to see it

20   is dire.  It is a -- it is an absolute constitutional right of

21   privacy that that people who have alleged that they were

22   sexually abused as children have, that their information and

23   their accusations and their pain gets to stay confidential.

24           The insurers have already secured an order saying that

25   they get access to all that subject to a protective order.  And

1    Your Honor, the protective order that the debtor negotiated

2    with the with the committee that was a stipulated protective

3    order that this Court signed, that is expressly a protective

4    order that is expressly open to any other party in the case,

5    and that expressly covers any dispute that could come up in the

6    case, including other adversary proceedings.  There is nothing

7    wrong with that order.  And the only thing that the insurers

8    have complained about is something that it has to do with

9    witnesses at deposition or preparing for deposition having to

10   sign -- having to sign a declaration saying that they agree to

11   be bound.

12           And ironically, their proposed language on that is

13   different than the model form that they think you should follow

14   and that they think should supplant the one that's been working

15   for months and will continue to work for months.  Thank you,

16   Your Honor.

17           THE COURT:  Well, let's say hypothetically, I like

18   their order.  Let's say hypothetically, I asked whether if they

19   were to reinsert the portion that you point out they've

20   excluded and accommodate the current definition of confidential

21   and highly confidential, whether that works for the debtor and

22   the committee.

23           MR. LEE:  So what that does, assuming -- again,

24   assuming that the language is identical, that we're

25   operating --

1          THE COURT:  Yeah.

2          MR. LEE:  -- on the same standards that we have that

3    addresses a lot of the convenience issues.  However, the issue

4    of who gets to review the documentation that is designated

5    confidential or highly confidential, that issue remains.  And

6    the witnesses -- anybody who looks -- our position is that

7    anybody who looks at this should be bound by some standard of

8    confidentiality.

9          THE COURT:  Well, the -- may I see if I'm

10   misunderstanding you?  I suggested if you also were to re-

11   import the language that you suggest they have excised with

12   respect to witnesses, what you cited to me as 7F, if that were

13   to be reincorporated, would that take care of the problem or

14   would that not take care of the problem?

15         MR. LEE:  That would address that problem.

16         THE COURT:  Okay.  Okay.  But you would tell -- and

17   I'm trying not to be angels on the head of a pin here, but you

18   would tell me that there's no enforceability difference between

19   what we've achieved already in this case, which is two parties

20   agreed to something and I blessed I, and something that is

21   called a protective order that more obviously emanates from a

22   form that is frequently used in the Northern District.  And

23   you're Mr. Schiavoni may believe there's some difference

24   between those two things.  You're telling me there isn't from

25   your perspective.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 120
of 209

1          MR. LEE:  I don't think so, Your Honor, because as you

2    pointed -- as you pointed out previously, the terms of the

3    existing main case protective order are typical of what you see

4    in these kinds of protective orders.  And I can say from

5    practicing seventeen years, it's typical of what I see in

6    protective order.  And thus far it's worked in this case.  The

7    debtor has produced over 10,000 documents to the committee

8    on -- based on the protections that that were put in there.

9          And, again, like I said, we'll continue to -- we'll

10   abide by whatever order -- whatever order or orders control.

11   But we submit that the simplest thing to do is just to roll it

12   over into the adversary proceeding and make it applicable to

13   everybody.

14          THE COURT:  Okay.

15          MR. LEE:  And the insurers have had a chance to weigh

16   in on that.  And we adopted some of their some of their

17   suggestions.  The bit about the common interest privilege in

18   paragraph 26, that was something the insurers demanded and you

19   ordered.

20          THE COURT:  Okay.

21          MR. LEE:  And we accepted it because you ordered it.

22          THE COURT:  Okay.  Mr. Schiavoni, let me give you the

23   same hypothetical.  What if I just liked your order better and

24   asked you to accommodate the two levels of confidentiality that

25   we've been working under so far and reincorporate the paragraph

1   that debtor tells me was excised with respect to witness

2   treatment?  Is that workable?

3          MR. SCHIAVONI:  I think that's workable if -- I am a

4   lawyer, so I got to add just one little thing.

5          THE COURT:  Oh, of course.

6          MR. LEE:  Okay.  We did absolutely modify provision

7   about witnesses.

8          THE COURT:  Yeah.  I thought you -- I didn't think you

9   excised it.  I thought you modified it.  Am I wrong?

10          MR. SCHIAVONI:  Right, we did.

11          THE COURT:  Okay, yeah.

12          MR. SCHIAVONI:  And, we were not hiding the ball.  We

13   gave you a black line.  Okay?  It's in most litigations the

14   day-to-day, right?  You're dealing with two parties, and they

15   both have their own witnesses.  And that it works very well to

16   make your company employees sign an acknowledgment.

17          And let's be clear here, the difference that we're

18   talking about.  The official form attaches something called

19   acknowledgment.

20          THE COURT:  Yeah.

21          MR. SCHIAVONI:  And what it does is it says I

22   acknowledge I've read the Court's order, and I think it says I

23   will abide by it, something to that effect.

24          THE COURT:  Yeah.

25          MR. SCHIAVONI:  By the way, not to bring in the news,

1  but I think that's actually what happened in court for Mr.

2  Trump.  He was -- like, his lawyer was told, make sure he

3  read -- you can confirm he's read it and he acknowledges it.

4          THE COURT:  Well --

5          MR. SCHIAVONI:  Okay?

6          THE COURT:  Well, it's the difference between breach

7  of contract and contempt, right, is what you're saying?

8          MR. SCHIAVONI:  Right.  It's totally different than

9  saying the Court entering an order saying, hey, you can have

10  access to stuff if you sign -- like, go sign a private

11  contract.  That's different.  The official form doesn't have

12  all of the -- all of the imitations are in this contract they

13  want us to sign.

14          In the official form, the acknowledgment is simply

15  having us acknowledge -- the recipient acknowledge that they're

16  aware of the order.

17          THE COURT:  Well, which is a predicate for contempt.

18          MR. SCHIAVONI:  Exactly.  And further, it goes

19  actually a step further.  Theirs doesn't.  It says that they'll

20  submit to the jurisdiction of this Court, okay, which if

21  they're parties out of state, it's sort of -- it's extra

22  protection.

23          THE COURT:  Okay.

24          MR. LEE:  Your --

25          MR. SCHIAVONI:  But the other -- just --

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 123
of 209

1    THE COURT:  Just I'm sorry.  Mr. Lee has something he

2    wants to interject real fast.  Go ahead, Mr. Lee.

3    MR. LEE:  I mean, our form declaration expressly says

4    I stipulate to the jurisdiction of this Court solely with

5    respect to the provisions of this order.

6    THE COURT:  Okay.  All right.  So there's no

7    difference there in your view.  Okay.  I appreciate it.  Thank

8    you.

9    Mr. Schiavoni, go ahead.

10   MR. SCHIAVONI:  So, Your Honor, with this issue about

11   the witnesses, look, the key thing here, the difference between

12   the two-party agreement and the official form, my memory isn't

13   exact, but there's a precursor.  I think it says unless

14   otherwise ordered by the Court, witnesses shall sign.  So that

15   gives you the ability to say, oh, you have a recalcitrant

16   witness who won't sign, I'll deal -- I will deal with it in

17   some such way.  Okay?  The private agreement, it doesn't give

18   any such --

19   THE COURT:  But that's the language you're telling me

20   you would be re-importing, right?

21   MR. SCHIAVONI:  Yes.  But I would -- Your Honor, if

22   that's what you want to do, all right, I just would suggest

23   that so that we're not back here every day, right -- not

24   that --okay.  I exaggerate.  It wouldn't be every day.  But

25   it's like I don't know if we could qualify that in some way so

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 124
of 209

1  that if there's -- we tried.  The little carveout we have is

2  actually very limited.  It's for -- it's not for people on the

3  street.  It's not for some witness on preparing.  It's for

4  somebody in a deposition who is declining to sign it, okay, in

5  the presence of other -- the other folks, right?  So if we were

6  to say abuse it, pick a janitor out and then try to give him a

7  pile of documents as high, the deposition would stop and I'm

8  sure they'd call the Court of some such thing.  Right?

9           But if we have -- but in that kind of instance, do we

10  need to make full application to you on fourteen days' notice

11  or everything else?

12           THE COURT:  No, of course not.

13           MR. SCHIAVONI:  I just wonder whether we could

14  retain -- like, we could wordsmith that a little bit to say

15  that sort of in essence, for in a deposition setting for

16  (indiscernible) in person that would apply.  Otherwise, we use

17  the standard language saying, otherwise for our witnesses and

18  whatnot, they would sign this.  They would they would have to

19  sign --

20           THE COURT:  All right.

21           MR. SCHIAVONI:  -- unless otherwise ordered by the

22  Court.

23           THE COURT:  All right.  Mr. Lee, any reaction to that?

24           MR. LEE:  My first reaction is that in the twenty-four

25  days that they -- that passed between us sending our proposed

order and then getting back their completely different proposed order, like, that might have been something they could have suggested either in a red line or an email, and that that never happened here.  There was never any effort to do this except on the record -- by the insurers except on the record right now.  That's my that's my first reaction.  My second --

THE COURT:  By the way, Mr. Lee, I hear you.  Okay?  I get it.

MR. LEE:  Thank you, Your Honor.

My second reaction is I guess that Your Honor is the ultimate arbiter of everything relating to whichever version of these orders get entered.  And if we have a recalcitrant witness who won't sign, you go before the Court and either get him to sign or the Court to compel them to sign or not compel them to sign it.

The purpose of the version that we that the debtor proposed is to force the parties to avoid all that and to be reasonable and to let the case go -- let the case flow without constantly being interrupted by discovery disputes.  And I don't see any reason why the insurer's proposed order would be any better at preventing that than the proposed order that the debtor submitted.

So I mean, I guess there's a lot of statements here that that theirs is better than ours, but they don't really say how.  And every time they say how, they point out something

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 126 of 209

1 that is very directly in our order in the same substantive way.

2 I hope I answered your question.

3       THE COURT: Oh, you did. Thank you. And I thank you.

4 And I know it's somewhat maddening to talk about these things.

5 As important as they are, they're also a little mind-numbing.

6 So thanks to all of you for your patience and your perseverance

7 on this. All right. Submitted?

8       MR. LEE: Thank you, Your Honor.

9       MR. SCHIAVONI: Thank you, Your Honor.

10       MR. LEE: The debtor, yes.

11       THE COURT: Look -- I'm sorry, did you want to --

12       UNIDENTIFIED SPEAKER: No. I'm switching seats, Your

13 Honor.

14       THE COURT: Okay. Okay. Look, I am inclined to use

15 the form Mr. Schiavoni and the insurers are proposing with the

16 suggested modifications that we've talked about here which is

17 accommodating. And I think it ought to be word for word. I

18 think we can modify the form of the order to take account of

19 what has been done so far in terms of highly confidential and

20 confidential. I think those definitions ought to be imported

21 essentially word for word into this form. And I think with the

22 accommodation further that the language that had been modified

23 or deleted with respect to witnesses from the official form be

24 reinserted.

25       And I would just -- look, I'll deal with it. If we

1  have a problem, we'll deal with it the way I deal with most

2  discovery issues, which is very quickly.  And you don't have to

3  file twenty-page briefs.

4          All right.  If you want to take a whack at that, I'm

5  happy to look at it.  And if parties want to talk about it

6  further and you need my help in talking about it, let me know.

7  I will do that at the drop of a hat.  Okay?  Sensible?  Okay.

8  Did you want to -- Sensible.  Okay.  I'm sorry.  Did you want

9  to --

10          MS. RESTEL:  Just one question, Your Honor.  Would it

11  be all right if we also added the language that's in the

12  current order so that the bar date order controls?

13          THE COURT:  Absolutely.

14          MS. RESTEL:  Thank you.

15          THE COURT:  So I will decide that independently.

16  Okay?  I appreciate it.  Okay.  Thank you.

17          MR. SCHIAVONI:  May I ask clarifying question, Your

18  Honor?

19          THE COURT:  of course.

20          MR. SCHIAVONI:  Will this order essentially abrogate

21  the previous order and govern both the main case and the

22  adversary proceeding or --

23          THE COURT:  Well, I'm reluctant to have it abrogate

24  because you've done things and you've relied on it.  So I mean,

25  I think go forward is probably a better way of thinking about

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 128
of 209

1  it than abrogate.  Makes sense?

2          MR. SCHIAVONI:  Yes, Your Honor.

3          THE COURT:  Thank you.

4          All right.  Does that leave the 2004 exam?

5          UNIDENTIFIED SPEAKER:  It does, Your Honor.

6          THE COURT:  Anything else?  Okay.  Everybody ready?

7          MR. SCHIAVONI:  Your Honor, can we just take a

8  five-minute break?

9          THE COURT:  Of course we can.

10          MR. SCHIAVONI:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. KAPLAN:  Your Honor, just in way -- what time is

13  the Court planning to break for lunch today?

14          THE COURT:  Well, are we likely to come back after

15  lunch?

16          MR. KAPLAN:  Hopefully not, Your Honor.

17          THE COURT:  Yeah, I've got another ruling I have to do

18  at 1:30 with a number of folks.  So, I mean, I'm anticipating

19  you want to take ten minutes now, longer?

20          Lesser.

21          THE COURT:  All right.  All right.  I mean, is there

22  any reason why we wouldn't be done by 12:30ish?

23          MR. KAPLAN:  I hope to be, Your Honor.  I think that

24  on our side, that's --

25          THE COURT:  Okay.  Then that'll be our --

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 129
of 209

1           MR. KAPLAN:  I do believe we're good to go.

2           THE COURT:  All right.  That'll be our goal.  We'll be

3   back in five, okay?  Thanks.

4       (Whereupon a recess was taken)

5           THE COURT:  Okay. 2004 exam.

6           MR. KAPLAN:  Thank you, Your Honor.  Michael Kaplan

7   again for Lowenstein Sandler on behalf of the committee.

8           Just by sort of setting the groundwork, Your Honor,

9   I'm going to just briefly give an overview of where we are with

10  this motion.  And then my special insurance counsel, who the

11  debtors may want to borrow, Mr. Burns, is going to come forward

12  and talk specifically about the insurance.  So if Your Honor

13  has ask questions specifically about the insurance request, I

14  will probably just stand here and give you a blank stare and

15  then go to the bullpen.

16          THE COURT:  Okay.

17          MR. KAPLAN:  So, Your Honor, we were here a couple of

18  months ago, I believe, maybe a month and a half ago, in

19  response with respect to the insurer's 2004 motion of the

20  debtor seeking documents that were being produced to the

21  committee related to the sexual abuse.

22          We argued vigorously, Your Honor, about the

23  application of the pending proceeding rule.  We argued

24  vigorously about why the insurers don't need the information.

25  I think I even argued that the insurers we don't even really

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 130
of 209

1    need them in the case.  But because the plan might be insurance

2    neutral, it might come back another time.

3            All those arguments aside, Your Honor said that that

4    the insurers are in the case.  They do have standing to be

5    heard.  They are heard on issues.  The more information the

6    shared is, the better which Your Honor, I believe said, I'm

7    paraphrasing, of course, hope will help move this case along in

8    a quicker resolution.

9            And, Your Honor, with that in mind, we said, okay, the

10    insurers want to participate.  They have represented to you

11    time and time again that they want to participate, that they

12    want to provide solutions and not problems, that they want to

13    move this case along, and they want to be constructive

14    participants.  And so we said, okay, we recognize -- Ms. Uetz

15    has said that we're all moving towards a mediation path.  We've

16    heard that a couple of times.  I think she called it a little

17    pea plan the last time we were here last time.  And we're all

18    moving in that direction at the debtor's desire to move toward

19    it.

20            With that said, Your Honor, we can't go to mediation

21    blind and uninformed with respect to what some courts have

22    called the debtors potentially largest asset, which is the

23    insurance, which I believe Your Honor commented on last time

24    with respect to in talking about the insurance.

25            And so we have served on the insurers a 2004 request,

1 which Mr. Burns is going to talk about the specifics designed

2 to address issues that are arising in the main case, issues

3 that from experience, Your Honor, we have seen the insurers

4 raise in other cases.  It has been impediments to moving

5 forward, issues that may become part and parcel to different

6 contested matters, and issues generally necessary so that we

7 understand the sum and -- the specifics of the insurance asset

8 that we are -- that everyone, the debtor in the community, are

9 going to be asked to consider in resolving it.

10      It's disappointing, Your Honor, that what we've heard

11 from the insurers, which is contrary to what we heard when they

12 were the ones speaking first on their motion, is that we

13 heard -- we hear about the pending proceeding rule and that

14 before wasn't an impediment.  We hear about we don't really

15 need this information, it's for embarrassment or otherwise.

16 And Mr. Burns is going to address that.

17      But, Your Honor, I simply leave it at this sort of

18 overall theme, which is we talked about the pending proceeding

19 rule last time.  I believe Your Honor commented that you had

20 less concerns over it with respect to documents and otherwise.

21 And we and we understand that and we respect it.

22      As a technical matter, however, just by way of Your

23 Honor's order a few moments ago, there's not much going on in

24 the quote unquote pending proceeding right now that we should

25 really be concerned about the duplicative discovery and the

1  documents, as Mr. Burns will explain, overlap very nicely.

2          But we've really gone beyond that, Your Honor, because

3  what we expect we will hear at some point is, is we will hear

4  about the vast insurance defenses that they have, the coverage

5  defenses, including they want it in disclosure statements, they

6  want to inform everyone about it.  We should be able to inform

7  ourselves about it to be able to assess it.

8          We're going to hear about financial solvency of

9  various carriers possibly and why they can't possibly pay these

10 amounts.  We should be able to inform ourselves about that.

11 We're going to hear about the strengths and weaknesses of

12 various coverage positions.  And again, my point, Your Honor,

13 is simply we should be able to inform ourselves about that.  We

14 shouldn't be testifying from the podium.  We should be -- we

15 should be working off of the same amount of evidence.  And if

16 we're really moving towards this path where the insurers want

17 to be meaningful participants in this process towards the

18 mediation, we believe, and I believe the debtor joins, that we

19 should all have the information we need in order to do that.

20         Unless you have any just general cases on that, I

21 defer to my colleague, Mr. Burns, who will talk to you

22 specifically about the request we ask for and why we need it.

23         THE COURT:  Yeah, let's do that.  Okay.

24         MR. BURNS:   Tim Burns for the committee, Your Honor.

25         The committee's essentially seeking six categories of

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 133
of 209

1    insurer files, six categories.  To understand why four of these

2    categories are important, I have to talk with you about two

3    fundamental principles of California insurance law.  These two

4    principles are going to play out, Your Honor, in what you've

5    called the MABA (ph.) insurance case.  They may have an impact

6    on the adversary.  They may shape them in some ways, but they

7    are going to play out in the meta case.  It will be how we

8    resolve this case.

9        These two principles of California insurance law put

10    the insurance companies in a vise.  It's not a bankruptcy vice.

11    It's not a Bankruptcy Code device.  It's not a bankruptcy law

12    device.  They are regulated by California and California law.

13    And California has chosen to put them in a vice.

14        The reason we need this information is because of what

15    California law creates.  It may well be the key to successful

16    resolution of this case.  And both of these cardinal principles

17    of California insurance law, which I'm going to get to next,

18    deal with the reasonable settlement value of sexual abuse cases

19    and the impact on liability insurance policies of those values,

20    and thus the reasonable value of the insurance asset.

21        Here are the cardinal principles of California

22    insurance law.  In California, if an insurer reserves its

23    rights, which the insurers have contended they've done more so

24    than deny, they reserve rather than deny coverage, the insurer

25    must reasonably settle the underlying case if they have the

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 134
of 209

1    opportunity to do so.  If they're offered a reasonable demand,

2    they have to take it.  They don't get to say like you can in

3    some state, hey, wait a minute, I have all these coverage

4    differences.  They have to pay the demand.

5           And that's important.  They may have a claim over

6    against the debtor if it turns out things aren't covered.  But

7    if they're reserving, they need to pay a reasonable settlement

8    demand.  That makes how the insurers have valued these claims

9    in the past and how they are valuing them now directly relevant

10   to the value of the insurance asset and resolution of the case.

11          Now, the second cardinal principle of California

12   insurance law is this.  If the insurers deny the claim as

13   opposed to reserving, the bishop can settle, the debtor can

14   settle with the survivors for a stipulated reasonable amount in

15   the form of a judgment collectible against the insurance

16   companies.  That's the vice under California law.  They have

17   their choice reserve and have to pay without reference to

18   coverage reasonable claims of abuse or deny and risk the

19   survivors getting a stipulated judgment against them.

20          The value of these claims are critical to both of

21   those -- both prongs of California law, looks to the reasonable

22   value of the underlying claims and their impact on the policies

23   as far as value is concerned because they're liability policies

24   whose value depends on the claims that they are covering.  So

25   the value will become key to help this case play out on a meta

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 135
of 209

1   mental level, whether we're able to globally resolve it, Your

2   Honor.

3           Those two cardinal principles are where we're seeking

4   four of the six categories of documents, claims files.  All

5   insurers are required to keep claims file.  They're bound to

6   have a claims filed that says RCBO.  And in that claims file,

7   there will be information on how they value the case and what

8   their coverage defenses are and things like that.  Critical to

9   the value.

10          Reserve Working papers.  Insurers have a statutory

11  duty to create reasonable reserves for these claims.  They look

12  back at the history of their settlement of the claims and

13  resolution of the claims to create these reserve working

14  papers.  And that goes to the reasonable value of these claims.

15          The third category is those two first categories.  But

16  with respect to the early California window in the early 2000,

17  because what they paid them is relevant to what their reserves

18  are and what these cases are worth as an insurance impact,

19  recognizing its liability insurers and insurance.

20          And then the final category of these first four are

21  the board minutes because they contain information in all

22  likelihood on this valuation and exposure issue.  This

23  information goes to the heart of the resolution of this case.

24  It goes to the very heart of what this insurance asset is

25  worth.  It will prevent the insurers from escaping their duty.

1        Insurers have to keep files.  They're businesses.

2   There's no mystery that they have reserve working papers,

3   claims, files and the like.  And their businesses, that can

4   pull on those.  It isn't the kind of burden they're describing.

5        Now, I want to talk to you briefly about the other two

6   categories.  The first of those is underwriting files.  These

7   files show the terms of the policies.  This is the case with

8   some lost or missing policies.  There will likely be evidence

9   of the terms of those policies within the underwriting files.

10  The underwriting files show the reinsurance backing of the

11  policy.  So whether these claims present any type of

12  collectability, how quickly can they be paid type issue, all

13  insurance companies keep these files.  They are organized.

14  They're not a huge burden for the insurance company to produce.

15       Final category, organizational charts, documentary

16  retention policies, and claims manuals.  Why organizational

17  charts?  They'll help us understand the other documents.  And

18  if we go to depositions, they won't give us an idea of who

19  we're deposing.

20       Why retention policies?  This is coverage issues

21  potentially turn on what these policies are and the some

22  policies will be missing.  We know what should be missing and

23  shouldn't be missing based on retention policies.

24       Finally, claims manuals.  Remember, Your Honor, the

25  value of these policies aren't measured just by the claims for

1  coverage and the value of the sexual abuse claims.  There may

2  also be extra contractual and statutory claims.  And whether

3  the insurance companies are following their own procedures with

4  respect to these claims will be part and parcel of that

5  analysis.

6          Now, the insurers try to limit what's relevant in a

7  2004 proceeding to what would be relevant in a coverage

8  proceeding.  Before I was fortunate enough four or five years

9  ago, Your Honor, to start representing survivors in these

10 cases, we did day in, day out coverage actions usually for

11 businesses.  And coverage actions are about the meaning of

12 policy terms.  They turn on the meaning of a policy terms.

13         These days, they don't turn on contexts,

14 unfortunately, so much.  It's usually a fairly straightforward,

15 leaning analysis.  But that's not what 2004 exam turns on.

16 That's not what the meta case is going to turn on here.  We

17 should not be constrained by what's available in a coverage

18 action with respect to a 2004 proceeding.

19         We tried to make clear in the letter to the insurance

20 companies a week ago, Your Honor, after the motion papers were

21 filed, look, this is what we're seeking.  Of course, we have

22 broadly worded requests, but they all sort of fall within this

23 category.  We did the same thing every other litigant does,

24 which is weary of folks gaming the system.  But these six

25 categories of documents are relevant.  They don't impose a

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 138
of 209

1   burden and undue burden at least because insurance companies

2   maintain these in the ordinary course of business.  It doesn't

3   require system-wide discovery.

4         The insurance companies tell the Court that why the

5   committee needs these documents are mediation, and all we

6   really need the policy and evidence of coverage.  That's part

7   of it.  But it's the meta case, Your Honor, that we're trying

8   to resolve.  And that's why we need the documents.  They

9   shouldn't be left to a mediator.  These documents go to the

10   heart of the case.

11         These are my final words.  The insurers are asking the

12   Court to show as solicitude for insurers that is not warranted

13   under the bankruptcy law under 2004.  We've watched insurers

14   across the country grasp at every advantage, Your Honor, in

15   Bankruptcy Courts.  But once their conduct is scrutinized under

16   the bankruptcy law, the advantage they purport to seek tends to

17   disappear.  I'm sure Your Honor is aware of Judge Poslusny's

18   (ph.) skepticism of Camden of the administrative claim.  The

19   insurers contend that because there was an insured diocesan

20   settlement that hadn't been approved by the court that the

21   diocese backed away from when it became clear that the

22   committee wasn't going to join that settlement.  That's

23   happened elsewhere.  It's happening in Rochester.

24         I will conclude on this point, Your Honor.  Went to

25   Martin Glenn of the Southern District of New York heard this

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 139
of 209

1    issue of administrative claim based on the purported insurance

2    settlement, this advantage that the insurance companies were

3    seeking was brought up to him.  His reaction was there's no

4    deal until I approve it.  There's no breach.  There's no

5    administrative claim.

6           My point is this, Your Honor, 2004 applies to all

7    apples just the same, even insurance companies.  They shouldn't

8    be grasping for advantages that just aren't deserved.

9           THE COURT:  Let me make sure I have all the

10   categories.  Can you -- would you mind restating the first

11   four?

12          MR. BURNS:  Sure.

13          THE COURT:  I had claims files, reserve working

14   papers, board minutes.  I think I missed one.

15          MR. BURNS:  The third one was -- so the first two or

16   the current claims files.  Reserve working papers.  The third

17   category is we've asked for the same information with respect

18   to the earlier California window.

19          THE COURT:  Okay.  All right.  Thank you very much.

20          MR. BURNS:  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MS. UETZ:  Excuse me, Your Honor.  I have just a brief

23   comment regarding the motion.  Would you like to hear that

24   before the opposition?

25          THE COURT:  I'm happy to if it's brief.

1      MS. UETZ:  Super brief, Your Honor.  We filed a
2  response that simply said any documents that are produced to
3  the committee from the insurers pursuant to this motion, we'd
4  like copies of the same.  We're not -- we just want to make
5  sure that we get whatever is produced as well.
6      THE COURT:  Okay.  Okay.
7      MS. UETZ:  Thank you.
8      MR. PLEVIN:  Your Honor, Mark Plevin for Continental
9  Casualty Company.
10      Your Honor may have thought that there was one Rule
11  2004 motion before the Court today, but there's actually two
12  and apparently an administrative -- an objection to an
13  administrative claim as well.
14      The first motion is the one that was filed by the
15  committee, which attached subpoenas containing thirty-seven
16  separate requests and nineteen subparts for a total of fifty-
17  six requests.  That's the motion that we responded to.
18      Then in its reply brief, the committee filed
19  essentially a new motion with six categories, uncertain whether
20  those six categories are a distillation of the first fifty-six
21  or a supplementation or a replacement.  I don't know what they
22  are.  There's no text of those requests.  There's nothing that
23  sets out other than what Mr. Burns just said.  He pointed to a
24  letter that he sent us, which I found frankly baffling because
25  I got the letter about an hour before they filed the reply

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 141
of 209

1 brief, so I'm not sure what I was supposed to do with that

2 letter. And we, of course, haven't had a chance to respond to

3 that second motion because it was the reply brief. So they've

4 completely gone in a new, different, and unexpected direction.

5       And I don't want to linger on it, but Mr. Burns

6 finished his remarks with a very impassioned plea to the Court

7 to reject an administrative claim based on a settlement between

8 the insurers and the debtor that hasn't taken place, citing

9 something from Judge Glenn in New York. I don't know what

10 Judge Glenn said, but I do know if that's what he said, he

11 wasn't aware of Second Circuit law. There's a case called

12 Liberty Towers, I don't have the citation with me, although I

13 can get it in a few minutes, which says exactly that when a

14 debtor enters into a an agreement and has a rule 9019 motion,

15 they can't just back away from it. They have to take it to the

16 Bankruptcy Court. And the Bankruptcy Court has to determine

17 whether it's a good deal or whether some deal that came along

18 later is better. So it seems like Mr. Burns is trying to

19 inoculate the Court against something. I'm not sure.

20       So I'd like to start my remarks with the first Rule

21 2004 motion, and then I'll come back to the second one.

22       THE COURT: Um-hum.

23       MR. PLEVIN: The key principle for the first one is

24 that Rule 2004 is not without limits. It is broad, but it's

25 not without limits. A request has to be reasonable and it has

1  to be relevant.  Relevant to what?  Relevant to the

2  justification given for the Rule 2004 request.

3          The justification that was given in the committee's

4  motion papers here was that they needed to fully understand the

5  nature and extent of the insurance coverage.  That's what they

6  said.  For purposes of mediation, I should add that.  They

7  needed to fully understand the coverage, the nature and extent

8  of coverage for purposes of mediation.  And then, as I said,

9  they hit us with fifty-six separate requests, which ranged all

10  over God's creation.

11          So we looked at their at their justification and their

12  request and realize that there was a huge disconnect between

13  the justification and the requests that were made.  And what we

14  did is we proposed a set of requests that was directly

15  responsive to the asserted justification and avowed purpose for

16  these requests.  And those are set forth in our in our brief.

17  We created a redline of their requests.

18          We also created a revised definition of the term

19  insurance policies because their term insurance policies wasn't

20  in any way linked to the debtor here.  And we said, if you need

21  policies, that's fair.  People need policies for mediation.  In

22  fact, one could argue that's all that's needed to understand

23  the coverage because it has the policy period, who the insurer

24  is, the terms and conditions of coverage, the limits of

25  liability.  And that's what you look at to determine what the

1  coverage is, is the policy.

2      Second, we said, well, okay, some policies are alleged

3  to be missing.  And in that case, secondary evidence of the

4  policies, whether that's a binder or correspondence with a

5  broker or an application, whatever is relevant to proving the

6  existence in terms of a policy that's fair as well.

7      The third thing that we thought would be appropriate

8  would be coverage position letters.  If they want to know

9  whether the insurers accepted coverage, reserved rights, denied

10  coverage, that would be in the coverage position letters, along

11  with the grounds for any position the insurers have taken.  And

12  then we thought that was a fair thing to offer as well.

13      And then the fourth thing that was -- would be

14  appropriate would be erosion or exhaustion information.  In

15  other words, how much of the policies are still available out

16  of the -- out of the limits of liability?

17      And so we proposed these revisions.  And that's all

18  the committee needs for the avowed purpose stated in the motion

19  of understanding the nature and extent of coverage for purposes

20  of mediation.  That's it, full stop.  They don't need

21  information about payments of claims over the past thirty years

22  involving not just this debtor but other debtors.

23      A request that would require the insurers to go

24  through their entire portfolio of insureds to determine who may

25  have had a sexual abuse claim and then to present documentation

1  on that going back thirty years, that same request intrudes on

2  the privacy rights of other insurers because in order to say

3  what we paid and what the circumstances were, we'd have to

4  present information about the -- I said other insurers.    I

5  meant the claimants.  They'd have to present information about

6  the claimants who were paid, the nature of the claims they

7  made, their identities, et cetera.

8         They talk about things like organizational charts,

9  which Mr. Burns said they need when they take a deposition.

10  Well, if you're preparing for mediation, you're not taking a

11  deposition.  You're preparing for mediation.  If they want to

12  ask my client a question in a mediation, they can ask my client

13  or they can ask the mediator to ask my client.  I don't know

14  why we're talking about depositions.  We're not authenticating

15  documents in a mediation.  We're not tying down testimony in a

16  mediation.  It's not how mediations work.

17         THE COURT:  Well, let me ask you this.  Let's say

18  we're not talking about depositions.  Do you have a problem

19  with the organizational charts one way or the other?

20         MR. PLEVIN:  It's not -- well, the problem is what

21  time frame.  If you look at their subpoenas, Your Honor, it's

22  not limited as to time.

23         THE COURT:  Okay.

24         MR. PLEVIN:  The only thing that's limited as to time

25  is this request for thirty years of --

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 145
of 209

1        THE COURT:  Yeah, yeah.  No, I saw that too.

2        MR. PLEVIN:  So I have to go back and find everything

3    from my client, and all the other insurers would have to do the

4    same thing going back decades to find out.  And for what

5    purpose?  That doesn't help understand the coverage.  The

6    coverage is in the policy.  It doesn't help to know who was a

7    claim handler in this particular unit in 1973.  That's just

8    not -- it's not relevant for mediation.

9        There's a case I wanted to refer Your Honor to, it

10    arises in a slightly different context, but I think it's

11    relevant.  It's Eleventh Circuit decision called in Re Gaddy

12    And the citation is.  851 F.App'x 996.  It arose in the context

13    of a Rule 9019 motion.  And the Bankruptcy Court didn't allow a

14    lot of discovery in that 9019 context.  And there was an appeal

15    on the Eleventh Circuit said, No, that's right.  And the thrust

16    of the Eleventh Circuit's ruling was if you're going to make

17    people go through all of the same litigation that they would

18    have to go through without a settlement, it doesn't make sense

19    to make them do it when they've settled.

20        And the same principle applies here in the sense that

21    if we're preparing for mediation, we're not preparing for a

22    full-scale litigation.  We're preparing for -- we're not

23    preparing for depositions.  We're preparing to sit at a table

24    with a mediator and talk about the claims that have come in

25    that how the coverage might apply, and what a fair settlement

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 146
of 209

1  value would be.  That's it.

2          All this other stuff that the committee asked for in

3  its original fifty-six requests is not relevant to any of that.

4  And to put us through all of that now under the guise of

5  preparing for mediation just can't be justified.

6          This same issue came up before Judge Lane in New York

7  and the Madison Square Boys and Girls Club case.  Very broad

8  Rule 2004 request by the committee to the insurers, objections

9  by the insurers.  And Judge Lane essentially ruled, as I've

10 suggested in the redline in our brief, policies, secondary

11 evidence, a few other small things, no depositions.  And

12 they've not pointed to any Bankruptcy Court in any one of these

13 cases, Diocese and sex abuse cases or otherwise, where a court

14 has gone beyond what Judge Lane did.  And neither should this

15 Court.

16         There's been a -- Mr. Kaplan started with this and Mr.

17 Burns picked it up.  There's an attempt to draw what I would

18 call a false equivalence here.  The insurers wanted information

19 about the claims, and the Court said we should have that

20 because we need it.  And they then say, well, it's only fair

21 for them to get whatever they want from us.  Well, the

22 difference is the claims are the very things that we're being

23 asked to pay.  And we need that that information in order to

24 assess whether things end or in our policy period, what the

25 severity of the claim is.  Mr. Burns wants to set us up for a

1    bad-faith claim by putting us in a vice.  And the one thing we

2    need to even have a reasonable settlement obligation is

3    information about the thing that we're being asked to settle.

4         So that's why we needed the information.  I say it's a

5    false equivalence because what we're offering them, what we've

6    said would be appropriate, is the mirror image from their

7    perspective.  They have the information about the claims.  We

8    don't.  We have the information about the policies.  They

9    don't.  That's the two things that you need to determine the

10   value of the claims and how the coverage applies, the claims

11   information and the policy information.  All the rest of it is

12   unnecessary.

13        Mr. Burns said that they should not be bound in any

14   way by the rules of relevance in an adversary proceeding

15   because Rule 2004 is broader and they brought it in the main

16   case.  Well, as Your Honor knows, when the committee moved to

17   intervene into the adversary proceeding, that intervention was

18   granted subject to the express limitation that they not

19   propound discovery.  I am confident that the Court didn't do

20   that for the purpose of saying you can go out and serve much,

21   much, much broader discovery in the main case.

22        And we're not the people who invoke the pending

23   proceeding rule, by the way.  They did that in their opening

24   motion trying to distinguish it.  And we actually said in our

25   opposition brief, Your Honor, that that's not the reason why

1  this is a problem.  The reason it's a problem is because their

2  discovery rights were limited for a particular and good

3  purpose, and it wasn't for the purpose of allowing them to then

4  go out and exceed all bounds of relevance in the Chapter 11

5  case under Rule 2004.

6        And when Ms. Uetz makes what sounds on its face like a

7  very straightforward, fair-minded request that, oh, if they get

8  stuff, we should get it to, the debtors are absolutely bound by

9  the pending proceeding rule because they're the plaintiff in

10 the adversary proceeding.  And that request is an overt attempt

11 to evade the restrictions of Rules 26 through 37.

12       One other thing worth noting, Mr. Burns said, and I

13 think he used the phrase in all likelihood the insurers are

14 going to claim financial solvency problems.  The only example

15 they propounded of an insurer -- of financial solvency problems

16 with an insurer was Arrowood in the Rockville Center case.  And

17 Arrowood was under supervision of the Delaware insurance

18 commissioner and just last week was actually placed in

19 liquidation by the Delaware Insurance Commissioner.  After we

20 filed our brief, the court entered an order of liquidation.

21       So that is a unique one-off situation.  It does not

22 justify rifling through our files to see what our finances are,

23 particularly since they can get the public documents that all

24 the insurance companies have to file by doing that.  They're

25 all publicly available.  They don't need to get into our files

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 149
of 209

1  and try to get all that information when no one in this case

2  has said I don't have a financial problem paying what I might

3  own under my policy.

4  Now, as I said, that's the first motion. We think

5  that it's reasonable for them to seek some information for

6  purposes of preparing for mediation. We think we've met them

7  halfway. We've offered to give them the information that Judge

8  Lane found was appropriate and Madison Square Boys and Girls

9  Club. And we think that's all they need.

10  So now we have the second motion, and I can speculate

11  as to why the second motion was made, what I'm calling the

12  second motion and the reply brief.

13  As I said, I don't know what they're doing with the

14  first fifty-six requests, whether these are six on top of

15  those, whether these are six instead of those, whether this is

16  some kind of, as I said, distillation of the fifty-six. These

17  are new arguments that shouldn't be permitted in reply. Even

18  if the Court considers them, they're living in a fantasy world,

19  a fantasy world in which we've got robust claim files on claims

20  where we don't even have the documents yet. We're still

21  waiting to get the proofs of claim. The claim file I would

22  venture of virtually all the insurers, if not all of them, at

23  this point consists of a tender letter which attaches a

24  complaint and a response to the tender letter which either

25  reserves rights, declines coverage, or accepts coverage and

1   accepts the defense.

2           But that's all that there could be at this point.  We
3   don't have the information.  These claims are actually still
4   being tendered.  Mr. Schiavoni told me this morning his client
5   just got another whole bunch of claims in this case because I
6   guess we all know the Alameda County Superior Court was so
7   burdened by claims that pushing them out very slowly.  So here
8   we are in November, ten and a half months after the window
9   closed for the filing of these claims, and claims are still
10  being pushed out and tendered.  So the idea that we have all
11  these claims and robust claim files is just wrong.

12          Mr. Burns seems to think that it would be relevant to
13  get all of the documents that were created or that are in files
14  relating to claims that have been paid in the past because he
15  says that way we know what the value of the claims are.  But I
16  don't see how you can draw a line between a claim involving
17  John Doe Number 1 that was settled in 1970 and a claim today by
18  John Doe Number 2 who's just asserted his claim.  To determine
19  for the first claim to be relevant, you'd have to know that
20  it's actually the same kind of claim, invoking the same kind of
21  coverage, that the circumstances of the claim were the same,
22  that the knowledge of the church was the same, and that the
23  knowledge of the insurers about the knowledge of the church was
24  the same.  I think we all know more in the year 2023 about what
25  the various dioceses knew about what their priests and others

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 151
of 209

1  were doing than we knew about back in the 1970s and 1980s.

2       And so that's a whole kind of collateral litigation

3  and investigation that doesn't make any sense.  What we should

4  be doing is valuing the claims that are being made in this case

5  by proofs of claim that we still don't have but we're hoping to

6  get soon and looking at those claims and determining the value

7  of those claims.

8       In their reply brief, the committee also talks about

9  the value of claims in other cases.  Well, we can all, either

10  ourselves or through consultants, go to the plans of

11  reorganization that have been confirmed in other cases and

12  figure out how many claims there were, what the total insurance

13  contribution was, what the diocesan contribution was, and

14  generate the numbers.  You don't need to go through decades of

15  the insurers' files in order to get there.

16       Skipping around a little bi, the claims manuals, we

17  litigated under Rule 2004 in both the Imerys case and the Boy

18  Scouts case, both before Judge Silverstein in Delaware whether

19  claims manuals were accessible under Rule 2004.  And she held

20  for good reason no, because it doesn't tell you anything about

21  the value of the claim for purposes of a mediation.  For

22  purposes of the mediation, you just look at the claim and the

23  policy.  You don't need to know what a company's claims manual

24  is.  It's not relevant in most coverage litigation.  And Judge

25  Silverstein held it's not relevant in a Rule 2004 context

1  either.

2          I think, Your Honor, that that covers most of it.

3  Just to make a few points, in the brief, they demand that we

4  respond in fourteen days.  These new requests -- first of all,

5  the fifty-six requests are incredibly broad.  And there's no

6  way that we could reasonably be required to respond to the

7  fifty-six requests in fourteen days.  It's just not possible.

8  Even if you cut back to the four requests we think is

9  appropriate, I think fourteen days is a bit aggressive.

10          We don't have a mediation scheduled.  We don't have a

11  mediator.  Ms. Uetz sent a letter yesterday opening the door to

12  discussion about who mediators might be.  I welcome that

13  approach from her.  We've just been engaged in that very

14  process in Santa Rosa.  So I and many of the other insurers on

15  the screen have recently been talking about mediators.  So I

16  think we should be able to respond fairly quickly to her.

17          But we don't have a mediation on the horizon.  There's

18  no reason we need to do this in fourteen days.

19          THE COURT:  Let me ask a question or two.  Let's say

20  that I accept some of your arguments enough to draw a line

21  between things that are generally probative of an asset and

22  questions that are really kind of litigation posture questions.

23  I think you would put your four categories that you're willing

24  to produce under the first category, right?  This is generally

25  what assets are about.  Well, I mean, would it be okay then

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 153
of 209

1    also to include underwriting files in those categories just as

2    an example?

3         MR. PLEVIN:  Right.  So underwriting files can be

4    complicated to the extent we're talking about policies in the

5    '60s and '70s.  I'm not sure that they necessarily exist.  If

6    they do exist, it's not on the top of someone's desk or their

7    file drawer.  There's undoubtedly going to have to be some

8    search undertaken within the company.  And some of these

9    insurance companies have very prescribed manners of looking for

10   policies and underwriting files, so that could be done.  I

11   would suggest that unless it's a missing policy situation where

12   you're looking for secondary evidence that something was done,

13   it's probably not necessary because the underwriting file will

14   generally include correspondence between the broker and the

15   insured or the broker and the insurance company, a lot of

16   premium information people trying to --

17        THE COURT:  Some reinsurance stuff, maybe.

18        MR. PLEVIN:  Maybe reinsurance.

19        THE COURT:  Yeah.

20        MR. PLEVIN:  Although often done in a separate unit.

21        THE COURT:  Okay.

22        MR. PLEVIN:  But one of the big problems is just the

23   age of those files and their accessibility.

24        THE COURT:  That is ever with us, right?

25        MR. PLEVIN:  Right.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 154
of 209

1    THE COURT:  Yeah.

2    MR. PLEVIN:  Especially when we're this many years

3  after --

4    THE COURT:  I know, I know.

5    MR. PLEVIN:  -- after the policies were written.

6    THE COURT:  How about -- so you've suggested to me

7  that the claims files, even were they to be produced that are

8  relevant in this case, are kind of a nothing burger?

9    MR. PLEVIN:  They're skeletons at best.

10    THE COURT:  Okay.  How about the reserve files or the

11  reserve working papers?

12    MR. PLEVIN:  So reserve working papers are --

13    THE COURT:  And let's start initially with what we're

14  talking what would be directly relevant here, okay?

15    MR. PLEVIN:  Okay.  So first of all, as a matter of

16  coverage law, reserves are not relevant.  And they're not

17  relevant because they are not a determination of the value of

18  the claim.  It's a determination of how much the insurance

19  company thinks it needs to have Under whatever statutory

20  accounting rules are required.  It doesn't reflect the value of

21  the claim.

22    At this point in the development of these claims, Your

23  Honor, where we don't have proofs of claim, I know because I

24  asked my client we don't have any reserves because we don't

25  have enough information to set reserves on any of these claims.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 155
of 209

1    I don't know what the other insurers have, but I suspect many,

2    if not most of them, are in the same boat.  You can't set a

3    reserve just because somebody filed a complaint with untested

4    allegations.  And that's all there is.

5            So reserves are set later.  Reserves are set at a

6    point when there's some confidence level about what you're

7    dealing with.  I think some companies may not even set reserves

8    in a situation like this on a contingent litigated tort claim

9    where there's scant information until settlements are reached

10   or at least until mediations are underway and progressing and

11   they have an idea of where the end point might be.  So I don't

12   think -- I think that's a nothing burger as well for that --

13           THE COURT:  Let me ask you another question, which I'm

14   also going to direct to Mr. Burns.  You can take 2004 exams

15   lots of different times in cases for lots of different reasons.

16   It may be that this is a useful thing to do for a relatively

17   limited purpose here without prejudice to.  It's going to look

18   a whole lot different un two months or three months or six

19   months.

20           And I'm going to ask you a question because you've

21   been through this and I haven't.  Okay?  Let's say you get a

22   mediator and you're talking about how we're going to get

23   everybody in the same room.  What is the mediators role in

24   trying to figure out what everybody needs to know?  Can the

25   mediator, for example, talk about that with both sides and then

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 156
of 209

1   let the Court know, I think, look, we need an X, Y and Z, we

2   don't know it yet?

3         MR. PLEVIN:  It's been my experience that mediators

4   often carry back and forth information requests between the

5   parties.  And the mediator will endorse requests that he or she

6   thinks are appropriate.

7         THE COURT:  Okay.

8         MR. PLEVIN:  And indeed --

9         THE COURT:  Which end up back at the court.

10        MR. PLEVIN:  Well --

11        THE COURT:  Or not.

12        MR. PLEVIN:  I know Mr. Schiavoni filed as a request

13   for judicial notice a transcript from Amreys case where this

14   issue just came up before Judge Silverstein.  And what she said

15   is I'm not going to allow any Rule 2004 discovery this point.

16   You go talk to the mediators.  And if you have a problem with

17   what the mediators are either doing or not doing or what, then

18   you can come back to me.  So she put it on the mediators first

19   to work with parties to get the information that the mediators

20   thought would be appropriate for the valuation of the claims

21   and the negotiations that would take place in the mediation.

22   And there was no -- she was clear I'm not dealing with this

23   today, but if there's a dispute that can't be solved in the

24   context of the mediation, then you come back to me and I'll get

25   involved at that point.  And I think that that's something that

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 157
of 209

1    would make sense.

2            THE COURT:  Finishing up the categories that Mr. Burns

3    gave us, how about board minutes?

4            MR. PLEVIN:  I guess that's the one where he said in

5    all likelihood, because now I'm looking at my notes, I put that

6    in quotes.  That's just sheer speculation about what's going on

7    here.  These are insurance companies that are very big

8    companies.  Not every settlement is board-worthy.  There are

9    executives within the company who have delegated authority from

10    the board in different amounts.  Your claim handler will have

11    desk authority and one amount.  That claim handler's supervisor

12    will have additional authority.  That person supervisor will

13    have additional authority.  Only when you get to very, very,

14    very high levels of authority is there even any chance that

15    you'd go to the board of directors for authority.

16            And if you've ever seen board minutes, Your Honor,

17    they are not -- they're not transcripts generally.  They are --

18    they record in a very cursory way what's happened.  So at most

19    you would have something where somebody would say in the board

20    minute that in such and such case, the board was asked to and

21    did authorize a payment or an offer of X dollars.  But if Mr.

22    Burns thinks that board minutes are going to be some kind of

23    opening the board's soul and talking about existential issues,

24    that's not what --

25            THE COURT:  Assumes facts not in evidence, correct.

1           MR. PLEVIN:  Yeah.  Well, it's speculative.  It
2    assumes facts not in evidence.  And I don't think it's --
3           THE COURT:  I mean boards having souls, but yeah.
4           MR. PLEVIN:  Well, corporations are people, as some
5    people --
6           THE COURT:  We don't have to all agree with that,
7    right, just because somebody prominent said it.
8           MR. PLEVIN:  Right.  But I think that the review of
9    board minutes is also going to be very intrusive.  And I think
10   we might have disputes about that because some boards deal with
11   lots of things.  And so would we have to produce board minutes
12   that don't deal with any of these claims at all?  Would we be
13   able to redact that?  In which case all the board minutes might
14   be redacted except for maybe one sentence.  And again, what's
15   the time frame here?  We're actually dealing with Mr. Burns's
16   request that isn't in the Rule 2004 application, so we don't
17   even know what the text of it says.  But what's the time frame?
18   Are we going back thirty, forty, fifty years?  You know,
19   there's a burden.  He says companies have to keep records.  And
20   that's true.  Companies keep records.  But they also don't
21   necessarily keep records for thirty, forty and fifty years.
22   And even if they do have them, they don't always know where
23   they are.  And it takes a huge effort to locate them.
24           And for what purpose?  I mean, the board minutes, I
25   don't think are probative of anything that's needed for the

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 159
of 209

1    committee to not be blindfolded in a mediation.

2           Mr. Kaplan, Mr. Burns, Mr. Bair, they all -- Ms.

3    Restel, they're all very, very experienced at this, and they

4    don't need to know what the board said in 1978 about a

5    particular sex abuse claim to figure out what position they're

6    taking in a mediation or how much they want to ask for on a

7    particular claim.

8           THE COURT:  Let me ask you one other question.  And

9    I'll try to ask it a couple of different ways.  I hear your

10   objection to going back thirty years, for lack of a better

11   word, claim files and valuation of claims.  I just don't know,

12   and you're going to know better than me, whether there is a

13   relevant subset.  Is there a five-year period that would make

14   some sense that could be more easily -- I mean, you're not --

15   you could still argue it's not relevant when the rubber meets

16   the road.  But is there a subset that you could identify or

17   suggest that would be responsive to the thought that they have

18   on the side?

19          MR. PLEVIN:  I don't really think so Your Honor,

20   because if you're talking about claims at a granular level,

21   you're looking at individual claims.  And what a particular

22   claim settled for is not probative of what some unrelated

23   different claim is worth.  Because the claims are different,

24   the circumstances are different, the insurance might be

25   different, the policies might be different.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 160
of 209

1          THE COURT:  I know.

2          MR. PLEVIN:  The applicable law might be different.

3          THE COURT:  Yeah.

4          MR. PLEVIN:  The attitude of the mediator might be

5     different.  If you're concerned -- if you're in litigation,

6     your valuation of the judge and your chances of success in a

7     trial might be different.

8          THE COURT:  Sure.

9          MR. PLEVIN:  So how you would take the information

10    about one claim and use that as a basis to say, okay, now

11    you're going to do this and some other claim later --

12          THE COURT:  I --

13          MR. PLEVIN:  But there's also one other point, Your

14    Honor, is that in my experience in these types of cases,

15    discussion of the individual claims is not typically how these

16    mediations go forward.  They go forward in bulk.  The committee

17    or the debtor makes a demand of X for the whole body of claims

18    and for a channeling injunction.  And then the insurer responds

19    with an offer of Y.  And then X and Y are at different

20    extremes.  And through the efforts of the mediator and the

21    parties, hopefully a deal gets done and they come somewhere in

22    the middle.

23          THE COURT:  Yeah.  I'm not disagreeing with you that

24    any particular claim -- I mean, there's so much variation.  My

25    instinct, and you're both going to disabuse me of this is, that

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 161
of 209

1    when you get into this, what you need are various touchstones,
2    right?  You need reference point.  There's not say that any one
3    is going to get you one hundred percent from A to B, but you
4    need them in the sense that where are we talking about twenty
5    bazillion dollars ere or three?  And I'm just exploring whether
6    there is a -- whether there's a reasonable way to provide
7    something that would be a touchstone that wouldn't be thirty
8    years ago.
9             THE COURT:  Well, so it's just way of --
10            MR. PLEVIN:  And, well, just by way of example --
11            THE COURT:  And maybe the answer is, well, go look at
12   what happens in bankruptcy cases.  Go look at the numbers.
13   Maybe that's the answer.
14            MR. PLEVIN:  I was going to say, that is exactly where
15   I was going.
16            THE COURT:  Yeah.
17            MR. PLEVIN:  So let me just give you an example --
18            THE COURT:  Sure.
19            MR. PLEVIN:  -- since Mr. Mr. Burns raised it, the
20   Rochester case, which is still pending.  Right now it's got
21   competing plans.  There are, I think, four insurers, maybe
22   five.  The debtor settled at one set of values.  The committee
23   objected.  All but one of the insurers then entered into
24   separate -- or additional settlements.  And the one settled --
25   one insurer who didn't settle proposed a plan and put forth

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 162
of 209

1    what it was -- its offering as its contribution.  This is all

2    public information.  And the committee knows how many claims

3    are against each insurer's policy, what each insurer has

4    settled with or settled for or offered to pay.  And they can do

5    a per claimant calculation based on that.  They can do the same

6    thing in every single bankruptcy case that's been resolved.

7    They can do it in Camden for the deal that the debtor cut with

8    the insurers that the insurers claim is binding and that the

9    other side claims is not.  So that's at least a touchstone.

10   The parties might have different views about whether that

11   touchstone should be enforceable or not.

12          But that information is all out there.  It's all out

13   there.  And the very experienced lawyers for the committee and

14   the debtor are aware of all of those values and all of those

15   cases going back to the Diocese of Billings case and the

16   Diocese of Northern Alaska, whenever those took place in the

17   '90s or early 2000, up through the more recent cases.  They're

18   involved in these mediations.  They know -- even though it's

19   not public, they know what's on the table between committees

20   and debtors on the one hand and insurers on the other hand.  So

21   they have those touchstones they don't need to get that

22   information from our files to the extent it's even relevant.

23          THE COURT:  Okay.

24          MR. PLEVIN:  Your Honor, Unless you have any other

25   questions, I think --

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 163
of 209

1          THE COURT:  No.  Thank you for your -- thank you for
2    your very helpful answers.

3          MR. PLEVIN:  Thank you.

4          THE COURT:  I appreciate it.  Okay.

5          MR. SCHIAVONI:  Your Honor, if I could just be heard
6    very briefly.

7          THE COURT:  Well, you didn't file anything.  Do you
8    want to say yes or no?

9          MR. KAPLAN:  Your Honor, I think that's exactly what
10   you said.  Mr. Schiavoni didn't file anything.

11         THE COURT:  Okay.

12         MR. KAPLAN:  I think --

13         MR. SCHIAVONI:  We did join, Your Honor, the brief.
14   We're on the brief.

15         MR. KAPLAN:  They're on the brief, but we've -- I
16   mean, this is the problem we've raised before, which is we
17   respect Mr. Plevin taking the lead on this.  We have taken the
18   lead.  He argued.  We have argued.  And this just sort of --
19   it's Your Honor's courtroom and Your Honor's decision.  But we
20   would respectfully request that Mr. Plevin has represented the
21   insurer.

22         THE COURT:  I'm going to agree with you.  Thank you
23   very much.

24         MR. SCHIAVONI:  Thank you, Your Honor.

25         THE COURT:  Thank you.

1          MR. KAPLAN:  Your Honor, just briefly, I saw Ms. Uetz

2     doing a hand thing.  I don't know if that was she had a -- I

3     don't want to --

4          THE COURT:  Okay.  Okay.  Ms. Uetz?

5          MS. UETZ:  Thanks, Your Honor.  Very briefly, just a

6     couple of points.

7          My recall is that the insurers filed a 2004 motion.

8     And when they did so, they didn't mind the single proceeding,

9     one proceeding rule.  It seems to me only fair that if this

10    motion is granted and there's a production to the committee,

11    that the debtor counted as well.

12         There's just one other point I would make.  Your

13    Honor, Mr. Plevin made some pretty sweeping statements about

14    his view of the information that is important to mediation.

15    And I would submit that that's just it.  It's his view.

16         We have made claim on behalf of the debtor that we are

17    pursuing the insurers and the adversary proceeding, as well

18    hope to pursue a mediation.

19         Candidly, had the committee not filed a 2004 motion,

20    the debtor may have done so.  So I just -- I want to -- I want

21    to express my view to the Court that more is needed for

22    mediation I think that Mr. Plevin suggested.  That's all I

23    wanted to say.

24         THE COURT:  Okay.

25         MS. UETZ:  Thank you, Your Honor.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 165
of 209

1      THE COURT:  Okay.  Thank you so much.  Okay.  Who

2  wants to talk for --

3      MR. KAPLAN:  Your Honor, given that I can't answer the

4  insurance specifics, I will save the parties the time of

5  deferring to my -- Mr. Burns.

6      THE COURT:  Okay.  Let me give you a couple of

7  thoughts to flesh out a bit where I was going with Mr. Plevin,

8  okay?

9      Okay.  Let me begin with, you know, the pending

10  proceeding rule, I think, is going to be on the back of the

11  stove for a while, this case.  So I'm not -- I'm not taking the

12  position that that you should, for all purposes, be foreclosed.

13  That's not the way I'm looking at.  And I'm also not accepting

14  as broadly as maybe Mr. Plevin would like me to the

15  implications of the committee intervening in the AP with an

16  understanding that their discovery role was going to be limited

17  or none.  Okay.  That's in the same way that it's kind of

18  apples and oranges in terms of what you're doing in the AP and

19  what you might do in the main case.

20      In the same way, it's kind of apples and oranges.

21  What kind of questions get asked at 2004 exam or what kind of

22  questions are litigation questions?  And that's where I think

23  I'm drawing a line here.  I think there are some things that

24  are -- that go generally to the kinds of what is the status of

25  the case, what are the assets, what are the liabilities, what

1  do we have to work with here that are more modest than some of

2  the questions that you're posing, which are great questions,

3  but in my mind they're much more, you know, litigation take a

4  position because we're going to contest it kind of situations

5  which include things like valuing of claims from X years ago.

6      So that's generally my mindset now, which is to say I

7  think this is also a moving target, that if I give you four or

8  five or six things here, it's not like you can't come back in

9  two months and say, well, now where at this stage we need

10  something else. I'll hear that. But I'm thinking it makes

11  sense to, for lack of a better word, stage this.

12      But let me put the same question to you that I put to

13  Mr. Plevin, toward the end of his presentation, which is, is

14  there a subset here of claims or claims analysis that you can't

15  get just from looking at the last five bankruptcy cases,

16  whatever they are? Is there a subset that you think would be

17  relevant over a reasonable period of time that might be a

18  little closer to what we're talking about here that you think

19  should be produced?

20      MR. BURNS: Your Honor, let me answer that two ways.

21      THE COURT: Okay.

22      MR. BURNS: Because there are really two questions.

23  The first question is what I would call the staging is, I

24  think, the term you used. And then the second question is the

25  subset.

1    Your Honor, with all due respect, and I do respect

2    you --

3         THE COURT:  You know what I say there, right?  In my

4    humble opinion.  And we're both lying, Mr. Burns.  Okay.

5         MR. BURNS:  And, Your Honor, we have the experience of

6    being in these cases in a number of bankruptcies for the last

7    three or four years.  We they have the experience of those

8    cases not resolving.  They just haven't resolved.  And I would

9    just suggest that public enemy number 1 in the cases not

10   resolving is what I call the bankruptcy holiday that the

11   insurers get.  They get a holiday.  They know they're not going

12   to pay claims for four or five years because the bankruptcy --

13   the courts are not going to push them to fulfill the obligation

14   that other litigants in other assets have.

15        Staging, there is a way of staging under the rules.

16   It's called a continuing obligation to produce documents.

17   That's the staging occasion by rules of just every subset.

18        Your Honor, it really goes to the nothing burger point

19   because I heard it a couple of times, and I was aghast.  But

20   one of the leading lawyers for survivors is in court with us.

21   nothing burger in the claims file, nothing burger in the

22   reserves.  California Window has been open for a while.  The

23   California window has been closed for a while.  Test case

24   number 1 was scheduled to go to trial two weeks before the

25   bankruptcy filing.  That's the Woodall of the case.  Nothing

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 168
of 209

1    burger.  There's no claims filed on Woodall by these guys.

2    There's no claims.  There's no reserve information set on

3    Woodall.  It --

4            THE COURT:  Are we talking a proper name here for a

5    particular reason?  I mean, isn't that confidential?

6            MR. BURNS:  I don't think --

7            UNIDENTIFIED SPEAKER:  (Indiscernible).

8            THE COURT:  Oh, okay.  All right.  Thank you.  Go

9    ahead.

10           MR. BURNS:  So as these approaches trial, they lose

11   some of their confidentiality.

12           THE COURT:  Okay.

13           MR. BURNS:  SO --

14           THE COURT:  Well, you can tell you know more about

15   this than I do.  That kind of stopped me in my tracks for a

16   second.  But you go ahead.

17           MR. BURNS:  Your Honor, And we appreciate the concern.

18   And if I'd rather you called me on it than I make --

19           THE COURT:  Okay.  Well, especially if you can correct

20   me, especially that.

21           MR. BURNS:  Understood.  A mistake.

22           THE COURT:  Sure.

23           MR. BURNS:  There were cases that were proceeding

24   along before the bankruptcy was filed.  We asked this board

25   document requests, Your Honor, because of the unbelievable --

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 169
of 209

1  the not plausible answers from the insurance companies.  If we

2  just asked for the claims file and it's going to have nothing

3  there, maybe some version of the claims file that has nothing

4  there, I don't dispute that, I've seen it before, that's why we

5  asked for all the additional information, because we want the

6  claims file.

7  THE COURT:  Well, let me just let me pull this apart a

8  little bit, okay?  Okay.  One aspect would be the claims files

9  for the claims that are relevant to this matter, right?  Is the

10  next step cases that are otherwise pending in California as

11  opposed to just this case?  Is that is that the progression?

12  MR. BURNS:  It would be, Your Honor, the claims file

13  relating to those other California claims.

14  THE COURT:  Okay.

15  MR. BURNS:  There are cases around the country.  But

16  Your Honor, frankly, that they haven't settled for the amount

17  that the California claims have settled for.

18  THE COURT:  Okay.

19  MR. BURNS:  There's a different valuation.  But while

20  I'm on valuation, Your Honor, and the touchstones issue, the

21  shorthand touchstone, earlier today, Mr. Schiavoni was talking

22  about hiring Brattle Group and I think Casey Isaac.  What are

23  those folks being hired to do?  They're being hired to look at

24  those touchstones.  Your Honor, they're being hired to look at

25  other claims to come up with valuation figures for litigation.

1  What we want is the valuation figures for their statutory
2  obligation to adjust these claims and set appropriate reserves
3  for these claims.
4          And so as a first step, Your Honor, getting the
5  complete set of claims documents for the cases related to the
6  dioceses and the reserves workup --
7          THE COURT:  For this case.
8          MR. BURNS:  -- for this case, you put your finger on
9  it, Your Honor.  The underwriting files, maybe their response
10 to the underwriting files, they'll sign the document requests
11 that they just don't have any.  And maybe we'll ask for a
12 deposition on that and see if that's the case.  But
13 underwriting files, which seems like they should be there.
14         A second step would be the broader California
15 universe.
16         And the third step would be what happened in these
17 cases -- I think fifty-five cases were resolved back in '07.
18 We don't have all the information.
19         The insurers -- we want these cases resolved.  We want
20 these cases to resolve by consensual solution.  It's our
21 experience that just going to mediation doesn't work.  We have
22 to be pushing on the insurers to fulfill the obligations of
23 other assets, other litigants to litigate some of these covered
24 issues or the case just won't -- it won't be resolved in
25 anything like an ordinary period of time for a bankruptcy case.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 171
of 209

```
 1              THE COURT:  Okay.
 2              MR. BURNS:  We are trying very hard, Your Honor, to
 3    make it so this case works.  We're at the end.  The bankruptcy
 4    plan is confirmed with everybody on board.  But we've seen how
 5    it hasn't worked that way over the last several cases.  And
 6    having these tools available for us, they love using bankruptcy
 7    tools in --
 8              THE COURT:  Well, they're not the only ones.  That
 9    auto-stay thing is pretty nice, you know?  Debtors love that.
10              MR. BURNS:  In these cases.  I love being in
11    Bankruptcy Court.  It was my second choice of profession.
12              THE COURT:  I need to take a minute.
13              MR. BURNS:  But what's good for the goose has to be
14    for the gander.
15              THE COURT:  No, I mean, that whole idea that you're
16    going to step away for a minute or two is helpful on a bunch of
17    levels.  So I'm certainly hearing you.  I don't think it's -- I
18    would not infer anything inappropriate to the insurance
19    companies if they found a benefit in there too as far as that
20    goes.  I know that you're saying something broader than that.
21    And I'm not -- I'm just -- I'm hearing it, okay?
22              MR. BURNS:  Okay.
23              THE COURT:  Okay.
24              MR. BURNS:  Thank you.
25              THE COURT:  All right.  Thank you very much.
```

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 172
of 209

1          MR. PLEVIN:  Your Honor, very briefly.

2          THE COURT:  Yeah, go ahead.

3          MR. PLEVIN:  First of all, on that last point, the

4   insurers are not the ones who filed for bankruptcy.

5          THE COURT:  I  know.

6          MR. PLEVIN:  We're here because the debtor did.

7          THE COURT:  Well, I mean, there's an argument that the

8   process helps everybody in a  that's all calm down kind of way.

9          MR. PLEVIN:  Right.  But pointing the finger at us --

10          THE COURT:  You know what?  I --

11          MR. PLEVIN:  Yeah.  We didn't file the case.

12          Second, Mr. Burns in his last remarks was very clear

13   that the reason the committee wants this doesn't have anything

14   to do with mediation.  It's beyond mediation.  But that's --

15   mediation was the reason they filed a Rule 2004 application.

16   And the reason that they said you should grant it.  And now

17   they've showed their true colors.

18          He said he wants documents from relating to claims

19   against other dioceses.  Well, it seems to me the proper place

20   to go ask for documents regarding the Diocese of Santa Rosa is

21   in Judge Novak's courtroom, or the Archdiocese of San Francisco

22   is in Judge Montali's courtroom, et cetera.  I don't think it's

23   appropriate for them to be fishing for that information here.

24          And then one last point, Your Honor, just about the

25   board minutes.  I was looking at Number 36 in their requests.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 173
of 209

1   And the board minute requests are -- in the original

2   application are tied to the -- what the board said about the

3   Diocese of Oakland.  What I now perceive in the new broad

4   requests which Your Honor has no text and we have no text, is

5   that it's board minutes writ large about, I guess, sexual abuse

6   claims, period.  That's not what they were asking for in their

7   original application.

8          And I think that shows the danger of allowing them to

9   change on the fly and to abandon the application and

10  essentially replace it with a new one in their reply brief, not

11  give us or Your Honor, the actual text of the requests that

12  they're asking to propound.  And I don't see how Your Honor

13  could can respond to that because you don't know what you're

14  being asked to authorize.  And I think they should go back and

15  do it again and file a new application.  And if they want to

16  ask just six categories, put the six categories in and give

17  Your Honor and us an explanation of why they think they're

18  entitled to it under Rule 2004, because as I said at the

19  outset, it's got to be relevant, relevant to the reason for the

20  request.  And they haven't done this with respect to the new

21  requests.

22          THE COURT:  Okay.

23          MR. PLEVIN:  Thank you.

24          THE COURT:  Thank you.  Submitted?

25          MR. KAPLAN: Submitted, Your Honor.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 174
of 209

1          THE COURT:  Okay.  Thank you very much.

2          Let me give you some thoughts.  Without casting any

3   blame one way or the other, because these things frequently are

4   moving target, this one is a moving target, I'm going to for

5   convenience -- and this is not to say that if somebody renewed

6   a request in a month or two, I wouldn't look at it differently.

7   But for convenience today, I'm going to drop down to what I

8   think is the last iteration of the request from Mr. Burns and

9   what I think is a sort of a response from Mr. Plevin.

10          With respect to what the documents Mr. Plevin suggests

11   they will produce, I think that's fine.  They're helpful.

12   They're not everything you want, but they're certainly helpful.

13   So that will be done.  And we can talk about how long that will

14   take.

15          I am -- things like the claims files and the reserve

16   working papers and the underwriting, working backwards a bit,

17   I am disinclined at this point -- well, first of all, I think

18   each of those arguably is much more of a litigation question

19   than a 2004 what are the assets kind of question.

20          That having been said, I think there is some

21   intellectual bleed-over between the idea that they wanted the

22   claims and you wanted some things in their files.  I think

23   there's some similarities there.  I am hard-pressed to think

24   that there's tremendous relevance, as I understand it now,

25   between what might have been a claim resolution in the early

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 175
of 209

1  2000s and what you're going to be looking at now.

2          So I think -- I mean, if somebody wants to renew that

3  argument at some point, I'll listen to it. But for right now,

4  I'm not inclined to require the production of anything having

5  to do with the earlier periods as long as thirty years ago.

6          I'm inclined to entertain the request with respect to

7  the current claims files, the reserve working papers, and the

8  underwriting information, if any, with respect to these cases.

9  I'm disinclined to go further than that for now because, among

10 other things, privacy concerns.  And I know that people would

11 be diligent in redacting, but all we need is one slip-up and we

12 would be in a bad place.  I'm inclined to grant the request as

13 to those.

14         I do think that you're going to want to sit down with

15 Mr. Plevin and just make sure everybody is agreeing on what the

16 wording is because this is a moving target.  And that's not a

17 critique because these things frequently are moving targets.

18 It's okay.  But I think we need a little precision on what you

19 mean by claims files, the reserve working files, and the

20 underwriting information.

21         I think with respect to this case, that is close

22 enough.  And it's analogous to getting the claims from their

23 perspective, okay?  So I -- but I think you should work to just

24 give me some language that is agreed to between you guys so

25 that we're talking about the same thing.

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 176
of 209

1    And I think as to any other request, I think it's --
2    we're really getting into litigation positions that I think is
3    rarely a proper function for 2004.  And I think there we are
4    getting a little bit closer to being concerned about the
5    committee's role in the AP where they basically said, listen,
6    we're not going to be generating discovery.  I'm not holding
7    you to that exactly here, but I don't want to intrude on that
8    too much.
9        I do think that what we're talking about here is
10   acceptable for current purposes.  And things are going to
11   change.  As you get closer to a mediation or other issues
12   bubble up to the surface, I will hear this again.  And I'll
13   listen to people as to why the world is different now and I
14   should do something else.  And/or when you get to the
15   mediation, either the mediator is going to tell you you've got
16   to do X, Y, and Z, and you guys have been through that drill
17   enough to know or it sounds like Mr. Plevin or maybe they both
18   confirmed something that I suspected, which is the judge role
19   at that point is fairly minimal in terms of -- I mean, would I
20   take direction from the mediator?  I'd certainly listen if
21   there were communication that, Judge, I think we need X, Y, and
22   Z and you can help with that.  I think I'd be inclined to
23   listen to it.  I don't know if that puts me in conflict with
24   Judge Silverstein.  If it does, I'm probably going to be
25   worried.  But there you go.

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 177
of 209

1        So I do think it's not that this can't be revisited,
2   but I think it's a fairly limited production now is what's
3   appropriate.  And I don't want to hear about depositions now.
4   We'll see about depositions down the road.  Okay?  I'm not sure
5   that -- I don't think that they're going to be necessary
6   "clarify" anything that you're going to be getting.  And to the
7   extent that they're depositions and the more traditional sense,
8   they really are litigation vehicles that I think were we're
9   just not there yet.  So that's my ruling.
10       If you guys can put your heads together about
11  appropriate wording for the three categories I suggested with
12  respect to this case, I think could be produced, I think I
13  can -- I'll be happy to see your handiwork.  And I'll approve
14  that, okay, subject to that being worked out.  All right?
15       Anything else for the good of the order?
16       Oh, you guys, I'm thinking about the bar date order.
17  And I promise you that will be category 1, okay?
18       MR. KAPLAN:  Thank you, Your Honor.
19       THE COURT:  All right.  Thank you very much.
20       MS. UETZ:  Your Honor, excuse me.  Sorry, sorry,
21  sorry.
22       THE COURT:  Yeah, Yeah.
23       MS. UETZ:  Just I know it's late, so I just want to
24  raise the subject of Alvarez responding to your questions and
25  see if we can't maybe set that for hearing or how you'd like to

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 178
of 209

1  proceed.  Because I know we've -- Mr. Moore has been in the

2  hearing and is prepared to respond to you, but I recognize

3  it's -- so I really didn't -- next procedurally --

4          THE COURT:  Yeah.  I really need to get ready -- IU

5  need to get ready for something at 1:30.

6          MS. UETZ:  Sure.  May we set it with Ms. Vann perhaps

7  for a date or something?

8          THE COURT:  Well, let me ask her a quick question,

9  okay?

10         S1:  May we set it with Ms. Fand, perhaps for a date

11 or.

12         THE COURT:  Let me just ask her a quick question.

13 Okay.  Ms. Fand, how are we looking on the 22nd?

14         THE CLERK:  We're pretty -- there's only three matters

15 so far set.

16         THE COURT:  All right.  I've got -- if anybody wants

17 to do the day before Thanksgiving, that's actually -- oddly

18 enough, that's a light calendar.  If you would rather not do

19 it, then we can do it a little bit later.  It's up to you

20 folks.

21         MS. UETZ:  Your Honor, Mr. Moore is on.  And I'll

22 defer to him.  We will have someone from Foley here for that

23 hearing on that date --

24         THE COURT:  All right, the 22nd.

25         MS. UETZ:  -- if he can make it.  And I know he's on

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 179
of 209

1  the hearing.

2          THE COURT:  All right.

3          MS. UETZ:  So maybe he can say so.

4          MR. MOORE:  Your Honor, it's --

5          THE COURT:  Well, no.  I mean, it's not as if you

6  can't do this by -- you can do it by Zoom.

7          MS. UETZ:  Sure.

8          MR. MOORE:  That's fine, Your Honor.

9          THE COURT:  Okay.  All right.  I appreciate it.  We'll

10  see you then.

11          MS. UETZ:  Thank you so much.  Sorry for the

12  interruption.

13          THE COURT:  Thank you.  Okay.  No, no.  Thanks very

14  much.

15          MS. UETZ:  Thanks.  Bye.

16          THE COURT:  Okay.  See you soon.

17      (Whereupon these proceedings were concluded)

18

19

20

21

22

23

24

25

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 180
of 209

1        C E R T I F I C A T I O N

2

3    I, Michael Drake, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ MICHAEL DRAKE, CET-513

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  November 20, 2023

16

17

18

19

20

21

22

23

24

25

`
`what (1)
19:8

A

A&M (2)
12:10,14
abandon (1)
173:9
aberrational (1)
44:13
abide (3)
85:16;120:10;
121:23
ability (8)
26:1,3,19;54:10;
68:20;90:9;108:20;
123:15
able (15)
10:5;24:4;26:2;
31:22;71:1;92:17;
109:1,24;132:6,7,10,
13;135:1;152:16;
158:13
above (1)
61:10
abrogate (3)
127:20,23;128:1
absent (1)
16:25
absolute (1)
117:20
absolutely (11)
24:15;33:3,5;53:8;
73:5;85:23,23;115:2;
121:6;127:13;148:8
abstract (2)
30:14,21
abuse (17)
26:22;86:8,16;
93:20;94:1;98:4;
110:20;111:21;124:6;
129:21;133:18;
134:18;137:1;143:25;
146:13;159:5;173:5
abused (2)
98:12;117:22
accept (1)
152:20
acceptable (1)
176:10
accepted (2)
120:21;143:9
accepting (1)
165:13
accepts (2)
149:25;150:1
access (9)
40:12;45:1;53:24;
86:20;93:21;100:16;

117:15,25;122:10
accessed (1)
61:18
accessibility (1)
153:23
accessible (1)
151:19
accommodate (3)
102:24;118:20;
120:24
accommodating (1)
126:17
accommodation (1)
126:22
account (2)
87:7;126:18
accounting (2)
12:12;154:20
accounts (1)
87:15
accusations (2)
20:25;117:23
accused (2)
86:9;114:3
achieve (1)
35:13
achieved (1)
119:19
acknowledge (5)
79:4;89:21;121:22;
122:15,15
acknowledged (1)
89:15
acknowledges (1)
122:3
acknowledging (1)
115:23
acknowledgment (6)
27:25;28:18;115:8;
121:16,19;122:14
across (1)
12:7;138:14
Act (2)
87:9;102:3
acting (1)
95:23
action (9)
54:7;62:2,13;64:15;
66:1;93:24;102:4;
115:7;137:18
actions (7)
58:1;62:11;63:2,7;
77:23;137:10,11
active (1)
109:21
actual (9)
52:1;63:15,21;
97:22;99:12;100:14;
103:17;108:4;173:11
actually (26)
23:25;29:25;38:2;
78:25;88:17;96:13;
98:5;100:15;105:5,

12,22;106:1,6;
108:21;109:12;
114:24;122:1,19;
124:2;140:11;147:24;
148:18;150:3,20;
158:15;178:17
ad (1)
86:10
add (5)
108:3,5;117:7;
121:4;142:6
added (3)
29:16;107:17;
127:11
addition (1)
61:13
additional (8)
12:17;24:16;35:18;
44:23;157:12,13;
161:24;169:5
address (10)
20:1;22:7;23:6;
78:16;90:16;101:9;
116:8;119:15;131:2,
16
addressed (1)
59:13
addresses (5)
116:9,9,10;117:12;
119:3
addressing (1)
102:8
adds (1)
108:19
adequately (3)
87:6,14;90:2
adhered (1)
69:20
adjudicata (1)
111:17
adjust (1)
170:2
administrative (7)
117:17;138:18;
139:1,5;140:12,13;
141:7
admittedly (1)
37:21
ado (1)
20:23
adopt (1)
87:18
adopted (3)
26:25;27:3;120:16
adults (1)
109:15
advance (1)
53:15
advantage (3)
138:14,16;139:2
advantages (1)
139:8
adversary (46)

6:11;9:1;10:11;
37:16,19,20,22;38:2,
7,10;40:23;41:1,2;
48:19;57:23;59:2,7;
65:4;76:25;77:9,16;
78:10,16;79:19;
80:25;82:5;85:11,21;
91:13;108:7,12;
113:19,21;114:16;
116:14,16,19,22;
118:6;120:12;127:22;
133:6;147:14,17;
148:10;164:17
adversary- (1)
80:21
adverse (1)
26:2
advice (3)
32:10,10;74:11
advised (3)
104:13;105:2;
115:20
advisory (1)
12:12
advocating (1)
111:3
Aetna (2)
56:5;57:11
affirmed (1)
62:20
afforded (1)
17:24
again (35)
17:8;25:17;28:9;
36:23;39:4,17;40:15;
42:16,23;43:5;53:4;
57:4;63:9;75:8;78:8;
79:15;82:17;88:11;
89:24;101:3;108:3;
109:8;113:4;114:25;
115:21;116:7,12;
118:23;120:9;129:7;
130:11;132:12;
158:14;173:15;
176:12
against (35)
20:25;53:23;57:19;
58:8;62:11;77:1;
102:5,8;109:22,24;
110:3,3;112:25;
134:6,15,19;141:19;
162:3;172:19
age (1)
153:23
aggregate (3)
26:20;62:5;109:1
aggregator (1)
104:1
aggressive (3)
68:10;79:18;152:9
aghast (1)
167:19
ago (12)

59:5;68:12;77:20;
106:5;129:18,18;
131:23;137:9,20;
161:8;166:5;175:5
agree (12)
16:25;17:9;42:10,
12;78:25;86:22;89:2;
90:7;91:18;118:10;
158:6;163:22
agreed (6)
61:25;90:3;101:12;
115:9;119:20;175:24
agreeing (3)
28:20;115:23;
175:15
agreement (42)
15:12;16:25;26:14;
32:19;39:22;40:5;
43:12;45:2,12;94:23,
23,25;95:1,5,6;97:12;
98:3;99:23;100:2,25;
103:15;104:3;105:6,
8,17,18,25;106:12;
107:22;108:4;109:4,
5;112:3,9;113:17;
114:4,7,11;115:8;
123:12,17;141:14
agreements (4)
28:18;86:6;87:10;
94:8
agrees (2)
18:9;60:7;61:2;
79:16
ahead (13)
6:8;7:11;8:16;9:9;
14:8;55:17;85:6;
113:6;123:2,9;168:9,
16;172:2
air (1)
67:15
al (2)
6:16,17
Alameda (2)
102:8;150:6
Alaska (1)
162:16
ALBERT (4)
7:5,6,9;15:1
allegations (6)
60:6;86:8,16;94:9,
11;155:4
allege (6)
53:24,25;58:23;
63:14;65:20;87:2
alleged (7)
57:19;60:15;63:16;
64:4;109:5;117:21;
143:2
allegedly (13)
56:11,15,16,19,22,
24,25;57:4,5,11,14;
59:19;61:21
alleges (6)

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 182
of 209

54:19;55:18,22;
57:23;58:1;98:12
**alleging (2)**
59:25;111:21
**alleviate (2)**
92:14,15
**allow (4)**
44:25;49:3;145:13;
156:15
**allowance (1)**
48:9
**allowed (3)**
78:8;86:5,7
**allowing (2)**
148:3;173:8
**allows (3)**
19:13;28:13;89:12
**alluded (1)**
78:3
**alluding (1)**
98:10
**almost (3)**
47:6;89:10;116:13
**alone (1)**
62:12
**along (9)**
6:11;7:13;76:3;
97:1;130:7,13;
141:17;143:10;
168:24
**although (6)**
42:4,20;55:7;89:24;
141:12;153:20
**Alvarez (4)**
11:12;12:5;13:8;
177:24
**always (4)**
36:12;45:25;103:2;
158:22
**ambiguity (1)**
19:20
**amend (5)**
28:25;29:6;60:9;
61:9;64:18
**amended (10)**
53:22;55:18;57:17;
65:1,11;66:4,10;68:2,
7;77:25
**amending (1)**
66:17
**Amendment (7)**
26:8;64:23;75:16;
78:13,25;107:23;
112:5
**amendments (1)**
65:9
**America (2)**
56:1,18
**among (4)**
50:19;95:9;112:3;
175:9
**amount (7)**
62:18,19;66:25;

132:15;134:14;
157:11;169:16
**amounted (1)**
62:6
**amounts (3)**
88:15;132:10;
157:10
**Amreys (1)**
156:13
**analogous (1)**
175:22
**analogy (1)**
17:16
**analysis (8)**
36:11;51:11;64:20;
97:11;111:10;137:5,
15;166:14
**analyze (1)**
26:19
**and/or (5)**
38:7,10;58:2,3;
176:14
**anew (1)**
78:16
**angels (1)**
119:17
**animal (1)**
74:14
**Ann (4)**
8:17;10:20;76:19;
83:5
**answered (1)**
126:2
**anticipating (1)**
128:18
**anti-fraud (2)**
21:3;27:3
**antitrust (1)**
106:6
**AP (4)**
53:7;165:15,18;
176:5
**apart (2)**
18:16;169:7
**apologize (3)**
10:6;30:20;76:17
**app (2)**
12:3;63:4
**apparently (1)**
140:12
**appeal (5)**
97:5,5;113:12;
115:22;145:14
**appealed (1)**
62:14
**appearances (2)**
6:21;10:9
**appears (1)**
58:11
**appellate (3)**
94:6;104:22;113:9
**apples (3)**
139:7;165:18,20

**applicable (2)**
120:12;160:2
**application (16)**
11:12;33:18;37:17;
38:1;43:11;89:12;
107:18;124:10;
129:23;143:5;158:16;
172:15;173:2,7,9,15
**applications (2)**
59:14,14
**applied (1)**
115:2
**applies (9)**
28:19;33:21;
103:21;108:12;
110:12;113:24;139:6;
145:20;147:10
**apply (8)**
17:11;33:17;37:23;
61:2;108:10;111:14;
124:16;145:25
**Appreciate (18)**
11:25;45:18;46:24;
48:1;51:18;55:5;
72:13;76:4,6;81:9;
83:1;90:20;102:14;
123:7;127:16;163:4;
168:17;179:9
**apprized (1)**
82:23
**approach (2)**
59:6;152:13
**approaches (1)**
168:10
**appropriate (21)**
28:18;41:2;52:21;
58:8;68:5,8;78:24;
83:6;86:1;95:6;143:7,
14;147:6;149:8;
152:9;156:6,20;
170:2;172:23;177:3,
11
**approval (2)**
19:13;24:4
**approve (4)**
94:24;114:4;139:4;
177:13
**approved (5)**
43:12;94:16;
102:18;113:16;
138:20
**approving (1)**
39:20
**apropos (1)**
53:8
**APs (2)**
53:10;55:2
**arbiter (1)**
125:11
**arch (2)**
12:7;69:11
**Archdiocese (1)**
172:21

**archly (1)**
12:7
**arguably (2)**
99:24;174:18
**argue (9)**
37:3,11;39:25;
43:25;58:18,21;
61:13;142:22;159:15
**argued (7)**
69:13;86:10;
129:22,23,25;163:18,
18
**arguing (1)**
84:24
**argument (17)**
17:11,15;27:15;
37:3,4,6;40:25;53:1;
59:23;62:25,25;
65:19;91:23;99:25;
113:11;172:7;175:3
**arguments (5)**
61:12;117:9;130:3;
149:17;152:20
**arise (1)**
73:25
**arises (2)**
58:19;145:10
**arising (1)**
131:2
**arose (1)**
145:12
**around (5)**
44:15;101:14;
109:4;151:16;169:15
**Arrowood (2)**
148:16,17
**Article (1)**
94:2
**aside (3)**
37:13;54:17;130:3
**askance (2)**
42:3,4
**aspect (2)**
65:20;169:8
**aspects (1)**
55:9
**assert (1)**
54:6
**asserted (2)**
142:15;150:18
**assertions (1)**
60:6
**asserts (1)**
60:20
**assess (2)**
132:7;146:24
**assessment (1)**
17:9
**asset (6)**
130:22;131:7;
133:20;134:10;
135:24;152:21
**assets (5)**

**archly (1)**
152:25;165:25;
167:14;170:23;
174:19
**assigned (1)**
47:12
**Association (2)**
10:11;56:14
**assumed (1)**
56:14
**Assumes (2)**
157:25;158:2
**assuming (6)**
9:10;66:14;67:17;
68:2;118:23,24
**attach (1)**
62:9
**attached (3)**
57:17;74:19;140:15
**attaches (3)**
62:17;121:18;
149:23
**attack (1)**
94:9
**attempt (2)**
146:17;148:10
**attempting (1)**
18:4
**attendance (1)**
81:17
**attention (1)**
47:20
**attitude (2)**
117:9;160:4
**attorney (3)**
93:25;114:4,19
**attorneys' (1)**
86:16
**August (2)**
91:7,15
**authenticating (1)**
144:14
**authority (12)**
28:14,16;29:25;
95:15;105:7;112:9;
157:9,11,12,13,14,15
**authorize (3)**
95:1;157:21;173:14
**authorized (17)**
15:25;19:19;20:5,9,
19;21:23;24:23;
27:11;29:11;38:8;
39:22;43:12;45:2,12;
46:11;50:18,19
**authors (1)**
86:18
**auto-stay (1)**
171:9
**available (7)**
13:21;18:11;98:13;
137:17;143:15;
148:25;171:6
**avoid (2)**
125:17

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 183
of 209

avowed (2)
142:15;143:18
aware (4)
122:16;138:17;
141:11;162:14
away (6)
20:21;26:7;48:19;
138:21;141:15;
171:16

**B**

back (46)
13:13,23,25;14:3;
20:21;41:20;42:19;
52:14;53:2,20;54:14;
59:4;67:18;89:17,17;
91:7;92:22;96:20;
111:16;116:19,20,21;
123:23;125:1;128:14;
129:3;130:2;135:12;
141:15,21;144:1;
145:2,4;151:1;152:8;
156:4,9,18,24;158:18;
159:10;162:15;
165:10;166:8;170:17;
173:14
backed (1)
138:21
background (1)
59:4
backing (2)
94:6;136:10
backwards (1)
174:16
bad (5)
30:3;101:17,25;
117:9;175:12
bad-faith (1)
147:1
baffling (1)
140:24
Bair (3)
7:10,22;159:2
balance (1)
83:17
ball (1)
121:12
ballpark (1)
103:5
balls (3)
17:15;91:8;112:25
bankruptcies (2)
95:7;167:6
Bankruptcy (37)
6:5,11,18;17:19;
23:10;24:17;44:7;
68:19;74:1,11;89:12,
13,13;94:24;110:13;
133:10,11,11;138:13,
15,16;141:16,16;
145:13;146:12;
161:12;162:6;166:15;

167:10,12,25;168:24;
170:25;171:3,6,11;
172:4
bar (28)
17:14,19,24;18:5,
13,19;19:9,14,21;
24:5,17;25:13;27:6;
37:8,11;39:4,9;40:3;
41:8;44:14;46:19;
93:4,6;100:1;106:20;
107:1;127:12;177:16
barriers (1)
42:9
baseball (2)
12:20;17:16
based (9)
62:12;64:2;78:8;
88:22;120:8;136:23;
139:1;141:7;162:5
basic (2)
26:7;95:8
basically (4)
13:3;26:8;59:21;
176:5
basis (6)
25:8;26:20,20;
36:18;64:7;160:10
battle (1)
53:13
bazillion (1)
161:5
bearing (1)
94:14
beat (1)
7:19
became (1)
138:21
become (3)
44:22;131:5;134:25
begin (2)
81:2;165:9
beginning (4)
48:7;53:20;56:11;
57:2
behalf (13)
7:6,13;8:18,22;9:1,
25;10:10;17:8;76:24;
84:24;91:4;129:7;
164:16
behind (1)
21:11
belabor (1)
87:17
belief (4)
55:23;56:2;77:6;
78:8
believes (6)
58:10,12;60:10,12,
13;61:2
belong (1)
41:1
benchmark (1)
113:1

beneficial (1)
109:3
benefit (4)
34:8;74:17;75:4;
171:19
benefits (3)
28:8;58:5;81:8
Benvenutti (1)
7:6
best (8)
22:14;35:18,22;
36:25;71:4;74:18;
77:6;154:9
bet (1)
49:6
better (17)
10:7,8;12:17;34:3;
45:3;70:18;82:23;
84:12;120:23;125:21,
24;127:25;130:6;
141:18;159:10,12;
166:11
beyond (10)
19:12;20:9;63:15;
64:15;68:16;69:5;
117:2;132:2;146:14;
172:14
bi (1)
151:16
Bible (1)
115:1
bifurcated (1)
61:23
big (6)
27:22;30:7;69:25;
110:4;153:22;157:7
bigger (1)
21:20
biggest (4)
96:18;97:7,25;98:1
bill (1)
21:15
Billings (1)
162:15
bind (1)
97:9
binder (1)
143:4
binding (1)
162:8
Bishop (5)
6:16,18,23;53:22;
134:13
bit (17)
37:19;59:6;65:6;
69:16;74:24;77:3,17;
78:1;103:2;120:17;
124:14;152:9;165:7;
169:8;174:16;176:4;
178:19
black (3)
96:6;112:24;121:13
Blaise (1)

9:18
blame (1)
174:3
blank (1)
129:14
bleed-over (1)
174:21
blessed (2)
107:22;119:20
blind (1)
130:21
blindfolded (1)
159:1
board (20)
135:21;139:14;
157:3,10,15,16,19,20,
22;158:9,11,13,24;
159:4;168:24;171:4;
172:25;173:1,2,5
boards (2)
158:3,10
board's (1)
157:23
board-worthy (1)
157:8
boat (1)
155:2
body (1)
160:17
bond (2)
74:4,5
borrow (1)
129:11
both (27)
12:4;23:23;30:9;
41:10,14;48:20;
59:12;62:3;79:25;
80:5;93:6;95:21;
108:7,10,12;114:14;
121:15;127:21;
133:16;134:20,21;
151:17,18;155:25;
160:25;167:4;176:17
bound (25)
28:19,20;32:20;
86:22;88:20;89:2,22;
90:7;95:15;99:24;
104:20;105:18;
106:14;113:24;115:8,
24,25;116:1,2,4;
118:11;119:7;135:5;
147:13;148:8
bounds (1)
148:4
boxed (1)
26:13
Boy (6)
26:18,24;27:3;
103:22;108:23;
151:17
Boys (2)
146:7;149:8
Bradley (1)

10:2
brand (1)
91:23
Brattle (7)
30:9;35:15;38:11,
12;42:19;43:15;
169:22
breach (10)
53:23;58:15;60:15,
23,23;62:22;65:21;
66:3;122:6;139:4
breached (3)
58:13;59:20;60:14
breaches (1)
60:7
breaching (1)
109:5
break (4)
83:25;84:1;128:8,
13
brevity (1)
12:4
brief (9)
20:13;38:14;46:8;
139:22,25;140:1,18;
141:1,3;142:16;
146:10;147:25;
148:20;149:12;151:8;
152:3;163:13,14,15;
173:10
briefed (1)
87:17
briefing (1)
86:24
briefly (6)
129:9;136:5;163:6;
164:1,5;172:1
briefs (1)
127:3
bring (9)
43:25;71:10;72:9,
15;77:24,25;79:1;
102:4;121:25
bringing (2)
47:19;104:3
brings (1)
102:2
broad (6)
30:23;41:4;141:24;
146:7;152:5;173:3
broader (4)
147:15,21;170:14;
171:20
broadly (3)
38:4;137:22;165:14
broker (3)
143:5;153:14,15
brothers (1)
110:25
brought (6)
19:5;80:18;88:1;
101:8;139:3;147:15
bubble (1)

Case: 23-40523     Doc# 783-2     Filed: 01/16/24     Entered: 01/16/24 18:56:48     Page 184
of 209

176:12
**Buffalo (3)**
  26:18;93:23,24
**built (1)**
  24:16
**built-in (1)**
  114:18
**bulk (1)**
  160:16
**bullpen (1)**
  129:15
**bunch (2)**
  150:5;171:16
**burden (9)**
  25:21;107:16;
  111:15;117:10;136:4,
  14;138:1,1;158:19
**burdened (1)**
  150:7
**burdens (1)**
  87:21
**burdensome (3)**
  40:19;43:14;110:11
**burger (6)**
  154:8;155:12;
  167:18,21,21;168:1
**Burns (68)**
  7:10,17,20,20,24;
  79:14,15,18,21,25;
  80:4,9,11,14,17,20,
  24;81:4,7,11;84:4,4;
  129:11;131:1,16;
  132:1,21,24,24;
  139:12,15,20;140:23;
  141:5,18;144:9;
  146:17,25;147:13;
  148:12;150:12;
  155:14;157:2,22;
  159:2;161:19;165:5;
  166:20,22;167:4,5;
  168:6,10,13,17,21,23;
  169:12,15,19;170:8;
  171:2,10,13,22,24;
  172:12;174:8
**Burns's (1)**
  158:15
**business (3)**
  12:12;101:25;138:2
**businesses (3)**
  136:1,3;137:11
**Bye (1)**
  179:15

**C**

**Cal (1)**
  63:4
**calculation (1)**
  162:5
**calendar (3)**
  13:11;66:19;178:18
**CALHOUN (2)**
  9:12,13

**CALIFORNIA (34)**
  6:1,6;10:11;56:14;
  60:21;61:21;62:15,
  16;63:1,6;86:11,14;
  87:7;102:5;133:3,9,
  12,12,13,15,17,21,22;
  134:11,16,21;135:16;
  139:18;167:22,23;
  169:10,13,17;170:14
**Call (17)**
  6:3,9,11;34:18;
  41:16;50:16;54:18,
  19;80:1;85:8;97:17;
  104:24;112:25;124:8;
  146:18;166:23;
  167:10
**called (13)**
  34:20;87:8;91:8;
  100:11;119:21;
  121:18;130:16,22;
  133:5;141:11;145:11;
  167:16;168:18
**Calling (2)**
  6:14;149:11
**calls (1)**
  17:15
**calm (1)**
  172:8
**Camden (11)**
  26:18;27:8;43:1,2;
  44:24;45:7;46:7;
  50:20;108:23;138:18;
  162:7
**came (7)**
  12:7;28:12;31:16;
  103:25;141:17;146:6;
  156:14
**CAMERON (2)**
  9:24,25
**camp (1)**
  78:2
**Can (94)**
  11:23;13:24;16:13;
  20:11,12;21:13;
  24:19;27:8;29:15;
  30:2,22;33:13;36:15;
  39:25;42:19;44:17;
  52:20;59:8;61:16;
  63:14,22;64:14;
  68:13;69:17;70:5,6;
  71:15;72:8;83:14;
  84:10;90:16;95:16,
  19;96:20;98:19;
  99:18;100:16;102:10,
  10,24;103:20;104:18;
  107:11,12,14;108:3,3;
  110:16;111:22;112:8,
  12,12,24;113:8,13;
  115:19;120:4;122:3,
  9;126:18;128:7,9;
  134:2,13,13;136:3,12;
  139:10;141:13;
  144:12,13;147:20;

148:23;149:10;
  150:16;151:9;153:3;
  155:14,24;156:18;
  162:4,5,7;168:14,19;
  173:13;174:13;
  176:22;177:10,13;
  178:19,25;179:3,6
**candid (1)**
  28:6
**candidly (2)**
  28:20;164:19
**capacity (1)**
  35:17
**cardinal (4)**
  133:16,21;134:11;
  135:3
**care (3)**
  54:22;119:13,14
**careful (1)**
  21:19
**carefully (1)**
  40:21
**Carrier (1)**
  10:11
**carriers (1)**
  132:9
**carry (1)**
  156:4
**carveout (2)**
  89:23;124:1
**case (165)**
  6:17,18;8:7;11:8;
  17:18,20;19:12;
  24:22;26:8;27:16;
  28:19;32:10;35:20;
  37:16,17;38:7,10;
  39:1;40:16,19;43:13,
  15,17,19;44:11;45:7,
  9;46:20;50:4;53:6,21;
  55:16;59:18;60:1,1,
  12;61:20;63:3,5,9,11,
  24;68:6;71:6,10,17;
  72:21,22;74:6;77:8,
  16;78:7;79:21,22;
  80:21,21,22;83:3;
  85:9,13,17,23;86:11,
  13,19;87:2,5,13,20,
  24;88:5,11;90:1,2,9,9;
  91:7,19;93:17,20;
  94:1;95:23;98:6;
  106:1,6;107:11;
  108:1,8,13;109:22;
  110:2,3,22;111:25;
  113:22,23;114:14,22,
  22;115:2,16;116:1,3,
  13;118:4,6;119:19;
  120:3,6;125:18,18;
  127:21;130:1,4,7,13;
  131:2;133:5,7,8,16,
  25;134:10,25;135:7,
  23;136:7;137:16;
  138:7,10;141:11;
  143:3;145:9;146:7;

147:16,21;148:5,16;
  149:1;150:5;151:4,
  17,18;154:8;156:13;
  157:20;158:13;
  161:20;162:6,15;
  165:11,19,25;167:23,
  25;169:11;170:7,8,12,
  24,25;171:3;172:11;
  175:21;177:12
**cases (50)**
  17:19;18:2,4;41:24;
  44:20,24,25;53:10,10;
  64:2;71:7;73:23;
  75:12;86:1;100:14;
  106:4;110:22;111:13;
  113:10,11,13;131:4;
  132:20;133:18;
  135:18;137:10;
  146:13,13;151:9,11;
  155:15;160:14;
  161:12;162:15,17;
  166:15;167:6,8,9;
  168:23;169:10,15;
  170:5,17,17,19,20;
  171:5,10;175:8
**Casey (1)**
  169:22
**casting (1)**
  174:2
**Casualty (2)**
  8:2;140:9
**categories (16)**
  132:25;133:1,2;
  135:4,15;136:6;
  137:25;139:10;
  140:19,20;152:23;
  153:1;157:2;173:16,
  16;177:11
**category (10)**
  89:3,18;115:12;
  135:15,20;136:15;
  137:23;139:17;
  152:24;177:17
**Catholic (6)**
  6:16,18,23;53:22;
  71:8;110:23
**cause (2)**
  92:23;102:4
**causes (2)**
  54:7;62:13
**cautious (1)**
  28:10
**Center (1)**
  148:16
**Central (1)**
  61:21
**certain (7)**
  15:14;53:23;54:5,
  12;56:9,10;57:20
**certainly (8)**
  35:17,21;42:20;
  45:11;82:24;171:17;
  174:12;176:20

**certainty (2)**
  54:22;98:19
**cetera (1)**
  21:18;26:25;27:13;
  103:19,19;109:2;
  110:18;113:23;144:7;
  172:22
**chain (1)**
  106:7
**challenge (2)**
  41:24;102:2
**challenges (1)**
  71:14
**chamber (1)**
  109:17
**chance (4)**
  40:5;120:15;141:2;
  157:14
**chances (1)**
  160:6
**change (4)**
  84:9;102:23;173:9;
  176:11
**changes (1)**
  87:19
**channeling (1)**
  160:18
**Chapter (5)**
  38:7,10;77:8;
  115:15;148:4
**Charles (1)**
  13:7
**chart (1)**
  57:18
**charts (4)**
  136:15,17;144:8,19
**chat (2)**
  13:6;83:3
**check (3)**
  11:13;41:9;45:11
**child (2)**
  109:12,13
**children (1)**
  117:22
**choice (2)**
  134:17;171:11
**chose (1)**
  44:1
**chosen (1)**
  133:13
**Christmas (1)**
  67:18
**church (8)**
  93:20,22;94:1,1;
  98:13;111:11;150:22,
  23
**CIGA (1)**
  65:12
**Cir (1)**
  61:15
**circle (1)**
  54:14
**Circuit (9)**

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 185
of 209

62:15,20;94:7,16;
101:23;108:14;
141:11;145:11,15
**Circuit's (1)**
145:16
**circulate (1)**
25:1
**circumstance (1)**
69:8
**circumstances (3)**
144:3;150:21;
159:24
**circus (1)**
105:1
**citation (3)**
111:13;141:12;
145:12
**citations (3)**
26:21;38:13,14
**cited (5)**
63:3;110:7;113:10,
11;119:12
**citing (1)**
141:8
**Civil (1)**
89:14
**claim (74)**
11:6;17:18;23:10,
13;24:19;26:17,22;
37:5,7;39:5,7,8;40:2,
3,14,20,25;41:6,15;
43:16,18;44:3;45:1,
10;50:8;58:3;60:2;
88:22;93:3,3,7;94:10;
134:5,12;138:18;
139:1,5;140:13;
141:7;143:25;145:7;
146:25;147:1;148:14;
149:19,21,21;150:11,
16,17,18,19,20,21;
151:5,21,22;154:18,
21,23;155:8;157:10,
11;159:5,7,11,22,23;
160:10,11,24;162:8;
164:16;174:25
**claimant (3)**
50:9;109:11;162:5
**claimants (13)**
26:10;34:16;35:4,9,
12;49:14,17;51:5;
100:15;108:16;112:3;
144:5,6
**claimants' (1)**
109:9
**claiming (1)**
94:9
**claims (99)**
18:12;20:12;21:5;
27:2;39:12;48:9;
57:21;60:17;100:19;
104:1;108:9,24;
134:8,18,20,22,24;
135:4,5,6,6,11,12,13,

14;136:3,11,16,24,25;
137:1,2,4;139:13,16;
143:21;144:6;145:24;
146:19,22;147:7,10,
10;149:19;150:3,5,7,
9,9,11,14,15;151:4,6,
7,9,12,16,19,23;
154:7,22,25;156:20;
158:12;159:11,20,21,
23;160:15,17;162:2,
9;166:5,14,14;167:12,
21;168:1,2;169:2,3,6,
8,9,12,13,17,25;
170:2,3,5;172:18;
173:6;174:15,22;
175:7,19,22
**clarifications (1)**
15:11
**clarify (7)**
17:23;29:1,6;53:19;
60:9,12;177:6
**clarifying (1)**
127:17
**clarity (2)**
18:13;23:3
**cleanest (1)**
20:18
**clear (21)**
17:24;20:6,23;
23:22;24:18;51:25;
55:8;59:24;78:14;
92:1;93:2,5,11;95:3;
107:7;109:9;121:17;
137:19;138:21;
156:22;172:12
**clearly (6)**
17:13;54:10;59:11;
61:20;66:5;76:15
**clergy (1)**
110:22
**clerical (1)**
57:20
**CLERK (6)**
6:4,10,14;67:11,13;
178:14
**client (7)**
114:5;144:12,12,
13;145:3;150:4;
154:24
**clients (1)**
72:7
**Clinton (1)**
9:24
**close (3)**
84:8,13;175:21
**closed (2)**
150:9;167:23
**closer (4)**
78:11;166:18;
176:4,11
**closing (2)**
105:21;117:7
**Club (2)**

146:7;149:9
**CNA (1)**
56:25
**Code (3)**
89:12;106:13;
133:11
**coded (1)**
108:17
**codes (1)**
108:18
**coffee (1)**
16:7
**collateral (2)**
102:7;151:2
**colleague (2)**
7:14;132:21
**colleagues (2)**
43:25;105:10
**collectability (1)**
136:12
**collectible (1)**
134:15
**collectively (1)**
25:22
**Colleen (2)**
7:14;91:3
**colors (1)**
172:17
**combine (1)**
65:8
**coming (3)**
47:1;69:20;110:22
**comma (1)**
34:16
**commencing (1)**
56:7
**comment (7)**
59:5;64:25;66:20;
68:20,23;69:5;139:23
**commented (2)**
130:23;131:19
**comments (5)**
67:23;70:3,10;
72:13;76:23
**Commercial (5)**
56:13;74:1,1,12;
95:9
**commissioner (2)**
148:18,19
**commit (2)**
71:13;109:24
**committed (2)**
71:15;72:9
**committee (58)**
7:7,13,21;9:7;11:5;
17:9;24:3;27:8;33:10;
35:17;41:11;45:15;
49:16,21;79:16;80:4;
87:2;88:3,4;90:3,24;
91:4;92:24;94:20;
97:2;98:23;107:4,13,
21;108:2;113:15;
116:20;117:13;118:2,

22;120:7;129:7,21;
132:24;138:5,22;
140:3,15,18;143:18;
146:2,8;147:16;
151:8;159:1;160:16;
161:22;162:2,13;
164:10,19;165:15;
172:13
**committees (1)**
162:19
**committee's (10)**
14:22;15:9;41:6;
76:14;80:14,18;
91:14;132:25;142:3;
176:5
**common (1)**
120:17
**communication (2)**
81:23;176:21
**community (1)**
131:8
**companies (21)**
60:24;95:4;112:4;
133:10;134:16;
136:13;137:3,20;
138:1,4;139:2,7;
148:24;153:9;155:7;
157:7,8;158:19,20;
169:1;171:19
**Company (19)**
8:2;9:11,13;35:15;
46:12;56:1,13,18,25;
61:14;63:3;97:13;
121:16;136:14;140:9;
153:8,15;154:19;
157:9
**company's (1)**
151:23
**compare (1)**
92:16
**COMPEAN (2)**
10:10,14
**compel (3)**
90:13;125:14,14
**competing (4)**
71:20;94:18;
108:11;161:21
**complain (1)**
104:11
**complained (1)**
118:8
**complaint (20)**
53:22;55:18,22;
56:3;57:17;60:4,8,9;
61:10;62:12;64:3,19;
65:1;66:4,23;68:2;
74:19;77:25;149:24;
155:3
**complaints (4)**
35:6;68:7;100:15;
109:8
**complete (1)**
170:5

**completely (6)**
14:13;91:21;
105:11;111:19;125:1;
141:4
**complicated (2)**
41:3;153:4
**complicates (1)**
108:1
**complicating (1)**
108:11
**complication (1)**
107:3
**complications (1)**
108:6
**complied (2)**
51:4;58:6
**complies (1)**
89:11,12
**comply (4)**
28:23;35:23;87:21;
89:19
**complying (1)**
49:10
**comprehensive (1)**
59:9
**conceiving (2)**
102:17,19
**concept (1)**
63:22
**conceptual (1)**
59:17
**concern (15)**
12:4,6,16,25;13:18;
89:24;96:19,25;97:7;
98:1,3;100:20;
102:22;109:20;
168:17
**concerned (6)**
12:9;49:9;131:25;
134:23;160:5;176:4
**concerning (1)**
60:15
**concerns (5)**
47:15;61:10;
105:21;131:20;
175:10
**conclude (1)**
138:24
**concluded (1)**
179:17
**conclusions (1)**
26:23
**conditions (1)**
142:24
**conduct (2)**
54:10;138:15
**conference (1)**
11:9
**confi (1)**
104:25
**confidence (1)**
155:6
**confident (1)**

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 186
of 209

147:19
**confidential (30)**
23:14;85:24;87:19;
90:5,6,14;92:8;94:3;
98:24,24;99:2;
102:23,23;104:16,16;
106:4;110:16,19,20;
115:6;116:12,12;
117:23;118:20,21;
119:5,5;126:19,20;
168:5
**confidentiality (16)**
20:10;26:5;41:8;
85:24;86:25;87:9;
88:8;94:25;95:24;
97:12;100:9;101:1;
111:21;119:8;120:24;
168:11
**confidentially (1)**
44:7
**confirm (4)**
10:21;24:21;58:2;
122:3
**confirmation (2)**
48:7;108:23
**confirmed (3)**
151:11;171:4;
176:18
**conflate (1)**
23:4
**conflict (1)**
176:23
**Congress (3)**
32:15;34:5;54:23
**connection (3)**
10:4;38:9;95:8
**consciously (1)**
117:3
**consensual (1)**
170:20
**consensus (2)**
85:15;114:20
**consent (6)**
26:15;54:3,8;86:19;
97:9;100:6
**consequences (1)**
22:9
**consider (2)**
78:6;131:9
**considered (1)**
65:2
**considering (1)**
59:7
**considers (1)**
149:18
**consistent (5)**
26:6;61:10;64:10;
94:15;102:1
**consists (1)**
149:23
**constantly (2)**
117:12;125:19
**constituents (1)**

95:23
**Constitutional (2)**
55:13;117:20
**constrained (1)**
137:17
**constructed (1)**
31:21
**construction (1)**
36:1
**constructive (1)**
130:13
**construed (1)**
35:24
**consult (2)**
30:22;32:9
**consultant (3)**
26:16;30:17;38:9
**consultants (9)**
16:15;19:17;26:1;
28:8,17;46:14;50:20;
112:21;151:10
**consulting (2)**
30:7;37:25
**contact (1)**
35:21
**contacted (1)**
20:20
**contain (1)**
135:21
**containing (1)**
140:15
**contemplate (2)**
92:8;103:20
**contemplated (2)**
62:19;63:8
**contemplates (2)**
103:17,18
**contempt (3)**
105:3;122:7,17
**contend (3)**
58:14,22;138:19
**contended (1)**
133:23
**contest (2)**
114:18;166:4
**contested (10)**
37:17;38:25;42:1,
10;48:6,16;103:20;
113:23;116:17;131:6
**contesting (1)**
114:17
**context (8)**
15:18;86:2,2;
145:10,12,14;151:25;
156:24
**contexts (1)**
137:13
**Continental (4)**
8:2;66:21;81:10;
140:8
**contingent (1)**
155:8
**continue (4)**

25:12;79:2;118:15;
120:9
**continuing (1)**
167:16
**contract (14)**
53:23;58:15;62:22;
99:23;100:11,11;
101:10,12,19;102:9,
18;122:7,11,12
**contracts (2)**
36:1;58:13
**contractual (1)**
137:2
**contrary (1)**
131:11
**contribution (3)**
151:13,13;162:1
**control (4)**
90:4,12;100:1;
120:10
**controls (2)**
93:6;127:12
**controversy (1)**
63:21
**conundrums (1)**
106:17
**convenience (3)**
119:3;174:5,7
**conversation (2)**
68:13;102:14
**conversations (1)**
18:17
**cooperate (1)**
100:22
**cooperating (1)**
103:16
**cooperative (1)**
104:2
**coordinating (1)**
82:1
**copies (1)**
140:4
**copy (2)**
97:20;115:20
**core (8)**
34:18;54:1,3,7,18,
20;55:12;68:16
**Corp (2)**
61:14;63:4
**corporate (1)**
86:6
**Corporation (1)**
9:16
**corporations (1)**
158:4
**corrected (1)**
18:18
**correctly (2)**
80:1,20
**correspondence (2)**
143:4;153:14
**cosigned (1)**
45:15

**cost (3)**
89:8;117:10,18
**costly (1)**
92:22
**costs (1)**
62:4
**counsel (20)**
7:9,21;8:16;9:11;
34:22;36:6;37:3;38:8;
46:13;49:18;67:24;
76:11,13;78:5,21;
79:7;92:3;102:3;
109:3;129:10
**count (1)**
40:7
**counted (1)**
164:11
**country (4)**
42:24;44:15;
138:14;169:15
**County (3)**
57:19;102:8;150:6
**couple (18)**
15:11;37:2,15;46:5;
53:1,17;54:16;70:10;
76:23;95:19,23;
106:16;129:17;
130:16;159:9;164:6;
165:6;167:19
**course (8)**
121:5;124:12;
127:19;128:9;130:7;
137:21;138:2;141:2
**Court (614)**
6:3,4,5,7,12,20,25;
7:3,8,11,15,18,23,25;
8:3,8,12,15,19,24;9:3,
6,9,14,17,19,21;10:1,
4,7,12,15,23,25;11:3,
7,10,14,17,23,25;
12:2,3,23,25;13:9,12,
16,23,25;14:3,5,8,12,
15,17,21,24;15:2,5,7,
13,16,22,24;16:2,6,9,
14,18,21,23;17:4,6,
12,17,25;18:7,15,20,
24;19:1,7,13,22;
20:16;21:10,17,21,25;
22:2,4,16,18,24;23:2,
11,15,18;24:2,10,14,
20,21,25;25:2,4,6,8,
11,14,16,19,24;26:11,
23;27:3,24;28:1,4,12,
14,22,25;29:4,7,12,
17,19,21,23;30:6,11,
15,19;31:4,9,11,14,
18,24;32:2,5,11,14,
18,21;33:1,4,6,9,12,
14,19,25;34:6,10,12,
19,21;35:1,5;36:12,
19,21;37:1;38:17,19,
21,24;39:20;41:21,
23;42:13,17,22;43:1,

3,6,10;44:12,19,21;
45:5,8,13,18,20,22,
25;46:3,6,9,15,19,22,
24;47:5,7,11,14,18,
21,23;48:1,4,8,10,13,
15,17,21,24;49:2,6,8,
12,20;50:2,15,17,19,
21,24;51:2,7,9,13,16,
18,21,24;52:2,4,7,10,
12,14,20,23;54:3,8,
10;57:19,25;58:24;
59:1,5;60:7;61:2;
62:10,20;63:3;65:7,
10,11,13,16,18;66:8,
10,13,16,20;67:1,4,6,
9,12,14,20,23;68:1,5,
19,19,25;69:2,4,6,13,
13,18,21;70:8,11,13,
16,22;71:3,5,9,12,18,
22,24;72:2,4,6,11,17,
24;73:2,4,8,10,13,16,
18,21,24;74:2,7,9,11,
13,18,22,25;75:3,6,
11,15,19,21,24;76:2,
6,10,14,17,21;78:14,
17,19;79:5,8,9,12,14,
17,20,24;80:3,8,10,
13,16,19,20,23;81:3,
6,9,13,18,20,24;82:1,
2,4,6,7,9,12,14,17,19,
22;83:13,16,19,22,
24;84:2,6,11,15,18,
20,22,25;85:4,6,10,
20;86:10;89:15;
90:10,20,22;91:2,6,
25;92:11;93:12,14;
95:1,2,2,14,15,17,19,
21;96:4,9,13,16,20,
22,25;97:4;98:8;99:7,
17,18,24;100:5,8,23;
101:8,8,20,22;102:8,
10,13,17,21;103:1,7,
12,24;104:15;105:13,
18;106:3,22;107:22;
109:25;111:1,1,18;
112:11;113:3,17;
114:2,21;115:4,10,13,
18;118:3,17;119:1,9,
16;120:14,20,22;
121:5,8,11,20,24;
122:1,4,6,9,17,20,23;
123:1,4,6,14,19;
124:8,12,20,22,23;
125:7,13,14;126:3,11,
14;127:13,15,19,23;
128:3,6,9,11,13,14,17,
21,25;129:2,5,16;
132:23;138:4,12,20;
139:9,13,19,21,25;
140:6,11;141:6,16,16,
19,22;144:17,23;
145:1,13;146:12,13,
15,19;147:19;148:20;

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 187
of 209

149:18;150:6;152:19;
153:17,19,21,24;
154:1,4,6,10,13;
155:13;156:1,7,9,9,
11;157:2,25;158:3,6;
159:8;160:1,3,8,12,
23;161:9,11,16,18;
162:23;163:1,4,7,11,
22,25;164:4,21,24;
165:1,6;166:21;
167:3,20;168:4,8,12,
14,19,22;169:7,14,18;
170:7;171:1,8,11,12,
15,23,25;172:2,5,7,
10;173:22,24;174:1;
177:19,22;178:4,8,12,
16,24;179:2,5,9,13,16
**courtroom (10)**
6:21;39:19;70:7;
93:18;105:21;106:9;
117:2;163:19;172:21,
22
**Courts (14)**
94:24;95:12,14;
102:18;104:21,22;
106:2;109:10,16;
110:13;113:9;130:21;
138:15;167:13
**Court's (5)**
65:5;70:2;78:13;
91:24;121:22
**cover (4)**
28:3;46:4;93:22;
108:7
**coverage (40)**
58:2,12;59:6,8,25;
62:6;77:23;132:4,12;
133:24;134:3,18;
135:8;136:20;137:1,
7,10,11,17;138:6;
142:5,7,8,23,24;
143:1,8,9,10,10,19;
145:5,6,25;147:10;
149:25,25;150:21;
151:24;154:16
**covered (2)**
134:6;170:23
**covering (1)**
134:24
**covers (3)**
113:22;118:5;152:2
**cover-up (1)**
94:11
**crafty (1)**
111:5
**create (1)**
135:11,13
**created (4)**
85:25;142:17,18;
150:13
**creates (2)**
100:18;133:15
**creating (1)**

97:1
**creation (1)**
142:10
**credibility (1)**
59:24
**credit (1)**
94:12
**creditor (1)**
99:3
**creditors (1)**
7:7
**critical (2)**
134:20;135:8
**critique (1)**
175:17
**cross- (1)**
84:15
**cross-motions (1)**
11:2
**crystal (1)**
17:24
**cure (3)**
19:25;21:13,20
**cures (1)**
89:2
**Curet (1)**
9:18
**curious (3)**
29:8;55:7;59:12
**current (9)**
66:4;75:6;92:18;
93:4;118:20;127:12;
139:16;175:7;176:10
**currently (1)**
37:17
**cursory (1)**
157:18
**cut (3)**
97:15;152:8;162:7

**D**

**damaged (1)**
58:4
**damages (2)**
61:23;63:25
**danger (1)**
173:8
**Daniels (1)**
8:10
**data (4)**
17:21;18:1,10,14
**database (1)**
20:12
**date (35)**
17:14,19,24;18:5,
13,19;19:9,14,21;
24:5,17;25:13;27:6;
37:8;39:4,9,14;40:4;
41:8;44:14;46:19;
66:11,16;68:1;78:13,
16;93:4;100:1;
106:20;107:1;127:12;

177:16;178:7,10,23
**dates (3)**
60:16,17,18
**day (10)**
26:5;51:22;53:18;
94:13;106:9;123:23,
24;137:10,10;178:17
**days (13)**
27:20;39:10;44:8;
49:14,24;50:1;51:17;
124:25;137:13;152:4,
7,9,18
**days' (1)**
124:10
**day-to-day (2)**
108:19;121:14
**de (1)**
55:15
**deadline (1)**
64:23
**deadlines (3)**
69:16,17,20
**deal (25)**
20:18,21;27:2;
69:25;95:12;100:12;
105:4;106:2,4,12,16;
112:22;123:16,16;
126:25;127:1,1;
133:18;139:4;141:17,
17;158:10,12;160:21;
162:7
**dealing (9)**
30:13;103:10;
107:3;117:5,6;
121:14;155:7;156:22;
158:15
**dealt (3)**
15:17;53:10;56:16
**debate (5)**
21:7;27:18,22;28:5,
7
**debtor (66)**
6:23;8:18,23;9:1,4;
10:21;13:4;23:10;
24:3,22;27:7;33:10;
39:6;41:10;45:15;
64:18;65:4;76:22,24;
77:12;78:9;79:16,22;
83:6;84:23,24;85:16,
19,23;87:1;88:2,3,5;
90:2;93:1;94:19;97:2;
98:23;100:11;107:21;
114:16;117:18;118:1,
21;120:7;121:1;
125:16,22;126:10;
129:20;131:8;132:18;
134:6,13;141:8,14;
142:20;143:22;
160:17;161:22;162:7,
14;164:11,16,20;
172:6
**debtors (16)**
85:13,14;86:9;87:6;

90:17,24;91:12,17;
92:19;103:15;129:11;
130:22;143:22;148:8;
162:20;171:9
**debtors' (3)**
8:15;77:6;78:20
**debtor's (12)**
85:20;86:5,14;87:3,
15;88:17;89:25;93:1,
5;113:15;117:9;
130:18
**dec (3)**
65:20,22,25
**decades (2)**
145:4;151:14
**December (5)**
57:16;66:19,22;
67:10;68:2
**decide (3)**
69:21;73:2;127:15
**decides (2)**
69:14,14
**decision (3)**
11:13;145:11;
163:19
**declaration (9)**
86:21;88:19;89:1;
90:7;100:13;114:24;
115:23;118:10;123:3
**declarations (1)**
111:10
**declaratory (7)**
53:23;58:11;63:2,7,
20,21;64:14
**declines (1)**
149:25
**declining (1)**
124:4
**decrees (2)**
54:4,9
**deem (2)**
40:11
**defend (3)**
57:25;58:7;60:14
**defendant (4)**
10:10;55:22;56:5;
109:24
**defendants (2)**
54:5,6
**defense (6)**
58:2,8,15,16;61:13;
150:1
**defenses (3)**
132:4,5;135:8
**defer (3)**
76:10;132:21;
178:22
**deferring (1)**
165:5
**deficient (3)**
27:2;58:14;60:21
**define (1)**
22:14

**defined (1)**
112:19
**defines (2)**
19:18;38:4
**definite (3)**
59:3,16;61:8
**definitely (2)**
23:3;96:2
**definition (9)**
21:23;41:4;99:8,9;
101:5;112:16,21;
118:20;142:18
**definitional (1)**
99:7
**definitions (3)**
98:24;99:12;126:20
**degree (2)**
68:8;77:2
**Delaware (3)**
148:17,19;151:18
**delay (1)**
92:23
**delegated (1)**
157:9
**deleted (1)**
126:23
**demand (5)**
134:1,4,8;152:3;
160:17
**demanded (1)**
120:18
**demands (2)**
41:19;54:5
**demonstrate (2)**
61:16;63:20
**demonstrated (2)**
85:13,14
**demonstrates (1)**
58:10
**denied (4)**
58:2,4;90:19;143:9
**deny (4)**
133:24,24;134:12,
18
**Depending (1)**
37:18
**depends (1)**
134:24
**deposed (1)**
114:24
**deposing (1)**
136:19
**deposition (13)**
88:25,25;97:20;
104:9,14;118:9,9;
124:4,7,15;144:9,11;
170:12
**depositions (12)**
39:2;41:19;115:6,
15;136:18;144:14,18;
145:23;146:11;177:3,
4,7
**described (1)**

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 188
of 209

61:10
**describing (1)**
136:4
**descriptions (2)**
12:5,17
**deserved (1)**
139:8
**designate (2)**
101:1,7
**designated (5)**
114:13;115:5,9;
116:11;119:4
**designates (1)**
99:14
**designating (2)**
115:4,10
**designation (2)**
27:14;114:17
**designed (1)**
131:1
**desire (2)**
54:12;130:18
**desk (2)**
153:6;157:11
**despite (1)**
58:5
**detailing (1)**
86:7
**details (2)**
60:15;97:14
**determination (2)**
154:17,18
**determine (6)**
92:20;141:16;
142:25;143:24;147:9;
150:18
**determined (1)**
62:24
**determining (1)**
151:6
**development (2)**
16:25;154:22
**device (3)**
61:22;133:11,12
**dichotomy (1)**
59:13
**difference (13)**
86:4;92:6;98:17;
102:19;103:9;107:18;
119:18,23;121:17;
122:6;123:7,11;
146:22
**differences (1)**
134:4
**different (53)**
33:16,21,21,22;
39:25;44:14;50:9;
52:25;53:9,10;54:16;
56:7;59:20;66:16;
67:15;72:9;73:22;
74:14;86:3;91:21;
95:5;97:4,5;98:12,15,
22;109:10;111:19;

117:14;118:13;122:8,
11;125:1;131:5;
141:4;145:10;155:15,
15,18;157:10;159:9,
23,23,24,25,25;160:2,
5,7,19;162:10;
169:19;176:13
**differently (4)**
15:17;54:25;
109:11;174:6
**difficult (1)**
117:11
**digit (1)**
40:9
**dilemma (1)**
69:16
**diligence (3)**
95:7;103:16;107:5
**diligent (1)**
175:11
**diocesan (4)**
17:19;44:25;
138:19;151:13
**diocese (11)**
12:13,14;63:24;
93:17,23;138:21;
146:13;162:15,16;
172:20;173:3
**dioceses (3)**
150:25;170:6;
172:19
**dire (1)**
117:20
**direct (1)**
155:14
**directed (2)**
61:9;66:15
**direction (4)**
13:22;130:18;
141:4;176:20
**directly (5)**
12:3;126:1;134:9;
142:14;154:14
**directors (1)**
157:15
**disabuse (1)**
160:25
**disagree (1)**
22:19
**disagreeing (1)**
160:23
**disagreement (2)**
15:18;101:8
**disappear (1)**
138:17
**disappointing (1)**
131:10
**disclose (9)**
30:24;32:9;33:6,10;
39:9;40:23;41:5;
42:15;115:5
**disclosing (1)**
31:1;33:23;39:21

**disclosure (10)**
18:4;23:5;31:23;
37:24;41:14;43:8;
44:4;115:7,16;132:5
**disclosures (1)**
44:23
**disconnect (1)**
142:12
**discount (1)**
113:14
**discovery (23)**
11:4;37:20,22;39:3;
40:15;41:20;88:10;
113:20;116:9,18,20;
117:6;125:19;127:2;
131:25;138:3;145:14;
147:19,21;148:2;
156:15;165:16;176:6
**discrimination (1)**
87:12
**discuss (1)**
81:2
**discussed (1)**
91:8
**discussion (3)**
83:3;152:12;160:15
**discussions (3)**
59:10;77:18;79:7
**disease (1)**
60:1
**disinclined (2)**
174:17;175:9
**disk (1)**
106:7
**dismiss (10)**
14:10;42:4;52:21;
53:2;59:2,15;61:6,8;
78:17;81:16
**dismissed (1)**
62:11
**dismissing (2)**
62:12,13
**dismissive (1)**
117:8
**disorder (1)**
87:15
**dispute (9)**
55:13;58:12;59:16;
93:20;112:24,25;
118:5;156:23;169:4
**disputed (2)**
72:20;91:5
**disputes (6)**
55:9,10;74:3;
113:23;125:19;
158:10
**disrespect (1)**
16:11
**dissemination (2)**
90:12;116:11
**distillation (2)**
140:20;149:16
**distinction (2)**

32:16;98:9
**distinguish (1)**
147:24
**distribution (1)**
82:3
**District (30)**
6:5;61:21;62:10;
68:18,25;69:2,4,6,13,
13,18,21;70:2;72:4;
73:2,8;89:6;91:24,25;
95:12;96:7;97:3;
101:24;102:1;106:3;
111:1;112:11;113:1;
119:22;138:25
**District's (2)**
85:25;88:21
**diverting (1)**
96:10
**docket (2)**
95:18;100:16
**document (8)**
41:19;86:7,18;88:8;
104:16;114:13;
168:25;170:10
**documentary (1)**
136:15
**documentation (2)**
119:4;143:25
**documents (44)**
39:6;85:25;86:6;
88:9;91:10;93:19,25;
94:3;104:6,12;
105:24;107:3,6,10,14;
108:2,8,17,22;110:10;
114:8,10;116:11;
120:7;124:7;129:20;
131:20;132:1;135:4;
136:17;137:25;138:5,
8,9;140:2;144:15;
148:23;149:20;
150:13;167:16;170:5;
172:18,20;174:10
**Doe (2)**
150:17,18
**dollars (7)**
21:15;62:1,4,5,7;
157:21;161:5
**done (25)**
19:9;21:13;26:4,6;
33:7;35:23;49:22;
63:22;68:20;87:23;
88:12;95:16;96:18;
102:18;126:19;
127:24;128:22;
133:23;153:10,12,20;
160:21;164:20;
173:20;174:13
**door (1)**
152:11
**doors (2)**
95:16;109:16
**doubt (1)**
69:5

**down (16)**
42:20;44:10;55:20;
64:13;74:21;76:25;
77:13;81:7;88:10,10;
95:4;144:15;172:8;
174:7;175:14;177:4
**Dr (2)**
61:22;62:1
**dramatic (1)**
86:4
**draw (3)**
146:17;150:16;
152:20
**drawer (1)**
153:7
**drawing (1)**
165:23
**drill (1)**
176:16
**drop (2)**
127:7;174:7
**due (4)**
95:7;103:16;107:4;
167:1
**dueling (2)**
85:8;91:6
**duplicative (1)**
131:25
**during (5)**
12:2;57:4;62:6;
115:6,15
**duties (2)**
59:19;60:7
**duty (8)**
57:24;58:19,25;
60:14;61:15;66:4;
135:11,25

**E**

**earlier (4)**
91:8;139:18;
169:21;175:5
**early (6)**
55:5;72:22;135:16,
16;162:17;174:25
**ears (1)**
70:5
**ease (1)**
106:17
**easily (1)**
159:14
**ECF (1)**
36:8
**effect (6)**
31:23;50:1,10;61:1;
106:21;121:23
**effective (2)**
49:24;77:7
**effectively (1)**
86:15
**effort (3)**
117:17;125:4;

158:23
**efforts (2)**
108:19;160:20
**eight (1)**
71:8
**eighty-seven (1)**
104:11
**Eileen (3)**
8:25;65:3;77:11
**either (16)**
13:20;49:15;58:1;
59:2;66:23;84:11;
87:22;96:25;116:12;
125:3,13;149:24;
151:9;152:1;156:17;
176:15
**elaboration (1)**
54:2
**elect (1)**
92:9
**Eleventh (3)**
145:11,15,16
**eliminates (1)**
108:21
**else (22)**
9:3;10:9,17;12:11;
14:13;21:2;24:6;
28:15;40:17;54:25;
65:2;66:3;86:18;
108:14;111:10;113:4;
116:3;124:11;128:6;
166:10;176:14;
177:15
**elsewhere (1)**
138:23
**email (6)**
70:20,23,24;82:3;
117:12;125:3
**emanates (1)**
119:21
**embarrassed (1)**
75:1
**embarrassment (1)**
131:15
**emphasize (1)**
77:5
**employee (1)**
97:13
**employees (3)**
87:11,11;121:16
**Employers (3)**
8:6;57:8;87:10
**Employer's (2)**
56:23;57:14
**encouraged (3)**
34:2,4;49:5
**encourages (1)**
114:19
**end (13)**
13:25;14:5;52:15;
53:18;85:17;106:9;
112:9;114:12;146:24;
155:11;156:9;166:13;

171:3
**endless (1)**
40:7
**endorse (1)**
156:5
**enemy (1)**
167:9
**enforceability (1)**
119:18
**enforceable (1)**
162:11
**engaged (3)**
31:17;93:22;152:13
**engagement (3)**
31:10,13,19
**enormous (4)**
25:22;71:14;87:20;
105:20
**enough (7)**
52:23;137:8;
152:20;154:25;
175:22;176:17;
178:18
**ensues (1)**
37:22
**ensure (6)**
17:23;18:13
**enter (6)**
13:16;49:15;85:20;
95:2;104:21;114:5
**entered (23)**
12:14;17:14;18:12,
14;39:16;44:15;87:5;
88:20;91:6,9,19;
93:10;101:3,18;
107:21;111:16,18;
113:22;114:2,15;
125:12;148:20;
161:23
**entering (7)**
54:4,8,20;106:18;
110:8;114:3;122:9
**enterprises (1)**
30:4
**enters (1)**
141:14
**entertain (2)**
75:23;175:6
**entire (1)**
143:24
**entirely (1)**
48:19
**entities (3)**
27:12;30:8;31:1
**entitled (1)**
173:18
**entity (3)**
28:2;38:5;110:25
**entry (2)**
11:2;106:25
**environment (1)**
103:20
**envisioned (1)**

32:16
**equal (1)**
85:25
**equivalence (2)**
146:18;147:5
**ere (1)**
161:5
**erosion (1)**
143:14
**escaping (1)**
135:25
**Especially (3)**
154:2;168:19,20
**essence (2)**
32:8;124:15
**essential (1)**
16:16
**essentially (8)**
16:23;97:8;126:21;
127:20;132:25;
140:19;146:9;173:10
**established (1)**
58:20
**estate (6)**
33:18;87:21;88:12;
89:8;92:23;117:10
**estimated (1)**
62:4
**et (12)**
6:16,16;21:18;
26:25;27:13;103:19,
19;109:2;110:17;
113:23;144:7;172:22
**evade (1)**
148:11
**eve (2)**
48:7;55:3
**even (32)**
8:6;19:24,24;26:16;
51:5;55:8;62:18;
63:22;68:10;77:21;
80:25;87:13;99:24;
104:5;105:10;107:17;
116:8,25;129:25,25;
139:7;147:2;149:17,
20;152:8;154:7;
155:7;157:14;158:17,
22;162:18,22
**event (1)**
55:15
**everybody (17)**
10:17;27:5;28:8;
29:18;43:13;63:25;
73:12;82:10;104:9;
116:2;120:13;128:6;
155:23,24;171:4;
172:8;175:15
**everyone (8)**
18:9;24:6;43:23;
81:8;94:8;109:18;
131:8;132:6
**everyone's (1)**
42:20

**everything's (1)**
12:21
**evidence (19)**
26:3;58:23;93:19;
95:13,17;100:20;
106:13;108:22,25;
109:6;112:5;132:15;
136:8;138:6;143:3;
146:11;153:12;
157:25;158:2
**evil (1)**
21:9
**evolving (1)**
117:12
**exact (1)**
123:13
**exactly (15)**
22:21;28:23;39:15,
16;47:3;50:20;87:5;
88:23;95:15;116:14;
122:18;141:13;
161:14;163:9;176:7
**exaggerate (1)**
123:24
**exam (5)**
14:17;128:4;129:5;
137:15;165:21
**examination (2)**
81:2;104:18
**examining (1)**
21:18
**example (9)**
15:14;67:2;86:17;
98:15;148:14;153:2;
155:25;161:10,17
**exams (2)**
59:9;155:14
**exceed (1)**
148:4
**exceeds (1)**
62:19
**Excellent (2)**
84:19;102:7
**except (4)**
15:10;125:4,5;
158:14
**exception (2)**
98:1;103:3
**exceptions (1)**
86:17
**excess (23)**
56:10,19,22,24;
57:1,3,24;61:11,11,
17;62:3,8,21,22,24;
63:14,17,22;64:6,8,
12,17,21
**excised (3)**
119:11;121:1,9
**exclude (2)**
15:23;62:22
**excluded (2)**
19:11;118:20
**exclusions (1)**

61:1
**Excuse (3)**
15:7;139:22;177:20
**excused (1)**
83:15
**executives (1)**
157:9
**exhausted (2)**
61:17;62:17
**exhaustion (1)**
143:14
**Exhibit (12)**
33:4;39:10;41:10,
13;46:10;57:17;
104:12,14,17;105:17,
18;115:9
**exhibits (2)**
105:13,24
**exist (2)**
153:5,6
**existence (2)**
58:23;143:6
**existential (1)**
157:23
**existing (3)**
87:23;107:1;120:3
**exists (1)**
23:10
**expect (3)**
12:13;97:5;132:3
**expectation (1)**
112:3
**expense (2)**
87:21;88:12
**experience (11)**
38:6;68:17,18;
69:11;73:11;131:3;
156:3;160:14;167:5,
7;170:21
**experienced (3)**
74:12;159:3;162:13
**expert (16)**
19:5,18,19,21;
22:15;26:15;32:9,13;
36:16;38:5,9;41:4;
48:11;86:17;88:18;
97:12
**experts (37)**
16:13;19:10,16,24;
23:6;25:13,25;26:21,
21;27:1,8,14,21;28:8,
17;30:1;32:17;33:24;
34:2;36:14;37:25;
39:20,21;42:21;
46:13;47:2;48:22;
49:4,25;50:19;100:1;
108:20,25;109:3;
112:16,19,21
**explain (6)**
20:13;81:17,22;
86:24;87:14;132:1
**explained (2)**
15:25;89:25

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 190
of 209

**explaining (1)**
111:10
**explanation (2)**
111:12;173:17
**explicit (1)**
28:10
**exploring (1)**
161:5
**exposure (1)**
135:22
**express (2)**
147:18;164:21
**expressly (5)**
111:17;118:3,4,5;
123:3
**extended (1)**
95:13
**extension (1)**
87:4
**extensive (1)**
59:10
**extensively (2)**
39:14;87:17
**extent (17)**
19:23;24:18;36:10;
59:21;60:10,13,24;
61:4;64:9;72:8;
102:22;142:5,7;
143:19;153:4;162:22;
177:7
**extra (7)**
23:5;74:20;108:19,
19;109:13;122:21;
137:2
**extreme (1)**
114:21
**extremely (1)**
74:12
**extremes (1)**
160:20
**eyes (1)**
86:16

## F

**F3d (1)**
61:14
**face (1)**
148:6
**faced (1)**
112:2
**facing (1)**
102:3
**fact (12)**
20:3;24:15;42:9;
54:19;55:5;59:7;
63:15;89:9;97:1;
100:23;112:5;142:22
**facts (2)**
157:25;158:2
**factual (3)**
55:9,10,13
**failed (2)**

58:2,23
**failure (2)**
58:15;65:22
**fair (7)**
15:19;142:21;
143:6,12;145:25;
146:20;164:9
**fairly (8)**
18:22;30:23;53:1;
68:9;137:14;152:16;
176:19;177:2
**fair-minded (1)**
148:7
**fall (2)**
111:16;137:22
**false (3)**
97:11;146:18;147:5
**Fand (2)**
178:10,13
**fantasy (2)**
149:18,19
**FApp'x (1)**
145:12
**far (19)**
21:12;45:3;74:16;
87:1;97:3,3,24;99:1;
102:11,18;109:7;
113:8;114:13;120:6,
25;126:19;134:23;
171:19;178:15
**fashion (1)**
99:1
**fast (1)**
123:2
**fault (2)**
47:19,22
**favor (2)**
90:25;108:16
**February (1)**
75:8
**Federal (3)**
32:8;89:13,14
**fee (2)**
11:12;12:2
**feel (2)**
33:16;55:20
**fees (1)**
21:14
**felt (1)**
35:18
**few (7)**
53:20;59:5;91:5;
131:23;141:13;
146:11;152:3
**fiduciary (1)**
35:16
**field (1)**
26:22
**fifth (1)**
62:12
**fifty (4)**
21:5;40:13;158:18,
21

**fifty- (1)**
140:16
**fifty-five (1)**
170:17
**fifty-six (7)**
140:20;142:9;
146:3;149:14,16;
152:5,7
**fight (1)**
71:15
**figure (5)**
13:1;98:18;151:12;
155:24;159:5
**figures (2)**
169:25;170:1
**file (19)**
54:12;67:2;77:19;
127:3;135:5,6;
148:24;149:21;153:7,
13;163:7,10;167:21;
169:2,3,6,12;172:11;
173:15
**filed (35)**
11:5;18:3;23:5;
53:11,22;54:5,14;
57:18;58:17;62:2;
68:2;78:15;80:25;
85:9,13;90:17,18;
91:9,12;100:16;
135:6;137:21;140:1,
14,18,25;148:20;
155:3;156:12;164:7,
19;168:1,24;172:4,15
**files (36)**
68:18;98:13;133:1;
135:4;136:1,3,6,7,9,
10,13;139:13,16;
148:22,25;149:19;
150:11,13;151:15;
153:1,3,10,23;154:7,
10;159:11;162:22;
169:8;170:9,10,13;
174:15,22;175:7,19,
19
**filing (5)**
23:10,12;80:7;
150:9;167:25
**final (6)**
54:4,8,20;135:20;
136:15;138:11
**Finally (1)**
136:24
**finances (1)**
148:22
**financial (8)**
12:11;103:18;
107:6,14;132:8;
148:14,15;149:2
**find (4)**
12:18;106:5;145:2,
4
**finding (1)**
62:20

**finds (1)**
59:5
**fine (15)**
17:1;20:24;38:22;
44:13;50:3;53:18;
66:1;71:24;75:19,21;
76:4;85:6;102:3;
174:11;179:8
**finger (2)**
170:8;172:9
**finished (1)**
141:6
**Finishing (1)**
157:2
**Fire (2)**
9:13;56:21
**firing (1)**
44:1
**firm (1)**
78:8
**first (34)**
29:10;34:24;76:1,
18;85:22;87:16;
94:19;97:7;104:13;
106:5;107:1;124:24;
125:6;131:12;135:15,
20;136:6;139:10,15;
140:14,20;141:20,23;
149:4,14;150:19;
152:4,24;154:15;
156:18;166:23;170:4;
172:3;174:17
**fishing (1)**
172:23
**fit (1)**
40:18
**five (8)**
21:1;84:1;129:3;
137:8;161:22;166:8,
15;167:12
**five-minute (2)**
83:25;128:8
**five-year (1)**
159:13
**flesh (1)**
165:7
**flexibility (3)**
63:6,19;112:1
**flow (1)**
125:18
**fly (2)**
106:10;173:9
**flying (1)**
70:20
**Foley (4)**
6:23;8:18,22;
178:22
**folks (10)**
9:10;31:1;36:7;
39:19;42:15;124:5;
128:18;137:24;
169:23;178:20
**follow (7)**

32:8;36:25;39:8;
40:3,20;70:6;118:13
**followed (2)**
34:15;43:19
**following (5)**
22:11;60:9;77:4,18;
137:3
**follows (1)**
115:3
**foot (1)**
11:11
**footnote (1)**
46:8
**forbid (1)**
31:6
**force (1)**
125:17
**forced (2)**
26:14;58:7
**foreclosed (1)**
165:12
**foregoing (1)**
58:10
**forget (1)**
34:18
**forgive (1)**
40:9
**forgot (1)**
14:9
**forgotten (1)**
14:13
**form (48)**
15:18;37:13;47:4;
60:5;86:1,20;89:1;
91:25;92:1,4,7,10;
94:5,15;95:5,11,25;
96:6,8,8,12,14;99:5,
12;100:21;101:3;
102:15;106:18;
108:13;110:7;112:23,
25;113:8;114:25;
115:21,22;118:13;
119:22;121:18;
122:11,14;123:3,12;
126:15,18,21,23;
134:15
**formal (1)**
39:3
**former (2)**
87:11;104:23
**forms (1)**
104:21
**form's (1)**
112:20
**forth (8)**
13:13;56:3;116:19,
20,21;142:16;156:4;
161:25
**fortunate (1)**
137:8
**forty (2)**
158:18,21
**forty-five (1)**

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 191
of 209

40:13
**forward (10)**
69:15;78:7;88:9;
108:24;112:2;127:25;
129:11;131:5;160:16,
16
**found (9)**
61:24;62:15;73:11;
106:11;109:3;111:2;
140:24;149:8;171:19
**four (16)**
17:19;18:3;62:11;
80:24;89:10;133:1;
135:4,20;137:8;
139:11;152:8,23;
161:21;166:7;167:7,
12
**fourteen (5)**
124:10;152:4,7,9,
18
**fourth (1)**
143:13
**frame (4)**
144:21;158:15,17
**Francisco (6)**
27:15;31:20;50:23;
101:18;104:7;172:21
**frankly (7)**
34:4;74:10;79:21;
108:21;117:4;140:24;
169:16
**frequently (3)**
119:22;174:3;
175:17
**fresh (1)**
84:8
**front (3)**
44:1;96:11;114:20
**fronts (1)**
89:6
**fulfill (2)**
167:13;170:22
**full (5)**
35:7;93:18;112:1;
124:10;143:20
**full-scale (1)**
145:22
**fully (4)**
21:24;42:12;142:4,
7
**function (2)**
26:16;36:18;176:3
**functions (2)**
12:12;13:4
**fundamental (2)**
55:9;133:3
**fundamentally (1)**
110:2
**funny (1)**
50:2
**furnish (1)**
58:15
**further (17)**

11:5;20:14,17;
50:24;51:20;58:1,18;
60:15,24;62:8;74:24;
83:3;122:18,19;
126:22;127:6;175:9

**G**

**Gabrielle (1)**
7:5
**Gaddy (1)**
145:11
**gag (1)**
104:24
**gallery (1)**
7:14
**gaming (1)**
137:24
**gander (1)**
171:14
**gating (1)**
77:22
**gave (4)**
26:23;96:6;121:13;
157:3
**general (3)**
70:3;93:25;132:20
**generally (11)**
11:9;57:24;59:24;
109:16;131:6;152:21,
24;153:14;157:17;
165:24;166:6
**generate (1)**
151:14
**generating (1)**
176:6
**gentlemen (1)**
102:6
**George (1)**
9:12
**Georgetown (1)**
71:8
**gets (7)**
90:4,5;98:4;110:11;
117:23;119:4;160:21
**gifts (1)**
94:14
**Girls (2)**
146:7;149:8
**given (10)**
26:21;65:4;68:6;
70:25;80:5;107:6;
112:4;142:2,3;165:3
**gives (1)**
123:15
**giving (6)**
26:13,15;49:13;
94:11;105:6,8
**glad (1)**
19:5
**Glenn (3)**
138:25;141:9,10
**globally (1)**

135:1
**goal (1)**
129:2
**God (1)**
31:6
**God's (1)**
142:10
**goes (15)**
20:8;23:25;24:9;
27:11;38:10;40:24;
111:25;112:1;114:5;
122:18;135:14,23,24;
167:18;171:20
**going-forward (1)**
36:18
**Good (47)**
6:22;7:5,12,16,20;
8:1,3,4,14,20,21,25;
9:12,14,21,22,23,24;
10:1,15;12:24;17:7;
24:23;30:3;36:9,23;
49:4;52:23;71:15;
74:11;76:16;77:10,
11;79:15;82:22;
94:16;101:16;102:5,
13;104:10,12;129:1;
141:17;148:2;151:20;
171:13;177:15
**goods (1)**
37:5
**goose (1)**
171:13
**govern (3)**
89:6;113:20;127:21
**governed (1)**
93:3
**governing (3)**
85:17,20,22
**governs (2)**
17:16;116:16
**grant (4)**
64:8,17;172:16;
175:12
**granted (8)**
25:8;61:8;62:12;
65:11;88:4;90:18;
147:18;164:10
**granting (1)**
61:6
**granular (1)**
159:20
**grasp (1)**
138:14
**grasping (1)**
139:8
**Great (7)**
7:23;8:12;10:5;
66:24;72:23;77:2;
166:2
**greater (2)**
63:6,18
**Greeks (1)**
94:14

**ground (1)**
37:6
**grounds (1)**
143:11
**groundwork (1)**
129:8
**Group (7)**
30:9;35:15;38:11,
12;42:19;43:15;
169:22
**grunt (1)**
69:2
**Guaranty (1)**
56:14
**guess (9)**
31:16;85:8;103:7;
117:7;125:10,23;
150:6;157:4;173:5
**guise (2)**
23:12;146:4
**guy (1)**
97:18
**guys (6)**
84:12;168:1;
175:24;176:16;
177:10,16

**H**

**half (4)**
13:18;37:18;
129:18;150:8
**halfway (1)**
149:7
**hammer (1)**
20:8
**hamstring (1)**
106:1
**hamstrings (1)**
90:1
**hamstrung (3)**
106:15;109:4;114:3
**hand (7)**
32:24;69:17;76:18;
77:15;162:20,20;
164:2
**handiwork (1)**
177:13
**handle (3)**
49:1;83:17;109:10
**handled (2)**
109:7;110:18
**handler (2)**
145:7;157:10
**handler's (1)**
157:11
**handling (1)**
109:25
**hands (1)**
76:22
**happen (6)**
30:25;72:5;101:2;
105:14,16;112:7

**happened (10)**
12:15;18:2;27:18;
47:8;58:21;122:1;
125:4;138:23;157:18;
170:16
**happening (3)**
41:25;109:18;
138:23
**happens (4)**
48:18;99:18;102:1;
161:12
**happy (13)**
18:18;24:18;45:25;
67:8;74:23;75:23;
79:2;81:20;93:9;
97:20;127:5;139:25;
177:13
**harassment (1)**
87:11
**hard (3)**
71:13;85:15;171:2
**hardly (1)**
59:25
**hard-pressed (2)**
44:10;174:23
**hat (1)**
127:7
**head (4)**
13:13;67:9;98:9;
119:17
**heads (1)**
177:10
**hear (22)**
10:5;33:15;45:25;
52:21;81:20;90:25;
98:2;101:11,13,14;
125:7;131:13,14;
132:3,3,8,11;139:23;
159:9;166:10;176:12;
177:3
**heard (16)**
12:22;17:14;22:7;
37:3;79:14;99:25;
112:15;130:5,5,16;
131:10,11,13;138:25;
163:5;167:19
**hearing (17)**
13:21;27:18;48:7;
83:7,18;85:2;91:16;
93:16;94:4;95:17;
99:19;171:17,21;
177:25;178:2,23;
179:1
**hearings (2)**
12:3;59:5
**heart (3)**
135:23,24;138:10
**heightens (1)**
81:1
**held (6)**
62:10;87:1,2;
110:16;151:19,25
**help (11)**

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 192
of 209

30:2;34:3;79:19;
101:20;127:6;130:7;
134:25;136:17;145:5,
6;176:22
**helpful (7)**
13:20;30:23;34:1;
163:2;171:16;174:11,
12
**helps (2)**
55:5;172:8
**Here's (1)**
103:13
**herring (1)**
37:25
**hey (4)**
101:21;102:5;
122:9;134:3
**hiding (1)**
121:12
**high (3)**
110:15;124:7;
157:14
**higher (2)**
98:4,7
**highest (3)**
98:11;99:15;111:21
**highly (9)**
90:14;92:8,16;
98:24;102:23;116:12;
118:21;119:5;126:19
**Hinton (1)**
42:21
**Hinton's (1)**
43:4
**hired (4)**
31:8;169:23,23,24
**hiring (2)**
57:20;169:22
**history (1)**
135:12
**hit (1)**
142:9
**hits (2)**
20:7,7
**hitting (2)**
22:5;23:7
**hold (5)**
32:19;70:1;77:3,17;
83:2
**holding (2)**
104:15;176:6
**hole (1)**
66:22
**holiday (3)**
67:18;167:10,11
**holidays (1)**
65:17
**honest (1)**
100:4
**honestly (1)**
74:19
**Honor (249)**
6:10,10,14,19,22;

7:5,12,16,20,24;8:1,4,
9,14,17,17,25;9:8,12,15,
23,24;10:2,14,20;
11:15,20;12:1,22;
13:7;14:18,23;15:1,9,
15,20;16:22;17:3,8,
14,15;18:2,13,25;
19:4;20:14;21:24;
22:1,13,21;23:5,8,24;
24:7,18;25:7,10,15,
17;27:19;29:10;
30:18;31:3;32:6;
33:11;34:17;35:9,10,
22;36:9,10,20,23;
37:8,14,18;38:1,13,
13,23;39:13,16,23;
40:8,19,21,25;41:11,
16;42:12;43:2,8,11,
23;44:4,9,17;45:11,
21;47:24;49:5,9,15;
50:13;51:15,20,25;
65:3;66:21;67:11,13;
68:4;70:6,17;71:7;
74:16;76:5,9,19,23,
24;77:4,16;78:12;
79:15;81:10,15;83:5,
21;84:7,23;85:7,12;
90:23,24;91:3,14;
94:19;96:2,21;97:24;
99:5;102:12,20,25;
105:3;110:21;111:22;
112:22;113:2,7,22;
115:17;116:6;117:11;
118:1,16;120:1;
123:10,21;125:9,10;
126:8,9,13;127:10,18;
128:2,5,7,10,12,16,
23;129:6,8,12,17,22;
130:3,6,9,20,23;
131:3,10,17,19;132:2,
12,24;133:4;135:2;
136:24;137:9,20;
138:7,14,17,24;139:6,
20,22;140:1,8,10;
144:21;145:9;147:16,
25;152:2;154:23;
157:16;159:19;
160:14;162:24;163:5,
9,13,24;164:1,5,13,
25;165:3;166:20;
167:1,5,18;168:17,25;
169:12,16,20,24;
170:4,9;171:2;172:1,
24;173:4,11,12,17,25;
177:18,20;178:21;
179:4,8
**Honorable (1)**
6:6
**Honor's (6)**
18:19;24:4;72:13;
131:23;163:19,19
**hope (6)**
37:21;85:14;126:2;

128:23;130:7;164:18
**hopefully (5)**
78:9,9,14;128:16;
160:21
**hoping (3)**
78:21;79:6;151:5
**horizon (1)**
152:17
**hostile (3)**
104:7;105:9,9
**hour (2)**
37:18;140:25
**how's (1)**
101:11
**huge (5)**
21:7;27:17;136:14;
142:12;158:23
**humanly (1)**
71:14
**humble (1)**
167:4
**hundred (1)**
161:3
**hundred-and-some-odd-thousand (1)**
21:15
**hurt (1)**
22:6
**husband (1)**
101:17
**hypothetical (1)**
120:23
**hypothetically (2)**
118:17,18

# I

**idea (9)**
24:23;30:25;67:4;
116:7;136:18;150:10;
155:11;171:15;
174:21
**ideas (1)**
64:1
**identical (2)**
45:10;118:24
**identified (2)**
30:1;77:19
**identify (1)**
159:16
**identities (3)**
26:10;109:19;144:7
**iiiJ (1)**
28:13
**illuminating (1)**
53:3
**illusory (1)**
36:4
**image (1)**
147:6
**Imagine (1)**
105:1
**Imerys (1)**
151:17

**imitations (1)**
122:12
**immediate (1)**
65:21
**immediately (1)**
53:15
**impact (5)**
81:5;133:5,19;
134:22;135:18
**impacts (1)**
80:18
**impassioned (1)**
141:6
**impediment (3)**
43:22;97:22;131:14
**impediments (2)**
42:8;131:4
**implicate (3)**
54:15;64:21;100:25
**implicated (3)**
59:19;63:14,17
**implicating (1)**
64:12
**implications (3)**
23:19;55:14;165:15
**implied (1)**
40:21
**import (1)**
119:11
**importance (1)**
25:22
**important (13)**
13:3;23:16;53:15;
61:20;72:21;80:12;
95:22,23;97:22;
126:5;133:2;134:5;
164:14
**importantly (1)**
88:7
**imported (2)**
95:25;126:20
**importing (1)**
99:5
**impose (1)**
137:25
**impossible (5)**
35:8;36:17;100:19,
19;116:8
**inadvertent (1)**
20:6
**inappropriate (1)**
171:18
**inclined (5)**
126:14;175:4,6,12;
176:22
**include (10)**
27:13;34:22,23,25;
46:12;50:19;107:5;
153:1,14;166:5
**includes (1)**
88:23
**including (5)**
38:10;60:16;70:5;

118:6;132:5
**inconsistent (3)**
19:11;35:12;41:7
**inconvenience (1)**
89:8
**incorporates (1)**
27:21
**incredible (1)**
107:3
**incredibly (2)**
95:22;152:5
**indeed (1)**
156:8
**indemnification (1)**
62:2
**indemnify (5)**
57:25;58:18,19,25;
60:11
**Indemnity (8)**
6:16;8:5;19:4;
55:23;57:3;58:3,9;
61:13
**indenture (1)**
74:5
**indentures (1)**
74:4
**independently (1)**
127:15
**indicate (2)**
12:2;13:14
**indicated (1)**
54:12
**indicating (1)**
86:21
**Indiscernible (9)**
10:24;45:17;57:18;
76:12;78:18;79:3;
105:23;124:16;168:7
**indiscernible- (1)**
30:18
**individual (8)**
26:20;35:8;44:5;
60:25;93:18;108:22;
159:21;160:15
**individualized (1)**
73:19
**individually (1)**
35:11
**Industrial (1)**
57:3
**infer (1)**
171:18
**inform (4)**
132:6,6,10,13
**information (88)**
15:14;17:1;18:11;
22:11;23:9,9,13,20;
24:19;39:12;40:2,13,
14,17,17;41:16;44:3,
6;55:23;56:1;61:5;
65:5;86:11,12,13,15,
20;87:19;90:5,6,13,
14;92:8,17,20,25;

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 193
of 209

**insurer (13)**
17:20;18:3;78:6;
133:1,22,24;142:23;
148:15,16;160:18;
161:25;162:3;163:21
**insurers (124)**
9:25;10:3;11:5;
14:22;23:4;24:11;
27:9,10;39:18,24;
40:8;41:5;42:15;
43:24;45:1;53:24;
54:12;57:24;58:1,9,
13,14,17,22,25;59:1,
21;60:2,7,17;61:11,
12;62:3,3,11,23;64:8;
68:9,14;77:1,2,7,8,17,
23,24;78:5,22;79:7,
23;86:23;87:14;88:1,
3,15;89:19;90:1,18;
91:7,15,20,23;92:9;
113:10;114:22;115:1,
11,24;117:8,13,24;
118:7;120:15,18;
125:5;126:15;129:24,
25;130:4,10,25;131:3,
11;132:16;133:23;
134:8,12;135:5,10,19,
25;136:1;137:6;
138:11,12,13,19;
140:3;141:8;143:9,
11,23;144:2,4;145:3;
146:8,9,18;148:13;
149:22;150:23;
152:14;155:1;161:21,
23;162:8,8,20;164:7,
17;167:11;170:19,22;
172:4
**insurers' (10)**
38:3;42:3;58:20;
60:19,20;61:7,12;
64:17;81:16;151:15
**insurer's (9)**
14:24;85:21;87:18;
88:4;93:8;117:4;
125:20;129:19;162:3
**intellectual (1)**
174:21
**intend (2)**
55:16;78:4
**intended (4)**
16:11;19:10;78:13,
15
**intent (1)**
76:25
**interact (1)**
73:14
**interest (1)**
120:17
**interim (1)**
12:19
**interject (1)**
123:2
**internal (1)**

110:24
**interpret (3)**
36:13;54:24,25
**interpretation (4)**
35:10;36:3;65:25;
91:14
**interpreting (2)**
36:1;62:16
**interrupt (1)**
16:6
**interrupted (1)**
125:19
**interruption (1)**
179:12
**Interstate (2)**
20:24;21:12
**intervene (1)**
147:17
**intervened (1)**
93:24
**intervening (1)**
165:15
**intervention (2)**
24:20;147:17
**into (30)**
21:7;26:13;27:17;
38:12;50:1;61:4;
68:13;70:23;71:20;
74:23;93:19;95:2,25;
97:14;99:5;101:18;
107:21;108:22;109:2;
114:7;116:23,24;
120:12;126:21;
141:14;147:17;
148:25;161:1,23;
176:2
**introduce (2)**
7:10;8:10
**intrude (1)**
176:7
**intrudes (1)**
144:1
**intrusive (1)**
158:9
**invasion (1)**
64:5
**investigate (1)**
100:19
**investigation (1)**
151:3
**invite (1)**
19:2
**inviting (1)**
77:1
**invoke (2)**
111:4;147:22
**invoking (2)**
29:22;150:20
**involve (2)**
91:15;95:13
**involved (4)**
109:12;110:5;
156:25;162:18

**involving (3)**
110:23;143:22;
150:16
**Iolab (12)**
61:14,19,20,20,24,
25;62:2,14,21;63:8,
10,25
**Iolab's (1)**
62:5
**ironically (1)**
118:12
**Isaac (1)**
169:22
**ISO (26)**
15:14,23;16:20;
17:21;18:2,5,10,14;
19:18,19,21,25;20:4,
11,18,24,25;21:2,3;
22:10,11,14;23:19;
28:12;31:15;43:20
**issue (38)**
14:14;16:20;19:4,
24;27:6;30:18;34:14;
37:14;44:15,18,22;
50:6,25;52:13;55:16;
59:6;69:7;72:14,19,
21;75:2;80:5;85:16;
88:16;97:25;99:4;
107:20;114:13,22;
119:3,5;123:10;
135:22;136:12;139:1;
146:6;156:14;169:20
**issued (11)**
55:23;56:2,5,15,18,
21;57:3,5,8,11,14
**issues (23)**
27:2;50:4;55:10;
61:3;63:19;68:6;
72:14;77:22;78:6;
89:7;97:4;105:2;
119:3;127:2;130:5;
131:2,2,5,6;136:20;
157:23;170:24;
176:11
**item (3)**
6:15,17;115:5
**items (1)**
6:14
**iteration (1)**
174:8
**IU (1)**
178:4
**iv (1)**
46:11

**J**

**jackhammer (1)**
23:17
**Jacobs (1)**
9:18
**janitor (1)**
124:6

**January (4)**
67:1,14,22;68:1
**jeez (1)**
112:10
**Jenson (2)**
61:22;62:1
**Jesse (1)**
7:22
**job (2)**
53:3;117:16
**John (2)**
150:17,18
**join (2)**
138:22;163:13
**joined (1)**
53:13
**joins (1)**
132:18
**jointly (1)**
6:15
**jot (1)**
55:20
**Judge (35)**
16:3;47:1;69:6;
70:1;72:22;73:2,8,8;
74:11;93:15,21;
96:10;105:1,11;
106:9;108:5;111:23,
24;114:9;138:17;
141:9,10;146:6,9,14;
149:7;151:18,24;
156:14;160:6;172:21,
22;176:18,21,24
**judges (1)**
106:3
**judgment (6)**
53:23;58:24;62:13;
63:11;134:15,19
**judgments (2)**
54:4,8
**judicial (1)**
156:13
**July (1)**
94:22
**jump (1)**
85:3
**jumping (1)**
19:12
**June (1)**
53:21
**juries (1)**
95:13
**jurisdiction (5)**
53:25;55:12;90:11;
122:20;123:4
**jurors (1)**
62:9
**jury (14)**
26:3;54:5,11;69:3;
72:4,21;73:8,12,15;
74:5;95:18;105:13,
14;112:12
**jury-trial (1)**

93:2;98:11;100:17;
103:19;105:17;106:4;
115:5;116:3,11;
117:19,22;129:24;
130:5;131:15;132:19;
133:14;135:7,21,23;
139:17;143:14,21;
144:4,5;146:18,23;
147:3,4,7,8,11,11;
149:1,5,7;150:3;
153:16;154:25;155:9;
156:4,19;160:9;
162:2,12,22;164:14;
168:2;169:5;170:18;
172:23;175:8,20
**infringement (1)**
61:24
**infringing (2)**
61:21;62:6
**initially (3)**
53:13;54:18;154:13
**injunction (1)**
160:18
**inoculate (1)**
141:19
**instance (8)**
29:10;31:16;43:8;
50:7;68:23,24;94:19;
124:9
**instances (4)**
21:1;60:15;68:21;
69:1
**instead (3)**
20:8;99:22;149:15
**instinct (3)**
22:4;63:5;160:25
**insurance (89)**
7:21;9:11,13,16;
10:11;22:17;35:14;
46:12;55:23;56:1,2,6,
13,14,15,18,19,21,22,
23,24,25;57:1,4,6,9,
12,14;58:5;59:6;
60:24;61:17;62:16,
19;63:3,22;76:10,13;
83:11,11;95:4;
100:12;112:4;129:10,
12,13;130:1,23,24;
131:7;132:4;133:3,5,
9,10,17,19,20,22;
134:10,12,15;135:18,
19,24;136:13,14;
137:3,19;138:1,4;
139:1,2,7;142:5,19,
19;148:17,19,24;
151:12;153:9,15;
154:18;157:7;159:24;
165:4;169:1;171:18
**insured (4)**
61:16,16;138:19;
153:15
**insureds (2)**
20:11;143:24

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 194
of 209

72:20
**justification (6)**
89:23;142:2,3,11,
13,15
**justified (1)**
146:5
**justify (3)**
18:4;114:21;148:22
**Justine (1)**
8:10

## K

**KAPLAN (92)**
7:12,12;9:8;11:22;
14:18,22;15:9,15;
17:3,5,7,8,13,18;18:1,
8,16,21,25;21:25;
22:1,3,13,17,19,25;
23:3,12,16,24;24:3,
11,15,24;25:1,3,5,7,
10,12;36:23,24;37:2;
38:18,20,22,25;41:22;
42:12,14,18,23;43:2,
4,7,11;44:17,20,22;
45:6,14,19;51:20,23,
25;52:3,6,9,11,13,18,
22;76:13,16;84:1,3;
128:12,16,23;129:1,6,
6,17;146:16;159:2;
163:9,12,15;164:1;
165:3;173:25;177:18
**Kaplan's (1)**
46:17
**keep (15)**
17:16;23:8;82:22;
94:3;104:17,17;
107:14;117:11,15;
135:5;136:1,13;
158:19,20,21
**keeping (1)**
95:18
**keeps (1)**
94:20
**Keller (1)**
7:6
**kept (1)**
23:13
**key (4)**
123:11;133:15;
134:25;141:23
**keys (2)**
77:3,17
**kids (1)**
71:7
**Kim (1)**
7:6
**kind (29)**
12:15;13:12;20:7;
24:7;26:19;35:23;
53:11;61:5;64:4;
71:22;103:20;114:3;
124:9;136:4;149:16;

150:20,20;151:2;
152:22;154:8;157:22;
165:17,20,21,21;
166:4;168:15;172:8;
174:19
**kindly (1)**
43:23
**kinds (5)**
41:24;53:9,15;
120:4;165:24
**knew (4)**
31:16;64:1;150:25;
151:1
**knowing (1)**
39:20
**knowledge (4)**
38:6;150:22,23,23
**known (7)**
31:1;34:17;35:2;
43:18;44:8;51:6;
69:22
**knows (5)**
43:13;86:10;
116:25;147:16;162:2

## L

**La (2)**
105:12,12
**lack (2)**
159:10;166:11
**lacks (1)**
59:24
**Lafferty (2)**
6:6;69:2
**land (2)**
75:8;105:12
**landing (1)**
71:11
**Lane (4)**
146:6,9,14;149:8
**language (10)**
25:1;27:10;118:12,
24;119:11;123:19;
124:17;126:22;
127:11;175:24
**Lardner (3)**
6:23;8:18,22
**large (3)**
13:2;59:23;173:5
**largely (1)**
63:10
**largest (1)**
130:22
**last (19)**
10:13;50:3;56:17;
64:23;68:6;81:16;
110:6;130:17,17,23;
131:19;148:18;
166:15;167:6;171:5;
172:3,12,24;174:8
**late (1)**
177:23

later (9)
53:22;56:14;81:12;
91:15;112:2;141:18;
155:5;160:11;178:19
**laundry (1)**
55:19
**law (25)**
54:7;60:22;62:15,
16;63:1,6;86:11,14;
87:7,8;133:3,9,11,12,
15,17,22;134:12,16,
21;138:13,16;141:11;
154:16;160:2
**lawsuits (3)**
57:18;58:8;102:7
**lawyer (5)**
34:25;77:12;
101:16;121:4;122:2
**lawyers (8)**
34:23,24;35:20;
93:19;94:10;102:6;
162:13;167:20
**lay (3)**
20:13;86:17;88:18
**layer (1)**
91:22
**lead (3)**
77:12;163:17,18
**leading (1)**
167:20
**leaning (1)**
137:15
**learn (1)**
82:17
**least (9)**
59:22;60:9;63:13;
85:14;91:13;95:22;
138:1;155:10;162:9
**leave (3)**
36:13;128:4;131:17
**leaves (1)**
117:4
**Lee (37)**
7:1;8:20,22,22;
83:17;84:23,23;85:1,
2,5,7,11;90:21;92:5,
21;113:4,6,7;115:14,
19;118:23;119:2,15;
120:1,15,21;121:6;
122:24;123:1,2,3;
124:23,24;125:7,9;
126:8,10
**left (3)**
36:15;98:5;138:9
**legal (1)**
62:23
**legitimate (1)**
30:4
**lengthy (1)**
53:1
**leniency (1)**
65:15
**less (2)**

70:18;131:20
**Lesser (1)**
128:20
**letter (13)**
18:3,3;22:22;28:24;
34:15;49:10;137:19;
140:24,25;141:2;
149:23,24;152:11
**letters (2)**
143:8,10
**level (14)**
43:8;59:17,18;60:3;
72:1;81:1;85:24;
90:14;98:11;101:1;
111:21;135:1;155:6;
159:20
**levels (6)**
86:25;106:8;
117:14;120:24;
157:14;171:17
**Levin's (1)**
15:3
**liabilities (1)**
165:25
**liability (9)**
58:20;61:23;62:9,
17;133:19;134:23;
135:19;142:25;
143:16
**liable (2)**
61:24;62:10
**Liberty (1)**
141:12
**light (3)**
64:25;78:12;178:18
**liked (3)**
79:25;80:5;120:23
**likelihood (5)**
63:14;64:5;135:22;
148:13;157:5
**likely (5)**
64:2,5,21;128:14;
136:8
**likes (1)**
77:10
**limit (3)**
39:24;40:19;47:25;
137:6
**limitation (3)**
19:8;90:8;147:18
**limited (10)**
40:22;60:16;95:15;
124:2;144:22,24;
148:2;155:17;165:16;
177:2
**limiting (1)**
110:11
**limits (5)**
87:9;141:24,25;
142:24;143:16
**line (13)**
6:14,15,17;7:2;
20:3;44:1;96:7;

112:24;121:13;125:3;
150:16;152:20;
165:23
**lines (2)**
76:4;97:1
**linger (2)**
69:22;141:5
**linked (1)**
142:20
**liquidation (2)**
148:19,20
**list (12)**
11:21;24:9;27:11;
34:18;35:7,19;36:8;
49:19;55:19;57:21;
82:3,11
**listen (2)**
175:3;176:5,13,20,
23
**listing (1)**
57:18
**lists (3)**
38:11;40:7;117:12
**literal (1)**
12:8
**literalistic (2)**
35:24;36:10
**literally (5)**
35:3;51:22;90:11;
113:18,20
**litigant (1)**
137:23
**litigants (2)**
167:14;170:23
**litigate (2)**
72:4;170:23
**litigated (7)**
37:9;39:14;44:18;
45:7;95:12;151:17;
155:8
**litigation (17)**
30:3;36:15;79:18;
81:5;103:18;145:17,
22;151:2,24;152:22;
160:5;165:22;166:3;
169:25;174:18;176:2;
177:8
**litigations (1)**
121:13
**litigator (3)**
71:15;77:10,11
**little (29)**
10:7,7;15:17;16:16;
37:19;54:2;59:6;
65:14;74:20,24;75:4;
77:3,17;78:1;103:2;
106:7,21;108:11;
121:4;124:1,14;
126:5;130:16;151:16;
166:18;169:8;175:18;
176:4;178:19
**live (1)**
12:18

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 195
of 209

**lived (1)**
102:22
**living (1)**
149:18
**Lloyd's (2)**
56:9;57:5
**Local (2)**
68:19;92:2
**locate (1)**
158:23
**lock (1)**
106:9
**Lockheed (1)**
63:4
**locking (1)**
95:16
**London (2)**
9:25;10:3
**long (5)**
12:20;111:22,23;
174:13;175:5
**longer (1)**
128:19
**Look (43)**
16:9;24:21;26:19;
27:1;31:22;38:3;42:2,
7;43:23;48:6;52:24;
64:3;72:24,24;74:3,
23;80:21,22;82:21;
88:21;101:4;102:22;
104:5;108:8;112:24;
114:14;123:11;
126:11,14,25;127:5;
135:11;137:21;
142:25;144:21;
151:22;155:17;156:1;
161:11,12;169:23,24;
174:6
**looked (5)**
21:2;71:25;79:21;
113:11;142:11
**looking (21)**
43:16,17;48:22;
63:5,19;64:11;66:18;
67:10;75:5,17;80:20;
151:6;153:9,12;
157:5;159:21;165:13;
166:15;172:25;175:1;
178:13
**looks (5)**
12:15;21:4;119:6,7;
134:21
**loose (1)**
109:21
**lose (1)**
168:10
**loses (1)**
99:24
**lost (4)**
40:7;60:18;100:1;
136:8
**lot (16)**
10:18;19:11;36:24;

47:10,16;82:22;
97:14;107:5;108:24;
117:16,17;119:3;
125:23;145:14;
153:15;155:18
**lots (5)**
98:21;106:4;
155:15,15;158:11
**love (5)**
82:17;84:1;171:6,9,
10
**Lowenstein (6)**
7:10,13;17:8;36:24;
91:4;129:7
**Lowenstein's (1)**
21:14
**lower (2)**
76:22;98:5
**lucky (1)**
77:10
**Ludgate (10)**
63:3,8,10,12,15,18;
64:10,14,20;65:25
**lunch (2)**
128:13,15
**lying (1)**
167:4

# M

**MABA (1)**
133:5
**maddening (1)**
126:4
**Madison (2)**
146:7;149:8
**main (24)**
37:15,17;39:1;
40:16,19;53:6;72:14;
87:23;91:7,19;
107:11;108:7,13;
109:20;113:22,23;
114:14;116:13;120:3;
127:21;131:2;147:15,
21;165:19
**Mainly (1)**
73:7
**maintain (3)**
90:14,15;138:2
**makes (10)**
35:25;36:2,4,17;
100:18;128:1;134:8;
148:6;160:17;166:10
**making (1)**
88:2
**management (4)**
11:9;68:6;79:22;
83:3
**mandatory (1)**
115:21
**mangled (1)**
52:4
**manifest (1)**

105:22
**manner (1)**
108:19
**manners (2)**
26:24;153:9
**manual (1)**
151:23
**manuals (4)**
136:16,24;151:16,
19
**many (12)**
41:25;44:6,6;55:2;
61:12;81:16;96:9;
151:12;152:14;154:2;
155:1;162:2
**March (1)**
57:15
**Marie (4)**
8:18;10:20;76:19;
83:5
**Mark (5)**
8:1;66:21;81:10;
96:6;140:8
**Market (2)**
9:25;10:3
**Marsal (1)**
12:5
**Marsal's (1)**
11:12
**Martin (2)**
63:4;138:25
**material (2)**
102:19;111:11
**Matt (2)**
9:15;84:23
**matter (24)**
6:8,9;17:22;26:17;
27:19;28:5;37:17;
38:6,25;42:1,10,16,
18;47:2;48:6,16;
54:11;55:12;87:13;
108:22;117:1;131:22;
154:15;169:9
**matters (12)**
54:1,6,16;74:12;
83:11;92:13;95:12,
12;113:23;116:17;
131:6;178:14
**Matthew (1)**
8:22
**may (36)**
22:5;30:9,16;35:19;
38:22;42:23;44:8;
46:1;54:25;61:1,1,2,
2;64:1;72:20;83:5;
86:13;92:3;115:5;
119:9,23;127:17;
129:11;131:5;133:5,
6,15;134:5;137:1;
140:10;143:24;155:7,
16;164:20;178:6,10
**maybe (39)**
8:6;10:21;14:11,11;

15:11;19:21;21:1;
22:8;32:10;37:19;
67:1;69:25;70:18,18;
77:21;78:23;84:7;
96:17;97:25;99:24;
100:6;101:15;103:8;
106:17;112:11;
129:18;153:17,18;
158:14;161:11,13,21;
165:14;169:3;170:9,
11;176:17;177:25;
179:3
**maze (1)**
26:4
**mean (61)**
12:7,9;16:23;19:11;
23:7,20;29:7;30:7,25;
33:7;38:5,21;42:6;
44:11,13;50:4,9;
52:20;59:11;65:19;
67:6;68:8,12;69:8;
70:1;73:4,14;76:15;
81:18;82:14;86:3,4;
92:11;97:10;98:5,7,
14;99:8,19;100:23;
105:10;108:8;111:24;
123:3;125:23;127:24;
128:18,21;152:25;
158:3,24;159:14;
160:24;163:16;168:5;
171:15;172:7;175:2,
19;176:19;179:5
**meaning (3)**
69:11;137:11,12
**meaningful (1)**
132:17
**means (2)**
39:9;53:15
**meant (5)**
12:8;35:10;47:25;
91:14;144:5
**meantime (1)**
14:5
**measured (1)**
136:25
**measures (1)**
26:25
**mechanism (6)**
19:9;21:3;36:7;
99:16;100:18;104:4
**mechanisms (1)**
106:5
**mediate (1)**
78:6
**mediation (35)**
79:3;130:15,20;
132:18;138:5;142:6,
8,21;143:20;144:10,
11,12,15,16;145:8,21;
146:5;149:6;151:21,
22;152:10,17;156:21,
24;159:1,6;164:14,18,
22;170:21;172:14,14,

15;176:11,15
**mediations (4)**
144:16;155:10;
160:16;162:18
**mediator (11)**
138:9;144:13;
145:24;152:11;
155:22,25;156:5;
160:4,20;176:15,20
**mediators (8)**
152:12,15;155:23;
156:3,16,17,18,19
**medical (1)**
110:24
**meet (1)**
111:14
**meet-and-confer (4)**
71:2;75:25;78:21;
80:6
**meets (1)**
159:15
**meld (1)**
98:19
**members (1)**
105:14
**memory (3)**
45:3;103:5;123:12
**mental (1)**
135:1
**mention (2)**
11:12;83:7
**mentioned (6)**
11:18;89:7;91:22;
92:5,21,25
**mere (1)**
96:25
**merit (1)**
94:12
**merits (1)**
61:3
**met (1)**
149:6
**meta (7)**
59:17;60:3;81:5;
133:7;134:25;137:16;
138:7
**meta-level (1)**
80:21
**method (1)**
94:3
**Michael (4)**
7:12;17:8;36:24;
129:6
**microphone (1)**
7:18
**Microsoft (2)**
106:5,13
**middle (3)**
75:7,8;160:22
**mid-February (1)**
77:21
**might (42)**
12:6;15:9;17:3;

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 196
of 209

37:20;40:9;42:4;
43:25;54:2;63:15,16;
66:1;70:25;78:6;93:8;
96:17;98:12,14,15;
101:3;106:17;107:17;
109:14;112:9;116:6;
125:2;130:1,2;
145:25;149:2;152:12;
155:11;158:10,13;
159:24,25;160:2,4,7;
162:10;165:19;
166:17;174:25
**million (5)**
61:25;62:4,4,5,7
**mind (9)**
23:8;41:6;65:23;
68:14;84:9;130:9;
139:10;164:8;166:3
**mind-numbing (1)**
126:5
**minds (1)**
68:17
**mindset (1)**
166:6
**minimal (1)**
176:19
**minimize (1)**
96:8
**ministerial (1)**
57:20
**minute (9)**
7:4;61:19;77:20;
84:1;134:3;157:20;
171:12,16;173:1
**minutes (15)**
68:12;84:18;
128:19;135:21;
139:14;141:13;157:3,
16,22;158:9,11,13,24;
172:25;173:5
**mirror (1)**
147:6
**mirrored (1)**
27:9
**missed (5)**
47:9,11;82:14;93:8;
139:14
**missing (8)**
11:21;16:3;136:8,
22,22,23;143:3;
153:11
**mistake (1)**
168:21
**misunderstanding (1)**
119:10
**model (10)**
86:1;88:21,24;92:3,
7,10;114:25;115:21,
22;118:13
**modeled (1)**
87:6
**modest (1)**
166:1

**modification (2)**
37:15;106:19
**modifications (1)**
126:16
**modified (5)**
23:22;98:20;
100:21;121:9;126:22
**modify (5)**
18:19;92:12;
115:13;121:6;126:18
**modifying (1)**
106:19
**moment (2)**
76:3;93:16
**moments (1)**
131:23
**Monday (4)**
42:24;52:16;67:11,
12
**Montali (4)**
47:1;96:17;101:3;
103:4
**Montali's (1)**
172:22
**month (2)**
129:18;174:6
**months (16)**
36:15;69:23;80:25;
85:12;89:9,10,10;
92:22;118:15,15;
129:18;150:8;155:18,
18,19;166:9
**Moore (5)**
13:8;178:1,21;
179:4,8
**moot (5)**
15:20;16:23;17:10;
19:4,20
**moral (1)**
89:5
**more (33)**
37:19;41:3;51:15;
53:14;59:3,16,18;
60:5,25;61:8;63:9;
65:6;66:24;68:24;
69:9;78:24;87:9;88:7;
89:9;99:2;102:3;
119:21;130:5;133:23;
150:24;159:14;
162:17;164:21;166:1,
3;168:14;174:18;
177:7
**morning (30)**
6:22;7:5,12,16,20;
8:1,3,4,14,20,21,25;
9:12,14,15,21,22,23,
24;10:1,2;16:7;17:7;
36:23;37:10;70:21;
79:15;83:8;92:25;
150:4
**Moses (3)**
6:22,22;7:1
**most (18)**

15:12;22:19;57:21;
59:8;77:7;86:12,13;
92:5;97:16;100:14;
109:8;114:1;121:13;
127:1;151:24;152:2;
155:2;157:18
**motion (83)**
11:5,20;14:16;
15:10,13;16:3,13,16;
17:23;19:5,16;23:4,
25;25:8,13,16;29:6;
37:8,11;45:6,8;50:5,
13;52:1,21;54:13,21;
58:18;59:15,16;61:6,
8;64:9;66:2,23;68:15,
18,23;69:7,21;72:12,
16;74:18;75:13;
77:19,25;78:22,24;
79:1,1;80:7,18;81:12;
86:23;88:1;90:17,18;
91:9;112:11;129:10,
19;131:12;137:20;
139:23;140:3,11,14,
17,19;141:3,14,21;
142:4;143:18;145:13;
147:24;149:4,10,11,
12;164:7,10,19
**motions (22)**
14:10;16:13;18:18;
25:21;42:3;53:2,18;
55:17;61:7,7;69:12;
77:21;78:17;80:25;
81:15;84:8,16,24;
85:8;90:16;91:6;
116:18
**motivations (1)**
116:5
**motive (1)**
21:9
**move (7)**
52:19;78:7;84:10;
92:4;130:7,13,18
**moved (3)**
59:1;110:24;147:16
**moves (1)**
110:10
**Moving (16)**
6:19;28:14;29:25;
36:11;38:14;46:8;
78:11;130:15,18;
131:4;132:16;166:7;
174:4,4;175:16,17
**much (37)**
16:7;20:23;36:21;
54:2;60:5;66:24;
68:24;69:5;72:20;
76:6;77:12;81:1;
82:21;83:19;90:20;
93:14;107:18;131:23;
137:14;139:19;
143:15;147:20,21,21;
154:18;159:6;160:24;
163:23;165:1;166:3;

171:25;174:1,18;
176:8;177:19;179:11,
14
**multiple (1)**
117:2
**must (4)**
62:16;111:7,7;
133:25
**mystery (1)**
136:2

## N

**nail (2)**
20:8;22:5
**name (6)**
8:5;21:4;41:17;
42:20;109:11;168:4
**names (9)**
26:9;30:12;100:15;
108:16,18;109:2,9,15;
111:20
**nature (5)**
88:14;142:5,7;
143:19;144:6
**nauseam (1)**
86:10
**NDA (2)**
107:4,15
**nearly (1)**
45:10
**necessarily (11)**
24:13;33:9;53:13;
60:16;63:8;64:13;
69:7;104:1;111:3;
153:5;158:21
**necessary (5)**
35:19;115:7;131:6;
153:13;177:5
**need (70)**
13:5,5;21:7;25:25;
26:1,1,2;30:16;40:3;
46:2;48:20,22;50:3;
53:19;55:20;57:21;
58:11;61:4;65:24;
66:24;81:1,18,21;
82:23;92:16,20;94:5,
15;104:4,10;106:20;
108:21;115:17;
124:10;127:6;129:24;
130:1;131:15;132:19,
22;133:14;134:7;
138:6,8;142:20,21;
143:20;144:9;146:20,
23;147:2,9;148:25;
149:9;151:14,23;
152:18;156:1;159:4;
161:1,2,4;162:21;
166:9;171:12;175:11,
18;176:21;178:4,5
**needed (6)**
142:4,7,22;147:4;
158:25;164:21

**needs (12)**
23:24;60:6;63:20;
64:9;66:4;83:11;
85:23;92:20;138:5;
143:18;154:19;
155:24
**negating (1)**
77:23
**negative (1)**
49:16
**negligent (1)**
57:19
**negotiate (1)**
114:7
**negotiated (1)**
118:1
**negotiations (1)**
156:21
**neither (7)**
24:3;38:17;59:10;
60:1;91:1;90:2;146:14
**NERA (4)**
30:9;38:11,12;
43:17
**neutral (1)**
130:2
**nevertheless (1)**
43:7
**New (19)**
67:18;91:21,23;
92:18;93:9,17,17;
94:2;138:25;140:19;
141:4,9;146:6;
149:17;152:4;173:3,
10,15,20
**News (3)**
93:24;101:18;
121:25
**newspaper (1)**
102:2
**next (11)**
25:11;52:17;71:4;
77:24;82:7;83:24;
84:6;90:22;133:17;
169:10;178:3
**Nice (5)**
7:23;8:12,17;83:19;
171:9
**nicely (1)**
132:1
**nine (2)**
40:8,10
**nineteen (1)**
140:16
**ninety-nine (1)**
73:23
**Ninth (4)**
62:15,20;94:6;
101:23
**nobody (9)**
20:11,12;22:11;
24:19;30:2;31:16;
47:14,14;101:25

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 197
of 209

**noncore (1)**
55:12
**nondebtors (1)**
90:10
**nondisclosure (4)**
94:23,25;95:5;
103:15
**none (2)**
18:17;165:17
**nonissue (1)**
107:9
**nonpublic (2)**
86:6,12
**nontestifying (7)**
32:9,16;33:2,24;
34:2;37:24;49:4
**nor (4)**
24:3;38:17;59:11;
90:2
**normally (4)**
74:10;97:16;100:4,
12
**North (1)**
56:18
**Northern (6)**
6:5;85:25;88:21;
89:6;119:22;162:16
**note (3)**
91:25;92:7,24
**noted (1)**
77:9
**notes (2)**
55:19;157:5
**notice (18)**
29:18;39:12;40:4;
44:4;45:16;49:13,16,
16,21,23;50:11,24;
51:4,5,14,15;124:10;
156:13
**noticed (2)**
49:17;50:5
**notices (1)**
35:14
**noting (1)**
148:12
**notion (5)**
37:24;48:5;107:2;
108:15;110:19
**notwithstanding (3)**
89:7,8,9
**Novak's (1)**
172:21
**NOVEMBER (4)**
6:1;64:24;65:1;
150:8
**novo (1)**
55:15
**number (18)**
6:15,15,17,17,18;
34:23;37:15;57:9;
68:20;102:21,21;
128:18;150:17,18;
167:6,9,24;172:25

**numbers (11)**
13:1;55:24;56:3,10,
15;57:1;63:16;64:1,1;
151:14;161:12

# O

**OAKLAND (6)**
6:1,16,18,24;53:22;
173:3
**object (4)**
40:6;41:15;49:25;
67:25
**objected (3)**
41:17;91:7;161:23
**objection (5)**
16:19;51:3;88:17;
140:12;159:10
**objections (1)**
146:8
**obligated (1)**
58:18
**obligation (5)**
60:11;147:2;
167:13,16;170:2
**obligations (3)**
56:13;62:23;170:22
**observation (1)**
41:24
**observe (1)**
76:24
**obviously (5)**
28:21;32:22;69:4;
85:16;119:21
**occasion (2)**
70:17;167:17
**occurred (1)**
44:23
**occurring (1)**
39:3
**occurs (1)**
55:2
**October (1)**
53:2
**oddly (1)**
178:17
**off (13)**
15:11,12;30:8;40:9;
67:17;70:19;72:3;
85:1;87:6;88:22;98:8;
110:14;132:15
**offended (2)**
54:22;73:4
**offer (5)**
106:11;111:15;
143:12;157:21;
160:19
**offered (5)**
108:25;111:9;
134:1;149:7;162:4
**offering (2)**
147:5;162:1
**office (2)**

8:10;67:18
**official (17)**
96:5,7;99:5,12;
100:21;101:24;
106:18;110:7;112:19,
20,23,25;121:18;
122:11,14;123:12;
126:23
**often (2)**
153:20;156:4
**Oftentimes (1)**
109:11
**O'Melveny (2)**
8:5;19:3
**once (3)**
37:9;99:23;138:15
**one (84)**
11:20,23;12:22,24;
13:13;16:3,24;17:20;
37:15;41:21;43:25;
48:22;50:4;53:4,17;
58:4;59:17;60:10,16;
65:1,18;69:17;72:10,
14;74:15;80:17;
84:25;85:9,11;89:18;
91:22;92:6,15,24;
98:8,9,10;103:25;
108:7,12;110:23;
113:21;115:11,12;
116:24;117:12;
118:14;121:4;127:10;
139:14,15;140:10,14;
141:21,23;142:22;
144:19;146:12;147:1;
148:12;149:1;153:22;
157:4,11;158:14;
159:8;160:10,13;
161:2,3,22,23,24,25;
162:20;164:9,12;
167:20;169:8;172:24;
173:10;174:3,4;
175:11
**one- (1)**
20:10
**one-off (1)**
148:21
**onerous (3)**
40:18;43:14,17
**ones (9)**
24:12;49:18;51:6;
99:12;107:7,12;
131:12;171:8;172:4
**one's (1)**
40:22
**one-sided (2)**
23:20;24:15
**only (30)**
23:9,10,18;24:12;
28:17;39:5,7,17;
40:16;54:21;58:19;
70:21;86:16;88:16;
89:3;90:12,12;91:22;
101:14;108:5;115:6;

116:15;118:7;144:24;
146:20;148:14;
157:13;164:9;171:8;
178:14
**onto (1)**
25:12
**oOo- (1)**
6:2
**oops (1)**
22:23
**open (5)**
96:2;98:21;110:14;
118:4;167:22
**opening (3)**
147:23;152:11;
157:23
**operating (2)**
89:10;118:25
**opinion (1)**
167:4
**opinions (1)**
26:23
**opportunity (4)**
44:6,9;71:2;134:1
**opposed (4)**
50:24;100:24;
134:13;169:11
**opposing (1)**
91:1
**opposite (1)**
88:13
**opposition (2)**
139:24;147:25
**optical (1)**
61:22
**optional (1)**
92:1
**oral (1)**
62:25
**oranges (2)**
165:18,20
**order (210)**
6:3;10:19;11:2,6;
12:14;13:16;15:19;
16:12,24;17:10,11,14,
19,24;18:5,12,13,17,
19;19:9,18,21;20:4,7;
22:10;23:21;24:5,17,
18;25:13;27:6,8,20;
28:9,13,20,23,25;
29:10;31:6,20;32:20;
35:11,13,24,25;36:3;
37:8,11;38:4;39:4,9;
41:8;44:14;46:7,15,
18,19;47:17;49:16,23,
25;50:20,22;82:13;
84:8;85:8,17,20,22;
86:15,20,21;87:4,4,6,
14,18,24;88:4,16,18,
20,22,24;89:2,5,11,
16,20,20,25;90:4,8;
91:6,9,10,12,17,20,21,
24;92:4,6,12,18,18;

93:4,4,5,6,10;94:5,15,
21,21;95:11;96:18;
97:8,22;98:25;99:22;
100:5,7,10,24;101:4,
20,23,24;102:15;
104:15,20,22;105:2;
106:20,25;107:1;
108:4,7,12,13;110:8,
9,11;111:6,16,18,22;
112:19;113:8,12,16,
17,18,18,19,20,25;
114:2,5,7,14,15;
115:15,21,24,25;
116:1,8,9,13,22;
117:3,5,24,25;118:1,
3,4,7,18,19,21;
120:3,6,10,10,23;
121:22;122:9,16;
123:5;125:1,2,20,21;
126:1,18;127:12,12,
20,21;131:23;132:19;
144:2;146:23;148:20;
151:15;177:15,16
**ordered (7)**
114:9;115:3,10;
120:19,21;123:14;
124:21
**ordering (1)**
100:5
**orders (28)**
15:21;17:22;20:2,3,
20;27:9;36:2,13;
52:19;54:4,8,20;
84:14,22;85:17;
87:22;92:3;93:6;
94:19;104:24;108:11;
110:23;113:13;114:1;
115:1;120:4,10;
125:12
**ordinary (2)**
138:2;170:25
**organizational (4)**
136:15,16;144:8,19
**organized (1)**
136:13
**original (3)**
146:3;173:1,7
**Orleans (2)**
93:17,17
**others (4)**
43:21;44:14;70:7;
150:25
**otherwise (17)**
37:23;39:6,22;
90:11;105:4,5;
111:24;115:3,9;
123:14;124:16,17,21;
131:15,20;146:13;
169:10
**ought (6)**
34:2,4;84:7;94:7;
126:17,20
**ours (1)**

125:24
**ourselves (5)**
37:6;132:7,10,13;
151:10
**out (61)**
6:20;11:12;13:1;
21:23;23:25;24:6;
27:7;28:11;35:11;
39:18;49:17,21,23;
59:16;63:10;67:9,15;
78:5;79:6;80:14;
82:10;84:8,13;89:3;
94:13;97:3;98:18;
110:1,22;111:6;
112:18;114:19,25;
115:11,13;117:4;
118:19;120:2;122:21;
124:6;125:25;133:4,
7;134:6,25;137:10;
140:23;143:15,16;
145:4;147:20;148:4;
150:7,10;151:12;
155:24;159:5;162:12,
12;165:7;177:14
**outcome (1)**
72:9
**outcomes (1)**
97:5
**outset (1)**
173:19
**outside (1)**
106:10
**over (16)**
6:19;13:4;36:15;
37:13;88:14;90:11;
99:25;100:1;120:7,
12;131:20;134:5;
142:10;143:21;
166:17;171:5
**over0objecting (1)**
43:23
**overall (1)**
131:18
**overcomplication (1)**
107:14
**overlap (2)**
52:24;132:1
**overreach (1)**
22:8
**override (1)**
107:1
**oversight (1)**
28:9
**overt (1)**
148:10
**overview (1)**
129:9
**own (6)**
28:21;36:13;97:12;
121:15;137:3;149:3
**owned (1)**
61:22

**P**

**pace (1)**
84:9
**Pacific (10)**
6:16;8:5,6;19:4;
25:18;55:22;57:14;
70:15,16;93:15
**package (2)**
16:12,17
**page (2)**
10:22;95:3
**paid (7)**
33:17;62:10;
135:17;136:12;144:3,
6;150:14
**pain (1)**
117:23
**papers (14)**
63:1;81:2;110:8;
135:10,14;136:2;
137:20;139:14,16;
142:4;154:11,12;
174:16;175:7
**parade (1)**
110:5
**paragraph (2)**
120:18,25
**paragraphs (1)**
114:14
**parallel (3)**
41:25;53:6;77:13
**paraphrasing (1)**
130:7
**parcel (2)**
131:5;137:4
**parsing (1)**
50:3
**part (9)**
19:14;38:2;54:2;
68:8;87:21;107:11;
131:5;137:4;138:6
**participants (2)**
130:14;132:17
**participate (2)**
130:10,11
**particular (14)**
12:5;17:20;34:7;
44:11;50:7,8;63:2;
145:7;148:2;159:5,7,
21;160:24;168:5
**particularized (2)**
59:18;60:5
**particularly (6)**
30:24;43:14;63:23,
24;75:2;148:23
**particulars (1)**
60:25
**parties (42)**
6:19;28:7;31:21;
39:1,10;40:5,10;
45:14;50:18,19;53:3;

61:25;69:24;78:11,
14;83:3;86:19;89:10;
90:15;91:18;92:2;
94:24;95:9;100:25;
101:1;102:16;103:10,
11,12;112:23;114:19;
116:21;119:19;
121:14;122:21;
125:17;127:5;156:5,
19;160:21;162:10;
165:4
**parties' (1)**
59:9
**parties-in-interest (1)**
117:2
**partner (1)**
7:22
**parts (1)**
29:11
**party (28)**
15:25;19:14,19;
20:5,9,19;21:23;24:7;
27:11;28:14;38:8;
39:22;43:12;45:2,12;
46:11;68:18;74:1;
85:15;91:9;97:9;
101:6;103:16;115:4,
5,9,10;118:4
**passed (2)**
85:12;124:25
**past (4)**
42:11;134:9;
143:21;150:14
**patent (2)**
61:22,24;86:1,2;
92:13;99:8
**path (4)**
76:25;77:13;
130:15;132:16
**paths (1)**
59:11
**patience (1)**
126:6
**pause (2)**
76:3;79:10
**pay (11)**
21:14;24:8;61:25;
62:10;132:9;134:4,7,
17;146:23;162:4;
167:12
**paying (1)**
149:2
**payment (1)**
157:21
**payments (1)**
143:21
**pea (1)**
130:17
**penalty (1)**
105:2
**pending (11)**
57:18;93:24;
129:23;131:13,18,24;

147:22;148:9;161:20;
165:9;169:10
**penny (1)**
64:13
**people (34)**
20:12;30:3,8;31:7;
36:5;40:12;41:16;
44:8;55:2;67:17;
82:22;83:25;86:9,17,
19;89:4,19;90:13;
104:10;111:20;
115:12,22;117:13,14,
21;124:2;142:21;
145:17;147:22;
153:16;158:4,5;
175:10;176:13
**people's (1)**
109:2
**per (1)**
162:5
**perceive (1)**
173:3
**perceived (1)**
19:20
**percent (2)**
73:23;161:3
**perfect (1)**
80:2
**perfectly (1)**
95:6
**performing (1)**
13:2
**perhaps (2)**
178:6,10
**peril (1)**
32:22
**period (16)**
41:14;55:25;56:20,
22;57:1,6,9,15;62:6;
69:23;142:23;146:24;
159:13;166:17;
170:25;173:6
**periods (6)**
56:4,7,11,16;57:12;
175:5
**permissible (1)**
111:8
**permission (1)**
117:19
**permit (2)**
18:14;64:18
**permitted (6)**
19:24;47:2;49:25;
61:9;115:4;149:17
**perpetrator (2)**
109:21,23
**perpetrators (1)**
110:5
**perseverance (1)**
126:6
**persists (1)**
59:13
**person (8)**

27:23;29:15;38:5;
42:19;98:11;104:2;
124:16;157:12
**personal (2)**
72:1;73:12
**personally (3)**
43:25;71:11;72:5
**personnel (1)**
57:21
**perspective (5)**
68:22;78:20;
119:25;147:7;175:23
**persuasive (1)**
97:18
**pertinent (3)**
38:6;40:11;63:1
**PG&E (1)**
113:10
**ph (2)**
133:5;138:18
**phonetic (2)**
30:9;43:9
**phrase (1)**
148:13
**pick (3)**
9:9;103:4;124:6
**picked (2)**
26:24;146:17
**piece (1)**
14:19
**pieces (1)**
23:5
**pile (2)**
104:11;124:7
**pin (1)**
119:17
**place (12)**
24:16;60:18;84:25;
94:4,22;95:17;
103:15;141:8;156:21;
162:16;172:19;
175:12
**placed (1)**
148:18
**plaintiff (31)**
53:21;55:24;56:2,6;
57:9,19,23,25;58:7,
10,12,16,19,22;59:1,
2,23,25;60:8,10,11,
13,14,17,20;61:9;
64:4,18,24;68:10;
148:9
**plaintiffs (8)**
35:4;53:24;54:3;
58:3;93:18;94:10;
102:6;110:23
**plaintiffs' (5)**
34:23,24,25;35:20;
58:4
**plan (6)**
95:9;107:5;130:1,
17;161:25;171:4
**plane (1)**

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 199
of 209

83:12
**planning (2)**
24:8;128:13
**plans (3)**
86:5;151:10;161:21
**plausibility (2)**
64:11,20
**plausible (2)**
63:21;169:1
**plausibly (1)**
63:13
**play (4)**
110:1;133:4,7;
134:25
**plays (1)**
59:16
**plea (1)**
141:6
**pleading (6)**
15:3;61:4;63:9,13,
15;64:15
**pleadings (2)**
62:11;68:11
**Please (1)**
6:7
**pleasure (2)**
16:22;24:24
**pled (1)**
65:23
**plenty (1)**
69:1
**Plevin (77)**
8:1,1;15:7;66:21,
21;67:3,5,17,21;
73:25;81:10,10,14,19,
22,25;82:3,5,7,10,13,
16,18,20;84:5;140:8,
8;141:23;144:20,24;
145:2;153:3,18,20,22,
25;154:2,5,9,12,15;
156:3,8,10,12;157:4;
158:1,4,8;159:19;
160:2,4,9,13;161:10,
14,17,19;162:24;
163:3,17,20;164:13,
22;165:7,14;166:13;
172:1,3,6,9,11;
173:23;174:9,10;
175:15;176:17
**plus (1)**
80:21
**podium (2)**
70:4;132:14
**point (51)**
13:10;18:6;22:9;
26:3;34:14;37:21;
38:20,23;42:1;43:7;
54:14;63:17;81:4;
82:22,25;86:14;87:8,
18,23;88:17;94:5,12;
95:22;96:7;99:21;
110:6;113:15;114:25;
117:14;118:19;

125:25;132:3,12;
138:24;139:6;149:23;
150:2;154:22;155:6,
11;156:15,25;160:13;
161:2;164:12;167:18;
172:3,24;174:17;
175:3;176:19
**pointed (6)**
63:10;114:19;
120:2,2;140:23;
146:12
**pointing (1)**
172:9
**points (7)**
37:2;46:5;60:9;
90:16;109:7;152:3;
164:6
**police (1)**
41:9
**policies (41)**
55:24;56:2,6,6,10,
15;57:6,12;58:5,7;
60:25;61:1;62:24;
64:6,12,21;133:19;
134:22,23;136:7,8,9,
16,20,21,22,23,25;
142:19,19,21,21;
143:2,4,15;146:10;
147:8;153:4,10;
154:5;159:25
**policy (32)**
55:24;56:3,10,19,
19,21,23,25;57:1,3,8,
9,15;62:8,18,20;
64:17;100:12;136:11;
137:12,12;138:6;
142:23;143:1,6;
145:6;146:24;147:11;
149:3;151:23;153:11;
162:3
**policyholders (1)**
62:22
**portfolio (1)**
143:24
**portion (2)**
92:5;118:19
**pose (1)**
96:20
**posing (1)**
166:2
**position (20)**
24:11,12;26:13;
35:18,22;36:14;42:3;
43:20;59:22;71:16;
80:14;90:25;109:23;
119:6;143:8,10,11;
159:5;165:12;166:4
**positions (3)**
114:21;132:12;
176:2
**positive (1)**
27:4
**Poslusny's (1)**

138:17
**possibilities (1)**
98:22
**possibility (1)**
64:11
**possible (5)**
71:14;74:4;94:16;
98:9;152:7
**possibly (5)**
13:6;23:8;98:16;
132:9,9
**posture (1)**
152:22
**potential (1)**
78:11
**potentially (3)**
68:16;130:22;
136:21
**power (2)**
36:12;99:25
**practical (3)**
26:17;107:18;
108:22
**practicing (1)**
120:5
**precise (2)**
60:6;74:17
**precisely (1)**
69:9;95:14;96:5
**precision (1)**
175:18
**precursor (1)**
123:13
**predicate (1)**
122:17
**prefer (1)**
85:5
**prejudice (1)**
155:17
**premature (1)**
116:24
**premise (2)**
87:25;88:1
**premium (1)**
153:16
**prepare (1)**
90:9
**prepared (3)**
20:19;21:24;23:6;
48:20;178:2
**preparing (13)**
90:2;107:5;118:9;
124:3;144:10,11;
145:21,21,22,23,23;
146:5;149:6
**prepped (2)**
88:25;114:23
**prescribed (1)**
153:9
**presence (1)**
124:5
**present (11)**
26:3;48:11;100:19;

105:9,17;106:13;
112:10;136:11;
143:25;144:4,5
**presentation (1)**
166:13
**presented (15)**
29:5,9;45:7,9;
63:16;69:12;74:18;
94:22;100:3,4,24;
109:6;110:20,21,22
**presenting (5)**
95:13,17;105:13;
106:1;111:6
**presently (1)**
54:11
**presents (1)**
110:2
**president (1)**
104:23
**presiding (1)**
6:6
**press (4)**
93:18,21;106:10;
117:1
**pretty (4)**
23:16;164:13;
171:9;178:14
**prevent (1)**
135:25
**preventing (2)**
93:22;125:21
**prevents (1)**
105:12
**previewed (1)**
84:4
**previous (1)**
127:21
**previously (3)**
44:20;111:16;120:2
**priests (1)**
150:25
**primarily (2)**
15:3;65:19
**primary (25)**
53:24;55:23;56:2,5,
9;57:24;58:14,17,20,
22,25;59:1;61:7,7,12,
16;62:3,6,16,18,23;
85:18,19;90:17;91:23
**principle (3)**
134:11;141:23;
145:20
**principles (6)**
133:3,4,9,16,21;
135:3
**print (1)**
20:24
**prior (1)**
69:21
**prism (1)**
63:19
**privacy (3)**
117:21;144:2;

175:10
**private (16)**
86:12;98:3,13;
100:10;101:10,19;
102:4,9;107:22;
108:4;109:5;113:17;
114:4,7;122:10;
123:17
**privilege (1)**
120:17
**privileged (2)**
70:24;104:11
**probably (15)**
12:3,18;30:23;
34:24;43:19;49:22;
67:24;68:24;80:6;
92:22;97:13;127:25;
129:14;153:13;
176:24
**probative (3)**
152:21;158:25;
159:22
**problem (33)**
20:2,22;21:20,20;
22:12,13;26:9;38:3;
55:2,4,16;73:6,24;
92:14,16;98:25;
99:22;105:4,5,7,20;
112:8;119:13,14,15;
127:1;144:18,20;
148:1,1;149:2;
156:16;163:16
**problematic (2)**
55:1;92:5
**problems (5)**
55:14;130:12;
148:14,15;153:22
**procedurally (2)**
37:11;178:3
**procedure (9)**
10:19;13:10;40:24;
43:18;51:4,5;89:14,
14;114:17
**procedures (7)**
39:8;40:20;91:11,
18,21;116:25;137:3
**proceed (2)**
6:13;178:1
**proceeding (56)**
9:2;10:11;37:16,19,
21;38:2,7;40:23;41:1,
2;53:5;57:23;59:2,7;
65:4;76:25;77:1,9,16;
78:10,16;81:1,7;82:5;
85:11,21;91:13;94:2;
110:14;112:1;113:19,
21;114:16;116:15,16,
19,22;120:12;127:22;
129:23;131:13,18,24;
137:7,8,18;147:14,17,
23;148:9,10;164:8,9,
17;165:10;168:23
**proceeding-level (1)**

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 200
of 209

80:22

**proceedings (6)**
58:25;95:14;96:9;
109:20;118:6;179:17

**process (7)**
48:9;55:6;102:16;
109:15;132:17;
152:14;172:8

**produce (12)**
88:9;107:12,12;
108:2;110:10,24;
111:12;136:14;
152:24;158:11;
167:16;174:11

**produced (15)**
11:4;88:6,8;91:11;
93:25;107:4;110:11,
25;120:7;129:20;
140:2,5;154:7;
166:19;177:12

**production (6)**
88:2;110:9;116:10;
164:10;175:4;177:2

**productive (1)**
36:16

**profession (1)**
171:11

**professional (3)**
27:17,23;33:17

**professionals (6)**
24:23;27:21;30:22;
31:21,25;47:3

**program (1)**
106:6

**progressing (1)**
155:10

**progression (1)**
169:11

**prominent (1)**
158:7

**promise (1)**
177:17

**promised (1)**
88:14

**promptly (2)**
13:16;52:15

**prongs (1)**
134:21

**proof (8)**
18:11;39:8;40:2,3,
14;41:15;44:3;50:8

**proof-of-claim (2)**
40:12,16

**proofs (25)**
11:6;17:18;23:9,13;
24:19;26:17,22;37:5,
7;39:5,7;40:20,25;
41:6;43:16,17;45:1,
10;93:2,3,6;108:24;
149:21;151:5;154:23

**proper (5)**
21:8,8;168:4;
172:19;176:3

**properly (1)**
37:12

**proposal (5)**
33:11;45:23,25;
49:7,14

**proposals (1)**
79:22

**proposed (41)**
15:21;20:3;27:20;
30:1;31:20;37:14;
38:4;43:4,5;85:20,21;
86:14;87:4,6,14,15,
18;88:4,18,22;89:20,
25;91:12,17;93:5;
104:5;113:19;114:5,
15;116:14,15;117:4;
118:12;124:25;125:1,
17,20,21;142:14;
143:17;161:25

**proposing (3)**
102:15;108:6;
126:15

**proposition (2)**
63:9,12

**propound (2)**
147:19;173:12

**propounded (1)**
148:15

**proprietary (1)**
99:9

**prosecute (1)**
90:9

**protect (3)**
47:12;72:7;98:10

**protected (3)**
109:11,15,19

**protecting (2)**
26:9;108:16

**protection (7)**
19:14;28:21;89:3;
91:22;106:8;114:18;
122:22

**protections (8)**
17:23;24:16;26:12;
39:13;93:11;108:19;
109:14;120:8

**protective (81)**
11:2,6;15:10,19,21;
16:12,24;17:10,11,22;
18:12,17;20:2,4,20;
22:10;26:24;35:13;
47:17;52:18;84:8,14,
22;85:8,17;86:21;
87:24;88:20;89:11,
20;90:7;91:6,12,17,
20,21,24;92:3,4,6,18,
18;93:4,5,9;94:21,21;
100:5;101:20;102:14,
15,16,16;104:15;
106:19,25;108:4,7;
110:8,9;113:13,16,18,
19,20,24;114:1;115:1,
24,25;116:1,13,22;

117:25;118:1,2,3;
119:21;120:3,4,6

**proud (1)**
8:9

**proverbial (1)**
44:1

**provide (10)**
35:19;39:11;40:4;
51:14;58:2,23;59:3;
60:14;130:12;161:6

**provided (8)**
24:5;36:7;38:15;
40:15;41:8;58:16;
62:8;115:20

**provider (1)**
24:7

**provides (6)**
27:7;29:10;39:4,6;
46:11;114:16

**providing (1)**
82:1

**proving (1)**
143:5

**provision (12)**
19:13;28:12;29:22;
34:15;36:4;45:9,16;
88:23;89:3;99:13;
115:11;121:6

**provisions (7)**
26:5;27:4;44:25;
87:10;89:16;100:10;
123:5

**provoked (1)**
53:17

**public (6)**
100:16;111:2;
148:23;162:2,19;
167:9

**publicly (2)**
18:10;148:25

**Puklin (3)**
10:2,2,6

**pull (2)**
136:4;169:7

**pulled (3)**
30:8;67:7,14

**punished (1)**
21:14

**purchased (1)**
58:5

**purely (1)**
55:11

**purport (1)**
138:16

**purported (1)**
139:1

**purpose (9)**
125:16;142:15;
143:18;145:5;147:20;
148:3,3;155:17;
158:24

**purposes (10)**
17:7;104:18;142:6,

8;143:19;149:6;
151:21,22;165:12;
176:10

**pursuant (3)**
40:16;91:11;140:3

**pursue (3)**
77:8;79:3;164:18

**pursuing (3)**
76:25;78:10;164:17

**push (1)**
167:13

**pushed (1)**
150:10

**pushing (2)**
150:7;170:22

**put (27)**
21:4;22:14;30:5;
71:16;83:2;93:19;
94:22;95:9;103:15;
104:11;108:21;112:5,
17,20;120:8;133:9,
13;146:4;152:23;
156:18;157:5;161:25;
166:12,12;170:8;
173:16;177:10

**puts (2)**
66:22;176:23

**putting (2)**
32:12;147:1

**puzzlement (1)**
42:5

# Q

**qualified (1)**
58:16

**qualify (3)**
31:2;101:6;123:25

**quick (3)**
48:2;178:8,12

**quicker (1)**
130:8

**quickly (4)**
46:4;127:2;136:12;
152:16

**quite (3)**
12:8;87:18;103:8

**quote (4)**
92:2;94:18;104:24;
131:24

**quotes (1)**
157:6

# R

**radar (1)**
14:14

**raise (6)**
52:1,11;77:23;
105:10;131:4;177:24

**raised (6)**
62:25;77:15;
161:19;163:16

**raises (1)**
13:8

**raising (1)**
82:25

**range (1)**
105:24

**ranged (1)**
142:9

**rarely (2)**
69:13;176:3

**rather (5)**
15:10;71:19;
133:24;168:18;
178:18

**rationale (1)**
34:8

**RCBO (1)**
135:6

**re (6)**
10:19;42:3;57:8;
65:25;83:3;145:11

**re- (1)**
119:10

**reach (3)**
82:10;85:15;114:20

**reached (6)**
26:22;78:5;79:6;
155:9

**reaction (6)**
41:21;124:23,24;
125:6,10;139:3

**read (14)**
15:16;18:18;20:14,
24;21:2,12;70:21;
86:21;96:13;105:12;
115:17;121:22;122:3,
3

**reading (1)**
46:8

**reads (1)**
115:2

**ready (5)**
68:25;69:3;128:6;
178:4,5

**real (5)**
77:10;97:22;
100:12;103:13;123:2

**realize (1)**
142:12

**really (55)**
12:13;13:1;15:2;
16:15;19:24;33:20;
37:7;40:18,24;41:3,
20;46:25;47:1,24;
48:5;49:9;53:3,13;
59:20;61:3;69:10,16;
75:13;77:11;78:7;
86:7;87:3;88:15;
92:23;98:18;99:14,
15;102:4;103:17,19;
106:15;109:25;110:2;
111:3,15;125:24;
129:25;131:14,25;

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 201
of 209

132:2,16;138:6;
152:22;159:19;
166:22;167:18;176:2;
177:8;178:3,4
**reason (28)**
33:22;42:2,5;49:4;
77:14,16;81:23;
85:22;87:16,16;
88:14,15;100:3;
103:1;104:10,12;
125:20;128:22;
133:14;147:25;148:1;
151:20;152:18;168:5;
172:13,15,16;173:19
**reasonable (20)**
26:12;64:10,11;
75:17;112:14;125:18;
133:18,20;134:1,7,14,
18,21;135:11,14;
141:25;147:2;149:5;
161:6;166:17
**reasonably (5)**
55:8;115:7,16;
133:25;152:6
**reasoned (3)**
35:10;36:3;51:11
**reasons (9)**
16:1;60:12,19;
68:16;85:18,19;
90:17;94:16;155:15
**reassess (1)**
88:7
**recalcitrant (2)**
123:15;125:12
**recall (4)**
45:3,6,8;164:7
**receive (1)**
70:20
**received (1)**
70:19
**receiving (2)**
93:1;115:5
**recent (1)**
162:17
**recently (1)**
152:15
**recess (2)**
84:21;129:4
**recipient (1)**
122:15
**recipients (1)**
86:18
**recognize (2)**
130:14;178:2
**recognizes (1)**
86:1
**recognizing (1)**
135:19
**reconsideration (3)**
36:12;37:8;91:10
**record (9)**
17:7;21:12;27:19;
34:23;38:16;70:12;

125:5,5;157:18
**records (5)**
110:18,25;158:19,
20,21
**red (2)**
37:25;125:3
**redact (1)**
158:13
**redacted (2)**
108:18;158:14
**redacting (1)**
175:11
**redesignate (1)**
88:6
**redline (2)**
142:17;146:10
**redo (2)**
87:22;88:11
**refer (1)**
145:9
**reference (16)**
54:13,21;68:15,24;
69:8,12,18,22;72:13;
77:20;78:1,23;80:5;
112:11;134:17;161:2
**referring (1)**
94:20
**reflect (1)**
154:20
**regard (4)**
25:3;49:5;106:25;
109:3
**regarding (7)**
11:4;58:12;61:13;
78:22;86:15;139:23;
172:20
**regimen (1)**
95:24
**regiment (1)**
102:23
**regular (1)**
109:15
**regulated (1)**
133:12
**re-importing (1)**
123:20
**reincorporate (1)**
120:25
**reincorporated (1)**
119:13
**reinsert (1)**
118:19
**reinserted (1)**
126:24
**reinsurance (4)**
46:13;136:10;
153:17,18
**reinsurers (1)**
27:13
**reinvokes (1)**
20:10
**reject (3)**
33:13;85:21;141:7

**related (5)**
27:12;55:11;59:8;
129:21;170:5
**relating (5)**
87:11;125:11;
150:14;169:13;
172:18
**relative (1)**
12:4
**relatively (1)**
155:16
**relevance (3)**
147:14;148:4;
174:24
**relevant (29)**
63:23,24;134:9;
135:17;137:6,7,25;
142:1,1,1;143:5;
145:8,11;146:3;
150:12,19;151:24,25;
154:8,14,16,17;
159:13,15;162:22;
166:17;169:9;173:19,
19
**relied (1)**
127:24
**relief (16)**
29:4;30:20;49:15;
50:10;58:11;60:5;
63:2,7,20,21;64:14;
65:20,22;66:1;
106:22,24
**relish (1)**
106:3
**relitigation (1)**
96:8
**reluctant (1)**
127:23
**rely (1)**
65:24
**remaining (1)**
62:13
**remains (1)**
119:5
**remarks (3)**
141:6,20;172:12
**remember (3)**
39:14;103:9;136:24
**remembered (1)**
31:6
**Remind (1)**
30:20
**removed (1)**
115:14
**render (1)**
54:2
**renew (1)**
175:2
**renewed (1)**
174:5
**reorganization (1)**
151:11
**repeat (1)**

28:11
**replace (2)**
91:20;173:10
**replacement (1)**
140:21
**replete (1)**
94:10
**replicate (1)**
61:12
**reply (7)**
140:18,25;141:3;
149:12,17;151:8;
173:10
**represent (1)**
44:17
**represented (3)**
35:16;130:10;
163:20
**representing (2)**
73:25;137:9
**reproduce (3)**
88:6;107:11;108:1
**request (29)**
28:25;34:9;49:15;
51:1,3;60:5;61:5;
93:10;129:13;130:25;
132:22;141:25;142:2,
12;143:23;144:1,25;
146:8;148:7,10;
156:12;158:16;
163:20;173:20;174:6,
8;175:6,12;176:1
**requested (1)**
30:20
**requesting (1)**
50:11
**requests (27)**
113:21;116:18,21;
137:22;140:16,17,22;
142:9,13,14,16,17;
146:3;149:14;152:4,
5,7,8;156:4,5;168:25;
170:10;172:25;173:1,
4,11,21
**require (9)**
30:24;59:2;64:15;
87:20;88:11;92:2;
138:3;143:23;175:4
**required (5)**
44:4;64:6;135:5;
152:6;154:20
**requirements (1)**
58:6
**requires (2)**
45:14;86:11
**res (1)**
111:17
**research (2)**
74:20;75:22
**reservation (1)**
58:16
**reserve (15)**
133:24;134:17;

135:10,13;136:2;
139:13,16;154:10,11,
12;155:3;168:2;
174:15;175:7,19
**reserved (1)**
143:9
**reserves (13)**
133:22;135:11,17;
149:25;154:16,24,25;
155:5,5,7;167:22;
170:2,6
**reserving (2)**
134:7,13
**resolution (12)**
77:2,6,7,18;78:11;
79:19;130:8;133:16;
134:10;135:13,23;
174:25
**resolve (8)**
28:6;32:10;74:10;
99:16;133:8;135:1;
138:8;170:20
**resolved (8)**
55:11;57:22;59:8;
162:6;167:8;170:17,
19,24
**resolving (4)**
55:12;131:9;167:8,
10
**respect (40)**
10:22;11:6;12:11;
31:3;50:4,7;61:11,19;
63:2,7;64:4,19,19;
83:7;95:16,24;
101:22;107:17;
119:12;121:1;123:5;
126:23;129:19;
130:21,24;131:20,21;
135:16;137:4,18;
139:17;163:17;167:1,
1;173:20;174:10;
175:6,8,21;177:12
**respectfully (2)**
103:17;163:20
**respective (1)**
46:13
**respects (2)**
45:4;73:7
**respond (11)**
60:2,8;65:22;69:9;
81:11;141:2;152:4,6,
16;173:13;178:2
**responded (1)**
140:17
**responding (2)**
66:22;177:24
**responds (1)**
160:18
**response (12)**
14:24;15:17;19:2;
58:14;60:21;68:1,9;
129:19;140:2;149:24;
170:9;174:9

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 202
of 209

**responses (2)**
60:19,20
**responsible (1)**
33:7
**responsive (2)**
142:15;159:17
**rest (1)**
147:11
**restating (1)**
139:10
**Restel (11)**
7:14,16;90:23;91:3,
3;92:15;93:13;
114:19;127:10,14;
159:3
**restrict (1)**
15:14
**restrictions (2)**
23:22;148:11
**result (2)**
27:4;58:3
**retain (7)**
24:4,6;39:19,24;
40:11;43:24;124:14
**retained (4)**
31:13;32:1;38:8;
43:9
**retaining (1)**
24:13
**retaliation (1)**
87:12
**retention (4)**
39:25;136:16,20,23
**rethink (1)**
69:19
**retirement (1)**
86:5
**return (1)**
79:7
**returning (1)**
77:21
**review (3)**
49:25;119:4;158:8
**reviewed (4)**
26:22;55:15,15;
108:25
**revised (2)**
25:1;142:18
**revisions (2)**
92:20;143:17
**revisited (1)**
177:1
**RIDLEY (28)**
8:21,25;9:1;61:3;
64:25;65:3,4,8,11,14,
17;66:7,9,12,14,18,
23;67:6,8,23,24;68:4;
77:11;81:25;83:10,
20,21,23
**rifling (1)**
148:22
**right (156)**
7:3,25;8:13;9:3;

10:12,13,14,15,17;
11:25;14:2,15,17,17,
24;15:2,3;16:5;19:6,
20;20:21;24:20,23;
26:15;30:17;31:16;
33:4,10,12,22;34:17;
35:7,15;36:2;37:4;
40:11;42:9,10,11,17;
46:17;47:3,11,21;
48:3;52:14,16,22,24;
65:18;66:6,8,10,19;
67:5,6,25;68:5;70:18,
19,25;72:25,25;73:3,
20;75:9,10,13,16,24;
76:15,15;78:2,9,9,10;
82:16,18;83:19;
84:16;97:17,21,21,23;
98:3,5,6;100:4,15;
102:6,7;103:14,18;
104:22,24,25;105:1,3,
6,8,8;106:3;109:14,
18;110:5,17;111:4,7;
112:5,18,20;117:3,20;
121:10,14;122:7,8;
123:6,20,22,23;124:5,
8,20,23;125:5;126:7;
127:4,11;128:4,21,21;
129:2;131:24;139:19;
145:15;152:24;153:3,
24,25;158:7,8;161:2,
20;167:3;168:8;
169:9;171:25;172:9;
175:3;177:14,19;
178:16,24;179:2,9
**rights (10)**
26:7;44:5;58:17;
72:8;107:23;133:23;
143:9;144:2;148:2;
149:25
**rise (2)**
6:4;80:9
**risk (3)**
50:2;114:2;134:18
**road (4)**
81:7;95:4;159:16;
177:4
**rob (1)**
33:23
**robust (2)**
149:19;150:11
**Rochester (3)**
44:24;138:23;
161:20
**Rockville (2)**
44:24;148:16
**role (4)**
155:23;165:16;
176:5,18
**roll (1)**
120:11
**Roman (4)**
6:15,17,23;53:21
**Romanette (2)**

28:13;29:13
**room (2)**
98:10;155:23
**Rosa (2)**
152:14;172:20
**roughly (2)**
55:25;75:7
**round (1)**
37:10
**rub (1)**
103:13
**rubber (1)**
159:15
**rubric (1)**
29:21
**Rule (44)**
26:15;33:23;34:15;
36:1;37:18,22,25;
49:3;55:17;71:25;
81:12,15;88:1;98:2;
103:3;110:9,12,13,14;
116:2,17;129:23;
131:13,19;140:10;
141:14,20,24;142:2;
145:13;146:8;147:15,
23;148:5,9;151:17,19,
25;156:15;158:16;
164:9;165:10;172:15;
173:18
**ruled (2)**
78:17;146:9
**Rules (13)**
32:8;33:16,23;
68:19;89:13,13,14;
92:2;147:14;148:11;
154:20;167:15,17
**ruling (12)**
14:10,16;41:23;
53:19;65:5;71:1;
78:13;83:11;111:17;
128:17;145:16;177:9
**rulings (1)**
64:25
**running (3)**
56:7,11;57:2

**S**

**S1 (1)**
178:10
**sad (1)**
117:9
**Safe (1)**
83:20
**safeguard (1)**
101:22
**sales (1)**
95:8
**salutary (2)**
27:4;109:2
**same (41)**
10:13,22;12:19;
18:3;21:6;24:6;27:10;

42:2,5;87:1;88:2;
91:19;96:22;104:19;
105:20;107:13;119:2;
120:23;126:1;132:15;
137:23;139:7,17;
140:4;144:1;145:4,
17,20;146:6;150:20,
20,21,22,24;155:2,23;
162:5;165:17,20;
166:12;175:25
**San (6)**
27:15;31:20;50:22;
101:18;104:7;172:21
**Sandler (3)**
7:13;91:4;129:7
**Santa (2)**
152:14;172:20
**sausage (1)**
97:15
**save (3)**
17:10;81:12;165:4
**saw (5)**
43:11;52:7,9;145:1;
164:1
**saying (24)**
19:23;20:9,21;29:7;
35:15;40:1,22;88:19;
89:2;90:7;101:18;
102:24;106:12;113:8;
115:1,19;117:24;
118:10;122:7,9,9;
124:17;147:20;
171:20
**scant (1)**
155:9
**schedule (5)**
68:10;75:7;78:22;
79:19;83:7
**scheduled (2)**
152:10;167:24
**schedules (1)**
71:20
**scheduling (1)**
70:3
**SCHIAVONI (224)**
8:4,5,9;11:20,24;
12:1;14:9;15:20,23,
25;16:3,6,11,15,19,
22;19:3,3,8,23;20:17;
21:11,18,22;22:8,20;
23:20;25:14,15,17,17,
20,25;26:12;27:25;
28:2,5,23;29:2,5,9,13,
15,18,20,22,24;30:7,
12,16;31:2,5,10,12,
15,19,25;32:3,6,12,
15,19,22;33:3,5,8,11,
13,15,20;34:1,7,11,
13,20,22;35:2,6;
36:20;38:11;45:3,21,
23;46:1,4,7,10,17,21,
23,25;47:6,8,12,16,
19,22,24;48:2,5,9,11,

14,16,18,22,25;49:3,
7,9,13,21;50:13,16,
18,22;51:1,3,8,10,14,
17;52:5;70:7,15,15,
17,23;71:4,6,10,13,
19,23,25;72:3,7,12,
18,25;73:3,7,11,14,
17,19,22;74:3,8,10,
14,23;75:1,4,10,12,
16,20,22,25;76:5;
77:9;78:3,23;84:7,13,
17,19;93:15,15;
95:20;96:2,5,14,17,
21,24;97:7;99:4,11,
21;100:9;101:2,21,
23;102:12,20,25;
103:2,11,13,25;
106:24;114:5;119:23;
120:22;121:3,10,12,
21,25;122:5,8,18,25;
123:9,10,21;124:13,
21;126:9,15;127:17,
20;128:2,7,10;150:4;
156:12;163:5,10,13,
24;169:21
**Schiavoni's (2)**
17:9;25:12
**schools (1)**
76:18
**scope (1)**
87:9
**Scouts (6)**
26:18,24;27:3;
103:23;108:23;
151:18
**screen (5)**
8:13;9:6,10;10:17;
152:15
**screwing (1)**
117:18
**scrutinized (1)**
138:15
**Seaboard (1)**
61:14
**sealed (1)**
95:18
**sealing (1)**
95:16
**search (2)**
42:20;153:8
**season (1)**
12:20
**seated (1)**
6:7
**seats (1)**
126:12
**second (29)**
11:23;13:18;23:25;
50:6;72:12;74:16;
84:3;87:16;99:5;
100:22;101:4;107:17;
108:3,5;125:6,10;
134:11;141:3,11,21;

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 203
of 209

143:2;149:10,11,12;
166:24;168:16;
170:14;171:11;
172:12
**secondary (6)**
62:17,19;107:20;
143:3;146:10;153:12
**Secondly (1)**
107:2
**secrecy (1)**
90:15
**secret (3)**
78:4;86:2;109:17
**secrets (2)**
86:3;110:17
**Section (5)**
46:11;88:23;89:11;
115:3,12
**secured (1)**
117:24
**seek (3)**
19:13;138:16;149:5
**seeking (8)**
20:7;59:23;62:2;
129:20;132:25;135:3;
137:21;139:3
**seeks (1)**
17:23
**seem (3)**
21:8;53:10;117:8
**seems (9)**
15:10;18:9;19:11;
35:12;141:18;150:12;
164:9;170:13;172:19
**sees (3)**
40:19;90:4;116:3
**self-reported (1)**
21:12
**sending (2)**
117:18;124:25
**sense (24)**
27:5;31:20;33:17;
44:14,16;55:11;65:1;
70:25,25;71:1;77:4;
80:6;99:13;104:23;
112:12;128:1;145:18,
20;151:3;157:1;
159:14;161:4;166:11;
177:7
**Sensible (2)**
127:7,8
**sensitive (7)**
22:6;86:12,13;92:8,
17,19;93:1
**sensitivity (2)**
22:20;98:11
**sent (2)**
140:24;152:11
**sentence (1)**
158:14
**separate (12)**
18:3,16;20:7;40:8,
10,24;108:11;117:15;

140:16;142:9;153:20;
161:24
**September (2)**
18:4;22:22
**series (2)**
25:21;27:12
**serve (9)**
34:16;35:8,12;36:5;
38:8;51:5,6;103:5;
147:20
**served (2)**
34:17;130:25
**service (12)**
24:7;34:18;35:18,
19;36:6,8,8,9;37:3,4;
49:18;52:1
**services (1)**
13:3
**session (1)**
6:4
**set (32)**
6:8;10:21;11:9;
13:21;27:7;33:16;
37:12;47:6;48:22;
54:11;56:3;63:25;
69:17;92:21;101:9;
111:6;142:14,16;
146:25;154:25;155:2,
5,5,7;161:22;168:2;
170:2,5;177:25;
178:6,10,15
**sets (2)**
110:15;140:23
**setting (3)**
109:22;124:15;
129:8
**settle (7)**
77:10,12;133:25;
134:13,14;147:3;
161:25
**settled (10)**
61:25;145:19;
150:17;159:22;
161:22,24;162:4,4;
169:16,17
**settlement (13)**
58:24;87:10;
133:18;134:7;135:12;
138:20,22;139:2;
141:7;145:18,25;
147:2;157:8
**settlements (2)**
155:9;161:24
**seventeen (1)**
120:5
**Seventh (3)**
26:7;107:23;112:4
**several (4)**
52:24;59:13;92:22;
171:5
**severity (1)**
146:25
**sex (2)**

146:13;159:5
**sexual (10)**
26:22;86:8,16;98:4;
110:19;129:21;
133:18;137:1;143:25;
173:5
**sexually (1)**
117:22
**SFO (1)**
22:25
**Shall (6)**
25:12;38:5;46:12;
52:18;61:9;123:14
**Shane (1)**
6:22
**shape (1)**
133:6
**share (9)**
18:1;22:11;24:19;
28:14,16,17;40:17;
45:9;104:6
**shared (6)**
17:1;18:14;20:25;
22:23;44:8;130:6
**sharing (5)**
17:21;18:10;76:15,
16;103:18
**sheer (1)**
157:6
**shops (1)**
104:1
**short (1)**
12:20
**shorthand (1)**
169:21
**shortly (1)**
75:17
**show (5)**
39:7;40:1;136:7,10;
138:12
**showed (1)**
172:17
**showing (2)**
41:6;100:13
**shows (2)**
75:22;173:8
**shutting (1)**
109:16
**side (10)**
30:25;33:15;39:19;
42:24;81:16;98:9;
102:17;128:24;
159:18;162:9
**sidedly (1)**
20:11
**sides (1)**
155:25
**sign (45)**
26:14;27:23;32:2,3;
39:21;40:4;41:13;
45:2;86:20;88:19;
89:1;90:6;97:12,14,
15,20;99:23;104:3,3,

21,25;105:7,14,16;
106:12;112:9;114:11,
24;115:23;118:10,10;
121:16;122:10,10,13;
123:14,16;124:4,18,
19;125:13,14,14,15;
170:10
**signed (12)**
28:18;35:11;41:10,
13;43:12;45:14;
100:2;102:9;105:21;
112:3;115:8;118:3
**significant (1)**
98:16
**signing (3)**
33:2;98:3;105:6
**signs (1)**
47:3
**Silence (1)**
102:3
**Silenced (1)**
87:9
**Silverstein (4)**
151:18,25;156:14;
176:24
**similar (4)**
45:6;46:15;50:22;
91:18
**similarities (1)**
174:23
**similarly (1)**
12:21
**simple (1)**
18:22
**simplest (1)**
120:11
**simply (17)**
22:9;40:1,22;42:24;
43:7,15;44:4;65:24;
69:13,19,24;87:18;
89:21;122:14;131:17;
132:13;140:2
**simultaneously (1)**
87:22
**single (4)**
39:18;113:12;
162:6;164:8
**sit (5)**
42:19;53:11;93:23;
145:23;175:14
**site (1)**
106:19
**sitting (1)**
39:19
**situation (10)**
34:3;35:3;39:17;
94:7;103:22;109:23;
111:19;148:21;
153:11;155:8
**situations (3)**
53:5,14;166:4
**six (14)**
85:12;132:25;

21,25;105:7,14,16;
133:1;135:4;137:24;
140:17,19,20;149:14,
15;155:18;166:8;
173:16,16
**skeletons (1)**
154:9
**skepticism (1)**
138:18
**skipped (1)**
56:12
**Skipping (1)**
151:16
**sledgehammer (5)**
20:8;22:5,7;23:7,17
**slightly (1)**
145:10
**slip-up (1)**
175:11
**slow (3)**
74:21;88:10,10
**slowing (1)**
44:10
**slowly (1)**
150:7
**small (2)**
59:14;146:11
**so-called (1)**
98:1
**soft (1)**
71:11
**solely (1)**
123:4
**solicitude (1)**
138:12
**solution (1)**
170:20
**solutions (1)**
130:12
**solved (1)**
156:23
**solvency (3)**
132:8;148:14,15
**somebody (16)**
21:5;31:15;54:19,
24;55:4;56:12;76:2;
99:14;110:10;117:19;
124:4;155:3;157:19;
158:7;174:5;175:2
**someday (1)**
53:12
**somehow (8)**
51:4;87:3;89:25;
93:8;100:1;104:11;
107:2;116:7
**someone (6)**
21:2;28:15;31:13,
17;39:8;178:22
**someone's (1)**
153:6
**sometime (1)**
39:15
**somewhat (4)**
12:7;42:3;108:21;

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 204
of 209

126:4
**somewhere (2)**
40:17;160:21
**soon (3)**
83:12;151:6;179:16
**sooner (1)**
75:23
**sorry (26)**
11:24;12:1;15:7;
16:6;25:20;30:18;
52:4;56:10;57:7,15;
60:18;62:21;66:12,
13;76:14;96:21;
102:12;111:24;
116:10;123:1;126:11;
127:8;177:20,20,21;
179:11
**sort (51)**
19:10;21:13;23:25;
31:23;35:22,24,25;
36:11,13,17,25;37:12;
40:2;42:11;53:15;
55:19;59:17,17;
66:22;70:18;72:14,
18;73:22;74:14,23;
83:2;97:11;98:2,6;
101:6;103:3,21;
106:20;107:9,16,18,
20;108:18;109:17,20;
110:1,24;111:16;
112:12;122:21;
124:15;129:8;131:17;
137:22;163:18;174:9
**sorts (2)**
20:10;95:9
**soul (1)**
157:23
**souls (1)**
158:3
**sound (1)**
22:12
**sounds (2)**
148:6;176:17
**source (1)**
108:9
**Southern (1)**
138:25
**speak (11)**
16:12;19:15,25;
21:22;34:11;74:19;
80:9;84:9;85:2;98:6;
103:14
**SPEAKER (7)**
9:22,23;15:4,6;
126:12;128:5;168:7
**speaking (1)**
131:12
**special (2)**
7:21;129:10
**specialized (1)**
38:6
**specially (1)**
6:8

**specific (11)**
27:13,16;30:1;31:5;
39:11;44:22;86:16;
90:16;106:24;110:16;
114:17
**specifically (16)**
9:1;15:21;19:17;
24:5;27:7;31:7,17;
44:3;46:18;62:8;63:6;
80:11;110:17;129:12,
13;132:22
**specifics (3)**
131:1,7;165:4
**specify (1)**
116:15
**speculate (2)**
116:5;149:10
**speculation (1)**
157:6
**speculative (1)**
158:1
**spoken (1)**
81:25
**Square (2)**
146:7;149:8
**stage (6)**
55:8;61:4;63:13,24;
166:9,11
**staging (4)**
166:23;167:15,15,
17
**stand (5)**
44:1;68:25;86:9;
104:19;129:14
**standard (6)**
87:1;110:15,16;
112:19;119:7;124:17
**standards (1)**
119:2
**standing (1)**
130:4
**standpoint (1)**
86:9
**stands (2)**
63:8,12
**star (1)**
109:17
**stare (1)**
129:14
**start (14)**
6:20;8:13,15;15:8,
11,12;37:2;48:12;
84:25;88:14;113:8;
137:9;141:20;154:13
**started (3)**
18:23;79:3;146:16
**starting (2)**
16:19;85:1
**starts (1)**
110:14
**state (7)**
54:7;57:25;58:24;
79:2;109:8;122:21;

134:3
**stated (1)**
143:18
**statement (7)**
59:3,16;61:8;64:10;
78:15;106:21;112:15
**statements (5)**
64:19;72:1;125:23;
132:5;164:13
**States (3)**
6:5;9:13;56:21
**status (2)**
11:8;165:24
**statute (1)**
36:2
**statutes (1)**
36:2
**statutory (4)**
135:10;137:2;
154:19;170:1
**stay (3)**
52:18;86:11;117:23
**step (8)**
59:4;71:4;122:19;
169:10;170:4,14,16;
171:16
**Stern (1)**
55:16
**still (12)**
16:4;39:21;41:14;
45:1;65:1;143:15;
149:20;150:3,9;
151:5;159:15;161:20
**stipulate (3)**
92:3;100:6;123:4
**stipulated (5)**
113:16;116:13;
118:2;134:14,19
**stipulation (2)**
113:18;114:1
**stones (1)**
30:2
**stop (2)**
124:7;143:20
**stopped (1)**
168:15
**Stout (3)**
43:9,12,13
**stove (1)**
165:11
**straightforward (3)**
102:1;137:14;148:7
**strata (1)**
59:17
**street (2)**
30:8;124:3
**streets (1)**
104:7
**strengths (1)**
132:11
**strictly (2)**
18:11;45:10
**strikes (3)**

17:15;91:9;113:1
**struck (1)**
53:8
**structure (1)**
103:14
**structured (1)**
98:23
**struggling (1)**
13:17
**stuck (1)**
101:11
**studied (1)**
75:2
**stuff (8)**
104:15;111:22;
116:19,20;122:10;
146:2;148:8;153:17
**subject (13)**
39:21;79:8;87:13;
94:9;98:4,7;105:25;
107:8;111:12;117:25;
147:18;177:14,24
**subjects (1)**
53:4
**submit (6)**
35:9;36:9;88:13;
120:11;122:20;
164:15
**submits (1)**
85:19
**submitted (9)**
21:5;44:7;51:19;
100:13;114:16;
125:22;126:7;173:24,
25
**subparts (1)**
140:16
**subpoena (1)**
97:18
**subpoenas (2)**
140:15;144:21
**subsequently (1)**
61:25
**subset (6)**
159:13,16;166:14,
16,25;167:17
**substance (2)**
37:13;88:16
**substantially (1)**
91:18
**substantive (1)**
126:1
**success (1)**
160:6
**successful (1)**
133:15
**successors (2)**
27:12;46:13
**sudden (1)**
35:14
**suddenly (2)**
12:20;55:4
**sued (2)**

61:20;62:21
**sufficient (2)**
50:12;63:13
**suggest (18)**
13:21;22:8;53:19;
66:10,16,18,19;75:13;
83:6;84:13;104:5;
111:24;112:22;
119:11;123:22;
153:11;159:17;167:9
**suggested (8)**
94:13;119:10;
125:3;126:16;146:10;
154:6;164:22;177:11
**suggesting (8)**
13:2;14:11;50:10;
65:22;99:10;100:24;
106:18;112:10
**suggestion (3)**
10:19;15:8;67:16
**suggestions (1)**
120:17
**suggests (5)**
23:21;64:14,24;
69:4;174:10
**suit (1)**
105:25
**suitcase (1)**
106:7
**sum (1)**
131:7
**summarize (1)**
102:10
**summary (2)**
62:13;63:11
**summer (1)**
39:15
**Super (1)**
140:1
**Superior (4)**
57:19;102:8;111:1;
150:6
**supervision (2)**
57:20;148:17
**supervisor (2)**
157:11,12
**supplant (2)**
12:14;118:14
**supplement (1)**
40:3
**supplementation (1)**
140:21
**supplements (2)**
93:3,7
**support (3)**
87:3;111:9;113:10
**supported (1)**
111:9
**supportive (1)**
111:20
**supports (1)**
90:24
**supposed (2)**

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 205 of 209

34:16;141:1
**sure (38)**
10:23,25,25,25;
11:24;14:4;22:16,21;
25:15;37:6;41:12,18,
20;43:22,24;51:23;
52:2;68:10;71:3,5;
109:21;113:9;122:2;
124:8;138:17;139:9,
12;140:5;141:1,19;
153:5;160:8;161:18;
168:22;175:15;177:4;
178:6;179:7
**Surety (1)**
61:14
**surface (1)**
176:12
**surprise (2)**
60:1;68:14
**surprising (1)**
89:16
**survivor (1)**
39:11
**survivors (5)**
44:5;134:14,19;
137:9;167:20
**survivor's (1)**
23:8
**suspect (2)**
69:9;155:1
**suspected (1)**
176:18
**suspecting (1)**
48:19
**swallow (2)**
98:2;103:3
**sweeping (1)**
164:13
**switching (1)**
126:12
**Syracuse (1)**
44:24
**system (4)**
82:24;92:9;109:8;
137:24
**system-wide (1)**
138:3

**T**

**table (4)**
10:21;94:18;
145:23;162:19
**tact (1)**
71:22
**tailors (1)**
116:15
**talk (19)**
26:6;77:14,15;
80:11;109:1;113:4;
126:4;127:5;129:12;
131:1;132:21;133:2;
136:5;144:8;145:24;

155:25;156:16;165:2;
174:13
**talked (4)**
64:23;77:20;
126:16;131:18
**talking (35)**
15:13;18:10,11;
23:9;37:5;39:5,5,6;
41:18;43:20;60:4;
68:7;69:23,25;90:10;
116:17,17,18;121:18;
127:6;130:24;144:14,
18;152:15;153:4;
154:14;155:22;
157:23;159:20;161:4;
166:18;168:4;169:21;
175:25;176:9
**talks (2)**
110:17;151:8
**Tanc (2)**
25:17;94:14
**Tancred (4)**
8:4;19:3;70:15;
93:15
**target (4)**
166:7;174:4,4;
175:16
**targets (1)**
175:17
**tasks (1)**
12:6
**TCC (3)**
35:17;94:20;107:21
**TCCs (1)**
107:8
**technical (1)**
131:22
**technically (2)**
42:1;85:9
**telling (4)**
42:18;98:20;
119:24;123:19
**tells (3)**
54:23;68:25;121:1
**ten (10)**
39:10;44:8;49:14,
24;50:1;51:17;62:13;
84:18;128:19;150:8
**tender (2)**
149:23,24
**tendered (3)**
60:17;150:4,10
**tends (1)**
138:16
**term (5)**
27:16;38:4;142:18,
19;166:24
**terms (14)**
27:16;35:25;53:6;
91:5;120:2;126:19;
136:7,9;137:12,12;
142:24;143:6;165:18;
176:19

**Test (1)**
167:23
**tested (6)**
94:6;99:13;104:22;
108:14;113:9;115:22
**testify (1)**
43:5
**testifying (4)**
32:13,16;33:2;
132:14
**testimony (1)**
144:15
**testing (1)**
104:23
**Thanks (13)**
8:17;46:24,24;70:6;
76:9,19;90:20;95:21;
126:6;129:3;164:5;
179:13,15
**Thanksgiving (1)**
178:17
**that'd (1)**
105:19
**that'll (2)**
128:25;129:2
**Theirs (2)**
122:19;125:24
**thematically (1)**
59:22
**theme (3)**
52:18;92:25;131:18
**theoretically (2)**
54:18;74:4
**theory (1)**
12:18
**thereafter (2)**
75:17;107:24
**there'd (2)**
101:7;108:11
**Therefore (1)**
59:1
**thereon (1)**
68:20
**thin (1)**
67:15
**thinking (10)**
11:14,18;52:15,21;
59:15;76:2;96:22;
127:25;166:10;
177:16
**third (10)**
97:9;98:11;103:10,
11,12;135:15;139:15,
16;143:7;170:16
**third- (1)**
24:6
**third-party (3)**
17:21;24:20;97:17
**thirty (9)**
40:13;143:21;
144:1,25;158:18,21;
159:10;161:7;175:5
**thirty-seven (1)**

140:15
**thirty-six (1)**
62:7
**though (2)**
51:5;162:18
**thought (13)**
40:21;55:20;65:19;
71:22;80:12;85:3;
121:8,9;140:10;
143:7,12;156:20;
159:17
**thoughts (4)**
68:12;70:5;165:7;
174:2
**three (9)**
60:19;89:9,9;
113:11;155:18;161:5;
167:7;177:11;178:14
**throughout (1)**
26:5
**throwing (1)**
30:2
**thrust (1)**
145:15
**Thursday (1)**
27:15
**Thus (4)**
60:1;87:1;120:6;
133:20
**tied (1)**
173:2
**tier (12)**
92:6;96:15;98:5,5,
7;99:5,15,15;100:22;
101:4;107:17;108:3
**tiers (6)**
92:7,12;96:18;97:1,
24;103:4
**Tim (2)**
7:20;132:24
**timeline (1)**
77:3
**times (4)**
44:6;130:16;
155:15;167:19
**time's (1)**
14:2
**timing (9)**
54:15;68:7;74:17;
77:14,15,18;78:1,22,
24
**today (12)**
9:5;10:18;13:8;
17:16;59:14;78:13;
128:13;140:11;
150:17;156:23;
169:21;174:7
**Todd (1)**
9:18
**together (5)**
46:12;62:4;95:9;
112:18;177:10
**told (7)**

44:6;54:24;99:1;
105:10,16;122:2;
150:4
**took (3)**
96:5;115:11;162:16
**tools (2)**
171:6,7
**top (3)**
98:8;149:14;153:6
**tort (1)**
155:8
**total (4)**
62:5,18;140:16;
151:12
**totally (5)**
12:14;30:13;104:1;
111:20;122:8
**touchstone (5)**
110:7;161:7;162:9,
11;169:21
**touchstones (4)**
161:1;162:21;
169:20,24
**toward (4)**
77:2;117:9;130:18;
166:13
**towards (3)**
130:15;132:16,17
**Towers (1)**
141:12
**track (1)**
117:11
**tracks (1)**
168:15
**trade (3)**
86:2,3;110:17
**traditional (1)**
177:7
**trait (2)**
101:16,17
**transcript (3)**
27:19;38:15;95:3;
104:16;156:13
**transcripts (1)**
157:17
**Travelers (2)**
56:5;57:11
**travels (1)**
83:20
**treated (1)**
87:20
**treatment (1)**
121:2
**tremendous (3)**
88:12;107:16;
174:24
**trial (25)**
54:11;55:4;61:23,
24;62:20;72:21;73:9;
74:5;97:17;104:19;
108:23,23;109:10,13,
25;112:12;116:8,8,23,
24,25;117:1;160:7;

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 206
of 209

167:24;168:10
**trials (4)**
  54:6;72:4;73:12;
  109:17
**tricky (1)**
  112:17
**tried (6)**
  12:2;22:14;106:5;
  112:13;124:1;137:19
**tries (2)**
  73:8;111:25
**triggered (2)**
  60:11;62:24
**true (6)**
  31:22;38:14;62:18;
  103:10;158:20;
  172:17
**truer (1)**
  68:11
**Trump (2)**
  104:25;122:2
**trust (1)**
  86:6
**try (15)**
  13:14,16;21:20;
  26:8;32:10;48:25;
  69:3;74:5;76:22;77:1;
  93:24;124:6;137:6;
  149:1;159:9
**trying (17)**
  35:13;39:18,24;
  73:12;74:20;77:13;
  78:7;90:1;93:19;
  98:18;119:17;138:7;
  141:18;147:24;
  153:16;155:24;171:2
**TUESDAY (1)**
  6:1
**turn (4)**
  136:21;137:12,13,
  16
**turns (2)**
  134:6;137:15
**tweak (1)**
  36:13
**twenty (2)**
  68:12;161:4
**twenty-five (1)**
  40:13
**twenty-four (1)**
  124:24
**twenty-page (1)**
  127:3
**two (59)**
  7:4;20:20;30:1,17;
  48:2;50:4,9;51:22;
  58:7;59:11,17,20;
  60:13,17;67:21;
  68:12,17;71:7;72:14;
  80:24;85:18,19;
  86:24;87:22;92:7,12;
  94:23;96:15,18;97:1,
  24;98:15;100:25;

102:19;103:4;109:7;
113:10;117:11;
119:19,24;120:24;
121:14;133:2,3,9;
135:3,15;136:5;
139:15;140:11;147:9;
152:19;155:18;166:9,
20,22;167:24;171:16;
174:6
**two-level (1)**
  95:24
**two-party (5)**
  94:8,23;99:22;
  113:17;123:12
**two-tier (1)**
  92:9
**two-tiered (1)**
  85:24
**tying (1)**
  144:15
**type (3)**
  39:3;136:11,12
**types (1)**
  160:14
**typical (3)**
  44:16;120:3,5
**typically (3)**
  101:5,9;160:15

# U

**Uetz (69)**
  7:1;8:14,16,17,18;
  9:5;10:20,20,24;11:1,
  4,8,11,15;12:22,24;
  13:7,10,15,20,24;
  14:2,4,7,10,13,16,20;
  70:5,6,9,12,14,21;
  76:8,9,12,17,19,20,
  22;78:20;79:6,10,13;
  83:5,5,10,14,17;
  130:14;139:22;140:1,
  7;148:6;152:11;
  164:1,4,5,25;177:20,
  23;178:6,21,25;179:3,
  7,11,15
**ultimate (1)**
  125:11
**ultimately (2)**
  54:19;110:1
**umbrella (5)**
  53:24;57:6,8,11,15
**Um-hum (90)**
  11:3,7,10;17:12,17,
  25;18:7,15;19:7,22;
  20:16;21:10,17,21;
  23:11,15;24:2,10,14;
  25:19,24;26:11;
  27:24;28:1,22;29:12,
  14;30:6,11,15;31:4,9,
  11,14,18,24;32:5,11,
  14,18,21;33:19,25;
  34:6,19,21;35:1,5;

37:1;38:24;43:10;
45:5,13;46:9;47:5;
48:8,10,21;49:2,12;
67:20;71:9,12;72:2,6,
11,17;73:10,13,16,18,
21;74:2,7,9,13,22,25;
75:15;79:17,24;80:3,
8,10,16,19,23;81:6,
13;141:22
**un (1)**
  155:18
**unacceptable (1)**
  41:7
**unbelievable (1)**
  168:25
**uncertain (3)**
  59:22;60:2;140:19
**unclear (1)**
  19:10
**uncontroverted (3)**
  15:10;18:8,22
**under (60)**
  18:5;19:9,21,25;
  23:12;26:7,15;28:12;
  29:13,19;33:23;
  37:25;39:10;50:14;
  53:25;54:1;55:24;
  56:2,6,10,19;57:9;
  58:6,16;59:10;60:21;
  61:14;62:15,17;63:6;
  64:20;68:19;86:13;
  87:23,25;89:11;
  91:13;92:17;100:1;
  107:4,7,15;108:3;
  110:9;111:22;120:25;
  134:16;138:13,13,15;
  146:4;148:5,17;
  149:3;151:17,19;
  152:24;154:19;
  167:15;173:18
**underlies (1)**
  57:21
**underlying (6)**
  58:24;62:9;94:10;
  100:14;133:25;
  134:22
**underneath (1)**
  50:6
**Understood (3)**
  66:7,9;168:21
**undertaken (1)**
  153:8
**underway (1)**
  155:10
**Underwriters (2)**
  56:9;57:5
**underwriting (13)**
  136:6,9,10;153:1,3,
  10,13;170:9,10,13;
  174:16;175:8,20
**undoubtedly (1)**
  153:7
**undue (1)**

138:1
**unexpected (1)**
  141:4
**unfortunately (1)**
  137:14
**UNIDENTIFIED (7)**
  9:22,23;15:4,6;
  126:12;128:5;168:7
**uninformed (1)**
  130:21
**unintended (1)**
  22:9
**Union/Armour (1)**
  56:13
**unique (3)**
  24:11;94:2;148:21
**unit (2)**
  145:7;153:20
**United (3)**
  6:5;9:13;56:21
**universe (2)**
  40:12;170:15
**unless (11)**
  24:7;51:20;69:20;
  76:10;115:3,9;
  123:13;124:21;
  132:20;153:11;
  162:24
**unlike (1)**
  63:25
**unnecessary (1)**
  147:12
**unpack (1)**
  36:24
**unpersuasive (1)**
  60:3
**unquote (1)**
  131:24
**unreasonable (1)**
  71:16
**unrelated (1)**
  159:22
**unsatisfactory (1)**
  60:21
**unsecured (1)**
  7:6
**untested (1)**
  155:3
**untoward (1)**
  89:15
**unusual (1)**
  59:6
**unwarranted (2)**
  86:24,25
**up (55)**
  7:18;9:10;17:6;
  19:5;22:2;25:16;
  26:13,15,24;31:16;
  32:12;36:22;44:16;
  45:22;46:18;47:1,6;
  55:5;68:8;69:20,22;
  70:2;76:18;82:23;
  85:17;87:23;90:23;

92:19;93:22;95:22;
96:6;101:9,25;103:4;
105:6,8;107:23;
109:22;111:7;112:4,
9,13;117:18;118:5;
139:3;146:6,17,25;
156:9,14;157:2;
162:17;169:25;
176:12;178:19
**up-to-date (1)**
  82:11
**urgent (1)**
  53:13
**USC (2)**
  53:25;54:1
**use (30)**
  16:13;20:11,12;
  27:8;28:8;30:1,9,22;
  35:15;36:4,14,15;
  42:16;71:1;91:24;
  92:2,9;96:1;104:12;
  105:23;107:11;
  108:20;110:6;112:20,
  23;116:10,10;124:16;
  126:14;160:10
**used (14)**
  27:10,17;95:6,7,8,
  12;96:6;98:20,21,21;
  112:16;119:22;
  148:13;166:24
**useful (1)**
  155:16
**using (2)**
  96:7;171:6
**usually (2)**
  137:10,14
**utility (3)**
  38:14,15;39:25
**utterly (1)**
  117:8

# V

**valuation (8)**
  135:22;156:20;
  159:11;160:6;169:19,
  20,25;170:1
**value (21)**
  133:18,20;134:10,
  20,22,23,24,25;135:7,
  9,14;136:25;137:1;
  146:1;147:10;150:15;
  151:6,9,21;154:17,20
**valued (1)**
  134:8
**values (3)**
  133:19;161:22;
  162:14
**valuing (3)**
  134:9;151:4;166:5
**Vann (1)**
  178:6
**variation (1)**

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 207 of 209

**various (10)**
55:24;56:3,6,15;
57:1;106:8;132:9,12;
150:25;161:1
**vast (1)**
132:4
**vehicle (3)**
53:12;97:10;108:20
**vehicles (1)**
177:8
**venture (1)**
149:22
**verbatim (1)**
116:14
**version (4)**
115:14;125:11,16;
169:3
**versus (3)**
44:16;86:6;92:18
**vice (4)**
133:10,13;134:16;
147:1
**victim (1)**
109:12
**view (10)**
17:13,21;63:18;
78:24;95:25;101:20;
123:7;164:14,15,21
**views (3)**
27:1;53:4;162:10
**vigorously (2)**
129:22,24
**violated (2)**
17:20;44:5
**violating (1)**
105:25
**violation (1)**
32:24
**violence (1)**
109:24
**virtually (2)**
45:7;149:22
**vise (1)**
133:10

**W**

**wait (1)**
134:3
**waiting (3)**
48:6;80:24;149:21
**wants (15)**
51:15;64:25;66:24;
69:14,14;70:4;82:7;
114:18;123:2;146:25;
165:2;172:13,18;
175:2;178:16
**warmly (1)**
70:19
**warranted (1)**
138:12
**watched (1)**

**way (68)**
12:6,18,19;18:22;
20:18,21;23:20;26:6,
16;30:5;31:7,21;34:5;
35:25;36:4;41:9,9;
47:25;59:10,14;
68:16;73:8;77:6,7;
84:11;90:12;96:11,
22;97:8;98:19,23;
100:3;101:7;102:17;
103:14;104:2;105:22;
106:14;107:13,25;
109:1;112:22;121:25;
123:17,25;125:7;
126:1;127:1,25;
128:12;131:22;
142:20;144:19;
147:14,23;150:15;
152:6;157:18;161:6,
9,10;165:13,17,20;
167:15;171:5;172:8;
174:3
**ways (10)**
23:23;25:20;52:25;
53:5,9;106:11;109:4;
133:6;159:9;166:20
**weaknesses (1)**
132:11
**weary (1)**
137:24
**website (2)**
21:3;91:25
**Wednesday (1)**
67:13
**week (9)**
10:13;52:15;56:17;
64:23;78:15;81:16;
94:4;137:20;148:18
**weeks (3)**
67:21;69:23;167:24
**weigh (2)**
113:5;120:15
**weird (1)**
107:13
**Weiss (4)**
9:15,15,18,20
**welcome (1)**
152:12
**weren't (3)**
30:13;108:24;109:4
**Westchester (1)**
8:6
**Westport (1)**
9:16
**whack (2)**
97:3;127:4
**whatnot (8)**
28:9;35:20;46:10;
74:21;100:2;104:2;
108:9;124:18
**what's (24)**
10:22;12:15;29:1,4;

53:6,7;59:18;71:4;
94:18;98:5;99:11,11;
109:18;112:7;116:14;
137:6,17;157:6,18;
158:14,17;162:19;
171:13;177:2
**whatsoever (1)**
61:15
**whenever (1)**
162:16
**Whereupon (3)**
84:21;129:4;179:17
**wherever (1)**
112:24
**whichever (1)**
125:11
**whistleblower (1)**
103:23
**whole (12)**
21:11;37:24;71:20;
96:7;100:3,18;
108:15;150:5;151:2;
155:18;160:17;
171:15
**wholly (1)**
80:1
**who's (9)**
13:1;33:17;90:22;
92:17;96:10;97:19,
19;117:2;150:18
**whose (3)**
39:11;44:5;134:24
**wife (1)**
101:14
**William (1)**
6:6
**willing (3)**
41:13;85:14;152:23
**win (1)**
72:3
**window (5)**
135:16;139:18;
150:8;167:22,23
**Windows (1)**
106:6
**withdraw (11)**
54:13;68:15,23;
69:8,12,22;72:13;
77:20;78:1,23;112:11
**withdrawing (1)**
80:5
**withdrawn (2)**
54:21;69:18
**within (7)**
12:13;50:1;103:5;
136:9;137:22;153:8;
157:9
**without (15)**
11:13;24:4,20;
39:20;58:8;69:11;
97:10;109:1;125:18;
134:17;141:24,25;
145:18;155:17;174:2

**witness (13)**
38:9;89:17,21;
103:23;104:7,13,13,
19;105:9;121:1;
123:16;124:3;125:13
**witnesses (22)**
26:2;86:17;88:18,
19,24;97:16,17;
104:4;111:7;114:23;
115:6,15;117:1;
118:9;119:6,12;
121:7,15;123:11,14;
124:17;126:23
**wonder (2)**
83:25;124:13
**wonderful (1)**
53:3
**wonderfully (1)**
13:3
**Woodall (3)**
167:25;168:1,3
**word (9)**
30:22;80:17;81:14;
126:17,17,21,21;
159:11;166:11
**worded (1)**
137:22
**wording (2)**
175:16;177:11
**words (3)**
21:4;138:11;143:15
**wordsmith (1)**
124:14
**wordsmithing (1)**
97:25
**work (20)**
23:22;48:12;69:2;
71:13;77:2,13;82:24;
85:15;87:12;88:10,
11;98:25;99:6,9;
118:15;144:16;
156:19;166:1;170:21;
175:23
**workable (2)**
121:2,3
**worked (3)**
120:6;171:5;177:14
**working (15)**
97:2;118:14;
120:25;132:15;
135:10,13;136:2;
139:13,16;154:11,12;
174:16,16;175:7,19
**works (3)**
118:21;121:15;
171:3
**workup (1)**
170:6
**world (8)**
22:17;30:3;40:10;
99:2;100:13;149:18,
19;176:13
**worried (2)**

114:23;176:25
**worry (1)**
16:9
**worth (5)**
116:6;135:18,25;
148:12;159:23
**writ (1)**
173:5
**writing (1)**
115:4
**written (12)**
56:5,15,18,21,23,
25;57:3,5,8,11,15;
154:5
**wrong (10)**
18:19;29:7;31:6;
78:9;93:9;101:15;
117:18;118:7;121:9;
150:11
**wrote (5)**
20:20;34:5;56:9,10,
25

**Y**

**year (1)**
150:24
**years (16)**
71:8;106:5;120:5;
137:8;143:21;144:1,
25;154:2;158:18,21;
159:10;161:8;166:5;
167:7,12;175:5
**Years' (1)**
67:18
**Yep (1)**
15:6
**yesterday (3)**
70:20;79:4;152:11
**York (3)**
94:2;138:25;141:9;
146:6

**Z**

**Zoom (3)**
6:19;7:2;179:6

**0**

**0.25 (1)**
37:9
**07 (1)**
170:17

**1**

**1 (8)**
6:15,15;62:4;
102:21;150:17;167:9,
24;177:17
**1:30 (2)**
128:18;178:5

Case: 23-40523   Doc# 783-2   Filed: 01/16/24   Entered: 01/16/24 18:56:48   Page 208
of 209

**10,000 (1)**
120:7
**107 (6)**
26:7;89:11;106:11;
110:13;111:4,12
**10th (3)**
67:1,13,14
**11 (5)**
38:7,10;77:8;
115:16;148:4
**12:30ish (1)**
128:22
**12b6 (7)**
53:17;55:8;58:17;
66:2;75:8;77:21,24
**12e (2)**
53:17;55:8
**13.5 (2)**
61:25;62:3
**1334 (1)**
53:25
**14 (2)**
6:1;28:13
**14.5 (1)**
62:5
**143iiJ (1)**
49:11
**14iiiJ (1)**
29:13
**15 (1)**
61:14
**1500 (1)**
61:15
**157b (2)**
54:1,2
**15iii (1)**
46:11
**16 (1)**
68:1
**16th (2)**
67:22,25
**18 (3)**
53:2;67:10;68:3
**18th (2)**
66:19,22
**1962 (2)**
56:11;57:7
**1963 (2)**
55:25;57:6
**1966 (4)**
55:25;56:4,11,20
**1970 (5)**
56:4,16,20,22;
150:17
**1970s (1)**
151:1
**1971 (2)**
56:22,24
**1973 (1)**
145:7
**1974 (3)**
56:24;57:2,9
**1975 (2)**

56:7,16
**1977 (1)**
57:10
**1978 (2)**
57:12;159:4
**1980 (2)**
57:2,4
**1980s (1)**
151:1
**1981 (4)**
56:8;57:4,12,12
**1985 (3)**
57:15,16,16
**1987 (1)**
57:13
**1994 (1)**
61:15

---

**2**

**2 (4)**
6:15,17;102:21;
150:18
**2000 (2)**
135:16;162:17
**2000s (1)**
175:1
**2002 (1)**
49:18
**2004 (44)**
14:17,22;40:16;
52:19;59:9;80:18;
81:2,4,8,12;84:4,6;
88:1;107:8;116:18;
128:4;129:5,19;
130:25;137:7,15,18;
138:13;139:6;140:11;
141:21,24;142:2;
146:8;147:15;148:5;
151:17,19,25;155:14;
156:15;158:16;164:7,
19;165:21;172:15;
173:18;174:19;176:3
**2008 (1)**
63:4
**2023 (2)**
6:1;150:24
**2024 (1)**
22:22
**22-04028 (1)**
6:17
**22nd (3)**
53:21;178:13,24
**23-40523 (1)**
6:18
**24 (1)**
114:14
**25 (1)**
114:14
**26 (10)**
26:15;33:23;37:18,
22,25;49:3;71:25;
110:9;120:18;148:11

**28 (2)**
53:25;54:1
**28th (4)**
18:4;22:22;64:24;
65:1
**2nd (1)**
67:19

---

**3**

**3 (1)**
110:22
**36 (1)**
172:25
**37 (1)**
148:11

---

**4**

**48 (1)**
95:3
**4th (1)**
63:4

---

**5**

**592 (1)**
63:4

---

**6**

**60s (1)**
153:5
**63 (2)**
57:7,7
**66 (1)**
57:7
**69 (2)**
56:4,4

---

**7**

**7 (1)**
46:8
**7.2 (2)**
115:3,12
**7.2F (1)**
88:23
**7026 (1)**
37:23
**70s (1)**
153:5
**78 (1)**
94:2
**7F (1)**
119:12

---

**8**

**82 (1)**
63:4
**851 (1)**
145:12

---

**9**

**9:01 (1)**
6:1
**9019 (3)**
141:14;145:13,14
**90s (1)**
162:17
**996 (1)**
145:12
**9th (1)**
61:15

Case: 23-40523    Doc# 783-2    Filed: 01/16/24    Entered: 01/16/24 18:56:48    Page 209
of 209