UNITED STATES BANKRUPTCY COURT
Northern District of California

In re: THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole

Debtor(s)

Bankruptcy No.: 23-40523 WJL
R.S. No.:
Hearing Date: 07/16/2025
Time: 1:00 pm

## Relief From Stay Cover Sheet

Instructions: Complete caption and Section A for all motions. Complete Section B for mobile homes, motor vehicles, and personal property. Complete Section C for real property. Utilize Section C as necessary. If moving party is not a secured creditor, briefly summarize the nature of the motion in Section D.

(A) Date Petition Filed: 05/08/2023     Chapter: 11
    Prior hearings on this obligation: 01/08/2025     Last Day to File §523/§727 Complaints: _____

(B) Description of personal property collateral (e.g. 1983 Ford Taurus):

Secured Creditor [ ] or lessor [ ]
Fair market value: $_____     Source of value: _____
Contract Balance: $_____     Pre-Petition Default: $_____
Monthly Payment: $_____     No. of months: _____
Insurance Advance: $_____     Post-Petition Default: $_____
                                No. of months: _____

(C) Description of real property collateral (e.g. Single family residence, Oakland, CA):

Fair market value: $_____     Source of value: _____     If appraisal, date: _____

Moving Party's position (first trust deed, second, abstract, etc.):

Approx. Bal.     $_____     Pre-Petition Default: $_____
As of (date): _____                  No. of months: _____
Mo. payment: $_____     Post-Petition Default: $_____
Notice of Default (date): _____          No. of months: _____
Notice of Trustee's Sale: _____     Advances Senior Liens: $_____

Specify name and status of other liens and encumbrances, if known (e.g. trust deeds, tax liens, etc.):

| Position | Amount | Mo. Payment | Defaults |
|---|---|---|---|
| 1st Trust Deed: _____ | $_____ | $_____ | $_____ |
| 2nd Trust Deed: _____ | $_____ | $_____ | $_____ |
| _____: | | | |
| _____: | | | |
| _____: | | | |
| (Total) | $_____ | $_____ | $_____ |

(D) Other pertinent information:

Dated: 06/25/2025

_____
Signature
Gabrielle L. Albert
Print or Type Name

Attorney for Official Committee of Unsecured Creditors

CANB Documents Northern District of California

Case: 23-40523   Doc# 2093   Filed: 06/25/25   Entered: 06/25/25 15:04:06   Page 1 of 10

**LOWENSTEIN SANDLER LLP**
JEFFREY D. PROL (*pro hac vice*)
jprol@lowenstein.com
BRENT WEISENBERG (*pro hac vice*)
bweisenberg@lowenstein.com
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500

**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
tkeller@kbkllp.com
JANE KIM (Cal. Bar No. 298192)
jkim@kbkllp.com
GABRIELLE L. ALBERT (Cal. Bar No. 190895)
galbert@kbkllp.com
101 Montgomery Street, Suite 1950
San Francisco, CA 94104
Telephone: (415) 496-6723

**BURNS BAIR LLP**
TIMOTHY W. BURNS (*pro hac vice*)
tburns@burnsbair.com
JESSE J. BAIR (*pro hac vice*)
jbair@burnsbair.com
10 East Doty Street, Suite 600
Madison, Wisconsin 53703-3392
Telephone: (608) 286-2808

*Counsel for the Official Committee of Unsecured Creditors*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| *In re*:<br><br>THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole,<br><br>Debtor. | Case No. 23-40523 WJL<br><br>Chapter 11<br><br>**RENEWED MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO LIFT THE AUTOMATIC STAY TO PERMIT CERTAIN PLAINTIFFS' PERSONAL INJURY CLAIMS TO PROCEED IN STATE COURT**<br><br>Judge: Hon. William J. Lafferty<br>Date: July 16, 2025<br>Time: 1:00 pm (Pacific Time)<br>Place: United States Bankruptcy Court<br>1300 Clay Street, Courtroom 220<br>Oakland, CA 94612 |

The Official Committee of Unsecured Creditors (the "**Committee**") of The Roman Catholic Bishop of Oakland (the "**Debtor**" or the "**Diocese**") files this renewed motion (this "**Motion**"), under section 362(d) of title 11 of the United States Code, for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), granting relief from the automatic stay and authorizing the Superior Court of the State of California, County of Alameda (the "**State Court**") overseeing the "Northern California Clergy Cases," being administered under Judicial Council Coordination Proceeding (JCCP 5108) (the "**Coordinated Proceedings**"), to release six cases (the selected cases are defined as the "**State Court Actions**") commenced by survivors of sexual abuse ("**Survivors**") against the Debtor for trial by jury, *solely for purposes of liquidation, not collection against the Debtor*, in accordance with the orders issued, and procedures used, by the State Court before this chapter 11 case (the "**Chapter 11 Case**") was filed.[1] In support of this Motion, the Committee states:[2]

## I.

### THE COURT SHOULD MODIFY THE AUTOMATIC STAY GIVEN THE CHANGE IN CIRCUMSTANCES

In late November 2024, the Committee filed the First Lift Stay Motion, requesting that the Court modify the automatic stay to allow six State Court Actions to proceed to trial. The Committee sought this relief to prod mediation, which had stalled. Historically, without the pressure of impending trials, diocesan bankruptcy mediations move slowly or fail altogether, as occurred here.

---

[1] Because the parties have not agreed to modify or terminate the automatic stay, this paragraph constitutes the concise statement of the relief requested required by Bankruptcy Rule 4001(d)(1)(B).

[2] On November 20, 2024, the Committee filed the *Motion of the Official Comm. of Unsecured Creditors to Lift the Automatic Stay to Permit Certain Plaintiffs' Pers. Inj. Claims to Proceed in State Ct.* [Dkt. No. 1460] (the "**First Lift Stay Motion**"). The First Lift Stay Motion is attached as **Exhibit 1** to the *Declaration of Gabrielle Albert in Support of Renewed Motion of the Official Committee of Unsecured Creditors to Lift the Automatic Stay to Permit Certain Plaintiffs' Personal Injury Claims to Proceed in State Court* (the "**Albert Dec.**") filed contemporaneously herewith. The First Lift Stay Motion is hereby incorporated by reference as if fully set forth herein. The authorities cited therein serve as the legal basis for this Motion. All capitalized terms not defined in this Motion are defined in the First Lift Stay Motion.

The Court denied the First Lift Stay Motion without prejudice after expressing concerns about the pace with which the State Court Actions might move through the State Court.[3] But the Court stated in its oral ruling that denial of the First Lift Stay Motion was "very much without prejudice because things may change, and it may be that it's something that will be very helpful in the future."[4] Indeed, in denying the Committee's motion for standing to continue prosecuting the Debtor's adversary proceeding against the Insurers the prior week, the Court made a similar observation, stating that:

> As I've said in [an]other context, time is a long thing. And if we end up in a situation where I am convinced, either by legal arguments or by the vote of constituents, that the plan the debtor proposes cannot be confirmed, we'll be in a different place. And at that point, it will be -- there will be nothing wrong with reconsidering whether, as part of that scenario, the better course is to is to allow the committee to be more of a protagonist here than they are right now.[5]

***The vote has concluded. Things have changed. And this case is in a dramatically different place. Given the sea change, stay relief will be helpful, if not vital, to resolving this case consensually.***

*First,* 341 out of 343 Survivors—**99.4%**—voted to reject the *Debtor's Third Amended Plan of Reorganization* [Dkt. No. 1830] (the "**Plan**").[6] The near-complete lopsidedness of the Survivor vote is unprecedented. Only two other Roman Catholic Dioceses have attempted to cramdown chapter 11 plans of reorganization on survivors of sexual abuse. In those cases, survivors voted to reject the debtors' plans of reorganization by 86% and 93%.[7]

---

[3] *See Order on Motion of the Official Comm. of Unsecured Creditors to Lift the Automatic Stay to Permit Certain Plaintiffs' Pers. Inj. Claims to Proceed in State Ct.* [Dkt. No. 1721] (denying the First Lift Stay Motion without prejudice for the reasons set forth in the Court's oral ruling discussed herein).

[4] Jan. 21, 2025 Hr'g Tr. at 17:22–24 [Dkt. No. 1667] ("**RCBO 1/21/25 Hr'g Tr.**"). The *RCBO* 1/21/25 Hr'g Tr. is attached as **Exhibit 2** to the Albert Dec.

[5] Jan. 15, 2025 Hr'g Tr. at 18:6–13 [Dkt. No. 1645] ("**RCBO 1/15/25 Hr'g Tr.**"). The *RCBO* 1/15/25 Hr'g Tr. is attached as **Exhibit 3** to the Albert Dec.

[6] *See Declaration of Andres A. Estrada with Respect to Solicitation and the Tabulation of Votes on the Debtor's Third Amended Plan of Reorganization* [Dkt. No. 2040] (the "**Vote Tabulation Declaration**").

[7] In *In re The Archdiocese of St. Paul & Minneapolis*, more than 93% of abuse claimants rejected the Archdiocese's plan when it was opposed by the committee. *See Rep. of Ballot Tabulation*, No. 15-30125 (Bankr. D. Minn. May. 11, 2017), Dkt. No. 1041. In *In re The Roman Catholic Diocese of Rockville Centre*,

Although the Debtor mulishly persists in its effort to cramdown the Plan on Survivors, the Debtor faces considerable challenges before its Plan may be confirmed. To name but a few:

- As set forth in the Committee's previous objections to the Disclosure Statement, the Debtor manufactures an impaired accepting class of creditors—Class 3 (General Unsecured Creditors)—to avail itself of cramdown.

    A review of the Vote Tabulation Declaration indicates that a number of Class 3 General Unsecured Creditors voting for the Plan are insiders—including the Bishop voting a $300 claim on account of an unreimbursed expense—or are claims being asserted by Parish Churches, which have no separate legal existence from the Debtor and cannot hold claims or vote on the Plan.

- As set forth in the Committee's previous objections to the Disclosure Statement, the Debtor fails to value Survivor claims to determine the actual percentage recovery Survivors will receive under the Plan. Rather, the Debtor seeks to establish the fairness of its payment to Survivors by comparing it to distributions made to *other* survivors in *other* bankruptcy cases pending in *other* jurisdictions in cases with ***different*** governing law, ***different*** estate assets, ***different*** insurance programs and ***different*** historical jury verdicts and settlements.[8] The Debtor also fails to factor into its analysis whether the statute of limitations was open in prior cases, which is a material factor in determining claim values.

- As set forth in the Committee's previous objections to the Disclosure Statement, the Debtor unilaterally declares that hundreds of millions of dollars of its assets, including the vast majority of its real estate holdings, are "mission critical" and should not be included in the hypothetical liquidation test.

- As alleged in the Committee's "Restricted Assets" complaint (Adv. Pro. No. 24-04051 WJL), the Debtor disregards $38 million in cash and investments that could be used to either pay Survivors directly or to satisfy future expenses—thereby freeing up unrestricted cash to pay Survivors—claiming these donations are "restricted."

***Second***, the State Court recently stated that it has "significant latitude" to schedule the State Court Actions and could do so "***expeditiously***."[9] Indeed, California law explicitly empowers

---

approximately 86% of abuse claimants voted to reject the diocese's plan. *See Declaration of Stephanie Kjontvedt of Epiq Corporate Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on Fourth Modified First Amended Chapter 11 Plan*, No. 20-12345-mg (Bankr. S.D.N.Y. Apr. 17, 2024), Dkt. No. 3057.

[8] Under applicable non-bankruptcy law, jury verdicts and individual case settlements are the proper mechanism to liquidate the value of Survivors' claims. Congress has expressly preserved claimants' jury-trial rights for personal-injury claims such as the sexual abuse actions in this case. *See* 28 U.S.C. § 157(b). Payment of claims against a bankrupt debtor may be limited by the debtor's resources, but the allowed amount of such claims is not. *See* 11 U.S.C. § 502(b)(1) (claims are allowed "except to the extent . . . unenforceable . . . under . . . applicable law").

[9] May 28, 2025 Hr'g Tr. at 28:16–18, *In re N. Calif. Clergy Cases*, No. JCCP5108 (Cal. Super. Ct.) ("**State Court Hr'g Tr.**") (emphasis added). The State Court Hr'g Tr. is attached as **Exhibit 4** to the Albert Dec.

coordination judges to schedule trials to "expedite the just determination of the coordinated actions" and "serve the ends of justice."[10]

California's official manual on complex cases states, "[t]he court should manage the selection of bellwether cases to maximize the impact of the bellwether trials on future settlements. . . . By participating in the process, the judge can . . . guide the parties to a selection of cases that are typical and yield predictive results."[11] The State Court thus previously entered an *Order on Criteria for Bellwether Cases* stating, in part, that the State Court was "inclined to select cases for bellwether trials based on whether they will present legal or factual issues that are present in many of [the] cases or that will otherwise provide information that will permit the parties to evaluate the value of other cases."[12]

The Court also expressed concern in its ruling on the First Lift Stay Motion that there was a newly appointed State Court Coordination Trial Judge.[13] Now, The Honorable Somnath Raj Chatterjee (the "**Coordination Judge**") has been overseeing the Coordinated Proceedings for close to six months and nothing suggests that there will be any change in Coordination Judges anytime soon.

***Third***, bankruptcy courts overseeing nonprofit sexual abuse cases across the country have recently granted stay relief to jumpstart stalled mediation. Stay relief, according to the courts, is:

- a way for the parties to "better appreciate their risks and the benefits of a consensual plan";[14]

- a means to "move the entire case toward, and not away from, a global resolution";[15] and

---

[10] Cal. R. Ct. § 3.541(b).

[11] 1 California Deskbook on Complex Civil Litigation § 4.04 (2025); *see also id.* § 5.68 ("Mass tort litigation primarily is resolved by settlement based upon the results of bellwether trials.").

[12] *Order on Criteria for Bellwether Cases* at 1, In re N. Calif. Clergy Cases, No. JCCP5108 (Cal. Super. Ct. Nov. 18, 2022). The Order is attached as **Exhibit 5** to the Albert Dec.

[13] *RCBO* 1/21/25 Hr'g Tr. at 17:9–18 ("I'm also somewhat concerned about the fact that there's a new presiding judge with respect to these matters and that that person has yet to have a hearing with respect to the consolidated matter.").

[14] *In re Diocese of Buffalo, N.Y.*, 665 B.R. 198, 202 (Bankr. W.D.N.Y. 2024).

[15] *Memorandum Decision on Motion for Relief from Stay*, *In re Roman Cath. Archbishop of S.F.* at 6, No. 23-30564-DM (Bankr. N.D. Cal. Apr. 10, 2025), Dkt. No. 1138 ("**S.F. Stay Relief Order**"). The *S.F.* Stay Relief Order is attached as **Exhibit 6** to the Albert Dec.

- a needed "different approach" amid parties' failure to settle.[16]

In the face of ineffective mediation, bankruptcy courts are increasingly concluding it is time to try something new.[17]

In three pending Roman Catholic Diocese bankruptcy cases (plus the *Franciscan Friars* case), courts have recently granted stay relief to survivors, concluding that resuming sex-abuse litigation was necessary to spur consensual resolution. First, in December, the court in *Diocese of Buffalo* lifted the stay to allow survivors to try their cases in state court.[18] "Litigated disputes," the court explained, "are often settled on the courthouse steps. By pushing litigants closer to a trial of tort claims, we hope that the parties may better appreciate their risks and the benefits of a consensual plan."[19] Next, the court overseeing the Diocese of Albany's bankruptcy case granted seven stay relief motions, reasoning that "with each passing day, the lack of settlement suggests the need to take a different approach."[20] Third, in the most recent decision, the *Archdiocese of San Francisco* bankruptcy court granted stay relief for two survivors, reasoning that "more good than harm will be achieved, more progress forward than retreat backward or status quo will be the case."[21] The court added: "[b]oth the [committee's] citations to other bankruptcies that have progressed after relief from stay has been lifted (and others that have languished where no stay relief was granted) and the court's own experience l[e]d the court to this decision."[22]

---

[16] March 12, 2025 Hr'g Tr. at 10:15, *In re Roman Cath. Diocese of Albany, N.Y.*, No. 23-10244 c ("**Albany Hr'g Tr.**"). The *Albany* Hr'g Tr. is attached as **Exhibit 7** to the Albert Dec.

[17] As the Court knows, stay relief was granted, with the consent of the debtor, in the *Franciscan Friars* bankruptcy case. While the Court noted that the situation in *Franciscan Friars* was "unique" because of the debtor's agreement to seek a modification of the stay, the Court's discussion and analysis of the purpose of the automatic stay as a "tool" is equally applicable here. *See* Apr. 1, 2025 Hr'g Tr. at 92:24–93:7, 93:15–94:2, *In re Franciscan Friars of Cal., Inc.*, No. 23-41723 (Bankr. N.D. Cal.), Dkt. No. 876 ("**Franciscan Friars Hr'g Tr.**"). In *Franciscan Friars*, modifying the automatic stay was intended to advance mediation. *Id.* at 94:13–16. Here too, the Committee seeks to modify the automatic stay to jumpstart a stalled mediation to drive this case to a successful conclusion. The *Franciscan Friars* Hr'g Tr. is attached as **Exhibit 8** to the Albert Dec.

[18] *See* 665 B.R. at 205.

[19] *Id.* at 202.

[20] *Albany* Hr'g Tr. at 10:13–15 (quoting *In re Diocese of Buffalo*, 665 B.R. at 202).

[21] *S.F.* Stay Relief Order at 8.

[22] *Id.* at 8–9.

Despite just how much things have changed, the Debtor and the Insurers will oppose this Motion, likely arguing that the status quo should remain pending the Plan confirmation trial. Ironically, the imminence of the Plan confirmation trial reinforces the need for the requested relief because allowing the State Court Actions to proceed is appropriate whether or not the Plan is confirmed. If the Plan is confirmed, Survivors electing the "Litigation Option" may continue prosecuting their cases in State Court for purposes of insurance recovery.[23] Lifting the automatic stay as requested herein merely expedites the Litigation Option contemplated by the Plan. If this Motion is granted, the Insurers will be asked to defend the Debtor now, just as they must if the Plan is confirmed. In either case, none of the Insurers' rights, claims, or defenses are modified in any way.

If the Court denies confirmation, the stasis the Committee long feared will follow. Earlier, the Debtor mocked the Committee for proposing an alternative to a contested plan confirmation, which focused on resolving two key issues: the value of Survivors' claims and the size of the Debtor's estate, all while saving the extraordinary costs of a contested plan confirmation hearing that the Debtor now complains of. The Committee's proposal stemmed from concern that if the Debtor's Plan was denied, no progress would be made on these issues. The Committee urged the Debtor to join a process allowing (i) an Alameda County jury to determine the value of certain Survivor claims, settling the dispute over their value, and (ii) the Court to decide the size and scope of the Debtor's bankruptcy estate. The Debtor refused, insisting on confirming its Plan with or without Survivor support. Previously, the Debtor could claim it did not need to prove the Plan could be crammed down on Survivors until after the vote. That argument is now moot: the conjecture that allowed the Debtor to get here has been put to rest.[24]

---

[23] See Plan § 9.8.4.

[24] See Dec. 18, 2024 Hr'g Tr. at 98:18–25, *In re The Roman Cath. Bishop of Oakland*, No. 23-40523 (Bankr. N.D. Cal.), Dkt. No. 1568 ("**RCBO 12/18/24 Hr'g Tr.**") (Debtor's counsel: "So on the issue of whether the plan is patently unconfirmable, it is not patently unconfirmable because it is possible -- it is not impossible -- that all four of those impaired classes could vote to support the plan. The committee is going to swear up and down, and they have sworn up and down, there's no way class 4 is going to support the plan. But they don't know that. I don't know that. You don't know that."). The *RCBO* 12/18/24 Hr'g Tr. is attached as **Exhibit 9** to the Albert Dec.

If this Court holds that it cannot, and will not, be the first Bankruptcy Court in the country to cramdown a plan of reorganization on Survivors, the parties stand on the precipice of having failed to resolve their fundamental disputes. Expediting a resolution is thus more important than ever. Survivors experience continuing trauma and evidence erodes while this Chapter 11 Case remains stagnant. And Survivors who pass away—at least ten Survivors have passed away—are permanently denied justice and lose the chance to corroborate their claims with testimony that is exclusively within their personal knowledge.

To course correct, the Committee files this Motion to begin the process needed to bring this case to a consensual resolution: exposing all parties, including the Insurers, to risk of loss, or guidance as to what a jury in Alameda County might award a Survivor. Indeed, this Court previously acknowledged that lifting the stay could have that very effect.[25] And while the Court expressed concern earlier in this case that the State Court Actions may not promptly move to trial, the Coordination Judge has since stated that the State Court Actions can move to trial expeditiously.[26] In fact, at least one of the six State Court Actions will likely be the case of Survivor Steve Woodall, whose bellwether case against the Debtor was set for trial on May 1, 2023.[27]

Substantially all discovery in Mr. Woodall's case is complete except the Debtor's mental health examination of Mr. Woodall. That examination may commence immediately after the automatic stay is lifted and any other discovery, to the extent any remains, can be completed in a few weeks' time while the Coordination Judge arranges his schedule to conduct a trial. No summary judgment motion will be brought, and the remaining motions are limited to motions in

---

[25] *See RCBO* 1/21/25 Hr'g Tr. at 16:20–17:1–2 ("I thought an awful lot of good could come from getting some real data on the claims. And frankly, I don't mean to be flip here, but also from creating in everybody's mind the possibility that you're going to hear something in those determinations that you don't like, which I think has been and an incentive to move cases along more quickly than perhaps they were proceeding without that incentive.").

[26] State Court Hr'g Tr. at 28:16–18 ("[I]f the question is, when can this Court set it for trial . . . [w]e could set it for trial pretty expeditiously").

[27] Mr. Woodall is the Chairperson of the Committee. The Insurers will undoubtedly argue that there is favoritism in, and a conflict of interest by, even suggesting that this case go forward to which the response is two-fold: first, it is up to the State Court to ultimately choose which State Court Actions proceed and second, it was the Debtor which chose the Woodall case as the first bellwether trial.

limine to be heard before trial. The Woodall case will be ready for trial in 90 days or less, depending on the Coordination Judge's calendar.

To help the parties gain clarity on the value of Survivor claims, to unlock the liability insurance assets, and to set this case on a path towards resolution, the Committee requests that this Court lift the automatic stay so that six cases pending against the Diocese may proceed to trial by jury, *solely for purposes of liquidation and not collection against the Debtor*.[28]

## II.

## NOTICE

Notice of this Motion will be provided to (i) the Debtor; (ii) the Insurers; (iii) the United States Trustee and (iv) those persons who have formally appeared in this Chapter 11 Case and requested service under Bankruptcy Rule 2002. Based on the nature of the requested relief, the Committee submits that no further notice is required.

**WHEREFORE**, the Committee requests entry of the Proposed Order and any other relief that the Court may deem just and appropriate.

Dated: June 25, 2025

**LOWENSTEIN SANDLER LLP**
**KELLER BENVENUTTI KIM LLP**
**BURNS BAIR LLP**

By: */s/ Gabrielle L. Albert*
Tobias S. Keller
Gabrielle L. Albert

-and-

Jeffrey D. Prol
Brent Weisenberg

*Counsel for the Official Committee of Unsecured Creditors*

-and-

Timothy W. Burns
Jesse J. Bair

*Special Insurance Counsel for the Official Committee of Unsecured Creditors*

---

[28] Given the Debtor's recent concerns about its diminishing liquidity, the Committee reserves the right to seek dismissal of this case if the Plan is not confirmed. *See Debtor's Motion to Amend Ord. Establishing Procs. for Interim Comp. and Reimbursement of Expenses of Pros.* [Dkt. No. 1908].