**Exhibit 8**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

| | |
|---|---|
| In Re:<br><br>FRANCISCAN FRIARS OF CALIFORNIA, INC.<br><br>Debtor. | ) Case No. 23-41723<br>) Chapter 11<br>)<br>)<br>)Oakland, California<br>) Tuesday, April 1, 2025<br>) 9:30 AM |

JOINT MOTION FOR ENTRY OF AN ORDER (L) REFERRING PARTIES TO MEDIATION, APPOINTING MEDIATOR AND GRANTING RELATED RELIEF AND (II) APPROVING STIPULATION FOR RELIEF FROM THE AUTOMATIC STAY FILED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE FRANCISCAN FRIARS OF CALIFORNIA, INC.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM J. LAFFERTY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor and Debtor-In-Possession: | ROBERT G. HARRIS, ESQ.<br>Binder Malter Harris & Rome-Banks LLP<br>2775 Park Avenue<br>Santa Clara, CA 95050<br>(408)295-1700 |
| Special Counsel for Tort and Insurance Issues for the Debtor: | BRIAN P. BROSNAHAN, ESQ.<br>Cornerstone Law Group<br>48 Gold Street<br>1st Floor<br>San Francisco, CA 94133<br>(415)974-1900 |

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 2 of 122

For the Associated Ministries: MICHAEL ST. JAMES, ESQ.
St. James Law, P.C.
236 West Portal Avenue
Suite 305
San Francisco, CA 94127
(415)391-7566

For Franciscan Ministries: CHRISTIAN M. KEINER, ESQ.
Dannis Woliver Kelley
555 Capitol Mall
Suite 645
Sacramento, CA 95814
(916)978-4040

For Official Committee of Unsecured Creditors: BRENT WEISENBERG, ESQ.
JEFFREY D. PROL, ESQ.
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
(973)597-2490

MORGAN K. STIPPEL, ESQ.
TIMOTHY W. BURNS, ESQ.
Burns Bair LLP
10 East Doty Street
Suite 600
Madison, WI 53703
(608)286-2302

GABRIELLE L. ALBERT, ESQ. (VIA ZOOM)
Keller Benvenutti Kim LLP
425 Market Street
26th Floor
San Francisco, CA 94105
(415)364-6791

For Aetna ACE: TANCRED V. SCHIAVONI, ESQ.
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
(212)326-2000

For General Insurance Company of America: KAITLIN R. WALSH, ESQ.
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
919 Third Avenue,
New York, NY 10022
(212)935-3000

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 3 of 122

ELLEN MACDONALD FARRELL, ESQ.
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
555 12th Street, Northwest
Suite 1100
Washington, DC 20004
(202)434-7300

For The Travelers Companies, Inc.:

ANDREW D. TELLES WYATT, ESQ.
Dentons US LLP
4675 Macarthur Court
Suite 1250
Newport Beach, CA 92660
(949)732-373

PATRICK C. MAXCY, ESQ. (VIA ZOOM)
Dentons US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
(312)876-8000

For London Market Insurers:

TIMOTHY W. EVANSTON, ESQ.
Skarzynski Marick & Black LLP
633 West Fifth Street
26th Floor
Los Angeles, CA 90071
213)721-0650

For Zurich American Insurance Company:

FRANK J. PERCH, III, ESQ. (VIA ZOOM)
White and Williams LLP
1650 Market Street
Suite 1800
Philadelphia, PA 19103
(215)864-7000

For Transcontinental Insurance Company:

MIRANDA H. TURNER, ESQ. (VIA ZOOM)
Plevin & Turner LLP
1701 Pennsylvania Avenue, Northwest
Suite 200
Washington, DC 20006
202.580.6640

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 4 of 122

Court Recorder: PHYLLIS WRIGHT
United States Bankruptcy Court
1300 Clay Street
Oakland, CA 94612

Transcriber: RIVER WOLFE
eScribers, LLC
7227 N. 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

Proceedings recorded by electronic sound recording; transcript provided by transcription service.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 5 of 122

OAKLAND, CALIFORNIA, TUESDAY, APRIL 1, 2025, 10:38 AM

-oOo-

(Call to order of the Court.)

THE CLERK: Calling line item number 12, Franciscan Friars of California, Inc, case number 23-41723. Transferring over parties now, Your Honor.

THE COURT: Okay. There'll be a few appearances in the courtroom. Why don't we start with those?

MR. HARRIS: Good morning, Your Honor. Robert Harris of Binder Malter Harris & Rome-Banks, representing the debtor and debtor-in-possession, Franciscan Friars of California, Inc.

THE COURT: Okay. Anybody else here with you for the debtor today?

MR. BROSNAHAN: Yes, Your Honor. Brian Brosnahan.

THE COURT: Okay. Go ahead and get up to a microphone.

MR. BROSNAHAN: Thank you, Your Honor.

THE COURT: Yeah.

MR. BROSNAHAN: Brian Brosnahan. I am special counsel for tort and insurance issues for Franciscan Friars of California, Inc., the debtor.

THE COURT: Okay. Great. Thanks.

MR. BROSNAHAN: Thank you, Your Honor.

THE COURT: All right. Anybody else for the debtor? Anybody else for parties related to the debtor?

MR. ST. JAMES: Good morning, Your Honor. Michael St. James appearing on behalf of the associated ministries.

THE COURT: Okay. Thanks. Okay.

MR. KEINER: Good morning, Your Honor. Chris Keiner for Franciscan ministries. We're a designated mediation party.

THE COURT: Okay. How about for the committee?

MR. WEISENBERG: Good morning, Your Honor. Brent Weisenberg of Lowenstein Sandler on behalf of the committee. With me is my partner Jeff Prol.

THE COURT: Okay. Morning.

MR. PROL: Morning, Your Honor.

MS. STIPPEL: Good morning, Your Honor. Atty. Morgan Stippel from Burns Bair, appearing on behalf of the UCC, and alongside with me is Atty. Tim Burns.

THE COURT: Okay. Great. Thank you.

Anybody else in the courtroom appearing on Franciscan Friars? Oh, you go ahead. Yes. We'll do the -- we're doing the courtroom first. Go ahead.

MR. SCHIAVONI: Tancred Schiavoni, Your Honor, from O'Melveny for Pacific.

Your Honor, however you want to proceed, but I think I might be able to just tell you sort of where we are. I really appreciate the break you gave us. And then --

THE COURT: Yeah. Okay. I've got some other

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 7 of 122

appearances on screen.

MR. SCHIAVONI: Oh, okay. Fine.

THE COURT: Can we do those?

MR. SCHIAVONI: Yeah.

THE COURT: Okay. Anybody else in the courtroom?

Come on up.

MS. WALSH: Good morning, Your Honor. Kaitlin Walsh from Mintz, Levin on behalf of General Insurance Company of America.

THE COURT: Okay. Great.

MS. FARRELL: And Ellen Farrell, also of Mintz, Levin on behalf of General Insurance Company of America.

THE COURT: Great. Nice to see you.

MS. FARRELL: Yeah.

Mr. WYATT: Good morning, Your Honor. Andrew Wyatt from Dentons on behalf of Travelers.

THE COURT: Okay.

MR. EVANSTON: Good morning, Your Honor. Timothy Evanston of Skarzynski Merick & Black, appearing on behalf of the London Market insurers.

THE COURT: Okay. That takes care of the courtroom appearances for Franciscan Friars.

Okay. How about on the screen? There's a couple of other folks, I think.

MS. ALBERT: Good morning, Your Honor.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 8 of 122

MR. PERCH: Good morning, Your Honor. Frank Perch For Zurich.

THE COURT: Okay.

MS. ALBERT: Good morning, Your Honor. Gabrielle L. Albert, Keller Benvenutti Kim, on behalf of the committee.

THE COURT: Okay.

MS. TURNER: Your Honor, Good morning. Miranda Turner, Plevin & Turner, on behalf of Trans Continental Insurance Company.

THE COURT: Okay. Thank you.

MR. MAXCY: Good morning, Patrick Maxcy, Dentons US LLP, for travelers.

THE COURT: Okay. Thank you.

I think that's all the appearances.

So we're sort of running up against each other here, and we had scheduled a hearing in Oakland diocese for 10:30. So unless Mr. Weisenberg is going to be substantively consolidate Oakland and Franciscan Friars, which I guess we should think about, right, we'll go forward separately.

MR. WEISENBERG: Your Honor, we're open to any creative ideas to get to yes.

THE COURT: Okay. Fine. All right. Come on up. It's your motion. But I'm looking forward to hearing Mr. Schiavoni's description of great progress being made.

MR. HARRIS: Absolutely, Your Honor. Thank you.

Well, you may have noticed we have a rather unique seating chart for today.

THE COURT: Yeah.

MR. HARRIS: You have the debtor and the committee on the same side of the table, at the same table, in fact.

THE COURT: Um-hum.

MR. HARRIS: And that is reflective of our alignment in the relief we seek.

THE COURT: Right.

MR. HARRIS: I will let you know that just in terms of responsibility today, Mr. Brosnahan will be discussing all matters pertaining to mediation and insurance. I'll be handling matters pertaining to relief from stay and otherwise general bankruptcy.

THE COURT: Okay.

MR. HARRIS: The break in the hall may have pushed us towards a potential resolution on the mediation question and --

THE COURT: But not on the relief from stay question?

MR. HARRIS: No, not on the relief from stay, Your Honor. We believe that the insurers -- well, well, don't want to say too much for that on their behalf, but we think the insurers are willing to go forward with the mediation on the scheduled date, with the concept that it is effectively a phonathon.

THE COURT: Yeah, that was my reaction, too, that it

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 10 of 122

sounded as if it was, let's see who's here and some structure. Right.

MR. HARRIS: Right. And it's --

THE COURT: Yeah.

MR. HARRIS: So we have been working on a mediation order.

THE COURT: Okay.

MR. HARRIS: I think you may have picked up from the papers that one of the reasons we didn't get before you on mediation earlier is because there was a disagreement between the committee and the insurers on the form of order.

THE COURT: Um-hum.

MR. HARRIS: So perhaps Your Honor would like to poll the courtroom and authorize parties to speak on the mediation motion first, and then we can get to relief from stay?

THE COURT: I suppose. I mean, I think, if I read maybe it was Mr. Brosnahan's input or maybe it was the committee's, that there were a couple of issues that were really nonissues. There were a couple of matters that could be fixed in the order that would be responsive to some of the insurers' concerns. So unless there's been a further development there, it sounds like maybe there's really just one or two matters that were still contentious.

MR. BROSNAHAN: There are just a couple, Your Honor.

THE COURT: Okay.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 11 of 122

MR. HARRIS: And perhaps I'll defer to Mr. Brosnahan here.

THE COURT: Okay. Come on up.

MR. BROSNAHAN: Thank you, Your Honor. As Mr. Harris noted, our principal objective is to get the mediation started --

THE COURT: Um-hum.

MR. BROSNAHAN: -- on May 14, and I hope the insurers are now prepared to do that. The first two issues that were addressed in our brief, I think, have been resolved. One had to do with --

THE COURT: The payment.

MR. BROSNAHAN: The payment, yes.

THE COURT: Yeah.

MR. BROSNAHAN: That's been resolved.

THE COURT: Um-hum.

MR. BROSNAHAN: The second had to do with adding a reservation to footnote 4.

THE COURT: Um-hum.

MR. BROSNAHAN: That's been resolved.

THE COURT: Okay.

MR. BROSNAHAN: The only other issue relates to the privilege log --

THE COURT: Yeah.

MR. BROSNAHAN: -- that they've asked for with respect

to what documents and information we've provided to the committee.

THE COURT: Um-hum.

MR. BROSNAHAN: It's our position that anything that we have provided to the committee that we don't want to share with them, the reason is that it's subject to a joint interest privilege with the committee.

THE COURT: But isn't this just categorical versus more specific?

MR. BROSNAHAN: Yes, Your Honor. And we --

THE COURT: Okay. So go ahead and tell me why more specific isn't appropriate.

MR. BROSNAHAN: Well, we have a very small estate, and we don't want to come before Your Honor with a lot of legal bills for doing what I would consider to be busy work. The main question is, if we provide material to the committee that we assert is subject to a joint interest privilege, why do we have to specify every date and every person who received such material?

THE COURT: Okay. Anything else?

MR. BROSNAHAN: That's the argument on that.

THE COURT: Okay.

MR. BROSNAHAN: The only other issue, Your Honor, relates to the objection that was made by ACE or Aetna -- I guess ACE is the current -- is the successor -- where they seek

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 13 of 122

a substantive ruling that it is never appropriate, never proper, and cannot be allowed for the insurer to share privileged information with the plaintiff, in other words, to waive a privilege, which happens all the time. If my client provides me with exculpatory information, I may want to share that with the committee. With plaintiffs' lawyers.

The ACE has sought an order that categorically prohibits any such disclosure without consent from all of the insurers, whereas all the other insurance companies have agreed that all parties will simply reserve rights on that issue. We reserve the right that we may be able to do it. They reserve the right to be able to argue that if we do it, it's a violation of the policy language. And we believe the Court should not be making a substantive ruling that precludes such a waiver of privilege --

THE COURT: Um-hum.

MR. BROSNAHAN: -- in the abstract at this point.

THE COURT: Um-hum.

MR. BROSNAHAN: That's all I have on the mediation order.

THE COURT: Okay. Well, let me ask you this. I mean, if -- I mean, does either one of the approaches contemplate that if this somehow really gets teed up and is problematic, it should come back here for me to decide it, or is it just you just want to leave it at we're just taking -- we think we

understand our legal obligations. We think we understand the risks. And if we do this, if that gives them a card to play, so be it. Which is it?

MR. BROSNAHAN: Yes. Yes, Your Honor, that's the approach taken by all the other insurance companies --

THE COURT: Okay.

MR. BROSNAHAN: -- where we've signed off on language, where each party just reserves rights on the issue

THE COURT: Okay.

MR. BROSNAHAN: And we're not asking the --

THE COURT: Well, does it help anything for me to reserve the ability to hear you folks, if this is an actual dispute?

MR. BROSNAHAN: Your Honor always reserves the ability to hear us.

THE COURT: Yeah, but I say it more than some people.

MR. BROSNAHAN: So I think that the Court should just accept the language --

THE COURT: I got it. All right. Okay.

MR. BROSNAHAN: -- we've worked out with all the other insurers.

THE COURT: All right. Thank you very much.

MR. BROSNAHAN: All right. Thank you, Your Honor.

THE COURT: All right. That that's the mediation piece, right?

MR. BROSNAHAN: I believe that resolves all the issues on the mediation.

THE COURT: Okay. Does the committee want to be heard on this, or are you guys saying you just satisfied with the --

MR. WEISENBERG: Thank you, Your Honor. Brent Weisenberg on behalf of the committee. We're satisfied with the agreements that have been reached.

THE COURT: Okay. All right. So on the less-than-satisfied side of things, come on up, Mr. Schiavoni.

MR. SCHIAVONI: Your Honor, let me just start -- actually, first, Mr. Brosnahan actually corrected me about who my client is. I'm embarrassed about that so --

THE COURT: Okay.

MR. SCHIAVONI: Yes, I'm here for ACE Aetna today.

THE COURT: Okay.

MR. SCHIAVONI: Not Pacific, that's --

THE COURT: Thank you. Okay.

MR. SCHIAVONI: -- later this morning.

THE COURT: That's later this morning or this afternoon. Okay.

MR. SCHIAVONI: So let me just start with the good news.

THE COURT: Great Okay.

MR. SCHIAVONI: Okay. The positives, because there's a lot here. It's we're all, all the insurers, want to mediate.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 16 of 122

We've made that clear right from the beginning.

THE COURT: Okay.

MR. SCHIAVONI: We made a lot of lot of compromises to get there --

THE COURT: Okay.

MR. SCHIAVONI: -- so to speak. This mediator that the debtor and the committee selected in Arizona was not our first choice. We're going to go with him.

THE COURT: Okay.

MR. SCHIAVONI: Okay. That's fine. And we've agreed on the payment things --

THE COURT: Okay.

MR. SCHIAVONI: -- and we are largely agreed on the order. There's three issues in the order, on the mediation order, we'd like to address.

THE COURT: Okay.

MR. SCHIAVONI: We were concerned, Your Honor, that because we don't have a big bulk of the documents at this moment that we just couldn't be ready to, like, mediate the thing to complete resolution in --

THE COURT: Um-hum.

MR. SCHIAVONI: -- I don't know, whatever it is, the thirty days that they had. So however this is pitched, I think it's a -- I think we're on the same page, and I appreciate if it's a compromise or accommodation. I don't know, but the

revised position sort of the debtor, of the Friars, that we will sit down first with the mediator, kind of talk about where we are, whether you call that a phonathon or not, whatever.

THE COURT: Um-hum.

MR. SCHIAVONI: But it sounds like we'll kind of put it to the mediator on sort of where we are. And then we have sort of a neutral kind of layout of process, and --

THE COURT: Okay.

MR. SCHIAVONI: -- we're on board with that.

THE COURT: Good. Great.

MR. SCHIAVONI: We think that's a positive.

THE COURT: Good.

MR. SCHIAVONI: And we're on board generally with the timing on that, et cetera.

THE COURT: Okay.

MR. SCHIAVONI: So all those things are good news.

THE COURT: Um-hum.

MR. SCHIAVONI: And you're smiling, so I think you're waiting for -- you're like, this isn't really bad news.

THE COURT: I'm waiting for the -- here's the pivot. Okay.

MR. SCHIAVONI: But here are the issues. If it's not clear, we're dead set that the worst thing that possibly could happen, as far as trying to reach a consensus, is to not just lift the stay, but to give to the committee the ability to sort

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 18 of 122

of select everybody who's, like, lifting the stay, who for whom the stay is lifted. We think, and I would like to be heard separately to argue this, but there's a very strong objection to lifting the stay that'll basically make the mediation fruitful.

The issues with the mediation order, these three issues that I'm going to lay out for you, they're really connected to the dispute over whether or not we're going into full-blown litigation because if we're not, I think these issues sort of narrow, and they become less important. All right. If we're going into full-fledged litigation, we've got to deal with this issues, like, who's going to defend. How that defense works. We're extremely concerned about that.

So the notion about a log, we didn't make a big deal about this in Oakland, if you remember, but here, and the log and then the issue of what documents are waived and given to the committee become of tremendous importance to us because in the tort system, the debtor would be aligned with us in trying to defend those cases, cooperating with us. They would have an economic incentive to cooperate with us in the investigation and defense of the claims, et cetera. They have a contractual obligation, but they'd also have an economic one.

Where we are now, that's not really the case. They've aligned themselves publicly with the committee. They've made a voluntary effort to allow themselves these cases to go forward,

which we believe is contrary to the contractual obligations under the policies. And it gives us extreme concern about how these cases will be defended. We cannot be in a situation where information developed in the defense of the claims is leaked or provided to the committee in the course of the defense of those claims. And we can't even be in a position where we're worried about that happening, all right, because it just will sort of undermine the whole effort here.

So part of the pushback on categorical log, look, there's contexts where categorical logs make sense. I mean, Mr. Brosnahan's communications with the Friars, for instance, categorically, just disclose that that's being withheld, obviously, but communications with the committee become much more of a concern if, behind that shield, they're sharing information about the claims for which we're supposed to be defending and how they're being defended and the defense counsel themselves. That becomes vitally important.

We don't really worry about that in the normal tort system. We don't worry about that because the policyholder is aligned with us. He doesn't really want to sort of do damage to his own case. But here, they're sort of taking a different approach. So we have no way of policing that.

Now, yes. You heard this sort of exchange about, well, would we preserve our rights to bring a breech claim, et cetera, et cetera. And the other insurers have said, yeah,

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 20 of 122

that's vitally important. Well, of course it is. And I don't think you'd be ruling on that right now but --

THE COURT: I wouldn't be denying it. Let's put it that way. Okay.

MR. SCHIAVONI: Right. Right. Right.

THE COURT: But I would preserve that. Yeah. Sure.

MR. SCHIAVONI: Right. One way or the other. But the problem here is, and that's why these two are linked --

THE COURT: Um-hum.

MR. SCHIAVONI: -- that unless there's disclosure through a log that, hey, we just, we're sharing the defense strategy, we have no way of jumping forward and saying, well, Judge, there's an issue --

THE COURT: Can I ask you --

MR. SCHIAVONI: -- on this or that document.

THE COURT: Let me ask you --

MR. SCHIAVONI: This goes away if we're not dealing at this moment with defending cases, I would tell you. All right.

THE COURT: Okay. Let me make sure I understand something. Okay. What is it about -- other than the fact that the debtor has agreed with the committee to the principle that some actions can go forward, and from their perspective, that has a salutary effect on the gestalt of this thing, for lack of a better word. It's not like they're hoping to get twenty-million-dollar judgments in each case. It's that they think

that moving the process along is helpful.

So but I think you look at it differently. You look at it as now there's been a real change in position, and I'm not sure I thoroughly understand why, other than you may not like the fact that they're aligned for any purpose. But what is it -- I mean, has the tort system really changed because they're pursuing a mediation and because in connection with that, they want to let some actions just go forward to see what some numbers are?

MR. SCHIAVONI: Yeah, I think so, Your Honor. And I think there's --

THE COURT: And that's why I'm asking is --

MR. SCHIAVONI: Yeah, I think --

THE COURT: -- you clearly have a different view of it.

MR. SCHIAVONI: I think the guide is really in their papers. In their papers, the debtors say that, like, well, whatever happens, the carriers are going to pay it, not us, not the debtor. As long as they're of that mentality, and it's really honestly not the case, since there's substantive coverage disputes, and there's many claims for which there's no coverage.

THE COURT: Yeah. Sure.

MR. SCHIAVONI: That it's like, if that's their attitude, then they're not economically aligned with us to put

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 22 of 122

up the strongest defense.

THE COURT: Okay.

MR. SCHIAVONI: The fact that they didn't sort of come to us and say, hey, in consultation with us, which cases should the stay be lifted for it? There was no such consultation. They let the committee basically pick the cases that they wanted. That's not what would happen normally. In the JCCP, the debtors or the policyholders and the carriers sort of work together on what cases to select and what aren't. There's no cooperation going on at all. The economics are different here. They think that the more money that they can sort of kind of pressure somehow --

THE COURT: Well --

MR. SCHIAVONI: -- to be released --

THE COURT: Okay.

MR. SCHIAVONI: -- leads to their getting a discharge so --

THE COURT: Well, what if -- let me give you a hypothetical.

MR. SCHIAVONI: Yeah.

THE COURT: What if, rather than what -- and I'm not going down this road necessarily. But if I were to say, look, relief from stay may generally help the process here, but let's really make a relief from stay, so let's just default down to the JCCP and do it the way you do it there, how much better is

that for you?

MR. SCHIAVONI: It still doesn't -- that changes how the cases are selected.

THE COURT: I know, but that seems to be a big deal to you.

MR. SCHIAVONI: But it doesn't change the fact of how we got to where we are because --

THE COURT: Yeah. No, I hear -- I get it.

MR. SCHIAVONI: -- the debtor perceives itself as not having an economic interest in the outcome --

THE COURT: I got it. Okay.

MR. SCHIAVONI: -- which is really dangerous. I mean, that's really a dangerous situation because the entire sort of insurance contract --

THE COURT: Um-hum.

MR. SCHIAVONI: -- is -- of course, it's a contract.

THE COURT: Um-hum.

MR. SCHIAVONI: But contracts that work are built around ensuring that the parties are economically aligned. There's a lot of countries where you can't enforce a contract.

THE COURT: Um-hum.

MR. SCHIAVONI: In those places, the deals are structured --

THE COURT: Um-hum.

MR. SCHIAVONI: -- so that people have an interest in

abiding by it, by even a handshake.

THE COURT: Um-hum.

MR. SCHIAVONI: That's how this how this contract is arranged. It's like, we defend on cases where you still have an interest. It's like, so the parties are working together.

THE COURT: Um-hum.

MR. SCHIAVONI: Yes, there's contractual obligations to cooperate, but there's also -- like, the whole contract is premised upon the policyholder having an interest in working with us.

THE COURT: Um-hum.

MR. SCHIAVONI: So it's voluntary. It's not that they're doing it --

THE COURT: Um-hum.

MR. SCHIAVONI: like, just with a knife to their back so --

THE COURT: Yeah. Well, we also don't really punish breaches. We just make people pay for them. Right.

MR. SCHIAVONI: But Your Honor --

THE COURT: I think. Yeah.

MR. SCHIAVONI: -- I started with sort of suggesting I would just lay out what the issues are.

THE COURT: Yeah.

MR. SCHIAVONI: Right. So the issue with the categorical log and then this other clause we suggested is --

THE COURT: Um-hum.

MR. SCHIAVONI: -- one could cure the other. If it's disclosed to us what they've shared, then we can come to Your Honor --

THE COURT: Um-hum.

MR. SCHIAVONI: -- based on that --

THE COURT: Um-hum.

MR. SCHIAVONI: -- and seek relief.

THE COURT: Um-hum.

MR. SCHIAVONI: Okay. If it's not disclosed to us because it's all buried in one line, categorical log --

THE COURT: Um-hum.

MR. SCHIAVONI: -- we have no ability to police the turning over of information that goes to the strategy of the underlying defense.

THE COURT: Okay. I gotcha.

MR. SCHIAVONI: So one or the other, we have to have. We took a different approach from the other insurers. It's not that we didn't disagree. We just said, well, look, if they're not going to agree to give us some sort of log on this --

THE COURT: Um-hum.

MR. SCHIAVONI: -- like, we should just have a prohibition and let them come forward and do a carve-out and explain what it is that they want to turn over. So those are two issues --

THE COURT: Okay.

MR. SCHIAVONI: -- on the order. The third, Your Honor, is just, there's somewhere in -- in paragraph 18, there's discussion that they're not going to search any emails. I think just a little more meet-and-confer, we might be able to sort of resolve that. I'm not even sure what that's about --

THE COURT: Okay.

MR. SCHIAVONI: -- to be honest. And then there's a nit about identifying my client, which is sort of funny since I got it wrong. We would just like to cure.

THE COURT: That's fine. Okay.

MR. SCHIAVONI: So Your Honor, with those three points --

THE COURT: Okay.

MR. SCHIAVONI: -- we think they go away if the lift stay goes away.

THE COURT: Okay.

MR. SCHIAVONI: And just to frame just one issue on the lift stay, the parties have had, really, I think we'd all agree, like, no substantive engagement on settlement at all because we were trying to sort of get basic information. And look, it may seem that, like, some time has gone by here, but I think there was some discussion back and forth about maybe some of these -- some of the other California cases, which were bigger, might set a path to resolution. And maybe this one

sort of awaits that.

THE COURT: Oh, maybe. Okay.

MR. SCHIAVONI: Okay. And I'm not suggesting that as a strategy.

THE COURT: Um-hum.

MR. SCHIAVONI: It's obvious we're not going there. But I think some time that passed between --

THE COURT: Okay.

MR. SCHIAVONI: -- the beginning and end of the -- beginning today.

THE COURT: Is attributable to that.

MR. SCHIAVONI: Was a little devoted to that.

THE COURT: Okay.

MR. SCHIAVONI: Okay. The hyperbole about people acting in bad faith and this and that.

THE COURT: Uh-huh.

MR. SCHIAVONI: Your Honor, that's not really -- that's not what -- that's not how we play ball.

But what I would just suggest to you, Your Honor, is an independent -- like, the parties haven't talked. An independent hasn't looked at this case at all. I always think, and I always tell clients that, although we have conceptual issues --

THE COURT: Um-hum.

MR. SCHIAVONI: -- that may be impossible to close, if

the dollars are small, smaller, the gap sometimes is easier to jump.

THE COURT: Um-hum.

MR. SCHIAVONI: And this is not a huge case by number of claimants. The parties have not spoken. I just, Your Honor, after you let us argue the lift stay, if you will, I would just ask you to consider whether the wisest course here isn't to deny or adjourn the motion for now. Let us get before this mediator. Let us even get you get some sense from him two months from now about whether we're on a course to sort of resolve the case or not and retake the motion to lift the stay up at that point.

THE COURT: Okay.

MR. SCHIAVONI: Because I just think if you do it now, for many of the reasons we laid out, it's immediately going to send the case. We're going to ask -- we'll be before you very quickly with a motion to lift stay to let the coverage action go forward. To let a coverage action go forward here. And there'll be a series of other disputes that will immediately come to pass about who the defense counsel should be. How the cases should be defended. What documents get produced.

And then we've got the whole discriminatory nature of injecting here -- appointing for claimants and for plaintiffs lawyers in a preferential position, even before we had one discussion with a mediator. And it's like, I think the case

will become immediately unsolvable. When you get Jeff Herman from Miami, who is a man of --

THE COURT: Famous in song and story, I'm sure.

MR. SCHIAVONI: -- enthusiastic view of --

THE COURT: Right. Okay.

MR. SCHIAVONI: -- his own skills, and I would say he's a skilled man.

THE COURT: Okay.

MR. SCHIAVONI: It's like, once he's given a preferential position, I just don't think we're going to knock that down. And to lose the opportunity of trying to resolve the case --

THE COURT: Okay.

MR. SCHIAVONI: -- in an equitable way before that --

THE COURT: Okay. Okay.

MR. SCHIAVONI: -- is an issue, Your Honor.

THE COURT: Thank you very much. Okay.

MR. SCHIAVONI: Thank you.

THE COURT: All right. I don't want to cut anybody off. Anybody else on the insurance side want to have a perhaps slightly quicker word?

MS. FARRELL: Again, Ellen Farrell at Mintz, Levin --

THE COURT: Um-hum.

MS. FARRELL: General Insurance Company of America.

THE COURT: Um-hum.

MS. FARRELL: I just want to follow up on the issue of the categorical versus document --

THE COURT: Okay. Okay.

MS. FARRELL: -- by-document log

THE COURT: Okay.

MS. FARRELL: And I will just say your question was why not specific. I will submit they did not provide a good reason why not specific. I think that in cases, you have to have enough information. It is a bedrock. You have to have enough information when you're withholding a document for the opposing party to determine whether that document was sufficiently withheld.

The language, and we can obviously talk with them about the specific language later, but the language in their order says it will be sufficient. If it describes the categories of documents withheld, it need not log each document. That is not sufficient. That does not provide dates. Who it was to. Really, what the general category is. I mean, I think that that just leaves a lot of room for mischief. And I think what it will result in necessarily is the carriers coming back to you and asking for in-camera review of documents, which I think is the typical course --

THE COURT: Um-hum.

MS. FARRELL: -- if these disputes cannot be resolved.

THE COURT: That's kind of what I was heading toward.

MS. FARRELL: Exactly.

THE COURT: Yeah.

MS. FARRELL: I think it's in-camera review, which, honestly, I just don't know if that's even a result that anybody thinks would make sense here. I think the wiser course, I would submit, for them is to agree to a document-by-document log. And it is interesting that what they have said is this is only for documents that are being withheld with respect to the committee. And the question I have is, why is that? Why are you carving out that category of documents? And to me, that just heightens the concerns, along with the reasons that Mr. Schiavoni said.

THE COURT: Okay. Thanks.

MS. FARRELL: Thank you.

THE COURT: Appreciate it.

Anybody else on the insurance side on that?

Okay. Mr. Brosnahan or whomever?

MR. BROSNAHAN: Well, Your Honor, Mr. Schiavoni made a lot of a lot of points. I want to emphasize one thing. Our incentives are not any different than they would be in the normal tort system.

THE COURT: That's what I was trying to ask.

MR. BROSNAHAN: Except for one thing --

THE COURT: Yeah.

MR. BROSNAHAN: -- and that is that we don't have the

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 32 of 122

resources to let this drag on --

THE COURT: Um-hum.

MR. BROSNAHAN: -- and on and on.

THE COURT: Um-hum.

MR. BROSNAHAN: And that's why we have sought to lift the stay in four cases so that we can accelerate the process. Other than that, we have no incentive for them to get any more money than they would in the tort system. And we don't have any incentive for the insurers to pay any more money than they would --

THE COURT: Um-hum.

MR. BROSNAHAN: -- in the tort system. But we really need to move this process along, Your Honor.

THE COURT: Okay. Well, let me ask you this. Let me put this the right way. Respond, if you will, to any other reasons why something more than what might be a fairly basic categorical disclosure re the privilege log is really a problem. I'm a little sympathetic on that one. So tell me why I'm wrong about that.

MR. BROSNAHAN: It's purely a question of the work involved, Your Honor. I mean, we would be happy to share with the --

THE COURT: Well, do you have --

MR. BROSNAHAN: -- we would be --

THE COURT: -- do you have any sense now how big a

deal this is?

MR. BROSNAHAN: Well --

THE COURT: You may have already given this -- I suspect you've given this a lot of thought already. So what's the universe here, in terms of --

MR. BROSNAHAN: Well, most of the things that we might -- in fact, all the things that we might exchange with the committee --

THE COURT: Uh-huh.

MR. BROSNAHAN: -- that we wouldn't want to share with the insurers would be in the category of coverage analysis --

THE COURT: Um-hum.

MR. BROSNAHAN: -- because if it doesn't relate to that, then we're happy to --

THE COURT: Um-hum.

MR. BROSNAHAN: -- provide it with the --

THE COURT: Well, that's a smaller universe than --

MR. BROSNAHAN: It may not be that big a universe, Your Honor.

THE COURT: Okay. I'm inclined to be sympathetic to their position about that.

MR. BROSNAHAN: All right. Thank you.

THE COURT: That's something a little bit more than a --

MR. BROSNAHAN: We'll do that. We'll do that.

THE COURT: Okay.

MR. BROSNAHAN: We'll do that, Your Honor.

THE COURT: All right. Well, maybe you want to meet and confer about the exact language, but you see what I'm saying.

MR. BROSNAHAN: All right. That would be fine, Your Honor.

THE COURT: Okay. I appreciate it. Okay. Anything else on --

MR. BROSNAHAN: I just don't want to have to log every single email that we exchange between us, even if it doesn't -- now, the order talks about documents and information.

THE COURT: Yeah.

MR. BROSNAHAN: If they're talking about coverage analysis, if they're talking about a draft of something, okay, that would be documents and information.

THE COURT: Yeah.

MR. BROSNAHAN: But I don't want to have to -- as long as that's what we're talking about, we can handle that.

THE COURT: Well, I'm okay with that. Let's see if you can come up with language between the two of you that gets you where you need to be. But I'm on their side on that one. Okay.

MR. BROSNAHAN: Okay.

THE COURT: I appreciate it.

MR. BROSNAHAN: Anything else, Your Honor?

THE COURT: Anything else on the mediation side before we get to the --

MR. BROSNAHAN: I guess the one other thing I would bring up, we mentioned this in a footnote --

THE COURT: Yeah.

MR. BROSNAHAN: -- the mediator has a rule that if he's dealing with a bunch of insurance carriers, one carrier needs to take the lead --

THE COURT: Oh, okay.

MR. BROSNAHAN: -- and fund the one third and then collect from the other insurers.

THE COURT: Is that logistically an issue?

MR. BROSNAHAN: We have requested that Travelers do that because they are on the great majority.

THE COURT: Okay.

MR. BROSNAHAN: They're by far the largest carrier here. They have so far not been willing to do that. And they want to work it out with the insurers. But there's been no traction on this at all. I would just request that --

THE COURT: Well, what do you think I could do about that?

MR. BROSNAHAN: Urge them to come to some agreement. That's all you --

THE COURT: Okay. All right.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 36 of 122

MR. BROSNAHAN: That's all I ask, Your Honor.

THE COURT: So I'm going to get all hortatory here on them. Okay.

MR. BROSNAHAN: And the mediator will be -- if I can tell the tell the mediator that I pitched it, then he'll be happy with me.

THE COURT: Mission accomplished. Okay.

MR. BROSNAHAN: So thank you.

THE COURT: All right. And that judge just would not listen. Okay.

Travelers want to be heard? Come on up.

MR. WYATT: Thank you, Your Honor.

THE COURT: This is what I'm supposed to look at you sternly. Okay.

MR. WYATT: Well, yeah, I can understand the concerns on this issue. I mean, we're still discussing with our client, and obviously, we don't want to be the one having to herd all the cats here. But I understand that it is the mediator's request --

THE COURT: Okay.

MR. WYATT: -- and I guess his rule. It's something that, I think, while we're meeting and conferring on some of these other issues, we can continue to meet and confer on this issue --

THE COURT: Okay.

MR. WYATT: -- discuss internally with the insurers, as we have been doing, and I think we can likely come to some sort of compromise here.

THE COURT: Okay. Thank you very much.

MR. WYATT: Thank you.

THE COURT: All right. Should we shift gears a little bit to the relief from stay aspects of this thing? Is that appropriate now?

MR. HARRIS: Yes, Your Honor.

THE COURT: Okay.

MR. HARRIS: Speaking for the debtor, Your Honor, it's unique situation.

THE COURT: Um-hum.

MR. HARRIS: I've looked at the efforts at stay relief in the Oakland case. I've read all the briefs and listened to Judge Montali's hearing from last week. Obviously, there are a lot of cases around the country, where courts are coming to the conclusion that it's time to consider stay relief. We're thirteen months -- excuse me, fifteen months in --

THE COURT: Um-hum.

MR. HARRIS: -- at this point. And I'm sad to say, we haven't even started mediation yet. But this isn't about starting mediation. This is about making it work.

I'm going to start from the proposition, the obvious one, that stay doesn't protect the insurers. Stay protects the

debtor. Debtor and the committee are together on the idea that, for a limited purpose, the stay should be lifted. I would note, Your Honor, that the four cases that were selected are all JCCP 501 cases before Judge Cunningham.

THE COURT: And that's --

MR. HARRIS: In the SoCal coordinated proceedings.

THE COURT: SoCal. Yeah. Okay.

MR. HARRIS: So I don't believe that Judge Cunningham has divided the cases into buckets, nor do I think he has pressed forward, as perhaps Judge Chatterjee has. This is all to say --

THE COURT: And Judge Wise before him, probably. Yeah.

MR. HARRIS: Right. Exactly.

THE COURT: Um-hum.

MR. HARRIS: This is to say that nothing's happening tomorrow. This is not like the two trial-ready cases in San Francisco, where they were two days from the beginning of trial when the case was filed.

THE COURT: Um-hum.

MR. HARRIS: So whatever is happening, it's not going to happen fast. But our point, our continuing theme, Your Honor, is this is a small case.

THE COURT: Um-hum.

MR. HARRIS: It has limited resources. And

unfortunately, the playbook of insurers and sometimes committees has been to just go slow. And that chews through a lot of fees.

THE COURT: Yeah. Can I ask you a question?

MR. HARRIS: Yes, Your Honor.

THE COURT: Other than it's going to take a lot more time, and I will hear that loud and clear, is there another reason why, if I were to grant relief from stay, I wouldn't do it to let this go forward in just the way it would in the JCCP protocols, which would include maybe a different way of looking at which cases go forward and an amalgam of cases and a bellwether concept that, to the extent it includes the insurers, fine. I'm not sure that gives them a veto or means that they get their every wish. But other than it's going to take a lot longer to do that, I assume, is there another reason why we should just pick cases in this process, as opposed to that process?

MR. HARRIS: Well, yes, Your Honor. As a matter of fact, there's a resource question. There are cases where there is no coverage across the ninety-four cases. There are cases where there is partial coverage.

THE COURT: And those would be in danger of being preferred ones at the state court level?

MR. HARRIS: Well, yeah, they could be selected, and then that would create a burden on the estate.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 40 of 122

THE COURT: Okay.

MR. HARRIS: The purpose of our jointly agreeing to select cases with the committee was to find cases where, A, there's coverage.

THE COURT: Um-hum.

MR. HARRIS: And we believe there's full coverage, at least for the first four. And B, where there are willing plaintiffs who want to go forward. This is an issue.

THE COURT: Well, is there any -- now, I'm going to talk about this as if I understand it, and I don't as deeply as I should. To the extent that when you're in the MDL world or the state court world, one of the concepts is that you're picking -- the input is let's have a variety of cases, so we get a spectrum. Not just the four greatest cases in the history of the world, but something that gives you an idea of where the spectrum will fall. Was that replicated here, or I mean, if it wasn't, you could just say it wasn't. And I don't want to get into settlement discussions.

MR. HARRIS: Well, we've had this discussion with the insurance companies.

THE COURT: I'm not surprised.

MR. HARRIS: And they have asked for a voice in the process as to which cases get taken. My view as to how that is handled is there are cases that we expect will settle, and we will move on to the next case. And maybe it won't be in the

exact same order as the insurance companies want, but to be kind of colloquial about it, I think the insurance companies would be perfectly happy to have some dogs in the pick.

THE COURT: Okay.

MR. HARRIS: Some bad cases.

THE COURT: But I mean, doesn't that sort of occur in the other fora that there are some great cases. There are maybe -- I mean, if there's input there's a variety of cases, right. So is there is there a variety of cases here? If there is, I'm not saying I'm not going to critique you if the answer is no, but I just, I'm curious.

MR. HARRIS: I would have to let Mr. Brosnahan --

MR. BROSNAHAN: I'd be happy to address that, Your Honor.

THE COURT: Okay.

MR. HARRIS: -- and Mr. Weisenberg speak to that.

MR. BROSNAHAN: If you want to hear from Mr. Weisberg.

THE COURT: Oh, whoever can tell me.

MR. BROSNAHAN: I can tell you from our perspective.

THE COURT: Okay.

MR. HARRIS: Go first.

MR. BROSNAHAN: Okay.

THE COURT: Come on up.

MR. BROSNAHAN: As we've pointed out in our papers, Your Honor we think that the most important factor here is not

picking bellwethers to sort of get a representative sample of cases. The most important concern was to create economic pressure and risk of loss for all parties, including the insurers. And therefore, two of the cases implicate excess policies. We think that's important because I've been doing insurance litigation for over forty years, and I know the attitude of excess insurers is don't bother me today. I have underlying coverage. Bother me some other time. So we think it's important that the excess carriers understand that they're important to this process as well and that they begin to focus immediately on what their exposure is.

Another case implicates the Chubb coverage, which would be ACE. From our papers, it should be obvious why we believe that that's important.

The fourth case, I actually think could really be the linchpin to a resolution here because the fourth case is a case where, from what we can tell, from the claim, from other information, there's only one 500,000-dollar policy limit that's implicated. And this is not somebody who responded to an ad that he saw on TV about filing a claim against clergy. This is someone who reported the abuse and sought treatment from the Friars before the statute was reopened. We think that it would not be rational for the carrier to want to fight this case and spend a lot of money on defense expenses. We think this case should be resolved, settled very quickly, and can be

the -- get the ball rolling to settle cases.

Those are the insurance elements of the selection. With regard to other elements, I can tell you that none of these cases, with all due respect to the claimants, would fall into the extreme category in terms of the nature of the abuse alleged. They all concern alleged perpetrators, who are on the credibly accused list that the Friars have put out. And we believe that that these are -- there was negotiation with the committee. We didn't just take all the cases that they submitted, that they requested and --

THE COURT: Well, why did you push back?

MR. BROSNAHAN: What?

THE COURT: Why did you push back, if you didn't take them? What was the principle that said, I'm not taking that one?

MR. BROSNAHAN: Well, some of the cases --

THE COURT: If you can tell me. If you can tell me.

MR. BROSNAHAN: Well, I can tell you, Your Honor, some of the cases, we didn't like the potential liability issues. The same kinds of things that the insurers would say --

THE COURT: Um-hum.

MR. BROSNAHAN: -- yeah, you shouldn't take that case. Other cases involve claims for injunctive relief that we don't think --

THE COURT: Okay.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 44 of 122

MR. BROSNAHAN: -- really should be going forward and being --

THE COURT: Okay.

MR. BROSNAHAN: -- litigated right now.

THE COURT: So let me play -- let me play this back and see if I have it right. One of the justifications -- one justification, not the only one, for doing this would be it will assist in a claims valuation concept. One way to do that would be to replicate what is allegedly, at least, the principle at MDL or JCCP, that you get a broad spectrum of cases. And that's not the only justification, but that's one. And what you're telling me is that's not the justification for this.

MR. BROSNAHAN: That's just an ancillary benefit. We want to resolve this case --

THE COURT: Well, maybe you want the bankruptcy lawyer to talk about that because that's -- ancillary benefit --

MR. BROSNAHAN: Okay. Your Honor, I --

THE COURT: -- that's a little derogatory for something fairly important.

MR. BROSNAHAN: I apologize if I'm using a term of art. What I mean is that is not the dominant purpose.

THE COURT: That's what I'm hearing, and that --

MR. BROSNAHAN: Judgments will not come in for a long time, and we hope to have this resolved way before then. So

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 45 of 122

the bellwether --

THE COURT: Um-hum.

MR. BROSNAHAN: -- concept is not the primary reason we're doing this.

THE COURT: Yeah.

MR. BROSNAHAN: It's to create risk of loss and loss and economic pressure on the parties.

THE COURT: So the important thing is to begin this?

MR. BROSNAHAN: Yes. And if not now, when? We feel it's important to begin --

THE COURT: All right.

MR. BROSNAHAN: -- focusing the mind, as Samuel L. Johnson --

THE COURT: Okay. I mean, I thought that was the case --

MR. BROSNAHAN: -- might have said.

THE COURT: -- but that helps me focus a bit on what's really at stake here. Okay. I appreciate it. Okay. Anything else from your guys, then?

Does anybody want to respond to the surreply that I allowed? By the way, I allowed it because this hearing was done on shortened time, and I want to hear everybody. Okay. So if anybody wants to respond orally to the surreply, you can do it.

MR. BROSNAHAN: Well, I certainly am confused by the

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 46 of 122

surreply, which says --

THE COURT: Okay.

MR. BROSNAHAN: -- that we didn't tell anyone other than ACE what the four cases were, when that's clearly not true, since it was attached to the stipulation that was filed with the committee's papers. I happen to have told Mr. Williams that I would tell him personally, in addition, and I sent him an email and told him that here are the four cases. But everyone else had already received the stipulation, which was attached to the committee's papers.

I was confused by the assertion in the paper that two of the of the accused priests are not, in fact, Franciscan friars. That is just not true. I don't know where that came from. The assertion that one of the codefendants is the Archdiocese of San Francisco, that is not true. I don't know where that came from.

So if there's anything substantive in the surreply that the Court would like me to address, I'd be happy to do that.

THE COURT: Well, what about the concern that having committee members go forward first is somehow inappropriate?

MR. BROSNAHAN: Well, that would be a bankruptcy issue. And --

THE COURT: You can let Mr. --

MR. BROSNAHAN: -- I would yield --

THE COURT: Okay.

MR. BROSNAHAN: -- the floor on that one.

THE COURT: All right. Very good. Okay.

MR. BROSNAHAN: Thank you. Thank you, Your Honor.

THE COURT: Thanks.

MR. WEISENBERG: Your Honor, Brent Weisenberg on behalf of the committee. I'm surprised we've gotten this far into the hearing without acknowledging what day it is. It is April 1st, which means it's Sidd Finch day.

THE COURT: It's Sidd Finch Day.

MR. WEISENBERG: And so I was reading my son Sports Illustrated.

THE COURT: So let's see your 168-mile-an-hour fastball. Okay.

MR. WEISENBERG: And so I thought of you, Your Honor.

THE COURT: Does everybody know what that means? Are we being obscure? The Curious Case of Sidd Finch is a story written by George Plimpton. It appeared in the April 1st, 1985 issue of Sports Illustrated. It is the greatest sports literary hoax of all time. It describes a prospect for the New York Mets. Very secret. A young man who went to Harvard, dropped out, plays the French horn, toured the Himalayas, and learned the art of the pitch and was able, in a very convoluted way, to throw a fastball with astonishing accuracy at 168 miles an hour.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 48 of 122

It was written incredibly tongue in cheek. Plimpton was a genius of that kind of thing, those of you who remember him, and it was believed for at least a few days by a significant portion of the population. It was a wonderful literary hoax. So thank you for bringing it up.

MR. WEISENBERG: And I learned a new fact, Your Honor --

THE COURT: Yeah.

MR. WEISENBERG: -- which is that the subhead, if you spell that out --

THE COURT: Yes.

MR. WEISENBERG: -- yeah, it's spelled, happy April Fool's day.

THE COURT: Exactly.

MR. WEISENBERG: So at some point, Your Honor, I will bring this up to you have a look. --

THE COURT: Very good. Appreciate it. And somebody else wants to remark in Sidd Finch fashion.

MR. BURNS: Similarly. Your Honor, I should point out, you probably remember who the expert who was quoted heavily in the article was. It was a certain Tim Burns --

THE COURT: Oh.

MR. BURNS: -- who was quoted heavily and repeatedly in the article. So I'm very happy that you brought this up at the last hearing.

THE COURT: And was that --

MR. BURNS: I've, of course, had a change of career since, but --

THE COURT: Um-hum.

MR. BURNS: -- I was happy to contribute to George's article.

THE COURT: I appreciate it.

MR. WEISENBERG: Brent --

THE COURT: Years ago -- sorry -- after PG&E was done, there was a gentleman named Kermit Kubitz, who was in-house at PG&E. He was a wonderful guy and a great lawyer. And he turned out to be a hero. He intervened in a situation where a woman was being attacked by a man with a knife, and he got stabbed. And I wrote to him after the story came out in the Chronicle, when he was given some medal by the mayor. And I couldn't resist writing to him saying, okay, are you that Kermit Kubitz? And he said he was. So there you go.

MR. WEISENBERG: For the record, Brent Weisenberg on behalf of the committee. Your Honor, we have two committee members with us today. We have Ms. Katherine Halberg and --

THE COURT: Okay.

MR. WEISENBERG: -- Mr. Michael Carey. And while we started off lighthearted, I think they know --

THE COURT: Um-hum.

MR. WEISENBERG: -- how seriously we take this issue,

meaning everyone in this courtroom.

THE COURT: Um-hum.

MR. WEISENBERG: I had hoped to start today's presentation giving you the committee's question. In the past, I've heard Your Honor say that to get to the right answer, you need to be asking the right question.

THE COURT: Um-hum.

MR. WEISENBERG: And it appears to us that if we go down the road that the insurers would like us to, we're asking the wrong question. This case, as you acknowledge and as you understand, is very different than any lift stay that has been filed across the country because the debtor and the committee agree. And so --

THE COURT: Um-hum.

MR. WEISENBERG: -- the question we believe, Your Honor, is has the debtor fulfilled its business judgment in making this determination? That's the question, Your Honor.

THE COURT: Um-hum.

MR. WEISENBERG: There are no facts whatsoever indicating anything other than the debtor is acting within the scope of its -- or using its business judgment and fulfilling its fiduciary duty.

I want to just rattle through a few issues, Your Honor, which we do not think are relevant today. If you disagree, you'll tell me, and I'll do my best to explain why I

don't think they're relevant. Or if you want to go down that road, we can talk about it. But let's start here.

Any prejudicial impact on lifting the stay, we don't believe, Your Honor, that is a question for today. Why?

THE COURT: Um-hum.

MR. WEISENBERG: Number one, the two fiduciaries to this estate, the debtor and the committee, have agreed to this requested relief. Collectively, we owe a duty to all survivors to make sure no one is preferred. And in fact, Your Honor, the order specifically says no one is permitted to collect on a judgment. Period. Hard stop. You may obtain a judgment. So there is absolutely no possibility that anyone receives any funds before another.

THE COURT: Can I stop you for a second and pause on that? If you took that point a little further, would you argue that the fact that somebody gets to a judgment number, unless this case implodes and you end up back out in this tort system, I guess that's a leg-up there, but I'm assuming you would argue that, given the collectivist nature of what we do here and given the fact that getting to numbers at some point has the effect of giving you a better sense of what the total number ought to be, that any particular advantage to an individual plaintiff is neither here nor there. The point is that's an aid of something that gets everybody to a resolution. Would that be the way you look at it?

MR. WEISENBERG: That's exactly correct, Your Honor.

THE COURT: Okay. Would you also agree that the -- I mean, we all get excited about the automatic stay. It's a lovely thing. It's a tool. Right. It is not the point of -- it's never the point of bankruptcy. It is a tool, and it's a tool to be deployed -- I mean, Congress used four verbs to tell me what I can do with it. So I mean, the whole point is flexibility and using it in the best way or ignoring it or cabining it in the best way to get to a bankruptcy result.

MR. WEISENBERG: So what's fascinating about this case, Your Honor, is the debtor is seeking to utilize that tool. Typically, the debtor utilizes it to protect itself.

THE COURT: Yeah.

MR. WEISENBERG: Here, it's actually asking this Court, I want to use this tool --

THE COURT: Yeah.

MR. WEISENBERG: -- to help drive resolution.

THE COURT: Um-hum.

MR. WEISENBERG: I'll probably say that ten more times, and I apologize. But I think it makes this case so different from any other that is currently going on.

THE COURT: Well, it comes from the same premise that this is a tool. It's not an end in itself.

MR. WEISENBERG: Your Honor, based on the prior point, any allegation that a committee member is somehow being

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 53 of 122

preferred, again, that falls flat. We're tilting at windmills with that argument. Number one, as I just said, they do not have the right to collect. Number two, the committee has a fiduciary duty to all survivors. I would be

THE COURT: Um-hum.

MR. WEISENBERG: -- standing here before you, Your Honor, having breached my fiduciary duty, if I decided or we decided to put a committee member up in with the notion that they would be preferred over others. That is not the case. Period. Hard stop. And so going down that road, Your Honor, it's a parade of horribles, and we don't need to go there.

Your Honor, you also may have seen in some of the papers an allegation that our request was not in accordance with the Bankruptcy Rules. I don't think we need to spend that much time on it. Insurers' counsel has since conceded that they misquoted the Bankruptcy Rules, having cited Bankruptcy Rule 4001(c), which has no relevance to this case, and in one case, citing language that just does not exist.

Whether the debtor informed the insurers about the requested relief, we cited a case, almost on all fours, Your Honor, I think it was the Grace case that indicates --

THE COURT: Um-hum.

MR. WEISENBERG: -- that the insurers have no say whatsoever in how the stay is deployed. It is not for their benefit. It is for the debtor's benefit. And the insurer

doesn't have the opportunity to decide when and where it may have to defend and ultimately have liability.

You're also going to hear a lot, Your Honor, and you've already started hearing a bit about the parade of horribles. If Your Honor does this, things will implode. Let me list all the things that will go badly. That's all hyperbole. It's all guesswork. We don't know what's going to happen in the future. And we don't stand here today telling you this is the silver bullet. This is going to work.

But here's what we do know. Based upon fact and history, these mediations in cases like this have not resolved themselves in a consensual resolution. They've dragged on and on. And so the great irony of the argument, Your Honor, is they're telling you, they being the insurers, are telling you if you do this, mediation will stall. But we know mediation has stalled because the stay hasn't been lifted.

And so to its credit, the debtor agreed with the committee to try a new path, a path new in this world, not necessarily in the litigation world, which is to put all parties at risk of loss to drive settlement. And I want to repeat that again. This is not one-sided. A survivor could go to trial and lose. We recognize that. Okay. It is the threat and the risk that all parties lose that drive people to settlement. So again, we are --

THE COURT: Um-hum.

MR. WEISENBERG: -- not coming before Your Honor saying this is the panacea of all of our problems. What we are saying is let's try something new in this sphere in order to drive settlement because of the unique facts of this case. This case is unlike the Oakland diocese in the scope of its assets. We can't afford to be here for years on end. And so collectively working with the debtor, we've decided to forge this new path.

So I think, Your Honor, in conclusion, there's a very narrow issue before Your Honor, and we'd urge Your Court not to go down all the avenues that the insurers would like to take you because it's all based on conjecture and hyperbole. The only facts we know are what's transpired in the past.

THE COURT: Okay. Thank you very much.

Anybody else on this side want to talk before Mr. Schiavoni grabs the lectern?

MR. HARRIS: No, Your Honor.

THE COURT: Yeah.

MS. STIPPEL: Yeah.

THE COURT: Um-hum. Come on up.

MS. STIPPEL: Yeah, sorry I blindsided you.

MR. HARRIS: Didn't see you.

MS. STIPPEL: But once again, for the record, Your Honor, Atty. Morgan Stippel, appearing on behalf of the committee as special insurance counsel. I am with Burns Bair.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 56 of 122

THE COURT: Um-hum.

MS. STIPPEL: There's been a suggestion today that we should just hold off, and we should wait. And I believe the question has already been posed, if not now, when? We have seen where waiting gets us. And stay relief has recently been granted in the Buffalo case, where seventeen cases were released after that case had been pending for five years.

THE COURT: Yeah. No, that case is, let's say, a point of discussion among the bankruptcy judges. Yeah, I know.

MS. STIPPEL: Yeah. And similarly, Albany. I'm sure that's another point of discussion.

THE COURT: Yep. Absolutely.

MS. STIPPEL: Seven cases. Two years. The notion that we should continue down the same path and follow this idea that we enter mediation, where parties are not at risk, we've already seen where that leads. Everybody waiting and seeing does not work.

THE COURT: Um-hum.

MS. STIPPEL: What will work is all parties, including survivors and the committee, being at risk. And even though these cases may not go to trial immediately upon the release of them, if we don't start now, it's only going to take longer, and we're going to be at this same point two years from now, like in Albany.

THE COURT: Um-hum.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 57 of 122

MS. STIPPEL: Five years from now, like in Syracuse --

THE COURT: Um-hum.

MS. STIPPEL: -- or excuse me, in Buffalo.

The other issue I wanted to address that was raised as more of a peripheral point in the insurers' briefing, but it is of great importance, not just in this case, but nationwide to all survivors, is serving demand letters and whether that constitutes a violation of the automatic stay. And I wanted to bring this to your attention now because it is part and parcel of what we're talking about here.

But what has been done recently, and the insurers are correct, is that the committee -- or excuse me, not the committee, but survivors through their state court counsel --

THE COURT: Yeah.

MS. STIPPEL: -- have sent letters inquiring as to policy limits and which policies apply to their claims. We're on firm ground there. That is allowed under boy court. The insurers in some of their responses have raised the issue that following that request up with a policy limits demand would violate the automatic stay. We, as a committee, believe that it does not. But the reason why this is so important is because there are conflicting opinions.

In the Syracuse case, for example, the judge there, Judge Kinsella, said that it would be a violation of the stay to serve demand letters. Subsequently, in the Rockville Center

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 58 of 122

case, when the committee did file a motion requesting stay relief, the judge essentially told us that such a motion was not even required because it defied logic that serving a demand on an insurer would violate the stay.

THE COURT: That's Judge Glenn.

MS. STIPPEL: Yes.

THE COURT: Um-hum.

MS. STIPPEL: And actually denied our fees for drafting the drafting the motion. And the request in that case was to come before the court and to say, what would you like us to do? And he said, if you would have come forward and asked that question, I would have said, serve your demands.

And we are seeking guidance from you at this time on the very same issue because it is absolutely vital to preserving survivors' rights and how this case will move forward.

THE COURT: Would it be fair to say that part of what Judge Kinsella ruled and sort of between the lines and kind of the takeaway was not just she was concerned about the stay, but in the same way that we talk about the stay as a tool, she was concerned that this was just going to start a whole distracting level of inquiry that was not helpful to the process where she thought it was then. I think that was also part and parcel of what I wrote and at least the spirit behind her decision.

MS. STIPPEL: Yes. And as many people have mentioned,

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 59 of 122

our case is not in the same posture. We're early on in the process.

THE COURT: Yeah.

MS. STIPPEL: And we are trying to catalyze mediation to preserve the resources --

THE COURT: Yeah.

MS. STIPPEL: -- and move things along. And we feel very strongly that this demand process is part and parcel of that.

THE COURT: Well, I won't surprise you by saying I'm unlikely to rule on this today. If somebody wants to tee this up in a way that everybody can have their say about it, I will. Okay. But I certainly understand there are different ways of looking at it. And we can cross that bridge when we come to it. I don't think we're there yet. Okay.

UNIDENTIFIED SPEAKER: The law is different in California. We'd ultimately like to be heard on it before you --

THE COURT: I think you should be. Okay. We'll see.

MS. STIPPEL: Yeah --

THE COURT: We'll see on that one. Okay.

MS. STIPPEL: -- and if the insurers are going to maintain that objection, we're happy to brief the issue. But I did want to raise one more point.

THE COURT: Well, you wouldn't be briefing it, right?

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 60 of 122

I mean, if this demand's going to come from individual attorneys --

MS. STIPPEL: Correct.

THE COURT: -- are you going to brief it? I'm not so sure you are. But well, do you think about that? Okay.

MS. STIPPEL: But the other point that I wanted to raise as well in Syracuse. None of the major insurers in that case have settled yet, and that could very well be because these demands were not served. And in Rockville Center, where those demands were allowed to be served, as I'm sure you know, that case has settled.

THE COURT: Um-hum. Okay.

MS. STIPPEL: So this is certainly a factor.

THE COURT: Okay.

MS. STIPPEL: That will come into play.

THE COURT: Look, I appreciate you highlighting it. It's an not important issue. It's not something I'm -- I think we've talked about it as much as we can today. If an appropriate person wants to bring it to my attention and get a response from the insurance companies, I promise you I'll hear it. Okay.

MS. STIPPEL: Thank you.

THE COURT: Okay. Thank you very much.

MR. WEISENBERG: Your Honor, I apologize. The very reason for me standing was to answer a question you posed, and

yet I never answered the question.

THE COURT: That's okay. Go ahead.

MR. WEISENBERG: Your Honor rightly is concerned with whether the lift stay stipulation interferes in any way with the state court proceedings. And the answer is no, Your Honor.

THE COURT: Um-hum.

MR. WEISENBERG: The debtor has agreed to work with survivors' counsel to expedite any case or any of the four cases. But ultimately, the state court retains complete jurisdiction over all of the cases and the way they move forward. You'll see, very specifically, the stipulation provides for a request --

THE COURT: Um-hum.

MR. WEISENBERG: -- by the debtor and the survivor. Nowhere does it say we're overriding the court's jurisdiction --

THE COURT: Yeah.

MR. WEISENBERG: -- or its ability to maintain the pace of cases.

THE COURT: My understanding is that this has been a point of tension in other circumstances, where the state courts may think they're being somewhat taken for granted in this process, and that is not what I want to do at all. You know, it sounds like.

MR. WEISENBERG: We were highly cognizant, especially

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 62 of 122

coming out of Oakland, Your Honor --

THE COURT: Yeah.

MR. WEISENBERG: -- where we spent a lot of time talking about how cases, if they stay were lifted, would work within the estate court system.

THE COURT: And just remembering what the dialog there was, I mean, I was the debtor and the committee were not on the same page there. And I was concerned that there was nothing that was ready enough in that context that, absent a different viewpoint from other constituents, was going to be helpful. That's why I denied the motion. No other reason.

MR. WEISENBERG: Right.

THE COURT: I mean, I was intrigued by it, honestly.

MR. WEISENBERG: Right. And Your Honor, again, that's why when we negotiated this stipulation, it was so important to both sides --

THE COURT: Um-hum.

MR. WEISENBERG: -- to get the agreement of one another --

THE COURT: Yeah.

MR. WEISENBERG: that they would work collaboratively --

THE COURT: Um-hum.

MR. WEISENBERG: -- to expedite the case because we understood Your Honor has concerns about where they may be in

the queue and the willingness of the state court to expedite them. All we can do --

THE COURT: Right.

MR. WEISENBERG: -- is request, Your Honor, but it's better to get started now --

THE COURT: Right.

MR. WEISENBERG: -- than in three years from ow..

THE COURT: Right. And just to state the obvious, again, the relief from stay issue is just should I be in the way of something, not me dictating to the state court how they're going to do their business. That is not my job.

MR. WEISENBERG: Exactly.

THE COURT: It's that's their job. Okay. Thank you.

MR. WEISENBERG: Thank you.

THE COURT: Okay. Anybody else on the debtors' side before I hear from the insurers?

Okay. Who's going to go forward for the insurers?

MS. FARRELL: Good morning, Your Honor. Again, it's Ellen Farrell --

THE COURT: Um-hum.

MS. FARRELL: -- for General Insurance Company. And my bankruptcy colleagues are going to be addressing this for the most part.

THE COURT: Okay. All right.

MS. FARRELL: I wanted to address one thing very

briefly, which is the slight of hand, which I would respectfully submit has been presented to you to this morning when you hear the debtor's counsel say, we're fifteen months in, and we haven't begun mediation. When you hear the committee counsel say, we're looking at facts and history and we're looking at what has happened in cases like these.

So Your Honor, I just wanted to remind you, as before, other counsel addressed this issue, in this case, in this case, the carriers have been cooperative at every step of the way. We have supported mediation at every step of the way. We proposed a mediator in July 2024. We submitted a mediation order in July 2024. That was not -- neither of those were responded to for many months. But when they were responded to, as Mr. Schiavoni said, we did agree with the committee's chosen mediator. We did that. We cooperated.

When on December 31st, 2024, five months plus, after we submitted a mediation order, when the debtor provided a new form of mediation order that basically essentially ignored what we had sent, we worked with them. We worked with them for two months, and we worked with them with little involvement of the committee, frankly, which did not provide input on that order, at least not visibly to us. And we were asking about it because we wanted to move ahead with the mediation.

And this all culminated in a discussion on March 7th in which we were very clear with the debtor. We want to move

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 65 of 122

forward with the mediation. We want to proceed. We want to get this case going. And we were met with this motion. So again, I understand that my colleagues will address this issue, but I just wanted you

THE COURT: Um-hum. Sure. Okay.

MS. FARRELL: -- respectfully not to lose the forest for the trees of this particular case.

THE COURT: Thank you very much.

MS. FARRELL: Thank you.

THE COURT: Okay.

MR. SCHIAVONI: Tanc Schiavoni for ACE Aetna.

THE COURT: Um-hum.

MR. SCHIAVONI: Your Honor, every once in a while, this happens. But here, I sort of feel that like my adversary or friend policyholder has kind of made half my case for me here. On this issue, when asked about how the cases were selected and what was driving the debtor in doing that, the way cases are selected to go forward as bellwethers or whatnot in an MDL or in a JCCP proceeding is the policyholder, the defendant, is looking to pick cases that they think they could win. Trying to pick a mix of them. I think Your Honor called them dogs.

THE COURT: I didn't use that word. That was --

MR. SCHIAVONI: I will use that. I take it --

THE COURT: Okay.

MR. SCHIAVONI: -- it'll be my word dogs. But I don't mean that negatively but like --

THE COURT: I'm not going to describe any bad feelings.

MR. SCHIAVONI: But you pick a mix here.

THE COURT: Um-hum.

MR. SCHIAVONI: What we heard back was no, we picked these cases based on their insurance elements.

THE COURT: Um-hum.

MR. SCHIAVONI: And that sort of gets to the crux of a lot of what's like the disengagement, how this process, going forward, the debtor is not approaching it with the same economic interest it would otherwise have outside of the tort system.

And this whole notion that they're sort of exercising their business judgment here, look closely at the declaration that the debtor put in it. It said it was against lifting the stay right up, right up to up to February 28th. And what happened here was the committee, and it's laid out in the papers, told them they wouldn't mediate, period. They wouldn't mediate a plan unless they did this. So we have a debtor with a gun to its head, saying, okay, fine, and then acquiescing to a selection of cases.

I thought very hard about putting in a surreply. Your Honor, I sort of, quite rightly, was chastised previously. But

here --

THE COURT: Well, let's remember that this was an accommodation that everybody granted to the committee and the debtor. This was on short time, if I remember correctly. And under those circumstances, I wanted to let everybody be heard, just so you know, okay.

MR. SCHIAVONI: Yeah.

THE COURT: That's why I granted it.

MR. SCHIAVONI: So the reason we put it in though, was, I think, an extraordinary situation. It was that in the moving papers and in the replies, the cases that were the subject of the lift stay weren't disclosed. They're just not there.

THE COURT: Um-hum.

MR. SCHIAVONI: Okay. We only got it because we had written and sort of pressed this. We got it through a private email on Saturday after the replies went in, and we put it into to develop the -- because that's a completely new development, and also because it was only in the replies that they sort of attempted to even address the cause issues. But the main thing was that's where they made the disclosure. And how strange is that? I mean, I can't say in my career I've ever actually been to a lift stay motion where they hadn't disclosed who they're lifting the stay for.

Well, just think why. It's like it's the exact reason

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 68 of 122

I'm going to sort of -- is at the core of our objection to lifting the stay. It's going to inject intense discrimination into the case. Not only were they keeping it from us so we could have made that argument in our moving papers, but I think the real reason here is none of the claimants had notice. All the claimants didn't have -- to this day, they don't have notice because it's not disclosed either in their moving papers, that who was selected, that one of their committee members was selected to go forward on a preferential basis, and that three out-of-state plaintiffs' lawyers, Mr. Herman in Miami, Mr. Anderson in Wisconsin, and Mr. Fau (phonetic) in -- I think he's in Oregon or Washington, that they were selected to bring forward those cases.

If you had all those -- all those committee -- if you had all the counsel, all these plaintiffs' lawyers here, and they were all told, oh, who should go forward, I think it'd be a long discussion because they know exactly what's at stake. They know exactly -- tomorrow, if we end early today, and it's not a pitch for that. But I'm flying to the Imerys pre-trial hearing. And we have two objections there by plaintiffs' lawyers, prominent plaintiffs' lawyers from Alameda County, who were asbestos lawyers. I think you probably know. They're very famous guys here. They're showing up to say that they got a judgment And somehow they got this judgment after the case went forward, and they don't want to be paid by the matrix.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 69 of 122

They don't want to be paid 400,000 dollars.

Mr. Kazin (phonetic) wants thirty-five-million dollars apiece for his two cases. Okay. And he will not be. His views will not change on that. That's exactly what's at stake here. And that's exactly what's been injected into the case. And we largely heard this really from the debtor that he sort of stood back and he let the cases be selected as they would.

Here, we're not -- I mean, I got this notion that, oh, this sort of, well, maybe on the courthouse steps, people settle faster. But this is bankruptcy court, and in bankruptcy, where we have multiple claimants all claiming against a limited pool of assets, if a court allows a preferred group, a small group after it, you will by definition introduced discrimination into the case. So that preferred group will have a preferred outcome with regard to those assets.

Now, I hear -- and that's what the automatic stay is about. And arguably the whole Bankruptcy Code is about stopping that rush to the courthouse where in advance of a bankruptcy, a few banks or a few trade creditors rush in and grab everything. I mean, respectfully, I think, in this context, it's not really a tool. It's the core. It's fundamental to bankruptcy not to allow that process to start.

There are cases. I'll be the first to admit it, where the stay is lifted to allow pursuit of insurance. You see that

oftentimes, I think, in your commercial cases involving D&O carriers. But in all of those cases, if you think about it and you look back at them, the plaintiff agrees to limit his recovery to the insurance. That's explicitly not what's happening here.

And I think they're not really -- hearing from the committee on this, they're not really being fulsome in their explanation to you by not pointing that out. It's like, sure, they're saying they will defer collection, but they're not giving up that right. It's like the cases where the state is lifted, outside of these few sui generis diocese cases, are cases where an agreement has been made not to pursue outside of insurance.

And that's really critical here because once somebody, like Mr. Kazin, who's not here and he's not an abuse lawyer, once he puts himself in a preferential position and his client does, all their economic incentives -- we're not speculating. We're not guessing what's going to happen. Right now, we know that if you let Mr. Herman, for instance, go forward, his economic interest is going to be to press that to the advantage of his client. There's no reason for him to give that up. If he gets a judgment, he will, I guarantee it, or maybe I can't guarantee it. That's maybe speculation, but I can tell you this.

THE COURT: You can issue a highly confident letter.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 71 of 122

MR. SCHIAVONI: His economic interest is in pursuing the full outcome.

THE COURT: Um-hum.

MR. SCHIAVONI: And even if he comes short of that, to the extent he advances his case, he immediately has a lesser interest from all the other claimant lawyers in in letting a plan be formulated. And I would offer, honestly, a counter sort of explanation for why some of these cases haven't settled, and that's exactly it. Some of these folks think that they can get to a judgment before anybody else, and that's tied a bunch of the cases up in knots because they think they can engineer it that way or whatnot for various reasons.

It's really it's absolutely toxic to getting a deal done here because if you lift it for these three prominent fellows, they will dominate any discussion, and they will ask for more than even the limits on the policies. And we'll never get anywhere. It's like, equitable distribution here will ultimately mean, whoever your lawyer is, you get paid what your claims are worth, not who your lawyer is or whether or not he was able to use his influence in how committee counsel is selected to get himself on the list to be one of the ones to go forward.

And you can't look at this list and say, it's just a coincidence that there's a committee member turned out to be on it. It's not just a coincidence that they didn't disclose this

in their moving papers who it would be because this isn't the only situation. You have in Oakland, if you recall, the same thing happened. They didn't disclose who it was that lift stay was going to be granted for. But then we heard after in a presentation by Mr. Simons --

THE COURT: Um-hum.

MR. SCHIAVONI: -- that the guy who was teed up was Mr. Woodhull (phonetic), who is a claimant for lift stay. Who was Mr. Woodhull? The chairman of the committee.

THE COURT: Um-hum.

MR. SCHIAVONI: Okay. And that has -- well, I don't want to talk about Oakland, but having a committee member think that his case is going to go to trial first and he's going to get first shot in any assets, like what we will hear on those arguments tomorrow with Mr. Kazin in Imerys, how does that position him, then, to sit in the exercise of his fiduciary duty and decide about how to negotiate a plan on behalf of all claimants, including some claimants for which there's no insurance and some claimants are represented pro se or some claimants who are represented by lawyers who are not licensed in the state. Who are unlikely to be in a position to sort of bring their case forward.

THE COURT: Um-hum.

MR. SCHIAVONI: It's like, that claimant is economically incentivized. I guess I can't speculate on what

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 73 of 122

he's going to do, but I am not speculating on what his economic interests are. His economic interest is to say, look, do we really need a plan? Why don't we just go forward and let me get a verdict, and then you guys can talk about whatever plan you have. And I'd like to be, frankly, in the position of Mr. Kazin. It's a toxic introduction into these cases.

Personally, if it was appropriate, I would tell you war stories about other cases I've been in, where I've seen this dynamic occur. I had one case -- this is the only minor war story I'll tell you. I had one case where the plaintiffs came back, and they had a matrix where people were paid in accordance with the level of prominence of their lawyer. It took a year for us to walk that back in this sort of gasoline explosion case. It's just toxic to the exchange.

THE COURT: Um-hum.

MR. SCHIAVONI: So this is a long pitch, Your Honor, to sort of explain to you why, really, how important it is that we'd suggest to let the mediation go forward somewhat. We have relatively modest limits at stake in these cases. We're going to find out relatively quickly, or not, whether they're willing to engage in that range, so to speak. If they're not, well, then, all bets are off and we can -- and tear through litigation. But it's not true, this notion here that you heard, that there's no prejudice by going forward.

There are differences in California law that really

introduce other prejudices right away. In California, insurers have something called bus rights, that if you start spending money under reservation of rights and it's later determined that there's no coverage, the carriers have a right of recoupment to get that money back. It's to sort of encourage our engagement and whatnot. There are coverage issues here going forward. How they turn out, who knows? It's like, they're not moving -- they're not asking to lift the stay for the coverage issues to be determined.

But should those -- like, they create those bus rights immediately going forward. They give us an economic interest that arguably is an administrative claim against the estate, directly, immediately in the estate as they go forward. And if it's proven for individual claims not to have coverage, then, like, strangely, like, we'd be given arguably a priority on the payout of those claims. So it's immediately creating some very complicated issues here.

Your Honor, so I'd ask you --

THE COURT: Okay.

MR. SCHIAVONI: -- please, in connection with -- just one last notion --

THE COURT: Sure.

MR. SCHIAVONI: -- on this issue of introducing discrimination. I made this point to you before, but it's like, when you look at these cases, there have been 150

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 75 of 122

asbestos mass tort bankruptcies --

THE COURT: Um-hum.

MR. SCHIAVONI: -- and another fifty other types of mass tort cases. I can't think of any. I have been unable to find anywhere the stay was lifted. And some of those cases went on for quite some time. And it was precisely for this reason, this problem that would occur. And that problem will occur here. Thank you, Your Honor.

THE COURT: Thank you very much.

Okay. Anybody else from the insurance side want to chat?

Come on up.

MS. WALSH: Good morning again, Your Honor.

THE COURT: Good morning.

MS. WALSH: For the record, Kaitlin Walsh of Mintz, Levin on behalf of General Insurance Company of America.

THE COURT: Go ahead.

MS. WALSH: Thank you for the opportunity to be heard here today.

THE COURT: Sure. Yeah.

MS. WALSH: I will echo a lot of Mr. Schiavoni's comments. I will try to be brief --

THE COURT: Okay.

MS. WALSH: -- in that echoing.

THE COURT: Okay.

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 76 of 122

MS. WALSH: Your Honor, the debtor and the committee are asking the Court to allow for cases to go forward in the tort system before we have even had one moment spent on mediation, despite the insurers' best efforts to move that process forward, as detailed by my partner Ms. Farrell. To proceed this way undermines principal tenets of bankruptcy law, which is reaching global settlement and that like creditors be treated likewise.

The movants argue that the path will speed up resolution of this case, and they say that this is because litigation drives settlement. But the movants offer nothing but conjecture as to how that will work in this case, that the litigation of four cases will somehow result in the settlement of some ninety-plus other cases. And again, it is the movant's burden to show cause here.

The debtor admits that none of these cases are ready for trial. So we've talked about this a bunch this morning --

THE COURT: Yeah.

MS. WALSH: -- and it cuts both ways, though. Right.

THE COURT: Um-hum.

MS. WALSH: Because they're saying that it drives settlement, but none of these cases are anywhere near being close to courthouse steps. So even if you accepted this premise that somehow by pursuing these limited number of cases, you would get closer to global settlement, which I don't

actually believe is true, even if you took that that notion, we're nowhere near that point. We're nowhere near the courthouse steps. Movant stresses that claimants will not be able to enforce any judgments against the estate, and yet they also state that the movants will be able to enforce these judgments against the insurers.

So here, you have a situation where one claimant could not only get a judgment, but could also get payment theoretically on their claim outside the bankruptcy process prior to this being resolved, prior to other claimants, not to mention that these claimants will get their day in court to the exclusion of other claimants. This is disparate treatment and calls into question the debtor's ability to confirm a plan under 1123. It violates the equal treatment standard.

And while we're speaking about plans, we should note that July 1st marks eighteen months since the case's filing, the statutory limit on which the debtor can extend its exclusivity period under 1121(d)(2)(A). We submit that the parties would be better served focusing on mediation and plan negotiation, rather than litigating these cases, which the debtor has recognized is not really for valuation purposes or for plan formulation purposes.

THE COURT: Um-hum.

MS. WALSH: Now, the movants aren't asking for only four cases, of course. They're asking this Court for the

extraordinary relief that if one of these four cases settles or reaches judgment or somehow resolves, they want this Court's authority to choose another case from a queue and simply replace that case. This scenario is unprecedented, and for good reason because why would a debtor remain in bankruptcy while it continues to cycle through its tort litigation in state court?

And it sets up a perverse dynamic that Mr. Schiavoni was speaking about a little while ago, perhaps looking at from a slightly different perspective, in that claimants' lawyers will be motivated to get to be the next in line to have their case be added to the queue, to have their case be able to be tried, rather than working towards a resolution in the bankruptcy.

THE COURT: Okay.

MS. WALSH: Not to mention serious procedural issues with notice and other substantive issues in terms of cause --

THE COURT: Um-hum.

MS. WALSH: -- for lifting of the stay.

THE COURT: Um-hum.

MS. WALSH: So accordingly, we submit that the parties should focus on mediation --

THE COURT: Okay.

MS. WALSH: -- rather than litigation, and at a minimum, that the evergreen nature of the relief sought should

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 79 of 122

be denied.

THE COURT: Absent some other process. If somebody wants to come in and say, look, X happened. We didn't expect it. We'd like to be able to name someone else. We could have a hearing about that, presumably, right?

MS. WALSH: Of course, the debtor would reserve rights to --

THE COURT: Yeah.

MS. WALSH: -- come to the Court again and ask for relief.

THE COURT: Um-hum.

MS. WALSH: But the way that the relief is structured, in current motion --

THE COURT: No, I hear you.

MS. WALSH: Yeah.

THE COURT: Got it. Thank you.

MS. WALSH: Okay. Thank you, Your Honor.

THE COURT: All right. Anybody else on the insurance side want to chat before I give the debtor and the committee the last word here?

Okay.

MS. TURNER: Your Honor.

THE COURT: Yes. I'm sorry.

MS. TURNER: Your Honor, sorry. Miranda Turner on behalf of Transcontinental Insurance, one of the CNA companies,

just briefly, Your Honor.

We joined Ms. Farrell and Ms. Walsh's briefs. We're in agreement with Mr. Schiavoni's points. I don't want to repeat any of that.

I do want to comment, though, on the cases identified in the committee's brief and some of the cases that Your Honor invoked as the subject of some discussion among the bankruptcy courts. Some of those are not examples that would support what the committee is asking for here. They're being brought out as examples of cases where individual suits proceed, and it drives progress in the mediation.

Your Honor, in Rochester, the description of the relief that the court granted there and then the agreement that the committee described as being reached, that happened in 2022. And the agreement cut the insurers out and presented a restructuring support agreement, followed by a plan that had prejudicial provisions that the insurers, including CNA, objected to. And three years later, there is no confirmed plan in that case.

The Diocese of Rockville Center, in that case, there were cases moving forward. There was also a threat by Judge Glenn to dismiss the bankruptcy case. And I think Mr. Jacobs and some of the other carriers who were involved there have made mention in Oakland before Your Honor of some of the other issues that were at stake in that case.

And Your Honor, the Buffalo case, you mentioned it expressly. I want to provide some additional context to that case. It has been pending for five years. Your Honor, in that case, the bar date was not set until the CVA window had closed. It was contemporaneous with the CVA window closing, and the CVA window was extended in New York because of the COVID-19 pandemic.

So the case sat, essentially, while the claims were coming in. There were far more claims in that case than the diocese had initially anticipated, and there is a very uneven insurance picture in that case. About half of the claims are uninsured. Seventeen lift stay motions were brought. Judge Bucki did grant that relief.

He also ordered the debtor to file a plan, by this September 2025, which is the deadline for the Diocese of Buffalo to put a plan on file that is going to happen before any of the lift stay cases actually conclude discovery, much less before they receive trial dates. So I think the notion that the lifting of the stay is driving any sort of progress in the cases and is going to have them result in a resolution is not supported by these other cases.

And Your Honor has confronted this situation in Oakland. You did deny the relief there, I think, under the circumstances of that case. And I guess my point would be the circumstances of all of these cases are quite different. And

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 82 of 122

in some of them, mediation has gone on for a period of time without success. In Oakland, the proposal was to put everyone back in the court system.

In this case, no mediation has even taken place. And I do want to -- I do want to echo Ms. Farrell's point briefly on the insurers' cooperation with respect to trying to get mediation started. I looked back at my emails in preparation for today, and our mediators name was provided by Mr. Brosnahan to the carriers in November of 2024.

The mediator presented a potential conflict with CNA. I immediately called him. I spoke with him. We talked it through. I got approval and said that CNA would agree with Mr. Warshak (phonetic) on December 2nd, 2024. We're here on Sidd Finch Day, and the mediation hasn't gone forward because we were advised the committee was the one refusing to go to mediation.

So I think, Your Honor, all of these cases are different is the point that I'd like to make. And in this case, there's a lot of focus on the insurers delaying. There's a lot of focus on whether two things can proceed at once and the insurers' opposition and the insurers' playbook, which is, I think, a point Mr. Weisenberg made. This is a playbook. These lift stay motions are a playbook that are being brought out in Oakland. In San Francisco. In this case. In Albany. In Buffalo. And I think that bears asking what the delay is

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 83 of 122

going to look like.

And once, if Your Honor grants the stipulation and these cases move forward, the committee may be incentivized to engage less with the mediation and to focus on these lift stay cases moving forward because this is an opportunity, a pursuit that they are making in multiple cases. And I question whether the mediation can go forward productively with these two things on track, not because the insurers are not prepared, but because this is something that we're seeing in multiple cases that does create all of the incentives Mr. Schiavoni was talking about.

And we think it's a risk to the process here as well. We remain committed to mediating in good faith. But the lift stay -- the lift stay cases moving forward at the same time is going to present real problems for the mediation.

THE COURT: Okay. Thank you very much.

Anybody else on the insurance side want to have a word?

MR. PERCH: Very, very briefly, Your Honor. Good afternoon, now. Frank Perch of White and Williams representing Zurich in this case, Your Honor. Zurich joins in the arguments that have been presented by Mr. Schiavoni, Ms. Farrell, and Ms. Turner. Mr. Schiavoni pointed out that there have been dozens of mass tort cases that have been successfully resolved without these kind of lift stay motions. That, by the way, includes a

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 84 of 122

large number of diocesan cases that have been filed over the last roughly twenty years.

So if something has changed, if something has changed in the willingness of parties to settle, is it the insurers' willingness to settle? I don't think so. The evidence today has been that the insurers have been trying to mediate, have been working in good faith, and have been accommodating in terms of identifying who the mediator is.

Now, let's look at something else. The debtors' response to the motion filed over the weekend, at page 2, says, the debtor is offering a plan in which it pays the liquidation value of its assets, there is a contribution from the associated ministries, and the debtor assigns rights against insurers to a creditor trust ..."

As any insurer seen that plan? My client has not seen that plan. I haven't seen that plan. So far as I know, no one has seen that plan. If we want to move this case towards resolution, let's actually negotiate. Let's take a look at the structure of a plan. Let's talk about the structure of a plan. Let's focus on the structure of a plan, instead of focusing on which cases can we use to browbeat the insurers into offering policy limits? Let's actually focus on resolving the case.

THE COURT: Okay.

MR. PERCH: That would be our recommendation, Your Honor.

THE COURT: Thank you very much. Appreciate it.

Okay. One more.

MR. WYATT: Good afternoon, Your Honor. Afternoon now. Andrew Wyatt, again, for the record.

A couple of things that I don't think were touched on is the debtor and the committee selecting these cases based on insurance issues can have, I think, a pretty detrimental effect on the availability of insurance as a whole for the remaining committee that is not part of these four cases going forward. For example, there could be detrimental facts that are discovered during the progress of these four cases that can create coverage issues that would preclude coverage as to many other members of the committee.

And right now, those issues are hypothetical and are not being asserted in the same way they would be if there is a concrete discovery response or there is a jury verdict finding as to knowledge or something of that nature. And especially with these cases being selected from a strictly insurance standpoint, I think it's more likely than not that these issues will start to come up pretty quickly.

And I think that brings us to our second point, which is so far, the insurers have not filed any sort of coverage action. And this goes to this whole idea of trying to cooperate in good faith in mediation and trying to resolve these issues before having to initiate additional litigation,

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 86 of 122

additional litigation that will involve not just the debtor, but also the individual claimants who have to be named as part of these coverage actions to be bound to any sort of judgment as to coverage. And we're in a situation where as those progress forward, the debtor is not agreeing to allow these insurance cases to go forward in the same way that he's allowing. It seems like an unlimited number of the claimants cases to go forward.

And I think that the last thing that we'd want to bring up is the insurance is not unlimited. I know that the committee might have you think differently, but this is a situation where policies can become exhausted. And this goes, I think, back to the discrimination point, as demands start to come in on any sort of these cases that are lifted from stay or as judgments are received and insurers have duties to pay on these final judgments, the policies will become exhausted and that will leave less money available, less policies available to then pay out to the rest of the claimants who have had to, unfortunately, sit on the sidelines, have not had a chance to have their stay in court because of these limited selections.

Whereas, if we were to pursue mediation without having the stay lifted, the full amount of insurance is available from all insurers to potentially contribute. And as soon as that starts to go away, whether it's a coverage offense or a policy exhaustion, the total amount of money available to the rest of

the survivors becomes extremely limited.

THE COURT: Okay. Thank you very much.

MR. WYATT: Thank you.

THE COURT: Okay.

MR. BROSNAHAN: Okay. Let me just -- should I just address the aggregate limit issue, Your Honor --

THE COURT: Um-hum. Yeah. Sure.

MR. BROSNAHAN: The exhaustion issue. Um-hum. Counsel for travelers hasn't pointed to any policy or any language that imposes an aggregate limit. And certainly none of the cases that have been proposed for the list are subject to any aggregate limits. Your Honor might recall, at the very outset of this case, we had a case called the Mers (phonetic) case that we had settled for 400,000 dollars on the eve of the filing.

THE COURT: Um-hum.

MR. BROSNAHAN: We filed a motion to have Your Honor approve that. One of the points we made was that there are no applicable aggregate limits, and therefore, paying Mr. Mers 400,000 dollars did not impair any of the other claimants' ability to recover insurance. Travelers did not object to that because the fact is there are no aggregate limits applicable. These are occurrence based limits only.

THE COURT: Okay. Thank you.

MR. BROSNAHAN: Thank you, Your Honor.

THE COURT: Let's hear from the debtor and committee.

MR. HARRIS: Your Honor, I'll be brief. Kind of a one off to start.

Ms. Walsh for General Insurance mentioned that if stay relief is granted to allow one or a few creditors to get very large claim amounts, that somehow that would enable them to be paid outside of bankruptcy, I don't see how in a single defendant in a single defendant stay relief in a trial unless the case is dismissed. So I contest that proposal.

Mr. Schiavoni introduced the concept of discrimination that, effectively, one large holder might somehow take control of the process. And there are large claims in bankruptcy all the time, and not every case is going to get tried here. I have faith in the committee that they will have a claims resolution process. There is a concept that they have pledged to stand by, which is equal distribution among similarly situated creditors. I don't see this as a risk, but to the extent that there is a large claim, Your Honor, we leave it to the committee to police its own side and to whip whatever votes are necessary when we get to the plan stage. We're not there yet.

Your Honor, the debtor absolutely believes that stay relief will aid the mediation process. This has got -- this one motion has gotten more interest from the insurers than anything else we've done in the case. And we have been talking

to them. I've come to this Court numerous times to report to the Court that we've had a lot of conversations, but we haven't gotten anywhere. And so at this point, the committee and the debtor have to ask us, if not now, when will we get to this process?

The final thing I want to say, and this is perspective, Your Honor, is that side of the room is filled with parties and counsel who represent parties who aren't protected by the stay. It's the debtor's stay. And it's obvious that the Court has the power to lift the stay or not at this point. But to the extent that mediation doesn't work the committee and the debtor are willing to take that risk. If the insurers don't want to come to mediation, that's fine. But our concept is that we will get insurers to come to mediation. And they will participate, and if they choose not to, well then their claims will be handled later in a reorganization plan.

The insurance risk here, final point, Your Honor. I would say this about it. Insurance in these cases is for the benefit of the survivors. It funds the reorganization. There are expert counsel on the committee's side and on the debtor side who believe that the risk to coverage is minimal to nonexistent. We're happy to listen to the insurers if they believe otherwise, and we've heard potential claims about that, but we think there will be coverage in whatever amount there is, and that there is a consensual reorganization plan here

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 90 of 122

that can be proposed between the debtor, the committee, and as many insurers as want to participate.

THE COURT: Okay. Thank you very much.

MR. HARRIS: Thank you, Your Honor.

MR. WEISENBERG: Brent Wisenberg on behalf of the committee. So not surprisingly, Your Honor, we've been punching at straw men the whole day. The narrow issue before, Your Honor, as I began, is whether the debtor has acted within its business judgment to join the committee in lifting the stay.

The parade of horribles that the insurers have begged you to go down, you don't need to go down. The amount of supposed sympathy and concern for survivors on this side of the courtroom is something I've never seen. This same group, as you know, who across the country have opposed every motion to allow survivors to speak, all of a sudden have grave concerns about how survivors are being treated? Well, the two fiduciaries, fiduciaries, lawfully, to the estate have considered that and have determined that is not an issue.

You've also heard, please, Your Honor, allow us to mediate first. Only then, if it fails, can we go to this route. Your Honor, this is not an either/or proposition. We are prepared to go to mediation immediately at the same time that this is taking place.

And so Your Honor, based upon those grounds, we ask

that you grant the motion.

THE COURT: Okay. Thank you very much.

I would like to give you guys some thoughts and then talk about how we go forward. I'm assuming that -- I mean, obviously we have Oakland to talk about. I'm assuming people would want to take a break between my giving you my thoughts about this motion and commencing Oakland; is that correct? I don't know if people are getting on planes at 3 o'clock if you are. I think it's --

MR. BROSNAHAN: Your Honor, if we get five minutes just for a break, that would be appreciated.

THE COURT: Well, no, we can take a little longer. I mean, I'm going to see what the room wants to do. Okay. I appreciate it.

UNIDENTIFIED SPEAKER: Your Honor, the debtors are not getting on a plane at 3 o'clock (indiscernible) --

THE COURT: All right. So would it be convenient to take a --

UNIDENTIFIED SPEAKER: A hundred percent to take a break.

THE COURT: -- noon kind of break, noon-ish break?

UNIDENTIFIED SPEAKER: We will be here for the day as, long as it takes.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: I just wanted to make that

clear.

THE CLERK: For the committee in Oakland as well, Your Honor.

THE COURT: All right. Okay. Very good.

MR. BROSNAHAN: How about we take a break and start (indiscernible).

THE COURT: Okay. All right. Thank you very much.

Thank you all for your wonderful arguments. Let me begin by saying that I'm aware, and this comes up frequently in these cases because it's possible to read the past events as indicative of somebody's good faith, bad faith. I have not had occasion in this case, and I may never have occasion in this case, to find anybody in bad faith or being dilatory for any reason that is outside the norm. Sometimes, things take longer. Whatever.

As important as I think it is to all of you to cast yourself in the best light and where you think appropriate, cast the other side in a different light. I have never had to get to that level to make any decision. I'm not going to do it today. I assume that all of you realize that this is a iterative, cooperative, constructive process. I have no basis to think anybody is dragging their heels or surprising the other guy or any -- that's all neither here nor there to me.

So clearing the field of that issue, I do think that this is a unique situation in which the debtor and the

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 93 of 122

committee have ultimately jointly agreed that it's in the best interest of the process and moving the process along to grant relief from stay as to a limited number of cases to add that as an incentive to realistically, productively, aggressively engaging in the mediation process on the theory that everybody could have something to lose in the context of litigation and lifting the stay.

I think, in that context, I will basically agree with the debtor, I could split some hairs here and there, that this is not a case where they are obligated to make the kind of showing of cause that we ordinarily expect from the creditor who's coming and asking the debtor to do something they don't want to do, which is lift the stay.  Ignore the bankruptcy protections.  Go off and litigate something somewhere else.

I firmly believe that the automatic stay is predominantly a tool.  It's a big one, but it is a tool.  And it is to be deployed, used, conditioned, terminated, annulled, whatever other words Congress chose to use, after, among other things, the debtor and other parties have assessed what the risks are, what the benefits are, what the detriments are, and presented that to a court.  And the court then makes a decision as to whether -- if it's a hostile situation, whether the Curtis factors or others are satisfied or whether in other circumstances, it is more akin to the debtor with the committee's sign on taking the position that all in all, it

would advance the cause of the most important thing in the case, the mediation to have a parallel track.

So I think that the debtor's showing here was perhaps not as heroic as maybe the insurers would suggest it needed to be. I think it's a relatively minimal standard in the first instance as to how they choose to use the stay and limit the stay and put the stay aside for a few minutes. I think that's all the right frame in which to look at this.

Having said that, I think that the showing here is minimal in the sense, as well, that I don't think I necessarily have to conclude that because five other cases have proceeded this way, there's a showing based on that, that this one will too. I think there is enough there to suggest that the mediation process can otherwise take a little bit longer, be little bit more elongated, and then when there are other risks by all parties, that that is actually a help in the process.

There are other cases that have not been mass tort cases where my colleagues have lifted the stay. It happened in PG&E, where I think Judge Montali was of the opinion that things were simply not moving terribly quickly. Lifting the stay or proposing to do that, with respect to some of the claims, in that case, I think, was quite beneficial. I think this is analogous to analogous to that.

Nobody's going to get a judgment tomorrow. That's not the point. The point is that we're going to begin a process

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 95 of 122

that possibly would benefit and possibly could -- whatever the opposite word of the benefit would be -- harm the interests of all the parties. And I think that's an appropriate incentive in this case.

I also agree that this is a case in which I don't know of any diocese is necessarily rich, but this one is of a smaller sort with smaller resources. And I think it is a responsible use of the debtor's overall view of the case and business judgment or the appropriate way to move the case forward to act somewhat aggressively in this fashion in this case.

So I think all of those are factors why I would grant this motion.

I don't believe -- look, the parade of horribles, I'm not trying to make fun of it. I don't know. I can't believe that many of many of those things can't be managed along the way, because what's happening here is there is relief from stay to go begin a process somewhere else. As I said, that's going to take some time. There's an awful lot of thought that can go into how that gets managed and how that is affecting various risks and the way people are approaching the mediation.

So I don't think that's necessarily putting anybody in a box. I think it's creating some other incentives that people can simply react to, and they will. So I don't take the parade of horribles at face value. I think people can still talk

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 96 of 122

about those things, and those things can be managed through to the extent there are risks, they can be managed. And if they can't, maybe the fact they can't be managed is an incentive in and of itself.

So I think those are all points in favor of allowing the relief from stay to go forward with the mediation.

I am not terribly concerned at the moment by the fact that at least one of the people among the four claimants happens to be a committee member because as I said, I think that if this plays out the way the committee and the debtor are intending it to play out, the result of this is going to be quicker progress toward a plan that's going to encompass everybody's determinations. And I think that -- I mean, look, if we're waiting for a judgment to get to a plan here, we are in a bad place. I don't think that's the dynamic at all. The dynamic is let's start this process and let's have the start of this process create some incentives.

So I think that's -- I mean, I agree that getting a judgment, certainly outside of bankruptcy, would advantage somebody. I don't think that progress along those lines has the same effect here under the sense of where we are in this case. So I'm not terribly worried about that, and I'm not terribly worried about the fact that one of the individuals happens to be on the committee. I don't think there's anything necessarily inappropriate about that because the ultimate

result to be obtained here is a fair disposition of everybody's claim. So I think that the identity of the claimant's not of any great importance to me.

I will say that I do want to acknowledge the Acknowledge the point that the insurers made about adding parties. I believe that if we start off with four, I think that if there are some resolutions, I don't think that other folks should be named and teed up, absent some process for everybody to come back here and tell me what they think the progress has been at this point, if there's anything, any unexpected results or consequences, I think we should take that into account. And I think that the naming of other individuals should occur only after we have a chance, at least on a status conference basis, if nothing else, to assess where we are and what we might be doing next.

So with all that, I'm prepared to grant the motion for relief from stay with that proviso. I think you heard me earlier said that with respect to the confidentiality -- I'm sorry, the privilege log, I think the insurers are right that some more detail is going to be very helpful to them. And I think you should work with them about the language of how particularly you want to want to describe that.

So with that I would grant the motion, and I would ask the debtor and the committee to prepare the order and to run your suggestion. If you want to be more particular about what

I'm saying about coming back to the Court, if there are matters for these cases, any of them are resolved and you want to add one, talk to the insurers about what kind of process that would be. All right.

MR. HARRIS: Your Honor.

THE COURT: Yes.

MR. HARRIS: Just for clarity, you're granting the entire motion, including the motion to mediate with the change you just mentioned?

THE COURT: I am. Yes.

MR. HARRIS: Okay. Thank you.

THE COURT: Okay. Thank you very much.

UNIDENTIFIED SPEAKER: Thank you, Your Honor. Can I just raise one thirty-second issue on the protective order?

THE COURT: Come on up. Come on up.

UNIDENTIFIED SPEAKER: Your Honor, there has been a stipulated protective order submitted --

MR. HARRIS: You got to talk at the mic.

UNIDENTIFIED SPEAKER: A stipulated protective order --

THE COURT: On the 25th?

UNIDENTIFIED SPEAKER: -- submitted. It's document 842, I believe.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: Submitted on the 25th.

THE COURT: Yeah. Mr. Schiavoni filed an objection --

THE COURT: Um-hum.

UNIDENTIFIED SPEAKER: -- having to do with the confidentiality designation of documents that had been subject to a prior state court order. I proposed language responding to his concern --

THE COURT: Um-hum.

UNIDENTIFIED SPEAKER: -- where we would designate anything that fell within that category. Okay. We urge the Court -- we'll submit a revised protective order. I'll run it by him. And I would urge the Court to enter that protective order as soon as we do that

THE COURT: Well, I'll let him respond.

MR. BROSNAHAN: Well, I think he's -- I think he's going to agree.

THE COURT: Okay.

MR. BROSNAHAN: My point is that the Court shouldn't just enter the protective order that's sitting there now.

THE COURT: Right.

MR. BROSNAHAN: We're going to come back with a slightly revised --

THE COURT: All right. I appreciate it. Okay.

MR. BROSNAHAN: Thank you, Your Honor.

THE COURT: Okay. Do you have a point about that?

MR. SCHIAVONI: Oh, I thought you were going to hear

me. Yes, Your Honor.

THE COURT: Yeah. Go ahead. Uh-huh.

MR. SCHIAVONI: I'll limit it to that.

THE COURT: Sure.

MR. SCHIAVONI: I respect the rulings you've made, Your Honor.

THE COURT: Thank you. Appreciate it.

MR. SCHIAVONI: So on this protective order, at the last minute when it was filed, a clause was added that said, basically, you could sort of, like, designate anything confidential. So there was an extremely extensive ruling and process that the California Court of -- Intermediate Appellate Court entered --

THE COURT: Um-hum.

MR. SCHIAVONI: -- making confidential the vast bulk of these documents. I don't know why, like, this protective order was held up from July until now, with insistence that, like, it was, all the documents would be attorney's eyes only. It was all these restrictions. When we could have gotten these documents in July that that the state had gone through this process.

So I would just ask you, like, we have language that just says simply that those documents shall not be deemed privileged, like confidential. I mean, a court order has already been entered on it. They can work through and cure,

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 101 of 122

and I'm fine with all that. But the order shouldn't permit them to -- like, shouldn't create confusion that this order allows those documents that have already been the subject of subject of a ruling to be deemed confidential. These are the very documents, by the way, that are at stake. All four of the cases that they've moved to lift the stay --

THE COURT: Um-hum. Um-hum.

MR. SCHIAVONI: -- are the subject of this order.

THE COURT: Okay.

MR. SCHIAVONI: So the plaintiffs have these documents.

THE COURT: Okay.

MR. SCHIAVONI: All right. So that's --

THE COURT: All right.

MR. SCHIAVONI: Like, the language we have, I think, addresses this. I'm happy to add a clause that says that they will cure -- they'll make whatever efforts to cure over the next couple of weeks.

MR. SCHIAVONI: Okay. And we can set a time limit with them.

THE COURT: Okay.

MR. SCHIAVONI: And that would do it, I think.

THE COURT: All right.

MR. SCHIAVONI: Okay.

THE COURT: Just, I look forward to you guys chatting

about that, and we'll --

MR. SCHIAVONI: Thank you, Your Honor. If we need to have a hearing about it, we can. Okay.

THE COURT: I don't think we would. All right.

(Whereupon these proceedings were concluded at 12:28 PM)

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 103 of 122

I N D E X

| RULINGS: | PAGE | LINE |
| --- | --- | --- |
| Joint motion for relief from stay is granted | 97 | 16 |

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 104 of 122

C E R T I F I C A T I O N

I, River Wolfe, certify that the foregoing transcript is a true and accurate record of the proceedings.

/s/ RIVER WOLFE, CDLT-265

eScribers
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020

Date: April 3, 2025

**A**

**abiding (1)** 24:1
**ability (7)** 14:12,14;17:25; 25:13;61:18;77:13; 87:21
**able (10)** 6:23;13:11,12;26:5; 47:23;71:20;77:4,5; 78:12;79:4
**absent (3)** 62:9;79:2;97:8
**Absolutely (6)** 8:25;51:12;56:12; 58:14;71:13;88:22
**abstract (1)** 13:17
**abuse (3)** 42:21;43:5;70:15
**accelerate (1)** 32:6
**accept (1)** 14:18
**accepted (1)** 76:23
**accommodating (1)** 84:7
**accommodation (2)** 16:25;67:3
**accomplished (1)** 36:7
**accordance (2)** 53:13;73:12
**accordingly (1)** 78:21
**account (1)** 97:12
**accuracy (1)** 47:24
**accused (2)** 43:7;46:12
**ACE (7)** 12:24,25;13:7; 15:14;42:13;46:4; 65:11
**acknowledge (3)** 50:10;97:4,5
**acknowledging (1)** 47:8
**acquiescing (1)** 66:22
**across (3)** 39:20;50:12;90:15
**act (1)** 95:10
**acted (1)** 90:8
**acting (2)** 27:15;50:20
**action (3)** 28:17,18;85:23
**actions (3)** 20:22;21:8;86:3
**actual (1)** 14:12
**actually (11)** 15:11,11;42:15; 52:14;58:8;67:22; 77:1;81:17;84:18,22; 94:16
**ad (1)** 42:20
**add (3)** 93:3;98:2;101:16
**added (2)** 78:12;100:9
**adding (2)** 11:17;97:5
**addition (1)** 46:7
**additional (3)** 81:2;85:25;86:1
**address (8)** 16:15;41:13;46:18; 57:4;63:25;65:3; 67:20;87:6
**addressed (2)** 11:10;64:8
**addresses (1)** 101:16
**addressing (1)** 63:22
**adjourn (1)** 28:8
**administrative (1)** 74:12
**admit (1)** 69:24
**admits (1)** 76:16
**advance (2)** 69:19;94:1
**advances (1)** 71:5
**advantage (3)** 51:22;70:20;96:19
**adversary (1)** 65:14
**advised (1)** 82:15
**Aetna (3)** 12:24;15:14;65:11
**affecting (1)** 95:20
**afford (1)** 55:6
**afternoon (4)** 15:20;83:20;85:3,3
**Again (13)** 29:22;53:1;54:21, 24;55:23;62:14;63:9, 18;65:3;75:13;76:14; 79:9;85:4
**against (8)** 8:15;42:20;66:17; 69:12;74:12;77:4,6; 84:13
**aggregate (5)** 87:6,10,12,19,22
**aggressively (2)** 93:4;95:10
**ago (2)** 49:9;78:9
**agree (11)** 25:20;26:20;31:6; 50:13;52:2;64:14; 82:12;93:8;95:5; 96:18;99:15
**agreed (8)** 13:9;16:10,13; 20:21;51:7;54:17; 61:7;93:1
**agreeing (2)** 40:2;86:5
**agreement (7)** 35:23;62:18;70:12; 80:3,13,15,16
**agreements (1)** 15:7
**agrees (1)** 70:3
**ahead (8)** 5:15;6:18,19;12:11; 61:2;64:23;75:17; 100:2
**aid (2)** 51:24;88:23
**akin (1)** 93:24
**Alameda (1)** 68:21
**Albany (3)** 56:10,24;82:24
**ALBERT (3)** 7:25;8:4,5
**aligned (6)** 18:18,24;19:20; 21:5,25;23:19
**alignment (1)** 9:7
**allegation (2)** 52:25;53:13
**alleged (2)** 43:6,6
**allegedly (1)** 44:9
**allow (8)** 18:25;69:23,25; 76:2;86:5;88:5;90:16, 20
**allowed (5)** 13:2;45:21,21; 57:17;60:10
**allowing (2)** 86:7;96:5
**allows (2)** 69:12;101:3
**almost (1)** 53:20
**along (7)** 21:1;31:11;32:13; 59:7;93:2;95:16; 96:20
**alongside (1)** 6:15
**although (1)** 27:22
**always (3)** 14:14;27:21,22
**amalgam (1)** 39:11
**America (4)** 7:9,12;29:24;75:16
**among (5)** 56:9;80:7;88:16; 93:18;96:8
**amount (4)** 86:22,25;89:24; 90:12
**amounts (1)** 88:6
**analogous (2)** 94:23,23
**analysis (2)** 33:11;34:15
**ancillary (2)** 44:14,17
**Anderson (1)** 68:11
**Andrew (2)** 7:15;85:4
**annulled (1)** 93:17
**answered (1)** 61:1
**anticipated (1)** 81:10
**apiece (1)** 69:3
**apologize (3)** 44:21;52:20;60:24
**appearances (4)** 5:7;7:1,22;8:14
**appeared (1)** 47:18
**appearing (5)** 6:2,14,17;7:19; 55:24
**appears (1)** 50:8
**Appellate (1)** 100:12
**applicable (2)** 87:19,22
**apply (1)** 57:16
**appointing (1)** 28:23
**appreciate (13)** 6:24;16:24;31:15; 34:8,25;45:18;48:17; 49:7;60:16;85:1; 91:14;99:22;100:7
**appreciated (1)** 91:11
**approach (3)** 14:5;19:22;25:18
**approaches (1)** 13:22
**approaching (2)** 66:12;95:21
**appropriate (8)** 12:12;13:1;37:8; 60:19;73:7;92:17; 95:3,9
**approval (1)** 82:12
**approve (1)** 87:18
**APRIL (4)** 5:1;47:9,18;48:12
**Archdiocese (1)** 46:15
**arguably (3)** 69:18;74:12,15
**argue (6)** 13:12;18:3;28:6; 51:15,18;76:9
**argument (4)** 12:21;53:2;54:13; 68:4
**arguments (3)** 72:15;83:21;92:8
**Arizona (1)** 16:7
**around (2)** 23:19;37:17
**arranged (1)** 24:4
**art (2)** 44:22;47:23
**article (3)** 48:21,24;49:6
**asbestos (2)** 68:22;75:1
**aside (1)** 94:7
**aspects (1)** 37:7
**assert (1)** 12:17
**asserted (1)** 85:15
**assertion (2)** 46:11,14
**assess (1)** 97:14
**assessed (1)** 93:19
**assets (5)** 55:6;69:12,16; 72:14;84:12

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 106 of 122

**assigns (1)**
84:13
**assist (1)**
44:8
**associated (2)**
6:2;84:13
**assume (2)**
39:15;92:20
**assuming (3)**
51:18;91:4,5
**astonishing (1)**
47:24
**attached (2)**
46:5,10
**attacked (1)**
49:13
**attempted (1)**
67:20
**attention (2)**
57:9;60:19
**attitude (2)**
21:25;42:7
**attorneys (1)**
60:2
**attorney's (1)**
100:18
**attributable (1)**
27:11
**Atty (3)**
6:13,15;55:24
**authority (1)**
78:3
**authorize (1)**
10:14
**automatic (5)**
52:3;57:8,20;69:17;93:15
**availability (1)**
85:8
**available (4)**
86:17,17,22,25
**avenues (1)**
55:11
**awaits (1)**
27:1
**aware (1)**
92:9
**away (5)**
20:17;26:15,16;74:1;86:24
**awful (1)**
95:19

## B

**back (20)**
13:24;24:15;26:23;30:21;43:11,13;44:5;51:17;66:7;69:7;70:3;73:11,13;74:5;82:3,7;86:13;97:9;98:1;99:20
**bad (7)**
17:19;27:15;41:5;66:3;92:11,13;96:15
**badly (1)**
54:6
**Bair (2)**
6:14;55:25
**ball (2)**
27:18;43:1
**bankruptcies (1)**
75:1
**bankruptcy (25)**
9:14;44:16;46:22;52:5,9;53:14,16,16;56:9;63:22;69:10,11,18,20,23;76:6;77:9;78:5,14;80:7,22;88:7,12;93:13;96:19
**banks (1)**
69:20
**bar (1)**
81:4
**based (9)**
25:6;52:24;54:10;55:12;66:8;85:6;87:23;90:25;94:12
**basic (2)**
26:21;32:16
**basically (5)**
18:4;22:6;64:18;93:8;100:10
**basis (3)**
68:9;92:21;97:14
**bears (1)**
82:25
**become (6)**
18:10,17;19:13;29:1;86:12,16
**becomes (2)**
19:17;87:1
**bedrock (1)**
30:9
**began (1)**
90:8
**begged (1)**
90:11
**begin (6)**
42:10;45:8,10;92:9;94:25;95:18
**beginning (4)**
16:1;27:9,10;38:18
**begun (1)**
64:4
**behalf (18)**
6:2,9,14;7:8,12,16,19;8:5,8;9:21;15:6;47:7;49:19;55:24;72:17;75:16;79:25;90:5
**behind (2)**
19:14;58:24
**believes (1)**
88:22
**bellwether (2)**
39:12;45:1
**bellwethers (2)**
42:1;65:18
**beneficial (1)**
94:22
**benefit (7)**
44:14,17;53:25,25;89:19;95:1,2
**benefits (1)**
93:20
**Benvenutti (1)**
8:5
**best (6)**
50:25;52:8,9;76:4;92:17;93:1
**bets (1)**
73:22
**better (5)**
20:24;22:25;51:21;63:5;77:19
**big (6)**
16:18;18:14;23:4;32:25;33:18;93:16
**bigger (1)**
26:25
**bills (1)**
12:15
**Binder (1)**
5:10
**bit (6)**
33:23;37:7;45:17;54:4;94:14,15
**Black (1)**
7:19
**blindsided (1)**
55:21
**board (2)**
17:9,13
**both (2)**
62:16;76:19
**bother (2)**
42:7,8
**bound (1)**
86:3
**box (1)**
95:23
**boy (1)**
57:17
**breached (1)**
53:7
**breaches (1)**
24:18
**break (8)**
6:24;9:16;91:6,11,20,21,21;92:5
**breech (1)**
19:24
**Brent (6)**
6:8;15:5;47:6;49:8,18;90:5
**Brian (2)**
5:14,19
**bridge (1)**
59:14
**brief (6)**
11:10;59:23;60:4;75:22;80:6;88:2
**briefing (2)**
57:5;59:25
**briefly (4)**
64:1;80:1;82:5;83:19
**briefs (2)**
37:15;80:2
**bring (8)**
19:24;35:5;48:16;57:9;60:19;68:13;72:22;86:10
**bringing (1)**
48:5
**brings (1)**
85:21
**broad (1)**
44:10
**BROSNAHAN (104)**
5:14,14,17,19,19,23;9:11;10:24;11:1,4,8,13,15,17,20,22,25;12:4,10,13,21,23;13:17,19;14:4,7,10,14,17,20,23;15:1,11;31:17,18,23,25;32:3,5,12,20,24;33:2,6,10,13,16,18,22,25;34:2,6,10,14,18,24;35:1,4,7,11,14,17,23;36:1,4,8;41:12,13,17,19,22,24;43:12,16,18,22;44:1,4,14,18,21,24;45:3,6,9,12,16,25;46:3,22,25;47:2,4;82:8;87:5,8,17,25;91:10;92:5;99:14,17,20,23
**Brosnahan's (2)**
10:17;19:11
**brought (4)**
48:24;80:9;81:12;82:23
**browbeat (1)**
84:21
**buckets (1)**
38:9
**Bucki (1)**
81:13
**Buffalo (5)**
56:6;57:3;81:1,16;82:25
**built (1)**
23:18
**bulk (2)**
16:18;100:15
**bullet (1)**
54:9
**bunch (3)**
35:8;71:11;76:17
**burden (2)**
39:25;76:15
**buried (1)**
25:11
**Burns (8)**
6:14,15;48:19,21,23;49:2,5;55:25
**bus (2)**
74:2,10
**business (6)**
50:16,21;63:11;66:16;90:9;95:9
**busy (1)**
12:15
**by-document (1)**
30:4

## C

**cabining (1)**
52:9
**CALIFORNIA (9)**
5:1,5,11,21;26:24;59:17;73:25;74:1;100:12
**Call (2)**
5:3;17:3
**called (4)**
65:21;74:2;82:11;87:13
**Calling (1)**
5:4
**calls (1)**
77:13
**came (4)**
46:13,16;49:14;73:11
**Can (58)**
7:3;10:15;20:14,22;22:11;25:3;30:13;32:6;34:19,21;36:4,15,23;37:2;39:4;41:18,19;42:17,25;43:3,17,17,18;45:23;46:24;51:2,14;52:7;59:12,14;60:18;63:2;70:23,25;71:10,11;73:4,22;77:17;82:20;83:7;84:21;85:7,11;86:12;90:1,21;91:12;94:14;95:19,24,25;96:1,2;98:13;100:25;101:19;102:3
**card (1)**
14:2
**care (1)**
7:21
**career (2)**
49:2;67:22
**Carey (1)**
49:22
**carrier (3)**
35:8,17;42:23

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 107 of 122

**carriers (10)** 21:18;22:8;30:21;35:8;42:9;64:9;70:2;74:4;80:23;82:9
**carve-out (1)** 25:23
**carving (1)** 31:10
**case (104)** 5:5;18:23;19:21;20:25;21:20;27:21;28:4,11,16,25;29:12;37:15;38:19,23;40:25;42:12,15,16,16,24,25;43:22;44:15;45:15;47:17;50:10;51:17;52:11,20;53:9,17,18,20,21;55:4,5;56:6,7,8;57:6,23;58:1,9,15;59:1;60:8,11;61:8;62:24;64:8,8;65:2,7,15;68:3,24;69:5,14;71:5;72:13,22;73:9,10,14;76:10,12;78:3,4,12,12;80:19,20,22,25;81:1,3,4,8,9,11,24;82:4,19,24;83:21;84:17,22;87:13,13,14;88:9,13,25;92:12,13;93:10;94:2,22;95:4,5,8,9,11;96:22
**cases (119)** 18:19,25;19:3;20:18;22:4,6,9;23:3;24:4;26:24;28:21;30:8;32:6;37:17;38:3,4,9,17;39:11,11,16,19,20,20;40:3,3,13,14,23,24;41:5,7,8,9;42:2,4;43:1,4,9,16,19,23;44:11;46:4,8;54:11;56:6,13,21;61:9,10,19;62:4;64:6;65:16,18,20;66:8,23;67:11;68:13;69:3,7,24;70:1,2,10,11,12;71:8,11;73:6,8,19;74:25;75:4,5;76:2,13,14,16,22,24;77:20,25;78:1;80:5,6,10,21;81:17,20,21,25;82:17;83:3,5,6,9,14,24;84:1,21;85:6,9,11,18;86:6,8,14;87:11;89:18;92:10;93:3;94:11,17,18;98:2;101:6
**case's (1)** 77:16
**cast (2)** 92:16,18
**catalyze (1)** 59:4
**categorical (7)** 12:8;19:9,10;24:25;25:11;30:2;32:17
**categorically (2)** 13:7;19:12
**categories (1)** 30:16
**category (5)** 30:18;31:10;33:11;43:5;99:9
**cats (1)** 36:18
**cause (5)** 67:20;76:15;78:17;93:11;94:1
**Center (3)** 57:25;60:9;80:20
**certain (1)** 48:21
**certainly (5)** 45:25;59:13;60:13;87:10;96:19
**cetera (4)** 17:14;18:21;19:25,25
**chairman (1)** 72:9
**chance (2)** 86:19;97:13
**change (5)** 21:3;23:6;49:2;69:4;98:8
**changed (3)** 21:6;84:3,3
**changes (1)** 23:2
**chart (1)** 9:2
**chastised (1)** 66:25
**chat (2)** 75:11;79:19
**Chatterjee (1)** 38:10
**chatting (1)** 101:25
**cheek (1)** 48:1
**chews (1)** 39:2
**choice (1)** 16:8
**choose (3)** 78:3;89:15;94:6
**chose (1)** 93:18
**chosen (1)** 64:14
**Chris (1)** 6:4
**Chronicle (1)** 49:15
**Chubb (1)** 42:12
**circumstances (5)** 61:21;67:5;81:24,25;93:24
**cited (2)** 53:16,20
**citing (1)** 53:18
**claim (8)** 19:24;42:17,20;74:12;77:9;88:6,18;97:2
**claimant (4)** 71:6;72:8,24;77:7
**claimants (18)** 28:5,23;43:4;68:5,6;69:11;72:18,18,19,20;77:3,10,11,12;86:2,7,18;96:8
**claimants' (2)** 78:10;87:20
**claimant's (1)** 97:2
**claiming (1)** 69:11
**claims (19)** 18:21;19:4,6,15;21:21;43:23;44:8;57:16;71:19;74:14,16;81:8,9,11;88:12,14;89:16,23;94:22
**clarity (1)** 98:7
**clause (3)** 24:25;100:9;101:16
**clear (5)** 16:1;17:23;39:7;64:25;92:1
**clearing (1)** 92:24
**clearly (2)** 21:14;46:4
**clergy (1)** 42:20
**CLERK (2)** 5:4;92:2
**client (7)** 13:4;15:12;26:9;36:16;70:16,21;84:15
**clients (1)** 27:22
**close (2)** 27:25;76:23
**closed (1)** 81:4
**closely (1)** 66:16
**closer (1)** 76:25
**closing (1)** 81:5
**CNA (4)** 79:25;80:17;82:10,12
**Code (1)** 69:18
**codefendants (1)** 46:14
**cognizant (1)** 61:25
**coincidence (2)** 71:24,25
**collaboratively (1)** 62:22
**colleagues (3)** 63:22;65:3;94:18
**collect (3)** 35:12;51:10;53:3
**collection (1)** 70:9
**Collectively (2)** 51:8;55:7
**collectivist (1)** 51:19
**colloquial (1)** 41:2
**coming (7)** 30:21;37:17;55:1;62:1;81:9;93:12;98:1
**commencing (1)** 91:7
**comment (1)** 80:5
**comments (1)** 75:22
**commercial (1)** 70:1
**committed (1)** 83:13
**committee (77)** 6:7,9;8:5;9:4;10:11;12:2,5,7,16;13:6;15:3,6;16:7;17:25;18:17,24;19:5,13;20:21;22:6;31:9;33:8;38:1;40:3;43:9;46:21;47:7;49:19,19;50:12;51:7;52:25;53:3,8;54:18;55:25;56:20;57:12,13,20;58:1;62:7;64:5,21;66:19;67:3;68:8,14;70:7;71:20,24;72:9,12;76:1;79:19;80:9,14;82:15;83:3;85:6,9,13;86:11;88:1,14,19;89:3,12;90:1,6,9;92:2;93:1;96:9,10,24;97:24
**committees (1)** 39:2
**committee's (8)** 10:18;46:6,10;50:4;64:14;80:6;89:20;93:25
**communications (2)** 19:11,13
**companies (7)** 13:9;14:5;40:20;41:1,2;60:20;79:25
**Company (6)** 7:8,12;8:9;29:24;63:21;75:16
**complete (2)** 16:20;61:9
**completely (1)** 67:18
**complicated (1)** 74:17
**compromise (2)** 16:25;37:3
**compromises (1)** 16:3
**conceded (1)** 53:15
**concept (7)** 9:23;39:12;44:8;45:3;88:10,15;89:14
**concepts (1)** 40:12
**conceptual (1)** 27:22
**concern (7)** 19:2,14;42:2;43:6;46:20;90:13;99:6
**concerned (7)** 16:17;18:13;58:19,21;61:3;62:8;96:7
**concerns (5)** 10:21;31:11;36:15;62:25;90:16
**conclude (2)** 81:17;94:11
**concluded (1)** 102:5
**conclusion (2)** 37:18;55:9
**concrete (1)** 85:16
**conditioned (1)** 93:17
**confer (2)** 34:4;36:23
**conference (1)** 97:14
**conferring (1)** 36:22
**confident (1)** 70:25
**confidential (4)** 100:11,15,24;101:4
**confidentiality (2)** 97:18;99:4
**confirm (1)** 77:13
**confirmed (1)** 80:18
**conflict (1)** 82:10

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 108 of 122

**conflicting (1)**
57:22
**confronted (1)**
81:22
**confused (2)**
45:25;46:11
**confusion (1)**
101:2
**Congress (2)**
52:6;93:18
**conjecture (2)**
55:12;76:12
**connected (1)**
18:8
**connection (2)**
21:7;74:20
**consensual (2)**
54:12;89:25
**consensus (1)**
17:24
**consent (1)**
13:8
**consequences (1)**
97:11
**consider (3)**
12:15;28:7;37:18
**considered (1)**
90:19
**consolidate (1)**
8:18
**constituents (1)**
62:10
**constitutes (1)**
57:8
**constructive (1)**
92:21
**consultation (2)**
22:4,5
**contemplate (1)**
13:22
**contemporaneous (1)**
81:5
**contentious (1)**
10:23
**contest (1)**
88:9
**context (5)**
62:9;69:22;81:2;93:6,8
**contexts (1)**
19:10
**Continental (1)**
8:8
**continue (2)**
36:23;56:14
**continues (1)**
78:6
**continuing (1)**
38:22
**contract (5)**
23:14,16,20;24:3,8
**contracts (1)**
23:18
**contractual (3)**
18:21;19:1;24:7
**contrary (1)**
19:1
**contribute (2)**
49:5;86:23
**contribution (1)**
84:12
**control (1)**
88:11
**convenient (1)**
91:17
**conversations (1)**
89:2
**convoluted (1)**
47:23
**cooperate (3)**
18:20;24:8;85:24
**cooperated (1)**
64:15
**cooperating (1)**
18:19
**cooperation (2)**
22:10;82:6
**cooperative (2)**
64:9;92:21
**coordinated (1)**
38:6
**core (2)**
68:1;69:22
**corrected (1)**
15:11
**correctly (1)**
67:4
**counsel (15)**
5:19;19:17;28:20;53:15;55:25;57:13;61:8;64:3,5,8;68:15;71:20;87:9;89:8,20
**counter (1)**
71:7
**countries (1)**
23:20
**country (3)**
37:17;50:12;90:15
**County (1)**
68:21
**couple (6)**
7:23;10:18,19,24;85:5;101:18
**course (10)**
19:5;20:1;23:16;28:7,10;30:22;31:6;49:2;77:25;79:6
**Court (415)**
5:3,7,12,15,18,22,24;6:3,7,11,16,25;7:3,5,10,13,17,21;8:3,6,10,13,22;9:3,6,9,15,18,25;10:4,7,12,16,25;11:3,7,12,14,16,19,21,24;12:3,8,11,20,22;13:13,16,18,21;14:6,9,11,16,17,19,22,24;15:3,8,13,15,17,19,23;16:2,5,9,12,16,21;17:4,8,10,12,15,17,20;20:3,6,9,14,16,19;21:12,14,23;22:2,13,15,18,21;23:4,8,11,15,17,21,24;24:2,6,11,14,17,20,23;25:1,5,7,9,12,16,21;26:1,7,11,14,17;27:2,5,8,11,13,16,24;28:3,13;29:3,5,8,13,15,17,19,23,25;30:3,5,23,25;31:2,13,15,22,24;32:2,4,11,14,23,25;33:3,9,12,15,17,20,23;34:1,3,8,13,17,20,25;35:2,6,10,13,16,21,25;36:2,7,9,13,20,25;37:4,6,10,13,20;38:5,7,12,15,20,24;39:4,6,22,23;40:1,5,9,12,21;41:4,6,15,18,20,23;43:11,13,17,21,25;44:3,5,16,19,23;45:2,5,8,11,14,17;46:2,18,20,24;47:1,3,5,10,13,16;48:8,11,14,17,22;49:1,4,7,9,21,24;50:2,7,14,18;51:5,14;52:2,13,15,16,18,22;53:5,22;54:25;55:10,14,18,20;56:1,8,12,18,25;57:2,13,14,17;58:5,7,10,17;59:3,6,10,19,21,25;60:4,12,14,16,23;61:2,5,6,9,13,17,20;62:2,5,6,13,17,20,23;63:1,3,6,8,10,13,15,20,24;65:5,8,10,12,23,25;66:3,6,9;67:2,8,14;69:10,12;70:25;71:3;72:6,10,23;73:15;74:19,22;75:2,9,14,17,20,23,25;76:2,18,20;77:11,23,25;78:7,15,18,20,23;79:2,8,9,11,14,16,18,23;80:13;82:3;83:16;84:23;85:1;86:20;87:2,4,7,16,24;88:1;89:1,2,10;90:3;91:2,12,17,21,24;92:4,7;93:21,21;98:1,6,10,12,15,21,24;99:1,2,5,7,10,11,13,16,17,19,22,24;100:2,4,7,12,13,14,24;101:7,9,12,14,21,23,25;102:4
**courthouse (4)**
69:9,19;76:23;77:3
**courtroom (8)**
5:8;6:17,19;7:5,21;10:14;50:1;90:14
**courts (3)**
37:17;61:21;80:8
**court's (2)**
61:15;78:2
**coverage (24)**
21:21,22;28:17,18;33:11;34:14;39:20,21;40:4,6;42:8,12;74:4,6,9,14;85:12,12,22;86:3,4,24;89:21,24
**COVID-19 (1)**
81:6
**create (8)**
39:25;42:2;45:6;74:10;83:10;85:12;96:17;101:2
**creating (2)**
74:16;95:23
**creative (1)**
8:21
**credibly (1)**
43:7
**credit (1)**
54:17
**creditor (2)**
84:14;93:11
**creditors (4)**
69:20;76:7;88:5,17
**critical (1)**
70:14
**critique (1)**
41:10
**cross (1)**
59:14
**crux (1)**
66:10
**culminated (1)**
64:24
**Cunningham (2)**
38:4,8
**cure (5)**
25:2;26:10;100:25;101:17,17
**curious (2)**
41:11;47:17
**current (2)**
12:25;79:13
**currently (1)**
52:21
**Curtis (1)**
93:23
**cut (2)**
29:19;80:15
**cuts (1)**
76:19
**CVA (3)**
81:4,5,5
**cycle (1)**
78:6

**D**

**D&O (1)**
70:1
**damage (1)**
19:20
**danger (1)**
39:22
**dangerous (2)**
23:12,13
**date (3)**
9:23;12:18;81:4
**dates (2)**
30:18;81:18
**day (9)**
47:8,9,10;48:13;68:6;77:11;82:14;90:7;91:22
**days (3)**
16:23;38:18;48:3
**dead (1)**
17:23
**deadline (1)**
81:15
**deal (5)**
18:12,14;23:4;33:1;71:13
**dealing (2)**
20:17;35:8
**deals (1)**
23:22
**debtor (62)**
5:10,13,21,24,25;9:4;16:7;17:1;18:18;20:21;21:19;23:9;37:11;38:1,1;50:12,16,20;51:7;52:11,12;53:19;54:17;55:7;61:7,14;62:7;64:17,25;65:17;66:12,17,21;67:4;69:6;76:1,16;77:17,21;78:5;79:6,19;81:14;84:11,13;85:6;86:1,5;88:1,22;89:4,12,20;90:1,8;92:25;93:9,12,19,24;96:10;97:24
**debtor-in-possession (1)**
5:11
**debtors (3)**
21:17;22:8;91:15
**debtors' (2)**
63:15;84:9
**debtor's (6)**
53:25;64:3;77:13;89:9;94:3;95:8
**December (2)**
64:16;82:13
**decide (3)**
13:24;54:1;72:17
**decided (3)**
53:7,8;55:7

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 109 of 122

**decision (3)**
58:24;92:19;93:21
**declaration (1)**
66:16
**deemed (2)**
100:23;101:4
**deeply (1)**
40:10
**default (1)**
22:24
**defend (4)**
18:12,19;24:4;54:2
**defendant (3)**
65:20;88:8,8
**defended (3)**
19:3,16;28:21
**defending (2)**
19:16;20:18
**defense (10)**
18:13,21;19:4,6,16;20:11;22:1;25:15;28:20;42:24
**defer (2)**
11:1;70:9
**defied (1)**
58:3
**definition (1)**
69:13
**delay (1)**
82:25
**delaying (1)**
82:19
**demand (5)**
57:7,19,25;58:3;59:8
**demands (4)**
58:12;60:9,10;86:13
**demand's (1)**
60:1
**denied (3)**
58:8;62:11;79:1
**Dentons (2)**
7:16;8:11
**deny (2)**
28:8;81:23
**denying (1)**
20:3
**deployed (3)**
52:6;53:24;93:17
**derogatory (1)**
44:19
**describe (2)**
66:3;97:22
**described (1)**
80:14
**describes (2)**
30:15;47:20
**description (2)**
8:24;80:12
**designate (2)**
99:8;100:10
**designated (1)**
6:5
**designation (1)**
99:4
**despite (1)**
76:4
**detail (1)**
97:20
**detailed (1)**
76:5
**determination (1)**
50:17
**determinations (1)**
96:13
**determine (1)**
30:11
**determined (3)**
74:3,9;90:19
**detrimental (2)**
85:7,10
**detriments (1)**
93:20
**develop (1)**
67:18
**developed (1)**
19:4
**development (2)**
10:22;67:18
**devoted (1)**
27:12
**dialog (1)**
62:6
**dictating (1)**
63:10
**differences (1)**
73:25
**different (15)**
19:21;21:14;22:10;25:18;31:20;39:10;50:11;52:21;59:13,16;62:9;78:10;81:25;82:18;92:18
**differently (2)**
21:2;86:11
**dilatory (1)**
92:13
**diocesan (1)**
84:1
**diocese (7)**
8:16;55:5;70:11;80:20;81:10,15;95:6
**directly (1)**
74:13
**disagree (2)**
25:19;50:25
**disagreement (1)**
10:10
**discharge (1)**
22:16
**disclose (3)**
19:12;71:25;72:3
**disclosed (5)**
25:3,10;67:12,23;68:7
**disclosure (4)**
13:8;20:10;32:17;67:21
**discovered (1)**
85:11
**discovery (2)**
81:17;85:16
**discrimination (5)**
68:2;69:14;74:24;86:13;88:10
**discriminatory (1)**
28:22
**discuss (1)**
37:1
**discussing (2)**
9:11;36:16
**discussion (10)**
26:4,23;28:25;40:19;56:9,11;64:24;68:17;71:15;80:7
**discussions (1)**
40:18
**disengagement (1)**
66:11
**dismiss (1)**
80:22
**dismissed (1)**
88:9
**disparate (1)**
77:12
**disposition (1)**
97:1
**dispute (2)**
14:13;18:8
**disputes (3)**
21:21;28:19;30:24
**distracting (1)**
58:21
**distribution (2)**
71:17;88:16
**divided (1)**
38:9
**document (7)**
20:15;30:2,10,11,17;31:7;98:22
**document-by- (1)**
31:6
**documents (18)**
12:1;16:18;18:16;28:21;30:16,22;31:8,10;34:12,16;99:4;100:16,18,20,23;101:3,5,11
**dogs (3)**
41:3;65:22;66:1
**dollars (5)**
28:1;69:1,2;87:14,20
**dominant (1)**
44:22
**dominate (1)**
71:15
**done (5)**
45:22;49:9;57:11;71:14;88:25
**down (11)**
17:2;22:22,24;29:11;50:9;51:1;53:10;55:11;56:14;90:12,12
**dozens (1)**
83:23
**draft (1)**
34:15
**drafting (2)**
58:9,9
**drag (1)**
32:1
**dragged (1)**
54:12
**dragging (1)**
92:22
**drive (4)**
52:17;54:20,23;55:4
**drives (3)**
76:11,21;80:10
**driving (2)**
65:17;81:19
**dropped (1)**
47:22
**due (1)**
43:4
**during (1)**
85:11
**duties (1)**
86:15
**duty (5)**
50:22;51:8;53:4,7;72:17
**dynamic (4)**
73:9;78:8;96:15,16

## E

**earlier (2)**
10:10;97:18
**early (2)**
59:1;68:18
**easier (1)**
28:1
**echo (2)**
75:21;82:5
**echoing (1)**
75:24
**economic (12)**
18:20,22;23:10;42:2;45:7;66:13;70:17,20;71:1;73:1,2;74:11
**economically (3)**
21:25;23:19;72:25
**economics (1)**
22:10
**effect (4)**
20:23;51:21;85:7;96:21
**effectively (2)**
9:23;88:11
**effort (2)**
18:25;19:8
**efforts (3)**
37:14;76:4;101:17
**eighteen (1)**
77:16
**either (2)**
13:22;68:7
**either/or (1)**
90:22
**elements (3)**
43:2,3;66:8
**Ellen (3)**
7:11;29:22;63:19
**elongated (1)**
94:15
**else (26)**
5:12,24,25;6:17;7:5;12:20;29:20;31:16;34:9;35:1,2;45:19;46:9;48:18;55:15;63:15;71:10;75:10;79:4,18;83:17;84:9;88:25;93:14;95:18;97:14
**email (3)**
34:11;46:8;67:17
**emails (2)**
26:4;82:7
**embarrassed (1)**
15:12
**emphasize (1)**
31:19
**enable (1)**
88:6
**encompass (1)**
96:12
**encourage (1)**
74:5
**end (5)**
27:9;51:17;52:23;55:6;68:18
**enforce (3)**
23:20;77:4,5
**engage (2)**
73:21;83:4
**engagement (2)**
26:20;74:6
**engaging (1)**
93:5
**engineer (1)**
71:12
**enough (4)**
30:9,10;62:9;94:13
**ensuring (1)**
23:19
**enter (3)**
56:15;99:11,18
**entered (2)**
100:13,25

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 110 of 122

**enthusiastic (1)**
29:4
**entire (2)**
23:13;98:8
**equal (2)**
77:14;88:16
**equitable (2)**
29:14;71:17
**especially (2)**
61:25;85:17
**essentially (3)**
58:2;64:18;81:8
**estate (8)**
12:13;39:25;51:7;62:5;74:12,13;77:4;90:18
**et (4)**
17:14;18:21;19:24,25
**EVANSTON (2)**
7:18,19
**eve (1)**
87:14
**even (17)**
19:6;24:1;26:6;28:9,24;31:4;34:11;37:22;56:20;58:3;67:20;71:4,16;76:3,23;77:1;82:4
**events (1)**
92:10
**evergreen (1)**
78:25
**everybody (10)**
18:1;45:22;47:16;51:24;56:16;59:12;67:3,5;93:5;97:9
**everybody's (2)**
96:13;97:1
**everyone (3)**
46:9;50:1;82:2
**evidence (1)**
84:5
**exact (3)**
34:4;41:1;67:25
**Exactly (10)**
31:1;38:14;48:14;52:1;63:12;68:17,18;69:4,5;71:9
**example (2)**
57:23;85:10
**examples (2)**
80:8,10
**Except (1)**
31:23
**excess (3)**
42:4,7,9
**exchange (4)**
19:23;33:7;34:11;73:14
**excited (1)**
52:3
**exclusion (1)**
77:12
**exclusivity (1)**
77:18
**exculpatory (1)**
13:5
**excuse (3)**
37:19;57:3,12
**exercise (1)**
72:16
**exercising (1)**
66:15
**exhausted (2)**
86:12,16
**exhaustion (2)**
86:25;87:8
**exist (1)**
53:18
**expect (3)**
40:24;79:3;93:11
**expedite (3)**
61:8;62:24;63:1
**expenses (1)**
42:24
**expert (2)**
48:20;89:20
**explain (3)**
25:24;50:25;73:17
**explanation (2)**
70:8;71:8
**explicitly (1)**
70:4
**explosion (1)**
73:14
**exposure (1)**
42:11
**expressly (1)**
81:2
**extend (1)**
77:17
**extended (1)**
81:6
**extensive (1)**
100:11
**extent (6)**
39:12;40:11;71:5;88:18;89:11;96:2
**extraordinary (2)**
67:10;78:1
**extreme (2)**
19:2;43:5
**extremely (3)**
18:13;87:1;100:11
**eyes (1)**
100:18

**F**

**face (1)**
95:25
**fact (17)**
9:5;20:20;21:5;22:3;23:6;33:7;39:19;46:12;48:6;51:9,16,20;54:10;87:22;96:3,7,23
**factor (2)**
41:25;60:13
**factors (2)**
93:23;95:12
**facts (5)**
50:19;55:4,13;64:5;85:10
**fails (1)**
90:21
**fair (2)**
58:17;97:1
**fairly (2)**
32:16;44:20
**faith (8)**
27:15;83:13;84:7;85:24;88:14;92:11,11,13
**fall (2)**
40:16;43:4
**falls (1)**
53:1
**Famous (2)**
29:3;68:23
**far (7)**
17:24;35:17,18;47:7;81:9;84:16;85:22
**Farrell (22)**
7:11,11,14;29:22,22,24;30:1,4,6,24;31:1,3,14;63:18,19,21,25;65:6,9;76:5;80:2;83:22
**Farrell's (1)**
82:5
**fascinating (1)**
52:10
**fashion (2)**
48:18;95:10
**fast (1)**
38:22
**fastball (2)**
47:14,24
**faster (1)**
69:10
**Fau (1)**
68:11
**favor (1)**
96:5
**February (1)**
66:18
**feel (3)**
45:9;59:7;65:14
**feelings (1)**
66:4
**fees (2)**
39:3;58:8
**fell (1)**
99:9
**fellows (1)**
71:15
**few (8)**
5:7;48:3;50:23;69:20,20;70:11;88:5;94:7
**fiduciaries (3)**
51:6;90:18,18
**fiduciary (4)**
50:22;53:4,7;72:16
**field (1)**
92:24
**fifteen (2)**
37:19;64:3
**fifty (1)**
75:3
**fight (1)**
42:23
**file (3)**
58:1;81:14,16
**filed (9)**
38:19;46:5;50:12;84:1,10;85:22;87:17;99:1;100:9
**filing (3)**
42:20;77:16;87:15
**filled (1)**
89:7
**final (3)**
86:16;89:6,17
**Finch (5)**
47:9,10,17;48:18;82:14
**find (4)**
40:3;73:20;75:5;92:13
**finding (1)**
85:16
**Fine (9)**
7:2;8:22;16:10;26:11;34:6;39:13;66:22;89:13;101:1
**firm (1)**
57:17
**firmly (1)**
93:15
**first (14)**
6:19;10:15;11:9;15:11;16:8;17:2;40:7;41:21;46:21;69:24;72:13,14;90:21;94:5
**five (6)**
56:7;57:1;64:16;81:3;91:10;94:11
**fixed (1)**
10:20
**flat (1)**
53:1
**flexibility (1)**
52:8
**floor (1)**
47:2
**flying (1)**
68:19
**focus (8)**
42:10;45:17;78:22;82:19,20;83:4;84:20,22
**focusing (3)**
45:12;77:19;84:20
**folks (4)**
7:24;14:12;71:9;97:8
**follow (2)**
30:1;56:14
**followed (1)**
80:16
**following (1)**
57:19
**Fool's (1)**
48:13
**footnote (2)**
11:18;35:5
**fora (1)**
41:7
**forest (1)**
65:6
**forge (1)**
55:7
**form (2)**
10:11;64:18
**formulated (1)**
71:7
**formulation (1)**
77:22
**forth (1)**
26:23
**forty (1)**
42:6
**forward (52)**
8:19,23;9:22;18:25;20:12,22;21:8;25:23;28:18,18;38:10;39:9,11;40:8;44:1;46:21;58:11,16;61:11;63:17;65:1,18;66:12;68:9,13,16,25;70:19;71:22;72:22;73:3,18,24;74:7,11,13;76:2,5;80:21;82:14;83:3,5,7,14;85:9;86:5,6,8;91:4;95:10;96:6;101:25
**four (16)**
32:6;38:3;40:7,14;46:4,8;52:6;61:8;76:13;77:25;78:1;85:9,11;96:8;97:6;101:5
**fours (1)**
53:20
**fourth (2)**
42:15,16
**frame (2)**
26:18;94:8
**Franciscan (8)**
5:4,11,20;6:5,17;7:22;8:18;46:12

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 111 of 122

**Francisco (3)** 38:18;46:15;82:24
**Frank (2)** 8:1;83:20
**frankly (2)** 64:21;73:5
**French (1)** 47:22
**frequently (1)** 92:9
**Friars (11)** 5:5,11,20;6:18;7:22;8:18;17:1;19:11;42:22;43:7;46:13
**friend (1)** 65:15
**fruitful (1)** 18:5
**fulfilled (1)** 50:16
**fulfilling (1)** 50:21
**full (3)** 40:6;71:2;86:22
**full-blown (1)** 18:9
**full-fledged (1)** 18:11
**fulsome (1)** 70:7
**fun (1)** 95:15
**fund (1)** 35:11
**fundamental (1)** 69:23
**funds (2)** 51:13;89:19
**funny (1)** 26:9
**further (2)** 10:21;51:15
**future (1)** 54:8

**G**

**Gabrielle (1)** 8:4
**gap (1)** 28:1
**gasoline (1)** 73:13
**gave (1)** 6:24
**gears (1)** 37:6
**General (8)** 7:8,12;9:14;29:24;30:18;63:21;75:16;88:4
**generally (2)** 17:13;22:23
**generis (1)** 70:11
**genius (1)** 48:2
**gentleman (1)** 49:10
**George (1)** 47:18
**George's (1)** 49:5
**gestalt (1)** 20:23
**gets (8)** 13:23;34:21;51:16,24;56:5;66:10;70:22;95:20
**given (8)** 18:16;29:9;33:3,4;49:15;51:19,20;74:15
**gives (4)** 14:2;19:2;39:13;40:15
**giving (4)** 50:4;51:21;70:10;91:6
**Glenn (2)** 58:5;80:22
**global (2)** 76:7,25
**goes (5)** 20:17;25:14;26:16;85:23;86:12
**Good (31)** 5:9;6:1,4,8,13;7:7,15,18,25;8:1,4,7,11;15:21;17:10,12,16;30:7;47:3;48:17;63:18;75:13,14;78:5;83:13,19;84:7;85:3,24;92:4,11
**gotcha (1)** 25:16
**grab (1)** 69:21
**grabs (1)** 55:16
**Grace (1)** 53:21
**grant (7)** 39:8;81:13;91:1;93:2;95:12;97:16,23
**granted (7)** 56:6;61:22;67:3,8;72:4;80:13;88:5
**granting (1)** 98:7
**grants (1)** 83:2
**grave (1)** 90:16
**Great (13)** 5:22;6:16;7:10,13;8:24;15:23;17:10;35:15;41:7;49:11;54:13;57:6;97:3
**greatest (2)** 40:14;47:19
**ground (1)** 57:17
**grounds (1)** 90:25
**group (4)** 69:13,13,15;90:14
**guarantee (2)** 70:22,23
**guess (7)** 8:18;12:25;35:4;36:21;51:18;72:25;81:24
**guessing (1)** 70:18
**guesswork (1)** 54:7
**guidance (1)** 58:13
**guide (1)** 21:16
**gun (1)** 66:22
**guy (3)** 49:11;72:7;92:23
**guys (6)** 15:4;45:19;68:23;73:4;91:3;101:25

**H**

**hairs (1)** 93:9
**Halberg (1)** 49:20
**half (2)** 65:15;81:11
**hall (1)** 9:16
**hand (1)** 64:1
**handle (1)** 34:19
**handled (2)** 40:24;89:16
**handling (1)** 9:13
**handshake (1)** 24:1
**happen (7)** 17:24;22:7;38:22;46:6;54:8;70:18;81:16
**happened (6)** 64:6;66:19;72:3;79:3;80:14;94:18
**happening (5)** 19:7;38:16,21;70:5;95:17
**happens (5)** 13:4;21:18;65:14;96:9,24
**happy (12)** 32:21;33:14;36:6;41:3,13;46:18;48:12,24;49:5;59:23;89:22;101:16
**Hard (3)** 51:11;53:10;66:24
**harm (1)** 95:2
**Harris (44)** 5:9,9,10;8:25;9:4,7,10,16,19;10:3,5,8,13;11:1,4;37:9,11,14,21;38:6,8,14,16,21,25;39:5,18,24;40:2,6,19,22;41:5,12,16,21;55:17,22;88:2;90:4;98:5,7,11,18
**Harvard (1)** 47:21
**head (1)** 66:22
**heading (1)** 30:25
**hear (16)** 14:12,15;23:8;39:7;41:17;45:22;54:3;60:20;63:16;64:3,4;69:17;72:14;79:14;88:1;99:25
**heard (15)** 15:3;18:2;19:23;36:11;50:5;59:17;66:7;67:5;69:6;72:4;73:24;75:18;89:23;90:20;97:17
**hearing (12)** 8:16,23;37:16;44:23;45:21;47:8;48:25;54:4;68:20;70:6;79:5;102:3
**heavily (2)** 48:21,23
**heels (1)** 92:22
**heightens (1)** 31:11
**held (1)** 100:17
**help (4)** 14:11;22:23;52:17;94:16
**helpful (4)** 21:1;58:22;62:10;97:20
**helps (1)** 45:17
**herd (1)** 36:17
**here's (2)** 17:20;54:10
**Herman (3)** 29:1;68:10;70:19
**hero (1)** 49:12
**heroic (1)** 94:4
**hey (2)** 20:11;22:4
**highlighting (1)** 60:16
**highly (2)** 61:25;70:25
**Himalayas (1)** 47:22
**himself (2)** 70:16;71:21
**history (3)** 40:15;54:11;64:5
**hoax (2)** 47:20;48:5
**hold (1)** 56:3
**holder (1)** 88:11
**honest (1)** 26:8
**honestly (4)** 21:20;31:4;62:13;71:7
**Honor (148)** 5:6,9,14,17,23;6:1,4,8,12,13,20,22;7:7,15,18,25;8:1,4,7,20,25;9:20;10:13,24;11:4;12:10,14,23;14:4,14,23;15:5,10;16:17;21:10;24:19;25:4;26:3,12;27:17,19;28:6;29:16;31:18;32:13,21;33:19;34:2,7;35:1;36:1,12;37:9,11;38:3,23;39:5,18;41:14,25;43:18;44:18;47:4,6,15;48:7,15,19;49:19;50:5,16,17,24;51:4,9;52:1,11,24;53:7,10,12,21;54:3,5,13;55:1,9,10,17,24;60:24;61:3,5;62:1,14,25;63:4,18;64:7;65:13,21;66:25;73:16;74:18;75:8,13;76:1;79:17,22,24;80:1,6,12,24;81:1,3,22;82:17;83:2,19,21;84:25;85:3;87:6,12,17,25;88:2,18,22;89:7,17;90:4,6,8,20,22,25;91:10,15;92:3;98:5,13,16;99:23;100:1,6;102:2
**hope (2)** 11:8;44:25

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 112 of 122

**hoped (1)** 50:3
**hoping (1)** 20:24
**horn (1)** 47:22
**horribles (5)** 53:11;54:5;90:11; 95:14,25
**hortatory (1)** 36:2
**hostile (1)** 93:22
**hour (1)** 47:25
**huge (1)** 28:4
**hundred (1)** 91:19
**hyperbole (3)** 27:14;54:7;55:12
**hypothetical (2)** 22:19;85:14

## I

**idea (4)** 38:1;40:15;56:14; 85:23
**ideas (1)** 8:21
**identified (1)** 80:5
**identifying (2)** 26:9;84:8
**identity (1)** 97:2
**Ignore (1)** 93:13
**ignored (1)** 64:18
**ignoring (1)** 52:8
**Illustrated (2)** 47:12,19
**Imerys (2)** 68:19;72:15
**immediately (11)** 28:15,19;29:1; 42:11;56:21;71:5; 74:11,13,16;82:11; 90:23
**impact (1)** 51:3
**impair (1)** 87:20
**implicate (1)** 42:4
**implicated (1)** 42:19
**implicates (1)** 42:12
**implode (1)** 54:5
**implodes (1)** 51:17
**importance (3)** 18:17;57:6;97:3
**important (18)** 18:10;19:17;20:1; 41:25;42:2,5,9,10,14; 44:20;45:8,10;57:21; 60:17;62:15;73:17; 92:16;94:1
**imposes (1)** 87:10
**impossible (1)** 27:25
**inappropriate (2)** 46:21;96:25
**Inc (3)** 5:5,11,21
**in-camera (2)** 30:21;31:3
**incentive (6)** 18:20;32:7,9;93:4; 95:3;96:3
**incentives (5)** 31:20;70:17;83:10; 95:23;96:17
**incentivized (2)** 72:25;83:3
**inclined (1)** 33:20
**include (1)** 39:10
**includes (2)** 39:12;83:25
**including (5)** 42:3;56:19;72:18; 80:17;98:8
**incredibly (1)** 48:1
**independent (2)** 27:20,21
**indicates (1)** 53:21
**indicating (1)** 50:20
**indicative (1)** 92:11
**indiscernible (2)** 91:16;92:6
**individual (5)** 51:22;60:1;74:14; 80:10;86:2
**individuals (2)** 96:23;97:12
**influence (1)** 71:20
**information (12)** 12:1;13:3,5;19:4, 15;25:14;26:21;30:9, 10;34:12,16;42:18
**informed (1)** 53:19
**in-house (1)** 49:10
**initially (1)** 81:10
**initiate (1)** 85:25
**inject (1)** 68:2
**injected (1)** 69:5
**injecting (1)** 28:23
**injunctive (1)** 43:23
**input (4)** 10:17;40:13;41:8; 64:21
**inquiring (1)** 57:15
**inquiry (1)** 58:22
**insistence (1)** 100:17
**instance (3)** 19:11;70:19;94:6
**instead (1)** 84:20
**insurance (41)** 5:20;7:8,12;8:9; 9:12;13:9;14:5;23:14; 29:20,24;31:16;35:8; 40:20;41:1,2;42:6; 43:2;55:25;60:20; 63:21;66:8;69:25; 70:4,13;72:19;75:10, 16;79:18,25;81:11; 83:17;85:7,8,18;86:6, 10,22;87:21;88:4; 89:17,18
**insurer (4)** 13:2;53:25;58:4; 84:15
**insurers (54)** 7:20;9:20,22;10:11; 11:8;13:9;14:21; 15:25;19:25;25:18; 32:9;33:11;35:12,19; 37:1,25;39:1,13;42:4, 7;43:20;50:9;53:19, 23;54:14;55:11; 57:11,18;59:22;60:7; 63:16,17;74:1;77:6; 80:15,17;82:19;83:8; 84:6,14,21;85:22; 86:15,23;88:24; 89:13,14,22;90:2,11; 94:4;97:5,19;98:3
**insurers' (8)** 10:21;53:15;57:5; 76:4;82:6,21,21;84:4
**intending (1)** 96:11
**intense (1)** 68:2
**interest (14)** 12:6,17;23:10,25; 24:5,9;66:13;70:20; 71:1,6;73:2;74:11; 88:24;93:2
**interesting (1)** 31:7
**interests (2)** 73:2;95:2
**interferes (1)** 61:4
**Intermediate (1)** 100:12
**internally (1)** 37:1
**intervened (1)** 49:12
**into (16)** 18:8,11;38:9;40:18; 43:5;47:8;60:15; 67:17;68:3;69:5,14; 73:6;77:13;84:21; 95:20;97:12
**intrigued (1)** 62:13
**introduce (1)** 74:1
**introduced (2)** 69:14;88:10
**introducing (1)** 74:23
**introduction (1)** 73:6
**investigation (1)** 18:20
**invoked (1)** 80:7
**involve (2)** 43:23;86:1
**involved (2)** 32:21;80:23
**involvement (1)** 64:20
**involving (1)** 70:1
**irony (1)** 54:13
**issue (35)** 11:22;12:23;13:10; 14:8;18:16;20:13; 24:24;26:18;29:16; 30:1;35:13;36:16,24; 40:8;46:23;47:19; 49:25;55:10;57:4,18; 58:14;59:23;60:17; 63:9;64:8;65:3,16; 70:25;74:23;87:6,8; 90:7,19;92:24;98:14
**issues (28)** 5:20;10:18;11:9; 15:1;16:14;17:22; 18:6,7,10,12;24:22; 25:25;27:23;36:23; 43:19;50:23;67:20; 74:6,9,17;78:16,17; 80:25;85:7,12,14,19, 25
**item (1)** 5:4
**iterative (1)** 92:21

## J

**Jacobs (1)** 80:22
**JAMES (2)** 6:1,2
**JCCP (6)** 22:7,25;38:4;39:9; 44:10;65:19
**Jeff (2)** 6:10;29:1
**job (2)** 63:11,13
**Johnson (1)** 45:13
**join (1)** 90:9
**joined (1)** 80:2
**joins (1)** 83:21
**joint (2)** 12:6,17
**jointly (2)** 40:2;93:1
**Judge (15)** 20:13;36:9;37:16; 38:4,8,10,12;57:23, 24;58:2,5,18;80:21; 81:12;94:19
**judges (1)** 56:9
**judgment (18)** 50:16,21;51:11,11, 16;66:16;68:24,24; 70:22;71:10;77:8; 78:2;86:3;90:9;94:24; 95:9;96:14,19
**judgments (6)** 20:25;44:24;77:4,6; 86:15,16
**July (5)** 64:11,12;77:16; 100:17,20
**jump (1)** 28:2
**jumping (1)** 20:12
**jurisdiction (2)** 61:10,16
**jury (1)** 85:16
**justification (3)**

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 113 of 122

44:7,11,12
**justifications (1)**
44:6

## K

**Kaitlin (2)**
7:7;75:15
**Katherine (1)**
49:20
**Kazin (4)**
69:2;70:15;72:15;
73:6
**keeping (1)**
68:3
**Keiner (2)**
6:4,4
**Keller (1)**
8:5
**Kermit (2)**
49:10,17
**Kim (1)**
8:5
**kind (14)**
17:2,5,7;22:11;
30:25;41:2;48:2;
58:18;65:15;83:25;
88:2;91:21;93:10;
98:3
**kinds (1)**
43:20
**Kinsella (2)**
57:24;58:18
**knife (2)**
24:15;49:13
**knock (1)**
29:10
**knots (1)**
71:11
**knowledge (1)**
85:17
**knows (1)**
74:7
**Kubitz (2)**
49:10,17

## L

**lack (1)**
20:23
**laid (2)**
28:15;66:19
**language (14)**
13:13;14:7,18;
30:13,14,14;34:4,21;
53:18;87:10;97:21;
99:5;100:22;101:15
**large (5)**
84:1;88:6,11,12,18
**largely (2)**
16:13;69:6
**largest (1)**
35:17

**last (7)**
37:16;48:25;74:21;
79:20;84:2;86:9;
100:9
**later (6)**
15:18,19;30:14;
74:3;80:18;89:16
**law (3)**
59:16;73:25;76:6
**lawfully (1)**
90:18
**lawyer (6)**
44:16;49:11;70:15;
71:18,19;73:12
**lawyers (10)**
13:6;28:24;68:10,
15,21,21,22;71:6;
72:20;78:10
**lay (2)**
18:7;24:22
**layout (1)**
17:7
**lead (1)**
35:9
**leads (2)**
22:16;56:16
**leaked (1)**
19:5
**learned (2)**
47:23;48:6
**least (7)**
40:7;44:9;48:3;
58:24;64:22;96:8;
97:13
**leave (3)**
13:25;86:17;88:18
**leaves (1)**
30:19
**lectern (1)**
55:16
**legal (2)**
12:14;14:1
**leg-up (1)**
51:18
**less (5)**
18:10;81:18;83:4;
86:17,17
**lesser (1)**
71:5
**less-than- (1)**
15:8
**letter (1)**
70:25
**letters (3)**
57:7,15,25
**letting (1)**
71:6
**level (4)**
39:23;58:22;73:12;
92:19
**Levin (4)**
7:8,11;29:22;75:16
**liability (2)**

43:19;54:2
**licensed (1)**
72:20
**lift (25)**
17:25;26:15,19;
28:6,11,17;32:5;
50:11;61:4;67:12,23;
71:14;72:3,8;74:8;
81:12,17;82:23;83:4,
13,14,25;89:10;
93:13;101:6
**lifted (11)**
18:2;22:5;38:2;
54:16;62:4;69:25;
70:11;75:5;86:14,22;
94:18
**lifting (11)**
18:1,4;51:3;66:17;
67:24;68:2;78:19;
81:19;90:9;93:7;
94:20
**light (2)**
92:17,18
**lighthearted (1)**
49:23
**likely (2)**
37:2;85:19
**likewise (1)**
76:8
**limit (8)**
42:18;70:3;77:17;
87:6,10;94:6;100:3;
101:19
**limited (7)**
38:2,25;69:12;
76:24;86:20;87:1;
93:3
**limits (9)**
57:16,19;71:16;
73:19;84:22;87:12,
19,22,23
**linchpin (1)**
42:16
**line (3)**
5:4;25:11;78:11
**lines (2)**
58:18;96:20
**linked (1)**
20:8
**liquidation (1)**
84:11
**list (5)**
43:7;54:6;71:21,23;
87:11
**listen (2)**
36:10;89:22
**listened (1)**
37:15
**literary (2)**
47:20;48:5
**litigate (1)**
93:14
**litigated (1)**

44:4
**litigating (1)**
77:20
**litigation (12)**
18:9,11;42:6;54:19;
73:23;76:11,13;78:6,
24;85:25;86:1;93:6
**little (12)**
26:5;27:12;32:18;
33:23;37:6;44:19;
51:15;64:20;78:9;
91:12;94:14,15
**LLP (1)**
8:12
**log (14)**
11:23;18:14,15;
19:9;20:11;24:25;
25:11,20;30:4,16;
31:7;32:17;34:10;
97:19
**logic (1)**
58:3
**logistically (1)**
35:13
**logs (1)**
19:10
**London (1)**
7:20
**long (6)**
21:19;34:18;44:24;
68:17;73:16;91:23
**longer (5)**
39:15;56:22;91:12;
92:15;94:14
**look (23)**
19:9;21:2,2;22:22;
25:19;26:22;36:13;
48:16;51:25;60:16;
66:16;70:3;71:23;
73:2;74:25;79:3;83:1;
84:9,18;94:8;95:14;
96:13;101:25
**looked (3)**
27:21;37:14;82:7
**looking (7)**
8:23;39:10;59:14;
64:5,6;65:20;78:9
**lose (5)**
29:11;54:22,23;
65:6;93:6
**loss (4)**
42:3;45:6,6;54:20
**lot (22)**
12:14;15:25;16:3,3;
23:20;30:19;31:19,
19;33:4;37:17;39:3,6,
15;42:24;54:3;62:3;
66:11;75:21;82:19,
20;89:2;95:19
**loud (1)**
39:7
**lovely (1)**
52:4

**Lowenstein (1)**
6:9

## M

**main (2)**
12:16;67:20
**maintain (2)**
59:23;61:18
**major (1)**
60:7
**majority (1)**
35:15
**makes (2)**
52:20;93:21
**making (5)**
13:14;37:23;50:17;
83:6;100:15
**Malter (1)**
5:10
**man (4)**
29:2,7;47:21;49:13
**managed (5)**
95:16,20;96:1,2,3
**many (8)**
21:21;28:15;58:25;
64:13;85:12;90:2;
95:16,16
**March (1)**
64:24
**Market (1)**
7:20
**marks (1)**
77:16
**mass (4)**
75:1,4;83:24;94:17
**material (2)**
12:16,19
**matrix (2)**
68:25;73:11
**matter (1)**
39:18
**matters (5)**
9:12,13;10:19,23;
98:1
**Maxcy (2)**
8:11,11
**may (20)**
9:1,16;10:8;11:8;
13:5,11;21:4;22:23;
26:22;27:25;33:3,18;
51:11;53:12;54:1;
56:21;61:22;62:25;
83:3;92:12
**maybe (16)**
10:17,17,22;26:23,
25;27:2;34:3;39:10;
40:25;41:8;44:16;
69:9;70:22,23;94:4;
96:3
**mayor (1)**
49:15
**MDL (3)**

Case: 23-40523    Doc# 2094-8    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
114 of 122

40:11;44:10;65:19
**mean (30)**
10:16;13:21,22;19:10;21:6;23:12;30:19;32:21;36:16;40:17;41:6,8;44:22;45:14;52:3,6,7;60:1;62:7,13;66:2;67:22;69:8,21;71:18;91:4,13;96:13,18;100:24
**meaning (1)**
50:1
**means (3)**
39:13;47:9,16
**medal (1)**
49:15
**mediate (7)**
15:25;16:19;66:20,21;84:6;90:21;98:8
**mediating (1)**
83:13
**mediation (54)**
6:5;9:12,17,22;10:5,10,14;11:5;13:19;14:24;15:2;16:14;18:4,6;21:7;35:2;37:22,23;54:15,15;56:15;59:4;64:4,10,11,17,18,23;65:1;73:18;76:4;77:19;78:22;80:11;82:1,4,7,14,16;83:4,7,15;85:24;86:21;88:23;89:11,13,14;90:23;93:5;94:2,14;95:21;96:6
**mediations (1)**
54:11
**mediator (12)**
16:6;17:2,6;28:9,25;35:7;36:4,5;64:11,15;82:10;84:8
**mediators (1)**
82:8
**mediator's (1)**
36:18
**meet (2)**
34:3;36:23
**meet-and-confer (1)**
26:5
**meeting (1)**
36:22
**member (5)**
52:25;53:8;71:24;72:12;96:9
**members (4)**
46:21;49:20;68:9;85:13
**men (1)**
90:7
**mentality (1)**
21:19
**mention (3)**
77:11;78:16;80:24
**mentioned (5)**
35:5;58:25;81:1;88:4;98:9
**Merick (1)**
7:19
**Mers (2)**
87:13,19
**met (1)**
65:2
**Mets (1)**
47:21
**Miami (2)**
29:2;68:11
**mic (1)**
98:18
**Michael (2)**
6:1;49:22
**microphone (1)**
5:16
**might (11)**
6:23;26:5,25;32:16;33:7,7;45:16;86:11;87:12;88:11;97:15
**miles (1)**
47:24
**million-dollar (1)**
20:25
**mind (1)**
45:12
**minimal (3)**
89:21;94:5,10
**minimum (1)**
78:25
**ministries (3)**
6:2,5;84:13
**minor (1)**
73:9
**Mintz (4)**
7:8,11;29:22;75:15
**minute (1)**
100:9
**minutes (2)**
91:10;94:7
**Miranda (2)**
8:7;79:24
**mischief (1)**
30:20
**misquoted (1)**
53:16
**Mission (1)**
36:7
**mix (2)**
65:21;66:5
**modest (1)**
73:19
**moment (4)**
16:19;20:18;76:3;96:7
**money (8)**
22:11;32:8,9;42:24;74:3,5;86:17,25
**Montali (1)**
94:19
**Montali's (1)**
37:16
**months (8)**
28:10;37:19,19;64:3,13,16,20;77:16
**more (23)**
12:9,11;14:16;19:14;22:11;26:5;32:7,9,16;33:23;39:6;52:19;57:5;59:24;71:16;81:9;85:2,19;88:24;93:24;94:15;97:20,25
**Morgan (2)**
6:13;55:24
**morning (22)**
5:9;6:1,4,8,11,12,13;7:7,15,18,25;8:1,4,7,11;15:18,19;63:18;64:2;75:13,14;76:17
**most (5)**
33:6;41:25;42:2;63:23;94:1
**motion (23)**
8:23;10:15;28:8,11,17;58:1,2,9;62:11;65:2;67:23;79:13;84:10;87:17;88:24;90:15;91:1,7;95:13;97:16,23;98:8,8
**motions (3)**
81:12;82:23;83:25
**motivated (1)**
78:11
**Movant (1)**
77:3
**movants (4)**
76:9,11;77:5,24
**movant's (1)**
76:14
**move (11)**
32:13;40:25;58:15;59:7;61:10;64:23,25;76:4;83:3;84:17;95:9
**moved (1)**
101:6
**moving (11)**
21:1;67:11;68:4,7;72:1;74:8;80:21;83:5,14;93:2;94:20
**much (20)**
9:21;14:22;19:13;22:25;29:17;37:4;53:15;55:14;60:18,23;65:8;75:9;81:17;83:16;85:1;87:2;90:3;91:2;92:7;98:12
**multiple (3)**
69:11;83:6,9

**N**

**name (2)**
79:4;82:8
**named (3)**
49:10;86:2;97:8
**naming (1)**
97:12
**narrow (3)**
18:10;55:10;90:7
**nationwide (1)**
57:6
**nature (5)**
28:22;43:5;51:19;78:25;85:17
**near (3)**
76:22;77:2,2
**necessarily (7)**
22:22;30:20;54:19;94:10;95:6,22;96:25
**necessary (1)**
88:20
**need (9)**
30:16;32:13;34:22;50:6;53:11,14;73:3;90:12;102:2
**needed (1)**
94:4
**needs (1)**
35:9
**negatively (1)**
66:2
**negotiate (2)**
72:17;84:18
**negotiated (1)**
62:15
**negotiation (2)**
43:8;77:20
**neither (3)**
51:23;64:12;92:23
**neutral (1)**
17:7
**New (9)**
47:20;48:6;54:18,18;55:3,8;64:17;67:18;81:6
**news (3)**
15:22;17:16,19
**next (4)**
40:25;78:11;97:15;101:18
**Nice (1)**
7:13
**ninety-four (1)**
39:20
**ninety-plus (1)**
76:14
**nit (1)**
26:9
**Nobody's (1)**
94:24
**none (6)**
43:3;60:7;68:5;76:16,22;87:10
**nonexistent (1)**
89:22
**nonissues (1)**
10:19
**noon (1)**
91:21
**noon-ish (1)**
91:21
**nor (3)**
38:9;51:23;92:23
**norm (1)**
92:14
**normal (2)**
19:18;31:21
**normally (1)**
22:7
**note (2)**
38:3;77:15
**noted (1)**
11:5
**nothing's (1)**
38:16
**notice (3)**
68:5,7;78:17
**noticed (1)**
9:1
**notion (9)**
18:14;53:8;56:13;66:15;69:8;73:23;74:21;77:1;81:18
**November (1)**
82:9
**Nowhere (3)**
61:15;77:2,2
**number (12)**
5:4,5;28:4;51:6,16,21;53:2,3;76:24;84:1;86:7;93:3
**numbers (2)**
21:9;51:20
**numerous (1)**
89:1

**O**

**OAKLAND (16)**
5:1;8:16,18;18:15;37:15;55:5;62:1;72:2,12;80:24;81:23;82:2,24;91:5,7;92:2
**object (1)**
87:21
**objected (1)**
80:18
**objection (5)**
12:24;18:3;59:23;68:1;99:1
**objections (1)**
68:20
**objective (1)**
11:5
**obligated (1)**
93:10
**obligation (1)**

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 115 of 122

18:22
**obligations (3)**
14:1;19:1;24:7
**obscure (1)**
47:17
**obtain (1)**
51:11
**obtained (1)**
97:1
**obvious (5)**
27:6;37:24;42:13;63:8;89:10
**obviously (5)**
19:13;30:13;36:17;37:16;91:5
**occasion (2)**
92:12,12
**occur (5)**
41:6;73:9;75:7,8;97:13
**occurrence (1)**
87:23
**o'clock (2)**
91:8,16
**off (8)**
14:7;29:20;49:23;56:3;73:22;88:3;93:14;97:6
**offense (1)**
86:24
**offer (2)**
71:7;76:11
**offering (2)**
84:11,21
**oftentimes (1)**
70:1
**O'Melveny (1)**
6:21
**once (7)**
29:9;55:23;65:13;70:14,16;82:20;83:2
**one (64)**
10:9,22;11:10;13:22;18:22;20:7;25:2,11,17;26:18,25;28:24;31:19,23;32:18;34:22;35:4,8,11;36:17;37:25;40:12;42:18;43:15;44:6,6,7,8,11;46:14;47:2;51:6,9,10;53:2,17;59:21,24;62:18;63:25;68:8;71:21;73:9,10;74:21;76:3;77:7;78:1;79:25;82:15;84:16;85:2;87:18;88:2,5,11,24;93:16;94:12;95:6;96:8,23;98:3,14
**ones (2)**
39:23;71:21
**one-sided (1)**
54:21
**only (19)**
11:22;12:23;31:8;42:18;44:7,11;55:13;56:22;67:15,19;68:3;72:2;73:9;77:8,24;87:23;90:21;97:13;100:18
**oOo- (1)**
5:2
**open (1)**
8:20
**opinion (1)**
94:19
**opinions (1)**
57:22
**opportunity (4)**
29:11;54:1;75:18;83:5
**opposed (2)**
39:16;90:15
**opposing (1)**
30:11
**opposite (1)**
95:2
**opposition (1)**
82:21
**orally (1)**
45:23
**order (34)**
5:3;10:6,11,20;13:7,20;16:14,14,15;18:6;26:2;30:15;34:12;41:1;51:10;55:3;64:12,17,18,21;97:24;98:14,17,20;99:5,10,12,18;100:8,17,24;101:1,2,8
**ordered (1)**
81:14
**ordinarily (1)**
93:11
**Oregon (1)**
68:12
**others (2)**
53:9;93:23
**otherwise (4)**
9:13;66:13;89:23;94:14
**ought (1)**
51:22
**out (27)**
14:20;18:7;24:22;28:15;31:10;35:19;41:24;43:7;47:22;48:10,20;49:12,14;51:17;62:1;66:19;70:8;71:24;73:20;74:7;80:9,15;82:24;83:23;86:18;96:10,11
**outcome (3)**
23:10;69:15;71:2
**out-of-state (1)**
68:10
**outset (1)**
87:13
**outside (7)**
66:13;70:11,12;77:9;88:7;92:14;96:19
**over (10)**
5:6;18:8;25:14,24;42:6;53:9;61:10;84:1,10;101:17
**overall (1)**
95:8
**overriding (1)**
61:15
**ow (1)**
63:7
**owe (1)**
51:8
**own (3)**
19:21;29:6;88:19

## P

**pace (1)**
61:19
**Pacific (2)**
6:21;15:16
**page (3)**
16:24;62:8;84:10
**paid (5)**
68:25;69:1;71:18;73:11;88:7
**panacea (1)**
55:2
**pandemic (1)**
81:7
**paper (1)**
46:11
**papers (13)**
10:9;21:17,17;41:24;42:13;46:6,10;53:13;66:20;67:11;68:4,8;72:1
**parade (5)**
53:11;54:4;90:11;95:14,24
**paragraph (1)**
26:3
**parallel (1)**
94:2
**parcel (3)**
57:9;58:23;59:8
**part (8)**
19:9;57:9;58:17,23;59:8;63:23;85:9;86:2
**partial (1)**
39:21
**participate (2)**
89:15;90:2
**particular (3)**
51:22;65:7;97:25
**particularly (1)**
97:22
**parties (24)**
5:6,25;10:14;13:10;23:19;24:5;26:19;27:20;28:5;42:3;45:7;54:20,23;56:15,19;77:19;78:21;84:4;89:8,8;93:19;94:16;95:3;97:6
**partner (2)**
6:10;76:5
**party (3)**
6:6;14:8;30:11
**pass (1)**
28:20
**passed (1)**
27:7
**past (3)**
50:4;55:13;92:10
**path (6)**
26:25;54:18,18;55:8;56:14;76:9
**Patrick (1)**
8:11
**pause (1)**
51:14
**pay (5)**
21:18;24:18;32:9;86:15,18
**paying (1)**
87:19
**payment (4)**
11:12,13;16:11;77:8
**payout (1)**
74:16
**pays (1)**
84:11
**pending (2)**
56:7;81:3
**people (14)**
14:16;23:25;24:18;27:14;54:23;58:25;69:9;73:11;91:5,8;95:21,23,25;96:8
**perceives (1)**
23:9
**percent (1)**
91:19
**Perch (5)**
8:1,1;83:19,20;84:24
**perfectly (1)**
41:3
**perhaps (6)**
10:13;11:1;29:20;38:10;78:9;94:3
**Period (5)**
51:11;53:10;66:20;77:18;82:1
**peripheral (1)**
57:5
**permit (1)**
101:1
**permitted (1)**
51:10
**perpetrators (1)**
43:6
**person (2)**
12:18;60:19
**personally (2)**
46:7;73:7
**perspective (4)**
20:22;41:19;78:10;89:7
**pertaining (2)**
9:12,13
**perverse (1)**
78:8
**PG&E (3)**
49:9,11;94:19
**phonathon (2)**
9:24;17:3
**phonetic (5)**
68:11;69:2;72:8;82:13;87:13
**pick (6)**
22:6;39:16;41:3;65:20,21;66:5
**picked (2)**
10:8;66:7
**picking (2)**
40:13;42:1
**picture (1)**
81:11
**piece (1)**
14:25
**pitch (3)**
47:23;68:19;73:16
**pitched (2)**
16:23;36:5
**pivot (1)**
17:20
**place (3)**
82:4;90:24;96:15
**places (1)**
23:22
**plaintiff (3)**
13:3;51:23;70:3
**plaintiffs (4)**
28:23;40:8;73:10;101:10
**plaintiffs' (5)**
13:6;68:10,15,20,21
**plan (25)**
66:21;71:7;72:17;73:3,4;77:13,19,22;80:16,18;81:14,16;84:11,15,16,16,17,19,19,20;88:20;89:16,25;96:12,14
**plane (1)**
91:16
**planes (1)**
91:8
**plans (1)**

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 116 of 122

77:15
**play (6)**
14:2;27:18;44:5,5;60:15;96:11
**playbook (4)**
39:1;82:21,22,23
**plays (2)**
47:22;96:10
**please (2)**
74:20;90:20
**pledged (1)**
88:15
**Plevin (1)**
8:8
**Plimpton (2)**
47:18;48:1
**plus (1)**
64:16
**PM (1)**
102:5
**point (37)**
13:17;28:12;37:21;38:22;48:15,19;51:15,20,23;52:4,5,7,24;56:9,11,23;57:5;59:24;60:6;61:21;74:24;77:2;81:24;82:5,18,22;85:21;86:13;89:3,11,17;94:25,25;97:5,10;99:17,24
**pointed (3)**
41:24;83:23;87:9
**pointing (1)**
70:8
**points (5)**
26:13;31:19;80:3;87:18;96:5
**police (2)**
25:13;88:19
**policies (7)**
19:2;42:5;57:16;71:16;86:12,16,17
**policing (1)**
19:22
**policy (7)**
13:13;42:18;57:16,19;84:22;86:24;87:9
**policyholder (4)**
19:19;24:9;65:15,19
**policyholders (1)**
22:8
**poll (1)**
10:13
**pool (1)**
69:12
**population (1)**
48:4
**portion (1)**
48:4
**posed (2)**
56:4;60:25
**position (12)**
12:4;17:1;19:6;21:3;28:24;29:10;33:21;70:16;72:16,21;73:5;93:25
**positive (1)**
17:11
**positives (1)**
15:24
**possibility (1)**
51:12
**possible (1)**
92:10
**possibly (3)**
17:23;95:1,1
**posture (1)**
59:1
**potential (4)**
9:17;43:19;82:10;89:23
**potentially (1)**
86:23
**power (1)**
89:10
**precisely (1)**
75:6
**preclude (1)**
85:12
**precludes (1)**
13:14
**predominantly (1)**
93:16
**preferential (4)**
28:24;29:10;68:9;70:16
**preferred (7)**
39:23;51:9;53:1,9;69:12,14,15
**prejudice (1)**
73:24
**prejudices (1)**
74:1
**prejudicial (2)**
51:3;80:17
**premise (2)**
52:22;76:24
**premised (1)**
24:9
**preparation (1)**
82:7
**prepare (1)**
97:24
**prepared (4)**
11:9;83:8;90:23;97:16
**present (1)**
83:15
**presentation (2)**
50:4;72:5
**presented (5)**
64:2;80:15;82:10;83:22;93:21
**preserve (3)**
19:24;20:6;59:5
**preserving (1)**
58:15
**press (1)**
70:20
**pressed (2)**
38:10;67:16
**pressure (3)**
22:12;42:3;45:7
**presumably (1)**
79:5
**pre-trial (1)**
68:19
**pretty (2)**
85:7,20
**previously (1)**
66:25
**priests (1)**
46:12
**primary (1)**
45:3
**principal (2)**
11:5;76:6
**principle (3)**
20:21;43:14;44:10
**prior (4)**
52:24;77:10,10;99:5
**priority (1)**
74:15
**private (1)**
67:16
**privilege (7)**
11:23;12:7,17;13:4,15;32:17;97:19
**privileged (2)**
13:3;100:24
**pro (1)**
72:19
**probably (4)**
38:12;48:20;52:19;68:22
**problem (4)**
20:8;32:18;75:7,7
**problematic (1)**
13:23
**problems (2)**
55:2;83:15
**procedural (1)**
78:16
**proceed (5)**
6:22;65:1;76:6;80:10;82:20
**proceeded (1)**
94:11
**proceeding (1)**
65:19
**proceedings (3)**
38:6;61:5;102:5
**process (37)**
17:7;21:1;22:23;32:6,13;39:16,17;40:23;42:10;58:22;59:2,8;61:23;66:11;69:23;76:5;77:9;79:2;83:12;88:12,15,23;89:5;92:21;93:2,2,5;94:14,16,25;95:18;96:16,17;97:8;98:3;100:12,21
**produced (1)**
28:21
**productively (2)**
83:7;93:4
**progress (8)**
8:24;80:11;81:19;85:11;86:5;96:12,20;97:10
**prohibition (1)**
25:23
**prohibits (1)**
13:8
**Prol (2)**
6:10,12
**prominence (1)**
73:12
**prominent (2)**
68:21;71:14
**promise (1)**
60:20
**proper (1)**
13:2
**proposal (2)**
82:2;88:9
**proposed (4)**
64:11;87:11;90:1;99:5
**proposing (1)**
94:21
**proposition (2)**
37:24;90:22
**prospect (1)**
47:20
**protect (2)**
37:25;52:12
**protected (1)**
89:9
**protections (1)**
93:14
**protective (8)**
98:14,17,19;99:10,11,18;100:8,16
**protects (1)**
37:25
**protocols (1)**
39:10
**proven (1)**
74:14
**provide (6)**
12:16;30:7,17;33:16;64:21;81:2
**provided (5)**
12:1,5;19:5;64:17;82:8
**provides (2)**
13:5;61:12
**provisions (1)**
80:17
**proviso (1)**
97:17
**publicly (1)**
18:24
**punching (1)**
90:7
**punish (1)**
24:17
**purely (1)**
32:20
**purpose (4)**
21:5;38:2;40:2;44:22
**purposes (2)**
77:21,22
**pursue (2)**
70:12;86:21
**pursuing (3)**
21:7;71:1;76:24
**pursuit (2)**
69:25;83:5
**push (2)**
43:11,13
**pushback (1)**
19:9
**pushed (1)**
9:16
**put (13)**
17:5;20:3;21:25;32:15;43:7;53:8;54:19;66:17;67:9,17;81:16;82:2;94:7
**puts (1)**
70:16
**putting (2)**
66:24;95:22

## Q

**queue (3)**
63:1;78:3,12
**quicker (2)**
29:21;96:12
**quickly (5)**
28:17;42:25;73:20;85:20;94:20
**quite (4)**
66:25;75:6;81:25;94:22
**quoted (2)**
48:20,23

## R

**raise (3)**
59:24;60:7;98:14
**raised (2)**
57:4,18
**range (1)**
73:21
**rather (5)**

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 117 of 122

9:1;22:21;77:20;
78:13,24
**rational (1)**
42:23
**rattle (1)**
50:23
**re (1)**
32:17
**reach (1)**
17:24
**reached (2)**
15:7;80:14
**reaches (1)**
78:2
**reaching (1)**
76:7
**react (1)**
95:24
**reaction (1)**
9:25
**read (3)**
10:16;37:15;92:10
**reading (1)**
47:11
**ready (3)**
16:19;62:9;76:16
**real (3)**
21:3;68:5;83:15
**realistically (1)**
93:4
**realize (1)**
92:20
**really (34)**
6:23;10:19,22;
13:23;17:19;18:7,23;
19:18,20;21:6,16,20;
22:24;23:12,13;
24:17;26:19;27:17;
30:18;32:12,17;
42:15;44:1;45:18;
69:6,22;70:6,7,14;
71:13;73:3,17,25;
77:21
**reason (15)**
12:6;30:8;39:8,15;
45:3;57:21;60:25;
62:11;67:9,25;68:5;
70:21;75:7;78:5;
92:14
**reasons (5)**
10:9;28:15;31:11;
32:16;71:12
**recall (2)**
72:2;87:12
**receive (1)**
81:18
**received (3)**
12:18;46:9;86:15
**receives (1)**
51:12
**recently (2)**
56:5;57:11
**recognize (1)**
54:22
**recognized (1)**
77:21
**recommendation (1)**
84:24
**record (4)**
49:18;55:23;75:15;
85:4
**recoupment (1)**
74:5
**recover (1)**
87:21
**recovery (1)**
70:4
**reflective (1)**
9:7
**refusing (1)**
82:15
**regard (2)**
43:3;69:15
**relate (1)**
33:13
**related (1)**
5:25
**relates (2)**
11:22;12:24
**relatively (3)**
73:19,20;94:5
**release (1)**
56:21
**released (2)**
22:14;56:7
**relevance (1)**
53:17
**relevant (2)**
50:24;51:1
**relief (32)**
9:8,13,18,19;10:15;
22:23,24;25:8;37:7,
14,18;39:8;43:23;
51:8;53:20;56:5;58:2;
63:9;78:1,25;79:10,
12;80:13;81:13,23;
88:5,8,23;93:3;95:17;
96:6;97:17
**remain (2)**
78:5;83:13
**remaining (1)**
85:8
**remark (1)**
48:18
**remember (5)**
18:15;48:2,20;67:2,
4
**remembering (1)**
62:6
**remind (1)**
64:7
**reopened (1)**
42:22
**reorganization (3)**
89:16,19,25
**repeat (2)**
54:21;80:4
**repeatedly (1)**
48:23
**replace (1)**
78:4
**replicate (1)**
44:9
**replicated (1)**
40:16
**replies (3)**
67:11,17,19
**report (1)**
89:1
**reported (1)**
42:21
**represent (1)**
89:8
**representative (1)**
42:1
**represented (2)**
72:19,20
**representing (2)**
5:10;83:20
**request (7)**
35:20;36:19;53:13;
57:19;58:9;61:12;
63:4
**requested (4)**
35:14;43:10;51:8;
53:20
**requesting (1)**
58:1
**required (1)**
58:3
**reservation (2)**
11:18;74:3
**reserve (5)**
13:10,11,11;14:12;
79:6
**reserves (2)**
14:8,14
**resist (1)**
49:16
**resolution (12)**
9:17;16:20;26:25;
42:16;51:24;52:17;
54:12;76:10;78:13;
81:20;84:18;88:15
**resolutions (1)**
97:7
**resolve (5)**
26:6;28:11;29:11;
44:15;85:24
**resolved (10)**
11:10,15,20;30:24;
42:25;44:25;54:11;
77:10;83:24;98:2
**resolves (2)**
15:1;78:2
**resolving (1)**
84:22
**resource (1)**
39:19
**resources (4)**
32:1;38:25;59:5;
95:7
**respect (7)**
11:25;31:9;43:4;
82:6;94:21;97:18;
100:5
**respectfully (3)**
64:2;65:6;69:21
**Respond (4)**
32:15;45:20,23;
99:13
**responded (3)**
42:19;64:13,13
**responding (1)**
99:5
**response (3)**
60:20;84:10;85:16
**responses (1)**
57:18
**responsibility (1)**
9:11
**responsible (1)**
95:8
**responsive (1)**
10:20
**rest (2)**
86:18,25
**restrictions (1)**
100:19
**restructuring (1)**
80:16
**result (7)**
30:20;31:4;52:9;
76:13;81:20;96:11;
97:1
**results (1)**
97:11
**retains (1)**
61:9
**retake (1)**
28:11
**review (2)**
30:21;31:3
**revised (3)**
17:1;99:10,21
**rich (1)**
95:6
**right (73)**
5:24;8:19,22;9:9;
10:2,3;13:11,12;
14:19,22,23,24,25;
15:8;16:1;18:11;19:7;
20:2,5,5,5,7,18;24:18,
24;29:5,19;32:15;
33:22;34:3,6;35:25;
36:9;37:6;38:14;41:9;
44:4,6;45:11;47:3;
50:5,6;52:4;53:3;
59:25;62:12,14;63:3,
6,8,24;66:18,18;
70:10,18;74:1,4;
76:19;79:5,18;85:14;
91:17;92:4,7;94:8;
97:19;98:4;99:19,22;
101:13,14,23;102:4
**rightly (2)**
61:3;66:25
**rights (9)**
13:10;14:8;19:24;
58:15;74:2,3,10;79:6;
84:13
**risk (11)**
42:3;45:6;54:20,23;
56:15,20;83:12;
88:17;89:12,17,21
**risks (5)**
14:2;93:20;94:15;
95:21;96:2
**road (4)**
22:22;50:9;51:2;
53:10
**Robert (1)**
5:9
**Rochester (1)**
80:12
**Rockville (3)**
57:25;60:9;80:20
**rolling (1)**
43:1
**Rome-Banks (1)**
5:10
**room (3)**
30:19;89:7;91:13
**roughly (1)**
84:2
**route (1)**
90:22
**rule (4)**
35:7;36:21;53:17;
59:11
**ruled (1)**
58:18
**Rules (2)**
53:14,16
**ruling (5)**
13:1,14;20:2;
100:11;101:4
**rulings (1)**
100:5
**run (2)**
97:24;99:10
**running (1)**
8:15
**rush (2)**
69:19,20

## S

**sad (1)**
37:21
**salutary (1)**
20:23
**same (20)**
9:5,5;16:24;41:1;
43:20;52:22;56:14,

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 118 of 122

23;58:14,20;59:1;62:8;66:12;72:2;83:14;85:15;86:6;90:14,23;96:21
**sample (1)** 42:1
**Samuel (1)** 45:12
**San (3)** 38:17;46:15;82:24
**Sandler (1)** 6:9
**sat (1)** 81:8
**satisfied (4)** 15:4,6,9;93:23
**Saturday (1)** 67:17
**saw (1)** 42:20
**saying (13)** 15:4;20:12;34:5;41:10;49:16;55:2,3;59:10;66:22;70:9;76:21;92:9;98:1
**scenario (1)** 78:4
**scheduled (2)** 8:16;9:23
**Schiavoni (122)** 6:20,20;7:2,4;15:9,10,14,16,18,21,24;16:3,6,10,13,17,22;17:5,9,11,13,16,18,22;20:5,7,10,15,17;21:10,13,16,24;22:3,14,16,20;23:2,6,9,12,16,18,22,25;24:3,7,12,15,19,21,24;25:2,6,8,10,13,17,22;26:2,8,12,15,18;27:3,6,9,12,14,17,25;28:4,14;29:4,6,9,14,16,18;31:12,18;55:16;64:14;65:11,11,13,24;66:1,5,7,10;67:7,9,15;71:1,4;72:7,11,24;73:16;74:20,23;75:3;78:8;83:10,22,23;88:10;99:1,25;100:3,5,8,15;101:8,10,13,15,19,22,24;102:2
**Schiavoni's (3)** 8:24;75:21;80:3
**scope (2)** 50:21;55:5
**screen (2)** 7:1,23
**se (1)** 72:19
**search (1)** 26:4
**seating (1)** 9:1
**second (3)** 11:17;51:14;85:21
**secret (1)** 47:21
**seeing (2)** 56:16;83:9
**seek (3)** 9:8;12:25;25:8
**seeking (2)** 52:11;58:13
**seem (1)** 26:22
**seems (2)** 23:4;86:7
**select (3)** 18:1;22:9;40:3
**selected (12)** 16:7;23:3;38:3;39:24;65:17,18;68:8,9,12;69:7;71:21;85:18
**selecting (1)** 85:6
**selection (2)** 43:2;66:23
**selections (1)** 86:20
**send (1)** 28:16
**sense (7)** 19:10;28:9;31:5;32:25;51:21;94:10;96:21
**sent (3)** 46:8;57:15;64:19
**separately (2)** 8:19;18:3
**September (1)** 81:15
**series (1)** 28:19
**serious (1)** 78:16
**seriously (1)** 49:25
**serve (2)** 57:25;58:12
**served (3)** 60:9,10;77:19
**serving (2)** 57:7;58:3
**set (4)** 17:23;26:25;81:4;101:19
**sets (1)** 78:8
**settle (5)** 40:24;43:1;69:10;84:4,5
**settled (5)** 42:25;60:8,11;71:9;87:14
**settlement (10)** 26:20;40:18;54:20,24;55:4;76:7,11,13,22,25
**settles (1)** 78:1
**Seven (1)** 56:13
**seventeen (2)** 56:6;81:12
**shall (1)** 100:23
**share (5)** 12:5;13:2,5;32:21;33:10
**shared (1)** 25:3
**sharing (2)** 19:14;20:11
**shield (1)** 19:14
**shift (1)** 37:6
**short (2)** 67:4;71:4
**shortened (1)** 45:22
**shot (1)** 72:14
**show (1)** 76:15
**showing (5)** 68:23;93:11;94:3,9,12
**Sidd (5)** 47:9,10,17;48:18;82:13
**side (17)** 9:5;15:9;29:20;31:16;34:22;35:2;55:15;63:15;75:10;79:19;83:17;88:19;89:7,20,21;90:13;92:18
**sidelines (1)** 86:19
**sides (1)** 62:16
**sign (1)** 93:25
**signed (1)** 14:7
**significant (1)** 48:4
**silver (1)** 54:9
**Similarly (3)** 48:19;56:10;88:16
**Simons (1)** 72:5
**simply (5)** 13:10;78:3;94:20;95:24;100:23
**single (3)** 34:11;88:7,8
**sit (3)** 17:2;72:16;86:19
**sitting (1)** 99:18
**situated (1)** 88:17
**situation (12)** 19:3;23:13;37:12;49:12;67:10;72:2;77:7;81:22;86:4,12;92:25;93:22
**Skarzynski (1)** 7:19
**skilled (1)** 29:7
**skills (1)** 29:6
**slight (1)** 64:1
**slightly (3)** 29:21;78:10;99:21
**slow (1)** 39:2
**small (4)** 12:13;28:1;38:23;69:13
**smaller (4)** 28:1;33:17;95:7,7
**smiling (1)** 17:18
**SoCal (2)** 38:6,7
**somebody (7)** 42:19;48:17;51:16;59:11;70:14;79:2;96:20
**somebody's (1)** 92:11
**somehow (10)** 13:23;22:12;46:21;52:25;68:24;76:13,24;78:2;88:6,11
**someone (2)** 42:21;79:4
**sometimes (3)** 28:1;39:1;92:14
**somewhat (3)** 61:22;73:18;95:10
**somewhere (3)** 26:3;93:14;95:18
**son (1)** 47:11
**song (1)** 29:3
**soon (2)** 86:23;99:12
**sorry (5)** 49:9;55:21;79:23,24;97:19
**sort (46)** 6:23;8:15;17:1,6,7,25;18:10;19:8,20,21,23;22:3,8,11;23:13;24:21;25:20;26:6,9,21;27:1;28:10;37:3;41:6;42:1;58:18;65:14;66:10,15,25;67:16,19;68:1;69:6,9;71:8;72:21;73:13,17;74:5;81:19;85:22;86:3,14;95:7;100:10
**sought (4)** 13:7;32:5;42:21;78:25
**sounded (1)** 10:1
**sounds (3)** 10:22;17:5;61:24
**speak (5)** 10:14;16:6;41:16;73:21;90:16
**SPEAKER (12)** 59:16;91:15,19,22,25;98:13,16,19,22,25;99:3,8
**Speaking (3)** 37:11;77:15;78:9
**special (2)** 5:19;55:25
**specific (5)** 12:9,12;30:7,8,14
**specifically (2)** 51:10;61:11
**specify (1)** 12:18
**spectrum (3)** 40:14,16;44:10
**speculate (1)** 72:25
**speculating (2)** 70:17;73:1
**speculation (1)** 70:23
**speed (1)** 76:9
**spell (1)** 48:10
**spelled (1)** 48:12
**spend (2)** 42:24;53:14
**spending (1)** 74:2
**spent (2)** 62:3;76:3
**sphere (1)** 55:3
**spirit (1)** 58:24
**split (1)** 93:9
**spoke (1)** 82:11
**spoken (1)**

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 119 of 122

28:5
**Sports (3)**
47:11,19,19
**St (2)**
6:1,1
**stabbed (1)**
49:14
**stage (1)**
88:20
**stake (6)**
45:18;68:17;69:4;73:19;80:25;101:5
**stall (1)**
54:15
**stalled (1)**
54:16
**stand (2)**
54:8;88:16
**standard (2)**
77:14;94:5
**standing (2)**
53:6;60:25
**standpoint (1)**
85:19
**start (17)**
5:8;15:10,21;37:24;50:3;51:2;56:22;58:21;69:23;74:2;85:20;86:13;88:3;92:5;96:16,16;97:6
**started (7)**
11:6;24:21;37:22;49:23;54:4;63:5;82:7
**starting (1)**
37:23
**starts (1)**
86:24
**state (15)**
39:23;40:12;57:13;61:5,9,21;63:1,8,10;70:10;72:21;77:5;78:7;99:5;100:20
**status (1)**
97:13
**statute (1)**
42:22
**statutory (1)**
77:17
**stay (83)**
9:13,18,19;10:15;17:25;18:1,2,4;22:5,23,24;26:16,19;28:6,11,17;32:6;37:7,14,18,25,25;38:2;39:8;50:11;51:3;52:3;53:24;54:16;56:5;57:8,20,24;58:1,4,19,20;61:4;62:4;63:9;66:18;67:12,23,24;68:2;69:17,25;72:3,8;74:8;75:5;78:19;81:12,17,19;82:23;83:4,14,14,25;86:14,20,22;88:4,8,22;89:9,9,10;90:10;93:3,7,13,15;94:6,7,7,18,21;95:17;96:6;97:17;101:6
**step (2)**
64:9,10
**steps (3)**
69:9;76:23;77:3
**sternly (1)**
36:14
**still (5)**
10:23;23:2;24:4;36:16;95:25
**STIPPEL (25)**
6:13,14;55:19,21,23,24;56:2,10,13,19;57:1,3,15;58:6,8,25;59:4,7,20,22;60:3,6,13,15,22
**stipulated (2)**
98:17,19
**stipulation (6)**
46:5,9;61:4,11;62:15;83:2
**stood (1)**
69:7
**stop (3)**
51:11,14;53:10
**stopping (1)**
69:19
**stories (1)**
73:8
**story (4)**
29:3;47:17;49:14;73:10
**strange (1)**
67:21
**strangely (1)**
74:15
**strategy (3)**
20:12;25:14;27:4
**straw (1)**
90:7
**stresses (1)**
77:3
**strictly (1)**
85:18
**strong (1)**
18:3
**strongest (1)**
22:1
**strongly (1)**
59:8
**structure (4)**
10:1;84:19,19,20
**structured (2)**
23:23;79:12
**subhead (1)**
48:9
**subject (9)**
12:6,17;67:12;80:7;87:11;99:4;101:3,4,8
**submit (6)**
30:7;31:6;64:2;77:18;78:21;99:10
**submitted (6)**
43:10;64:11,17;98:17,22,25
**Subsequently (1)**
57:25
**substantive (6)**
13:1,14;21:20;26:20;46:17;78:17
**substantively (1)**
8:17
**success (1)**
82:2
**successfully (1)**
83:24
**successor (1)**
12:25
**sudden (1)**
90:16
**sufficient (2)**
30:15,17
**sufficiently (1)**
30:12
**suggest (4)**
27:19;73:18;94:4,13
**suggested (1)**
24:25
**suggesting (2)**
24:21;27:3
**suggestion (2)**
56:2;97:25
**sui (1)**
70:11
**suits (1)**
80:10
**support (2)**
80:8,16
**supported (2)**
64:10;81:21
**suppose (1)**
10:16
**supposed (3)**
19:15;36:13;90:13
**Sure (17)**
20:6,19;21:4,23;26:6;29:3;39:13;51:9;56:10;60:5,10;65:5;70:8;74:22;75:20;87:7;100:4
**surprise (1)**
59:10
**surprised (2)**
40:21;47:7
**surprising (1)**
92:22
**surprisingly (1)**
90:6
**surreply (5)**
45:20,23;46:1,17;66:24
**survivor (2)**
54:21;61:14
**survivors (10)**
51:8;53:4;56:20;57:7,13;87:1;89:19;90:13,16,17
**survivors' (2)**
58:15;61:8
**suspect (1)**
33:4
**sympathetic (2)**
32:18;33:20
**sympathy (1)**
90:13
**Syracuse (3)**
57:1,23;60:7
**system (11)**
18:18;19:19;21:6;31:21;32:8,12;51:17;62:5;66:14;76:3;82:3

**T**

**table (2)**
9:5,5
**takeaway (1)**
58:19
**talk (15)**
17:2;30:13;40:10;44:17;51:2;55:15;58:20;72:12;73:4;84:19;91:4,5;95:25;98:3,18
**talked (4)**
27:20;60:18;76:17;82:11
**talking (7)**
34:14,15,19;57:10;62:4;83:11;88:25
**talks (1)**
34:12
**Tanc (1)**
65:11
**Tancred (1)**
6:20
**tear (1)**
73:22
**tee (1)**
59:11
**teed (3)**
13:23;72:7;97:8
**telling (4)**
44:12;54:8,14,14
**ten (1)**
52:19
**tenets (1)**
76:6
**tension (1)**
61:21
**term (1)**
44:21
**terminated (1)**
93:17
**terms (5)**
9:10;33:5;43:5;78:17;84:8
**terribly (4)**
94:20;96:7,22,23
**Thanks (4)**
5:22;6:3;31:13;47:5
**that'll (1)**
18:4
**theme (1)**
38:22
**theoretically (1)**
77:9
**theory (1)**
93:5
**therefore (2)**
42:4;87:19
**There'll (2)**
5:7;28:19
**third (2)**
26:2;35:11
**thirteen (1)**
37:19
**thirty (1)**
16:23
**thirty-five-million (1)**
69:2
**thirty-second (1)**
98:14
**thoroughly (1)**
21:4
**though (4)**
56:20;67:9;76:19;80:5
**thought (7)**
33:4;45:14;47:15;58:23;66:24;95:19;99:25
**thoughts (2)**
91:3,6
**threat (2)**
54:22;80:21
**three (7)**
16:14;18:6;26:12;63:7;68:10;71:14;80:18
**throw (1)**
47:24
**tied (1)**
71:10
**tilting (1)**
53:1
**Tim (2)**
6:15;48:21
**times (2)**
52:20;89:1
**timing (1)**
17:14
**Timothy (1)**
7:18
**today (18)**
5:13;9:2,11;15:14;

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 120 of 122

27:10;42:7;49:20;50:24;51:4;54:8;56:2;59:11;60:18;68:18;75:19;82:8;84:5;92:20
**today's (1)** 50:3
**together (3)** 22:9;24:5;38:1
**told (5)** 46:6,8;58:2;66:20;68:16
**tomorrow (4)** 38:17;68:18;72:15;94:24
**tongue (1)** 48:1
**took (4)** 25:18;51:15;73:13;77:1
**tool (10)** 52:4,5,6,12,15,23;58:20;69:22;93:16,16
**tort (15)** 5:20;18:18;19:18;21:6;31:21;32:8,12;51:17;66:13;75:1,4;76:3;78:6;83:24;94:17
**total (2)** 51:21;86:25
**touched (1)** 85:5
**toured (1)** 47:22
**toward (2)** 30:25;96:12
**towards (3)** 9:17;78:13;84:17
**toxic (3)** 71:13;73:6,14
**track (2)** 83:8;94:2
**traction (1)** 35:20
**trade (1)** 69:20
**Trans (1)** 8:8
**Transcontinental (1)** 79:25
**Transferring (1)** 5:5
**transpired (1)** 55:13
**Travelers (6)** 7:16;8:12;35:14;36:11;87:9,21
**treated (2)** 76:8;90:17
**treatment (3)** 42:21;77:12,14
**trees (1)** 65:7
**tremendous (1)** 18:17
**trial (7)** 38:18;54:22;56:21;72:13;76:17;81:18;88:8
**trial-ready (1)** 38:17
**tried (2)** 78:13;88:13
**true (5)** 46:5,13,15;73:23;77:1
**trust (1)** 84:14
**try (3)** 54:18;55:3;75:22
**trying (12)** 17:24;18:18;26:21;29:11;31:22;59:4;65:21;82:6;84:6;85:23,24;95:15
**TUESDAY (1)** 5:1
**turn (2)** 25:24;74:7
**turned (2)** 49:12;71:24
**TURNER (7)** 8:7,8,8;79:22,24,24;83:23
**turning (1)** 25:14
**TV (1)** 42:20
**twenty (1)** 84:2
**twenty- (1)** 20:24
**two (21)** 10:23;11:9;20:8;25:25;28:9;34:21;38:17,18;42:4;46:11;49:19;51:6;53:3;56:13,23;64:19;68:20;69:3;82:20;83:7;90:17
**types (1)** 75:3
**typical (1)** 30:22
**Typically (1)** 52:12

**U**

**UCC (1)** 6:14
**ultimate (1)** 96:25
**ultimately (5)** 54:2;59:17;61:9;71:18;93:1
**Um-hum (92)** 9:6;10:12;11:7,16,19;12:3;13:16,18;16:21;17:4,17;20:9;23:15,17,21,24;24:2,6,11,14;25:1,5,7,9,12,21;27:5,24;28:3;29:23,25;30:23;32:2,4,11;33:12,15;37:13,20;38:15,20,24;40:5;43:21;45:2;49:4,24;50:2,7,14,18;51:5;52:18;53:5,22;54:25;55:20;56:1,18,25;57:2;58:7;60:12;61:6,13;62:17,23;63:20;65:5,12;66:6,9;67:14;71:3;72:6,10,23;73:15;75:2;76:20;77:23;78:18,20;79:11;87:7,8,16;99:2,7;100:14;101:7,7
**unable (1)** 75:4
**under (8)** 19:2;57:17;67:5;74:3;77:14,18;81:23;96:21
**underlying (2)** 25:15;42:8
**undermine (1)** 19:8
**undermines (1)** 76:6
**understood (1)** 62:25
**uneven (1)** 81:10
**unexpected (1)** 97:11
**unfortunately (2)** 39:1;86:19
**UNIDENTIFIED (12)** 59:16;91:15,19,22,25;98:13,16,19,22,25;99:3,8
**uninsured (1)** 81:12
**unique (4)** 9:1;37:12;55:4;92:25
**universe (3)** 33:5,17,18
**unless (6)** 8:17;10:21;20:10;51:16;66:21;88:8
**unlike (1)** 55:5
**unlikely (2)** 59:11;72:21
**unlimited (2)** 86:7,10
**unprecedented (1)** 78:4
**unsolvable (1)** 29:1
**up (41)** 5:15;7:6;8:15,22;10:8;11:3;13:23;15:9;22:1;28:12;30:1;34:21;35:5;36:11;41:23;48:5,16,24;51:17;53:8;55:20;57:19;59:12;66:18,18,18;68:23;70:10,21;71:11;72:7;75:12;76:9;78:8;85:20;86:10;92:9;97:8;98:15,15;100:17
**upon (4)** 24:9;54:10;56:21;90:25
**Urge (4)** 35:23;55:10;99:9,11
**use (8)** 52:15;65:23,24;71:20;84:21;93:18;94:6;95:8
**used (2)** 52:6;93:17
**using (3)** 44:21;50:21;52:8
**utilize (1)** 52:11
**utilizes (1)** 52:12

**V**

**valuation (2)** 44:8;77:21
**value (2)** 84:12;95:25
**variety (3)** 40:13;41:8,9
**various (2)** 71:12;95:20
**vast (1)** 100:15
**verbs (1)** 52:6
**verdict (2)** 73:4;85:16
**versus (2)** 12:8;30:2
**veto (1)** 39:13
**view (4)** 21:14;29:4;40:23;95:8
**viewpoint (1)** 62:10
**views (1)** 69:4
**violate (2)** 57:20;58:4
**violates (1)** 77:14
**violation (3)** 13:13;57:8,24
**visibly (1)** 64:22
**vital (1)** 58:14
**vitally (2)** 19:17;20:1
**voice (1)** 40:22
**voluntary (2)** 18:25;24:12
**votes (1)** 88:19

**W**

**wait (1)** 56:3
**waiting (5)** 17:19,20;56:5,16;96:14
**waive (1)** 13:4
**waived (1)** 18:16
**waiver (1)** 13:15
**walk (1)** 73:13
**Walsh (22)** 7:7,7;75:13,15,15,18,21,24;76:1,19,21;77:24;78:16,19,21,24;79:6,9,12,15,17;88:4
**Walsh's (1)** 80:2
**wants (7)** 45:23;48:18;59:11;60:19;69:2;79:3;91:13
**war (2)** 73:8,10
**Warshak (1)** 82:13
**Washington (1)** 68:12
**way (36)** 19:22;20:4,7,12;22:25;29:14;32:15;39:9,10;44:8,25;45:21;47:24;51:25;52:8,9;58:20;59:12;61:4,10;63:10;64:9,10;65:17;71:12;76:6;79:12;83:25;85:15;86:6;94:12;95:9,17,21;96:10;101:5
**ways (2)**

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 121 of 122

59:13;76:19
**week (1)**
37:16
**weekend (1)**
84:10
**weeks (1)**
101:18
**Weisberg (1)**
41:17
**WEISENBERG (52)**
6:8,9;8:17,20;15:5,6;41:16;47:6,6,11,15;48:6,9,12,15;49:8,18,18,22,25;50:3,8,15,19;51:6;52:1,10,14,17,19,24;53:6,23;55:1;60:24;61:3,7,14,18,25;62:3,12,14,18,21,24;63:4,7,12,14;82:22;90:5
**weren't (1)**
67:12
**whatnot (3)**
65:18;71:12;74:6
**what's (12)**
33:4;45:17;52:10;54:7;55:13;66:11;68:17;69:4,5;70:4,18;95:17
**whatsoever (2)**
50:19;53:24
**whereas (2)**
13:9;86:21
**Whereupon (1)**
102:5
**whip (1)**
88:19
**White (1)**
83:20
**whole (10)**
19:8;24:8;28:22;52:7;58:21;66:15;69:18;85:8,23;90:7
**whomever (1)**
31:17
**who's (6)**
10:1;18:1,12;63:17;70:15;93:12
**Williams (2)**
46:7;83:20
**willing (5)**
9:22;35:18;40:7;73:20;89:12
**willingness (3)**
63:1;84:4,5
**win (1)**
65:21
**windmills (1)**
53:1
**window (3)**
81:4,5,6
**Wisconsin (1)**
68:11
**Wise (1)**
38:12
**Wisenberg (1)**
90:5
**wiser (1)**
31:5
**wisest (1)**
28:7
**wish (1)**
39:14
**withheld (4)**
19:12;30:12,16;31:8
**withholding (1)**
30:10
**within (4)**
50:20;62:5;90:8;99:9
**without (5)**
13:8;47:8;82:2;83:24;86:21
**woman (1)**
49:13
**wonderful (3)**
48:4;49:11;92:8
**Woodhull (2)**
72:8,9
**word (7)**
20:24;29:21;65:23;66:1;79:20;83:18;95:2
**words (2)**
13:3;93:18
**work (16)**
12:15;22:8;23:18;32:20;35:19;37:23;54:9;56:17,19;61:7;62:4,21;76:12;89:11;97:21;100:25
**worked (4)**
14:20;64:19,19,20
**working (6)**
10:5;24:5,9;55:7;78:13;84:7
**works (1)**
18:13
**world (5)**
40:11,12,15;54:18,19
**worried (3)**
19:7;96:22,23
**worry (2)**
19:18,19
**worst (1)**
17:23
**worth (1)**
71:19
**writing (1)**
49:16
**written (3)**
47:18;48:1;67:16
**wrong (3)**
26:10;32:19;50:10
**wrote (2)**
49:14;58:24
**Wyatt (10)**
7:15,15;36:12,15,21;37:1,5;85:3,4;87:3

**Y**

**year (1)**
73:13
**years (11)**
42:6;49:9;55:6;56:7,13,23;57:1;63:7;80:18;81:3;84:2
**Yep (1)**
56:12
**yield (1)**
46:25
**York (2)**
47:21;81:6
**young (1)**
47:21

**Z**

**Zurich (3)**
8:2;83:21,21

**1**

**1 (1)**
5:1
**10:30 (1)**
8:16
**10:38 (1)**
5:1
**1121d2A (1)**
77:18
**1123 (1)**
77:14
**12 (1)**
5:4
**12:28 (1)**
102:5
**14 (1)**
11:8
**150 (1)**
74:25
**168 (1)**
47:24
**168-mile-an-hour (1)**
47:13
**18 (1)**
26:3
**1985 (1)**
47:18
**1st (3)**
47:9,18;77:16

**2**

**2 (1)**
84:10
**2022 (1)**
80:15
**2024 (5)**
64:11,12,16;82:9,13
**2025 (2)**
5:1;81:15
**23-41723 (1)**
5:5
**25th (2)**
98:21,25
**28th (1)**
66:18
**2nd (1)**
82:13

**3**

**3 (2)**
91:8,16
**31st (1)**
64:16

**4**

**4 (1)**
11:18
**400,000 (3)**
69:1;87:14,20
**4001c (1)**
53:17

**5**

**500,000-dollar (1)**
42:18
**501 (1)**
38:4

**7**

**7th (1)**
64:24

**8**

**842 (1)**
98:23

Case: 23-40523 Doc# 2094-8 Filed: 06/25/25 Entered: 06/25/25 15:09:50 Page 122 of 122