# Exhibit 9

```
1              UNITED STATES BANKRUPTCY COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                        -oOo-

4   In Re:                      ) Case No. 23-40523
                                ) Chapter 11
5   THE ROMAN CATHOLIC BISHOP OF )
    OAKLAND                      ) Oakland, California
6                               ) Wednesday, December 18, 2024
                      Debtor.   ) 11:36 AM
7   _____ )
                                  1. DEBTOR'S MOTION FOR ORDER
8                                 (I) APPROVING DISCLOSURE
                                  STATEMENT; AND (II)
9                                 ESTABLISHING PROCEDURES FOR
                                  PLAN SOLICITATION FILED BY
10                                THE ROMAN CATHOLIC BISHOP OF
                                  OAKLAND (DOC. 1453)
11
                                  4. MOTION FOR ENTRY OF AN
12                                ORDER APPOINTING A LEGAL
                                  REPRESENTATIVE FOR UNKNOWN
13                                ABUSE CLAIMANTS FILED BY THE
                                  ROMAN CATHOLIC BISHOP OF
14                                OAKLAND (DOC. 1503)

15             TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE WILLIAM J. LAFFERTY
16             UNITED STATES BANKRUPTCY JUDGE

17  APPEARANCES:
    For the Debtor:        ANN MARIE UETZ, ESQ.
18                          Foley & Lardner LLP
                            500 Woodward Avenue
19                          Suite 2700
                            Detroit, MI 48826
20                          (313)234-2800

21                         MARK C. MOORE, ESQ.
                            Foley & Lardner LLP
22                          2021 McKinney Avenue
                            Suite 1600
23                          Dallas, TX 75201
                            (214)999-4667

24

25
```

```
 1  APPEARANCES (CONT'D):
    For the Debtor:            MATTHEW D. LEE, ESQ.
 2                              Foley & Lardner LLP
                                150 East Gilman Street
 3                              Suite 5000
                                Madison, WI 53703
 4                              (608)258-4258

 5
    For Official Committee of  GABRIELLE ALBERT, ESQ.
 6  Unsecured Creditors:       Keller Benvenutti Kim LLP
                                425 Market Street
 7                              26th Floor
                                San Francisco, CA 94105
 8                              (415)496-6723

 9                             BRENT WEISENBERG, ESQ.
                                JEFFREY D. PROL, ESQ.
10                              Lowenstein Sandler LLP
                                One Lowenstein Drive
11                              Roseland, NJ 07068
                                (973)597-2500
12
                               JESSE J. BAIR, ESQ.
13                              TIMOTHY W. BURNS, ESQ.
                                Burns Bair LLP
14                              10 East Doty Street
                                Suite 600
15                              Madison, WI 53703
                                (608)286-2302
16
    For Continental Insurance  MARK D. PLEVIN, ESQ.
17  Company:                   Crowell & Moring LLP
                                Three Embarcadero Center
18                              26th Floor
                                San Francisco, CA 94111
19                              (415)986-2800

20  For Westport Insurance     TODD C. JACOBS, ESQ.
    Corporation:               Parker, Hudson, Rainer & Dobbs LLP
21                              Two North Riverside Plaza
                                Suite 1850
22                              Chicago, IL 60606
                                (312)477-3306
23

24

25
```

```
 1   APPEARANCES (CONT'D):
     For Certain Underwriters    BETTY LUU, ESQ.
 2   at Lloyd's of London        Duane Morris LLP
     Subscribing:                865 South Figueroa Street
 3                                Suite 3100
                                  Los Angeles, CA 90017
 4                                (213)689-7421

 5   For Office of the United    JASON BLUMBERG, ESQ.
     States Trustee:             United States Department of
 6                                Justice
                                  501 I Street
 7                                Suite 7-500
                                  Sacramento, CA 95814
 8                                (916)930-2100

 9   Also Present:               HON. MICHAEL HOGAN
                                  Mediator
10

11

12

13

14

15

16

17   Court Recorder:             DA'WANA CHAMBERS
                                  United States Bankruptcy Court
18                                1300 Clay Street
                                  Oakland, CA 94612
19

20   Transcriber:                MICHAEL DRAKE
                                  eScribers, LLC
21                                7227 N. 16th Street
                                  Suite #207
22                                Phoenix, AZ 85020
                                  (800) 257-0885
23
     Proceedings recorded by electronic sound recording;
24   transcript provided by transcription service

25
```

1   OAKLAND, CALIFORNIA  WEDNESDAY, DECEMBER 18, 2024 11:36 A.M.

2                        --oOo--

3           THE CLERK:  Calling line item number 10 for the Roman

4   Catholic Bishop of Oakland, Case Number 23-40523.

5           THE COURT:  Okay.  Let's start with appearances in the

6   courtroom, please.

7           MS. UETZ:  From the table is okay, Your Honor, or --

8           THE COURT:  For now.

9           MS. UETZ:  Thanks.  Ann Marie Uetz of Foley & Lardner

10  on behalf of the debtor.

11          THE COURT:  Okay.

12          MS. UETZ:  I have with me Bishop Barber, as well as

13  Attila Bartos, our chief financial officer, with me in Court as

14  well.

15          THE COURT:  Very good.  Okay.  Thank you so much.

16  Okay.  And you're presenting the argument?

17          MS. UETZ:  I'm presenting the argument, Your Honor.

18  I'm going to request that I share parts of it with my partners,

19  but I'll address that with the Court when I can.

20          THE COURT:  Well, do you want to -- should they state

21  their appearances now?

22          MS. UETZ:  Oh, they -- I would like them to, yes.

23          THE COURT:  Okay.  Are they on the Zoom or are they

24  here?

25          MS. UETZ:  They're here.

```
1              THE COURT:  Okay.

2              MS. UETZ:  Thank you.

3              THE COURT:  They can go ahead and do that.

4              MR. MOORE:  Your Honor, Mark Moore and Matt Lee from

5    Foley & Lardner on behalf of the Roman Catholic Bishop of

6    Oakland.

7              THE COURT:  Okay.

8              MS. UETZ:  Also with us is Shane Moses.

9              THE COURT:  I see Mr. Lee lurking in the shadows

10   there.  Okay.

11             MR. LEE:  Thank you, Your Honor.

12

13             THE COURT:  All right.  Hi, Mr. Moses.  Nice to see

14   you.

15             Okay.  Other side of the room?

16             MS. ALBERT:  Good morning, Your Honor.  Gabrielle

17   Albert, Keller Benvenutti Kim, on behalf of the committee.

18             THE COURT:  Okay.

19             MS. ALBERT:  I will let Mr. Lowenstein introduce

20   himself.

21             THE COURT:  Mr. Lowenstein?  Now that is a field

22   promotion, right?  Mr. Lowenstein.  That's rare.

23             MR. WEISENBERG:  Your Honor, I'll --

24             UNIDENTIFIED SPEAKER:  If Mr. Lowenstein wasn't here

25   today --
```

1        MS. ALBERT:  I just caught that.

2        THE COURT:  I've always wanted to be Mr. Jerry Falk

3   (phonetic), but it never happened that way.  So too bad.  Okay.

4        MR. WEISENBERG:  Having been a name partner, I'm now

5   going to retire.

6        THE COURT:  Yeah.

7        MR. WEISENBERG:  And I'll leave Mr. Prol to argue.

8        Your Honor, Brent Weisenberg of Lowenstein Sandler on

9   behalf of the committee.  Your Honor, we also would ask your

10  indulgence to allow myself and Mr. Prol, as well as Mr. Burns

11  and Mr. Bair in the event insurance issues come up.

12       THE COURT:  Sure.  Thank you.

13       MR. WEISENBERG:

14       THE COURT:  Sure, sure, sure.  Okay.

15       MR. PROL:  Good morning, Your Honor.  Jeff Prol of

16  Lowenstein Sandler also for the committee.

17       THE COURT:  Okay.

18       MR. BAIR:  Good morning, Your Honor.  Jesse Bair,

19  Burns Bair, special insurance counsel for the committee.

20       THE COURT:  Okay.

21       MR. BURNS:  Good morning, Your Honor.  I'm Tim Burns.

22       THE COURT:  Okay.  Anybody else in the gallery who

23  expects to make a presentation today?

24       MS. UETZ:  Excuse me, Your Honor.  I would note that

25  we have Matthew Kemner here as well.  Who is counsel to the

1  bishop.  We don't expect he'll make a --

2          THE COURT:  Not.  Not for Foley & Lardner.

3          MS. UETZ:  Want to highlight him.  Correct.

4          MR. KEMNER:  Good morning, Your Honor.  Matthew

5  Kemner.

6          THE COURT:  Okay.

7          MR. PLEVIN:  Good morning, Your Honor.  I don't know

8  if I'll be saying anything, but Mark Levi, on behalf of

9  Continental Insurance Company.

10         THE COURT:  Okay, great.  Nice to see you.

11         MR. PLEVIN:  Thank you.

12         THE COURT:  Thank you.

13         MR. JACOBS:  Good morning, Your Honor.  Nice to see

14  you again.  Todd Jacobs on behalf of Westport Insurance

15  Corporation.  And I'm here with my partner, Harris Ginsberg.

16         THE COURT:  Okay.  Good morning.

17         MR. JACOBS:  And Blaise Curet.

18         THE COURT:  Okay.  Very good.

19         MR. JACOBS:  I don't know if we'll have anything to

20  say today or not.

21         THE COURT:  Okay.

22         MR. JACOBS:  We'll see.

23         THE COURT:  Okay.

24         MR. JACOBS:  Oh, you bet.  Okay.

25         MR. SCHIAVONI:  Judge, Tanc Schiavoni for Pacific.

1 And I have my partner, Steve Warren.

2        THE COURT:  Right.

3        MR. SCHIAVONI:  I don't think I'm going to say

4 anything.  But the one thing I would like to say is just to

5 express our appreciation to the mediator judge who worked so

6 hard on this.

7        THE COURT:  Okay.  Thank you very much.  Okay.  All

8 right.  Anybody else in the courtroom?  Okay.

9        How about on the Zoom?

10        MS. LUU:  Good morning, Your Honor.  Betty Luu on

11 behalf of the certain London market insurers.

12        THE COURT:  Okay.

13        MR. BLUMBERG:  Good morning, Your Honor. Jason

14 Blumberg for the United States Trustee.

15        THE COURT:  Okay.  All right.

16        Well, Ms. Uetz, it's your motion.  If there's

17 something that you want to begin by way of an opening

18 statement, I'm happy to hear it.  I have some thoughts.  And

19 I'm happy to go second.  So if there's anything you want to

20 lead off with, feel free.

21        MS. UETZ:  Your Honor, if it please the Court, my

22 comments may be informed by yours.  And so I'm happy to go

23 second.

24        THE COURT:  Okay.  All right.  Okay.

25        MS. UETZ:  It's your show.  Thank you.

1        THE COURT:  Well, no, it's all of our show.

2        MS. UETZ:  Well, it's all of us.

3        THE COURT:  Okay.

4        MS. UETZ:  But we take direction from you.

5        THE COURT:  Thank you.

6        MS. UETZ:  Thank you so much.

7        THE COURT:  Let me make the following comments.  And

8   this -- when we had the discussion, the sort of scheduling

9   discussion a few weeks ago in light of the committee's request

10  that I consider matters that they believe to be quite

11  important, and I'm sure they believe to be not just important

12  in the progress of the case but also related to disclosure

13  statement issues, I did separate them out.  And I did indicate

14  that I wanted to begin with this as a disclosure statement

15  hearing.

16        Having said that, everybody in this room has been

17  through enough disclosure statement hearings to know that in a

18  process as complicated and dynamic and iterative as the

19  bankruptcy confirmation process, there are a lot of different

20  ways to, shall we say, handle a disclosure statement here.

21  There are a lot of things that can come up in connection with

22  this beginning of this process.  And for me, it is the

23  beginning.  You've all been at this a long time.  You know what

24  your negotiations have been like.  You know what accommodations

25  have been made and haven't been able to be made yet.  And you

1   probably have an idea of where you think this ends up in a

2   month or two or three.  But this is the beginning of the

3   process for me.

4           So let me give you the following thoughts.  Well, let

5   me let me begin with a point that I want to get out there not

6   because I'm cynical, but because I think these cases are a

7   little different.  To the extent that a disclosure statement is

8   a document prepared by the proponent of a plan that is to aid

9   people voting on the plan in making an intelligent decision

10  about this, without meaning to be too cynical, these cases may

11  play out a little bit differently in the sense that we could --

12  my guess is, on some level, we could have a vote tomorrow.  And

13  the people who are here know how they're going to vote.

14          So part of this reality is, this is not as much about

15  convincing people who are unsure what to do as it is in some

16  ways about making sure that everybody who cares about this has

17  a chance to contextualize this process in a way that they think

18  is important so that the information is out there, whether it

19  necessarily changes their mind or not.  I think that there is a

20  perfectly valid purpose to a disclosure statement that is

21  supplemental to am I going to convince somebody to vote one way

22  or the other.  I think we are making a record in all kinds of

23  ways with this, beginning with the disclosure statement.  And I

24  think that's important.

25          So even though one could say, do you really need to

1    add that because the committee has formed a conclusion about

2    the plan that isn't favorable, and if we voted on it, I know

3    how they vote?  Okay, you could say that.  I still think that

4    it's important enough to begin this process and continue this

5    process in as comprehensive a way as we can so that, to the

6    extent it's necessary to the process that all voices are heard,

7    all voices are heard.  So I hope that's sensible as a beginning

8    of a contextualization.

9          So if we treated this -- if indulging that notion, we,

10    for lack of a better word, treated this as a disclosure

11    statement hearing, it seems to me there's typically three

12    buckets that you put things in.  The first bucket is somebody

13    says you really need more information about X or Y or Z or the

14    description isn't clear or we need to clarify something, or

15    sometimes and it may be very relevant here, there is a very

16    important constituency here that has a very different view of

17    something and that should be -- that view should be exposed as

18    well as the proponents view.  So there's a bucket of issues

19    that fall into that.  And there are a few of those today.

20          There are sometimes matters that are so clearly not

21    going to work that you don't want people going to the trouble

22    of soliciting acceptances or rejections based on something that

23    you flat out know or the judge believes is not going to be an

24    appropriate approach or one that's going to be consistent with

25    1129(a)(1) et seq., as interpreted by the case law.

1      And then there's the third piece.  And the third piece
2   is things that people feel very passionately about and are
3   convinced they're going to win an argument about factually and
4   legally at confirmation.  But you don't look at it as today
5   it's a showstopper.  If they're right, yeah, it is.  But
6   between the robustness of that third category, which is not
7   quite you could never get there but there could be some serious
8   problems here, between that and the notion that this is a
9   dynamic situation and that a lot of things could happen here,
10  including there could be further conversations, including that
11  I may -- I'm not trying to give anybody a heart attack, I may
12  well grant a motion for relief from stay in two weeks to start
13  testing some of the things that are being discussed here, I may
14  well require there to be considerably more disclosure about
15  some of the transactions that predated the bankruptcy, which
16  may lead to further discovery issues, may lead to further
17  litigation issues.
18      And I would certainly want to take account of how I
19  fold in is another question.  I certainly want to take account
20  of the committee's idea that they simply have a very different
21  idea about this case and what the principles are that should be
22  guiding what the assets are available and what the claims are
23  to be paid.
24      All of that, I think, is part of a dynamic that even
25  if I don't say I'm going to stop the presses right now because

1  of those disagreements, I think they have to be in the front of

2  our minds the whole time.

3        So that's my sense of this.  Now, where we -- my

4  recollection is that the exclusivity re solicitation is through

5  January 8th.  All right.

6        Look, it's not -- let me throw another idea out there.

7  If it turns out that we don't approve a disclosure statement

8  today, and I think probably we're looking at some amendments

9  and some clarifications and we're coming back at some point is

10 my sense, but we'll see, if we don't there's a big difference

11 to me between extending out somewhat the solicitation deadline

12 so that we get to an agreement about what this thing ought to

13 look like for solicitation purposes and when we have a

14 confirmation hearing.  Those things don't have to be linked up

15 by twenty-eight or thirty-five days.  There's a lot of play in

16 the joints there as far as I'm concerned.  Once we get to -- if

17 we get to a angle of repose on what the disclosure statement

18 ought to look like, we can time a lot of other things according

19 to what the parties need to do and what they think I need to be

20 mindful of and the possibility of further discussion and all

21 the other things you're already knowing I'm not saying, okay?

22        So that's where I begin this process.  Is that

23 helpful?  Okay.  Doesn't surprise you?

24        MS. UETZ:  No.

25        THE COURT:  Other than I may not approve it today.

1    MS. UETZ:  Not surprised by that.

2    THE COURT:  Well, no, you're entitled to say I'm

3 shocked by that, Judge.  Okay.  All right.

4    How would you folks like to proceed?  I mean, I don't

5 want to interfere in the way you want to present the motion.

6 But in my mind, we can start with any one of those three

7 buckets, or you can organize it differently in your own mind.

8 If you need a few minutes, given what I've said, to think, we

9 can take five minutes.  Up to you.

10    MS. UETZ:  Your Honor, if it pleases the Court, I have

11 about six minutes of an opening statement that I would like to

12 make --

13    THE COURT:  Sure, sure.

14    MS. UETZ:  -- that touches on some of what you said.

15    THE COURT:  Yeah, I'm not surprised.

16    MS. UETZ:  And then I will land with your last

17 question.

18    THE COURT:  Okay.  All right.

19    MS. UETZ:  Is that okay?

20    THE COURT:  Are you ready now?

21    MS. UETZ:  I am.

22    THE COURT:  Okay.  Come on up.

23    MS. UETZ:  Thank you.

24    THE COURT:  Um-hum.  If I were timing you.

25    MS. UETZ:  Well, Mr. Lee kept interrupting me when I

1  was practicing, so it was between six and seven minutes.  All
2  right.
3        THE COURT:  All right.  We'll allow you to go over
4  budget by ten percent.  Okay.
5        MS. UETZ:  Thank you, Your Honor.
6        THE COURT:  All right.  No problem.
7        MS. UETZ:  Thank you very much.
8        And good morning.  It's still morning.
9        THE COURT:  Yeah.  It's still morning.
10        MS. UETZ:  May it please the Court?
11        THE COURT:  Yeah.
12        MS. UETZ:  Just a quick note.  We are here today on
13  actually two motions that are scheduled.  It's the motion to
14  approve the disclosure statement as well as the debtor's motion
15  to appoint a legal representative --
16        THE COURT:  Right, right, right, right.
17        MS. UETZ:  -- for unknown abuse claimants.
18        THE COURT:  Right.
19        MS. UETZ:  It goes without saying, but I will say it,
20  Your Honor, today represents a critically important milestone
21  for the parties and stakeholders in this Chapter 11 case.
22        Since filing this case some nineteen months ago, the
23  debtor has been consistent in pursuit of its stated goal.  And
24  I've stated this goal repeatedly:  One, to provide a fair and
25  equitable compensation for survivors of sexual abuse; and two,

1   to reorganize the debtor to enable it to continue its mission

2   to do its charitable work and serve the needs of the faithful,

3   including parishioners and including the poor, within the

4   Diocese of Oakland and the counties which it serves, Alameda

5   and Contra Costa primarily.

6          These two prongs are the focal point of the plan that

7   the debtor filed with this Court.  The committee complains that

8   Bishop Barber did not propose the plan in good faith.  We

9   believe this is belied not just by his actions throughout this

10  Chapter 11 case, some of which you have seen firsthand, some of

11  which will be described to the Court during this process.  It

12  is also belied by Bishop Barber's actions before we filed

13  Chapter 11, through his leadership and work to prevent future

14  abuse of minors and to help ensure child protection,

15  reconciliation and healing for sexual abuse survivors.  Bishop

16  Barber is attempting to do here what the diocese can do in

17  accordance with the Bankruptcy Code to achieve the two goals

18  that we have repeatedly described.

19         We believe the disclosure statement adequately

20  describes a plan which establishes a survivor's trust funded by

21  the debtor and non-debtor contributing entities.  Of course,

22  the debtor believes the plan is fair and equitable and that the

23  payment to the survivors trust is significant, meaningful, and

24  fair, and compares favorably to already confirmed plans and

25  other diocese cases.

1          Your Honor, I've previously expressed to this Court, I

2     think I do it nearly every time I'm here, that it is our strong

3     preference to reach a global settlement in this case.  And that

4     remains the debtor's preference.  But we are where we are.

5          The debtor worked tirelessly with the committee and

6     the insurers toward a global settlement during mediation

7     sessions throughout 2024.  Bishop Barber has been committed to

8     the debtor's goals in this Chapter 11 and to that process to

9     try to reach a global resolution.  Unlike some of the members

10    of the committee and some employees of the insurers, Bishop

11    Barber attended mediation sessions in person.  He wasn't

12    required to by the mediators.  He was there trying to reach

13    agreement, trying to get consensus for a plan.

14         Bishop Barber has been transparent throughout this

15    case.  He approved the production of information and documents

16    requested by the committee.  And you've repeatedly heard about

17    that.  What the committee now complains about, and as just one

18    example, the transfer of assets to the Oakland Parochial Fund

19    prior to the filing, which funded the administrative costs of

20    this Chapter 11, the burn of about 1.2 to 1.3 million dollars

21    per month to pay professionals and other costs for this Chapter

22    11, that was fully disclosed since day 1.  That's just one

23    example, Your Honor.

24         THE COURT:  Well, it wasn't described in the

25    disclosure statement.  Now maybe you thought, well, it's been

1  discussed elsewhere.  But the rationale for it wasn't

2  described.

3          MS. UETZ:  And --

4          THE COURT:  That's a point that we may pause on later,

5  okay?

6          MS. UETZ:  To Your Honor --

7          THE COURT:  And by the way, none of this suggests I

8  think there's something nefarious here.  The disclosure is

9  always sort of in the eye of the disclosure, right?

10         MS. UETZ:  Sure.

11         THE COURT:  Okay.

12         MS. UETZ:  And to your point earlier -- and look,

13 we're under no illusion.

14         THE COURT:  Yeah.

15         MS. UETZ:  Based on your comments and based on our

16 experience, there will be changes to the disclosure

17 statement --

18         THE COURT:  I bet there will.

19         MS. UETZ:  -- before it goes out.

20         THE COURT:  I bet there will.

21         MS. UETZ:  Right?

22         THE COURT:  Yep.

23         MS. UETZ:  Better than my Lions bet last weekend, one

24 of which I made by mistake and the second one which --

25         THE COURT:  Well, did you have the over or the under?

1          MS. UETZ:  I mistakenly pushed under, Your Honor.  It

2    was a disaster.

3          THE COURT:  It was a bad bet.  Yeah, it was a bad bet.

4          MS. UETZ:  Your Honor, Bishop Barbour agreed to the --

5    again, consistent with trying to move toward resolution, and

6    then I'll move on, he agreed to the committee's request for the

7    two survivor conferences which have been conducted.  He didn't

8    have to do that.  We embraced it.  We cooperated with it.  And

9    he was here.  And he expressed his sincere and unequivocal

10   sorrow and regret to the survivors.

11         Again, unfortunately, we are where we are with the

12   committee for a variety of reasons.  But nonetheless, we are in

13   Chapter 11.  And Bishop Barber has been able to propose a plan

14   which pays abuse survivors in line with other dioceses, Chapter

15   11 cases.  And it provides with the agreement of the insurers,

16   which was reached in mediation the day before we filed,

17   November 7th, for the complete assignment of insurance rights

18   for the benefit of the survivors of sexual abuse through a

19   transfer to the trust of the rights and obligations of the

20   debtor to its insurance policies and providing a direct right

21   of action to the claimholder to each survivor to decide for him

22   or herself.  It is the survivor's choice under this plan, not

23   the committee's, not the trustee of the survivors trust, not

24   anyone's choice but the individual survivor, so that under the

25   plan, if a survivor wants to have his or her day in court, they

1  can.  We've heard that repeatedly through this case.  They

2  don't have to, but they can.

3      THE COURT:  I have to say, it's not as if any part of

4  the disclosure statement was tossed off lightly.  But the

5  provisions about the litigation option and about the continuing

6  rights of the nonsettling insurers, I thought without

7  indicating approval or not, because that's not important right

8  now, they were very, very, very clearly thought through with

9  enormous detail.  And I get that.  And everybody will comment

10 on that.  But it was  -- that was a particular place where it

11 was clear people were spending a lot of time thinking that

12 through, because I think, among other things, there have been

13 cases where when those issues have not been so carefully

14 thought through and things come up post-confirmation, it's

15 never a good result.  So just an observation.  Nothing more

16 than that.

17      MS. UETZ:  Your Honor, we've heard loud and clear

18 throughout this case that the rights of the survivors are very

19 important.  And we felt it very important in this provision to

20 give that choice to the survivors.  And I will say we thank

21 Judge Newsome and Mr. Gallagher who were extraordinary in

22 bringing some of the parties together on those points.

23      THE COURT:  Well, I know the committee probably has a

24 different idea.  And we'll certainly hear that too.  So that's

25 fine.  Okay.

1          MS. UETZ:  Your Honor, the plan does not -- this is
2    what it does not do.  Plan does not pay sexual abuse survivors
3    the amounts the committee claims might be awarded by state
4    court juries in California or elsewhere, nor do we purport to
5    do so.  We are a debtor in a Chapter 11 case administered
6    pursuant to the Federal Bankruptcy Code.  And in accordance
7    with the requirements of the Federal Bankruptcy Code, the
8    debtor's plan in this Chapter 11 case, we believe, provides
9    fair and equitable compensation for survivors of sexual abuse
10   and reorganizes the Roman Catholic Bishop of Oakland to enable
11   it to continue to serve the needs of the faithful and to
12   continue its mission within the community.
13          Much of the committee's objection to the disclosure
14   statement is premised on really three things.  We think whether
15   the plan is fair and equitable, whether it was proposed in good
16   faith, whether the debtor can satisfy the best interest test.
17   And we'll get to the committee's other objections.
18          But in short, Your Honor, I think even the committee
19   would agree with me that their objection is that the debtor is
20   not giving enough.
21          Your Honor, added to that is that despite the
22   committee's repeated statements to this Court from the earliest
23   days in this case that it wanted for its constituents an
24   assignment of the debtor's insurance rights, it now objects to
25   that when we've given the choice to the survivors themselves.

1        Your Honor, there will be a day when this Court

2   decides whether the debtor has given enough and whether the

3   insurance assignment, which has been which has been confirmed

4   in other cases, is appropriate here.  Of course, that day will

5   come.

6        But first we need to get the disclosure statement

7   approved.  We need creditors to vote on the plan.  And

8   ultimately, as the judge in this case, you will decide whether

9   the debtor has met the requirements for confirmation.

10       The committee's objection filed with this Court, we

11  believe, can really be distilled into two buckets.  One is

12  specific objections to specific statements, kind of like one of

13  your buckets, Your Honor, about statements that are either

14  included or not included in the disclosure statement.  And

15  we've addressed those in our reply in a chart we attached as an

16  appendix and incorporated into the reply.

17       The committee also, I put this in the second bucket,

18  makes broad objections to the plan, arguing essentially it's

19  patently unconfirmable.

20       Additionally, and this touches on some of what Your

21  Honor mentioned in your remarks, through its objection, the

22  committee -- Your Honor didn't say this.  That might have been

23  a poor choice of an intro, but it relates I think.  The

24  committee toward the end of its objection I think in the final

25  section seeks to delay the schedule for confirmation of the

1  plan. And of course, that doesn't need to be decided today.

2  But I would just note that it appears that the schedule that

3  the committee is suggesting in light of the lift stay and six

4  state court cases going to trial in state court is two-plus

5  years.

6        Of course, this isn't a disclosure statement

7  objection. It may or may not be a plan objection. We do

8  believe that it's a pretty transparent attempt by the committee

9  to leverage the debtor and the insurers into a better plan,

10  into a better deal. And I get that.

11        The issue, and I've been plain about this more so

12  recently, is one of time we don't have the money to pay the

13  burn to stay in Chapter 11. We've shared the cash forecast

14  with the parties. And we are running out of money. And that

15  will be something that's addressed before this Court in fairly

16  short order as well in more detail. So when we get to talking

17  about the schedule and what lies ahead, if the plan is to run

18  out the clock on the debtor's ability to pay the Chapter 11

19  administrative expenses associated with this case, that may

20  happen.

21        Finally, Your Honor, not to be overlooked, the United

22  States Trustee has filed its objection to the disclosure

23  statement. We believe that many of those objections are really

24  plan objections and not disclosure statement objections. And

25  we don't think that the UST's objection rise to the patently

1  unconfirmable level, nor do we think the committee's do.

2      There are some technical objections which the United

3  States Trustee has made which, I believe, can be worked

4  through, so to speak.  And I don't think that they would be an

5  ultimate bar to approval of the disclosure statement.

6      And of course, the UST, as expected and projected,

7  objects to the opt-out third-party releases, arguing they are

8  non-consensual and they violate the Supreme Court's decision in

9  Purdue.  We believe the law supports the debtor's position on

10  that issue in a way that will support approval of the

11  disclosure statement as we work through that argument with the

12  Court.

13      In terms of how to proceed, Your Honor, in light of

14  what you've described and our own thoughts one idea -- and we

15  could put this over if the Court prefers, but one idea is to

16  just get through the motion to appoint the future claims rep

17  because he's on the Zoom, and it probably won't take long.  I

18  don't believe there have been any objections to that motion, if

19  my memory is accurate  And then address the committee's

20  specific objections regarding what the disclosure statement

21  does and does not state, the chart if you will, then proceed to

22  the committee's broader objections, and then to the United

23  States Trustee's objections because some of those we believe

24  will have been addressed through our discussion about the

25  committee.

1         And finally, Your Honor, as I mentioned earlier, if it

2   please the Court, I will need the help of my partners in these

3   arguments.  So I have Mr. Lee, Mr. Moore, and Mr. Moses here.

4   I also have my insurance partner or partners, I'm not sure,

5   available by Zoom.

6         And Your Honor, with that, we truly thank the parties,

7   all of the parties, and the Court for your and for their

8   consideration.

9         THE COURT:  Okay.  Thank you.

10        Would it make sense to have the committee make a

11  similar opening statement?  Do you want to do that for theme

12  purposes?  Mr. Weisenberg, it's up to you.

13        MR. WEISENBERG:  Sure.  Your Honor.  typically I --

14        THE COURT:  if you want to defer it and have us take

15  up the --

16        MR. WEISENBERG:  Your Honor, Brent Weisenberg on

17  behalf of the committee.

18        I think it will be helpful.  Typically, I enjoy when

19  Your Honor asks questions and we can think through problems

20  collectively.  But I do believe that, given some of the

21  comments that were made, a retort is required.  I will not go

22  point by point.

23        THE COURT:  Sure.  Okay.

24        MR. WEISENBERG:  I will do my best to stick with why

25  we're here today.

1          THE COURT:  Okay.  And if it's okay, I don't want

2    to -- because I think there should be some immediacy between

3    the two statements.  If at that point we want to take up the

4    probably unopposed motion with the rep, that's fine, okay?

5    Does that work for folks?  Okay.  But I don't want to delay

6    you.  Go ahead.

7          MR. WEISENBERG:  Thank you, Your Honor.

8          Let me start in reverse order, such that I believe we

9    should use the initial part of today's hearing to determine

10   whether the plan is confirmable.  We've set forth in great

11   detail that we believe the plan is dead on arrival.  Whether

12   that be because of the definition of release or exculpation or

13   the admitted failure not to follow the hypothetical liquidation

14   test, any one of those three reasons makes the plan, within its

15   four corners today, unconfirmable.  And so there's no reason to

16   go through what is or is not missing in the disclosure

17   statement, what may be misleading.  We'd prefer to focus on the

18   plan.

19         And Your Honor, that kind of ties in to our case

20   vision.  And that has been used against us in many ways, as if

21   it's nefarious, that we have an idea about how this case should

22   unfold.  Your Honor, we want this case to unfold logically and

23   linearly.  What do I mean by that?  We have fundamental

24   disputes with the debtor about what is and is not assets of the

25   estate.  We have fundamental disputes about the value of

1  claims.  We do not believe this case can move forward,

2  decisions can be made until those issues are resolved.

3       It ties into the entire problem with the disclosure

4  statement.  Like Your Honor has already observed, there is no

5  discussion in the disclosure statement about 106-million-dollar

6  transfer on the eve of bankruptcy.  Until Your Honor has an

7  opportunity to decide that, we don't know if those funds are

8  property of the estate and potentially available to pay

9  creditors or they're not.

10      The same issue lies with respect to the relationship

11  between the non-debtor entities and the debtor.  We're talking

12  about hundreds of millions of dollars that essentially divide

13  us regarding what's available to pay creditors.  And so we're

14  continually tagged with the notion that we're running out the

15  clock, we're trying to drive expenses.  Nothing could be

16  further from the truth, Your Honor.  In every one of our

17  pleadings -- not every one, but we'll say half, we make mention

18  of the fact that every day, survivors' memory fades and

19  survivors pass away.  We want resolution immediately, but we

20  want a fair and equitable resolution for all survivors.

21      And Your Honor, fair and equitable doesn't mean what

22  the debtor tells us what it means.  And that's what this plan

23  is.  The debtor has said we filed this case to treat survivors

24  fairly and equitably, and we've decided that this plan is fair

25  and equitable.  They say that at the same time by saying that

1  two fundamental protections that the Bankruptcy Code provides,

2  the absolute priority rule and the hypothetical liquidation

3  test, are inapplicable to this case.  So think about that.  The

4  two fundamental protections that prevent a debtor from

5  unilaterally deciding what it could pay creditors in this case

6  would be removed.  The ramifications of allowing that, Your

7  Honor, would essentially allow a debtor to determine what it

8  thinks is fair and deprive creditors of those vital

9  protections.

10          And so, Your Honor, we think it's important that we go

11  through this case, again, logically and linearly.  Let's talk

12  about what is and is not asset to the estate.  And through the

13  lift stay, let's find out what these cases are really worth.

14  The insurers and the debtor and the committee have vehement

15  disagreement about that.

16          Well, how do we solve for that?  Why don't we allow an

17  actual jury to determine what these cases may be worth or may

18  not be?  And so if that's going to be tagged with the notion

19  that we're running out the clock, then so be it, Your Honor.

20  But we would submit that it's a better path forward than if we

21  stay on this course and in three, four, or five months from

22  now, you find the plan is not confirmable for any number of

23  reasons, what have we achieved?  We haven't figured out what

24  are assets to the estate.  We haven't figured out the valuation

25  of claims.  And so we're starting from scratch.  That seems to

1  make little sense.

2        We would submit that our way, our proposed way,

3  actually drives this case to resolution, because once Your

4  Honor makes a decision about these fulcrum issues, the parties

5  are going to know what the playing field is.  And they'll be

6  able to mediate within those confines.  But standing here

7  today, we have diametrically opposed views.

8        THE COURT:  Can I make an observation?

9        MR. WEISENBERG:  Of course.

10        THE COURT:  This is probably very simplistic, but it

11  strikes me that there's two pieces to what you just said.  One

12  piece is a complicated legal question of whether entities that

13  are separately incorporated really should be deemed to be -- I

14  mean, I don't want to say liable for these claims, but there

15  should be a world in which we think of them as essentially

16  owning assets that are available to pay or should be made to be

17  available to pay claims.  Okay?  That's the lawsuit, right?

18  That's the adversary proceeding?

19        MR. WEISENBERG:  Correct, Your Honor.

20        THE COURT:  Okay.  That's complicated.  And we'll talk

21  about how that might play out.

22        The other piece of this where I'm kind of searching

23  for how to articulate it best, to the extent that the diocese

24  says we are the diocese, within the diocese, there are churches

25  there are different sorts of entities for purposes other than

1  whether our assets are theirs -- I don't think there's not an

2  explicit disagreement that a church asset is a diocese asset.

3  But within that, we're making a decision how much of that is

4  available.  And I think part of that -- I mean, that goes to

5  the question of, well, if you couldn't liquidate us because

6  we're a nonprofit and you couldn't replace the bishop for First

7  Amendment reasons, does that mean we have no obligation to make

8  these assets available?

9        What I'm searching for is a world in which the debtor

10 tells us why that's the case.  What is the rationale for why

11 this is available?  And that is, what is the limit?  And

12 there's a lot of ways they could express that.  And just to get

13 this on the table, I'm not seeing that in the disclosure

14 statement yet.  And maybe the debtor can tell me if they think

15 that's totally inappropriate.  But it seems to me at a minimum,

16 some articulation of why on a principled basis X is available

17 and Y isn't is something that I think we need to know because

18 you're not going to agree -- we need to know why we disagree

19 about that.  So, I mean, that's just an observation.  We'll get

20 into that when we get into the particular objections, okay?

21 Does that distinction make sense?

22        MR. WEISENBERG:  Your Honor nailed it for two reasons.

23 Number 1, if the debtor's argument is correct, today they can

24 take every last dollar of cash, buy a piece of property,

25 improve it with a church and say, under the First Amendment,

1  you cannot compel us to sell a church, ergo we don't need to

2  make any payment to creditors, or taken a step further, they

3  can say every last dollar within the diocese is in furtherance

4  of our religious purposes and therefore we don't need to pay

5  anything, because if you could -- if you try to compel me to

6  pay one cent, you're violating my First Amendment, right?

7            THE COURT:  But my --

8            MR. WEISENBERG:  That can't be the answer.

9            THE COURT:  No.  But my point, I think you agree with

10 me, is that what we need is that articulated.  What is the

11 basis for that?  And then we can agree with it or disagree with

12 it.  The debtor can say not another penny because X, Y, and Z,

13 or the debtor can say, well, this asset is different from that

14 asset, and here's why.

15            But the point of a disclosure statement ought to be,

16 among other things, to give the debtor, the proponent, the

17 ability to articulate why they're doing what they're doing,

18 what you're going to get, and why that's fair and legally

19 supportable.  And I think there's -=- my sense is there's a

20 void there right now.  I have a sense -- I may guess what the

21 debtor is thinking, but I think that's a point where some

22 articulation would be helpful.

23            And I mean -- and I'm at the moment indifferent to the

24 answer.  I mean, whatever they say, you're probably going to

25 take a different position.  That's fine.  But I think for

1  today's purposes, what we need is to have them tell us more

2  clearly what that means.  Does that make sense?

3           MR. WEISENBERG:  Your Honor, it does.  Suffice it to

4  say that our position is a debtor does not get to pick and

5  choose what is and is not part of its estate and available to

6  pay creditors and survivors.  We think, again --

7           THE COURT:  Well --

8           MR. WEISENBERG:  -- the fundamental protection of the

9  Bankruptcy Code was this hypothetical liquidation test.  Let's

10 think about from a --

11          THE COURT:  Can I --

12          MS. UETZ:  -- drafter's perspective.

13          THE COURT:  Can I agree with you real fast?  Because

14 it is hypothetical, that's the point, because it is

15 hypothetical.

16          Having said that, they have a point that they cannot

17 be liquidated, and we're not going to replace the bishop.  But

18 I don't have to confirm a plan either, right?  I mean, that's

19 the stark reality here.  So I mean, somewhere in there, there

20 has to be some articulation of what their theory is, and you

21 have to be able to say we disagree with it because.  Fair?

22          MR. WEISENBERG:  Your Honor will not be the first

23 person to be asked this question.  The court in Boy Scouts was

24 asked this question.

25          THE COURT:  Yeah.

1      MR. WEISENBERG:  The court in Camden was asked this
2   question.
3      THE COURT:  I'm glad I'm in good company.
4      MR. WEISENBERG:  And in our papers, we put forth at
5   least six or seven cases in which going through the 1129
6   factors, every one of those courts made a decision about
7   whether the plan was confirmable based upon whether the plan
8   proponent fulfilled this test.  So, Your Honor, suffice it to
9   say, I think we see it very closely to the way you see it.
10      THE COURT:  But having said that, it may also be true
11   that I think that the purpose of today and whatever continued
12   hearings we have is to get the debtor to articulate that, not
13   to decide whether it's enough or not, right?  Whether it's
14   enough or not is a -- in my view now, subject to your brilliant
15   arguments, whether it's enough or not is a confirmation issue.
16      MR. WEISENBERG:  Your Honor, it's the first time I've
17   ever been accused of a brilliant argument.  But with that
18   aside --
19      THE COURT:  You got to get out more.
20      MR. WEISENBERG:  Your Honor, we will submit that the
21   hypothetical liquidation test as proposed by the debtor makes
22   the plan patently confirmable.
23      THE COURT:  Okay.  All right.  Okay.
24      MR. WEISENBERG:  Okay.
25      THE COURT:  Okay.

1          MR. WEISENBERG:  Just a few more points, Your Honor.

2          THE COURT:  No, no.  I'm not trying to rush you.  I'm

3    just trying to make sure that you understand where I'm coming

4    from, okay?

5          MR. WEISENBERG:  I'm going to get a little out of my

6    depth by addressing the insurance assignment.  And I know that

7    I have great counsel behind me if I get it wrong.

8          THE COURT:  Okay.  Okay.

9          MR. WEISENBERG:  But the bottom line is this, Your

10   Honor.  The debtor stands up and says the committee has always

11   wanted this.  That may or not -- may or not be true.  However,

12   I'll tell you what we don't want.  We don't want an assignment

13   that increases the rights of the insurers and decreases the

14   rights of the survivors, okay?

15          The fact that all the insurers are here today, Your

16   Honor, that should tell you everything you need to know about

17   this plan and how it's viewed between the debtor and the

18   insurers and the committee, okay?  If past is prologue, the

19   insurers typically do not stand in favor of an assignment that

20   is not insurance-neutral, okay?  In this case, we'd submit it

21   actually impairs the rights of survivors in the state courts.

22   And so whether or not we want an assignment, I can tell you

23   this.  We don't want one that hurts survivors' rights.

24          THE COURT:  I know we'll get into this.  Is that

25   because of the sort of, for lack of a better word, the credits

1    and the offsets that are available or the limitations on the

2    recovery, or what's the --

3            MR. WEISENBERG:  Your Honor, I'm going to --

4            THE COURT:  Just thematically, what's the font of

5    that?

6            MR. WEISENBERG:  I want to answer your question, but

7    then I also would like my colleagues to answer.

8            THE COURT:  Yeah.

9            MR. WEISENBERG:  We do make an argument, and again,

10   this is a patently unconfirmable argument, that the plan as

11   drafted allows the insurers an offset for any amount that a

12   survivor may have received from the debtor.  However, the plan

13   provides the debtor is paying survivors for the uninsured

14   exposure that they may have for any claim.  And so

15           THE COURT:  So those are apples and oranges.

16           MR. WEISENBERG:  Exactly.  Under California law, that

17   simply -- the insurers are not entitled to an offset.

18           THE COURT:  Okay.  I got it.  I got it.  I got it.

19   Okay.  I don't need more now unless you guys are dying to tell

20   me, okay?  All right.  Okay.

21           MR. WEISENBERG:  Let me end in this way, Your Honor.

22   Maybe this is the good news.  We share the debtor's desire to

23   consensually resolve this case.  We earnestly do.  And

24   everything we've done so far has been towards that goal.

25           THE COURT:  Yep.

1       MR. WEISENBERG:  It's unfortunate that sometimes the

2   debtor doesn't see it that way.  For example, we truly believe

3   that the survivor status conferences were vital to bringing

4   survivors under the tent.  And hopefully they will support a

5   consensual plan.  Okay?  So that's the good news.  We want to

6   continue to work there.  But given our vehement disagreements

7   about fundamental problems, we just submit there's a better,

8   more economic way.

9       THE COURT:  Okay.  I appreciate it.

10      MR. WEISENBERG:  Thank you, Your Honor.

11      THE COURT:  Thank you very much.

12      Can I make a suggestion?  Just so we don't keep

13  anybody who could otherwise be off doing something more fun, do

14  you want to take up appointment issue?

15      MS. UETZ:  We'd like to take up the appointment issue

16  and then suggest we break, Your Honor.

17      THE COURT:  I'm thinking the same thing.  And before

18  we break, I want to give you an idea of where I'd like to start

19  when we come back, okay?

20      MS. UETZ:  That would be helpful.

21      THE COURT:  Great.

22      MS. UETZ:  Yes, Your Honor.

23      THE COURT:  Okay.  Okay.  Come on up, Ms. Lee.

24      MR. LEE:  Thank you, Your Honor.

25      Good afternoon, Judge Hogan.

1      We're here today on the debtor's motion to appoint --

2  in addition to all the disclosure statement talk we're going to

3  have, we're here on the motion to appoint Judge Michael Hogan

4  as the unknown abuse claims representative in this case.  The

5  motion was filed on December 9th as docket number 1503,

6  supported by declarations at dockets 1504 and 1505.  Your Honor

7  agreed to hear it on short notice.

8      THE COURT:  Yep.

9      MR. LEE:  Sorry, short notice, with the consent of the

10 committee and the U.S. Trustee.  Objections were due on

11 December 13th.  None have been filed.

12     This motion acknowledges, as has been done in many

13 other dioceses in Chapter 11 bankruptcies, that there may be

14 individuals who have abuse-related claims against this

15 particular debtor whose claims have not legally accrued under

16 California law or, for whatever reason, have not had notice of

17 these proceedings.  This would be related to abuse that

18 occurred or is alleged to have occurred before the effective

19 date of the plan and in which case is appropriately dealt with

20 in these proceedings.

21     Recognizing that holders of current known abuse claims

22 may have slightly different interests than holders of claims

23 who either don't know they have a claim under California law or

24 don't have -- haven't had a chance to assert that claim in this

25 bankruptcy, the debtor proposes to appoint Judge Hogan as a

1  representative for those unknown abuse claimants in this

2  Chapter 11 case.  Judge Hogan is very experienced in this role.

3  He served in over a dozen diocesan bankruptcies.

4           THE COURT:  In the same role.

5           MR. LEE:  In the same role.  Yes, Your Honor.

6           THE COURT:  Okay.

7           MR. LEE:  He's a former federal judge.  He currently

8  has a mediation practice that's active.  He has proposed to

9  charge 850 dollars an hour to the estate, with a cap of 100,000

10 total dollars, all in.

11          THE COURT:  Even post Post-effective date?

12          MR. LEE:  I believe that's correct.

13          THE COURT:  Okay.

14          MR. LEE:  He has no conflicts that would prevent his

15 disinterestedness under Section 101 -- sorry, Section 101.14 of

16 the Bankruptcy code.

17          THE COURT:  Okay.

18          MR. LEE:  And after all, this is -- at bottom, it's at

19 327(a) representation.  He would be representing not the

20 debtor, but he would be representing a constituency of the

21 estate.  And therefore I think it's appropriate to proceed

22 under 327(a).

23          THE COURT:  I'm guessing he's probably dealt with a

24 lot of the same parties, but that's not -- I mean, that's not

25 even a connection you would tell me, right, within the

1  disclosure requirements?

2         MR. LEE:  I believe he's dealt with the same -- he's

3  been involved in cases with --

4         THE COURT:  It would make sense that he had.  Yeah.

5  Okay.

6         MR. LEE:  Yes.  Yes, Your Honor.

7         THE COURT:  Okay.

8         MR. LEE:  His tasks are outlined specifically in the

9  motion.

10        THE COURT:  Yeah.

11        MR. LEE:  I can go through them if you like.  But I do

12 know that he's able and willing to do all of this immediately

13 upon entry of the order we've proposed to Your Honor.

14        THE COURT:  Okay.

15        MR. LEE:  If you have questions for me or for Judge

16 Hogan, I would invite you to ask them.

17        THE COURT:  Yeah, This may be one of those questions

18 that can't be answered, but just given that he's -- Judge

19 Hogan, given that you've done this a number of times before,

20 empirically, when do these issues arise?  I mean, are there

21 people that you would be identifying now or be aware of now Who

22 would be your constituents or your flock, or is that something

23 that's going to develop over time, It's not a now issue?

24        MR. HOGAN:  Develops over time.  We don't know who

25 those people are yet.

1          THE COURT:  Yeah.  Okay.  All right.  And Judge Hogan,

2    obviously, you've read the application.  And you're familiar

3    with the presentation.  Anything you want to add at this point?

4          MR. HOGAN:  Well, the only other thing I would like to

5    do is apologize for my dress today.

6          THE COURT:  I've been known to let people know that

7    without a tie, I'm not hearing them the same way.  But go

8    ahead.  That's all right.

9          MR. HOGAN:  My finest rodeo vest.

10         THE COURT:  Okay.  I appreciate that.  I appreciate

11   that.  All right.  Thank you.

12         MR. HOGAN:  I'll dress in big boys after close-out.

13         THE COURT:  All right.  Thank you very much.  Well,

14   listen, you may be perfectly well attired for most of what

15   you're going to be doing, which won't be talking to me.  Lucky

16   you.  Okay?  Yeah.  All right.  All right.

17         Does anybody want to be heard on the application with

18   respect to Judge Hogan's appointment?  I think the

19   understanding was the given it was shortened time, if someone

20   had a comment, I wouldn't stop them from the lectern, okay?

21         MR. PROL:  Good afternoon, Your Honor.  Jeff Prol,

22   Lowenstein Sandler, for the committee.

23         THE COURT:  Good afternoon.

24         MR. PROL:  Judge, the committee has no objection to

25   the application for the retention of Judge Hogan.  Judge Hogan

1  and unknown claim representatives have been instrumental in

2  other cases in driving consensus.  And we're hopeful that that

3  by him coming and being involved, that that will be a result

4  here.

5       We do, however, object to the proposed use of Judge

6  Hogan in the plan as it presently stands.  And I could address

7  that now, or I can address that later.

8       THE COURT:  I read your papers.  Does that cover it?

9       MR. PROL:  Yes, Your Honor.

10      THE COURT:  I got it.  Thank you.

11      MR. PROL:  Okay.  Great.

12      THE COURT:  Thank you very much.

13      MR. PROL:  Thank you, Your Honor.

14      THE COURT:  Okay.  You're welcome.

15      Okay.  Anybody else want to be heard?  Okay.  Then the

16  debtor is proposing the appointment of a Judge Hogan as the

17  unknown abuse survivors representative, correct?  Okay.

18  Hearing no objection and hearing from Judge Hogan -- thank you

19  very much for participating today -- and hearing from the

20  debtor's representative and counsel, that's approved.  Okay?

21  Thank you very much.

22      MR. HOGAN:  Thank you for your time.

23      THE COURT:  All right.  Yeah.  Okay.  I hope to see

24  you again.  Okay.  Thank you.

25      We'll take a break.  But when we come back, you may

1   not agree with me, but one thing I do want to address fairly

2   early on is the release opt-in, opt-out question, because I

3   think that's a big part of how we're going to solicit or not

4   hear.  So I think that's a big deal.  And I have some -- I have

5   some thoughts about that, okay?  And I will give you those

6   thoughts.  We can have a conversation.  I will leave -- I will,

7   I suspect, leave open something for somebody to inform me

8   slightly better on.  But you're going to -- you're going to get

9   where I'm coming from, I promise you, okay?

10          After that, I have probably -- I've probably condensed

11  and hopefully not dumbed down categories where I think some

12  expectation, amendment, amplification is probably a good idea.

13  And that would include the possibility for the committee, if

14  appropriate, to just say we have a different view.  Here's

15  appendix A, this is our view.  And we'll talk about those,

16  okay?  That's how I would like to start the afternoon session.

17  And that's subject to anybody having a better idea.  And I mean

18  that sincerely.  If anybody thinks there's something we need to

19  do first, that's fine.  But that's how I'd get going if it's

20  okay, all right?

21          How long do you folks want?

22          MS. UETZ:  Thirty minutes.

23          THE COURT:  That's all.  Seriously?  Does anybody want

24  longer than that?

25          MS. UETZ:  Well, that's all I want.  But if other

1  people want more --

2          THE COURT:  Okay.  No.  I mean, I will leave it --

3  I'll leave it to you guys.

4          UNIDENTIFIED SPEAKER:  Judge, I think we'll defer to

5  you.  Your staff is obviously here, and you folks need lunch as

6  well.  And whatever you typically do --

7          THE COURT:  How about 1:15?

8          UNIDENTIFIED SPEAKER:  -- that would be fine with us.

9          THE COURT:  How is 1:15, okay?

10         MS. UETZ:  Thank you, Your Honor.

11         THE COURT:  1:15.  All right.  Thank you very much.

12  Thank you.

13     (Recess from 12:27 p.m., until 1:16 p.m.)

14          THE COURT:  Okay.  Please be seated.

15         So one housekeeping note.  I don't want to predict

16  that we will go this long, but I think 5 was going to be a hard

17  stop for us, okay?  So if we can -- not that that's something

18  to shoot for, but it is a limit.

19         I also will note, echoing I think everybody's comments

20  about the relentless goodwill that has prevailed in this case,

21  that this case is the furthest advanced of the diocese cases in

22  ND Cal

23         I'll tell you a secret.  Montali complains all the

24  time that nobody argues about anything in his case.  He doesn't

25  know what to do with himself.  It's a very quiet case

1  apparently, in his view at least.  And Santa Rosa, I think, is
2  mediating but not yet to a plan.  And you probably -- many of
3  you probably know this better than I do.  And my case,
4  Franciscan Friars, is not close to a plan, I don't think.
5       So somebody has their hand up.  It looks like -- is it
6  Mr. Manz (phonetic)?
7       MR. MANZ:  It is, Your Honor.  Good afternoon.
8       THE COURT:  Good afternoon.  Something you want to
9  tell me?
10      MR. MANZ:  Just to make a note of an appearance, Your
11  Honor.
12      THE COURT:  Sure.
13      MR. MANZ:  I had an issue making an appearance at the
14  outset.  I represent RCC and RCWC.
15      THE COURT:  Okay.
16      MR. MANZ:  Thank you.
17      THE COURT:  Thank you so much.  Okay.
18      MR. MANZ:  Thank you to your chambers as well.
19      THE COURT:  You bet.  Okay.
20      If there's anything that you guys need to tell me from
21  a housekeeping or order progression standpoint, now is the
22  time.  Otherwise, we'll segue to one issue that I think we
23  should just deal with and largely dispose of, which is the
24  opt-in release, opt-out release question, okay?
25      So I'm prepared to -- I think the committee may have

1  something to say about this. I wouldn't say it was their prime
2  focus, but they may well have some comments. But certainly the
3  principal objection came from the U.S. Trustee. So I would let
4  them kick us off on this.
5          MR. BLUMBERG: Thank you, Your Honor. Jason Blumberg
6  for the United States trustee.
7          Our objection -- our primary objection in our papers
8  is that the third-party release and the channeling injunction
9  is not consensual because of the opt-out procedure. And under
10 the opt out-procedure, as I understand it, creditors would be
11 deemed to consent if they don't respond to the solicitation
12 package for whatever reason. Creditors would also be deemed to
13 consent if they fail to execute an opt-out form even if they
14 reject the plan. So from our perspective, what the debtor is
15 proposing is that silence or inaction will be deemed consent to
16 a third party release in this case.
17         Now the debtor's reply brief, excuse me, acknowledges
18 that there is a case to support every view on this issue. I
19 can't disagree with that. But what I did not see in the
20 debtors papers was any Ninth Circuit authority permitting
21 opt-out releases.
22         It's the United States Trustee's position that the
23 Bankruptcy Code does not deal with third-party releases,
24 consensual or otherwise, or how parties actually consent to a
25 release. Thus, as we set forth in our objection, it's our

1    position that whether a release is consensual or not should

2    look to state contract law.  And under that law, which is well

3    developed, except in exceptional circumstances, an offeree has

4    no duty to respond to an offer -- excuse me, respond to an

5    offer.

6            So the first bucket of creditors or releases that we

7    would have take issue with are those who don't vote and don't

8    return --

9            THE COURT:  Can I put a thought in there before we get

10   to the particulars?

11           MR. BLUMBERG:  Of course, Your Honor.

12           THE COURT:  I mean, some people have also commented

13   that the contract scenario is arguably different because

14   there's a difference between acceptance and consent.  So if you

15   want to at some point address that, I'd be grateful.

16           MR. BLUMBERG:  Sure.  Your Honor, as I mentioned,

17   there's a case to support every view.  The cases that we relied

18   upon, the Smallhold case, the Sun Energy case, and the case out

19   of the Northern District of New York, the Tonawanda Coke case,

20   they defaulted to contract principles.  We think that's the

21   appropriate result because there is nothing in the Bankruptcy

22   Code that deals with this issue.

23           And in essence, a plan is a contract between the

24   debtor and between the creditors that resolves the debts

25   between those two parties.  This is a separate piece of the

1  plan.  This is essentially a contract between the non-debtor

2  and the creditors.  So it could exist outside of the plan

3  entirely.

4          THE COURT:  Well, okay.  But it's the debtor that's

5  the proponent and is going to get the benefit of getting a

6  confirmed plan if this plays out the way they like.

7          I don't know that -- also, I hear you on some courts

8  adopting the contract theory.  I don't know that that's how I

9  would have characterized Goldblatt's opinion.  I think it's a

10  little different.  But you can convince me why I'm wrong about

11  that one.

12          MR. BLUMBERG:  Well, I respect Your Honor's take on

13  the Smallhold case.  But I would just note that Judge

14  Goldblatt, I think, did at least refer to the contract

15  principles in determining that --

16          THE COURT:  Okay.

17          MR. BLUMBERG:  -- silence can't be consent --

18          THE COURT:  Right.

19          MR. BLUMBERG:  -- with creditors who don't participate

20  in the plan.

21          THE COURT:  Well, yeah.  I mean, the place where I

22  think he really balked was this notion that if you don't

23  respond at all, you're agreeing to whatever I say.  I mean,

24  you're going to -- unless you give me this form back, you're

25  going to pay for my college education I think it was this hypo,

1  right?

2          MR. BLUMBERG:  That's correct, Your Honor.

3          THE COURT:  Right.  Which I think speaks to a lot

4  here.  He would -- if I read him correctly, he would be in

5  accord with this form that the debtor is suggesting but for the

6  notion that if you don't respond at all, you are deemed to

7  consent, right?  I think he drew the line there.

8          MR. BLUMBERG:  Agreed, Your Honor.  He would --

9          THE COURT:  Okay, Your Honor.

10          MR. BLUMBERG:  Agreed, Your Honor.

11          THE COURT:  Okay.  So if you want to -- if you want

12  to -- I don't mean to derail you.  If you want to tell me why

13  the contract theory in all its robustness is the right one, I'm

14  all ears.  I don't think -- that's not the way I read about

15  Goldblatt was doing it.  I usually find him pretty persuasive

16  on issues like this.  So go ahead.

17          MR. BLUMBERG:  Well, Your Honor, I would just note

18  that there are other cases that we cited --

19          THE COURT:  Yeah.

20          MR. BLUMBERG:  -- the contract theory --

21          THE COURT:  I agree.  You're right.  There are.  Okay.

22          MR. BLUMBERG:  And just taking the buckets of

23  creditors who would be deemed to consent, I think the easier

24  case are those who just don't participate in the process at

25  all.  And set forth in our objection, there's no duty for a

1　creditor to vote on a plan.  Moreover, we cited a BAP case
2　called Long M. Arabians (sic), which is 103 B.R. 211.  It's an
3　old BAP decision, but there the BAP held that a creditor's
4　silence or failure to vote is not the equivalent of the
5　acceptance of a plan.  And so if a creditor's failure to vote
6　or decision not to vote is not acceptance of a plan, it can't
7　be acceptance of a release in that plan.
8　　　　　　　THE COURT:  Okay.  Anything else?
9　　　　　　　MR. BLUMBERG:  Well, just the more difficult bucket
10　are the folks that do vote --
11　　　　　　　THE COURT:  Yeah.
12　　　　　　　MR. BLUMBERG:  -- that do vote.
13　　　　　　　THE COURT:  Okay.  How do you -- did you address
14　whether it's appropriate to have the release be part of the
15　ballot or whether a separate document is better or worse?
16　　　　　　　MR. BLUMBERG:  We did, Your Honor.  We did in the
17　context of creditors who vote to reject the plan but don't
18　execute the opt-out.  In our view, there's case law that
19　suggests -- I think it was the Chassix case that suggests if
20　you have someone who rejects the plan, imposing the additional
21　requirement of an opt-out is nothing more than a trap for the
22　unwary or inattentive creditor.  In our view, that issue is
23　magnified here because the ballot is a separate document.
24　　　　　　　THE COURT:  Okay.
25　　　　　　　MR. BLUMBERG:  Easy to overlook in that circumstance.

1          THE COURT:  Okay.  I appreciate it.  Thank you.  Okay.

2   Why don't I -- why don't I let the committee -- I don't think

3   this is their principal objection, but they may have some

4   thoughts.  And they may be anticipating some of the things

5   you're going to say about why this is -- given the number of

6   counsel involved for the victims, they may have a thought about

7   whether they agree with you that this is not so God awful a

8   scenario, for lack of a better word, okay?

9          Okay.  Mr. Weisenberg or Mr. Prol, you want to give me

10  your thoughts?

11         MR. WEISENBERG:  Brent Weisenberg on behalf of the

12  committee.

13         Generally speaking, Your Honor, we have not weighed in

14  on this issue with a caveat -- well, two caveats.  Number 1, in

15  the context of this plan, which is nonconsensual, we don't

16  believe that the form that the debtor has chosen is

17  appropriate.  That is not to say in a fully consensual plan

18  under different facts, the answer might be different.

19         THE COURT:  Okay.

20         MR. WEISENBERG:  Number 2, Your Honor --

21         THE COURT:  Can I -- Okay.  You finish, and I'll ask

22  you a question.

23         MR. WEISENBERG:  Number 2, Your Honor, you always

24  chart your own path.  And that's been very beneficial.  But I

25  do want to let you know what happened in Syracuse.

```
1              THE COURT:  Okay.
2              MR. WEISENBERG:  In Syracuse --
3              THE COURT:  Is that Judge Kinsella's case?
4              MR. WEISENBERG:  Yes.
5              THE COURT:  Yeah.
6              MR. WEISENBERG:  And in that case --
7              THE COURT:  We've spoken.
8              MR. WEISENBERG:  Okay.  And so we would submit that
9    that's the better course of action for the same reasons we've
10   been telling you, which is if we get five months down the road
11   and ultimately you issue your decision which makes the debtor's
12   plan unconfirmable, we won't have made any progress.  And so
13   isn't it better to know now what the rules of the game are, and
14   then we can engage with creditors in that fashion?
15             THE COURT:  Okay.  I was wondering if you were going
16   to pick up on her rule 23 points.
17             MR. WEISENBERG:  I was not, Your Honor.
18             THE COURT:  Okay.
19             MR. WEISENBERG:  I wasn't going to get into that
20   depth.  I was just talking procedurally.
21             THE COURT:  Okay.  Okay.  As in we should cross this
22   bridge now?
23             MR. WEISENBERG:  Exactly.
24             THE COURT:  I agree with you.  Okay.  Thank you very
25   much.
```

1           Okay.  Mr. Moses, come on up and --

2           MR. MOSES:  Can I ask one quick point of

3    clarification, was that we should cross this bridge now or we

4    should not cross this bridge now?

5           THE COURT:  We should.

6           MR. MOSES:  Yes.  Okay.

7           THE COURT:  I think it's an important issue.  I think

8    it's discrete enough that it can be dealt with now.  I think

9    that the options are also limited enough that we can deal with

10   it now, although I'm thinking to hold something -- potentially

11   hold something open for you to further convince me on one

12   point.  I haven't made up my mind about that.

13          But I think that if we're talking about going out to

14   solicitation sometime around January, if we are lucky enough to

15   be doing that, I don't want to solicit in a form that someone

16   is going to tell me later we never should have done.  So that's

17   my thinking, okay?

18          MR. MOSES:  Certainly, Your Honor.  And I think to

19   start with that point, this really breaks down into sort of two

20   kind of distinct issues.  One is -- and especially when you

21   look at it in terms of what the solicitation look like, one of

22   those issues is can opt-out -- can an opt-out be deemed

23   consensual, or is opt-in the -- as the U.S. Trustee argues the

24   only possible means of consent?

25          And then the second question is if the Court agrees

1   with, know what at least one bankruptcy court, the Robertshaw
2   court said was the overwhelming majority of cases that at least
3   in some circumstances as to some creditors opt-out as
4   appropriate, what is the extent of that?  In other words, does
5   it apply to creditors who vote against the plan and don't opt
6   out?  And does it apply to creditors who do not respond?
7           THE COURT:  To what extent am I limited in Robertshaw
8   by Lopez's opening comment that the Supreme Court didn't change
9   a darn thing about how we look at this in the Fifth Circuit?
10  And I have an interpretation of that history in the Fifth
11  Circuit.  And therefore, I come to the following conclusion.
12          MR. MOSES:  Well, I think there is some relevance
13  there in that -- and we discussed this a little bit in our
14  papers, that the Supreme Court was very clear that this was not
15  intended, that its decision in Purdue was not intended to call
16  into question or to address the question of what is deemed
17  consent.  And the argument that the U.S. Trustee is making here
18  that consent specifically requires an opt-in, an affirmative
19  opt-in, would mean -- the effect of that is that now Purdue
20  would result in the erasing of all of that precedent on all of
21  those prior decisions.  I think Robertshaw says hundreds of
22  plans have been confirmed in the Fifth Circuit on this basis.
23          THE COURT:  I don't know that he took that seriously
24  when he said it.  But anyway --
25          MR. MOSES:  I don't know.  I doubt he counted.

1          THE COURT:  Yeah.

2          MR. MOSES:  But I think it's fair to say a substantial

3    amount of --

4          THE COURT:  Well, no.  I mean, whether you got --

5          MR. MOSES:  Yeah.

6          THE COURT:  -- a hundred plans or not, it is something

7    to say this is inconsistent with the result of hundreds of

8    cases.  That is enough to pause, right?

9          MR. MOSES:  Right.

10          THE COURT:  Okay.

11          MR. MOSES:  And I think what both Robertshaw and to

12    some extent, the LaVie Care Centers case --

13          THE COURT:  Yeah.

14          MR. MOSES:  -- both suggest is that if we take this

15    argument that opt-out is -- opt-in is required to its

16    conclusion, then the result is Purdue does something that the

17    Supreme Court in Purdue specifically said it wasn't doing,

18    which was to upset current law on what is consensual and what's

19    not consensual.

20          THE COURT:  Or if you're putting this on a spectrum,

21    to weigh in on what you might think of as the most onerous end

22    of the spectrum, right?

23          MR. MOSES:  Correct.

24          THE COURT:  If they're saying we're not commenting on

25    this, it wouldn't follow that, oh, and you have to do the most

1   difficult thing in order to get to consent, right?

2           MR. MOSES:  Right, exactly.

3           THE COURT:  Okay.

4           MR. MOSES:  Exactly.

5           THE COURT:  Yeah.

6           MR. MOSES:  I do -- to sort of with regard to that

7   spectrum, the decision that we really do have to resolve, not

8   if the hearings continue today, but at this stage, is what does

9   the form look like that we send out.  Is it appropriate to send

10  out an opt-out form?  The question that Your Honor could decide

11  at this stage, but does not have to, is whether or not the

12  release would apply to creditors.  So if it's balloted,

13  solicited as an opt-out plan, whether or not the release would

14  apply to creditors who simply don't respond, right?  In the

15  Smallhold decision, that was decided actually post-

16  confirmation.  We point to a couple of other cases where that

17  was decided at least at the confirmation stage because it

18  doesn't affect the solicitation.  It just affects the nature of

19  the release.

20          THE COURT:  Well --

21          MR. MOSES:  I'm sorry, the nature of the form.

22          THE COURT:  Okay.  I might argue with that --

23          MR. MOSES:  Yeah.

24          THE COURT:  -- in a minute, but okay.

25          MR. MOSES:  Okay.  I would like to -- and I think

1 that's -- Smallhold recognizes I think in addressing that issue

2 that there's a little bit of a distinction between the

3 procedure and the substance --

4       THE COURT:  Oh, yeah.

5       MR. MOSES:  -- of the release, right?

6       THE COURT:  Oh, yeah.  Oh, yeah.  Yeah.

7       MR. MOSES:  And so the procedural question is

8 essential to solicitation.  The substance in some ways may not

9 be.  That that's my only point.  But I'm happy to address it

10 all.

11       THE COURT:  Okay.

12       MR. MOSES:  Before we get to -- there's sort of a

13 fundamental issue of what the correct legal framework is.  Is

14 the correct legal framework contract?  Is it something else?

15 But a number of the cases also address that there is a

16 contextual question.  And this is what I think Your Honor

17 mentioned earlier.  The contextual question in a specific case

18 of what might be appropriately deemed consent in that case.

19       And in particular, one of the -- the Tonawanda Coke

20 case that the U.S. Trustee references -- no, I think it was

21 actually the Chassix case, they raise this issue of there is a

22 high likelihood of inadvertence.  Is there a trap for the

23 unwary here?  And the circumstances of this case are very

24 distinct there in that, as we point out, approximately ninety-

25 nine of these claimants are represented by counsel.  Their

1    claims were filed by counsel.  There were four claims, one of

2    which was untimely, that were not filed by counsel.

3          So these notices are going to their counsel.  There is

4    almost no chance of inadvertence or a trap for the unwary or,

5    frankly, of someone not responding because they simply don't

6    understand the question because they have counsel to address

7    that for them.

8          And although, as Your Honor mentioned, the Spokane

9    case, it addresses the Rule 23 question.  It also specifically

10   makes that point as well, that one of the bases for an opt-out

11   being appropriate is the fact that in that case, it was ninety-

12   four of the creditors were represented by counsel.  So I think

13   it's just important to contextualize this.

14         THE COURT:  Yeah.  No, no, no.

15         MR. MOSES:  And I think the LaVie Care Centers case

16   makes that point as well.

17         THE COURT:  Okay.

18         MR. MOSES:  That the context is important in deciding

19   whether or not there was consent.

20         THE COURT:  Okay.  And just as I remember it, what

21   Judge Goldblatt said was, look, I can see this as a principle.

22   I don't know that it's really relevant here or not based on

23   what I have in front of me.  And Judge Kinsella, I thought, was

24   a little more convinced that it was a vibrant concept in her

25   case.  Is that fair?

1           MR. MOSES:  I think that's fair.

2           THE COURT:  Okay.

3           MR. MOSES:  Yeah.

4           THE COURT:  And is there another case that you think

5    advances that theory beyond that, or is there another case that

6    is more robust than its acceptance of Rule 23?

7           MR. MOSES:  I don't --

8           THE COURT:  I don't think so.  Okay.

9           MR. MOSES:  I don't think so, no.

10          THE COURT:  And what are we -- what are we -- if

11   that's something I should be worried about, is there a -- is

12   there a order of proof that I need to be thinking of along

13   those lines?  Or what do I -- what do I do?  I'm thinking about

14   that.

15          MR. MOSES:  Well, I don't think I'm really arguing the

16   Rule 23 point as a basis.

17          THE COURT:  Well let me -- can I interrupt --

18          MR. MOSES:  Sure.

19          THE COURT:  -- and tell you that my very strong

20   inclination is to agree with Judge Goldblatt and I think you.

21   But at the point that one has engaged on this and has

22   participated enough to deal with a ballot, I think that is -- I

23   will agree with Judge Goldblatt that the failure to check an

24   opt-out at that point is hard to describe as anything other

25   than you didn't want to do it, although you might -- there

1    might be some inadvertence there.  But I think his argument

2    that that's very different from the if you don't respond,

3    you're paying for my college tuition.  And it is consensual

4    enough that one has participated enough to engage with the

5    ballot, that -- I think I'm with you that I would agree that

6    somebody returning a ballot, not checking the opt-out under the

7    arguments advanced in Smallhold I would think is going to be

8    sufficient.

9           Where I'm going to disagree with you, subject to

10   whether we need to have some sort of evidentiary basis for

11   this, is what I'll call the Rule 23 principle, that it just is

12   not -- if what we're guarding here is purely inadvertence, I'm

13   not sure that's right.  But if we are, that there should be

14   some argument based on -- I'm not sure what yet, but you can

15   help me with that, when we get to that point in our next

16   hearing on this, if you want to expand and engage with the

17   committee whether -- basically because of the high level of

18   representation here, I shouldn't be as worried about ballots

19   simply not returned.  I'm willing to keep that crack open, but

20   I'm not -- I'm dubious about the notion.

21           MR. MOSES:  Okay.

22           THE COURT:  Okay?

23           MR. MOSES:  And I think there is a little bit of a

24   distinction, Your Honor, that in the Spokane decision, the

25   court focused in the Rule 23 argument on the notion of the

1  creditors' committee as the equivalent of a class

2  representative.

3          THE COURT:  Yeah.

4          MR. MOSES:  But I think --

5          THE COURT:  Well, and they can respond to that and say

6  we are or we aren't.

7          MR. MOSES:  Right.

8          THE COURT:  I haven't heard from them yet, so we'll

9  see.

10          MR. MOSES:  But there is a slightly distinct that the

11  court in Spokane also addressed the question of simply these

12  creditors are represented by their state court counsel who can

13  identify this issue, make sure they don't miss it, explain --

14          THE COURT:  Well, so you --

15          MR. MOSES:  -- to them what it means.

16          THE COURT:  You've kind of hit on this, but I don't

17  know that we're -- if I should be looking at this in terms of

18  making findings and so on.  I don't think I'm in a position to

19  do that if it presents that way, okay?

20          MR. MOSES:  Okay.

21          THE COURT:  Sensible?

22          MR. MOSES:  Right.

23          THE COURT:  I agree with you it doesn't have to be an

24  opt-in.  I'm going to agree with that.

25          MR. MOSES:  Okay.

1          THE COURT:  Okay?

2          MR. MOSES:  I think the point I would want to identify

3    with regard to Smallhold and where I think the LaVie Care

4    Centers does, I agree with the point that is made there with

5    regard to -- and with regard to Smallhold is Judge Goldblatt

6    seemed, I think, to have the sticking point of what is the

7    limiting principle of this.

8          THE COURT:  Yeah.

9          MR. MOSES:  And that's where the college tuition comes

10   in.  And the LaVie Care Centers directly addresses that and

11   says there are limiting principles that can apply to that,

12   right?  There is -- for one thing, that is an agreement, the

13   example of the college tuition, this sort of -- the extreme

14   example is an agreement to an affirmative act to contribute

15   money to this college fund.  What we're talking about is

16   effectively a waiver of a right, a waiver of the right to

17   pursue this claim, which in many cases can be accomplished

18   through inaction, can result from inaction.

19          And the other point is that there is always backstops

20   of fair and equitable and good faith for any plan.  I don't

21   think there's any bankruptcy court in the country that would

22   say -- require people to contribute to the CEO's college

23   tuitions --

24          THE COURT:  Well, I -- in good faith.

25          MR. MOSES:  Right?

1            THE COURT:  I agree.  No.  I think what Goldblatt was

2    trying to recognize was it's contractual in the sense that you

3    have to -- there has to be some manifestation of something that

4    you call assent.  But we all know that when we're dealing with

5    courts, rights are highlighted, notice is given, and you've got

6    to do something.

7            MR. MOSES:  Yeah.

8            THE COURT:  So there's got to be a balance between

9    those concepts.  But that's where I think he was trying to get

10   to in my view.

11           MR. MOSES:  Right, right.

12           THE COURT:  Okay.

13           MR. MOSES:  And I guess I do want to make -- sort of

14   identify -- there's a question.  The U.S. Trustee raised this

15   issue of whether or not it needs to be a separate -- should be

16   a separate form or whether or not it should be part of the

17   ballot that, to the extent the Court is approving, the opt-out

18   concept does need to be addressed.

19           THE COURT:  Yeah.

20           MR. MOSES:  We proposed it as a separate form because,

21   frankly, we thought that was more conspicuous to have a

22   separate form that says do you or do you not consent to this?

23           THE COURT:  Yeah.

24           MR. MOSES:  And it's called out in the ballot.  If the

25   Court disagrees with that and thinks it's more appropriate to

1  put it in the --

2          THE COURT:  I do.

3          MR. MOSES:  Okay.

4          THE COURT:  I mean, I think one could conspicuously

5  highlight the title, ballot and form of release, as in don't

6  forget that.  There are ways to handle that.  But I think one

7  document is -- I mean, by the logic of where Goldblatt ended

8  up, I think one form is better than two.

9          MR. MOSES:  Okay.

10         THE COURT:  Okay?

11         MR. MOSES:  And so I guess I understand -- do I

12 understand where the Court is on this, that --

13         THE COURT:  Opt-in is not required.

14         MR. MOSES:  Okay.

15         THE COURT:  Opt-out is okay.  Where I -- returning a

16 ballot without indicating the opt-out, at the moment at least,

17 I'm agreeing with Goldblatt that that's enough engagement to

18 count.  And that where I'm differing from you at the moment is

19 no action whatsoever equals opt-out.  I'm not with you there.

20 Okay?

21         But if you -- I mean, if you think that something Rule

22 23ish and some sort of proof about that or argument about that

23 is appropriate, I think it's really only been kind of

24 preliminarily raised here.  If you think that that's ripe for

25 discussion, more ripe for discussion when we come back to talk

1    about the disclosure statement, I'm not opposed to that, okay?

2            MR. MOSES:  Understood, Your Honor.

3            THE COURT:  Because I think the committee really needs

4    to be heard about that if we're going to -- if we're going to

5    sharpen that question.  I'm not going to decide that.  I'm

6    leaning against no responses as a yes, but, well we can explore

7    that further, okay?

8            MR. MOSES:  Okay.

9            THE COURT:  All right.

10           MR. MOSES:  Understood.  Now --

11           THE COURT:  Thank you.

12           MR. MOSES:  I guess my question, there are a number of

13   other objections in the U.S. Trustee --

14           THE COURT:  Yeah.  I mean, if you want --

15           MR. MOSES:  It might make more sense to sort of tackle

16   the other larger issues and come back to that, but I'm

17   flexible.

18           THE COURT:  Well, my inclination on the derivative fee

19   question is that that's -- we can argue about that at

20   confirmation.  That's not going to be ripe until you got a plan

21   to confirm and monies to pay.  And it seems as if there are

22   decent arguments on both sides of that.  I don't think that

23   should long detain us right now.  I'd certainly hear the U.S.

24   Trustee.  And I expect you both -- you can raise it further

25   then.  You can amplify your arguments then.  We can get to that

1  then.  I don't think it's something we have to decide now.
2  It's not a showstopper for disclosure statement purposes in my
3  mind.
4          MR. MOSES:  I agree, Your Honor.  I think it's
5  completely appropriate to address that at confirmation.
6          THE COURT:  Yeah.
7          MR. MOSES:  We might come to some narrowing --
8          THE COURT:  That's fine.
9          MR. MOSES:  -- or agreement.  You never know.
10         THE COURT:  That's fine.  That's fine.  Was there
11 another issue?
12         MR. MOSES:  Okay.  There were a couple of other.
13 Well, those that was the other patently unconfirmed argument.
14         THE COURT:  I remember it, yeah.
15         MR. MOSES:  There were a couple of other small --
16 well, not necessarily small, but a couple of other disclosure
17 issues.  There were the question of whether we disclosed
18 sufficient information regarding the churches and the basis for
19 the discharge of the churches.  That I think might tie --
20         THE COURT:  We're going to get -- we're going to get
21 there.
22         MR. MOSES:  Whether we provided adequate information
23 regarding the survivors trust --
24         THE COURT:  That we're going to get to.
25         MR. MOSES:  -- that I think we might get to.  Then

1  there was whether we provided adequate disclosure of who the

2  recipients of the release are.

3        THE COURT:  We're going to get there too.

4        MR. MOSES:  So we're going to get there.

5        THE COURT:  We're going to get to those.

6        MR. MOSES:  And then finally, there was an objection

7  that we didn't identify the obligation for post-confirmation

8  reporting in the planner disclosure statement.  I don't think

9  that really needs, frankly, Your Honor, to be in the disclosure

10  statement.  We acknowledged that we'd be happy to put that in

11  the plan --

12        THE COURT:  Yeah.

13        MR. MOSES:  -- the next time the plan is revised.

14        THE COURT:  That's what I expected you'd say.

15        MR. MOSES:  Okay.

16        THE COURT:  Okay.  Thank you.

17        MR. MOSES:  Thank you, Your Honor.

18        THE COURT:  All right.  Appreciate it.

19        Okay.  Mr. Blumberg, anything else?  I think I'm with

20  you on a major point there, and you're hearing me.  And we

21  can -- we'll take  -- if we need to take up the no response

22  issue again, we can, but I'm with you on that one, okay?

23        MR. BLUMBERG:  I appreciate, Your Honor.  And I would

24  just note very quickly on the Rule 23 issue that obviously Rule

25  23 doesn't -- applies in adversary proceedings but doesn't --

```
1            THE COURT:  Yeah.  I agree.  I agree.

2            MR. BLUMBERG:  And in the (indiscernible) case, the

3    committee was a plan proponent.  So I don't think we're even at

4    the stage --

5            THE COURT:  Okay.

6            MR. BLUMBERG:  -- actually where that could work.

7            THE COURT:  Okay, okay.  Fair enough.  Okay.  All

8    right.

9            I thought the next step would be some version of going

10   down matters where I think we're talking about amplification

11   amendment, putting things in the disclosure statement that

12   aren't there right now, or giving the committee a chance to

13   draft their own version of what they believe on some of these

14   points.  If anybody wants to proceed differently, tell me.

15           MS. UETZ:  Not proceed differently, Your Honor.  I'd

16   just like to make one comment to the Court if I may.

17           THE COURT:  Um-hum.

18           MS. UETZ:  Thanks, Your Honor.  Ann Marie Uetz on

19   behalf of the debtor.

20           The debtor -- well, we're going to -- we're going to

21   receive Your Honor's direction.  But I just want to make clear,

22   debtor supports and is fine with the committee attaching its

23   appendix A as you suggested.  And we'll be talking --

24           THE COURT:  Well, that's just one idea.

25           MS. UETZ:  That's just one.  But I just want to say
```

1  we're fine with that.

2           THE COURT:  Yeah.

3           MS. UETZ:  I would also just comment that as to at

4  least some of the things that you mentioned this morning and

5  some of what we anticipate in terms of amendment, we have

6  already prepared some version of that.  And we will, following

7  this hearing, share it with the committee and other

8  stakeholders here and try to bring some consensus around those

9  issues.  So I just -- we're prepared to make those amendments.

10  Some of them are already drafted, ready to go.  And I just

11  wanted to offer that to the Court.

12           THE COURT:  Okay.  Well, would it be most efficient to

13  start with those?

14           MS. UETZ:  I mean, the two that really come to mind,

15  they're kind of easy ones I think, is litigation that's been

16  filed since we filed the disclosure statement.  We've got that

17  ready to go.

18           Another one that occurred to me during the break was

19  the subject of OPS.  And you said that the transaction that was

20  completed pre-petition wasn't disclosed.  And we have that.  So

21  those are the two that really come to mind.  And I just wanted

22  to kind of convey the spirit to the Court and to the others in

23  the courtroom.

24           THE COURT:  Okay.  Thank you very much.

25           MS. UETZ:  You're welcome.

1          THE COURT:  Should we just proceed with the objections

2     by Mr. Weisenberg and your responses?

3          MS. UETZ:  Well, I was -- if there are other areas of

4     amplification that the Court was willing to direct on, we would

5     love to hear that --

6          THE COURT:  Yeah.

7          MS. UETZ:  -- because I think that will help with the

8     argument back and forth and --

9          THE COURT:  Yeah.

10         MS. UETZ:  That's always helpful.

11         THE COURT:  Yeah.  Okay.

12         MS. UETZ:  Thank you.

13         THE COURT:  Can I give you -- can I give you some

14    thoughts?  Is that okay?

15         MR. WEISENBERG:  Sure.

16         THE COURT:  Okay.  Some of these are -- I'm going to

17    try not to overstate them, okay?  To the extent we are writing

18    to an audience of abuse survivors, I realize we're writing to

19    their lawyers too, but I very much appreciated the initial

20    description of the plan in what was I think intended to be

21    relatively easy-to-understand language.

22         I do think that there was a little bit of a mix-up in

23    the beginning between and among the exculpation release and

24    channeling injunction concepts.  And I think you can tell that

25    when you look at the language of who's getting what, I think

1    it's a little jumbled.  It might be helpful to just tell people

2    who don't otherwise know what this stuff means that in some

3    circumstances, parties may make contributions that are beyond

4    the debtor's resources.  And those parties may want to be

5    released, okay?  And that's the thesis.  That's the basis for

6    this, is those parties have done something that is helpful,

7    increases the distribution allegedly.  I mean, maybe there are

8    fights about whether it's material or not.  And that on that

9    basis, it's not inappropriate to ask parties to consent to a

10   release.

11         Because the Ninth Circuit has made such a big deal

12   about the difference between releases and exculpations, I think

13   a quick statement about why an exculpation is appropriate is a

14   good idea, not just the language of the exculpation, but just

15   participating in this process may -- in good faith may entitle

16   one to ask for an exculpation so that one's good-faith actions

17   taken in connection with the creation proposal, blah blah blah,

18   of a plan and the reorganization process.  Those actions may be

19   protected.  So the following types of entities may ask for

20   that.

21         Because I think we do get into some -- I don't think

22   this was intentional, but when we start talking about

23   affiliates and entities of that type, we do start giving some

24   purchase, I think, to the committee's concept that this is way

25   broader than it ought to be, okay?  And then we have to be very

1  careful about that.  But I think step 1 is just explaining in a

2  paragraph why there's a basis for a release, why there's a

3  basis for exculpation, who's entitled to that maybe, and what

4  you're going to be asked to do about, you, creditor, are going

5  to be asked to do about that, okay?

6          I think the channeling injunction is -- I don't know

7  that you can describe it any clearer than it is.  The idea is

8  that once this becomes effective, the request is that all

9  requests for relief go strictly to that source and no other,

10 okay?

11         MS. UETZ:  And, Your Honor, if I may.

12         THE COURT:  Yeah, um-hum.

13         MS. UETZ:  You were highlighting at the beginning of

14 your statement the -- I'll call it the introductory executive

15 summary.

16         THE COURT:  Yeah, yeah.

17         MS. UETZ:  We also have an FAQ.

18         THE COURT:  Yes.

19         MS. UETZ:  And I just mentioned that because it could

20 go in both.  It could go in one or the other.

21         THE COURT:  I think it should go in both.

22         MS. UETZ:  Okay.  Thank you.

23         THE COURT:  Okay?  I think it should go on both.  So

24 that's -- again, I'm going to hear -- the committee will have

25 more to say about this than I am.  But these are my 10,000-foot

1  areas where I think we could do a little good here, okay?  I do

2  think -- again, I think the scope of the relief with respect to

3  the release and the exculpation can be described a little more

4  precisely than it is.

5          Now I'm going to get into a big subject here, which is

6  the survivor trust documents.  I'm going to hear from both of

7  you, but I think it's going to help enormously if those can be

8  ready by the time we're soliciting, okay?  Do you want to

9  address it now.

10         MS. UETZ:  We have a draft that we can share with

11  everybody to work toward that, Your Honor.

12         THE COURT:  Okay.  Well, no.  If that was -- if you

13  were to tell me that's completely --

14         MS. UETZ:  Just (indiscernible) --

15         THE COURT:  -- unrealistic, I'm happy to hear it.

16         MS. UETZ:  -- to everybody else.

17         THE COURT:  Okay.  Okay.  All right.  This is going to

18  sort of cover a couple of different concepts, but the debtor,

19  to their credit, set forth, for lack of a better word,

20  benchmarks in terms of what they think the overall claim

21  aggregate is going to be.

22         I think there's two concepts there.  One is from the

23  committee's standpoint, those were your choices.  They would

24  make different ones.  I would leave open the possibility either

25  that the committee -- that that's appendix A, that the

1 committee says, well, wait a minute, if you really want to look

2 more comprehensively at where cases have turned out or what the

3 realistic, estimable values are, we think the following cases

4 are more helpful than the ones the debtor has suggested.  And

5 they can also go on to say, and by the way, we're asking the

6 Court to grant relief from stay so we can get a more particular

7 handle on this so people know that that's a distinct

8 possibility.

9   Now, we may have to be updated.  Depending on what I

10 do on the 8th, we may update that further.  But I think the I

11 think the committee ought to be heard in that sense that they

12 just do not agree with the frame the debtor has put on this,

13 and their frame would be very different, and they can say what

14 it is.

15   Similarly, I think that, although I think there was an

16 admirable effort to make the valuation process clear, I don't

17 know if you can say anything more about what you think the

18 basis for the evaluators, both the initial one and then the

19 neutral -- if you have any idea about on what they're going to

20 be basing that, I think you could say so.

21   MR. MOORE:  So, Your Honor, Mark Moore, on behalf of

22 our RCBO.

23   This is one of the things that's actually governed

24 almost exclusively by the survivor trust documents, which may

25 solve that problem.

1        THE COURT:  Well, at least it'll tell me what you
2   think.
3        MR. MOORE:  Right, because part of the survivor trust
4   documents is going to be the trust distribution protocol.
5        THE COURT:  Okay.
6        MR. MOORE:  And that will set out the exact --
7        THE COURT:  Okay, okay.
8        MR. MOORE:  -- here's the scoring metrics.
9        THE COURT:  Yeah.
10       MR. MOORE:  Here's the possible things taken into
11  consideration.
12       THE COURT:  Yeah.  I mean, I don't want to get ahead
13  of myself here.  You may believe that plans have been confirmed
14  or disclosure statements have been approved without that.  As I
15  look at this from the perspective of an abuse survivor, I just
16  think it's going to be enormously helpful to have that
17  information.
18       MR. MOORE:  As Ms. Uetz said, this is something we've
19  been working on.  We are prepared in the next day, week,
20  however long, to be able to share that with the committee.
21       THE COURT:  Okay.  Okay.
22       MR. MOORE:  Part of the reason that we did not
23  previously is that typically the survivors trustee has a pretty
24  significant amount of --
25       THE COURT:  Sure, sure.

 1          MR. MOORE:  -- input into that.

 2          THE COURT:  Sure.

 3          MR. MOORE:  As does the claims reviewer, which is a

 4  different --

 5          THE COURT:  Is there somebody identified yet?

 6          MR. MOORE:  We have not.

 7          THE COURT:  Okay.

 8          MR. MOORE:  That's typically something that's done in

 9  connection with the committee.

10          THE COURT:  Okay.

11          MR. MOORE:  Obviously, we haven't reached that step.

12          THE COURT:  Yeah, I would hope so.  Okay.

13          MR. MOORE:  And so we can put those documents together

14  with the understanding that it establishes a framework pursuant

15  to the plan and disclosure statement but may be subject to a

16  little bit of change.

17          THE COURT:  Okay.  All right.  And again, this is not

18  meant to steal the committee's thunder on these.  These are my

19  large-scale concerns, okay?

20          MS. UETZ:  Your Honor, can I just ask a question about

21  the one before this?

22          THE COURT:  Yes.

23          MS. UETZ:  Just to clarify what you said or what I

24  heard.

25          THE COURT:  Sure.

1           MS. UETZ:  For the benchmarks in the other cases the

2    debtor has described in the disclosure statement, are you

3    saying that the committee's sort of counter to that can go in

4    in appendix A?

5           THE COURT:  That was my thinking.  I mean, we don't

6    have --

7           MS. UETZ:  Okay.  That's what I thought --

8           THE COURT:  We don't have to do it --

9           MS. UETZ:  -- I heard you say.

10          THE COURT:  -- that way.

11          MS. UETZ:  I just wasn't certain.

12          THE COURT:  But I'm assuming they have a different

13   universe.

14          MR. WEISENBERG:  Your Honor, we're going to have a lot

15   to say about those charts.

16          THE COURT:  Okay.

17          MS. UETZ:  Okay.  Thank you.

18          THE COURT:  Okay.  Appreciate it.

19          The most contentious disclosure statement I ever dealt

20   with as a lawyer was PG&E 1.  And there were 75 objections.

21   And we got to the point where -- I'm not trying to be funny

22   here.  Judge Montali just said, for God's sake, put it in.  If

23   that's what they want, put it in, and we'll figure it out

24   later.

25          So I'm not trying to make light of this, but there is

1  a point at which, if we're going to go down this road and we're

2  going to take this seriously as a disclosure statement, where

3  we know there is just a fundamental disagreement, there is

4  nothing wrong with indicating what the basis of that

5  disagreement is and what the other reality is, okay?  And

6  maybe -- well, we'll see where we end up.  But I think that's a

7  concept we can readily employ.

8          MS. UETZ:  Your Honor.  It reminds me of some of the

9  CMC statements that we filed with this Court and the district

10 court where we each have our own --

11         THE COURT:  Yeah.

12         MS. UETZ:  -- the debtor beliefs --

13         THE COURT:  Well, and --

14         MS. UETZ:  -- the insurers' beliefs --

15         THE COURT:  And to that -- yeah.  I mean, to that

16 point, I think obviously updates on litigation -- and to the

17 extent that the insurance litigation -- insurance coverage

18 litigation, the description is not up to date in the disclosure

19 statement, it should be up to date.

20         MS. UETZ:  Of course.

21         THE COURT:  Okay.  There is also a motion by the

22 committee, I think, to play a more prominent role there, right?

23         MS. UETZ:  That's the understatement of the day, Your

24 Honor.

25         THE COURT:  Okay.  S

1          MS. UETZ:  Forgive me but --

2          THE COURT:  All right.  Well --

3          MS. UETZ:  I couldn't resist.

4          THE COURT:  I'll forgive myself for understanding that

5    one.  Okay.  Thank you.

6          Did you want -- did you want to say something?  I'm

7    sorry.

8          MR. WEISENBERG:  Your Honor, I -- no.  I was going to

9    say yes to your question.

10         THE COURT:  Yeah.

11         MR. WEISENBERG:  And we'll wait to address all the --

12         THE COURT:  I appreciate it.  Okay.  Thank you.

13         I think to the extent that there are particular assets

14   that the committee would identify as, for lack of a better

15   word, pursuable, I think either they can identify those and/or

16   the debtor can say we have chosen not to pursue A, B, C, or D

17   because.  And there may be perfectly good reasons why in the

18   debtor's mind, okay?

19         To a similar end, there is a reservation of rights for

20   a potential avoiding powers causes of action.  I think to the

21   extent you are aware of any of those with any particularity,

22   they ought to be described.  If you're not aware of them with

23   particularity, you can say so.  Maybe the committee is.  And

24   that could be another point of disagreement.

25         We talked about this before, but the general concept

1  of what's going to be available from the debtor's side,

2  including the churches and other, for lack of a better word,

3  entities within the diocese frame, I think that some

4  explanation of what the debtor's principle is that's guiding

5  what's being contributed and what's contributable and what

6  isn't, not -- and again, not that we're all going to agree on

7  the numbers at this point.  We're certainly not.  But I think a

8  better understanding of where the debtor is coming from and

9  what's the principle guiding that I think is going to be very

10 helpful, okay?

11        I know there's a disclosure of the transfer of the

12 cathedral property, but you might want to include some

13 explanation about why.  I mean, there's -- it's a fairly

14 significant amount of debt.  Maybe in the diocese's mind it's

15 completely awash and no harm, no foul.  But if you wanted to

16 describe that, my sense is the committee is going to take a

17 different view of that.  And we might as well -- might as well

18 sharpen that up a little bit.

19        I want to let -- I had some confusion myself about

20 some of the logistics, particularly the litigation option.  I

21 think really the committee is probably more all over that than

22 I am.  I think my concerns are probably relatively -- they're

23 not as precise, so I'll let them address those.  Although I

24 will agree that I got a little lost in the weeds there too in

25 terms of what someone's going to end up with and what's

1   offsetting against what.  But I'll let Mr. Weisenberg and

2   others present that and try to -- I'll try to clarify it in my

3   own head.  But it struck me that needed a little bit of help in

4   terms of the explanation.

5           MS. UETZ:  May I make a comment, your Honor?

6           THE COURT:  Yeah, of course.

7           MS. UETZ:  In terms of the objection concerning

8   specifically the offset --

9           THE COURT:  Yeah.

10          MS. UETZ:  -- we've talked with at least some of the

11  insurers during the break.  And we expect to be able to resolve

12  that hopefully to the satisfaction of the --

13          THE COURT:  That's a language issue or something else?

14          MS. UETZ:  Probably by withdrawing that offending

15  offset provision.

16          THE COURT:  Okay.

17          MS. UETZ:  So I just want to preview that.  And we're

18  going to be having hopefully some discussion about that.

19          THE COURT:  Okay.

20          MS. UETZ:  Almost, like, put a pin in it.  But --

21          THE COURT:  That's okay.

22          MS. UETZ:  It'll hopefully not be of the pin for very

23  long.

24          THE COURT:  Okay.  So those are in a very big picture

25  my thoughts about where I know we're going to need a little

1    help here, okay?  And that's not to take any of the thunder out

2    of Mr. Weisberg's presentation.  But that's just -- as somebody

3    who has not lived with this as much as you guys have, this case

4    and this document, those are my thoughts.

5          So do you want to come on up and kick us off here?

6          MR. WEISENBERG:  Thank you, Your Honor.  Brent

7    Weisberg on behalf of the committee.

8          Your Honor, we would suggest to proceed differently.

9          THE COURT:  Okay.

10         MR. WEISENBERG:  And it's consistent with the mantra

11   that we've said many times today, which is there are gating

12   issues that this Court needs to decide.

13         THE COURT:  Okay.

14         MR. WEISENBERG:  And if ultimately you agree with us,

15   then there is no sense moving forward.

16         The easiest two examples, although easily solvable

17   admittedly, is the definition of a release and exculpated

18   party.  It was not hyperbole, Your Honor, when we said if you

19   read the release --

20         THE COURT:  Right, as that --

21         MR. WEISENBERG:  -- as written --

22         THE COURT:  Yeah.

23         MR. WEISENBERG:  -- the San Francisco Archdiocese will

24   be released and the Holy See will be released.  I suspect that

25   is not what the debtor intended, and so they need to fix that,

1    okay?

2          With exculpation, it's a little more challenging.

3    Your Honor.  There is a Ninth Circuit decision which provides

4    that parties who are integral in the plan promulgation process

5    are entitled to an exculpation.  Yet the debtor lists four or

6    five entities, their brothers, sisters and aunts, all of whom

7    are entitled to an exculpation.  That is inconsistent with

8    Ninth Circuit law.  And so as drafted, the plan cannot be

9    confirmed.

10          THE COURT:  Okay.  Now because these things can be a

11   moving target and fixable, is your request that I address that

12   in terms of what I believe my answer would be or something

13   else?

14          MR. WEISENBERG:  Your Honor, again, we want to be

15   constructive.

16          THE COURT:  Well, I appreciate that.

17          MR. WEISENBERG:  And so --

18          THE COURT:  That's why I'm asking in the same spirit.

19          MR. WEISENBERG:  Yeah.  And if Your Honor agrees with

20   us and says I would like the debtor do this, that, and the

21   other thing, of course, we'd like to see them do that now.

22          THE COURT:  Okay.

23          MR. WEISENBERG:  I think the trickier piece, Your

24   Honor, and I think you and I may have been talking over one

25   another, is when we're talking about the liquidation analysis.

1    I think there's two issues there.  There's not just a

2    disclosure issue, which is the debtor believes it does not need

3    to contribute these assets because.  The other issue, the more

4    fundamental issue, is we don't believe the debtor has a right

5    to make that decision.

6           Like we said before, this is a fundamental protection,

7    in fact, one of the only protections that a group of creditors

8    who doesn't agree to a plan has.  And under the debtor's

9    worldview, they can pick and choose how that analysis is done.

10   And that just can't be the intent of the drafters.  The intent

11   of the drafters provided two vital protections to make sure

12   that creditors who did not consent to a plan were nonetheless

13   protected.  The absolute priority rule, which we understand

14   also, the debtor argues we're a nonprofit, that does not govern

15   us, and the hypothetical liquidation test.

16          And so if the debtor is permitted to say you can never

17   compel us to sell our churches because that would be a First

18   Amendment violation, it obviously greatly skews what are the

19   assets of the estate.  In turn, it greatly skews what's fair

20   and equitable.  And so we need Your Honor to give us guidance

21   today or before the disclosure statement could ever be approved

22   about whether that liquidation analysis is accurate, because if

23   it's not, creditors are going to pick up the disclosure

24   statement and say wow, I'm doing better than if this were

25   liquidated.  We don't believe that's the case.  We believe that

1   Your Honor needs to determine what is and is not assets of the

2   estate.

3          THE COURT:  Can I ask you a question?  I think I know

4   what the answer is, but you're going to help me out.  Could I

5   find both that the debtor could not be forced to sell all the

6   churches and the plan isn't fair and equitable?

7          MR. WEISENBERG:  Yes.

8          THE COURT:  Okay.  I mean, that's where I'm kind of

9   headed here, okay?  Because look, it's a hypothetical test.

10  And there's a point at which -- can we make them sell this

11  church?  Maybe not.  Should we be in a Chapter 11 and

12  confirming a plan?  Maybe not.  Makes sense?

13         MR. WEISENBERG:  It does, Your Honor.  But I think the

14  quibble I would have with your analysis is if we move forward

15  in that paradigm, it makes it easier for you to find that the

16  plan is fair and equitable because we're not using an accurate

17  liquidation test.  What we're arguing is on its face, this plan

18  fails that test.

19         If we go your route, there's a lot more subjectivity

20  as to whether the plan is fair and equitable because they may

21  satisfy that test on its face because you've determined, okay,

22  I'll agree with you guys, for the time being, you can never be

23  compelled to sell your churches.  The churches --

24  conservatively, the real property 400 to 700 million dollars,

25  Your Honor.  Okay?  This is a billion-dollar real estate

1    enterprise.

2            Again, getting back to the intent of the drafters of

3    the code, it cannot be the intent that an entity rich in real

4    estate, arguably poor in cash, can get away with paying pennies

5    on the dollar and saying -- folding their arms and saying you

6    can't compel me to sell my real estate.  And, Your Honor, no

7    one's saying that you have to.  All you have to do is say I

8    cannot confirm this plan.  You're not -- no one is asking you

9    to compel them to sell churches.

10           And again, like Your Honor just said, it is a

11   hypothetical test.  The Boy Scouts court recognized that.

12           THE COURT:  And would I be wrong in your mind to say

13   if there's a limiting principle here, the debtor needs to tell

14   us what it is, and we can -- I can agree with it or not?

15           MR. WEISENBERG:  I would love to hear, Your Honor,

16   what the validity is.  And I'd also like to --

17           THE COURT:  Well, I would too.  That's why --

18           MR. WEISENBERG:  I would like --

19           THE COURT:  That's what I'm asking for.

20           MR. WEISENBERG:  Yeah.  But I'd also like the ability

21   to challenge their assertions.

22           THE COURT:  Of course.

23           MR. WEISENBERG:  We know -- listen, we know what the

24   assertion is going to be.

25           THE COURT:  Yeah.

```
1              MR. WEISENBERG:  The assertion is going to be you
2      violate my First Amendment right by compelling me to sell
3      churches.
4              THE COURT:  Yeah.  But my --
5              MR. WEISENBERG:  It is a hypothetical test.
6              THE COURT:  Okay.
7              MR. WEISENBERG:  It can never happen.
8              THE COURT:  Okay.  But my point is, for disclosure
9      statement purposes, is it enough for them to articulate
10     whatever that basis is and then we argue about that at
11     confirmation?
12             MR. WEISENBERG:  I don't think so, Your Honor.
13             THE COURT:  Okay.
14             MR. WEISENBERG:  Again, I think you are skewing a
15     creditors' view of the fairness of the plan even with
16     descriptions that say the debtor asserts this, the committee
17     asserts this.  I think that's very different from providing an
18     accurate liquidation analysis, which a creditor is entitled to,
19     where they can look at the plan, look what they're receiving,
20     and compare it to a Chapter 7.
21             THE COURT:  Okay.  Let me give you another version of
22     it, see if this makes any more sense.  They could file -- they
23     could put together liquidation analysis says look, but for our
24     arguments re the First Amendment and we can't be liquidated,
25     the value of the real estate minus any existing debt is X.  The
```

1    debtor's position is they'll never be -- they will never be
2    compelled to do that, but just so if you want a number, here's
3    a number.  But there will be a disagreement at confirmation
4    about what's fair and equitable and what is required of an
5    entity in this scenario.
6            MR. WEISENBERG:  I'm not sure that solves our problem,
7    Your Honor, for the reasons we've been explaining, which is if
8    ultimately we are correct at plan confirmation, what have we
9    achieved?  We --
10           THE COURT:  Well, we know we're not going to confirm a
11   plan.
12           MR. WEISENBERG:  Right.
13           THE COURT:  I think, right?
14           MR. WEISENBERG:  Well, that's correct.
15           THE COURT:  Okay.
16           MR. WEISENBERG:  But we haven't addressed other gating
17   issues, right, which is through the plan, Your Honor, the
18   debtor essentially seeks to gloss over the most meaningful
19   issues of this case, what are its assets, what are its
20   liabilities, okay?  We have complaints on file and a motion on
21   file to get those answers.  If we go the plan route and you do
22   not hold that it's confirmable for any number of reasons, but
23   right now for our dialog it's because the plan does not comport
24   with the Chapter 7 liquidation, we don't have any answers to
25   those questions.

```
1            And so isn't it better now in the same way you want to
2   address the third-party release issue to know the rules of the
3   game so that when a creditor picks it up, they have an accurate
4   analysis?  That's what we're afraid of, is you could punt any
5   issue down the road, but is it actually economical?
6            THE COURT:  Well, to me -- I'm not trying to -- I'm
7   not trying to argue with you.  But there's a difference in
8   punting and if there is a scenario in which some debtors cannot
9   be compelled ultimately to do the thing that is the test.  You
10  could say the test is this, this is the number.  Just so you
11  know, if this were any other kind of case, it's 700 million
12  dollars.  The debtor contends that it will never be in that
13  position.  And it offers as a principled answer to that
14  question that the following is available and the following
15  isn't available.  I mean, to me, that's not punting the
16  question.  That's articulating what the difference is in the
17  opinions between your side and their side.
18           MR. WEISENBERG:  I was about to say, with all due
19  respect, but I think we know in --
20           THE COURT:  In my humble opinion.  I know.  I know.
21           MR. WEISENBERG:  We know that as off limits.
22           THE COURT:  No, it's never off limits.  I get to say
23  in my humble opinion.
24           MR. WEISENBERG:  With all sincerity --
25           THE COURT:  Yeah.  That's --
```

1          MR. WEISENBERG:  -- I still find that solution

2   problematic because Your Honor can decide this as a matter of

3   law.  I don't think it's fact-based, okay?  It's an

4   interpretation of the Bankruptcy Code and the test.  And so

5   again, I would agree with you if there are factual issues that

6   needed to be determined.

7          THE COURT:  Okay.  Then let me ask you this.  Should I

8   determine now that there's no First Amendment issue here and no

9   liquidating a nonprofit?  Should I determine that right now?

10         MR. WEISENBERG:  I think you would need briefing, Your

11  Honor.  It's a very, very important point.  As you can tell, we

12  are making a lot of it because it's one of the fundamental

13  protections.  So humbly we'd suggest that we both be allowed to

14  brief the issue.

15         THE COURT:  Okay.  Do you want to pause for a minute?

16  Because this is a biggie.  Okay.  And let me hear from

17  whoever -- one or more of the worthy counsel.

18         MS. UETZ:  Your Honor, I think it's going to be Mr.

19  Moore and Mr. Lee --

20         THE COURT:  Okay.

21         MS. UETZ:  -- if it is okay with the Court.

22         THE COURT:  I don't mind.  Mr. Weisenberg, are you

23  okay with that?

24         MR. WEISENBERG:  Of course, Your Honor.

25         THE COURT:  Okay.  Can we start with some of the

1  less -- well, maybe the less contentious matters, the language

2  of the release and the exculpation?

3          MR. MOORE:  Thank you, Your Honor.  Mark Moore on

4  behalf of RCBO.

5          And I'm going to defer to Mr. Lee as we get into

6  arguments about what is patently unconfirmable versus what

7  isn't because that was going to be how we kind of broke this

8  up.

9          THE COURT:  Okay.

10         MR. MOORE:  I do think that the Court has already

11  somewhat solved both of these issues.  And by both I mean the

12  hypothetical liquidation analysis test, whatever you want to

13  call it, and the releases because we've already heard the Court

14  say that we need more precision, frankly, on who's getting

15  exculpated and why, who's getting released and why --

16         THE COURT:  Yeah.

17         MR. MOORE:  -- what the implications of those things

18  would be.  And so we hear that.  And we will make those

19  alterations --

20         THE COURT:  Okay.

21         MR. MOORE:  -- in both the executive summary and in

22  our FAQ-like formulation.

23         THE COURT:  All right.  Do you have any doubt about

24  what the tension points are?

25         MR. MOORE:  No, Your Honor.

1          THE COURT:  You've heard it.

2          MR. MOORE:  and I think we can be absolutely certain

3    that we didn't intend to provide for a release of the

4    Archdiocese of San Francisco, for example.

5          THE COURT:  Okay.  All right.

6          MR. MOORE:  And that kind of illustrates why we may

7    need a little bit more precision.

8          THE COURT:  Montali would be so upset if you did.

9          MR. MOORE:  Well --

10         THE COURT:  He'd have nothing to do.

11         MR. MOORE:  I think you'd have a lot more lawyers in

12   the room probably.  So that's just one example of how that

13   issue can be resolved through more disclosure and more

14   precision.

15         THE COURT:  Yeah.  But I agree that's a now issue.

16   You do too, right?

17         MR. MOORE:  I'm sorry?

18         THE COURT:  That's a now issue, let's fix that now,

19   right?

20         MR. MOORE:  In the disclosure statement, yeah.

21         THE COURT:  Yes.

22         MR. MOORE:  Absolutely, Your Honor.

23         THE COURT:  Yes.

24         MR. MOORE:  The second issue, to the extent that we

25   need to talk about what the argument is, I'm going to defer to

1   Mr. Lee.  But I think that the Court actually paved the way for

2   the resolution of that issue as well, because the Court already

3   indicated that we need to provide you with the why, the why of

4   the debtor's, for lack of a better way to put it, business

5   judgment in proposing the plan and putting out what is

6   conservatively, we think about 160 million dollars, maybe 150

7   million dollars from the debtor alone.  That's not pennies on

8   the dollar.  That's a significant and meaningful contribution.

9         And you've already said that we need to provide the

10   why of that.  How did we get to those numbers?  What do we

11   believe is or is not to be included and why?  And we hear you.

12   That is something that we can do in a revision to the

13   disclosure statement.

14         THE COURT:  And I'm not trying to be cynical when I

15   say this.  I don't know what's the chicken and what's the egg

16   here between we think this is fair and we think the claims are

17   worth this much.

18         MR. MOORE:  Absolutely.

19         THE COURT:  I don't know which -- I don't know where

20   you're starting, if you're starting with the claims analysis or

21   you're starting with what you think is available, and those are

22   just magically syncing up.

23         MR. MOORE:  Well, I think --

24         THE COURT:  I don't mean -- that sounded way more

25   cynical than I meant it to sound.

1        MR. MOORE:  I think that it's appropriate in the

2    context of your prior comments where you said we need to

3    understand where you start, debtor, because you are the plan

4    proponent.

5        THE COURT:  Yep.

6        MR. MOORE:  And you need to provide a little bit more

7    information about that --

8        THE COURT:  Yeah.

9        MR. MOORE:  -- about how you get there, why you get

10   there, what the arguments are, which we can do.

11       I think the Court has also given the committee an

12   opportunity, and we've agreed to it, to provide their view and

13   provide their appendix A or their committee letter or whatever

14   you want to describe it, which is where if they believe that

15   there's real estate that should be available that's worth 400

16   to 700 million dollars, they can say that and they can say why,

17   and they can say what they rely on for that.  I think that the

18   Court has already given kind of that link that maybe solves

19   that problem.

20       But then finally, Your Honor, and this is where Mr.

21   Lee can maybe take over for me, these are ultimately

22   confirmation issues.  These are ultimately your discretion to

23   approve or not approve the plan if we get to the point where

24   claimants vote it down.  Where we are right now, Your Honor, is

25   that we don't actually know what claimants believe.  We know

1  what counsel says that they'll probably believe, but we don't

2  really know.  And we do believe that the disclosure statement,

3  as directed to be amended by you, will provide them with a

4  meaningful opportunity to tell us.  And at that point, we'll be

5  much more informed about what they think about all of this.

6        And it, frankly, sounds a little bit like the

7  committee saying, well, they may think that this is a good idea

8  and that's helpful or it's not.  But ultimately, what you're

9  describing is a confirmation issue where the Court is going to

10  have to make a decision.

11        THE COURT:  How do you react to the suggestion that we

12  maybe brief this question of whether you could be compelled to

13  sell all assets and possibly liquidate, for lack of a better

14  word.

15        MR. MOORE:  Your Honor, I think it's part and parcel

16  of what the Court will ultimately determine in confirmation.

17  So we're very much aware that that is going to be a contested

18  legal issue.  I'm not sure that it should be, but I think that

19  the time for briefing of that will come.  I don't think the

20  time for briefing for that is now.

21        THE COURT:  So help me out here.  I think I know the

22  answer to this.  Just read from the language of the Code, I

23  think Mr. Weisenberg is not wrong that there is some very

24  direct language about the best interest tests.  It's a big deal

25  to protect creditors.  And your argument is that there's a

1   superseding principle here or because it's a hypothetical test,

2   even if we gave you a number, it would be useful only in some

3   sort of fair-and-equitable context that's arguably different

4   and must be adjudicated as part of a plan or something -- well,

5   choose either of those or both or more.  So tell me how this

6   plays out for you.

7         MR. MOORE:  Your Honor, hold on.

8         THE COURT:  If you guys want to -- if you want to

9   switch up here, feel free.

10        MR. MOORE:  Okay.  And this was actually going to be

11   part of the second (indiscernible) --

12        THE COURT:  Okay.

13        MR. MOORE:  So I'm going to defer to Mr. Lee.

14        THE COURT:  Yeah.  Sure, sure, sure.  Okay.

15        MR. MOORE:  Thank you.

16        THE COURT:  Okay.  My question makes sense?

17        MR. LEE:  Matt Lee for the debtor.  Can you repeat it,

18   Your Honor?  I'm sorry.

19        THE COURT:  Yeah.  What I'm being told is, look, this

20   is a gating issue because 1129(a) -- I forget which now.  Maybe

21   (10).

22        MR. LEE:  (7).

23        THE COURT:  (7)?  Thank you.  Says, look, it is an

24   absolute requirement that one demonstrate that the confirmation

25   is in the best interest of the creditors because they are doing

1    at least as well under confirmation as they would under a under

2    liquidation.  So there aren't any off ramps built into that per

3    se.

4           But you could tell me any number of different things.

5    You could tell me, well, there's a superseding issue here,

6    which is that we can't be liquidated under applicable

7    nonbankruptcy law.  And I need to be respectful of that and

8    play that into the bankruptcy analysis.  Or because it's a

9    hypothetical test, all you really need to do, you could show

10   that in the abstract.  Okay, it's 700 million.  Who cares.

11   Doesn't matter.  It can't be done.  So it becomes a fair-and-

12   equitable test that we have to deal with at confirmation and

13   not before.

14          Those are my -- those are two ideas for how you might

15   think about that, but you may have others.

16          MR. LEE:  Your questions and your ideas make sense and

17   are clear.  May I start with a clinical discussion of what

18   1129(a)(7) says?

19          THE COURT:  I'm not sure I've heard one before, so I

20   guess I'm looking forward to that.

21          MR. LEE:  I hope "clinical" is the right adjective.

22          THE COURT:  Is this from personal experience or --

23          MR. LEE:  Going to claim privilege on that.

24          THE COURT:  Okay.

25          MR. LEE:  1129(a)(7)(A) gives the debtor an either-or

1    proposition for satisfying it.

2              THE COURT:  Uh-huh.

3              MR. LEE:  The first of the either-or, the first

4    option, is that all impaired classes vote in favor of the plan.

5              THE COURT:  Um-hum.

6              MR. LEE:  The second option, if not all impaired

7    classes vote in favor of the plan, then you have to satisfy the

8    best-interest-of-creditors test.

9              THE COURT:  Or for a dissenting class.

10             MR. LEE:  Correct.

11             THE COURT:  Okay.

12             MR. LEE:  Yes.  Because we're at the disclosure-

13   statement phase of the case --

14             THE COURT:  Um-hum.

15             MR. LEE:  -- what matters now is not whether we can

16   establish the 1129(a) requirements.  What matters now is

17   whether there's anything structural inherent in the fabric of

18   the plan that makes it impossible to satisfy an -- to satisfy

19   the 1129(a) requirements.  And the committee has not argued and

20   cannot argue that standing here today, it is impossible to

21   confirm a plan under 1129(a)(7)(A)(i), that a holder of a claim

22   in each class -- I'm sorry, that each class has accepted the

23   plan, each impaired class has accepted the plan.  We have four

24   noninsider -- there are four noninsider classes in this plan,

25   3, 4, 5, and 6.

1           THE COURT:  Um-hum.

2           MR. LEE:  3 is general unsecureds.

3           THE COURT:  Um-hum.

4           MR. LEE:  4 is the abuse claimants.

5           THE COURT:  Um-hum.

6           MR. LEE:  Holders of abuse claims.  5 is the holders

7   of unknown abuse claims.

8           THE COURT:  Unknown.  Unknown.  Yeah.  Uh-huh.

9           MR. LEE:  And then 6 is the nonabuse litigation

10  claims, so the slip-and-fall cases.

11          THE COURT:  And those are just, they're riding

12  through, right, basically?

13          MR. LEE:  That we're establishing a reserve and then

14  making insurance available for them.

15          THE COURT:  Okay.

16          MR. LEE:  Under the current draft of the plan.

17          THE COURT:  Okay.

18          MR. LEE:  So on the issue of whether the plan is

19  patently unconfirmable, it is not patently unconfirmable

20  because it is possible -- it is not impossible -- that all four

21  of those impaired classes could vote to support the plan.  The

22  committee is going to swear up and down, and they have sworn up

23  and down, there's no way class 4 is going to support the plan.

24  But they don't know that.  I don't know that.  You don't know

25  that.

1         THE COURT:  Um-hum.

2         MR. LEE:  Okay.  So for purposes of the disclosure

3    statement, we don't have to get in at all into whether our

4    liquidation analysis is good, is bad, is complete, or is

5    incomplete.  As it is, because I want to be responsive to your

6    question and responsive to the --

7         THE COURT:  Um-hum.

8         MR. LEE:  -- committee's arguments, because it is an

9    important issue, obviously.  In the event that we can't

10   satisfy, that the debtor cannot satisfy 1129(a)(7)(A)(i), we

11   have to go to (ii), the best interest of creditors test.  And

12   obviously, this is what the committee's objection focuses on.

13   And the debtor did, in fact, do a liquidation analysis.

14   Nobody's disputing that the debtor did a liquidation analysis.

15   The question is whether, at this phase, the disclosure

16   statement -- I mean, even then, the question is whether at this

17   phase, does the disclosure statement accurately describe the

18   liquidation analysis.

19         Now, to your point, there are assumptions in the

20   liquidation analysis that we're making and legal arguments that

21   we're relying on for including or excluding certain things that

22   are not in the disclosure statement as it's currently drafted.

23   And I think what you've heard from us today is that we are

24   absolutely willing to put that basis into the disclosure

25   statement and also to give the committee an opportunity to

1    respond.

2           So that's why I agree with Mr. Moore.  On the subject

3    of briefing, it's premature to brief that.  Okay.  That issue

4    is going to get hashed out at the confirmation phase.  It's not

5    the debtor's burden to prove that its liquidation analysis is

6    sound at the disclosure statement phase.  And the reason for

7    that is because it's still possible that all the impaired

8    classes are going to vote to approve the plan.  So we might

9    not, in theory, ever even have to get to the liquidation

10   analysis.  If we have to get to the liquidation analysis,

11   Congress has set up a process that you do that at confirmation.

12          You want to know what our disclosure statement is

13   going to say about the legal basis for including or excluding

14   certain items.  Okay.

15          THE COURT:  Um-hum.

16          MR. LEE:  I'm happy to get to that.  If there were a

17   Chapter 7 liquidation in this case, committee is incorrect

18   about what assets have to be included.  The committee's

19   position is that all of the debtor's assets have to be

20   included.  And that's simply not the law in the Ninth Circuit.

21   There's a case that we cited in our reply brief.

22          THE COURT:  Um-hum.

23          MR. LEE:  Security Farms v. the Teamsters.  I'm just

24   going to call it Security Farms because the name of the union's

25   quite long, and it appears twice in the Ninth Circuit decision.

1   So I'm just going to call it Security Farms.  The Court, I

2   mean, in that case, obviously it wasn't a religious

3   institution.  Okay.  But it was about a labor organization that

4   was heavily -- that is heavily regulated by the National Labor

5   Relations Act.

6          THE COURT:  Um-hum.

7          MR. LEE:  And the court affirmed the exclusion of two

8   key assets that the creditors wanted to be valued, liquidated,

9   and the proceeds of the liquidation used to pay creditors.  One

10  was the collective bargaining rights of the union, and the

11  other -- I'm sure you know this.  It's a twenty-three year old

12  case.  But one was the collective bargaining rights of the

13  union, and then the other was the right to collect future union

14  dues.  And what the court said was, look, those assets, even if

15  liquidated, cannot be used to pay creditors because as a matter

16  of federal law, they are dedicated for specific purposes.  The

17  benefits of the members.  The benefits of the union itself.

18  You can't include those, even in a hypothetical liquidation --

19          THE COURT:  Um-hum.

20          MR. LEE:  -- analysis.  So I think maybe a corollary

21  in our case would be -- I'll get to the First Amendment issues

22  in a moment and the idea of selling church buildings, but I'll

23  start with restricted funds.

24          THE COURT:  Um-hum.

25          MR. LEE:  Okay.  That's a creature of California state

1    law.  Somebody makes a gift to a church.  It's earmarked for a
2    specific purpose.  That gift, the church can't take that money
3    outside of bankruptcy.  Outside of the insolvency context.  The
4    church can't take that gift and pay the light bill.  Can't take
5    that gift and buy the bishop a car.  Can only use that money
6    for the purpose that the donor has granted to it.
7         So in a hypothetical Chapter 7 liquidation, the same
8    is true.  That money is not available to pay creditors because
9    the donor intent restricts it to that specific gift, okay, and
10   the purpose that the donor made the gift.
11        So now we'll get into the First Amendment issue.  Do
12   you have any questions about that as --
13        THE COURT:  Well, I mean, it's "property of the estate
14   but", right?
15        MR. LEE:  I think it's not property of the estate --
16        THE COURT:  Not property of the estate?
17        MR. LEE:  Because of the restricted nature of the
18   asset, it's not available to pay creditors.  Now, again, it
19   doesn't mean that it's available to pay the light bill, but it
20   means that, under California law, it's not available other than
21   for the specific purpose --
22        THE COURT:  Okay.
23        MR. LEE:  -- that the donor made the gift for.
24        THE COURT:  This is very helpful, but in some ways,
25   the principle I have was the debtor should say why.  You're

1   doing that now.  The committee may not agree with you.  And

2   that's a fight -- I mean, my original conception of this is

3   it's the debtor's obligation to provide a rationale for this,

4   and it's the rationale that can be -- that can be reacted to

5   and that can tee up the issue at confirmation so we know at --

6   and people want to take discovery about this, that's fine, and

7   file briefs at that.  My sense was that this was a definition

8   question, a disclosure statement time, and an argument question

9   at confirmation.

10         MR. LEE:  We agree, Your Honor.

11         THE COURT:  Okay.  But I'm not trying to cut you off.

12   It's helpful.

13         MR. LEE:  I won't be cut off.  I'll answer your

14   question because I think this is kind of --

15         THE COURT:  Yeah.

16         MR. LEE:  -- where the discussion is leading.

17         THE COURT:  Uh-huh.

18         MR. LEE:  There's a supreme -- there's a body of

19   Supreme Court case law that talks about what is the -- what are

20   the limits and what are the -- what is the scope of the free

21   exercise clause.  What is the scope of the establishment

22   clause.  That's an understatement.  There's tons of cases on

23   that.

24         But specifically as to how you square religious

25   missions with generally applicable, laws that apply to all of

1  us, there's one in particular that I want to highlight.  It's a

2  2012 decision.  It's called Hosanna-Tabor Evangelical Lutheran

3  Church and School v. EEOC, Equal Employment Opportunity

4  Commission.

5              THE COURT:  Um-hum.

6              MR. LEE:  It's a 2012 case.  It was a unanimous

7  decision of the court.  And in that case, the court was dealing

8  with the ministerial exception.  I don't know if you're

9  familiar with the case.  I don't want to --

10             THE COURT:  Not as much as you are.  Go ahead.

11             MR. LEE:  It just means you hadn't read it in the last

12  two days.  But so the case is dealing with the ministerial

13  exception --

14             THE COURT:  Um-hum.

15             MR. LEE:  -- to the employment discrimination laws.

16             THE COURT:  Um-hum.

17             MR. LEE:  Discrimination and retaliation laws.  In

18  that case, it was a disability claim against a chapter of the

19  Lutheran Church.  And they had fired a minister for not

20  following church protocols in dealing with her issue

21  surrounding her disability.  And so she sued for disability

22  discrimination and retaliation.  And the unanimous court said,

23  no -- she was a minister.  I'm sorry.  She was an ordained

24  minister who had taken vows and agreed to be bound by specific

25  code and specific set of conduct.

1          THE COURT:  Um-hum.

2          MR. LEE:  And what the what the Court ultimately

3   held -- I'll read a brief quote from it.

4              "Requiring a church to accept or retain an unwanted

5              minister or punishing a church for failure to do so

6              intrudes upon more than a mere employment decision.

7              Such action interferes with the internal governance of

8              the church, depriving the church of control over the

9              selection of those who will personify its beliefs.

10             And by imposing an unwanted minister, the state

11             infringes the free exercise clause, which protects a

12             religious groups right to shape its own faith and

13             mission through its appointments.  According to state,

14             the power to determine which individuals will minister

15             to the faithful also violates the establishment

16             clause, which prohibits government involvement in such

17             ecclesiastical decisions."

18         Now, the decision of when and where to establish a

19   church, a Catholic Church, or to sell property with a church

20   building on it is fundamental to the mission of the church, and

21   it's fundamentally a decision left to the bishop of the diocese

22   in which the church sits.

23         In the Catholic faith, the church building itself is

24   of significance that is difficult to describe.  I'm going to

25   try and do it for you now.  The church is where the faithful

1  experiences the Holy Trinity.  You walk into the church.  You

2  are in the presence of God.  You go get communion.  You receive

3  the body and blood of Christ.  And the whole time you're there,

4  you're surrounded by the Holy Spirit descended upon those

5  gathered there.  It is the mission.  It is the church.

6          And yes, it's a piece of real estate.  And yes, it's a

7  piece of real estate on planet Earth in the State of

8  California, United States of America.  But to tell the bishop

9  that he has to close X number of churches or that he has to

10 close this church or he has to sell this church and combine

11 that congregation with another congregation fundamentally

12 infringes on the debtor's First Amendment rights and on the

13 bishop's First Amendment rights.  It substitutes church

14 doctrine for the will of the Court.  And our position is going

15 to be that the Court can't do that.  That the government can't

16 do that.

17         Now, I want to say what we're not saying.  We are not

18 saying that this applies to every asset.  We are not saying

19 that it means we are exempt from any particular requirement of

20 1129.  It does not mean that we can get around the fair-and-

21 equitable point.  We have to propose a plan that's fair and

22 equitable.

23         The plan we've proposed -- and we could perhaps be

24 more specific about this in the disclosure statement as well.

25 But the plan that we have proposed depends upon the sale of

1   church real estate, vacant land, and land that is not vacant.

2   It depends on it.  It depends on it to make our plan payments,

3   which are significant, 103 million to the survivors trust from

4   the debtor, reorganized debtor, over the course of a four-year

5   period after the effective date, including a 63-million-dollar

6   payment on the effective date of the plan.  How are we paying

7   for that?  We're taking out a fifty-five-million-dollar loan --

8           THE COURT:  Um-hum.

9           MR. LEE:  -- from the Roman Catholic Cemeteries of

10  Oakland.  And it's a real loan.  We're going to give them

11  mortgages on other properties, which then we're going to have

12  to sell -- we're going to have to sell assets to pay that off.

13  So not only are we paying 103 million to the survivors, we've

14  got to pay back our lender and we've got to make all of our

15  other payments.

16          THE COURT:  Um-hum.

17          MR. LEE:  We can consensually and the bishop can

18  consensually and has acknowledged that he's willing to do that.

19  He's willing to alienate church real estate in order to do

20  right by the survivors.  But as far as the 1129(a)(7) argument

21  goes, and specifically 1129(a)(7)(A)(ii), our position is going

22  to be that the we cannot be, in a hypothetical Chapter 7

23  liquidation, forced to sell buildings with churches on it

24  because of the reason I described.  Briefing on this will be

25  much more eloquently stated --

1          THE COURT:  Um-hum.

2          MR. LEE:  -- than what you've heard today --

3          THE COURT:  But your position is that for today's

4    purpose, what I need to direct you to do is articulate exactly

5    what these principles are so that at confirmation, with further

6    briefing, we can have an intelligent argument.

7          MR. LEE:  That's exactly what I'm saying, Your Honor.

8          THE COURT:  Okay.

9          MR. LEE:  I agree with you.

10         THE COURT:  All right.

11         MR. LEE:  And if I can add --

12         THE COURT:  Yeah.

13         MR. LEE:  -- none of this makes the plan patently

14   unconfirmable sitting here today because of the clinical

15   argument I made before.

16         THE COURT:  No, but I do think -- I mean, I don't

17   think it would be -- I may not make a ruling on this now.  I

18   don't know that it would necessarily be out of bounds to

19   include in that presentation that it may be that if the Court

20   is not convinced that the diocese has the winning legal

21   position here, the plan isn't confirmable because I think at

22   that point, we're just going to be -- we may be at the end of

23   our rope, and it may be that Chapter 11 is not a viable concept

24   anymore if I agree more with the committee than I agree with

25   you.

1          MR. LEE:  Or it may be that you order us to redo the

2    liquidation analysis, including --

3          THE COURT:  Okay.  I mean, you tell me where the hard

4    stop is on that.  Okay.

5          MR. LEE:  Well, if we're talking at confirmation, I

6    think you have a number of options.  I think for today's --

7          THE COURT:  And look, I mean, the elephant in the

8    room.  You guys are going to talk.  Right.  And this is a

9    highly iterative process.  I have no illusions that this is the

10   last-and-best offer at all, nor do you, nor does the committee,

11   which is another reason why, if this is a moving target in that

12   sense, it's one that ought to keep moving and not stop now,

13   right, is what you're going to tell me?

14         MR. LEE:  Yes, Your Honor.

15         THE COURT:  Right?  Okay.  Got it.  All set?

16         MR. LEE:  On 1129(a)(7), yes.

17         THE COURT:  Okay.  Is there something else you want to

18   talk about?

19         MR. LEE:  They raised the number of patent --

20         THE COURT:  Okay.

21         MR. LEE:  -- unconfirmability issues.  I'm happy to

22   let you --

23         THE COURT:  Well, I wanted to pause on this one and

24   get everybody's input.  Okay.  But Mr. Weisenberg, it's your

25   objection, so you get the last word.  Okay.

1          MR. WEISENBERG:  Thank you, Your Honor.  Mr. Prol is
2    going to take the last whack at it.
3          THE COURT:  Okay.  Thanks.  Appreciate it.
4          MR. PROL:  Thank you, Judge.  Jeff Prol, Lowenstein
5    Sandler, on behalf of the committee.
6          THE COURT:  Um-hum.
7          MR. PROL:  Just addressing this 1129(a)(7)(A) issue --
8          THE COURT:  Um-hum.
9          MR. PROL:  -- the debtor argues that the committee
10   cannot argue that the plan is patently unconfirmable because
11   they can potentially meet the Romanette (i).  And we would
12   argue in response to that, Your Honor, that what we're trying
13   to do here is to eliminate a costly detour and frolic.
14         THE COURT:  Yeah.
15         MR. PROL:  And that if, ultimately, this Section
16   1129(a)(7)(A)(i) and (ii) cannot be met, we shouldn't spend the
17   time or the money that the debtor says it doesn't have to go on
18   a --
19         THE COURT:  Um-hum.
20         MR. PROL:  -- three, four, five, however-long-month
21   junket it is to go through discovery --
22         THE COURT:  Yeah.
23         MR. PROL:  -- and a confirmation hearing and that this
24   issue can be determined as a matter of law, either today or
25   after subsequent briefing, before we go through that process.

1          Although they say the committee can't argue that they
2    cannot meet Romanette (i), I will tell you that there are only
3    two cases, two diocese cases, that have ever gone to
4    solicitation of a plan without the consent of a committee.  And
5    both cases, the tort claim has voted more than ninety percent
6    to reject the plan.  So I think that that -- and we reference
7    those cases in our brief.  I think Your Honor can take judicial
8    notice that it's very unlikely that this case will be any
9    different than the only two cases in history that have
10   proceeded down that course.

11          Secondly, with regard to Romanette (ii), the debtor
12   conflates a hypothetical liquidation test with somehow Your
13   Honor forcing them to sell churches.  That's not the case.  In
14   a hypothetical liquidation test, the debtor has to show what
15   the assets would bring in a liquidation.  They don't have to
16   sell them.  The point is, and Your Honor made this in your
17   opening comments, you don't have to confirm the plan.  If they
18   don't meet this test --

19          THE COURT:  Um-hum.

20          MR. PROL:  -- Your Honor cannot confirm the plan.  And
21   it has nothing to do with whether or not you can force them to
22   sell churches.  It has nothing to do with religious freedom.
23   Okay.  They ultimately don't have to sell churches.  They can
24   raise the money somehow else.

25          I haven't read the Security Farms case, but Mr. Lee's

1    recitation is that there were two key assets that were
2    excluded, and I wrote this down, collective bargaining rights
3    and the right to collect future dues.  In a liquidation, I'm
4    assuming the collective bargaining rights aren't worth anything
5    because they go away, and future dues don't exist because
6    they're not collected.  And that could be the reason why the
7    court didn't require them to value those particular assets.
8    Completely different than valuing real estate in this case.

9            The terms of the argument with regard to religious
10   freedom and the establishment clause, again, I don't think that
11   that really weighs in in this case.  So this is a hypothetical
12   liquidation.  It's not an actual liquidation.  It doesn't
13   prevent parishioners from continuing to worship in their
14   churches or in other churches.

15           And I don't have the citation at hand, but I think we
16   cited a case in our papers that stands for the proposition that
17   even if churches are liquidated in a bankruptcy case, it's not
18   the only church.  There are other churches in the area.  And we
19   did cite in our papers the fact that the bishop here, pre-
20   bankruptcy, did engage in a mission realignment process, where
21   he himself acknowledged that the diocese, because of the
22   economic condition, because of the survivor liabilities here,
23   would have to close churches.  And if that's necessary, it's
24   necessary, but again, it's not impacted by the 1129(a)(7) test,
25   which is only hypothetical.  Okay.  Thank you, Your Honor.

1          THE COURT:  Thank you.  Anything more on this?

2          No?  Anybody else want to be heard?

3          No?  Okay.  Let me make a quasi-ruling.  I'm very

4   aware -- I appreciate everybody's concern about the status of

5   the case now and the burn rate and the need to move forward.  I

6   also appreciate that, where you have an objection that really

7   is, as a matter of law, not resolvable, one should not go

8   through the exercise of soliciting a plan.  This doesn't fall

9   there for me for a couple reasons.

10          I think a disclosure statement time, the exercise is

11  for the debtor to articulate a basis on which they believe they

12  could confirm a plan and that plan is, in their belief, fair

13  and equitable and meets the other 1129(a) requirements.  I'm

14  hearing loud and clear what the committee is saying about their

15  views of the plan and what's happened in other situations where

16  a plan's gone out without committee approval.  I'm going to,

17  notwithstanding that, focus more on teeing up the issues and

18  framing the issues because I do think there is at least an

19  argument that a hypothetical test is appropriate here.

20          And look, you can create two versions of a balance

21  sheet.  You can create one that says, okay, if we sold

22  everything, here's the result.  We don't think that's pertinent

23  to anything.  We think, based on the principles we're

24  articulating in another portion of the disclosure statement,

25  that it is a principled position that the result of a

1  liquidation would be X.

2      And then we will argue about that.  And the committee

3  will take a very different view of it.  And having articulated

4  that, I think the debtor should say something along the lines

5  of there is a material risk that if the Court does not agree

6  with the debtor about this limitation and the debtor is not

7  able otherwise to make assets available and satisfy what the

8  debtor -- what the committee will say is the hard-and-fast

9  liquidation analysis.  We may not be able to confirm a plan in

10  this case.  Period.  End of story.  The case may have to be

11  dismissed.  I think it's just about that stark.

12      And I'm not trying to be funny here.  I also think

13  because this is a highly iterative process and because maybe

14  I'm kidding myself that this case has been especially

15  constructive and cordial, and I think it has been, that the

16  opportunity for further discussion here and to reach some

17  accord is alive, even though I thoroughly expect the committee

18  to say, we think this plan is unconfirmable.  We think the

19  values are not in line with reality.  I get all that.  It

20  doesn't mean that there can't be further discussion and this is

21  not a solvable problem.  This is potentially a solvable

22  problem.

23      So I think I'm going to ask the -- I'm going to

24  require that the debtor articulate the basis for whatever

25  limits it thinks it has with respect to assets available.  And

1    if that includes assets that the debtor believes it may hold

2    but are not property of the estate, okay, they can articulate

3    that too.  And the committee may say, well, it is property of

4    the estate, and therefore, that precludes the State law

5    analysis you want to provide us re the use of the property.  We

6    can have those fights.

7            But I think, for today's purposes, for disclosure

8    statement purposes, this is a matter of definition, sharpening

9    up the question and making sure we all understand what we're

10   going to be talking about before and during confirmation so

11   that everybody knows what the risks are.  All right.  Thank you

12   very much for the very good arguments on that.

13           MR. PROL:  Just to be clear on that --

14           THE COURT:  Yeah.

15           MR. PROL:  I'd like to understand and make sure that

16   if the debtor is going to put in its liquidation analysis and

17   its explanation, the committee will have an opportunity --

18           THE COURT:  Absolutely.

19           MR. PROL:  -- to criticize that --

20           THE COURT:  Oh, absolutely.

21           MR. PROL:  -- and put it in its own liquidation

22   analysis.

23           THE COURT:  Absolutely.  I mean, why not.  Right.

24           MR. PROL:  Yeah.  Yeah.

25           THE COURT:  Absolutely right.  Yeah.

1           MR. PROL:  And Your Honor, we --

2           THE COURT:  And that's beyond the briefing.  I mean,

3     that's just something that people can look at that.  I get it.

4           MR. PROL:  Okay.  And Your Honor, just structurally,

5     we've talked before about the committee attaching an appendix A

6     on some of these issues.

7           THE COURT:  Yeah.

8           MR. PROL:  I think it would be much more helpful to

9     the reader if it appeared in the text of the document, rather

10    than having to have creditors have to read a separate document.

11    So if the debtor puts in its liquidation analysis and

12    explanation, we should be able to have a paragraph right below

13    it that says, "the committee says".

14          THE COURT:  Anybody have a reaction to that?

15          MS. UETZ:  Yes.  Your Honor, it's not uncommon for

16    there to be a letter.  An appendix.  Something.  But to have

17    the debtor's disclosure statement confused with statements by

18    the committee in the middle of it, we think, would actually

19    worsen the disclosure.  So keeping it in a separate appendix

20    makes the most sense.

21          THE COURT:  Well, if we do that, I think it's

22    incumbent on the debtor to say at each one of those places--

23          MS. UETZ:  Sure.

24          THE COURT:  -- the committee vigorously disagrees, and

25    their explanation is included at.  Okay.  And please read that

1  for a full understanding of the competing positions.  Okay.

2          MS. UETZ:  Noted.

3          THE COURT:  I think that's what I want to do on that.

4  Okay.

5          MS. UETZ:  Thank you.

6          THE COURT:  Okay.  We have more to talk about.

7          MR. WEISENBERG:  Brent Weisenberg on behalf of the

8  committee.  I think the next issue is somewhat related and --

9          THE COURT:  By the way, anybody want to take a break?

10  Been going about an hour and a half.

11          MS. UETZ:  Everybody said yes.

12          THE COURT:  Okay.  All right.  I didn't mean to cut

13  you off.  You want to tell us what it is so we can come back

14  with anticipation?

15          MR. WEISENBERG:  I've been voted down.  I'm happy to

16  take a break, Your Honor.

17          THE COURT:  Okay.  Thank you very much.  All right.

18  Thank you.  How long, folks?  Ten minutes?  All right.  Five-

19  to-3?  Okay.  Thank you.

20     (Recess from 2:44 p.m., until 3:03 p.m.)

21          THE CLERK:  Come to attention.  The court is back in

22  session.

23          THE COURT:  Okay.  Please be seated.

24          MR. WEISENBERG:  Brent Weisenberg on behalf of the

25  committee.  Your Honor, there are a few insurance-specific

1  issues that we'd like to raise with you.  And I'd like to ask

2  Mr. Burns if he can address the Court.

3          THE COURT:  You bet.  You're a part of your objection,

4  right?

5          MR. BURNS:  Yes.  Your Honor, some of them aren't

6  spelled out in detail in the objection, but we alluded to

7  having insurance issues with the plan.  We mentioned

8  specifically the set off.

9          THE COURT:  Okay.

10          MR. BURNS:  And the bad-faith issue.  All right.  But

11  first, let me apologize, Your Honor.  I am Tim Burns.

12          THE COURT:  Yeah.  Um-hum.

13          MR. BURNS:  I am special insurance counsel --

14          THE COURT:  Yep.

15          MR. BURNS:  -- for the committee.  And thank you.

16          THE COURT:  Um-hum.

17          MR. BURNS:  I'm going to start with something the

18  Court said very early on today, which we --

19          THE COURT:  Don't know when I've been quoted more

20  frequently.

21          MR. BURNS:  So the Court said that the provisions in

22  the plan regarding the litigation option and the continuing

23  rights of the insurers had been thought through with enormous

24  detail.  We would agree with that.

25          THE COURT:  Yeah.

1          MR. BURNS:  The plan is intent on making sure that the

2   insurers are in no way prejudiced.  But the plan, there's

3   actually, as the Court knows, a five-and-a-half page section of

4   the plan, 8.3, aimed at preserving nonsettling insurers'

5   rights.

6          THE COURT:  Right.

7          MR. BURNS:  But the plan actually results in an array

8   of insurance-law benefits for the insurers that prejudice the

9   survivors' rights.  I'm going to talk about five of what I'd

10  call the most glaring of these.  I'm cognizant that some of

11  these probably fall within all three buckets that the Court

12  pointed out this morning.  Some are designed to aid the

13  iterative process here --

14         THE COURT:  Yeah.

15         MR. BURNS:  -- of saying, we have a real problem with

16  this.  Some, in our view, go to confirmability.

17         So let me start.  And I love roadmaps, so you just saw

18  the brief introduction.  I'm going to hit five points, and

19  thankfully only five because of the concession this morning, or

20  at least --

21         THE COURT:  Okay.

22         MR. BURNS:  -- the announcement of the design to fix

23  the sixth problem that I would have pointed out here.

24         THE COURT:  Okay.

25         MR. BURNS:  Then I have a short conclusion.

1          So first, section 5.14 of the plan, and I point folks

2     to -- I call them red pages 35 and 36 because the it's the

3     docket page number, as opposed to the page number of the

4     disclosure statement itself.  So section 5.14 of the plan at

5     red page 35 and 36 limits and abuse claim and from recovering

6     from the trust or the nonsettling insurers more than the abuse

7     claim judgment.  Totally inconsistent with California law.

8     This provision wipes out the survivors' rights with respect to

9     claims-handling bad faith, and post-judgment bad faith, which

10    is alive and well in California under the Hand v. Farmer

11    Insurance Exchange decision.

12          It amounts, Your Honor, and to a silent release of the

13    insurers from bad faith liability or certain types of bad faith

14    liability.  And we think that's actually confirmability issues.

15    A Purdue issue.  What you call the Purdue willingness issue we

16    had an earlier argument this morning.  So in order to recover

17    for --

18          THE COURT:  That's, in your view, compulsive and not

19    be consensual?

20          MR. BURNS:  Um-hum.  And --

21          THE COURT:  Okay.  And that relates to the release?

22          MR. BURNS:  Yes.  So we ended up fixing this problem

23    in Rockville Center.  But in Rockville Center, we had settling

24    insurers who were paying money.  But Judge Glenn expressed a

25    lot of concern about a very similar problem, the silent

1  releases --

2         THE COURT:  Okay.

3         MR. BURNS:  -- of direct claims against the insurers.

4  And how I characterize it for myself is in order to recover

5  debtor's insurance assets, the survivors are being compelled to

6  release their direct -- their statutory bad faith, their bad

7  faith, their other statutory claims against the insurers

8  because they can't collect more than the abuse judgment.  And

9  these amounts would be on top of the abuse judgment.  So that's

10  number one.

11         THE COURT:  Um-hum.

12         MR. BURNS:  Second point is the slips (phonetic), and

13  I want to be careful about this because I worry if I'm stuck

14  with a plan like this, if I say too much now, I harm myself

15  later.  And so I just want to be very cognizant.  But I do want

16  to explain to the Court probably my biggest concern at the

17  moment about the plan.  The plan creates a huge risk for

18  survivors with respect to holding the insurers liable for

19  refusing to settle these cases in good faith.

20         This, Your Honor, is our greatest bargaining leverage

21  in representing claimants in these cases and others, the

22  ability, if an insurer doesn't settle reasonably, to hold the

23  insurer liable in bad faith.  Ideally, to preserve bad faith

24  claims, bad faith refusal to settle claims in California,

25  survivors would be required to make demands to the insurers.

1  The insurers would have to refuse.  And then after both of

2  those things happen, the diocese would have to trade its bad

3  faith rights for a nonrecourse agreement.  That's under the

4  Hamilton decision under California law.

5       So in an ideal world, all of this would happen before

6  discharge and release of the debtor because bad faith is based

7  on the debtor being held potentially liable for more than

8  policy limits.  So ideally, it would happen before discharge

9  and release, survivors' most powerful tool, and there's no

10  process contemplated in this plan to allow us to do that.

11       I'm very hesitant.  I realized that I live in an

12  imperfect world, and I'm going to have to deal with plans.  We

13  represent five or six committees in California in these cases.

14  I may have to end up dealing with plans that give me a less-

15  than-ideal outcome.  And so but it creates a risk that we

16  shouldn't have with bad faith refusal to settle claims.

17       My third point, the third problem, and admittedly,

18  this may fall in the iterative-process category.  And trying to

19  get clarification.  Trying to get change here.  But the plan

20  takes away the trust's ability to pursue the insurance

21  declaratory judgment action for the benefit of all claimants.

22  Plan provision 8.3.13, and I'm quoting, "Any effort to collect

23  from abuse insurance policies issued by the nonsettling

24  insurers to satisfy an abuse claim after confirmation of the

25  plan shall be set individually by the applicable holder."

1    There are many reasons that the trust would want to
2  pursue the DJ.  It's efficient.  There are many questions that
3  can be decided by declaration, ones that would conceivably
4  apply to all.  And we fear that this plan takes away that
5  right.  Admittedly, and Mr. Bair may talk about this when we
6  talk about true disclosure statement issues, the language is a
7  bit confusing at times about whether that's happening or not.
8    Fourth point.  Mr. Weisenberg talked about how the
9  diocese contribution is based on uninsured exposures.  That's
10  set out in plan section 9.8.4.1.  And I'm not going to the set-
11  off point, being the dioceses and the insurers are helpfully
12  trying to fix that point.  But there's another point.
13    Even though the contribution is based on uninsured
14  exposure, a survivors' share of the contribution is held back,
15  instead of paid like other claimants if they choose the
16  litigation option.  Or at least there's a huge concern at that
17  because some of the language says that there's a little
18  ambiguity because frankly, the plan could potentially be said
19  to go both ways on this.  So if we stop and think about that,
20  why are we holding back these funds from folks who choose the
21  litigation option?
22    The natural effect of making their receipt of the
23  diocesan contribution wait until the litigation option is
24  concluded is it discourages litigation.  I don't know what
25  their motive was, but I do know that in most of our plans

1  around the country that we've been working on, the diocesan

2  contribution is also treated as covering uninsured exposures.

3  But survivors would each get their portion of a diocesan

4  contribution, whether they chose the litigation option or not.

5  It increases the dioceses' and insurers' bargaining power.

6        Fifth point, Cumis counsel, and let me explain what

7  that is, Your Honor.  California law requires insurers to

8  provide a policyholder independent counsel when the insurance

9  company's defense under a reservation of rights creates a

10  conflict in the sense that insurer-controlled counsel can steer

11  the defense of the claim to noncovered aspects of the claim.

12  That's a real concern.  California weighed in on statute after

13  weighing in on case law.

14        So this conflict doesn't disappear because the debtor

15  is only nominally in the picture.  The insurers' handpicked

16  defense counsel could, for example, attempt to show that the

17  diocese acted with actual intent to injure the abuse claimants

18  in an effort to try to destroy coverage.  So they've gotten rid

19  of the check of Cumis counsel.  The plan takes away independent

20  counsel in these cases.

21        So those are the five what I call the most significant

22  problems from an insurance standpoint at the moment.  I'm

23  taking folks at their word they're fixing the one that Mr.

24  Weisenberg talked about.

25        THE COURT:  Um-hum.

1      MR. BURNS:  I want to say this.  And Your Honor, I

2  actually say it sadly and respectfully for all the parties'

3  efforts at a plan.  From an insurance standpoint, this

4  nonconsensual plan, and we believe it will be nonconsensual,

5  may be the predictable result of the dynamics of mediation in

6  these cases.  And I don't want to go into this particular

7  mediation.  I'm speaking mediation writ large in these cases.

8      The automatic stay, and I'm well aware of the benefits

9  of the automatic stay, but the automatic stay takes away the

10  survivors' bargaining power --

11      THE COURT:  Um-hum.

12      MR. BURNS:  -- not only with respect to the diocese,

13  but also with respect to the insurance company.  It takes away

14  the courthouse steps, where these disputes are often resolved,

15  when the courthouse steps of these underlying sexual abuse

16  cases probably what's most needed.  And we mediate for months,

17  and the survivors are unhappy with the result because they're

18  in a process where a large part of their bargaining power has

19  been taken away.

20      And I would say there are ways to fix this.  Lifting

21  the stay with respect to test cases would start to give some of

22  that bargaining leverage back.  Get us a normal bargaining

23  leverage.  Allowing us to proceed.  And we'll talk about this

24  more on the 8th.

25      THE COURT:  Um-hum.

1          MR. BURNS:  I know, with the insurance adversary in an

2     aggressive manner, would begin to give us some of the

3     bargaining power back.

4          And with that, Your Honor, I thank you --

5          THE COURT:  Thank you.

6          MR. BURNS:  -- for the opportunity to address the

7     Court and the parties --

8          THE COURT:  Okay.

9          MR. BURNS:  -- on these issues.

10         THE COURT:  Appreciate it.

11         Okay.  Who wants to tell me the debtor's version of

12    this?

13         MS. UETZ:  Your Honor, I have a brief comment, and

14    then Mr. Moore is going to be responding.

15         THE COURT:  Okay.

16         MS. UETZ:  I think much of what we just heard was not

17    in the objection.  We were struggling to find the arguments.

18    And so we're going to do our best to respond to the Court today

19    based on Mr. Burns' presentation.  And Mr. Moore is going to do

20    that.

21         I would also note Ms. Ridley is in London.  She's

22    coming back.  And with that, I'm going to yield to Mr. Moore,

23    if that's okay.

24         THE COURT:  Okay.

25         MS. UETZ:  Thank you.

1          THE COURT:  Um-hum.  I guess one opening comment would
2    be, and I'm not trying to critique Mr. Burns, but to the extent
3    that maybe some of these comments were a little more precise
4    than they were in the papers, it's probably less likely that I
5    find that they're in a bucket-2 showstopper.  I mean, these are
6    things hopefully people can talk about.  And so I mean -- so I
7    mean, from Mr. Burns' standpoint, some of them are
8    clarifications and some of them aren't.  But I look forward to
9    your comments.
10         MR. MOORE:  Well, Your Honor, I think that's right.  I
11   would agree with you.  And I would go a step further and say, I
12   didn't actually hear a reference to the disclosure statement in
13   that entire presentation.
14         THE COURT:  Well, okay.  But it describes a plan, and
15   we're here to talk about that.
16         MR. MOORE:  So but what you have, Your Honor, is that
17   to the extent that they exist, they are confirmation issues.
18          And Ms. Uetz is correct.  As we were listening to the
19   presentation, we were scanning the committee's objection, and
20   the first issue that he raised was the plan section 5.14.  That
21   doesn't appear in -- and it was about releases and then about
22   potentially bad faith claims.  Doesn't appear in section
23   2(a)(1) about releases or in section 2(b) about bad faith.  So
24   frankly, we don't really know how to respond to that issue.
25          But to the extent that it's a plan issue that they

1    believe impacts inadvertently or improperly the insurers'

2    rights, then I think we can address that at confirmation.  The

3    same thing is basically --

4              THE COURT:  Can I stop you for a sec and let me just

5    see if this makes sense?  To the extent that Mr. Burns would

6    say this isn't just clarification.  This plan is contra

7    California statutes or long-standing public policy.  It can't

8    be confirmed.  You could address -- you could have a

9    conversation about that between now and January 8th.

10             MR. MOORE:  Certainly, we could, Your Honor.

11             THE COURT:  And certainly, if Mr. Burns believes that

12   under those circumstances, the plan wouldn't be confirmable, he

13   can make -- if you haven't resolved it, I can hear it again on

14   the 8th.  Maybe with a little bit more context.  And that may

15   be something that goes into the lengthening appendix A.

16             MR. MOORE:  I think that's right, Your Honor.  And I

17   think that probably goes to all five of the points that Mr.

18   Burns raised that --

19             THE COURT:  Some of them sounded more clarifying than

20   others.  But you go ahead, and you tell me.

21             MR. MOORE:  Well, I think that to the extent that

22   clarification is needed, let's talk about the litigation

23   option.  The litigation option is intended to allow survivors

24   that so elect to pursue litigation to monetize the insurance,

25   for lack of a better word.  To go after insurance proceeds, to

1    the extent that it exists.  And the way that it works
2    mechanically is that their claim will be scored by the claims
3    abuse reviewer, and a reserve will be created for them of their
4    pro rata distribution of then-available assets or later-
5    available assets based on their scoring.  That will not be
6    provided to them at that time because we don't know the outcome
7    of the litigation option.
8            There is a world in which there is an amount reserved
9    for them for that claimant, but then a judgment comes back that
10   says the survivor trusts -- the survivors' trust liability to
11   that claimant is actually less than the reserve.  And we built
12   into the plan that if that happens, whether it's large or
13   small, the remainder part or the gap will be redistributed to
14   all of the other creditors.
15           But it can't be paid to them until the litigation
16   option is resolved.  Mechanically speaking, it's necessary to
17   do it that way.  And the intent is obviously not to discourage
18   the litigation option because at that point the debtor, to use
19   the phrase, has no dog in the fight.  We're a nominal party
20   only.  We have made our contribution to the survivors' trust
21   assets, and we're a nominal party only.
22           THE COURT:  Would it be -- would it be anomalous to
23   say, well, we'll just have a hold back?
24           MR. MOORE:  Well, it's effectively the same thing.
25   It's a reserved amount for that claimant.

1          THE COURT:  Right, but I mean, could you pay sixty

2    percent of that?

3          MR. MOORE:  Well, I suppose you could, Your Honor, but

4    then you run the risk of -- let's just use round numbers, and

5    I'm not suggesting that these are right.  But let's say that

6    the trust reserves 500,000 dollars for a given claim.

7          THE COURT:  Um-hum.

8          MR. MOORE:  And then the litigation comes back and

9    says, yes, the claim is worth however much that it's worth, and

10   it could be millions in that circumstance.  But it's all

11   covered by insurance.  And the insurer, they've made the point

12   under 8.7, there's this offset issue that we're going to

13   resolve.  The insurer is directly liable to that claimant under

14   this plan.  Will make the payment directly to the claimant.

15   Well, the claimant can't get paid twice for the same amount.

16   So the rest of that number that was reserved for it, assuming

17   that it's entirely allocated to the insurer, is redistributed

18   to everyone else.

19          And so you could theoretically do a holdback on if you

20   did some kind of a statistical analysis about what the

21   likelihood is that you're going to come out, but you just won't

22   know.  But in the meantime, the claimant's protected because

23   they're reserved for.  And then the trust gets the option of if

24   someone else is going to pay the claim and it's insured, then I

25   can distribute the rest to all my other claimants.

1    Mechanically, I think that's the way that it has to work.  And
2    the offset issue kind of plays into that because who gets the
3    credit.  And so I don't know that you can say at both times you
4    can't give an offset to the insurer, but then the trust pays
5    first, if that makes sense.
6            THE COURT:  Well, I mean, it's one way of looking at
7    it.  I'm not sure that's exhausting all the possibilities, so
8    let me just -- I'm not going to rule on this now, obviously.
9            MR. MOORE:  Sure.  Sure.
10           THE COURT:  But I think that if you can explore that
11   with some flexibility, I think it's probably worth the
12   conversation.
13           MR. MOORE:  I understand, Your Honor.
14           THE COURT:  Okay.
15           MR. MOORE:  But fundamentally, the litigation option
16   is clearly not intended to discourage litigation.  It's
17   actually intended to allow claimants to choose --
18           THE COURT:  Right.
19           MR. MOORE:  -- an individualized option to be able to
20   increase their own recoveries using that insurance.
21           THE COURT:  Yeah.
22           MR. MOORE:  And to the Court's point, we did spend a
23   significant amount of time trying to figure out how to make
24   that work.  And I think that's fundamental to both 3, which is
25   that the plan takes away -- Mr. Burns's 3 -- the plan takes

1  away the trust's ability to pursue insurance declaratory

2  judgment action for the benefit of all claimants, necessarily

3  so, because our plan is an individualized litigation option.

4  You don't have both at the same time. And but to the extent

5  that they don't like that, then they can object to that on

6  confirmation.

7          THE COURT: Well, and I'm not hearing that that's void

8  as a matter of California statutes. The world would be a

9  better place if it proceeded otherwise. All right.

10         MR. MOORE: From the committee's perspective, Your --

11         THE COURT: Yeah.

12         MR. MOORE: Yeah, absolutely. That's --

13         THE COURT: I mean, so it's not -- no one's going to

14  tell me that X section of the insurance code says you can't do

15  that.

16         MR. MOORE: I haven't heard it yet, Your Honor.

17  Certainly not --

18         THE COURT: Okay.

19         MR. MOORE: -- seen in the briefing.

20         THE COURT: I got it.

21         MR. MOORE: But it is an individualized option to

22  allow individual claimants to --

23         THE COURT: Yeah.

24         MR. MOORE: -- elect to proceed that direction. And

25  if they elect not to proceed that direction, that's their

1  choice as well.

2          THE COURT:  Yeah, but I guess all I'm -- I'm not going

3  to resolve any of this today.  I'm not hearing anything here

4  that couldn't be part of a comprehensive discussion --

5          MR. MOORE:  Absolutely.  I think --

6          THE COURT:  -- with Mr. Burns.

7          MR. MOORE:  -- we're going to have that discussion --

8          THE COURT:  And I think you should.

9          MR. MOORE:  -- as we continue to refine and to clarify

10  and to amplify some of these issues.

11          THE COURT:  All right.

12          MR. MOORE:  And Your Honor, I'm not going to address

13  the automatic stay.  We'll be back in a couple of weeks on that

14  issue.  I think that the last was that the policyholder must

15  have independent counsel.  Again, I think that's part of the

16  discussion that we can have.  To the extent that the plan says

17  otherwise and they disagree, we can deal with that on

18  confirmation.  So to use the Court's phrase, I don't think any

19  of these issues are showstoppers, to the extent that they're

20  even issues at all.

21          THE COURT:  Okay.  I appreciate it.

22          Okay.  Mr. Burns, do you want to clarify anything

23  or --

24          MR. BURNS:  (Indiscernible) Your Honor --

25          MR. PLEVIN:  Your Honor, could I speak?

1          THE COURT:  Yeah.  Let Mr. Burns finish if he needs

2     to.

3          Are you all set?

4          Okay.  Come on up, Mr. Plevin.

5          MR. PLEVIN:  Your Honor, Mark Plevin on behalf of

6     continental.  When I gave my appearance at the beginning of the

7     hearing, I said I probably wouldn't be speaking.  And that was

8     based on the fact that the committee's disclosure statement

9     objection said nothing about insurance.

10          THE COURT:  Um-hum.

11          MR. PLEVIN:  They were, I think, two sentences, and

12     the word "bad faith" was in there.  But Mr. Burns talked about

13     statutes.

14          THE COURT:  Um-hum.

15          MR. PLEVIN:  He didn't identify any.  He talked about

16     the Hamilton case.  I think he gave one other citation.

17          THE COURT:  Um-hum.

18          MR. PLEVIN:  There's none of this in their brief.

19          THE COURT:  And I'm not deciding it now.

20          MR. PLEVIN:  Well, that's good.  I want to join the

21     debtor's remarks by saying I think these are confirmation

22     objections.  What's clear is that Mr. Burns and the committee

23     don't like the agreement that was reached in mediation --

24          THE COURT:  Um-hum.

25          MR. PLEVIN:  -- with the assistance of Judge Newsome

1  and Mr. Gallagher, between the insurers on the one hand and the

2  debtor on the other hand.

3         THE COURT:  Um-hum.

4         MR. PLEVIN:  We don't think there's anything that's

5  even a confirmation problem.  Certainly, there's no disclosure

6  problem here.  And therefore, we would urge the Court to not

7  rely on anything that was said today as a reason for not

8  approving the disclosure statement.  If we have to have a

9  confirmation hearing about it, I look forward to seeing Mr.

10 Burns' arguments in writing so we could respond --

11        THE COURT:  Um-hum.

12        MR. PLEVIN:  -- because I think some of what he said,

13 if not a lot of what he said, is just wrong.  And it's not

14 reflective of California law.  And I would welcome the

15 opportunity to explain to the Court at the right time in a

16 brief that responds to an objection by the committee why that's

17 so.

18        THE COURT:  Okay.

19        MR. PLEVIN:  Thank you.

20        THE COURT:  Um-hum.  I think we're headed toward

21 further consideration of an amended version of this document

22 I'm guessing on January 8th.  But if people want to reserve a

23 different day, that's up to you.  I don't want to -- if Mr.

24 Burns wants to translate anything he said into something that

25 he thinks is fundamentally contra California law and the plan

1    would be void were it confirmed in that fashion, I want to give

2    him a chance to do that.  And you can respond.  Okay.  If

3    that's all doable before the 8th, great.  I'm not hearing that

4    now, but I'm not going to silence him on that.

5            Did you want to say something?

6            MS. UETZ:  Just on that point, Your Honor, if I'm

7    hearing implicit in what you're saying a suggestion that if Mr.

8    Burns wants to brief that issue, just in terms of the

9    calendar --

10           THE COURT:  Yeah.

11           MS. UETZ:  -- going from recall, but I think our

12   response to some motions are due maybe December 30th.  And then

13   there's a reply date.

14           THE COURT:  Yeah.

15           MS. UETZ:  Maybe we use those same dates for that

16   follow up.

17           THE COURT:  Okay for me.  And by the way, we put this

18   on the 8th, look, it's a Wednesday.  It's a 10:30 calendar.

19   If, between now and the time we break, people have a better

20   idea about when we ought to be taking chapter 2 of this, I'm

21   all ears.  Okay.  We don't have to do it on the 8th.  If a day

22   here or there is helpful, that's a possibility.  Okay.

23           MR. MOORE:  I think before we get to the hearing,

24   Judge, just looking at the holiday calendar and what they're

25   going to need to do to modify documents --

1          THE COURT:  Uh-huh.

2          MR. MOORE:  -- and us review it and prepare our own

3   piece, seems the 8th might be a little aggressive.

4          THE COURT:  It might be, and that's okay.

5          MR. MOORE:  But let's just put up (indiscernible) --

6          THE COURT:  Well, you guys --

7          MR. MOORE:  -- then we'll talk about it before the end

8   of the day.

9          THE COURT:  Whatever you guys agree with, within

10  reason, I'll try to work with.  Okay.  The only thing.  I'm

11  fairly certain I'm leaving early on the 22nd.  So the 22nd will

12  be a tough day for me to do.

13         Is that right, Ms. Fan?

14         THE CLERK:  Yes, Your Honor.

15         THE COURT:  Okay.  Unless you all want to come to Las

16  Vegas and hear some BAP arguments.  Okay.

17         MS. UETZ:  Your Honor, just a clarification.

18         UNIDENTIFIED SPEAKER:  Oh, sounds good.

19         UNIDENTIFIED SPEAKER:  Yeah.  No, I'm good with that.

20         MS. UETZ:  Are you talking about the continuation on

21  the disclosure statement hearing date, or are you talking about

22  everything that's scheduled for the 8th.  I just want to

23  understand.

24         THE COURT:  You guys tell me what works.

25         MS. UETZ:  We should talk and then return.

1          THE COURT:  Yes.  You guys tell me what works.  Okay.

2     I mean, if you agree that we should have the hearing is

3     currently set on the 8th on the 8th and have the disclosure

4     statement hearings on some other day, I'll do my best to

5     accommodate you.  Okay.  But you tell me.

6          MS. UETZ:  Okay.  Well, we should take the break and

7     then talk and --

8          THE COURT:  Yeah.  So yeah, at an appropriate time.

9     Let's do that.  Okay.

10          MS. UETZ:  Thanks.

11          THE COURT:  Okay.  Thanks.

12          MR. WEISENBERG:  Your Honor, Brent Weisenberg on

13     behalf of the committee.  If it's okay with Your Honor, given

14     the time, what I'd like to do is run through a list of issues

15     that we haven't yet covered.

16          THE COURT:  Um-hum.

17          MR. WEISENBERG:  It sounds like we are going to have

18     the opportunity after this hearing to work with the debtor to

19     either refine the language --

20          THE COURT:  Yep.

21          MR. WEISENBERG:  -- or insert our differences.

22          THE COURT:  Right.

23          MR. WEISENBERG:  I think some of these issues may need

24     to be called by you.  And so that's why I want to get them out

25     on the table.  And then we can --

1          THE COURT:  Okay.  Is the hope I can call them today

2     or that I call them at a further hearing?

3          MR. WEISENBERG:  At some point.  I just want to -- I

4     just want to flag the issue for Your Honor.

5          THE COURT:  That's fine.  That's a good idea.

6          MR. WEISENBERG:  Thank you.

7          THE COURT:  Okay.  Ms. Uetz, do you want to tell me

8     it's a bad idea?

9          MS. UETZ:  No, it's a good --

10          THE COURT:  No?

11          MS. UETZ:  -- idea.  I just want to use the most time

12     we can get with Your Honor today to try to call some of the

13     issues and have (audio interference) but --

14          THE COURT:  Okay.  Well, look, if Mr. Weisenberg is

15     saying, I'd rather talk than tell you this is a showstopper, I

16     assume you're going to enjoy --

17          MS. UETZ:  Very much, Your Honor.

18          THE COURT:  -- that remark.  Right.  Okay.  Thank you.

19     Appreciate it.

20          MS. UETZ:  But it also helps to get your direction.

21          THE COURT:  And we got to get Ms. Albert home to watch

22     Cal.  Okay.  That's important.

23          MS. ALBERT:  Thank you, Your Honor.

24          THE COURT:  You're welcome.

25          MR. WEISENBERG:  Your Honor, in no particular order --

1          THE COURT:  Um-hum.

2          MR. WEISENBERG:  -- we believe that the disclosure

3    statement is deficient or misleading in the following ways.

4          Number one, we identified for Your Honor the ninety-

5    eight-million-dollar valuation that the debtor puts on sexual

6    abuse claims.

7          THE COURT:  Yeah.

8          MR. WEISENBERG:  Yet there is no methodology or report

9    or anything of the like to support that analysis.

10         Number two is --

11         THE COURT:  Um-hum.

12         MR. WEISENBERG:  -- with respect to each class of

13   claims, we would submit, there needs to be an approximation of

14   the number of claimants in that class.  An approximation of the

15   value of their claims.  The reason for that, Your Honor, is I

16   think the best example is the general unsecured creditor pool.

17   The debtor may very well have more than sufficient funds to pay

18   them in full.

19         THE COURT:  Um-hum.

20         MR. WEISENBERG:  But if it's choosing not to in order

21   to create an impaired accepting class, then that's something

22   we're entitled to argue at plan confirmation and so -- and by

23   the way, that's not just for us.  That's also for that class

24   itself to understand its treatment as compared to the debtor's

25   assets and the comparative treatment of other classes.  So as a

1   matter of disclosure, we think that's required.

2           THE COURT:  Well, can I stop you and see?  I don't

3   mean to get in the weeds on this, but it'd be one thing for the

4   debtor to say, our position is that we're unable to pay these

5   claims on X date because, and you can test that in discovery.

6   But you think this should all be articulated more fully in the

7   disclosure statement?

8           MR. WEISENBERG:  Yes, Your Honor.

9           THE COURT:  Okay.  Okay.

10          MR. WEISENBERG:  Again, just flagging the issue.

11          THE COURT:  Um-hum.

12          MR. WEISENBERG:  We would like to discuss with Your

13  Honor the classification of the unknown abuse claimants.

14          THE COURT:  Meaning?

15          MR. WEISENBERG:  There's two issues with that

16  classification, Your Honor.  Number one.  There's no estimation

17  of how many claims may fall within that bucket.  The estimated

18  value of their claims.  The amount.  I'm sorry, Your Honor.

19          With respect to the unknown abuse claimant, the

20  objection is more specific, which is as a matter of due

21  process, we don't believe that the --

22          THE COURT:  Yeah.

23          MR. WEISENBERG:  -- future claims representative has

24  sufficient time.

25          THE COURT:  I know.  I read that loud and clear.

1          MR. WEISENBERG:  Right.  Okay.  Sorry.

2          THE COURT:  No, no problem.

3          MR. WEISENBERG:  What I was alluding to, Your Honor,

4   was actually class 6, which is the nonabuse litigation claims.

5   And for the same reason I just identified for you,

6   understanding the treatment of that class is important.  I

7   heard today that the debtor would revise the disclosure

8   statement to inform readers of the amount being put into the

9   nonabuse litigation reserve.  It still begs the question of

10  whether there are any claimants in that class and if so what

11  the value of their claims are so that a creditor could

12  understand the treatment being proposed to them.

13         Your Honor, with respect to the executive summary, we

14  think, again, it's misleading and also inaccurate in a few

15  ways.

16         First, I think the most material issue we'd like to

17  discuss with you is the use of the charts.  We think that is

18  entirely misleading and frankly, a dangerous road to go down.

19  We spoke about the omitted claims valuation.  The valuation of

20  the Livermore property, that appears in several places.  It's

21  in the charts.  It's also in the executive summary, standing

22  alone, and also in the liquidation analysis or the comparison

23  to the liquidation analysis.

24         I may ask Mr. Bair to better identify for the Court

25  some of the issues that are raised by the litigation option and

1    the distribution option.  There were instances where it was

2    unclear the ramifications of a creditor doing so.  There was

3    also some confusion on our end about, even with respect to the

4    litigation option, what a claimant having elected that option,

5    what their rights would be.  In certain instances, it seemed

6    like he or she may be the claimant.  In other places, it

7    appeared the survivors' trust would be the claimant.

8              In addition, the plan -- or excuse me, the disclosure

9    statement also alludes to the fact that the survivors' trustee

10   can settle the claims with the insurers.  It's entirely unclear

11   how that settlement would impact a distribution option claimant

12   or a litigation option claimant.

13             So if it's okay with Your Honor, let's talk about the

14   charts.

15             THE COURT:  Um-hum.

16             MR. WEISENBERG:  And Your Honor is not the first

17   person to be asked to address this.  Judge Glenn spent

18   considerable time speaking with the debtor about the charts.

19   In fact, we attached to our objection the transcript of the

20   hearing, where Judge Glenn found that the charts were highly

21   misleading.

22             Number one, he was concerned by the fact that the

23   information was only half there.  The debtor admits that it is

24   selectively chosen what cases to include.  It is glaring that

25   they have not chosen the San Diego diocese case or the Stockton

1    Diocese case or frankly, other cases, which would -- even if

2    this was a comparison, I'm going to tell you why it's not to

3    contextualize the return in this case to others.  But Your

4    Honor, let's start with this.

5         There is no comparison about what a return in one case

6    should mean in another.  The joke we made in our pleadings was

7    the creditors in Sears don't look to Lord & Taylor and say, oh,

8    my return is reasonable based upon how creditors were treated

9    in that case.  Why?  Because we have different facts.  We have

10   different law.  We have a different insurance program.  Here,

11   specifically, whether the statute of limitations applies is one

12   of the most meaningful drivers to the value of a claim.

13        The cases or at least certain of the cases that are

14   set forth in that chart were greatly impacted by the statute of

15   limitations.  Okay.  And so when each of these creditor bodies

16   in these cases was trying to determine what they believe would

17   be fair and equitable in the construct of that case, they

18   looked at the drivers I just spoke about.  What is the -- what

19   is the debtor's insurance policy?  What are the severity of the

20   claims?  What is the state law?  Then what are the debtor's

21   assets in this particular case?  What circuit are we in such

22   that there may be informing decisions about any number of

23   varying opinions about how to interpret the Bankruptcy Code?

24        There's also, again, the number of claims, and I think

25   I referred to the different severity.  And again, it can't be

1   understated that the statute of limitations has one of the most

2   meaningful drivers.  And so in Rockville Center, the judge

3   ultimately instructed the debtor to not include the charts or

4   if it was or if they were going to be included, there was going

5   to need to be meaningful changes to what was being presented to

6   creditors.

7          And again, Judge Glenn referenced the fact that there

8   needs to be a reference to recoveries outside of bankruptcy.

9   For example, this very diocese historically settled their

10  claims for 1.1-million dollars.  Adjusted for inflation, it's

11  1.7 million.  Shouldn't creditors be informed about that

12  recovery?  It is very possible, if, unfortunately, we're unable

13  to settle, and the debtor has said it's running out of cash,

14  this case might be dismissed.  And if so, creditors should

15  understand what a recovery outside of bankruptcy should be.

16         But again, I don't want to go there, Your Honor,

17  because I think it's highly misleading to make a creditor

18  believe that the reasonableness of this recovery is based upon

19  looking at other cases.  There's no market for sexual abuse

20  claims.  There's nothing of the sort.  And so we can't look to

21  those other cases.

22         So we would submit, Your Honor, that the charge should

23  be omitted.  And if Your Honor thought there was some validity,

24  then we would have extensive comments, not only to the

25  selection of the cases, but we also have disagreements about

1  some of the facts embedded in the charts.  For example, the

2  debtor submits that a recovery in Syracuse may be X.  We don't

3  believe that's the recovery.  Or the number of claims they

4  used.  And so we would like the opportunity to speak with the

5  debtor because we don't agree with the valuations that even

6  they've used.

7         THE COURT:  I'm thinking I'm going to be noodling this

8  a little bit and rereading Glenn's transcript between now and

9  the 8th or so.  Okay.  But you're open to different

10  possibilities here?  I mean, omission of the charts is one.

11  Heavy clarification is another, right?

12         MR. WEISENBERG:  I don't think I have the luxury of

13  deciding what I am and I'm not okay with.  Yes, we would prefer

14  the charge to be omitted.

15         THE COURT:  Okay.

16         MR. WEISENBERG:  If Your Honor ultimately says you

17  want them in, then we will work with the debtor and work with

18  Your Honor to make what we think is at least --

19         THE COURT:  I appreciate it.

20         MR. WEISENBERG:  -- a more realistic --

21         THE COURT:  I appreciate it.   Thank you.

22         MR. WEISENBERG:  Do you want to allow the debtor to

23  speak to this, Your Honor?

24         THE COURT:  If it's okay, yeah.

25         MR. WEISENBERG:  Of course.

1      THE COURT:  I mean, I don't know if it's -- there may

2  not be much conversation now but --

3      MR. WEISENBERG:  I'm sorry.  Before that, could I let

4  Mr. Bair just make --

5      THE COURT:  Yeah.  Come on up.

6      MR. WEISENBERG:  -- one or two points and then --

7      THE COURT:  Sure, sure, sure.

8      MR. BAIR:  Your Honor, we appreciate the opportunity

9  to be able to respond without moving to another set of issues.

10      THE COURT:  Well, I don't know that we are.  Are we

11  talking about the same issue?

12      MR. BAIR:  Same issue.

13      THE COURT:  Okay.

14      MR. BAIR:  Your Honor, Jesse Bair, special insurance

15  counsel --

16      THE COURT:  Okay.

17      MR. BAIR:  -- for the committee.

18      THE COURT:  Okay.

19      MR. BAIR:  I just wanted --

20      THE COURT:  I mean, look, we've all been kind of open

21  minded about who grabs the lectern here.  Okay.  So I --

22      MR. BAIR:  Yes.

23      THE COURT:  -- appreciate it.  Thank you.

24      MR. BAIR:  I just wanted to provide two illustrative

25  examples.  Mr. Weisenberg mentioned that we have some

1  disagreements with the facts that are embedded --

2            THE COURT:  Yeah.

3            MR. BAIR:  -- even within the chart as presented.  So

4  just for Your Court's -- for the Court's edification, I wanted

5  to provide examples of that, just --

6            THE COURT:  Okay.

7            MR. BAIR:  -- to explain why we feel strongly about

8  the charts --

9            THE COURT:  Okay.

10           MR. BAIR:  -- so that, for example, on page 12 of 86,

11 the first chart --

12           THE COURT:  Yep.  Um-hum.

13           MR. BAIR:  -- which talks about debtor contributions,

14 for example, the debtor here is listed at about a hundred-

15 million dollars, and that's money coming from the debtor and

16 the parishes.

17           THE COURT:  Yep.

18           MR. BAIR:  And here, they say that, well, the parishes

19 are part of the debtor, so it's all the debtor money.  That's

20 listed as a hundred million.  But if you go down to the middle

21 of the chart, Syracuse, New York, it's listed as around fifty-

22 million dollars.  Now, the debtor in parish contribution in

23 Syracuse is a hundred-million dollars.  And what I assume

24 they're doing here is they're saying, well, in New York, the

25 parishes are separately incorporated.  So the debtor

1    contribution is fifty.  And they just cut fifty off.

2            So this chart would look very different if you

3    included the debtor contribution in other states and the parish

4    money.  And so I think we need to just be very careful here if

5    we're going --

6            THE COURT:  Okay.

7            MR. BAIR:  -- to have these comparisons to really show

8    the whole pool of assets because if you're going to say the

9    hundred million here is debtor and parishes but we're just not

10   going to include parish money in other jurisdictions, that can

11   skew this chart quite substantially.

12           THE COURT:  Okay.  All right.  Thank you.

13           MR. BAIR:  So and then the other point is just in the

14   second chart, when they're talking about average payments in

15   other cases, we just need to be very careful about how they're

16   counting claims because here in the debtor numbers, they're

17   using 345 as the number.  And they say here that they're

18   deducting duplicate claims, for example.  But when you do the

19   math in these other cases, they're clearly leaving duplicate

20   claims in.  And so that's skewing those average claimant

21   numbers.

22           And I'm not saying they're doing that on purpose

23   necessarily.  But if they're outsiders looking into a case, for

24   example, in Rockville Center, they might say, oh, there's over

25   700 claims.  But if you go through the claim objections and

1    count up all the claims that are left at the end, it's closer

2    to 600 so -- and that can make --

3              THE COURT:  Okay.

4              MR. BAIR:  -- a big difference here.  So I think we

5    just need to be --

6              THE COURT:  Okay.

7              MR. BAIR:  -- careful with these charts.

8              THE COURT:  Okay.

9              MR. BAIR:  And I appreciate the time, Your Honor.

10             THE COURT:  Sure.

11             MR. MOORE:  Thank you, Your Honor.  Mark Moore, on

12   behalf of the RCBO.

13             THE COURT:  Um-hum.

14             MR. MOORE:  Your Honor, let's start with the charts,

15   and let's start with contextualizing why they exist.  One of

16   the reasons that the debtor has proposed this plan is that we

17   think it's a good plan.  One of the reasons that we think it's

18   a good plan is that we compare it to other similar diocesan

19   religious order cases, and we come out to a place where we

20   believe we are providing more, we being the debtor and related

21   entities.

22             This is a point of comparison that is important to our

23   creditors to be able to understand what we're giving them and

24   how it compares to other cases.  I understand that the

25   committee doesn't like that because they want to go get

1  information about jury verdicts and use that instead, jury

2  verdicts that we filed bankruptcy because we can't pay the

3  multiplicity. I understand that they have concerns about the

4  representation of different cases, whether you choose San Diego

5  or Stockton or Rockville Center, which was confirmed last week,

6  or not.

7       And again, I think the Court's already provided them

8  with the method to put that into the world, which is their

9  letter, their appendix, whatever it is that they want their

10  position to be. They can say, no, the debtors are wrong, and

11  they have the right to do that, as the Court has recognized.

12  But this information is important about other cases. We have

13  taken great care to try and delve through publicly available

14  filings, other disclosure statements, other claim objections,

15  and other cases to try and figure out how these things do

16  compare to each other because it is a data point. It frames a

17  point of reference. And it's a point of reference that's

18  important for the debtor because it gets to what is a fair,

19  ultimate outcome, whether the committee agrees with that or

20  not.

21       Regarding the ninety-eight-million value of the abuse

22  claims, that's not a value. That is a pledge of assets from

23  the Diocese of Oakland, plus five-million dollars for the

24  unknown abuse claims, which, if it's not paid, will be spilled

25  back over into the survivors' trust. It's not a valuation.

1  And we've been very explicit in our plan that we've not

2  attempted a valuation because these unliquidated tort claims

3  are by nature unliquidated.

4        And so to say that we need to back into how we get to

5  ninety-eight-million dollars, I think, number one, the Court's

6  already said we need to make more disclosure about how we got

7  there and why about what we're doing. So we will. But it's

8  not a valuation, and it can't be construed as a valuation. To

9  say that it is goes against the language of our plan.

10       About other asset valuation, Livermore, for example,

11 again, we're not required to disclose in a disclosure statement

12 precisely how we get to a valuation for that. It's a

13 confirmation issue where we'll put on our evidence. I

14 understand the committee may have a different view about what

15 Livermore is worth. They can present that view if it's

16 informed and show us how it's informed.

17       Other issues, Your Honor. Omitted information

18 regarding claim value and number, again, we're happy to put in

19 the number of claims that we think are in each class. That's

20 relatively easy. I think that there may be three in class 6.

21 Unknown claims, the tricky part about unknown claims is that

22 they're unknown. And obviously we have described in some

23 detail our claims review analysis and claims review process in

24 the plan.

25       Regarding settlement information from previous to --

1    from the diocese, we actually did have that in our plan.  It's

2    on page 35 of 86.  We clearly disclosed the prior settlements

3    from what I think is called the initial legislation in the

4    plan.  You can find it there.  It was fifty-six-million dollars

5    for fifty-two claims, or maybe fifty-two-million dollars for

6    fifty-six claims.  Actually, I think I was right the first

7    time.

8           Your Honor, but again, a lot of this is going to be

9    stuff that we're going to talk about over the next couple of

10   weeks, which I think is where the Court's going to direct us to

11   go.

12          THE COURT:  Okay.

13          MR. MOORE:  A lot of it is going to be things that

14   they want us to say differently that we're just not willing to

15   say, because we do believe that it's true.  We do believe that

16   it's fair.  We do believe that it's right.  And it is our

17   disclosure statement for our plan.  If they want to say

18   something different, we've already given them the opportunity

19   to do that, and we welcome their submission.  Obviously, we're

20   going to need to take a look at that too, and we'll have the

21   opportunity to do that.

22          Finally, I think the last thing that was mentioned was

23   the classification of the unknown claims.  Your Honor, this is

24   something we've seen in multiple diocese bankruptcy cases,

25   particularly where you now have an approved unknown claims

1   representative.  That class is separate from the known class,

2   but again, to the point that the Court disagrees with that

3   somehow, again, that's a confirmation issue.  If you don't like

4   our classification, then you can tell us that whenever we come

5   back, whenever it is that we come back.

6       But for right now, Your Honor, I think that all of

7   these issues are either confirmation issues.  They're either

8   the committee's perspective, which it's able to communicate.

9   But these are not issues that should prohibit the ultimate

10  solicitation of the debtor's disclosure statement.

11      THE COURT:  Well, I think that I'm somebody I don't

12  have to order you guys to meet and confer.  You're going to do

13  that, and I think that --

14      MR. MOORE:  We will do that, Your Honor.

15      THE COURT:  And I think we begin there.  And if you do

16  not -- if the committee makes a comment or requests

17  clarification or an amendment and you don't make it, that may

18  prompt you to say, with more clarity, why you're taking the

19  position you are.  And that will either end up with me in the

20  charts, maybe deciding that they're more trouble than they're

21  worth, we'll see, or a lengthening exhibit A.

22      MR. MOORE:  I understand, Your Honor.  And coming out

23  of this hearing, we've heard loud and clear that there's things

24  that we need to clarify.  There's things

25      THE COURT:  Yeah.

1          MR. MOORE:  -- we need to amplify.

2          THE COURT:  Yep.

3          MR. MOORE:  And there's a discussion that needs to be

4     had.

5          THE COURT:  Okay.

6          MR. MOORE:  And we've already committed ourselves to

7     eliminate some things or to clarify some things, and we're

8     going to do that.

9          THE COURT:  Okay.

10         MR. MOORE:  We'll be doing that over the next days and

11    weeks.

12         THE COURT:  Yeah.

13         MR. MOORE:  Hopefully we can resolve some of these

14    issues.

15         THE COURT:  Um-hum.

16         MR. MOORE:  But as to use your term "showstoppers", we

17    don't think that any of this stuff rises to that level

18    because --

19         THE COURT:  Okay.

20         MR. MOORE:  -- ultimately, it's about information.

21    It's about casting an informed vote.  And that's what we want

22    our creditors to do.

23         THE COURT:  Okay.  Thank you very much.

24         MR. WEISENBERG:  Brent Weisenberg for the committee.

25         THE COURT:  Um-hum.

1          MR. WEISENBERG:  Your Honor, we hear you loud and

2     clear with respect to how we should move forward.  And so we

3     would submit that there's no need to go through the litany of

4     other issues.  We understand how Your Honor wants us to try to

5     solve it.  We will.

6          THE COURT:  Um-hum.

7          MR. WEISENBERG:  We'll try.  I don't know if we will.

8     And so again, I don't think we need to argue any further about

9     those issues.  We're going to work through that with the

10    debtor.

11         THE COURT:  I appreciate it.  Thank you.

12         MR. WEISENBERG:  If you don't mind, we do need to

13    speak with one another about hearing dates.

14         THE COURT:  Shall we adjourn for a minute and let you

15    guys talk about that?

16         MS. UETZ:  Yes.  It would be helpful, Your Honor, if I

17    may, if we might get a preview from the Court on available

18    dates, perhaps the week of the 13th and the 20th.  That might

19    help inform our discussion, if that's possible to hear that.

20         THE COURT:  Well, sure.  I mean, 22 through 24 are

21    out.

22         MS. UETZ:  Are no?

23         THE COURT:  Yeah, are no.

24         MS. UETZ:  Okay.

25         THE COURT:  Yeah, I've got to be somewhere else.

1          MS. UETZ:  Good.  So does Mr. Lee.

2          THE COURT:  Okay.  Well, maybe you're arguing

3    something in Las Vegas for all I know.

4          MS. UETZ:  Sorry, I just outed Mr. Lee.

5          THE COURT:  Yeah.  Okay.  That, I'm highly confident

6    about.

7          Remind me, Ms. Fan, if anything else is blocked out at

8    the moment.

9          THE CLERK:  The week of the 13th is pretty open, Your

10   Honor.  We just have the calendars on the 15th.  So Monday,

11   Tuesday, Wednesday --

12         THE COURT:  Okay.

13         THE CLERK:  -- Thursday's open.  And the week --

14         THE COURT:  Okay.

15         THE CLERK:  -- of the 20th, the 20th is a holiday, so

16   we would only have the 21st.

17         THE COURT:  Oh, right.  Okay.  So the 21st is open,

18   but the rest of the week is not so great?

19         THE CLERK:  Yes, Your Honor.

20         THE COURT:  But we have a lot of -- I take it we're

21   having the 13 calendar on the 9th?

22         THE CLERK:  Yes, Your Honor.

23         THE COURT:  Okay.  So we have a lot of availability

24   the week of the 13th.  Everything but the Wednesday morning is

25   pretty open.

1          MS. UETZ:  That's helpful, Your Honor, because --

2          MR. MOORE:  We're actually here in front of Judge

3   Corley on the 16th.

4          THE COURT:  Okay.

5          MR. MOORE:  So if we could have it --

6          THE COURT:  Yeah, you tell me.

7          MR. MOORE:  -- on the 15th or the 17th --

8          THE COURT:  Yeah.

9          MR. MOORE:  -- that would eliminate some airfare.

10         MS. UETZ:  Early afternoon on the 16th.  So that's

11  what --

12         THE COURT:  I'm sorry.

13         MS. UETZ:  -- I was going to talk with counsel about

14  that.

15         THE COURT:  Okay.

16         MS. UETZ:  Maybe the break, and then we'll return with

17  suggestions?

18         THE COURT:  That's fine.  Yeah.  No, the afternoon of

19  the 15th is fine for me.  And I'll work with the rest of the

20  week.  Okay.

21         MS. UETZ:  For the afternoon of 16th, is that good

22  too?

23         THE COURT:  Sure.  Are you seeing Corley in the

24  morning?  Okay.

25         MS. UETZ:  Back and hopefully squeeze it in.  Well,

1    schedule it for --

2          THE COURT:  A couple of years ago, we were on a panel

3    presentation about bankruptcy appeals at all levels.  And she

4    was a brand new DJ, and she hadn't had a bankruptcy appeal yet.

5    So she asked me to sort of take the laboring oar, which I tried

6    to do.  She's a delightful human being and wonderfully smart

7    judge.

8          MS. UETZ:  I've had one ever.  That's it.

9          THE COURT:  Oh, really?  Okay.  All right.  Okay.

10         MS. UETZ:  I was just telling somebody that yesterday.

11         THE COURT:  Very good.  All right.  How long do you

12   guys want?

13         MS. UETZ:  Five, ten minutes, I think.

14         UNIDENTIFIED SPEAKER:  Yeah.

15         MS. UETZ:  Yeah.

16         THE COURT:  All right.  Come back about ten after.

17         MS. UETZ:  Thanks so much.

18      (Recess from 3:56 p.m., until 4:15 p.m.)

19         THE CLERK:  The court is back in session.

20         THE COURT:  Okay.  Are some dates others may try to

21   pencil in or --

22         MS. UETZ:  Yes, Your Honor.

23         THE COURT:  Okay.  Sure.

24         MS. UETZ:  I can go?  Okay.

25         THE COURT:  Yeah.

1        MS. UETZ:  Thanks.  I'm sorry, are we on the record?

2  Do I make an appearance?  I'm just -- we are, right?

3        THE COURT:  We should be.

4        MS. UETZ:  Okay.  I'm sorry.  Ann Marie Uetz for the

5  debtor, Foley & Lardner, Your Honor.

6        THE COURT:  Okay.  Thank you.

7        MS. UETZ:  We are looking at the following schedule.

8        THE COURT:  Uh-huh.

9        MS. UETZ:  Backing off of Thursday, January 16th, for

10  the hearing and the continuation of the disclosure statement.

11        THE COURT:  Okay.

12        MS. UETZ:  So backing off from that, January 14th,

13  which is Tuesday, the debtor's reply to any objection.  Friday,

14  January 10, the committee objection.  Friday, January 3rd, the

15  debtor will file its amended disclosure statement.  So I went

16  backwards there.

17        THE COURT:  Okay.  Okay.

18        MS. UETZ:  Two related items.  One of them I just

19  thought of.  The appendix for the committee and what they

20  might -- what they might attach, we didn't actually talk about

21  that.  I guess I would suggest it be with the objection.

22        MR. WEISENBERG:  That's what I was going to suggest.

23  Fine.

24        MS. UETZ:  Cool.

25        THE COURT:  That's fine.

1          MS. UETZ:  Okay.  See, we're all agreeing.  So the

2     appendix with the objection on --

3          THE COURT:  Okay.

4          MS. UETZ:  -- the 10th, and we talked about extending

5     the solicitation period with a recognition and a commitment

6     statement that neither the committee nor the insurers will file

7     any plan through and including January 16th.  And we'll address

8     it again on that day when we're back in court.

9          THE COURT:  Okay.  Do you have in mind already how

10    many days it takes you to get from approval to out-the-door?

11         MS. UETZ:  This is where Mr. Moore is going to stand

12    up.

13         THE COURT:  All right.

14         MR. MOORE:  Remind him of January 8th.

15         MS. UETZ:  Oh, and --

16         THE COURT:  We're not moving the 8th?

17         MS. UETZ:  -- we're staying with January 8th.

18         THE COURT:  Got it.  To the extent we're filing things

19    on the 14th, can we make that noon?

20         MS. UETZ:  Yes, Your Honor.

21         THE COURT:  Okay.  Thanks.

22         MS. UETZ:  Hundred percent.

23         THE COURT:  Okay.

24         MS. UETZ:  Thank you for --

25         THE COURT:  Sure.

1            MS. UETZ:  -- indulging us on that.

2            THE COURT:  That's okay.

3            MR. MOORE:  Your Honor, in the run up to filing the

4     plan and disclosure statement, we talked a little bit to our

5     claims noticing agent.  They think that they can get it done in

6     three business days.

7            THE COURT:  Wow.

8            MR. MOORE:  If it's over a weekend, it may be the

9     following Monday or Tuesday.  Because I think we just said was

10    the 16th is a Thursday.

11           THE COURT:  Okay.

12           MR. MOORE:  So it may be as long as five business

13    days.  I'll have to discuss that with them --

14           THE COURT:  Okay.

15           MR. MOORE:  -- taking into account the weekend.

16           THE COURT:  Okay.

17           MR. MOORE:  But I think that that should work.

18           THE COURT:  All right.  Well, look, in the meantime,

19    I'll at least give you some strong inclinations on the 8th

20    about a whole bunch of things.  And as I teased before,

21    soliciting is one thing.  Actually having the confirmation

22    hearing is another.  We can build in -- I'll hear everybody

23    about how that ought to work.  Okay.

24           MR. MOORE:  That's why I stood, Your Honor, which is,

25    I suspect we will not be able to agree on a timetable.  And so

1   we'll likely need Your Honor to call.

2           THE COURT:  We'll take it up, I promise.  Okay.

3   Anything else?

4           MR. MOORE:  We'll take that up on the 16th.  Is that

5   right, Your Honor?  You gave inclinations on things on the 8th

6   and then be back.

7           THE COURT:  Oral rulings.

8           MR. MOORE:  Right.  Of course.

9           THE COURT:  Yeah.

10          MR. MOORE:  Okay.

11          THE COURT:  Okay.

12          MR. MOORE:  Yeah.

13          MR. PLEVIN:  Your Honor, Mark Plevin.  Just a point of

14  clarification because we weren't involved in the discussion.

15          THE COURT:  Um-hum.  Do you want to participate in

16  some briefing?

17          MR. PLEVIN:  No, no.  Just what time the hearings are.

18          THE COURT:  Are you sure?

19          MR. PLEVIN:  I've got enough briefs to write, Your

20  Honor.

21          THE COURT:  Okay.

22          MR. PLEVIN:  Just when the hearings will be on January

23  the 16th.

24          THE COURT:  Well, the 8th is already 2 o'clock et seq.

25  Right.

```
 1           UNIDENTIFIED SPEAKER:  Yes, Your Honor.
 2           THE COURT:  And you guys, you're going to -- you need
 3    to go see Judge Corley in the morning on the 16th.
 4           MS. UETZ:  Correct.
 5           THE COURT:  So should we say 2, or is there a better
 6    time?
 7           MR. MOORE:  I think maybe more time.
 8           MS. UETZ:  I think the soonest we could start in the
 9    afternoon would be optimal.  We'll be done with Judge Corley by
10    noon, I would imagine.  So maybe 1 o'clock start or whatever
11    the --
12           THE COURT:  All right.  You want to -- I mean, 1:30,
13    just to be --
14           MS. UETZ:  1:30 would be great.
15           THE COURT:  -- build in a half hour?  Okay.
16           MS. UETZ:  Sure.
17           MR. PLEVIN:  That's on the 16th?
18           THE COURT:  Yes.
19           MR. PLEVIN:  And then I had heard, I think, that the
20    start of the hearing on January 8 had been moved back.
21           THE COURT:  Well, I think we're doing it in the
22    afternoon.  We're not trying to compete with all the --
23           MR. PLEVIN:  Okay.  So --
24           THE COURT:  -- business on the way.  I understood it
25    was 2.  If somebody wants to tell me that's wrong, I'm all
```

1  ears.

2  THE CLERK:  It's currently scheduled for 2 p.m., Your

3  Honor.

4  THE COURT:  Okay.  Anybody need to change that or are

5  we good?

6  MR. PLEVIN:  I just wanted to know when to be where.

7  Thank you, Your Honor.

8  THE COURT:  Okay.  All right.  Anything else for the

9  good of the order?

10  No?  There's always one more thing.

11  No?  All set?  See you, guys.

12  MS. UETZ:  Not today, Your Honor.

13  THE COURT:  All right.  Well, have a lovely holiday.

14  IN UNISON:  Thank you, Your Honor.

15  THE COURT:  Yeah, it was a pleasure, as always.  Thank

16  you so much.  Okay.  See you later.

17  (Whereupon these proceedings were concluded at 4:19 PM)

18

19

20

21

22

23

24

25

1                          I N D E X

2    RULINGS:                                  PAGE LINE

3    Motion to approve Judge Michael Hogan as      41    20

4    unknown abuse survivors representative is

5    granted.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3    I, Michael Drake, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ MICHAEL DRAKE, CER-513, CET-513

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  December 23, 2024

16

17

18

19

20

21

22

23

24

25

**=**

**=- (1)**
31:19

**A**

**ability (6)**
23:18;31:17;85:20;
121:22;122:20;132:1
**able (15)**
9:25;19:13;29:6;
32:21;39:12;74:20;
80:11;114:7,9;
116:12;131:19;147:9;
150:23;154:8;162:25
**absolute (3)**
28:2;83:13;95:24
**absolutely (10)**
91:2,22;92:18;
99:24;115:18,20,23,
25;132:12;133:5
**abstract (1)**
96:10
**abuse (33)**
15:17,25;16:14,15;
19:14,18;21:2,9;37:4,
17,21;38:1;41:17;
69:18;74:15;98:4,6,7;
120:5,6;121:8,9;
122:23,24;124:17;
125:15;129:3;140:6;
141:13,19;145:19;
151:21,24
**abuse-related (1)**
37:14
**accept (1)**
105:4
**acceptance (5)**
46:14;49:5,6,7;58:6
**acceptances (1)**
11:22
**accepted (2)**
97:22,23
**accepting (1)**
140:21
**accommodate (1)**
138:5
**accommodations (1)**
9:24
**accomplished (1)**
61:17
**accord (2)**
48:5;114:17
**accordance (2)**
16:17;21:6
**according (2)**
13:18;105:13
**account (3)**
12:18,19;162:15
**accrued (1)**
37:15

**accurate (5)**
24:19;83:22;84:16;
86:18;88:3
**accurately (1)**
99:17
**accused (1)**
33:17
**achieve (1)**
16:17
**achieved (2)**
28:23;87:9
**acknowledged (3)**
66:10;107:18;
112:21
**acknowledges (2)**
37:12;45:17
**act (2)**
61:14;101:5
**acted (1)**
124:17
**action (7)**
19:21;51:9;63:19;
78:20;105:7;122:21;
132:2
**actions (4)**
16:9,12;70:16,18
**active (1)**
38:8
**actual (3)**
28:17;112:12;
124:17
**actually (26)**
15:13;29:3;34:21;
45:24;55:15;56:21;
67:6;73:23;88:5;92:1;
93:25;95:10;116:18;
119:3,7;120:14;
125:2;127:12;129:11;
131:17;142:4;153:1,
6;158:2;160:20;
162:21
**add (3)**
11:1;40:3;108:11
**added (1)**
21:21
**addition (2)**
37:2;143:8
**additional (1)**
49:20
**Additionally (1)**
22:20
**address (24)**
4:19;24:19;41:6,7;
42:1;46:15;49:13;
53:16;56:9,15;57:6;
65:5;72:9;78:11;
79:23;82:11;88:2;
118:2;126:6;128:2,8;
133:12;143:17;161:7
**addressed (6)**
22:15;23:15;24:24;
60:11;62:18;87:16
**addresses (2)**

57:9;61:10
**addressing (3)**
34:6;56:1;110:7
**adequate (2)**
65:22;66:1
**adequately (1)**
16:19
**adjective (1)**
96:21
**adjourn (1)**
156:14
**adjudicated (1)**
95:4
**Adjusted (1)**
145:10
**administered (1)**
21:5
**administrative (2)**
17:19;23:19
**admirable (1)**
73:16
**admits (1)**
143:23
**admitted (1)**
26:13
**admittedly (3)**
81:17;122:17;123:5
**adopting (1)**
47:8
**advanced (2)**
43:21;59:7
**advances (1)**
58:5
**adversary (3)**
29:18;66:25;126:1
**affect (1)**
55:18
**affects (1)**
55:18
**affiliates (1)**
70:23
**affirmative (2)**
53:18;61:14
**affirmed (1)**
101:7
**afraid (1)**
88:4
**afternoon (11)**
36:25;40:21,23;
42:16;44:7,8;158:10,
18,21;164:9,22
**again (36)**
7:14;19:5,11;28:11;
32:6;35:9;41:24;
66:22;71:24;72:2;
75:17;79:6;82:14;
85:2,10;86:14;89:5;
102:18;112:10,24;
128:13;133:15;
141:10;142:14;
144:24,25;145:7,16;
151:7;152:11,18;
153:8;154:2,3;156:8;

161:8
**against (9)**
26:20;37:14;53:5;
64:6;80:1;104:18;
121:3,7;152:9
**agent (1)**
162:5
**aggregate (1)**
72:21
**aggressive (2)**
126:2;137:3
**ago (3)**
9:9;15:22;159:2
**agree (41)**
21:19;30:18;31:9,
11;32:13;42:1;48:21;
50:7;51:24;58:20,23;
59:5;60:23,24;61:4;
62:1;65:4;67:1,1;
73:12;79:6,24;81:14;
83:8;84:22;85:14;
89:5;91:15;100:2;
103:1,10;108:9,24,24;
114:5;118:24;127:11;
137:9;138:2;146:5;
162:25
**agreed (7)**
19:4,6;37:7;48:8,
10;93:12;104:24
**agreeing (3)**
47:23;63:17;161:1
**agreement (8)**
13:12;17:13;19:15;
61:12,14;65:9;122:3;
134:23
**agrees (3)**
52:25;82:19;151:19
**ahead (8)**
5:3;23:17;26:6;
40:8;48:16;74:12;
104:10;128:20
**aid (2)**
10:8;119:12
**aimed (1)**
119:4
**airfare (1)**
158:9
**Alameda (1)**
16:4
**ALBERT (6)**
5:16,17,19;6:1;
139:21,23
**alienate (1)**
107:19
**alive (2)**
114:17;120:10
**alleged (1)**
37:18
**allegedly (1)**
70:7
**allocated (1)**
130:17
**allow (9)**

6:10;15:3;28:7,16;
122:10;128:23;
131:17;132:22;
146:22
**allowed (1)**
89:13
**allowing (2)**
28:6;125:23
**allows (1)**
35:11
**alluded (1)**
118:6
**alludes (1)**
143:9
**alluding (1)**
142:3
**almost (3)**
57:4;73:24;80:20
**alone (2)**
92:7;142:22
**along (2)**
58:12;114:4
**alterations (1)**
90:19
**although (7)**
52:10;57:8;58:25;
73:15;79:23;81:16;
111:1
**always (8)**
6:2;18:9;34:10;
50:23;61:19;69:10;
165:10,15
**ambiguity (1)**
123:18
**amended (3)**
94:3;135:21;160:15
**Amendment (15)**
30:7,25;31:6;42:12;
67:11;68:5;83:18;
86:2,24;89:8;101:21;
102:11;106:12,13;
154:17
**amendments (2)**
13:8;68:9
**America (1)**
106:8
**among (3)**
20:12;31:16;69:23
**amount (10)**
35:11;54:3;74:24;
79:14;129:8,25;
130:15;131:23;
141:18;142:8
**amounts (2)**
21:3;120:12;121:9
**amplification (3)**
42:12;67:10;69:4
**amplify (3)**
64:25;133:10;155:1
**analysis (30)**
82:25;83:9,22;
84:14;86:18,23;88:4;
90:12;92:20;96:8;

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
169 of 194

99:4,13,14,18,20;
100:5,10,10;101:20;
109:2;114:9;115:5,
16,22;116:11;130:20;
140:9;142:22,23;
152:23
**and/or (1)**
78:15
**angle (1)**
13:17
**Ann (3)**
4:9;67:18;160:4
**announcement (1)**
119:22
**anomalous (1)**
129:22
**answered (1)**
39:18
**anticipate (1)**
68:5
**anticipating (1)**
50:4
**anticipation (1)**
117:14
**anymore (1)**
108:24
**apologize (2)**
40:5;118:11
**apparently (1)**
44:1
**appeal (1)**
159:4
**appeals (1)**
159:3
**appear (2)**
127:21,22
**appearance (4)**
44:10,13;134:6;
160:2
**appearances (2)**
4:5,21
**appeared (2)**
116:9;143:7
**appears (3)**
23:2;100:25;142:20
**appendix (13)**
22:16;42:15;67:23;
72:25;76:4;93:13;
116:5,16,19;128:15;
151:9;160:19;161:2
**apples (1)**
35:15
**applicable (3)**
96:6;103:25;122:25
**application (3)**
40:2,17,25
**applies (3)**
66:25;106:18;
144:11
**apply (7)**
53:5,6;55:12,14;
61:11;103:25;123:4
**appoint (5)**

15:15;24:16;37:1,3,
25
**appointment (4)**
36:14,15;40:18;
41:16
**appointments (1)**
105:13
**appreciate (21)**
36:9;40:10,10;50:1;
66:18,23;76:18;
78:12;82:16;110:3;
113:4,6;126:10;
133:21;139:19;
146:19,21;147:8,23;
150:9;156:11
**appreciated (1)**
69:19
**appreciation (1)**
8:5
**approach (1)**
11:24
**appropriate (17)**
11:24;22:4;38:21;
42:14;46:21;49:14;
50:17;53:4;55:9;
57:11;62:25;63:23;
65:5;70:13;93:1;
113:19;138:8
**appropriately (2)**
37:19;56:18
**approval (5)**
20:7;24:5,10;
113:16;161:10
**approve (6)**
13:7,25;15:14;
93:23,23;100:8
**approved (6)**
17:15;22:7;41:20;
74:14;83:21;153:25
**approving (2)**
62:17;135:8
**approximately (1)**
56:24
**approximation (2)**
140:13,14
**Arabians (1)**
49:2
**Archdiocese (2)**
81:23;91:4
**area (1)**
112:18
**areas (2)**
69:3;72:1
**arguably (3)**
46:13;85:4;95:3
**argue (2)**
6:7;55:22;64:19;
86:10;88:7;97:20;
110:10,12;111:1;
114:2;140:22;156:8
**argued (1)**
97:19
**argues (4)**

43:24;52:23;83:14;
110:9
**arguing (5)**
22:18;24:7;58:15;
84:17;157:2
**argument (25)**
4:16,17;12:3;24:11;
30:23;33:17;35:9,10;
53:17;54:15;59:1,14,
25;63:22;65:13;69:8;
91:25;94:25;103:8;
107:20;108:6,15;
112:9;113:19;120:16
**arguments (14)**
25:3;33:15;59:7;
64:22,25;86:24;90:6;
93:10;99:8,20;
115:12;126:17;
135:10;137:16
**arise (1)**
39:20
**arms (1)**
85:5
**around (5)**
52:14;68:8;106:20;
124:1;148:21
**array (1)**
119:7
**arrival (1)**
26:11
**articulate (8)**
29:23;31:17;33:12;
86:9;108:4;113:11;
114:24;115:2
**articulated (3)**
31:10;114:3;141:6
**articulating (2)**
88:16;113:24
**articulation (3)**
30:16;31:22;32:20
**aside (1)**
33:18
**aspects (1)**
124:11
**assent (1)**
62:4
**assert (1)**
37:24
**assertion (2)**
85:24;86:1
**assertions (1)**
85:21
**asserts (2)**
86:16,17
**asset (8)**
28:12;30:2,2;31:13,
14;102:18;106:18;
152:10
**assets (32)**
12:22;17:18;26:24;
28:24;29:16;30:1,8;
78:13;83:3,19;84:1;
87:19;94:13;100:18,

19;101:8,14;107:12;
111:15;112:1,7;
114:7,25;115:1;
121:5;129:4,5,21;
140:25;144:21;149:8;
151:22
**assignment (7)**
19:17;21:24;22:3;
34:6,12,19,22
**assistance (1)**
134:25
**associated (1)**
23:19
**assume (2)**
139:16;148:23
**assuming (3)**
76:12;112:4;130:16
**assumptions (1)**
99:19
**attach (1)**
160:20
**attached (2)**
22:15;143:19
**attaching (2)**
67:22;116:5
**attack (1)**
12:11
**attempt (2)**
23:8;124:16
**attempted (1)**
152:2
**attempting (1)**
16:16
**attended (1)**
17:11
**attention (1)**
117:21
**Attila (1)**
4:13
**attired (1)**
40:14
**audience (1)**
69:18
**audio (1)**
139:13
**aunts (1)**
82:6
**authority (1)**
45:20
**automatic (4)**
125:8,9,9;133:13
**availability (1)**
157:23
**available (27)**
12:22;25:5;27:8,13;
29:16,17;30:4,8,11,
16;32:5;35:1;79:1;
88:14,15;92:21;
93:15;98:14;102:8,
18,19,20;114:7,25;
129:5;151:13;156:17
**average (2)**
149:14,20

**avoiding (1)**
78:20
**awarded (1)**
21:3
**aware (6)**
39:21;78:21,22;
94:17;113:4;125:8
**awash (1)**
79:15
**away (11)**
27:19;85:4;112:5;
122:20;123:4;124:19;
125:9,13,19;131:25;
132:1
**awful (1)**
50:7

# B

**back (30)**
13:9;36:19;41:25;
47:24;63:25;64:16;
69:8;85:2;107:14;
117:13,21;123:14,20;
125:22;126:3,22;
129:9,23;130:8;
133:13;151:25;152:4;
154:5,5;158:25;
159:16,19;161:8;
163:6;164:20
**Backing (2)**
160:9,12
**backstops (1)**
61:19
**backwards (1)**
160:16
**bad (20)**
6:3;19:3,3;99:4;
120:9,9,13,13;121:6,
6,23,23,24;122:2,6,
16;127:22,23;134:12;
139:8
**bad-faith (1)**
118:10
**Bair (25)**
6:11,18,18,19;
123:5;142:24;147:4,
8,12,14,14,17,19,22,
24;148:3,7,10,13,18;
149:7,13;150:4,7,9
**balance (2)**
62:8;113:20
**balked (1)**
47:22
**ballot (9)**
49:15,23;58:22;
59:5,6;62:17,24;63:5,
16
**balloted (1)**
55:12
**ballots (1)**
59:18
**bankruptcies (2)**

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
170 of 194

37:13;38:3
**bankruptcy (26)**
9:19;12:15;16:17;
21:6,7;27:6;28:1;
32:9;37:25;38:16;
45:23;46:21;53:1;
61:21;89:4;96:8;
102:3;112:17,20;
144:23;145:8,15;
151:2;153:24;159:3,4
**BAP (4)**
49:1,3,3;137:16
**bar (1)**
24:5
**Barber (7)**
4:12;16:8,16;17:7,
11,14;19:13
**Barber's (1)**
16:12
**Barbour (1)**
19:4
**bargaining (11)**
101:10,12;112:2,4;
121:20;124:5;125:10,
18,22,22;126:3
**Bartos (1)**
4:13
**based (15)**
11:22;18:15,15;
33:7;57:22;59:14;
113:23;122:6;123:9,
13;126:19;129:5;
134:8;144:8;145:18
**bases (1)**
57:10
**basically (3)**
59:17;98:12;128:3
**basing (1)**
73:20
**basis (17)**
30:16;31:11;53:22;
58:16;59:10;65:18;
70:5,9;71:2,3;73:18;
77:4;86:10;99:24;
100:13;113:11;
114:24
**becomes (2)**
71:8;96:11
**begin (7)**
8:17;9:14;10:5;
11:4;13:22;126:2;
154:15
**beginning (8)**
9:22,23;10:2,23;
11:7;69:23;71:13;
134:6
**begs (1)**
142:9
**behalf (19)**
4:10;5:5,17;6:9;7:8,
14;8:11;25:17;50:11;
67:19;73:21;81:7;
90:4;110:5;117:7,24;

134:5;138:13;150:12
**behind (1)**
34:7
**belied (2)**
16:9,12
**belief (1)**
113:12
**beliefs (3)**
77:12,14;105:9
**believes (5)**
11:23;16:22;83:2;
115:1;128:11
**below (1)**
116:12
**benchmarks (2)**
72:20;76:1
**beneficial (1)**
50:24
**benefit (4)**
19:18;47:5;122:21;
132:2
**benefits (4)**
101:17,17;119:8;
125:8
**Benvenutti (1)**
5:17
**best (9)**
21:16;25:24;29:23;
94:24;95:25;99:11;
126:18;138:4;140:16
**best-interest-of-creditors (1)**
97:8
**bet (8)**
7:24;18:18,20,23;
19:3,3;44:19;118:3
**better (28)**
11:10;18:23;23:9,
10;28:20;34:25;36:7;
42:8,17;44:3;49:15;
50:8;51:9,13;63:8;
72:19;78:14;79:2,8;
83:24;88:1;92:4;
94:13;128:25;132:9;
136:19;142:24;164:5
**Betty (1)**
8:10
**beyond (3)**
58:5;70:3;116:2
**big (9)**
13:10;40:12;42:3,4;
70:11;72:5;80:24;
94:24;150:4
**biggest (1)**
121:16
**biggie (1)**
89:16
**bill (2)**
102:4,19
**billion-dollar (1)**
84:25
**Bishop (20)**
4:4,12;5:5;7:1;16:8,
12,15;17:7,10,14;

19:4,13;21:10;30:6;
32:17;102:5;105:21;
106:8;107:17;112:19
**bishop's (1)**
106:13
**bit (15)**
10:11;53:13;56:2;
59:23;69:22;75:16;
79:18;80:3;91:7;93:6;
94:6;123:7;128:14;
146:8;162:4
**blah (3)**
70:17,17,17
**Blaise (1)**
7:17
**blocked (1)**
157:7
**blood (1)**
106:3
**BLUMBERG (23)**
8:13,14;45:5,5;
46:11,16;47:12,17,19;
48:2,8,10,17,20,22;
49:9,12,15,25;66:19,
23;67:2,6
**bodies (1)**
144:15
**body (2)**
103:18;106:3
**both (21)**
54:11,14;64:22,24;
71:20,21,23;72:6;
73:18;84:5;89:13;
90:11,11,21;95:5;
111:5;122:1;123:19;
131:3,24;132:4
**bottom (2)**
34:9;38:18
**bound (1)**
104:24
**bounds (1)**
108:18
**Boy (2)**
32:23;85:11
**boys (1)**
40:12
**BR (1)**
49:2
**brand (1)**
159:4
**break (10)**
36:16,18;41:25;
68:18;80:11;117:9,
16;136:19;138:6;
158:16
**breaks (1)**
52:19
**Brent (8)**
6:8;25:16;50:11;
81:6;117:7,24;
138:12;155:24
**bridge (3)**
51:22;52:3,4

**brief (12)**
45:17;89:14;94:12;
100:3,21;105:3;
111:7;119:18;126:13;
134:18;135:16;136:8
**briefing (10)**
89:10;94:19,20;
100:3;107:24;108:6;
110:25;116:2;132:19;
163:16
**briefs (2)**
103:7;163:19
**brilliant (2)**
33:14,17
**bring (2)**
68:8;111:15
**bringing (2)**
20:22;36:3
**broad (1)**
22:18
**broader (2)**
24:22;70:25
**broke (1)**
90:7
**brothers (1)**
82:6
**bucket (6)**
11:12,18;22:17;
46:6;49:9;141:17
**bucket-2 (1)**
127:5
**buckets (6)**
11:12;14:7;22:11,
13;48:22;119:11
**budget (1)**
15:4
**build (2)**
162:22;164:15
**building (2)**
105:20,23
**buildings (2)**
101:22;107:23
**built (2)**
96:2;129:11
**bunch (1)**
162:20
**burden (1)**
100:5
**burn (3)**
17:20;23:13;113:5
**Burns (38)**
6:10,19,21,21;
118:2,5,10,11,13,15,
17,21;119:1,7,15,22,
25;120:20,22;121:3,
12;125:1,12;126:1,6,
9;127:2;128:5,11,18;
133:6,22,24;134:1,12,
22;135:24;136:8
**Burns' (3)**
126:19;127:7;
135:10
**Burns's (1)**

131:25
**business (4)**
92:4;162:6,12;
164:24
**buy (2)**
30:24;102:5

**C**

**Cal (2)**
43:22;139:22
**calendar (4)**
136:9,18,24;157:21
**calendars (1)**
157:10
**CALIFORNIA (19)**
4:1;21:4;35:16;
37:16,23;101:25;
102:20;106:8;120:7,
10;121:24;122:4,13;
124:7,12;128:7;
132:8;135:14,25
**call (15)**
53:15;59:11;62:4;
71:14;90:13;100:24;
101:1;119:10;120:2,
15;124:21;139:1,2,
12;163:1
**called (5)**
49:2;62:24;104:2;
138:24;153:3
**Calling (1)**
4:3
**Camden (1)**
33:1
**came (1)**
45:3
**can (150)**
4:19;5:3;9:21;11:5;
13:18;14:6,7,9;16:16;
20:1,2;21:16;22:11;
24:3;25:19;27:1,2;
29:8;30:14,23;31:3,
11,12,13;32:11,13;
34:22;36:12;39:11;
41:7;42:6;43:17;46:9;
47:10;50:21;51:14;
52:2,8,9,22,22;57:21;
58:17;59:14;60:5,12;
61:11,17,18;64:6,19,
24,25,25;66:21,22;
69:13,13,24;71:7;
72:3,7,10;73:5,6,13,
17;75:13,20;76:3;
77:7;78:15,16,23;
82:10;83:9,16;84:3,
10,22;85:4,14,14;
86:7,19;89:2,11,25;
91:2,13;92:13;93:10,
16,16,17,21;95:17;
97:15;102:5;103:4,4,
5;106:20;107:17,17;
108:6,11;110:11,24;

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
171 of 194

111:7,21,23;113:20,
21;115:2,6;116:3;
117:13;118:2;123:3;
124:10;127:6;128:2,
4,13,13;130:25;131:3,
10;132:5;133:16,17;
136:2;138:25;139:1,
12;141:2,5;143:10;
149:10;150:2;151:10;
152:15;153:4;154:4;
155:13;159:24;
161:19;162:5,22
**cap (1)**
38:9
**car (1)**
102:5
**Care (5)**
54:12;57:15;61:3,
10;151:13
**careful (5)**
71:1;121:13;149:4,
15;150:7
**carefully (1)**
20:13
**cares (2)**
10:16;96:10
**Case (101)**
4:4;9:12;11:25;
12:21;15:21,22;
16:10;17:3,15;20:1,
18;21:5,8,23;22:8;
23:19;26:19,21,22;
27:1,23;28:3,5,11;
29:3;30:10;34:20;
35:23;37:4,19;38:2;
43:20,21,24,25;44:3;
45:16,18;46:17,18,18,
18,19;47:13;48:24;
49:1,18,19;51:3,6;
54:12;56:17,18,20,21,
23;57:9,11,15,25;
58:4,5;67:2;81:3;
83:25;87:19;88:11;
97:13;100:17,21;
101:2,12,21;103:19;
104:6,7,9,12,18;
111:8,13,25;112:8,11,
16,17;113:5;114:10,
10,14;124:13;134:16;
143:25;144:1,3,5,9,
17,21;145:14;149:23
**cases (54)**
10:6,10;16:25;
19:15;20:13;22:4;
23:4;28:13,17;33:5;
39:3;41:2;43:21;
46:17;48:18;53:2;
54:8;55:16;56:15;
61:17;73:2,3;76:1;
98:10;103:22;111:3,
3,5,7,9;121:19,21;
122:13;124:20;125:6,
7,16,21;143:24;144:1,

13,13,16;145:19,21,
25;149:15,19;150:19,
24;151:4,12,15;
153:24
**cash (4)**
23:13;30:24;85:4;
145:13
**casting (1)**
155:21
**categories (1)**
42:11
**category (2)**
12:6;122:18
**cathedral (1)**
79:12
**Catholic (6)**
4:4;5:5;21:10;
105:19,23;107:9
**caught (1)**
6:1
**causes (1)**
78:20
**caveat (1)**
50:14
**caveats (1)**
50:14
**Cemeteries (1)**
107:9
**cent (1)**
31:6
**Center (5)**
120:23,23;145:2;
149:24;151:5
**Centers (4)**
54:12;57:15;61:4,
10
**CEO's (1)**
61:22
**certain (9)**
8:11;76:11;91:2;
99:21;100:14;120:13;
137:11;143:5;144:13
**certainly (11)**
12:18,19;20:24;
45:2;52:18;64:23;
79:7;128:10,11;
132:17;135:5
**challenge (1)**
85:21
**challenging (1)**
82:2
**chambers (1)**
44:18
**chance (5)**
10:17;37:24;57:4;
67:12;136:2
**change (4)**
53:8;75:16;122:19;
165:4
**changes (3)**
10:19;18:16;145:5
**channeling (3)**
45:8;69:24;71:6

**Chapter (23)**
15:21;16:10,13;
17:8,20,21;19:13,14;
21:5,8;23:13,18;
37:13;38:2;84:11;
86:20;87:24;100:17;
102:7;104:18;107:22;
108:23;136:20
**characterize (1)**
121:4
**characterized (1)**
47:9
**charge (3)**
38:9;145:22;146:14
**charitable (1)**
16:2
**chart (10)**
22:15;24:21;50:24;
144:14;148:3,11,21;
149:2,11,14
**charts (13)**
76:15;142:17,21;
143:14,18,20;145:3;
146:1,10;148:8;
150:7,14;154:20
**Chassix (2)**
49:19;56:21
**check (2)**
58:23;124:19
**checking (1)**
59:6
**chicken (1)**
92:15
**chief (1)**
4:13
**child (1)**
16:14
**choice (6)**
19:22,24;20:20;
21:25;22:23;133:1
**choices (1)**
72:23
**choose (7)**
32:5;83:9;95:5;
123:15,20;131:17;
151:4
**choosing (1)**
140:20
**chose (1)**
124:4
**chosen (4)**
50:16;78:16;
143:24,25
**Christ (1)**
106:3
**church (30)**
30:2,25;31:1;84:11;
101:22;102:1,2,4;
104:3,19,20;105:4,5,
8,8,19,19,19,20,22,23,
25;106:1,5,10,10,13;
107:1,19;112:18
**churches (20)**

29:24;65:18,19;
79:2;83:17;84:6,23,
23;85:9;86:3;106:9;
107:23;111:13,22,23;
112:14,14,17,18,23
**Circuit (3)**
45:20;53:9,11,22;
70:11;82:3,8;100:20,
25;144:21
**circumstance (2)**
49:25;130:10
**circumstances (5)**
46:3;53:3;56:23;
70:3;128:12
**citation (2)**
112:15;134:16
**cite (1)**
112:19
**cited (4)**
48:18;49:1;100:21;
112:16
**claim (23)**
35:14;37:23,24;
41:1;61:17;72:20;
96:23;97:21;104:18;
111:5;120:5,7;
122:24;124:11,11;
129:2;130:6,9,24;
144:12;149:25;
151:14;152:18
**claimant (13)**
129:9,11,25;
130:13,14,15;141:19;
143:4,6,7,11,12;
149:20
**claimants (17)**
15:17;38:1;56:25;
93:24,25;98:4;
121:21;122:21;
123:15;124:17;
130:25;131:17;132:2,
22;140:14;141:13;
142:10
**claimant's (1)**
130:22
**claimholder (1)**
19:21
**claims (61)**
12:22;21:3;24:16;
27:1;28:25;29:14,17;
37:4,14,15,21,22;
57:1,1;75:3;92:16,20;
98:6,7,10;121:3,7,24,
24;122:16;127:22;
129:2;140:6,13,15;
141:5,17,18,23;142:4,
11,19;143:10;144:20,
24;145:10,20;146:3;
149:16,18,20,25;
150:1;151:22,24;
152:2,19,21,21,23,23;
153:5,6,23,25;162:5
**claims-handling (1)**

120:9
**clarification (8)**
52:3;122:19;128:6,
22;137:17;146:11;
154:17;163:14
**clarifications (2)**
13:9;127:8
**clarify (7)**
11:14;75:23;80:2;
133:9,22;154:24;
155:7
**clarifying (1)**
128:19
**clarity (1)**
154:18
**class (17)**
60:1;97:9,22,22,23;
98:23;140:12,14,21,
23;142:4,6,10;152:19,
20;154:1,1
**classes (6)**
97:4,7,24;98:21;
100:8;140:25
**classification (4)**
141:13,16;153:23;
154:4
**clause (5)**
103:21,22;105:11,
16;112:10
**clear (13)**
11:14;20:11,17;
53:14;67:21;73:16;
96:17;113:14;115:13;
134:22;141:25;
154:23;156:2
**clearer (1)**
71:7
**clearly (6)**
11:20;20:8;32:2;
131:16;149:19;153:2
**CLERK (10)**
4:3;117:21;137:14;
157:9,13,15,19,22;
159:19;165:2
**clinical (3)**
96:17,21;108:14
**clock (3)**
23:18;27:15;28:19
**close (4)**
44:4;106:9,10;
112:23
**closely (1)**
33:9
**close-out (1)**
40:12
**closer (1)**
150:1
**CMC (1)**
77:9
**Code (14)**
16:17;21:6,7;28:1;
32:9;38:16;45:23;
46:22;85:3;89:4;

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
172 of 194

94:22;104:25;132:14; 144:23

**cognizant (2)** 119:10;121:15

**Coke (2)** 46:19;56:19

**colleagues (1)** 35:7

**collect (4)** 101:13;112:3; 121:8;122:22

**collected (1)** 112:6

**collective (4)** 101:10,12;112:2,4

**collectively (1)** 25:20

**college (6)** 47:25;59:3;61:9,13, 15,22

**combine (1)** 106:10

**coming (8)** 13:9;34:3;41:3; 42:9;79:8;126:22; 148:15;154:22

**comment (9)** 20:9;40:20;53:8; 67:16;68:3;80:5; 126:13;127:1;154:16

**commented (1)** 46:12

**commenting (1)** 54:24

**comments (11)** 8:22;9:7;18:15; 25:21;43:19;45:2; 93:2;111:17;127:3,9; 145:24

**Commission (1)** 104:4

**commitment (1)** 161:5

**committed (2)** 17:7;155:6

**committee (92)** 5:17;6:9,16,19; 11:1;16:7;17:5,10,16, 17;19:12;20:23;21:3, 18;22:17,22,24;23:3, 8;24:25;25:10,17; 28:14;34:10,18; 37:10;40:22,24; 42:13;44:25;50:2,12; 59:17;60:1;64:3;67:3, 12,22;68:7;71:24; 72:25;73:1,11;74:20; 75:9;77:22;78:14,23; 79:16,21;81:7;86:16; 93:11,13;94:7;97:19; 98:22;99:25;100:17; 103:1;108:24;109:10; 110:5,9;111:1,4;

113:14,16;114:2,8,17; 115:3,17;116:5,13,18, 24;117:8,25;118:15; 134:22;135:16; 138:13;147:17; 150:25;151:19; 152:14;154:16; 155:24;160:14,19; 161:6

**committees (1)** 122:13

**committee's (22)** 9:9;12:20;19:6,23; 21:13,17,22;22:10; 24:1,19,22;70:24; 72:23;75:18;76:3; 99:8,12;100:18; 127:19;132:10;134:8; 154:8

**communicate (1)** 154:8

**communion (1)** 106:2

**community (1)** 21:12

**Company (3)** 7:9;33:3;125:13

**company's (1)** 124:9

**comparative (1)** 140:25

**compare (3)** 86:20;150:18; 151:16

**compared (1)** 140:24

**compares (2)** 16:24;150:24

**comparison (4)** 142:22;144:2,5; 150:22

**comparisons (1)** 149:7

**compel (5)** 31:1,5;83:17;85:6,9

**compelled (5)** 84:23;87:2;88:9; 94:12;121:5

**compelling (1)** 86:2

**compensation (2)** 15:25;21:9

**compete (1)** 164:22

**competing (1)** 117:1

**complains (3)** 16:7;17:17;43:23

**complaints (1)** 87:20

**complete (2)** 19:17;99:4

**completed (1)**

68:20

**completely (4)** 65:5;72:13;79:15; 112:8

**complicated (3)** 9:18;29:12,20

**comport (1)** 87:23

**comprehensive (2)** 11:5;133:4

**comprehensively (1)** 73:2

**compulsive (1)** 120:18

**conceivably (1)** 123:3

**concept (6)** 57:24;62:18;70:24; 77:7;78:25;108:23

**conception (1)** 103:2

**concepts (4)** 62:9;69:24;72:18, 22

**concern (5)** 113:4;120:25; 121:16;123:16; 124:12

**concerned (2)** 13:16;143:22

**concerning (1)** 80:7

**concerns (3)** 75:19;79:22;151:3

**concession (1)** 119:19

**concluded (2)** 123:24;165:17

**conclusion (4)** 11:1;53:11;54:16; 119:25

**condensed (1)** 42:10

**condition (1)** 112:22

**conduct (1)** 104:25

**conducted (1)** 19:7

**confer (1)** 154:12

**conferences (2)** 19:7;36:3

**confident (1)** 157:5

**confines (1)** 29:6

**confirm (9)** 32:18;64:21;85:8; 87:10;97:21;111:17, 20;113:12;114:9

**confirmability (2)** 119:16;120:14

**confirmable (7)** 26:10;28:22;33:7, 22;87:22;108:21; 128:12

**confirmation (40)** 9:19;12:4;13:14; 22:9,25;33:15;55:16, 17;64:20;65:5;86:11; 87:3,8;93:22;94:9,16; 95:24;96:1,12;100:4, 11;103:5,9;108:5; 109:5;110:23;115:10; 122:24;127:17;128:2; 132:6;133:18;134:21; 135:5,9;140:22; 152:13;154:3,7; 162:21

**confirmed (9)** 16:24;22:3;47:6; 53:22;74:13;82:9; 128:8;136:1;151:5

**confirming (1)** 84:12

**conflates (1)** 111:12

**conflict (2)** 124:10,14

**conflicts (1)** 38:14

**confused (1)** 116:17

**confusing (1)** 123:7

**confusion (2)** 79:19;143:3

**congregation (2)** 106:11,11

**Congress (1)** 100:11

**connection (4)** 9:21;38:25;70:17; 75:9

**consensual (10)** 36:5;45:9,24;46:1; 50:17;52:23;54:18, 19;59:3;120:19

**consensually (3)** 35:23;107:17,18

**consensus (3)** 17:13;41:2;68:8

**consent (19)** 37:9;45:11,13,15, 24;46:14;47:17;48:7, 23;52:24;53:17,18; 55:1;56:18;57:19; 62:22;70:9;83:12; 111:4

**conservatively (2)** 84:24;92:6

**consider (1)** 9:10

**considerable (1)** 143:18

**considerably (1)** 12:14

**consideration (3)** 25:8;74:11;135:21

**consistent (4)** 11:24;15:23;19:5; 81:10

**conspicuous (1)** 62:21

**conspicuously (1)** 63:4

**constituency (2)** 11:16;38:20

**constituents (2)** 21:23;39:22

**construct (1)** 144:17

**constructive (2)** 82:15;114:15

**construed (1)** 152:8

**contemplated (1)** 122:10

**contends (1)** 88:12

**contentious (2)** 76:19;90:1

**contested (1)** 94:17

**context (7)** 49:17;50:15;57:18; 93:2;95:3;102:3; 128:14

**contextual (2)** 56:16,17

**contextualization (1)** 11:8

**contextualize (3)** 10:17;57:13;144:3

**contextualizing (1)** 150:15

**Continental (2)** 7:9;134:6

**continually (1)** 27:14

**continuation (2)** 137:20;160:10

**continue (7)** 11:4;16:1;21:11,12; 36:6;55:8;133:9

**continued (1)** 33:11

**continuing (3)** 20:5;112:13;118:22

**Contra (3)** 16:5;128:6;135:25

**contract (10)** 46:2,13,20,23;47:1, 8,14;48:13,20;56:14

**contractual (1)** 62:2

**contributable (1)** 79:5

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
173 of 194

**contribute (3)**
61:14,22;83:3
**contributed (1)**
79:5
**contributing (1)**
16:21
**contribution (11)**
92:8;123:9,13,14,
23;124:2,4;129:20;
148:22;149:1,3
**contributions (2)**
70:3;148:13
**control (1)**
105:8
**conversation (4)**
42:6;128:9;131:12;
147:2
**conversations (1)**
12:10
**convey (1)**
68:22
**convince (3)**
10:21;47:10;52:11
**convinced (3)**
12:3;57:24;108:20
**convincing (1)**
10:15
**Cool (1)**
160:24
**cooperated (1)**
19:8
**cordial (1)**
114:15
**Corley (4)**
158:3,23;164:3,9
**corners (1)**
26:15
**corollary (1)**
101:20
**Corporation (1)**
7:15
**correctly (1)**
48:4
**Costa (1)**
16:5
**costly (1)**
110:13
**costs (2)**
17:19,21
**counsel (24)**
6:19,25;34:7;41:20;
50:6;56:25;57:1,2,3,6,
12;60:12;89:17;94:1;
118:13;124:6,8,10,16,
19,20;133:15;147:15;
158:13
**count (2)**
63:18;150:1
**counted (1)**
53:25
**counter (1)**
76:3
**counties (1)**

16:4
**counting (1)**
149:16
**country (2)**
61:21;124:1
**couple (9)**
55:16;65:12,15,16;
72:18;113:9;133:13;
153:9;159:2
**course (18)**
16:21;22:4;23:1,6;
24:6;28:21;29:9;
46:11;51:9;77:20;
80:6;82:21;85:22;
89:24;107:4;111:10;
146:25;163:8
**COURT (686)**
4:5,8,11,13,15,19,
20,23;5:1,3,7,9,13,18,
21;6:2,6,12,14,17,20,
22;7:2,6,10,12,16,18,
21,23;8:2,7,12,15,21,
24;9:1,3,5,7;13:25;
14:2,10,13,15,18,20,
22,24;15:3,6,9,10,11,
16,18;16:7,11;17:1,
24;18:4,7,11,14,18,
20,22,25;19:3,25;
20:3,23;21:4,22;22:1,
10;23:4,4,15;24:12,
15;25:2,7,9,14,23;
26:1;29:8,10,20;31:7,
9;32:7,11,13,23,25;
33:1,3,10,19,23,25;
34:2,8,24;35:4,8,15,
18,25;36:9,11,17,21,
23;37:8;38:4,6,11,13,
17,23;39:4,7,10,14,
17;40:1,6,10,13,23;
41:8,10,12,14,23;
42:23;43:2,7,9,11,14;
44:8,12,15,17,19;
46:9,12;47:4,16,18,
21;48:3,9,11,19,21;
49:8,11,13,24;50:1,
19,21;51:1,3,5,7,15,
18,21,24;52:5,7,25;
53:1,2,7,8,14,23;54:1,
4,6,10,13,17,20,24;
55:3,5,20,22,24;56:4,
6,11;57:14,17,20;
58:2,4,8,10,17,19;
59:22,25;60:3,5,8,11,
12,14,16,21,23;61:1,
8,21,24;62:1,8,12,17,
19,23,25;63:2,4,10,
12,13,15;64:3,9,11,
14,18;65:6,8,10,14,
20,24;66:3,5,13,14,
16,18;67:1,5,7,16,17,
24;68:2,11,12,22,24;
69:1,4,6,9,11,13,16;
71:12,16,18,21,23;

72:12,15,17;73:6;
74:1,5,7,9,12,21,25;
75:2,5,7,10,12,17,22,
25;76:5,8,10,12,16,
18;77:9,10,11,13,15,
21,25;78:2,4,10,12;
80:6,9,13,16,19,21,
24;81:9,12,13,20,22;
82:10,16,18,22;84:3,
8;85:11,12,17,19,22,
25;86:4,6,8,13,21;
87:10,13,15;88:6,20,
22,25;89:7,15,20,21,
22,25;90:9,10,13,16,
20,23;91:1,5,8,10,15,
18,21,23;92:1,2,14,
19,24;93:5,8,11,18;
94:9,11,16,21;95:8,
12,14,16,19,23;96:19,
22,24;97:2,5,9,11,14;
98:1,3,5,8,11,15,17;
99:1,7;100:15,22;
101:1,6,7,14,19,24;
102:13,16,22,24;
103:11,15,17,19;
104:5,7,7,10,14,16,
22;105:1,2;106:14,
15;107:8,16;108:1,3,
8,10,12,16,19;109:3,
7,15,17,20,23;110:3,
6,8,14,19,22;111:19;
112:7;113:1;114:5;
115:14,18,20,23,25;
116:2,7,14,21,24;
117:3,6,9,12,17,21,
23;118:2,3,9,12,14,
16,18,19,21,25;119:3,
6,11,14,21,24;120:18,
21;121:2,11,16;
124:25;125:11,25;
126:5,7,8,10,15,18,
24;127:1,14;128:4,11,
19;129:22;130:1,7;
131:6,10,14,18,21;
132:7,11,13,18,20,23;
133:2,6,8,11,21;
134:1,10,14,17,19,24;
135:3,6,11,15,18,20;
136:10,14,17;137:1,4,
6,9,15,24;138:1,8,11,
16,20,22;139:1,5,7,
10,14,18,21,24;140:1,
7,11,19;141:2,9,11,
14,22,25;142:2,24;
143:15;146:7,15,19,
21,24;147:1,5,7,10,
13,16,18,20,23;148:2,
6,9,12,17;149:6,12;
150:3,6,8,10,13;
151:11;153:12;154:2,
11,15,25;155:2,5,9,
12,15,19,23,25;156:6,
11,14,17,20,23,25;

157:2,5,12,14,17,20,
23;158:4,6,8,12,15,
18,23;159:2,9,11,16,
19,20,23,25;160:3,6,
8,11,17,25;161:3,8,9,
13,16,18,21,23,25;
162:2,7,11,14,16,18;
163:2,7,9,11,15,18,21,
24;164:2,5,12,15,18,
21,24;165:4,8,13,15
**courthouse (2)**
125:14,15
**courtroom (2)**
4:6;8:8;68:23
**courts (4)**
33:6;34:21;47:7;
62:5
**Court's (8)**
24:8;131:22;
133:18;148:4,4;
151:7;152:5;153:10
**cover (2)**
41:8;72:18
**coverage (2)**
77:17;124:18
**covered (2)**
130:11;138:15
**covering (1)**
124:2
**crack (1)**
59:19
**create (3)**
113:20,21;140:21
**created (1)**
129:3
**creates (3)**
121:17;122:15;
124:9
**creation (1)**
70:17
**creature (1)**
101:25
**credit (2)**
72:19;131:3
**creditor (10)**
49:1,22;71:4;86:18;
88:3;140:16;142:11;
143:2;144:15;145:17
**creditors (43)**
22:7;27:9,13;28:5,
8;31:2;32:6;45:10,12;
46:6,24;47:2,19;
48:23;49:17;51:14;
53:3,5,6;55:12,14;
57:12;60:12;83:7,12,
23;94:25;95:25;
99:11;101:8,9,15;
102:8,18;116:10;
129:14;144:7,8;
145:6,11,14;150:23;
155:22
**creditors' (2)**
60:1;86:15

**creditor's (2)**
49:3,5
**credits (1)**
34:25
**critically (1)**
15:20
**criticize (1)**
115:19
**critique (1)**
127:2
**cross (3)**
51:21;52:3,4
**Cumis (2)**
124:6,19
**Curet (1)**
7:17
**current (3)**
37:21;54:18;98:16
**currently (4)**
38:7;99:22;138:3;
165:2
**cut (4)**
103:11,13;117:12;
149:1
**cynical (4)**
10:6,10;92:14,25

**D**

**dangerous (1)**
142:18
**darn (1)**
53:9
**data (1)**
151:16
**date (9)**
37:19;38:11;77:18,
19;107:5,6;136:13;
137:21;141:5
**dates (4)**
136:15;156:13,18;
159:20
**day (14)**
17:22;19:16,25;
22:1,4;27:18;74:19;
77:23;135:23;136:21;
137:8,12;138:4;161:8
**days (7)**
13:15;21:23;
104:12;155:10;
161:10;162:6,13
**dead (1)**
26:11
**deadline (1)**
13:11
**deal (11)**
23:10;42:4;44:23;
45:23;52:9;58:22;
70:11;94:24;96:12;
122:12;133:17
**dealing (2)**
62:4;104:7,12,20;
122:14

Case: 23-40523   Doc# 2094-9   Filed: 06/25/25   Entered: 06/25/25 15:09:50   Page 174 of 194

**deals (1)**
46:22
**dealt (5)**
37:19;38:23;39:2;
52:8;76:19
**debt (2)**
79:14;86:25
**debtor (124)**
4:10;15:23;16:1,7,
21,22;17:5;19:20;
21:5,16,19;22:2,9;
23:9;26:24;27:11,22,
23;28:4,7,14;30:9,14;
31:12,13,16,21;32:4;
33:12,21;34:10,17;
35:12,13;36:2;37:15,
25;38:20;41:16;
45:14;46:24;47:4;
48:5;50:16;67:19,20,
22;72:18;73:4,12;
76:2;77:12;78:16;
79:8;81:25;82:5,20;
83:2,4,14,16;84:5;
85:13;86:16;87:18;
88:12;92:7;93:3;
95:17;96:25;99:10,
13,14;102:25;107:4,
4;110:9,17;111:11,
14;113:11;114:4,6,6,
8,24;115:1,16;116:11,
22;122:6,7;124:14;
129:18;135:2;138:18;
140:5,17;141:4;
142:7;143:18,23;
145:3,13;146:2,5,17,
22;148:13,14,15,19,
19,22,25;149:3,9,16;
150:16,20;151:18;
156:10;160:5,15
**debtors (3)**
45:20;88:8;151:10
**debtor's (33)**
15:14;17:4,8;21:8,
24;23:18;24:9;30:23;
35:22;37:1;41:20;
45:17;51:11;70:4;
78:18;79:1,4;83:8;
87:1;92:4;100:5,19;
103:3;106:12;116:17;
121:5;126:11;134:21;
140:24;144:19,20;
154:10;160:13
**debts (1)**
46:24
**DECEMBER (4)**
4:1;37:5,11;136:12
**decent (1)**
64:22
**decide (9)**
19:21;22:8;27:7;
33:13;55:10;64:5;
65:1;81:12;89:2
**decided (5)**

23:1;27:24;55:15,
17;123:3
**decides (1)**
22:2
**deciding (5)**
28:5;57:18;134:19;
146:13;154:20
**decision (23)**
10:9;24:8;29:4;
30:3;33:6;49:3,6;
51:11;53:15;55:7,15;
59:24;82:3;83:5;
94:10;100:25;104:2,
7;105:6,18,21;
120:11;122:4
**decisions (4)**
27:2;53:21;105:17;
144:22
**declaration (1)**
123:3
**declarations (1)**
37:6
**declaratory (2)**
122:21;132:1
**decreases (1)**
34:13
**dedicated (1)**
101:16
**deducting (1)**
149:18
**deemed (9)**
29:13;45:11,12,15;
48:6,23;52:22;53:16;
56:18
**defaulted (1)**
46:20
**defense (3)**
124:9,11,16
**defer (5)**
25:14;43:4;90:5;
91:25;95:13
**deficient (1)**
140:3
**definition (4)**
26:12;81:17;103:7;
115:8
**delay (2)**
22:25;26:5
**delightful (1)**
159:6
**delve (1)**
151:13
**demands (1)**
121:25
**demonstrate (1)**
95:24
**Depending (1)**
73:9
**depends (3)**
106:25;107:2,2
**deprive (1)**
28:8
**depriving (1)**

105:8
**depth (2)**
34:6;51:20
**derail (1)**
48:12
**derivative (1)**
64:18
**descended (1)**
106:4
**describe (6)**
58:24;71:7;79:16;
93:14;99:17;105:24
**described (10)**
16:11,18;17:24;
18:2;24:14;72:3;76:2;
78:22;107:24;152:22
**describes (2)**
16:20;127:14
**describing (1)**
94:9
**description (3)**
11:14;69:20;77:18
**descriptions (1)**
86:16
**design (1)**
119:22
**designed (1)**
119:12
**desire (1)**
35:22
**despite (1)**
21:21
**destroy (1)**
124:18
**detail (6)**
20:9;23:16;26:11;
118:6,24;152:23
**detain (1)**
64:23
**determine (9)**
26:9;28:7,17;84:1;
89:8,9;94:16;105:14;
144:16
**determined (3)**
84:21;89:6;110:24
**determining (1)**
47:15
**detour (1)**
110:13
**develop (1)**
39:23
**developed (1)**
46:3
**Develops (1)**
39:24
**dialog (1)**
87:23
**diametrically (1)**
29:7
**Diego (2)**
143:25;151:4
**difference (6)**
13:10;46:14;70:12;

88:7,16;150:4
**differences (1)**
138:21
**different (37)**
9:19;10:7;11:16;
12:20;20:24;29:25;
31:13,25;37:22;
42:14;46:13;47:10;
50:18,18;59:2;72:18,
24;73:13;75:4;76:12;
79:17;86:17;95:3;
96:4;111:9;112:8;
114:3;135:23;144:9,
10,10,25;146:9;
149:2;151:4;152:14;
153:18
**differently (6)**
10:11;14:7;67:14,
15;81:8;153:14
**differing (1)**
63:18
**difficult (3)**
49:9;55:1;105:24
**diocesan (5)**
38:3;123:23;124:1,
3;150:18
**Diocese (24)**
16:4,16,25;29:23,
24,24;30:2;31:3;
43:21;79:3;105:21;
108:20;111:3;112:21;
122:2;123:9;124:17;
125:12;143:25;144:1;
145:9;151:23;153:1,
24
**dioceses (3)**
19:14;37:13;123:11
**dioceses' (1)**
124:5
**diocese's (1)**
79:14
**direct (7)**
19:20;69:4;94:24;
108:4;121:3,6;153:10
**directed (1)**
94:3
**direction (5)**
9:4;67:21;132:24,
25;139:20
**directly (3)**
61:10;130:13,14
**disability (3)**
104:18,21,21
**disagree (6)**
30:18;31:11;32:21;
45:19;59:9;133:17
**disagreement (6)**
28:15;30:2;77:3,5;
78:24;87:3
**disagreements (4)**
13:1;36:6;145:25;
148:1
**disagrees (3)**

62:25;116:24;154:2
**disappear (1)**
124:14
**disaster (1)**
19:2
**discharge (3)**
65:19;122:6,8
**disclose (1)**
152:11
**disclosed (4)**
17:22;65:17;68:20;
153:2
**disclosure (92)**
9:12,14,22;20:10;7,
20,23;11:10;12:14;
13:7,17;15:14;16:19;
17:25;18:8,9,16;20:4;
21:13;22:6,14;23:6,
22,24;24:5,11,20;
26:16;27:3,5;30:13;
31:15;37:2;39:1;64:1;
65:2,16;66:1,8,9;
67:11;68:16;74:14;
75:15;76:2,19;77:2,
18;79:11;83:2,21,23;
86:8;91:13,20;92:13;
94:2;99:2,15,17,22,
24;100:6,12;103:8;
106:24;113:10,24;
115:7;116:17,19;
120:4;123:6;127:12;
134:8;135:5,8;
137:21;138:3;140:2;
141:1,7;142:7;143:8;
151:14;152:6,11;
153:17;154:10;
160:10,15;162:4
**disclosure- (1)**
97:12
**discourage (2)**
129:17;131:16
**discourages (1)**
123:24
**discovery (4)**
12:16;103:6;
110:21;141:5
**discrete (1)**
52:8
**discretion (1)**
93:22
**discrimination (3)**
104:15,17,22
**discuss (3)**
141:12;142:17;
162:13
**discussed (3)**
12:13;18:1;53:13
**discussion (18)**
9:8,9;13:20;24:24;
27:5;63:25,25;80:18;
96:17;103:16;114:16,
20;133:4,7,16;155:3;
156:19;163:14

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
175 of 194

**disinterestedness (1)**
38:15
**dismissed (2)**
114:11;145:14
**dispose (1)**
44:23
**disputes (3)**
26:24,25;125:14
**disputing (1)**
99:14
**dissenting (1)**
97:9
**distilled (1)**
22:11
**distinct (4)**
52:20;56:24;60:10;
73:7
**distinction (3)**
30:21;56:2;59:24
**distribute (1)**
130:25
**distribution (5)**
70:7;74:4;129:4;
143:1,11
**District (2)**
46:19;77:9
**divide (1)**
27:12
**DJ (2)**
123:2;159:4
**doable (1)**
136:3
**docket (2)**
37:5;120:3
**dockets (1)**
37:6
**doctrine (1)**
106:14
**document (8)**
10:8;49:15,23;63:7;
81:4;116:9,10;135:21
**documents (6)**
17:15;72:6;73:24;
74:4;75:13;136:25
**dog (1)**
129:19
**dollar (4)**
30:24;31:3;85:5;
92:8
**dollars (18)**
17:20;27:12;38:9,
10;84:24;88:12;92:6,
7;93:16;130:6;
145:10;148:15,22,23;
151:23;152:5;153:4,5
**done (10)**
35:24;37:12;39:19;
52:16;70:6;75:8;83:9;
96:11;162:5;164:9
**donor (4)**
102:6,9,10,23
**doubt (2)**
53:25;90:23

**down (14)**
42:11;51:10;52:19;
67:10;77:1;88:5;
93:24;98:22,23;
111:10;112:2;117:15;
142:18;148:20
**dozen (1)**
38:3
**draft (3)**
67:13;72:10;98:16
**drafted (4)**
35:11;68:10;82:8;
99:22
**drafters (3)**
83:10,11;85:2
**drafter's (1)**
32:12
**dress (2)**
40:5,12
**drew (1)**
48:7
**drive (1)**
27:15
**drivers (3)**
144:12,18;145:2
**drives (1)**
29:3
**driving (1)**
41:2
**dubious (1)**
59:20
**due (4)**
37:10;88:18;
136:12;141:20
**dues (3)**
101:14;112:3,5
**dumbed (1)**
42:11
**duplicate (2)**
149:18,19
**during (5)**
16:11;17:6;68:18;
80:11;115:10
**duty (2)**
46:4;48:25
**dying (1)**
35:19
**dynamic (3)**
9:18;12:9,24
**dynamics (1)**
125:5

**E**

**earlier (4)**
18:12;25:1;56:17;
120:16
**earliest (1)**
21:22
**early (4)**
42:2;118:18;
137:11;158:10
**earmarked (1)**

102:1
**earnestly (1)**
35:23
**ears (3)**
48:14;136:21;165:1
**Earth (1)**
106:7
**easier (2)**
48:23;84:15
**easiest (1)**
81:16
**easily (1)**
81:16
**Easy (3)**
49:25;68:15;152:20
**easy-to-understand (1)**
69:21
**ecclesiastical (1)**
105:17
**echoing (1)**
43:19
**economic (2)**
36:8;112:22
**economical (1)**
88:5
**edification (1)**
148:4
**education (1)**
47:25
**EEOC (1)**
104:3
**effect (2)**
53:19;123:22
**effective (4)**
37:18;71:8;107:5,6
**effectively (2)**
61:16;129:24
**efficient (2)**
68:12;123:2
**effort (3)**
73:16;122:22;
124:18
**efforts (1)**
125:3
**egg (1)**
92:15
**eight-million-dollar (1)**
140:5
**either (11)**
22:13;32:18;37:23;
72:24;78:15;95:5;
110:24;138:19;154:7,
7,19
**either-or (2)**
96:25;97:3
**elect (3)**
128:24;132:24,25
**elected (1)**
143:4
**elephant (1)**
109:7
**eliminate (3)**
110:13;155:7;158:9

**eloquently (1)**
107:25
**else (18)**
6:22;8:8;41:15;
49:8;56:14;66:19;
72:16;80:13;82:13;
109:17;111:24;113:2;
130:18,24;156:25;
157:7;163:3;165:8
**elsewhere (2)**
18:1;21:4
**embedded (2)**
146:1;148:1
**embraced (1)**
19:8
**empirically (1)**
39:20
**employ (1)**
77:7
**employees (1)**
17:10
**Employment (3)**
104:3,15;105:6
**enable (2)**
16:1;21:10
**end (13)**
22:24;35:21;54:21;
77:6;78:19;79:25;
108:22;114:10;
122:14;137:7;143:3;
150:1;154:19
**ended (2)**
63:7;120:22
**ends (1)**
10:1
**Energy (1)**
46:18
**engage (4)**
51:14;59:4,16;
112:20
**engaged (1)**
58:21
**engagement (1)**
63:17
**enjoy (2)**
25:18;139:16
**enormous (2)**
20:9;118:23
**enormously (2)**
72:7;74:16
**enough (18)**
9:17;11:4;21:20;
22:2;33:13,14,15;
52:8,9,14;54:8;58:22;
59:4,4;63:17;67:7;
86:9;163:19
**ensure (1)**
16:14
**enterprise (1)**
85:1
**entire (2)**
27:3;127:13
**entirely (4)**

47:3;130:17;
142:18;143:10
**entities (9)**
16:21;27:11;29:12,
25;70:19,23;79:3;
82:6;150:21
**entitle (1)**
70:15
**entitled (7)**
14:2;35:17;71:3;
82:5,7;86:18;140:22
**entity (2)**
85:3;87:5
**entry (1)**
39:13
**Equal (1)**
104:3
**equals (1)**
63:19
**equitable (18)**
15:25;16:22;21:9,
15;27:20,21,25;
61:20;83:20;84:6,16,
20;87:4;96:12;
106:21,22;113:13;
144:17
**equitably (1)**
27:24
**equivalent (2)**
49:4;60:1
**erasing (1)**
53:20
**ergo (1)**
31:1
**especially (2)**
52:20;114:14
**essence (1)**
46:23
**essential (1)**
56:8
**essentially (6)**
22:18;27:12;28:7;
29:15;47:1;87:18
**establish (2)**
97:16;105:18
**establishes (2)**
16:20;75:14
**establishing (1)**
98:13
**establishment (3)**
103:21;105:15;
112:10
**estate (24)**
26:25;27:8;28:12,
24;32:5;38:9,21;
83:19;84:2,25;85:4,6;
86:25;93:15;102:13,
15,16;106:6,7;107:1,
19;112:8;115:2,4
**estimable (1)**
73:3
**estimated (1)**
141:17

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
176 of 194

**estimation (1)**
141:16
**et (2)**
11:25;163:24
**evaluators (1)**
73:18
**Evangelical (1)**
104:2
**eve (1)**
27:6
**even (22)**
10:25;12:24;21:18;
38:11,25;45:13;67:3;
86:15;95:2;99:16;
100:9;101:14,18;
112:17;114:17;
123:13;133:20;135:5;
143:3;144:1;146:5;
148:3
**event (2)**
6:11;99:9
**everybody (8)**
9:16;10:16;20:9;
72:11,16;115:11;
117:11;162:22
**everybody's (3)**
43:19;109:24;113:4
**everyone (1)**
130:18
**evidence (1)**
152:13
**evidentiary (1)**
59:10
**exact (1)**
74:6
**Exactly (6)**
35:16;51:23;55:2,4;
108:4,7
**example (16)**
17:18,23;36:2;
61:13,14;91:4,12;
124:16;140:16;145:9;
146:1;148:10,14;
149:18,24;152:10
**examples (3)**
81:16;147:25;148:5
**except (1)**
46:3
**exception (2)**
104:8,13
**exceptional (1)**
46:3
**Exchange (1)**
120:11
**excluded (1)**
112:2
**excluding (2)**
99:21;100:13
**exclusion (1)**
101:7
**exclusively (1)**
73:24
**exclusivity (1)**

13:4
**exculpated (2)**
81:17;90:15
**exculpation (11)**
26:12;69:23;70:13,
14,16;71:3;72:3;82:2,
5,7;90:2
**exculpations (1)**
70:12
**Excuse (4)**
6:24;45:17;46:4;
143:8
**execute (2)**
45:13;49:18
**executive (4)**
71:14;90:21;
142:13,21
**exempt (1)**
106:19
**exercise (4)**
103:21;105:11;
113:8,10
**exhausting (1)**
131:7
**exhibit (1)**
154:21
**exist (4)**
47:2;112:5;127:17;
150:15
**existing (1)**
86:25
**exists (1)**
129:1
**expand (1)**
59:16
**expect (4)**
7:1;64:24;80:11;
114:17
**expectation (1)**
42:12
**expected (2)**
24:6;66:14
**expects (1)**
6:23
**expenses (2)**
23:19;27:15
**experience (2)**
18:16;96:22
**experienced (1)**
38:2
**experiences (1)**
106:1
**explain (5)**
60:13;121:16;
124:6;135:15;148:7
**explaining (2)**
71:1;87:7
**explanation (6)**
79:4,13;80:4;
115:17;116:12,25
**explicit (2)**
30:2;152:1
**explore (2)**

64:6;131:10
**exposed (1)**
11:17
**exposure (2)**
35:14;123:14
**exposures (2)**
123:9;124:2
**express (2)**
8:5;30:12
**expressed (3)**
17:1;19:9;120:24
**extending (2)**
13:11;161:4
**extensive (1)**
145:24
**extent (22)**
10:7;11:6;29:23;
53:4,7;54:12;62:17;
69:17;77:17;78:13,
21;91:24;127:2,17,
25;128:5,21;129:1;
132:4;133:16,19;
161:18
**extraordinary (1)**
20:21
**extreme (1)**
61:13
**eye (1)**
18:9

## F

**fabric (1)**
97:17
**face (2)**
84:17,21
**fact (11)**
27:18;34:15;57:11;
83:7;99:13;112:19;
134:8;143:9,19,22;
145:7
**fact-based (1)**
89:3
**factors (1)**
33:6
**facts (4)**
50:18;144:9;146:1;
148:1
**factual (1)**
89:5
**factually (1)**
12:3
**fades (1)**
27:18
**fail (1)**
45:13
**fails (1)**
84:18
**failure (5)**
26:13;49:4,5;58:23;
105:5
**fair (27)**
15:24;16:22,24;

21:9,15;27:20,21,24;
28:8;31:18;32:21;
54:2;57:25;58:1;
61:20;67:7;83:19;
84:6,16,20;87:4;
92:16;106:21;113:12;
144:17;151:18;
153:16
**fair-and- (2)**
96:11;106:20
**fair-and-equitable (1)**
95:3
**fairly (5)**
23:15;27:24;42:1;
79:13;137:11
**fairness (1)**
86:15
**faith (23)**
16:8;21:16;61:20,
24;70:15;105:12,23;
120:9,9,13,13;121:6,
7,19,23,23,24;122:3,
6,16;127:22,23;
134:12
**faithful (4)**
16:2;21:11;105:15,
25
**Falk (1)**
6:2
**fall (5)**
11:19;113:8;
119:11;122:18;
141:17
**familiar (2)**
40:2;104:9
**Fan (2)**
137:13;157:7
**FAQ (1)**
71:17
**FAQ-like (1)**
90:22
**far (3)**
13:16;35:24;107:20
**Farmer (1)**
120:10
**Farms (2)**
100:23,24;101:1;
111:25
**fashion (2)**
51:14;136:1
**fast (1)**
32:13
**favor (3)**
34:19;97:4,7
**favorable (1)**
11:2
**favorably (1)**
16:24
**fear (1)**
123:4
**Federal (4)**
21:6,7;38:7;101:16
**fee (1)**

64:18
**feel (4)**
8:20;12:2;95:9;
148:7
**felt (1)**
20:19
**few (6)**
9:9;11:19;14:8;
34:1;117:25;142:14
**field (2)**
5:21;29:5
**Fifth (4)**
53:9,10,22;124:6
**fifty (2)**
149:1,1
**fifty- (1)**
148:21
**fifty-five-million-dollar (1)**
107:7
**fifty-six (1)**
153:6
**fifty-six-million (1)**
153:4
**fifty-two (1)**
153:5
**fifty-two-million (1)**
153:5
**fight (2)**
103:2;129:19
**fights (2)**
70:8;115:6
**figure (3)**
76:23;131:23;
151:15
**figured (2)**
28:23,24
**file (6)**
86:22;87:20,21;
103:7;160:15;161:6
**filed (14)**
16:7,12;19:16;
22:10;23:22;27:23;
37:5,11;57:1,2;68:16,
16;77:9;151:2
**filing (4)**
15:22;17:19;
161:18;162:3
**filings (1)**
151:14
**final (1)**
22:24
**Finally (5)**
23:21;25:1;66:6;
93:20;153:22
**financial (1)**
4:13
**find (9)**
28:13,22;48:15;
84:5,15;89:1;126:17;
127:5;153:4
**findings (1)**
60:18
**fine (16)**

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
177 of 194

20:25;26:4;31:25;
42:19;43:8;65:8,10,
10;67:22;68:1;103:6;
139:5;158:18,19;
160:23,25

**finest (1)**
40:9

**finish (2)**
50:21;134:1

**fired (1)**
104:19

**first (27)**
11:12;22:6;30:6,25;
31:6;32:22;33:16;
42:19;46:6;83:17;
86:2,24;89:8;97:3,3;
101:21;102:11;
106:12,13;118:11;
120:1;127:20;131:5;
142:16;143:16;
148:11;153:6

**firsthand (1)**
16:10

**five (13)**
14:9;28:21;51:10;
82:6;110:20;119:9,
18,19;122:13;124:21;
128:17;159:13;
162:12

**Five- (1)**
117:18

**five-and-a-half (1)**
119:3

**five-million (1)**
151:23

**fix (5)**
81:25;91:18;
119:22;123:12;
125:20

**fixable (1)**
82:11

**fixing (2)**
120:22;124:23

**flag (1)**
139:4

**flagging (1)**
141:10

**flat (1)**
11:23

**flexibility (1)**
131:11

**flexible (1)**
64:17

**flock (1)**
39:22

**focal (1)**
16:6

**focus (3)**
26:17;45:2;113:17

**focused (1)**
59:25

**focuses (1)**
99:12

**fold (1)**
12:19

**folding (1)**
85:5

**Foley (4)**
4:9;5:5;7:2;160:5

**folks (9)**
14:4;26:5;42:21;
43:5;49:10;117:18;
120:1;123:20;124:23

**follow (3)**
26:13;54:25;136:16

**following (12)**
9:7;10:4;53:11;
68:6;70:19;73:3;
88:14,14;104:20;
140:3;160:7;162:9

**font (1)**
35:4

**force (1)**
111:21

**forced (2)**
84:5;107:23

**forcing (1)**
111:13

**forecast (1)**
23:13

**forget (2)**
63:6;95:20

**Forgive (2)**
78:1,4

**form (13)**
45:13;47:24;48:5;
50:16;52:15;55:9,10,
21;62:16,20,22;63:5,8

**formed (1)**
11:1

**former (1)**
38:7

**formulation (1)**
90:22

**forth (7)**
26:10;33:4;45:25;
48:25;69:8;72:19;
144:14

**forward (9)**
27:1;28:20;81:15;
84:14;96:20;113:5;
127:8;135:9;156:2

**foul (1)**
79:15

**found (1)**
143:20

**four (9)**
26:15;28:21;57:1,
12;82:5;97:23,24;
98:20;110:20

**Fourth (1)**
123:8

**four-year (1)**
107:4

**frame (3)**
73:12,13;79:3

**frames (1)**
151:16

**framework (3)**
56:13,14;75:14

**framing (1)**
113:18

**Franciscan (1)**
44:4

**Francisco (2)**
81:23;91:4

**frankly (9)**
57:5;62:21;66:9;
90:14;94:6;123:18;
127:24;142:18;144:1

**free (4)**
8:20;95:9;103:20;
105:11

**freedom (2)**
111:22;112:10

**frequently (1)**
118:20

**Friars (1)**
44:4

**Friday (2)**
160:13,14

**frolic (1)**
110:13

**front (3)**
13:1;57:23;158:2

**fulcrum (1)**
29:4

**fulfilled (1)**
33:8

**full (2)**
117:1;140:18

**fully (3)**
17:22;50:17;141:6

**fun (1)**
36:13

**Fund (2)**
17:18;61:15

**fundamental (13)**
26:23,25;28:1,4;
32:8;36:7;56:13;77:3;
83:4,6;89:12;105:20;
131:24

**fundamentally (4)**
105:21;106:11;
131:15;135:25

**funded (2)**
16:20;17:19

**funds (4)**
27:7;101:23;
123:20;140:17

**funny (2)**
76:21;114:12

**further (17)**
12:10,16,16;13:20;
27:16;31:2;52:11;
64:7,24;73:10;108:5;
114:16,20;127:11;
135:21;139:2;156:8

**furtherance (1)**

31:3

**furthest (1)**
43:21

**future (6)**
16:13;24:16;
101:13;112:3,5;
141:23

## G

**Gabrielle (1)**
5:16

**Gallagher (2)**
20:21;135:1

**gallery (1)**
6:22

**game (2)**
51:13;88:3

**gap (1)**
129:13

**gathered (1)**
106:5

**gating (3)**
81:11;87:16;95:20

**gave (4)**
95:2;134:6,16;
163:5

**general (3)**
78:25;98:2;140:16

**Generally (2)**
50:13;103:25

**gets (3)**
130:23;131:2;
151:18

**gift (7)**
102:1,2,4,5,9,10,23

**Ginsberg (1)**
7:15

**given (15)**
14:8;21:25;22:2;
25:20;36:6;39:18,19;
40:19;50:5;62:5;
93:11,18;130:6;
138:13;153:18

**gives (1)**
96:25

**giving (4)**
21:20;67:12;70:23;
150:23

**glad (1)**
33:3

**glaring (2)**
119:10;143:24

**Glenn (3)**
120:24;143:17,20;
145:7

**Glenn's (1)**
146:8

**global (3)**
17:3,6,9

**gloss (1)**
87:18

**goal (3)**

15:23,24;35:24

**goals (2)**
16:17;17:8

**God (2)**
50:7;106:2

**God's (1)**
76:22

**goes (7)**
15:19;18:19;30:4;
107:21;128:15,17;
152:9

**Goldblatt (9)**
47:14;48:15;57:21;
58:20,23;61:5;62:1;
63:7,17

**Goldblatt's (1)**
47:9

**good (47)**
4:15;5:16;6:15,18,
21;7:4,7,13,16,18;
8:10,13;15:8;16:8;
20:15;21:15;33:3;
35:22;36:5,25;40:21,
23;42:12;44:7,8;
61:20,24;70:14,15;
72:1;78:17;94:7;99:4;
115:12;121:19;
134:20;137:18,19;
139:5,9;150:17,18;
157:1;158:21;159:11;
165:5,9

**good-faith (1)**
70:16

**goodwill (1)**
43:20

**govern (1)**
83:14

**governance (1)**
105:7

**governed (1)**
73:23

**government (2)**
105:16;106:15

**grabs (1)**
147:21

**grant (2)**
12:12;73:6

**granted (1)**
102:6

**grateful (1)**
46:15

**great (9)**
7:10;26:10;34:7;
36:21;41:11;136:3;
151:13;157:18;
164:14

**greatest (1)**
121:20

**greatly (3)**
83:18,19;144:14

**group (1)**
83:7

**groups (1)**

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
178 of 194

105:12
**guarding (1)**
59:12
**guess (9)**
10:12;31:20;62:13;
63:11;64:12;96:20;
127:1;133:2;160:21
**guessing (2)**
38:23;135:22
**guidance (1)**
83:20
**guiding (3)**
12:22;79:4,9
**guys (16)**
35:19;43:3;44:20;
81:3;84:22;95:8;
109:8;137:6,9,24;
138:1;154:12;156:15;
159:12;164:2;165:11

**H**

**half (4)**
27:17;117:10;
143:23;164:15
**Hamilton (2)**
122:4;134:16
**hand (5)**
44:5;112:15;
120:10;135:1,2
**handle (3)**
9:20;63:6;73:7
**handpicked (1)**
124:15
**happen (6)**
12:9;23:20;86:7;
122:2,5,8
**happened (3)**
6:3;50:25;113:15
**happening (1)**
123:7
**happens (1)**
129:12
**happy (10)**
8:18,19,22;56:9;
66:10;72:15;100:16;
109:21;117:15;
152:18
**hard (4)**
8:6;43:16;58:24;
109:3
**hard-and-fast (1)**
114:8
**harm (2)**
79:15;121:14
**Harris (1)**
7:15
**hashed (1)**
100:4
**head (1)**
80:3
**headed (2)**
84:9;135:20

**healing (1)**
16:15
**hear (20)**
8:18;20:24;37:7;
42:4;47:7;64:23;69:5;
71:24;72:6,15;65:15;
89:16;90:18;92:11;
127:12;128:13;
137:16;156:1,19;
162:22
**heard (23)**
11:6,7;17:16;20:1,
17;40:17;41:15;60:8;
64:4;73:11;75:24;
76:9;90:13;91:1;
96:19;99:23;108:2;
113:2;126:16;132:16;
142:7;154:23;164:19
**hearing (30)**
9:15;11:11;13:14;
26:9;40:7;41:18,18,
19;59:16;66:20;68:7;
110:23;113:14;132:7;
133:3;134:7;135:9;
136:3,7,23;137:21;
138:2,18;139:2;
143:20;154:23;
156:13;160:10;
162:22;164:20
**hearings (6)**
9:17;33:12;55:8;
138:4;163:17,22
**heart (1)**
12:11
**heavily (2)**
101:4,4
**Heavy (1)**
146:11
**held (4)**
49:3;105:3;122:7;
123:14
**help (10)**
16:14;25:2;59:15;
69:7;72:7;80:3;81:1;
84:4;94:21;156:19
**helpful (17)**
13:23;25:18;31:22;
36:20;69:10;70:1,6;
73:4;74:16;79:10;
94:8;102:24;103:12;
116:8;136:22;156:16;
158:1
**helpfully (1)**
123:11
**helps (1)**
139:20
**here's (6)**
31:14;42:14;74:8,
10;87:2;113:22
**herself (1)**
19:22
**hesitant (1)**
122:11

**Hi (1)**
5:13
**high (2)**
56:22;59:17
**highlight (3)**
7:3;63:5;104:1
**highlighted (1)**
62:5
**highlighting (1)**
71:13
**highly (5)**
109:9;114:13;
143:20;145:17;157:5
**himself (3)**
5:20;43:25;112:21
**historically (1)**
145:9
**history (2)**
53:10;111:9
**hit (2)**
60:16;119:18
**Hogan (17)**
36:25;37:3,25;38:2;
39:16,19,24;40:1,4,9,
12,25,25;41:6,16,18,
22
**Hogan's (1)**
40:18
**hold (7)**
52:10,11;87:22;
95:7;115:1;121:22;
129:23
**holdback (1)**
130:19
**holder (2)**
97:21;122:25
**holders (4)**
37:21,22;98:6,6
**holding (2)**
121:18;123:20
**holiday (3)**
136:24;157:15;
165:13
**Holy (3)**
81:24;106:1,4
**home (1)**
139:21
**Honor (234)**
4:7,17;5:4,11,16,
23;6:8,9,15,18,21,24;
7:4,7,13;8:10,13,21;
14:10;15:5,20;17:1,
23;18:6;19:1,4;20:17;
21:1,18,21;22:1,13,
21,22;23:21;24:13;
25:1,6,13,16,19;26:7,
19,22;27:4,6,16,21;
28:7,10,19;29:4,19;
30:22;32:3,22;33:8,
16,20;34:1,10,16;
35:3,21;36:10,16,22,
24;37:6;38:5;39:6,13;
40:21;41:9,13;43:10;

44:7,11;45:5;46:11,
16;48:2,8,9,10,17;
49:16;50:13,20,23;
51:17;52:18;55:10;
56:16;57:8;59:24;
64:2;65:4;66:9,17,23;
67:15,18;71:11;
72:11;73:21;75:20;
76:14;77:8,24;78:8;
80:5;81:6,8,18;82:3,
14,19,24;83:20;84:1,
13,25;85:6,10,15;
86:12;87:7,17;89:2,
11,18,24;90:3,25;
91:22;93:20,24;
94:15;95:7,18;
103:10;108:7;109:14;
110:1,12;111:7,13,16,
20;112:25;116:1,4,
15;117:16,25;118:5,
11;120:12;121:20;
124:7;125:1;126:4,
13;127:10,16;128:10,
16;130:3;131:13;
132:16;133:12,24,25;
134:5;136:6;137:14,
17;138:12,13;139:4,
12,17,23,25;140:4,15;
141:8,13,16,18;142:3,
13;143:13,16;144:4;
145:16,22,23;146:16,
18,23;147:8,14;150:9,
11,14;152:17;153:8,
23;154:6,14,22;156:1,
4,16;157:10,19,22;
158:1;159:22;160:5;
161:20;162:3,24;
163:1,5,13,20;164:1;
165:3,7,12,14
**Honor's (2)**
47:12;67:21
**hope (5)**
11:7;41:23;75:12;
96:21;139:1
**hopeful (1)**
41:2
**hopefully (8)**
36:4;42:11;80:12,
18,22;127:6;155:13;
158:25
**Hosanna-Tabor (1)**
104:2
**hour (3)**
38:9;117:10;164:15
**housekeeping (2)**
43:15;44:21
**however-long-month (1)**
110:20
**huge (2)**
121:17;123:16
**human (1)**
159:6
**humble (2)**

88:20,23
**humbly (1)**
89:13
**hundred (4)**
54:6;148:20;149:9;
161:22
**hundred- (1)**
148:14
**hundred-million (1)**
148:23
**hundreds (3)**
27:12;53:21;54:7
**hurts (1)**
34:23
**hyperbole (1)**
81:18
**hypo (1)**
47:25
**hypothetical (21)**
26:13;28:2;32:9,14,
15;33:21;83:15;84:9;
85:11;86:5;90:12;
95:1;96:9;101:18;
102:7;107:22;111:12,
14;112:11,25;113:19

**I**

**idea (21)**
10:1;12:20,21;13:6;
20:24;24:14,15;
26:21;36:18;42:12,
17;67:24;70:14;71:7;
73:19;94:7;101:22;
136:20;139:5,8,11
**ideal (1)**
122:5
**Ideally (2)**
121:23;122:8
**ideas (2)**
96:14,16
**identified (3)**
75:5;140:4;142:5
**identify (8)**
60:13;61:2;62:14;
66:7;78:14,15;
134:15;142:24
**identifying (1)**
39:21
**ii (3)**
99:11;110:16;
111:11
**illusion (1)**
18:13
**illusions (1)**
109:9
**illustrates (1)**
91:6
**illustrative (1)**
147:24
**imagine (1)**
164:10
**immediacy (1)**

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
179 of 194

26:2
**immediately (2)**
27:19;39:12
**impact (1)**
143:11
**impacted (2)**
112:24;144:14
**impacts (1)**
128:1
**impaired (6)**
97:4,6,23;98:21;
100:7;140:21
**impairs (1)**
34:21
**imperfect (1)**
122:12
**implications (1)**
90:17
**implicit (1)**
136:7
**important (21)**
9:11,11;10:18,24;
11:4,16;15:20;20:7,
19,19;28:10;52:7;
57:13,18;89:11;99:9;
139:22;142:6;150:22;
151:12,18
**imposing (2)**
49:20;105:10
**impossible (3)**
97:18,20;98:20
**improperly (1)**
128:1
**improve (1)**
30:25
**inaccurate (1)**
142:14
**inaction (3)**
45:15;61:18,18
**inadvertence (4)**
56:22;57:4;59:1,12
**inadvertently (1)**
128:1
**inapplicable (1)**
28:3
**inappropriate (2)**
30:15;70:9
**inattentive (1)**
49:22
**inclination (2)**
58:20;64:18
**inclinations (2)**
162:19;163:5
**include (7)**
42:13;79:12;
101:18;108:19;
143:24;145:3;149:10
**included (8)**
22:14,14;92:11;
100:18,20;116:25;
145:4;149:3
**includes (1)**
115:1

**including (10)**
12:10,10;16:3,3;
79:2;99:21;100:13;
107:5;109:2;161:7
**incomplete (1)**
99:5
**inconsistent (3)**
54:7;82:7;120:7
**incorporated (3)**
22:16;29:13;148:25
**incorrect (1)**
100:17
**increase (1)**
131:20
**increases (3)**
34:13;70:7;124:5
**incumbent (1)**
116:22
**independent (3)**
124:8,19;133:15
**indicate (1)**
9:13
**indicated (1)**
92:3
**indicating (3)**
20:7;63:16;77:4
**indifferent (1)**
31:23
**indiscernible (5)**
67:2;72:14;95:11;
133:24;137:5
**individual (2)**
19:24;132:22
**individualized (3)**
131:19;132:3,21
**individually (1)**
122:25
**individuals (2)**
37:14;105:14
**indulgence (1)**
6:10
**indulging (2)**
11:9;162:1
**inflation (1)**
145:10
**inform (3)**
42:7;142:8;156:19
**information (13)**
10:18;11:13;17:15;
65:18,22;74:17;93:7;
143:23;151:1,12;
152:17,25;155:20
**informed (6)**
8:22;94:5;145:11;
152:16,16;155:21
**informing (1)**
144:22
**infringes (2)**
105:11;106:12
**inherent (1)**
97:17
**initial (4)**
26:9;69:19;73:18;

153:3
**injunction (3)**
45:8;69:24;71:6
**injure (1)**
124:17
**input (2)**
75:1;109:24
**insert (1)**
138:21
**insolvency (1)**
102:3
**instances (2)**
143:1,5
**instead (2)**
123:15;151:1
**institution (1)**
101:3
**instructed (1)**
145:3
**instrumental (1)**
41:1
**insurance (34)**
6:11,19;7:9,14;
19:17,20;21:24;22:3;
25:4;34:6;77:17,17;
98:14;118:7,13;
120:11;121:5;122:20,
23;124:8,22;125:3,
13;126:1;128:24,25;
130:11;131:20;132:1,
14;134:9;144:10,19;
147:14
**insurance-law (1)**
119:8
**insurance-neutral (1)**
34:20
**insurance-specific (1)**
117:25
**insured (1)**
130:24
**insurer (6)**
121:22,23;130:11,
13,17;131:4
**insurer-controlled (1)**
124:10
**insurers (31)**
8:11;17:6,10;19:15;
20:6;23:9;28:14;
34:13,15,18,19;35:11,
17;80:11;118:23;
119:2,8;120:6,13,24;
121:3,7,18,25;122:1,
24;123:11;124:7;
135:1;143:10;161:6
**insurers' (5)**
77:14;119:4;124:5,
15;128:1
**integral (1)**
82:4
**intelligent (2)**
10:9;108:6
**intend (1)**
91:3

**intended (7)**
53:15,15;69:20;
81:25;128:23;131:16,
17
**intent (8)**
83:10,10;85:2,3;
102:9;119:1;124:17;
129:17
**intentional (1)**
70:22
**interest (4)**
21:16;94:24;95:25;
99:11
**interests (1)**
37:22
**interfere (1)**
14:5
**interference (1)**
139:13
**interferes (1)**
105:7
**internal (1)**
105:7
**interpret (1)**
144:23
**interpretation (2)**
53:10;89:4
**interpreted (1)**
11:25
**interrupt (1)**
58:17
**interrupting (1)**
14:25
**into (34)**
11:19;22:11,16;
23:9,10;27:3;30:20,
20;34:24;51:19;
52:19;53:16;70:21;
72:5;74:10;75:1;90:5;
96:2,8;99:3,24;
102:11;106:1;125:6;
128:15;129:12;131:2;
135:24;142:8;149:23;
151:8,25;152:4;
162:15
**intro (1)**
22:23
**introduce (1)**
5:19
**introduction (1)**
119:18
**introductory (1)**
71:14
**intrudes (1)**
105:6
**invite (1)**
39:16
**involved (4)**
39:3;41:3;50:6;
163:14
**involvement (1)**
105:16
**issue (67)**

23:11;24:10;27:10;
33:15;36:14,15;
39:23;44:13,22;
45:18;46:7,22;49:22;
50:14;51:11;52:7;
56:1,13,21;60:13;
62:15;65:11;66:22,
24;80:13;83:2,3,4;
88:2,5;89:8,14;91:13,
15,18,24;92:2;94:9,
18;95:20;96:5;98:18;
99:9;100:3;102:11;
103:5;104:20;110:7,
24;117:8;118:10;
120:15,15;127:20,24,
25;130:12;131:2;
133:14;136:8;139:4;
141:10;142:16;
147:11,12;152:13;
154:3
**issued (1)**
122:23
**issues (49)**
6:11;9:13;11:18;
12:16,17;20:13;27:2;
29:4;39:20;48:16;
52:20,22;64:16;
65:17;68:9;81:12;
83:1;87:17,19;89:5;
90:11;93:22;101:21;
109:21;113:17,18;
116:6;118:1,7;
120:14;123:6;126:9;
127:17;133:10,19,20;
138:14,23;139:13;
141:15;142:25;147:9;
152:17;154:7,7,9;
155:14;156:4,9
**item (1)**
4:3
**items (2)**
100:14;160:18
**iterative (4)**
9:18;109:9;114:13;
119:13
**iterative-process (1)**
122:18

**J**

**JACOBS (6)**
7:13,14,17,19,22,24
**January (13)**
13:5;52:14;128:9;
135:22;160:9,12,14,
14;161:7,14,17;
163:22;164:20
**Jason (2)**
8:13;45:5
**Jeff (3)**
6:15;40:21;110:4
**Jerry (1)**
6:2

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
180 of 194

**Jesse (2)**
6:18;147:14
**join (1)**
134:20
**joints (1)**
13:16
**joke (1)**
144:6
**Judge (42)**
7:25;8:5;11:23;
14:3;20:21;22:8;
36:25;37:3,25;38:2,7;
39:15,18;40:1,18,24,
25,25;41:5,16,18;
43:4;47:13;51:3;
57:21,23;58:20,23;
61:5;76:22;110:4;
120:24;134:25;
136:24;143:17,20;
145:2,7;158:2;159:7;
164:3,9
**judgment (7)**
92:5;120:7;121:8,9;
122:21;129:9;132:2
**judicial (1)**
111:7
**jumbled (1)**
70:1
**junket (1)**
110:21
**juries (1)**
21:4
**jurisdictions (1)**
149:10
**jury (3)**
28:17;151:1,1

**K**

**keep (3)**
36:12;59:19;109:12
**keeping (1)**
116:19
**Keller (1)**
5:17
**Kemner (3)**
6:25;7:4,5
**kept (1)**
14:25
**key (2)**
101:8;112:1
**kick (2)**
45:4;81:5
**kidding (1)**
114:14
**Kim (1)**
5:17
**kind (17)**
22:12;26:19;29:22;
52:20;60:16;63:23;
68:15,22;84:8;88:11;
90:7;91:6;93:18;
103:14;130:20;131:2;

147:20
**kinds (1)**
10:22
**Kinsella (1)**
57:23
**Kinsella's (1)**
51:3
**knowing (1)**
13:21
**known (1)**
37:21;40:6;154:1
**knows (2)**
115:11;119:3

**L**

**labor (2)**
101:3,4
**laboring (1)**
159:5
**lack (9)**
11:10;34:25;50:8;
72:19;78:14;79:2;
92:4;94:13;128:25
**land (3)**
14:16;107:1,1
**language (11)**
69:21,25;70:14;
80:13;90:1;94:22,24;
123:6,17;138:19;
152:9
**Lardner (4)**
4:9;5:5;7:2;160:5
**large (3)**
125:7,18;129:12
**largely (1)**
44:23
**larger (1)**
64:16
**large-scale (1)**
75:19
**Las (2)**
137:15;157:3
**last (10)**
14:16;18:23;30:24;
31:3;104:11;109:25;
110:2;133:14;151:5;
153:22
**last-and-best (1)**
109:10
**later (6)**
18:4;41:7;52:16;
76:24;121:15;165:16
**later- (1)**
129:4
**LaVie (4)**
54:12;57:15;61:3,
10
**law (28)**
11:25;24:9;35:16;
37:16,23;46:2,2;
49:18;54:18;82:8;
89:3;96:7;100:20;

101:16;102:1,20;
103:19;110:24;113:7;
115:4;120:7;122:4;
124:7,13;135:14,25;
144:10,20
**laws (3)**
103:25;104:15,17
**lawsuit (1)**
29:17
**lawyer (1)**
76:20
**lawyers (2)**
69:19;91:11
**lead (3)**
8:20;12:16,16
**leadership (1)**
16:13
**leading (1)**
103:16
**leaning (1)**
64:6
**least (17)**
33:5;44:1;47:14;
53:1,2;55:17;63:16;
68:4;74:1;80:10;96:1;
113:18;119:20;
123:16;144:13;
146:18;162:19
**leave (6)**
6:7;42:6,7;43:2,3;
72:24
**leaving (2)**
137:11;149:19
**lectern (2)**
40:20;147:21
**Lee (76)**
5:4,9,11;14:25;
25:3;36:23,24;37:9;
38:5,7,12,14,18;39:2,
6,8,11,15;89:19;90:5;
92:1;93:21;95:13,17,
17,22;96:16,21,23,25;
97:3,6,10,12,15;98:2,
4,6,9,13,16,18;99:2,8;
100:16,23;101:7,20,
25;102:15,17,23;
103:10,13,16,18;
104:6,11,15,17;105:2;
107:9,17;108:2,7,9,
11,13;109:1,5,14,16,
19,21;157:1,4
**Lee's (1)**
111:25
**left (2)**
105:21;150:1
**legal (8)**
15:15;29:12;56:13,
14;94:18;99:20;
100:13;108:20
**legally (3)**
12:4;31:18;37:15
**legislation (1)**
153:3

**lender (1)**
107:14
**lengthening (2)**
128:15;154:21
**less (4)**
90:1,1;127:4;
129:11
**less- (1)**
122:14
**letter (3)**
93:13;116:16;151:9
**level (4)**
10:12;24:1;59:17;
155:17
**levels (1)**
159:3
**leverage (4)**
23:9;121:20;
125:22,23
**Levi (1)**
7:8
**liabilities (2)**
87:20;112:22
**liability (3)**
120:13,14;129:10
**liable (5)**
29:14;121:18,23;
122:7;130:13
**lies (2)**
23:17;27:10
**lift (2)**
23:3;28:13
**Lifting (1)**
125:20
**light (6)**
9:9;23:3;24:13;
76:25;102:4,19
**lightly (1)**
20:4
**likelihood (2)**
56:22;130:21
**likely (2)**
127:4;163:1
**limit (2)**
30:11;43:18
**limitation (1)**
114:6
**limitations (4)**
35:1;144:11,15;
145:1
**limited (2)**
52:9;53:7
**limiting (3)**
61:7,11;85:13
**limits (6)**
88:21,22;103:20;
114:25;120:5;122:8
**line (5)**
4:3;19:14;34:9;
48:7;114:19
**linearly (1)**
26:23;28:11
**lines (2)**

58:13;114:4
**link (1)**
93:18
**linked (1)**
13:14
**Lions (1)**
18:23
**liquidate (2)**
30:5;94:13
**liquidated (7)**
32:17;83:25;86:24;
96:6;101:8,15;112:17
**liquidating (1)**
89:9
**liquidation (40)**
26:13;28:2;32:9;
33:21;82:25;83:15,
22;84:17;86:18,23;
87:24;90:12;96:2;
99:4,13,14,18,20;
100:5,9,10,17;101:9,
18;102:7;107:23;
109:2;111:12,14,15;
112:3,12,12;114:1,9;
115:16,21;116:11;
142:22,23
**list (1)**
138:14
**listed (3)**
148:14,20,21
**listen (2)**
40:14;85:23
**listening (1)**
127:18
**lists (1)**
82:5
**litany (1)**
156:3
**litigation (29)**
12:17;20:5;68:15;
77:16,17,18;79:20;
98:9;118:22;123:16,
21,23,24;124:4;
128:22,23,24;129:7,
15,18;130:8;131:15,
16;132:3;142:4,9,25;
143:4,12
**little (28)**
10:7,11;29:1;34:5;
47:10;53:13;56:2;
57:24;59:23;69:22;
70:1;72:1,3;75:16;
79:18,24;80:3,25;
82:2;91:7;93:6;94:6;
123:17;127:3;128:14;
137:3;146:8;162:4
**live (1)**
122:11
**lived (1)**
81:3
**Livermore (3)**
142:20;152:10,15
**loan (2)**

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
181 of 194

107:7,10
**logic (1)**
63:7
**logically (2)**
26:22;28:11
**logistics (1)**
79:20
**London (2)**
8:11;126:21
**long (12)**
9:23;24:17;42:21;
43:16;49:2;64:23;
74:20;80:23;100:25;
117:18;159:11;
162:12
**longer (1)**
42:24
**long-standing (1)**
128:7
**look (34)**
12:4;13:6,13,18;
18:12;46:2;52:21,21;
53:9;55:9;57:21;
69:25;73:1;74:15;
84:9;86:19,19,23;
95:19,23;101:14;
109:7;113:20;116:3;
127:8;135:9;136:18;
139:14;144:7;145:20;
147:20;149:2;153:20;
162:18
**looked (1)**
144:18
**looking (8)**
13:8;60:17;96:20;
131:6;136:24;145:19;
149:23;160:7
**looks (1)**
44:5
**Lopez's (1)**
53:8
**Lord (1)**
144:7
**lost (1)**
79:24
**lot (19)**
9:19,21;12:9;13:15,
18;20:11;30:12;
38:24;48:3;76:14;
84:19;89:12;91:11;
120:25;135:13;153:8,
13;157:20,23
**loud (5)**
20:17;113:14;
141:25;154:23;156:1
**love (3)**
69:5;85:15;119:17
**lovely (1)**
165:13
**Lowenstein (8)**
5:19,21,22,24;6:8,
16;40:22;110:4
**Lucky (2)**

40:15;52:14
**lunch (1)**
43:5
**lurking (1)**
5:9
**Lutheran (2)**
104:2,19
**Luu (2)**
8:10,10
**luxury (1)**
146:12

## M

**magically (1)**
92:22
**magnified (1)**
49:23
**major (1)**
66:20
**majority (1)**
53:2
**makes (18)**
22:18;26:14;29:4;
33:21;51:11;57:10,
16;84:12,15;86:22;
95:16;97:18;102:1;
108:13;116:20;128:5;
131:5;154:16
**making (13)**
10:9,16,22;30:3;
44:13;53:17;60:18;
89:12;98:14;99:20;
115:9;119:1;123:22
**manifestation (1)**
62:3
**manner (1)**
126:2
**mantra (1)**
81:10
**many (10)**
23:23;26:20;37:12;
44:2;61:17;81:11;
123:1,2;141:17;
161:10
**Manz (6)**
44:6,7,10,13,16,18
**Marie (3)**
4:9;67:18;160:4
**Mark (7)**
5:4;7:8;73:21;90:3;
134:5;150:11;163:13
**market (2)**
8:11;145:19
**material (3)**
70:8;114:5;142:16
**math (1)**
149:19
**Matt (2)**
5:4;95:17
**matter (9)**
89:2;96:11;101:15;
110:24;113:7;115:8;

132:8;141:1,20
**matters (6)**
9:10;11:20;67:10;
90:1;97:15,16
**Matthew (2)**
6:25;7:4
**may (85)**
8:22;10:10;11:15;
12:11,11,13,16,16;
13:25;15:10;18:4;
23:7,7,19;26:17;
28:17,17;31:20;
33:10;34:11,11;
35:12,14;37:13,22;
39:17;40:14;41:25;
44:25;45:2;50:3,4,6;
56:8;67:16;70:3,4,15,
15,18,19;71:11;73:9,
10,24;74:13;75:15;
78:17;80:5;82:24;
84:20;91:6;94:7;
96:15,17;103:1;
108:17,19,22,23;
109:1;114:9,10;
115:1,3;122:14,18;
123:5;125:5;128:14;
138:23;140:17;
141:17;142:24;143:6;
144:22;146:2;147:1;
152:14,20;154:17;
156:17;159:20;162:8,
12
**maybe (28)**
17:25;30:14;35:22;
70:7;71:3;77:6;78:23;
79:14;84:11,12;90:1;
92:6;93:18,21;94:12;
95:20;101:20;114:13;
127:3;128:14;136:12,
15;153:5;154:20;
157:2;158:16;164:7,
10
**mean (62)**
14:4;26:23;27:21;
29:14;30:4,7,19;
31:23,24;32:18,19;
38:24;39:20;42:17;
43:2;46:12;47:21,23;
48:12;53:19;54:4;
63:4,7,21;64:14;
68:14;70:7;74:12;
76:5;77:15;79:13;
84:8;88:15;90:11;
92:24;99:16;101:2;
102:13,19;103:2;
106:20;108:16;109:3,
7;114:20;115:23;
116:2;117:12;127:5,
6,7;130:1;131:6;
132:13;138:2;141:3;
144:6;146:10;147:1,
20;156:20;164:12
**meaning (2)**

10:10;141:14
**meaningful (7)**
16:23;87:18;92:8;
94:4;144:12;145:2,5
**means (8)**
27:22;32:2;52:24;
60:15;70:2;102:20;
104:11;106:19
**meant (2)**
75:18;92:25
**meantime (2)**
130:22;162:18
**mechanically (3)**
129:2,16;131:1
**mediate (2)**
29:6;125:16
**mediating (1)**
44:2
**mediation (8)**
17:6,11;19:16;38:8;
125:5,7,7;134:23
**mediator (1)**
8:5
**mediators (1)**
17:12
**meet (4)**
110:11;111:2,18;
154:12
**meets (1)**
113:13
**members (2)**
17:9;101:17
**memory (2)**
24:19;27:18
**mention (1)**
27:17
**mentioned (10)**
22:21;25:1;46:16;
56:17;57:8;68:4;
71:19;118:7;147:25;
153:22
**mere (1)**
105:6
**met (2)**
22:9;110:16
**method (1)**
151:8
**methodology (1)**
140:8
**metrics (1)**
74:8
**Michael (1)**
37:3
**middle (2)**
116:18;148:20
**might (27)**
21:3;22:22;29:21;
50:18;54:21;55:22;
56:18;58:25;59:1;
64:15;65:7,19,25;
70:1;79:12,17,17;
96:14;100:8;137:3,4;
145:14;149:24;

156:17,18;160:20,20
**milestone (1)**
17:20;84:24;88:11;
92:6,7;93:16;96:10;
107:3,13;145:11;
148:15,20,22;149:9
**millions (1)**
27:12;130:10
**mind (13)**
10:19;14:6,7;52:12;
65:3;68:14,21;78:18;
79:14;85:12;89:22;
156:12;161:9
**minded (1)**
147:21
**mindful (1)**
13:20
**minds (1)**
13:2
**minimum (1)**
30:15
**minister (6)**
104:19,23,24;
105:5,10,14
**ministerial (2)**
104:8,12
**minors (1)**
16:14
**minus (1)**
86:25
**minute (4)**
55:24;73:1;89:15;
156:14
**minutes (7)**
14:8,9,11;15:1;
42:22;117:18;159:13
**misleading (6)**
26:17;140:3;
142:14,18;143:21;
145:17
**miss (1)**
60:13
**missing (1)**
26:16
**mission (6)**
16:1;21:12;105:13,
20;106:5;112:20
**missions (1)**
103:25
**mistake (1)**
18:24
**mistakenly (1)**
19:1
**mix-up (1)**
69:22
**modify (1)**
136:25
**moment (7)**
31:23;63:16,18;
101:22;121:17;
124:22;157:8

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
182 of 194

**Monday (2)**
157:10;162:9
**monetize (1)**
128:24
**money (13)**
23:12,14;61:15;
102:2,5,8;110:17;
111:24;120:24;
148:15,19;149:4,10
**monies (1)**
64:21
**Montali (3)**
43:23;76:22;91:8
**month (2)**
10:2;17:21
**months (4)**
15:22;28:21;51:10;
125:16
**Moore (103)**
5:4,4;25:3;73:21,
21;74:3,6,8,10,18,22;
75:1,3,6,8,11,13;
89:19;90:3,3,10,17,
21,25;91:2,6,9,11,17,
20,22,24;92:18,23;
93:1,6,9;94:15;95:7,
10,13,15;100:2;
126:14,19,22;127:10,
16;128:10,16,21;
129:24;130:3,8;
131:9,13,15,19,22;
132:10,12,16,19,21,
24;133:5,7,9,12;
136:23;137:2,5,7;
150:11,11,14;153:13;
154:14,22;155:1,3,6,
10,13,16,20;158:2,5,
7,9;161:11,14;162:3,
8,12,15,17,24;163:4,
8,10,12;164:7
**more (69)**
11:13;12:14;20:15;
23:11,16;32:1;33:19;
34:1;35:19;36:8,13;
43:1;49:9,21;57:24;
58:6;62:21,25;63:25;
64:15;71:25;72:3;
73:2,4,6,17;77:22;
79:21;82:2;83:3;
84:19;86:22;89:17;
90:14;91:7,11,13,13;
92:24;93:6;94:5;95:5;
105:6;106:24;107:25;
108:24;111:5;113:1,
17;116:8;117:6;
118:19;120:6;121:8;
122:7;125:24;127:3;
128:14,19;140:17;
141:6,20;146:20;
150:20;152:6;154:18,
20;164:7;165:10
**Moreover (1)**
49:1

**morning (20)**
5:16;6:15,18,21;
7:4,7,13,16,8:10,13;
15:8,8,9;68:4;119:12,
19;120:16;157:24;
158:24;164:3
**mortgages (1)**
107:11
**Moses (70)**
5:8,13;25:3;52:1,2,
6,18;53:12,25;54:2,5,
9,11,14,23;55:2,4,6,
21,23,25;56:5,7,12;
57:15,18;58:1,3,7,9,
15,18;59:21,23;60:4,
7,10,15,20,22,25;
61:2,9,25;62:7,11,13,
20,24;63:3,9,11,14;
64:2,8,10,12,15;65:4,
7,9,12,15,22,25;66:4,
6,13,15,17
**most (16)**
40:14;54:21,25;
68:12;76:19;87:18;
116:20;119:10;122:9;
123:25;124:21;
125:16;139:11;
142:16;144:12;145:1
**motion (15)**
8:16;12:12;14:5;
15:13,14;24:16,18;
26:4;37:1,3,5,12;
39:9;77:21;87:20
**motions (2)**
15:13;136:12
**motive (1)**
123:25
**move (6)**
19:5,6;27:1;84:14;
113:5;156:2
**moved (1)**
164:20
**moving (6)**
81:15;82:11;
109:11,12;147:9;
161:16
**much (34)**
4:15;8:7;9:6;10:14;
15:7;21:13;30:3;
36:11;40:13;41:12,
19,21;43:11;44:17;
51:25;68:24;69:19;
81:3;92:17;94:5,17;
104:10;107:25;
115:12;116:8;117:17;
121:14;126:16;130:9;
139:17;147:2;155:23;
159:17;165:16
**multiple (1)**
153:24
**multiplicity (1)**
151:3
**must (2)**

95:4;133:14
**myself (7)**
6:10;74:13;78:4;
79:19;114:14;121:4,
14

## N

**nailed (1)**
30:22
**name (2)**
6:4;100:24
**narrowing (1)**
65:7
**National (1)**
101:4
**natural (1)**
123:22
**nature (4)**
55:18,21;102:17;
152:3
**ND (1)**
43:22
**nearly (1)**
17:2
**necessarily (5)**
10:19;65:16;
108:18;132:2;149:23
**necessary (4)**
11:6;112:23,24;
129:16
**need (58)**
10:25;11:13,14;
13:19,19;14:8;22:6,7;
23:1;25:2;30:17,18;
31:1,4,10;32:1;34:16;
35:19;42:18;43:5;
44:20;58:12;59:10;
62:18;66:21;80:25;
81:25;83:2,20;89:10;
90:14;91:7,25;92:3,9;
93:2,6;96:7,9;108:4;
113:5;136:25;138:23;
145:5;149:4,15;
150:5;152:4,6;
153:20;154:24;155:1;
156:3,8,12;163:1;
164:2;165:4
**needed (4)**
80:3;89:6;125:16;
128:22
**needs (12)**
16:2;21:11;62:15;
64:3;66:9;81:12;84:1;
85:13;134:1;140:13;
145:8;155:3
**nefarious (2)**
18:8;26:21
**negotiations (1)**
9:24
**neither (1)**
161:6
**neutral (1)**

73:19
**New (4)**
46:19;148:21,24;
159:4
**news (2)**
35:22;36:5
**Newsome (2)**
20:21;134:25
**next (7)**
59:15;66:13;67:9;
74:19;117:8;153:9;
155:10
**Nice (3)**
5:13;7:10,13
**nine (1)**
56:25
**nineteen (1)**
15:22
**ninety (1)**
111:5
**ninety- (3)**
56:24;57:11;140:4
**ninety-eight-million (2)**
151:21;152:5
**Ninth (6)**
45:20;70:11;82:3,8;
100:20,25
**nobody (1)**
43:24
**Nobody's (1)**
99:14
**nominal (2)**
129:19,21
**nominally (1)**
124:15
**nonabuse (3)**
98:9;142:4,9
**nonbankruptcy (1)**
96:7
**nonconsensual (3)**
50:15;125:4,4
**non-consensual (1)**
24:8
**noncovered (1)**
124:11
**non-debtor (3)**
16:21;27:11;47:1
**none (4)**
18:7;37:11;108:13;
134:18
**nonetheless (2)**
19:12;83:12
**noninsider (2)**
97:24,24
**nonprofit (3)**
30:6;83:14;89:9
**nonrecourse (1)**
122:3
**nonsettling (4)**
20:6;119:4;120:6;
122:23
**noodling (1)**
146:7

**noon (2)**
161:19;164:10
**nor (5)**
21:4;24:1;109:10,
10;161:6
**normal (1)**
125:22
**Northern (1)**
46:19
**note (10)**
6:24;15:12;23:2;
43:15,19;44:10;
47:13;48:17;66:24;
126:21
**Noted (1)**
117:2
**notice (5)**
37:7,9,16;62:5;
111:8
**notices (1)**
57:3
**noticing (1)**
162:5
**notion (8)**
11:9;12:8;27:14;
28:18;47:22;48:6;
59:20,25
**notwithstanding (1)**
113:17
**November (1)**
19:17
**number (37)**
4:3,4;28:22;30:23;
37:5;39:19;50:5,14,
20,23;56:15;64:12;
87:2,3,22;88:10;95:2;
96:4;106:9;109:6,19;
120:3,3;121:10;
130:16;140:4,10,14;
141:16;143:22;
144:22,24;146:3;
149:17;152:5,18,19
**numbers (5)**
79:7;92:10;130:4;
149:16,21

## O

**OAKLAND (8)**
4:1,4;5:6;16:4;
17:18;21:10;107:10;
151:23
**oar (1)**
159:5
**object (2)**
41:5;132:5
**objection (34)**
21:13,19;22:10,21,
24;23:7,7,22,25;
40:24;41:18;45:3,7,7,
25;48:25;50:3;66:6;
80:7;99:12;109:25;
113:6;118:3,6;

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page 183 of 194

126:17;127:19;134:9;
135:16;141:20;
143:19;160:13,14,21;
161:2
**objections (19)**
21:17;22:12,18;
23:23,24,24;24:2,18,
20,22,23;30:20;
37:10;64:13;69:1;
76:20;134:22;149:25;
151:14
**objects (2)**
21:24;24:7
**obligation (3)**
30:7;66:7;103:3
**obligations (1)**
19:19
**observation (3)**
20:15;29:8;30:19
**observed (1)**
27:4
**obviously (13)**
40:2;43:5;66:24;
75:11;77:16;83:18;
99:9,12;101:2;
129:17;131:8;152:22;
153:19
**occurred (3)**
37:18,18;68:18
**o'clock (2)**
163:24;164:10
**off (17)**
8:20;20:4;36:13;
45:4;81:5;88:21,22;
96:2;103:11,13;
107:12;117:13;118:8;
123:11;149:1;160:9,
12
**offending (1)**
80:14
**offer (4)**
46:4,5;68:11;
109:10
**offeree (1)**
46:3
**offers (1)**
88:13
**officer (1)**
4:13
**offset (7)**
35:11,17;80:8,15;
130:12;131:2,4
**offsets (1)**
35:1
**offsetting (1)**
80:1
**often (1)**
125:14
**old (2)**
49:3;101:11
**omission (1)**
146:10
**omitted (4)**

142:19;145:23;
146:14;152:17
**Once (1)**
13:16;29:3;71:8
**one (93)**
8:4;10:21,25;11:24;
14:6;15:24;17:17,22;
18:23,24;22:11,12;
23:12;24:14,15;
26:14;27:16,17;
29:11;31:6;33:6;
34:23;39:17;42:1;
43:15;44:22;47:11;
48:13;52:2,11,20,21;
53:1;56:19;57:1,10;
58:21;59:4;61:12;
63:4,6,8;66:22;67:16,
24,25;68:18;70:16;
71:20;72:22;73:18,
23;75:21;78:5;82:24;
83:7;85:8;89:12,17;
91:12;95:24;96:19;
101:9,12;104:1;
109:12,23;113:7,21;
116:22;121:10;
124:23;127:1;131:6;
134:16;135:1;140:4;
141:3,16;143:22;
144:5,11;145:1;
146:10;147:6;150:15,
17;152:5;156:13;
159:8;160:18;162:21;
165:10
**onerous (1)**
54:21
**ones (4)**
68:15;72:24;73:4;
123:3
**one's (3)**
70:16;85:7;132:13
**only (21)**
40:4;52:24;56:9;
63:23;83:7;95:2;
102:5;107:13;111:2,
9;112:18,25;119:19;
124:15;125:12;
129:20,21;137:10;
143:23;145:24;
157:16
**oOo- (1)**
4:2
**open (10)**
42:7;52:11;59:19;
72:24;146:9;147:20;
157:9,13,17,25
**opening (6)**
8:17;14:11;25:11;
53:8;111:17;127:1
**opinion (3)**
47:9;88:20,23
**opinions (2)**
88:17;144:23
**opportunity (14)**

27:7;93:12;94:4;
99:25;104:3;114:16;
115:17;126:6;135:15;
138:18;146:4;147:8;
153:18,21
**opposed (3)**
29:7;64:1;120:3
**OPS (1)**
68:19
**opt (2)**
45:10;53:5
**optimal (1)**
164:9
**opt-in (8)**
42:2;44:24;52:23;
53:18,19;54:15;
60:24;63:13
**option (25)**
20:5;79:20;97:4,6;
118:22;123:16,21,23;
124:4;128:23,23;
129:7,16,18;130:23;
131:15,19;132:3,21;
142:25;143:1,4,4,11,
12
**options (2)**
52:9;109:6
**opt-out (21)**
24:7;42:2;44:24;
45:9,13,21;49:18,21;
52:22,22;53:3;54:15;
55:10,13;57:10;
58:24;59:6;62:17;
63:15,16,19
**Oral (1)**
163:7
**oranges (1)**
35:15
**ordained (1)**
104:23
**order (15)**
23:16;26:8;39:13;
44:21;55:1;58:12;
107:19;109:1;120:16;
121:4;139:25;140:20;
150:19;154:12;165:9
**organization (1)**
101:3
**organize (1)**
14:7
**original (1)**
103:2
**others (7)**
68:22;80:2;96:15;
121:21;128:20;144:3;
159:20
**otherwise (7)**
36:13;44:22;45:24;
70:2;114:7;132:9;
133:17
**ought (9)**
13:12,18;31:15;
70:25;73:11;78:22;

109:12;136:20;
162:23
**ourselves (1)**
155:6
**out (53)**
9:13;10:5,11,18;
11:23;13:6,7,11;
18:19;23:14,18;
27:14;28:13,19,23,24;
29:21;33:19;34:5;
46:18;47:6;52:13;
53:6;55:9,10;56:24;
62:24;73:2;74:6;
76:23;81:1;84:4;92:5;
94:21;95:6;100:4;
107:7;108:18;113:16;
118:6;119:12,23;
120:8;123:10;130:21;
131:23;138:24;
145:13;150:19;
151:15;154:22;
156:21;157:7
**outcome (3)**
122:15;129:6;
151:19
**outed (1)**
157:4
**outlined (1)**
39:8
**out-procedure (1)**
45:10
**outset (1)**
44:14
**outside (5)**
47:2;102:3,3;145:8,
15
**outsiders (1)**
149:23
**out-the-door (1)**
161:10
**over (19)**
15:3;18:25;24:15;
38:3;39:23,24;79:21;
82:24;87:18;93:21;
105:8;107:4;149:24;
151:25;153:9;155:10;
162:8
**overall (1)**
72:20
**overlook (1)**
49:25
**overlooked (1)**
23:21
**overstate (1)**
69:17
**overwhelming (1)**
53:2
**own (10)**
14:7;24:14;50:24;
67:13;77:10;80:3;
105:12;115:21;
131:20;137:2
**owning (1)**

29:16

**P**

**Pacific (1)**
7:25
**package (1)**
45:12
**page (6)**
119:3;120:3,3,5;
148:10;153:2
**pages (1)**
120:2
**paid (5)**
12:23;123:15;
129:15;130:15;
151:24
**panel (1)**
159:2
**papers (8)**
33:4;41:8;45:7,20;
53:14;112:16,19;
127:4
**paradigm (1)**
84:15
**paragraph (2)**
71:2;116:12
**parcel (1)**
94:15
**parish (3)**
148:22;149:3,10
**parishes (4)**
148:16,18,25;149:9
**parishioners (2)**
16:3;112:13
**Parochial (1)**
17:18
**part (21)**
10:14;12:24;20:3;
26:9;30:4;32:5;42:3;
49:14;62:16;74:3,22;
94:15;95:4,11;118:3;
125:18;129:13;133:4,
15;148:19;152:21
**participate (3)**
47:19;48:24;163:15
**participated (2)**
58:22;59:4
**participating (2)**
41:19;70:15
**particular (12)**
20:10;30:20;37:15;
56:19;73:6;78:13;
104:1;106:19;112:7;
125:6;139:25;144:21
**particularity (2)**
78:21,23
**particularly (2)**
79:20;153:25
**particulars (1)**
46:10
**parties (16)**
13:19;15:21;20:22;

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
184 of 194

23:14;25:6,7;29:4;
38:24;45:24;46:25;
70:3,4,6,9;82:4;126:7
**parties' (1)**
125:2
**partner (4)**
6:4;7:15;8:1;25:4
**partners (3)**
4:18;25:2,4
**parts (1)**
4:18
**party (4)**
45:16;81:18;
129:19,21
**pass (1)**
27:19
**passionately (1)**
12:2
**past (1)**
34:18
**patent (1)**
109:19
**patently (10)**
22:19;23:25;33:22;
35:10;65:13;90:6;
98:19,19;108:13;
110:10
**path (2)**
28:20;50:24
**pause (4)**
18:4;54:8;89:15;
109:23
**paved (1)**
92:1
**pay (27)**
17:21;21:2;23:12,
18;27:8,13;28:5;
29:16,17;31:4,6;32:6;
47:25;64:21;101:9,
15;102:4,8,18,19;
107:12,14;130:1,24;
140:17;141:4;151:2
**paying (6)**
35:13;59:3;85:4;
107:6,13;120:24
**payment (4)**
16:23;31:2;107:6;
130:14
**payments (3)**
107:2,15;149:14
**pays (2)**
19:14;131:4
**pencil (1)**
159:21
**pennies (2)**
85:4;92:7
**penny (1)**
31:12
**people (19)**
10:9,13,15;11:21;
12:2;20:11;39:21,25;
40:6;43:1;46:12;
61:22;70:1;73:7;

103:6;116:3;127:6;
135:22;136:19
**per (2)**
17:21;96:2
**percent (4)**
15:4;111:5;130:2;
161:22
**perfectly (3)**
10:20;40:14;78:17
**perhaps (2)**
106:23;156:18
**period (3)**
107:5;114:10;161:5
**permitted (1)**
83:16
**permitting (1)**
45:20
**person (3)**
17:11;32:23;143:17
**personal (1)**
96:22
**personify (1)**
105:9
**perspective (5)**
32:12;45:14;74:15;
132:10;154:8
**persuasive (1)**
48:15
**pertinent (1)**
113:22
**PG&E (1)**
76:20
**phase (5)**
97:13;99:15,17;
100:4,6
**phonetic (3)**
6:3;44:6;121:12
**phrase (2)**
129:19;133:18
**pick (4)**
32:4;51:16;83:9,23
**picks (1)**
88:3
**picture (2)**
80:24;124:15
**piece (10)**
12:1,1;29:12,22;
30:24;46:25;82:23;
106:6,7;137:3
**pieces (1)**
29:11
**pin (2)**
80:20,22
**place (4)**
20:10;47:21;132:9;
150:19
**places (2)**
142:20;143:6
**places- (1)**
116:22
**plain (1)**
23:11
**plan (163)**

10:8,9;11:2;16:6,8,
20,22;17:13;19:13,22,
25;21:1,2,8,15;22:7,
18;23:1,7,9,17,24;
26:10,11,14,18;27:22,
24;28:22;32:18;33:7,
7,22;34:17;35:10,12;
36:5;37:19;41:6;44:2,
4;45:14;46:23;47:1,2,
6,20;49:1,5,6,7,17,20;
50:15,17;51:12;53:5;
55:13;61:20;64:20;
66:11,13;67:3;69:20;
70:18;75:15;82:4,8;
83:8,12;84:6,12,16,
17,20;85:8;86:15,19;
87:8,11,17,21,23;
92:5;93:3,23;95:4;
97:4,7,18,21,23,23,
24;98:16,18,21,23;
100:8;106:21,23,25;
107:2,6;108:13,21;
110:10;111:4,6,17,20;
113:8,12,12,15;114:9,
18;118:7,22;119:1,2,
4,7;120:1,4;121:14,
17,17;122:10,19,22,
25;123:4,10,18;
124:19;125:3,4;
127:14,20,25;128:6,
12;129:12;130:14;
131:25,25;132:3;
133:16;135:25;
140:22;143:8;150:16,
17,18;152:1,9,24;
153:1,4,17;161:7;
162:4
**planet (1)**
106:7
**planner (1)**
66:8
**plans (7)**
16:24;53:22;54:6;
74:13;122:12,14;
123:25
**plan's (1)**
113:16
**play (5)**
10:11;13:15;29:21;
77:22;96:8
**playing (1)**
29:5
**plays (3)**
47:6;95:6;131:2
**pleadings (2)**
27:17;144:6
**please (7)**
4:6;8:21;15:10;
25:2;43:14;116:25;
117:23
**pleases (1)**
14:10
**pleasure (1)**

165:15
**pledge (1)**
151:22
**PLEVIN (23)**
7:7,11;133:25;
134:4,5,5,11,15,18,20,
25;135:4,12,19;
163:13,13,17,19,22;
164:17,19,23;165:6
**plus (1)**
151:23
**pm (8)**
43:13,13;117:20,
20;159:18,18;165:2,
17
**point (66)**
10:5;13:9;16:6;
18:4,12;25:22,22;
26:3;31:9,15,21;
32:14,16;40:3;46:15;
52:2,12,19;55:16;
56:9,24;57:10,16;
58:16,21,24;59:15;
61:2,4,6,19;66:20;
76:21;77:1,16;78:24;
79:7;84:10;86:8;
89:11;93:23;94:4;
99:19;106:21;108:22;
111:16;120:1;121:12;
122:17;123:8,11,12,
12;124:6;129:18;
130:11;131:22;136:6;
139:3;149:13;150:22;
151:16,17,17;154:2;
163:13
**pointed (2)**
119:12,23
**points (8)**
20:22;34:1;51:16;
67:14;90:24;119:18;
128:17;147:6
**policies (2)**
19:20;122:23
**policy (3)**
122:8;128:7;144:19
**policyholder (2)**
124:8;133:14
**pool (2)**
140:16;149:8
**poor (3)**
16:3;22:23;85:4
**portion (2)**
113:24;124:3
**position (17)**
24:9;31:25;32:4;
45:22;46:1;60:18;
87:1;88:13;100:19;
106:14;107:21;108:3,
21;113:25;141:4;
151:10;154:19
**positions (1)**
117:1
**possibilities (2)**

131:7;146:10
**possibility (5)**
13:20;42:13;72:24;
73:8;136:22
**possible (6)**
52:24;74:10;98:20;
100:7;145:12;156:19
**possibly (1)**
94:13
**post (1)**
38:11
**post- (1)**
55:15
**post-confirmation (2)**
20:14;66:7
**Post-effective (1)**
38:11
**post-judgment (1)**
120:9
**potential (1)**
78:20
**potentially (7)**
27:8;52:10;110:11;
114:21;122:7;123:18;
127:22
**power (5)**
105:14;124:5;
125:10,18;126:3
**powerful (1)**
122:9
**powers (1)**
78:20
**practice (1)**
38:8
**practicing (1)**
15:1
**pre- (1)**
112:19
**precedent (1)**
53:20
**precise (2)**
79:23;127:3
**precisely (2)**
72:4;152:12
**precision (3)**
90:14;91:7,14
**precludes (1)**
115:4
**predated (1)**
12:15
**predict (1)**
43:15
**predictable (1)**
125:5
**prefer (2)**
26:17;146:13
**preference (2)**
17:3,4
**prefers (1)**
24:15
**prejudice (1)**
119:8
**prejudiced (1)**

Case: 23-40523      Doc# 2094-9      Filed: 06/25/25      Entered: 06/25/25 15:09:50      Page
185 of 194

119:2
**preliminarily (1)**
63:24
**premature (1)**
100:3
**premised (1)**
21:14
**prepare (1)**
137:2
**prepared (5)**
10:8;44:25;68:6,9;
74:19
**pre-petition (1)**
68:20
**presence (1)**
106:2
**present (3)**
14:5;80:2;152:15
**presentation (8)**
6:23;40:3;81:2;
108:19;126:19;
127:13,19;159:3
**presented (2)**
145:5;148:3
**presenting (2)**
4:16,17
**presently (1)**
41:6
**presents (1)**
60:19
**preserve (1)**
121:23
**preserving (1)**
119:4
**presses (1)**
12:25
**pretty (5)**
23:8;48:15;74:23;
157:9,25
**prevailed (1)**
43:20
**prevent (4)**
16:13;28:4;38:14;
112:13
**preview (2)**
80:17;156:17
**previous (1)**
152:25
**previously (2)**
17:1;74:23
**primarily (1)**
16:5
**primary (1)**
45:7
**prime (1)**
45:1
**principal (2)**
45:3;50:3
**principle (8)**
57:21;59:11;61:7;
79:4,9;85:13;95:1;
102:25
**principled (3)**

30:16;88:13;113:25
**principles (6)**
12:21;46:20;47:15;
61:11;108:5;113:23
**prior (4)**
17:19;53:21;93:2;
153:2
**priority (2)**
28:2;83:13
**privilege (1)**
96:23
**pro (1)**
129:4
**probably (25)**
10:1;13:8;20:23;
24:17;26:4;29:10;
31:24;38:23;42:10,
10,12;44:2,3;79:21,
22;80:14;91:12;94:1;
119:11;121:16;
125:16;127:4;128:17;
131:11;134:7
**problem (15)**
15:6;27:3;73:25;
87:6;93:19;114:21,
22;119:15,23;120:22,
25;122:17;135:5,6;
142:2
**problematic (1)**
89:2
**problems (4)**
12:8;25:19;36:7;
124:22
**procedural (1)**
56:7
**procedurally (1)**
51:20
**procedure (2)**
45:9;56:3
**proceed (11)**
14:4;24:13,21;
38:21;67:14,15;69:1;
81:8;125:23;132:24,
25
**proceeded (2)**
111:10;132:9
**proceeding (1)**
29:18
**proceedings (4)**
37:17,20;66:25;
165:17
**proceeds (2)**
101:9;128:25
**process (26)**
9:18,19,22;10:3,17;
11:4,5,6;13:22;16:11;
17:8;48:24;70:15,18;
73:16;82:4;100:11;
109:9;110:25;112:20;
114:13;119:13;
122:10;125:18;
141:21;152:23
**production (1)**

17:15
**professionals (1)**
17:21
**program (1)**
144:10
**progress (2)**
9:12;51:12
**progression (1)**
44:21
**prohibit (1)**
154:9
**prohibits (1)**
105:16
**projected (1)**
24:6
**Prol (28)**
6:7,10,15,15;40:21,
21,24;41:9,11,13;
50:9;110:1,4,4,7,9,15,
20,23;111:20;115:13,
15,19,21,24;116:1,4,8
**prologue (1)**
34:18
**prominent (1)**
77:22
**promise (2)**
42:9;163:2
**promotion (1)**
5:22
**prompt (1)**
154:18
**promulgation (1)**
82:4
**prongs (1)**
16:6
**proof (2)**
58:12;63:22
**properties (1)**
107:11
**property (12)**
27:8;30:24;79:12;
84:24;102:13,15,16;
105:19;115:2,3,5;
142:20
**proponent (6)**
10:8;31:16;33:8;
47:5;67:3;93:4
**proponents (1)**
11:18
**proposal (1)**
70:17
**propose (3)**
16:8;19:13;106:21
**proposed (11)**
21:15;29:2;33:21;
38:8;39:13;41:5;
62:20;106:23,25;
142:12;150:16
**proposes (1)**
37:25
**proposing (3)**
41:16;45:15;92:5
**proposition (2)**

97:1;112:16
**protect (1)**
94:25
**protected (3)**
70:19;83:13;130:22
**protection (3)**
16:14;32:8;83:6
**protections (6)**
28:1,4,9;83:7,11;
89:13
**protects (1)**
105:11
**protocol (1)**
74:4
**protocols (1)**
104:20
**prove (1)**
100:5
**provide (13)**
15:24;91:3;92:3,9;
93:6,12,13;94:3;
103:3;115:5;124:8;
147:24;148:5
**provided (5)**
65:22;66:1;83:11;
129:6;151:7
**provides (5)**
19:15;21:8;28:1;
35:13;82:3
**providing (3)**
19:20;86:17;150:20
**provision (4)**
20:19;80:15;120:8;
122:22
**provisions (2)**
20:5;118:21
**public (1)**
128:7
**publicly (1)**
151:13
**punishing (1)**
105:5
**punt (1)**
88:4
**punting (2)**
88:8,15
**purchase (1)**
70:24
**Purdue (7)**
24:9;53:15,19;
54:16,17;120:15,15
**purely (1)**
59:12
**purport (1)**
21:4
**purpose (8)**
10:20;33:11;102:2,
6,10,21;108:4;149:22
**purposes (11)**
13:13;25:12;29:25;
31:4;32:1;65:2;86:9;
99:2;101:16;115:7,8
**pursuable (1)**

78:15
**pursuant (2)**
21:6;75:14
**pursue (6)**
61:17;78:16;
122:20;123:2;128:24;
132:1
**pursuit (1)**
15:23
**pushed (1)**
19:1
**put (23)**
11:12;22:17;24:15;
33:4;46:9;63:1;66:10;
73:12;75:13;76:22,
23;80:20;86:23;92:4;
99:24;115:16,21;
136:17;137:5;142:8;
151:8;152:13,18
**puts (2)**
116:11;140:5
**putting (3)**
54:20;67:11;92:5

## Q

**quasi-ruling (1)**
113:3
**quibble (1)**
84:14
**quick (3)**
15:12;52:2;70:13
**quickly (1)**
66:24
**quiet (1)**
43:25
**quite (4)**
9:10;12:7;100:25;
149:11
**quote (1)**
105:3
**quoted (1)**
118:19
**quoting (1)**
122:22

## R

**raise (4)**
56:21;64:24;
111:24;118:1
**raised (6)**
62:14;63:24;
109:19;127:20;
128:18;142:25
**ramifications (2)**
28:6;143:2
**ramps (1)**
96:2
**rare (1)**
5:22
**rata (1)**
129:4

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
186 of 194

**rate (1)**
113:5
**rather (2)**
116:9;139:15
**rationale (4)**
18:1;30:10;103:3,4
**RCBO (3)**
73:22;90:4;150:12
**RCC (1)**
44:14
**RCWC (1)**
44:14
**re (3)**
13:4;86:24;115:5
**reach (4)**
17:3,9,12;114:16
**reached (3)**
19:16;75:11;134:23
**react (1)**
94:11
**reacted (1)**
103:4
**reaction (1)**
116:14
**read (12)**
40:2;41:8;48:4,14;
81:19;94:22;104:11;
105:3;111:25;116:10,
25;141:25
**reader (1)**
116:9
**readers (1)**
142:8
**readily (1)**
77:7
**ready (4)**
14:20;68:10,17;
72:8
**real (15)**
32:13;84:24,25;
85:3,6;86:25;93:15;
106:6,7;107:1,10,19;
112:8;119:15;124:12
**realignment (1)**
112:20
**realistic (2)**
73:3;146:20
**reality (4)**
10:14;32:19;77:5;
114:19
**realize (1)**
69:18
**realized (1)**
122:11
**really (26)**
10:25;11:13;21:14;
22:11;23:23;28:13;
29:13;47:22;52:19;
55:7;57:22;58:15;
63:23;64:3;66:9;
68:14,21;73:1;79:21;
94:2;96:9;112:11;
113:6;127:24;149:7;

159:9
**reason (12)**
26:15;37:16;45:12;
74:22;100:6;107:24;
109:11;112:6;135:7;
137:10;140:15;142:5
**reasonable (1)**
144:8
**reasonableness (1)**
145:18
**reasonably (1)**
121:22
**reasons (13)**
19:12;26:14;28:23;
30:7,22;51:9;78:17;
87:7,22;113:9;123:1;
150:16,17
**recall (1)**
136:11
**receipt (1)**
123:22
**receive (2)**
67:21;106:2
**received (1)**
35:12
**receiving (1)**
86:19
**recently (1)**
23:12
**Recess (3)**
43:13;117:20;
159:18
**recipients (1)**
66:2
**recitation (1)**
112:1
**recognition (1)**
161:5
**recognize (1)**
62:2
**recognized (2)**
85:11;151:11
**recognizes (1)**
56:1
**Recognizing (1)**
37:21
**recollection (1)**
13:4
**reconciliation (1)**
16:15
**record (2)**
10:22;160:1
**recover (2)**
120:16;121:4
**recoveries (1)**
131:20;145:8
**recovering (1)**
120:5
**recovery (6)**
35:2;145:12,15,18;
146:2,3
**red (2)**
120:2,5

**redistributed (2)**
129:13;130:17
**redo (1)**
109:1
**refer (1)**
47:14
**reference (5)**
111:6;127:12;
145:8;151:17,17
**referenced (1)**
145:7
**references (1)**
56:20
**referred (1)**
144:25
**refine (2)**
133:9;138:19
**reflective (1)**
135:14
**refusal (2)**
121:24;122:16
**refuse (1)**
122:1
**refusing (1)**
121:19
**regard (6)**
55:6;61:3,5,5;
111:11;112:9
**regarding (8)**
24:20;27:13;65:18,
23;118:22;151:21;
152:18,25
**regret (1)**
19:10
**regulated (1)**
101:4
**reject (3)**
45:14;49:17;111:6
**rejections (1)**
11:22
**rejects (1)**
49:20
**related (5)**
9:12;37:17;117:8;
150:20;160:18
**relates (2)**
22:23;120:21
**Relations (1)**
101:5
**relationship (1)**
27:10
**relatively (3)**
69:21;79:22;152:20
**release (30)**
26:12;42:2;44:24,
24;45:8,16,25;46:1;
49:7,14;55:12,13,19;
56:5;63:5;66:2;69:23;
70:10;71:2;72:3;
81:17,19;88:2;90:2;
91:3;120:12,21;
121:6;122:6,9
**released (4)**

70:5;81:24,24;
90:15
**releases (9)**
24:7;45:21,23;46:6;
70:12;90:13;121:1;
127:21,23
**relentless (1)**
43:20
**relevance (1)**
53:12
**relevant (2)**
11:15;57:22
**relied (1)**
46:17
**relief (4)**
12:12;71:9;72:2;
73:6
**religious (7)**
31:4;101:2;103:24;
105:12;111:22;112:9;
150:19
**rely (2)**
93:17;135:7
**relying (1)**
99:21
**remainder (1)**
129:13
**remains (1)**
17:4
**remark (1)**
139:18
**remarks (2)**
22:21;134:21
**remember (2)**
57:20;65:14
**Remind (2)**
157:7;161:14
**reminds (1)**
77:8
**removed (1)**
28:6
**reorganization (1)**
70:18
**reorganize (1)**
16:1
**reorganized (1)**
107:4
**reorganizes (1)**
21:10
**rep (2)**
24:16;26:4
**repeat (1)**
95:17
**repeated (1)**
21:22
**repeatedly (4)**
15:24;16:18;17:16;
20:1
**replace (2)**
30:6;32:17
**reply (2)**
22:15,16;45:17;
100:21;136:13;

160:13
**report (1)**
140:8
**reporting (1)**
66:8
**repose (1)**
13:17
**represent (2)**
44:14;122:13
**representation (3)**
38:19;59:18;151:4
**representative (8)**
15:15;37:4;38:1;
41:17,20;60:2;
141:23;154:1
**representatives (1)**
41:1
**represented (3)**
56:25;57:12;60:12
**representing (3)**
38:19,20;121:21
**represents (1)**
15:20
**request (5)**
4:18;9:9;19:6;71:8;
82:11
**requested (1)**
17:16
**requests (2)**
71:9;154:16
**require (4)**
12:14;61:22;112:7;
114:24
**required (8)**
17:12;25:21;54:15;
63:13;87:4;121:25;
141:1;152:11
**requirement (3)**
49:21;95:24;106:19
**requirements (6)**
21:7;22:9;39:1;
97:16,19;113:13
**requires (2)**
53:18;124:7
**Requiring (1)**
105:4
**rereading (1)**
146:8
**reservation (2)**
78:19;124:9
**reserve (5)**
98:13;129:3,11;
135:22;142:9
**reserved (4)**
129:8,25;130:16,23
**reserves (1)**
130:6
**resist (1)**
78:3
**resolution (6)**
17:9;19:5;27:19,20;
29:3;92:2
**resolvable (1)**

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page 187 of 194

113:7
**resolve (6)**
35:23;55:7;80:11;
130:13;133:3;155:13
**resolved (5)**
27:2;91:13;125:14;
128:13;129:16
**resolves (1)**
46:24
**resources (1)**
70:4
**respect (16)**
27:10;40:18;47:12;
72:2;88:19;114:25;
120:8;121:18;125:12,
13,21;140:12;141:19;
142:13;143:3;156:2
**respectful (1)**
96:7
**respectfully (1)**
125:2
**respond (15)**
45:11;46:4,4;47:23;
48:6;53:6;55:14;59:2;
60:5;100:1;126:18;
127:24;135:10;136:2;
147:9
**responding (2)**
57:5;126:14
**responds (1)**
135:16
**response (3)**
66:21;110:12;
136:12
**responses (2)**
64:6;69:2
**responsive (2)**
99:5,6
**rest (4)**
130:16,25;157:18;
158:19
**restricted (2)**
101:23;102:17
**restricts (1)**
102:9
**result (11)**
20:15;41:3;46:21;
53:20;54:7,16;61:18;
113:22,25;125:5,17
**results (1)**
119:7
**retain (1)**
105:4
**retaliation (2)**
104:17,22
**retention (1)**
40:25
**retire (1)**
6:5
**retort (1)**
25:21
**return (6)**
46:8;137:25;144:3,

5,8;158:16
**returned (1)**
59:19
**returning (2)**
59:6;63:15
**reverse (1)**
26:8
**review (3)**
137:2;152:23,23
**reviewer (2)**
75:3;129:3
**revise (1)**
142:7
**revised (1)**
66:13
**revision (1)**
92:12
**rich (1)**
85:3
**rid (1)**
124:18
**riding (1)**
98:11
**Ridley (1)**
126:21
**right (138)**
5:13,22;8:2,8,15,
24;12:5,25;13:5;14:3,
18;15:2,3,6,16,16,16,
16,18;18:9,21;19:20;
20:7;29:17;31:6,20;
32:18;33:13,23;
35:20;38:25;40:1,8,
11,13,16,16;41:23;
42:20;43:11;47:18;
48:1,3,7,13,21;54:8,9,
22;55:1,2,14;56:5;
59:13;60:7,22;61:12,
16,16,25;62:11,11;
64:9,23;66:18;67:8,
12;72:17;74:3;75:17;
77:22;78:2;81:20;
83:4;86:2;87:12,13,
17,23;89:9;90:23;
91:5,16,19;93:24;
96:21;98:12;101:13;
102:14;105:12;
107:20;108:10;109:8,
13,15;112:3;115:11,
23,25;116:12;117:12,
17,18;118:4,10;
119:6;123:5;127:10;
128:16;130:1,5;
131:18;132:9;133:11;
135:15;137:13;
138:22;139:18;142:1;
146:11;149:12;
151:11;153:6,16;
154:6;157:17;159:9,
11,16;160:2;161:13;
162:18;163:5,8,25;
164:12;165:8,13
**rights (25)**

19:17,19;20:6,18;
21:24;34:13,14,21,23;
62:5;78:19;101:10,
12;106:12,13;112:2,
4;118:23;119:5,9;
120:8;122:3;124:9;
128:2;143:5
**ripe (3)**
63:24,25;64:20
**rise (1)**
23:25
**rises (1)**
155:17
**risk (4)**
114:5;121:17;
122:15;130:4
**risks (1)**
115:11
**road (4)**
51:10;77:1;88:5;
142:18
**roadmaps (1)**
119:17
**Robertshaw (4)**
53:1,7,21;54:11
**robust (1)**
58:6
**robustness (2)**
12:6;48:13
**Rockville (5)**
120:23,23;145:2;
149:24;151:5
**rodeo (1)**
40:9
**role (4)**
38:2,4,5;77:22
**Roman (4)**
4:3;5:5;21:10;
107:9
**Romanette (3)**
110:11;111:2,11
**room (4)**
5:15;9:16;91:12;
109:8
**rope (1)**
108:23
**Rosa (1)**
44:1
**round (1)**
130:4
**route (2)**
84:19;87:21
**rule (12)**
28:2;51:16;57:9;
58:6,16;59:11,25;
63:21;66:24,24;
83:13;131:8
**rules (2)**
51:13;88:2
**ruling (1)**
108:17
**rulings (1)**
163:7

**run (4)**
23:17;130:4;
138:14;162:3
**running (4)**
23:14;27:14;28:19;
145:13
**rush (1)**
34:2

## S

**sadly (1)**
125:2
**sake (1)**
76:22
**sale (1)**
106:25
**same (20)**
27:10,25;36:17;
38:4,5,24;39:2;40:7;
51:9;82:18;88:1;
102:7;128:3;129:24;
130:15;132:4;136:15;
142:5;147:11,12
**San (4)**
81:23;91:4;143:25;
151:4
**Sandler (4)**
6:8,16;40:22;110:5
**Santa (1)**
44:1
**satisfaction (1)**
80:12
**satisfy (9)**
21:16;84:21;97:7,
18,18;99:10,10;
114:7;122:24
**satisfying (1)**
97:1
**saw (1)**
119:17
**saying (21)**
7:8;13:21;15:19;
27:25;54:24;76:3;
85:5,5,7;94:7;106:17,
18,18;108:7;113:14;
119:15;134:21;136:7;
139:15;148:24;
149:22
**scanning (1)**
127:19
**scenario (4)**
46:13;50:8;87:5;
88:8
**schedule (5)**
22:25;23:2,17;
159:1;160:7
**scheduled (3)**
15:13;137:22;165:2
**scheduling (1)**
9:8
**Schiavoni (3)**
7:25,25;8:3

**School (1)**
104:3
**scope (1)**
72:2;103:20,21
**scored (1)**
129:2
**scoring (2)**
74:8;129:5
**Scouts (2)**
32:23;85:11
**scratch (1)**
28:25
**se (1)**
96:3
**searching (2)**
29:22;30:9
**Sears (1)**
144:7
**seated (2)**
43:14;117:23
**sec (1)**
128:4
**second (10)**
8:19,23;18:24;
22:17;52:25;91:24;
95:11;97:6;121:12;
149:14
**Secondly (1)**
111:11
**secret (1)**
43:23
**section (12)**
22:25;38:15,15;
110:15;119:3;120:1,
4;123:10;127:20,22,
23;132:14
**Security (4)**
100:23,24;101:1;
111:25
**seeing (3)**
30:13;135:9;158:23
**seeks (2)**
22:25;87:18
**seemed (2)**
61:6;143:5
**seems (5)**
11:11;28:25;30:15;
64:21;137:3
**segue (1)**
44:22
**selection (2)**
105:9;145:25
**selectively (1)**
143:24
**sell (18)**
31:1;83:17;84:5,10,
23;85:6,9;86:2;94:13;
105:19;106:10;
107:12,12,23;111:13,
16,22,23
**selling (1)**
101:22
**send (2)**

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
188 of 194

55:9,9

**sense (25)**
10:11;13:3,10;
25:10;29:1;30:21;
31:19,20;32:2;39:4;
62:2;64:15;73:11;
79:16;81:15;84:12;
86:22;95:16;96:16;
103:7;109:12;116:20;
124:10;128:5;131:5

**sensible (2)**
11:7;60:21

**sentences (1)**
134:11

**separate (11)**
9:13;46:25;49:15,
23;62:15,16,20,22;
116:10,19;154:1

**separately (2)**
29:13;148:25

**seq (2)**
11:25;163:24

**serious (1)**
12:7

**Seriously (3)**
42:23;53:23;77:2

**serve (2)**
16:2;21:11

**served (1)**
38:3

**serves (1)**
16:4

**session (3)**
42:16;117:22;
159:19

**sessions (2)**
17:7,11

**set (16)**
26:10;45:25;48:25;
72:19;74:6;100:11;
104:25;109:15;118:8;
122:25;123:10;134:3;
138:3;144:14;147:9;
165:11

**set- (1)**
123:10

**settle (6)**
121:19,22,24;
122:16;143:10;
145:13

**settled (1)**
145:9

**settlement (4)**
17:3,6;143:11;
152:25

**settlements (1)**
153:2

**settling (1)**
120:23

**seven (2)**
15:1;33:5

**several (1)**
142:20

**severity (2)**
144:19,25

**sexual (8)**
15:25;16:15;19:18;
21:2,9;125:15;140:5;
145:19

**shadows (1)**
5:9

**shall (3)**
9:20;122:25;156:14

**Shane (1)**
5:8

**shape (1)**
105:12

**share (6)**
4:18;35:22;68:7;
72:10;74:20;123:14

**shared (1)**
23:13

**sharpen (2)**
64:5;79:18

**sharpening (1)**
115:8

**sheet (1)**
113:21

**shocked (1)**
14:3

**shoot (1)**
43:18

**short (5)**
21:18;23:16;37:7,9;
119:25

**shortened (1)**
40:19

**show (7)**
8:25;9:1;96:9;
111:14;124:16;149:7;
152:16

**showstopper (4)**
12:5;65:2;127:5;
139:15

**showstoppers (2)**
133:19;155:16

**sic (1)**
49:2

**side (4)**
5:15;79:1;88:17,17

**sides (1)**
64:22

**significance (1)**
105:24

**significant (7)**
16:23;74:24;79:14;
92:8;107:3;124:21;
131:23

**silence (4)**
45:15;47:17;49:4;
136:4

**silent (2)**
120:12,25

**similar (4)**
25:11;78:19;
120:25;150:18

**Similarly (1)**
73:15

**simplistic (1)**
29:10

**simply (7)**
12:20;35:17;55:14;
57:5;59:19;60:11;
100:20

**sincere (1)**
19:9

**sincerely (1)**
42:18

**sincerity (1)**
88:24

**sisters (1)**
82:6

**sits (1)**
105:22

**sitting (1)**
108:14

**situation (1)**
12:9

**situations (1)**
113:15

**six (5)**
14:11;15:1;23:3;
33:5;122:13

**sixth (1)**
119:23

**sixty (1)**
130:1

**skew (1)**
149:11

**skewing (2)**
86:14;149:20

**skews (2)**
83:18,19

**slightly (3)**
37:22;42:8;60:10

**slip-and-fall (1)**
98:10

**slips (1)**
121:12

**small (3)**
65:15,16;129:13

**Smallhold (7)**
46:18;47:13;55:15;
56:1;59:7;61:3,5

**smart (1)**
159:6

**sold (1)**
113:21

**solicit (2)**
42:3;52:15

**solicitation (11)**
13:4,11,13;45:11;
52:14,21;55:18;56:8;
111:4;154:10;161:5

**solicited (1)**
55:13

**soliciting (4)**
11:22;72:8;113:8;
162:21

**solution (1)**
89:1

**solvable (3)**
81:16;114:21,21

**solve (3)**
28:16;73:25;156:5

**solved (1)**
90:11

**solves (2)**
87:6;93:18

**somebody (11)**
10:21;11:12;42:7;
44:5;59:6;75:5;81:2;
102:1;154:11;159:10;
164:25

**somehow (3)**
111:12,24;154:3

**someone (3)**
40:19;49:20;52:15;
57:5;130:24

**someone's (1)**
79:25

**sometime (1)**
52:14

**sometimes (3)**
11:15,20;36:1

**somewhat (3)**
13:11;90:11;117:8

**somewhere (2)**
32:19;156:25

**soonest (1)**
164:8

**sorrow (1)**
19:10

**Sorry (15)**
37:9;38:15;55:21;
78:7;91:17;95:18;
97:22;104:23;141:18;
142:1;147:3;157:4;
158:12;160:1,4

**sort (16)**
9:8;18:9;34:25;
52:19;55:6;56:12;
59:10;61:13;62:13;
63:22;64:15;72:18;
76:3;95:3;145:20;
159:5

**sorts (1)**
29:25

**sound (2)**
92:25;100:6

**sounded (2)**
92:24;128:19

**sounds (3)**
94:6;137:18;138:17

**source (1)**
71:9

**speak (5)**
24:4;133:25;146:4,
23;156:13

**SPEAKER (7)**
5:24;43:4,8;137:18,
19;159:14;164:1

**speaking (5)**
50:13;125:7;
129:16;134:7;143:18

**speaks (1)**
48:3

**special (3)**
6:19;118:13;147:14

**specific (12)**
22:12,12;24:20;
56:17;101:16;102:2,
9,21;104:24,25;
106:24;141:20

**specifically (9)**
39:8;53:18;54:17;
57:9;80:8;103:24;
107:21;118:8;144:11

**spectrum (3)**
54:20,22;55:7

**spelled (1)**
118:6

**spend (2)**
110:16;131:22

**spending (1)**
20:11

**spent (1)**
143:17

**spilled (1)**
151:24

**spirit (3)**
68:22;82:18;106:4

**Spokane (3)**
57:8;59:24;60:11

**spoke (2)**
142:19;144:18

**spoken (1)**
51:7

**square (1)**
103:24

**squeeze (1)**
158:25

**staff (1)**
43:5

**stage (4)**
55:8,11,17;67:4

**stakeholders (2)**
15:21;68:8

**stand (2)**
34:19;161:11

**standing (3)**
29:6;97:20;142:21

**standpoint (5)**
44:21;72:23;
124:22;125:3;127:7

**stands (3)**
34:10;41:6;112:16

**stark (2)**
32:19;114:11

**start (23)**
4:5;12:12;14:6;
26:8;36:18;42:16;
52:19;68:13;70:22,
23;89:25;93:3;96:17;
101:23;118:17;

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
189 of 194

119:17;125:21;144:4;
150:14,15;164:8,10,
20
**starting (4)**
28:25;92:20,20,21
**state (14)**
4:20;21:3;23:4,4;
24:21;34:21;46:2;
60:12;101:25;105:10,
13;106:7;115:4;
144:20
**stated (3)**
15:23,24;107:25
**statement (84)**
8:18;9:13,14,17,20;
10:7,20,23;11:11;
13:7,17;14:11;15:14;
16:19;17:25;18:17;
20:4;21:14;22:6,14;
23:6,23,24;24:5,11,
20;25:11;26:17;27:4,
5;30:14;31:15;37:2;
64:1;65:2;66:8,10;
67:11;68:16;70:13;
71:14;75:15;76:2,19;
77:2,19;83:21,24;
86:9;91:20;92:13;
94:2;97:13;99:3,16,
17,22,25;100:6,12;
103:8;106:24;113:10,
24;115:8;116:17;
120:4;123:6;127:12;
134:8;135:8;137:21;
138:4;140:3;141:7;
142:8;143:9;152:11;
153:17;154:10;
160:10,15;161:6;
162:4
**statements (8)**
21:22;22:12,13;
26:3;74:14;77:9;
116:17;151:14
**States (8)**
8:14;23:22;24:3,23;
45:6,22;106:8;149:3
**statistical (1)**
130:20
**status (2)**
36:3;113:4
**statute (4)**
124:12;144:11,14;
145:1
**statutes (3)**
128:7;132:8;134:13
**statutory (2)**
121:6,7
**stay (11)**
12:12;23:3,13;
28:13,21;73:6;125:8,
9,9,21;133:13
**staying (1)**
161:17
**steal (1)**

75:18
**steer (1)**
124:10
**step (5)**
31:2;67:9;71:1;
75:11;127:11
**steps (2)**
125:14,15
**Steve (1)**
8:1
**stick (1)**
25:24
**sticking (1)**
61:6
**still (6)**
11:3;15:8,9;89:1;
100:7;142:9
**Stockton (2)**
143:25;151:5
**stood (1)**
162:24
**stop (8)**
12:25;40:20;43:17;
109:4,12;123:19;
128:4;141:2
**story (1)**
114:10
**strictly (1)**
71:9
**strikes (1)**
29:11
**strong (3)**
17:2;58:19;162:19
**strongly (1)**
148:7
**struck (1)**
80:3
**structural (1)**
97:17
**structurally (1)**
116:4
**struggling (1)**
126:17
**stuck (1)**
121:13
**stuff (3)**
70:2;153:9;155:17
**subject (7)**
33:14;42:17;59:9;
68:19;72:5;75:15;
100:2
**subjectivity (1)**
84:19
**submission (1)**
153:19
**submit (9)**
28:20;29:2;33:20;
34:20;36:7;51:8;
140:13;145:22;156:3
**submits (1)**
146:2
**subsequent (1)**
110:25

**substance (2)**
56:3,8
**substantial (1)**
54:2
**substantially (1)**
149:11
**substitutes (1)**
106:13
**sued (1)**
104:21
**Suffice (2)**
32:3;33:8
**sufficient (4)**
59:8;65:18;140:17;
141:24
**suggest (6)**
36:16;54:14;81:8;
89:13;160:21,22
**suggested (2)**
67:23;73:4
**suggesting (3)**
23:3;48:5;130:5
**suggestion (3)**
36:12;94:11;136:7
**suggestions (1)**
158:17
**suggests (3)**
18:7;49:19,19
**summary (4)**
71:15;90:21;
142:13,21
**Sun (1)**
46:18
**superseding (2)**
95:1;96:5
**supplemental (1)**
10:21
**support (7)**
24:10;36:4;45:18;
46:17;98:21,23;140:9
**supportable (1)**
31:19
**supported (1)**
37:6
**supports (2)**
24:9;67:22
**suppose (1)**
130:3
**Supreme (6)**
24:8;53:8,14;54:17;
103:18,19
**Sure (49)**
6:12,14,14,14;9:11;
10:16,14:13,13;
18:10;25:4,4,13,23;
34:3;44:12;46:16;
58:18;59:13,14;
60:13;69:15;74:25,
25;75:2,25;83:11;
87:6;94:18;95:14,14,
14;96:19;101:11;
115:9,15;116:23;
119:1;131:7,9,9;

147:7,7,7;150:10;
156:20;158:23;
159:23;161:25;
163:18;164:16
**surprise (1)**
13:23
**surprised (2)**
14:1,15
**surrounded (1)**
106:4
**surrounding (1)**
104:21
**survivor (12)**
19:7,21,24,25;
35:12;36:3;72:6;
73:24;74:3,15;
112:22;129:10
**survivors (33)**
15:25;16:15,23;
19:10,14,18,23;20:18,
20;21:2,9,25;27:19,
20,23;32:6;34:14,21;
35:13;36:4;41:17;
65:23;69:18;74:23;
107:3,13,20;121:5,18,
25;124:3;125:17;
128:23
**survivors' (12)**
27:18;34:23;119:9;
120:8;122:9;123:14;
125:10;129:10,20;
143:7,9;151:25
**survivor's (2)**
16:20;19:22
**suspect (3)**
42:7;81:24;162:25
**swear (1)**
98:22
**switch (1)**
95:9
**sworn (1)**
98:22
**syncing (1)**
92:22
**Syracuse (5)**
50:25;51:2;146:2;
148:21,23

**T**

**table (3)**
4:7;30:13;138:25
**tackle (1)**
64:15
**tagged (2)**
27:14;28:18
**talk (25)**
28:11;29:20;37:2;
42:15;63:25;91:25;
109:8,18;117:6;
119:9;123:5,6;
125:23;127:6,15;
128:22;137:7,25;

138:7;139:15;143:13;
153:9;156:15;158:13;
160:20
**talked (9)**
78:25;80:10;116:5;
123:8;124:24;134:12,
15;161:4;162:4
**talking (17)**
23:16;27:11;40:15;
51:20;52:13;61:15;
67:10,23;70:22;
82:24,25;109:5;
115:10;137:20,21;
147:11;149:14
**talks (2)**
103:19;148:13
**Tanc (1)**
7:25
**target (2)**
82:11;109:11
**tasks (1)**
39:8
**Taylor (1)**
144:7
**Teamsters (1)**
100:23
**teased (1)**
162:20
**technical (1)**
24:2
**tee (1)**
103:5
**teeing (1)**
113:17
**telling (2)**
51:10;159:10
**tells (2)**
27:22;30:10
**ten (4)**
15:4;117:18;
159:13,16
**tension (1)**
90:24
**tent (1)**
36:4
**term (1)**
155:16
**terms (11)**
24:13;52:21;60:17;
68:5;72:20;79:25;
80:4,7;82:12;112:9;
136:8
**test (29)**
21:16;26:14;28:3;
32:9;33:8,21;83:15;
84:9;17,18,21;85:11;
86:5;88:9,10;89:4;
90:12;95:1;96:9,12;
97:8;99:11;111:12,
14,18;112:24;113:19;
125:21;141:5
**testing (1)**
12:13

Case: 23-40523     Doc# 2094-9     Filed: 06/25/25     Entered: 06/25/25 15:09:50     Page
190 of 194

**tests (1)**
94:24
**than-ideal (1)**
122:15
**thankfully (1)**
119:19
**Thanks (8)**
4:9;67:18;110:3;
138:10,11;159:17;
160:1;161:21
**theirs (1)**
30:1
**thematically (1)**
35:4
**theme (1)**
25:11
**then-available (1)**
129:4
**theoretically (1)**
130:19
**theory (6)**
32:20;47:8;48:13,
20;58:5;100:9
**therefore (5)**
31:4;38:21;53:11;
115:4;135:6
**thesis (1)**
70:5
**thinking (9)**
20:11;31:21;36:17;
52:10,17;58:12,13;
76:5;146:7
**third (6)**
12:1,1,6;45:16;
122:17,17
**third-party (4)**
24:7;45:8,23;88:2
**Thirty (1)**
42:22
**thirty-five (1)**
13:15
**thoroughly (1)**
114:17
**though (3)**
10:25;114:17;
123:13
**thought (13)**
17:25;20:6,8,14;
46:9;50:6;57:23;
62:21;67:9;76:7;
118:23;145:23;
160:19
**thoughts (10)**
8:18;10:4;24:14;
42:5,6;50:4,10;69:14;
80:25;81:4
**three (10)**
10:2;11:11;14:6;
21:14;26:14;28:21;
110:20;119:11;
152:20;162:6
**throughout (4)**
16:9;17:7,14;20:18

**throw (1)**
13:6
**thunder (2)**
75:18;81:1
**Thursday (2)**
160:9;162:10
**Thursday's (1)**
157:13
**Thus (1)**
45:25
**tie (2)**
40:7;65:19
**ties (2)**
26:19;27:3
**Tim (2)**
6:21;118:11
**times (4)**
39:19;81:11;123:7;
131:3
**timetable (1)**
162:25
**timing (1)**
14:24
**tirelessly (1)**
17:5
**title (1)**
63:5
**to-3 (1)**
117:19
**today (35)**
5:25;6:23;7:20;
11:19;12:4;13:8,25;
15:12,20;23:1;25:25;
26:15;29:7;30:23;
33:11;34:15;37:1;
40:5;41:19;55:8;
81:11;83:21;97:20;
99:23;108:2,14;
110:24;118:18;
126:18;133:3;135:7;
139:1,12;142:7;
165:12
**today's (5)**
26:9;32:1;108:3;
109:6;115:7
**Todd (1)**
7:14
**together (3)**
20:22;75:13;86:23
**told (1)**
95:19
**tomorrow (1)**
10:12
**Tonawanda (2)**
46:19;56:19
**tons (1)**
103:22
**took (1)**
53:23
**tool (1)**
122:9
**top (1)**
121:9

**tort (2)**
111:5;152:2
**tossed (1)**
20:4
**total (1)**
38:10
**totally (2)**
30:15;120:7
**touches (2)**
14:14;22:20
**tough (1)**
137:12
**toward (5)**
17:6;19:5;22:24;
72:11;135:20
**towards (1)**
35:24
**trade (1)**
122:2
**transaction (1)**
68:19
**transactions (1)**
12:15
**transcript (2)**
143:19;146:8
**transfer (4)**
17:18;19:19;27:6;
79:11
**translate (1)**
135:24
**transparent (2)**
17:14;23:8
**trap (3)**
49:21;56:22;57:4
**treat (1)**
27:23
**treated (4)**
11:9,10;124:2;
144:8
**treatment (4)**
140:24,25;142:6,12
**trial (1)**
23:4
**trickier (1)**
82:23
**tricky (1)**
152:21
**tried (1)**
159:5
**Trinity (1)**
106:1
**trouble (2)**
11:21;154:20
**true (5)**
33:10;34:11;102:8;
123:6;153:15
**truly (2)**
25:6;36:2
**trust (19)**
16:20,23;19:19,23;
65:23;72:6;73:24;
74:3,4;107:3;120:6;
123:1;129:10,20;

130:6,23;131:4;
143:7;151:25
**Trustee (15)**
8:14;19:23;23:22;
24:3;37:10;45:3,6;
52:23;53:17;56:20;
62:14;64:13,24;
74:23;143:9
**Trustee's (2)**
24:23;45:22
**trusts (1)**
129:10
**trust's (2)**
122:20;132:1
**truth (1)**
27:16
**try (15)**
17:9;31:5;68:8;
69:17;80:2,2;105:25;
124:18;137:10;
139:12;151:13,15;
156:4,7;159:20
**trying (24)**
12:11;17:12,13;
19:5;27:15;34:2,3;
62:2,9;76:21,25;88:6,
7;92:14;103:11;
110:12;114:12;
122:18,19;123:12;
127:2;131:23;144:16;
164:22
**Tuesday (3)**
157:11;160:13;
162:9
**tuition (3)**
59:3;61:9,13
**tuitions (1)**
61:23
**turn (1)**
83:19
**turned (1)**
73:2
**turns (1)**
13:7
**twenty-eight (1)**
13:15
**twenty-three (1)**
101:11
**twice (2)**
100:25;130:15
**two (37)**
10:2;12:12;15:13,
25;16:6,17;19:7;
22:11;26:3;28:1,4;
29:11;30:22;46:25;
50:14;52:19;63:8;
68:14,21;72:22;
81:16;83:1,11;96:14;
101:7;104:12;111:3,
3,9;112:1;113:20;
134:11;140:10;
141:15;147:6,24;
160:18

**two-plus (1)**
23:4
**type (1)**
70:23
**types (2)**
70:19;120:13
**typically (7)**
11:11;25:13,18;
34:19;43:6;74:23;
75:8

## U

**UETZ (156)**
4:7,9,9,12,17,22,25;
5:2,8,6:24;7:3;8:16,
21,25;9:2,4,6;13:24;
14:1,10,14,16,19,21,
23,25;15:5,7,10,12,
17,19;18:3,6,10,12,
15,19,21,23;19:1,4;
20:17;21:1;32:12;
36:15,20,22;42:22,25;
43:10;67:15,18,18,25;
68:3,14,25;69:3,7,10,
12;71:11,13,17,19,22;
72:10,14,16;74:18;
75:20,23;76:1,7,9,11,
17;77:8,12,14,20,23;
78:1,3;80:5,7,10,14,
17,20,22;89:18,21;
116:15,23;117:2,5,11;
126:13,16,25;127:18;
136:6,11,15;137:17,
20,25;138:6,10;139:7,
9,11,17,20;156:16,22,
24;157:1,4;158:1,10,
13,16,21,25;159:8,10,
13,15,17,22,24;160:1,
4,4,7,9,12,18,24;
161:1,4,11,15,17,20,
22,24;162:1;164:4,8,
14,16;165:12
**ultimate (3)**
24:5;151:19;154:9
**ultimately (15)**
22:8;51:11;81:14;
87:8;88:9;93:21,22;
94:8,16;105:2;
110:15;111:23;145:3;
146:16;155:20
**Um-hum (54)**
14:24;67:17;71:12;
97:5,14;98:1,3,5;99:1,
7;100:15,22;101:6,19,
24;104:5,14,16;
105:1;107:8,16;
108:1;110:6,8,19;
111:19;118:12,16;
120:20;121:11;
124:25;125:11,25;
127:1;130:7;134:10,
14,17,24;135:3,11,20;

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
191 of 194

138:16;140:1,11,19;
141:11;143:15;
148:12;150:13;
155:15,25;156:6;
163:15
**unable (2)**
141:4;145:12
**unanimous (2)**
104:6,22
**unclear (2)**
143:2,10
**uncommon (1)**
116:15
**unconfirmability (1)**
109:21
**unconfirmable (11)**
22:19;24:1;26:15;
35:10;51:12;90:6;
98:19,19;108:14;
110:10;114:18
**unconfirmed (1)**
65:13
**under (31)**
18:13,25;19:1,22,
24;30:25;35:16;36:4;
37:15,23;38:15,22;
45:9;46:2;50:18;59:6;
83:8;96:1,1,1,6;
97:21;98:16;102:20;
120:10;122:3,4;
124:9;128:12;130:12,
13
**underlying (1)**
125:15
**understated (1)**
145:1
**understatement (2)**
77:23;103:22
**Understood (3)**
64:2,10;164:24
**unequivocal (1)**
19:9
**unfold (2)**
26:22,22
**unfortunate (1)**
36:1
**unfortunately (2)**
19:11;145:12
**unhappy (1)**
125:17
**UNIDENTIFIED (7)**
5:24;43:4,8;137:18,
19;159:14;164:1
**unilaterally (1)**
28:5
**uninsured (4)**
35:13;123:9,13;
124:2
**union (4)**
101:10,13,13,17
**union's (1)**
100:24
**UNISON (1)**

165:14
**United (7)**
8:14;23:21;24:2,22;
45:6,22;106:8
**universe (1)**
76:13
**unknown (16)**
15:17;37:4;38:1;
41:1,17;98:7,8,8;
141:13,19;151:24;
152:21,21,22;153:23,
25
**unless (3)**
35:19;47:24;137:15
**Unlike (1)**
17:9
**unlikely (1)**
111:8
**unliquidated (2)**
152:2,3
**unopposed (1)**
26:4
**unrealistic (1)**
72:15
**unsecured (1)**
140:16
**unsecureds (1)**
98:2
**unsure (1)**
10:15
**untimely (1)**
57:2
**unwanted (2)**
105:4,10
**unwary (3)**
49:22;56:23;57:4
**up (50)**
6:11;9:21;10:1;
13:14;14:9,22;20:14;
25:12,15;26:3;34:10;
36:14,15,23;44:5;
51:16;52:1,12;63:8;
66:21;77:6,18,19;
79:18,25;81:5;83:23;
88:3;90:8;92:22;95:9;
98:22,22;100:11;
103:5;113:17;115:9;
120:22;122:14;134:4;
135:23;136:16;137:5;
147:5;150:1;154:19;
161:12;162:3;163:2,4
**update (1)**
73:10
**updated (1)**
73:9
**updates (1)**
77:16
**upon (8)**
33:7;39:13;46:18;
105:6;106:4,25;
144:8;145:18
**upset (2)**
54:18;91:8

**urge (1)**
135:6
**use (12)**
26:9;41:5;102:5;
115:5;129:18;130:4;
133:18;136:15;
139:11;142:17;151:1;
155:16
**used (5)**
26:20;101:9,15;
146:4,6
**useful (1)**
95:2
**using (3)**
84:16;131:20;
149:17
**UST (1)**
24:6
**UST's (1)**
23:25
**usually (1)**
48:15

**V**

**vacant (2)**
107:1,1
**valid (1)**
10:20
**validity (2)**
85:16;145:23
**valuation (11)**
28:24;73:16;140:5;
142:19,19;151:25;
152:2,8,8,10,12
**valuations (1)**
146:5
**value (10)**
26:25;86:25;112:7;
140:15;141:18;
142:11;144:12;
151:21,22;152:18
**valued (1)**
101:8
**values (2)**
73:3;114:19
**valuing (1)**
112:8
**variety (1)**
19:12
**varying (1)**
144:23
**Vegas (2)**
137:16;157:3
**vehement (2)**
28:14;36:6
**verdicts (2)**
151:1,2
**version (6)**
67:9,13;68:6;86:21;
126:11;135:21
**versions (1)**
113:20

**versus (1)**
90:6
**vest (1)**
40:9
**viable (1)**
108:23
**vibrant (1)**
57:24
**victims (1)**
50:6
**view (20)**
11:16,17,18;33:14;
42:14,15;44:1;45:18;
46:17;49:18,22;
62:10;79:17;86:15;
93:12;114:3;119:16;
120:18;152:14,15
**viewed (1)**
34:17
**views (2)**
29:7;113:15
**vigorously (1)**
116:24
**violate (2)**
24:8;86:2
**violates (1)**
105:15
**violating (1)**
31:6
**violation (1)**
83:18
**vision (1)**
26:20
**vital (3)**
28:8;36:3;83:11
**voices (2)**
11:6,7
**void (3)**
31:20;132:7;136:1
**vote (20)**
10:12,13,21;11:3;
22:7;46:7;49:1,4,5,6,
10,12,17;53:5;93:24;
97:4,7;98:21;100:8;
155:21
**voted (3)**
11:2;111:5;117:15
**voting (1)**
10:9
**vows (1)**
104:24

**W**

**wait (3)**
73:1;78:11;123:23
**waiver (2)**
61:16,16
**walk (1)**
106:1
**wants (7)**
19:25;67:14;
126:11;135:24;136:8;

156:4;164:25
**Warren (1)**
8:1
**watch (1)**
139:21
**way (35)**
6:3;8:17;10:17,21;
11:5;14:5;18:7;24:10;
29:2,2;33:9;35:21;
36:2,8;40:7;47:6;
48:14;60:19;70:24;
73:5;76:10;88:1;92:1,
4,24;98:23;117:9;
119:2;129:1,17;
131:1,6;136:17;
140:23;164:24
**ways (12)**
9:20;10:16,23;
26:20;30:12;56:8;
63:6;102:24;123:19;
125:20;140:3;142:15
**WEDNESDAY (4)**
4:1;136:18;157:11,
24
**weeds (2)**
79:24;141:3
**week (8)**
74:19;151:5;
156:18;157:9,13,18,
24;158:20
**weekend (3)**
18:23;162:8,15
**weeks (5)**
9:9;12:12;133:13;
153:10;155:11
**weigh (1)**
54:21
**weighed (2)**
50:13;124:12
**weighing (1)**
124:13
**weighs (1)**
112:11
**Weisberg (1)**
81:7
**Weisberg's (1)**
81:2
**WEISENBERG (127)**
5:23;6:4,7,8,13;
25:12,13,16,16,24;
26:7;29:9,19;30:22;
31:8;32:3,8,22;33:1,4,
16,20,24;34:1,5,9;
35:3,6,9,16,21;36:1,
10;50:9,11,11,20,23;
51:2,4,6,8,17,19,23;
69:2,15;76:14;78:8,
11;80:1;81:6,10,14,
21,23;82:14,17,19,23;
84:7,13;85:15,18,20,
23;86:1,5,7,12,14;
87:6,12,14,16;88:18,
21,24;89:1,10,22,24;

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
192 of 194

94:23;109:24;110:1;
117:7,7,15,24,24;
123:8;124:24;138:12,
12,17,21,23;139:3,6,
14,25;140:2,8,12,20;
141:8,10,12,15,23;
142:1,3;143:16;
146:12,16,20,22,25;
147:3,6,25;155:24,24;
156:1,7,12;160:22
**welcome (5)**
41:14;68:25;
135:14;139:24;
153:19
**weren't (1)**
163:14
**Westport (1)**
7:14
**whack (1)**
110:2
**what's (16)**
27:13;35:2,4;54:18;
79:1,5,5,9,25;83:19;
87:4;92:15,15;
113:15;125:16;
134:22
**whatsoever (1)**
63:19
**whenever (2)**
154:4,5
**Whereupon (1)**
165:17
**whole (4)**
13:2;106:3;149:8;
162:20
**who's (4)**
69:25;71:3;90:14,
15
**whose (1)**
37:15
**willing (7)**
39:12;59:19;69:4;
99:24;107:18,19;
153:14
**willingness (1)**
120:15
**win (1)**
12:3
**winning (1)**
108:20
**wipes (1)**
120:8
**withdrawing (1)**
80:14
**within (13)**
16:3;21:12;26:14;
29:6,24;30:3;31:3;
38:25;79:3;119:11;
137:9;141:17;148:3
**without (9)**
10:10;15:19;20:6;
40:7;63:16;74:14;
111:4;113:16;147:9

**wonderfully (1)**
159:6
**wondering (1)**
51:15
**word (11)**
11:10;34:25;50:8;
72:19;78:15;79:2;
94:14;109:25;124:23;
128:25;134:12
**words (1)**
53:4
**work (18)**
11:21;16:2,13;
24:11;26:5;36:6;67:6;
72:11;131:1,24;
137:10;138:18;
146:17,17;156:9;
158:19;162:17,23
**worked (3)**
8:5;17:5;24:3
**working (2)**
74:19;124:1
**works (3)**
129:1;137:24;138:1
**world (7)**
29:15;30:9;122:5,
12;129:8;132:8;151:8
**worldview (1)**
83:9
**worried (2)**
58:11;59:18
**worry (1)**
121:13
**worse (1)**
49:15
**worsen (1)**
116:19
**worship (1)**
112:13
**worth (10)**
28:13,17;92:17;
93:15;112:4;130:9,9;
131:11;152:15;
154:21
**worthy (1)**
89:17
**wow (2)**
83:24;162:7
**writ (1)**
125:7
**write (1)**
163:19
**writing (3)**
69:17,18;135:10
**written (1)**
81:21
**wrong (8)**
34:7;47:10;77:4;
85:12;94:23;135:13;
151:10;164:25
**wrote (1)**
112:2

## Y

**year (1)**
101:11
**years (2)**
23:5;159:2
**Yep (9)**
18:22;35:25;37:8;
93:5;118:14;138:20;
148:12,17;155:2
**yesterday (1)**
159:10
**yield (1)**
126:22
**York (3)**
46:19;148:21,24

## Z

**Zoom (4)**
4:23;8:9;24:17;
25:5

## 1

**1 (6)**
17:22;30:23;50:14;
71:1;76:20;164:10
**1.1-million (1)**
145:10
**1.2 (1)**
17:20
**1.3 (1)**
17:20
**1.7 (1)**
145:11
**1:15 (3)**
43:7,9,11
**1:16 (1)**
43:13
**1:30 (2)**
164:12,14
**10 (3)**
4:3;95:21;160:14
**10,000-foot (1)**
71:25
**10:30 (1)**
136:18
**100,000 (1)**
38:9
**101 (1)**
38:15
**101.14 (1)**
38:15
**103 (3)**
49:2;107:3,13
**106-million-dollar (1)**
27:5
**10th (1)**
161:4
**11 (16)**
15:21;16:10,13;

17:8,20,22;19:13,15;
21:5,8;23:13,18;
37:13;38:2;84:11;
108:23
**11:36 (1)**
4:1
**1129 (2)**
33:5;106:20
**1129a (4)**
95:20;97:16,19;
113:13
**1129a1 (1)**
11:25
**1129a7 (4)**
96:18;107:20;
109:16;112:24
**1129a7A (2)**
96:25;110:7
**1129a7Ai (3)**
97:21;99:10;110:16
**1129a7Aii (1)**
107:21
**12 (1)**
148:10
**12:27 (1)**
43:13
**13 (1)**
157:21
**13th (4)**
37:11;156:18;
157:9,24
**14th (2)**
160:12;161:19
**150 (1)**
92:6
**1503 (1)**
37:5
**1504 (1)**
37:6
**1505 (1)**
37:6
**15th (3)**
157:10;158:7,19
**160 (1)**
92:6
**16th (10)**
158:3,10,21;160:9;
161:7;162:10;163:4,
23;164:3,17
**17th (1)**
158:7
**18 (1)**
4:1

## 2

**2 (7)**
50:20,23;136:20;
163:24;164:5,25;
165:2
**2:44 (1)**
117:20
**2012 (2)**

104:2,6
**2024 (2)**
4:1;17:7
**20th (3)**
156:18;157:15,15
**211 (1)**
49:2
**21st (2)**
157:16,17
**22 (1)**
156:20
**22nd (2)**
137:11,11
**23 (8)**
51:16;57:9;58:6,16;
59:11,25;66:24,25
**23-40523 (1)**
4:4
**23ish (1)**
63:22
**24 (1)**
156:20
**2a1 (1)**
127:23
**2b (1)**
127:23

## 3

**3 (4)**
97:25;98:2;131:24,
25
**3:03 (1)**
117:20
**3:56 (1)**
159:18
**30th (1)**
136:12
**327a (2)**
38:19,22
**345 (1)**
149:17
**35 (3)**
120:2,5;153:2
**36 (2)**
120:2,5
**3rd (1)**
160:14

## 4

**4 (3)**
97:25;98:4,23
**4:15 (1)**
159:18
**4:19 (1)**
165:17
**400 (2)**
84:24;93:15

## 5

**5 (3)**

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
193 of 194

43:16;97:25;98:6
**5.14 (3)**
120:1,4;127:20
**500,000 (1)**
130:6

### 6

**6 (4)**
97:25;98:9;142:4;
152:20
**600 (1)**
150:2
**63-million-dollar (1)**
107:5

### 7

**7 (7)**
86:20;87:24;95:22,
23;100:17;102:7;
107:22
**700 (5)**
84:24;88:11;93:16;
96:10;149:25
**75 (1)**
76:20
**7th (1)**
19:17

### 8

**8 (1)**
164:20
**8.3 (1)**
119:4
**8.3.13 (1)**
122:22
**8.7 (1)**
130:12
**850 (1)**
38:9
**86 (2)**
148:10;153:2
**8th (20)**
13:5;73:10;125:24;
128:9,14;135:22;
136:3,18,21;137:3,22;
138:3,3;146:9;
161:14,16,17;162:19;
163:5,24

### 9

**9.8.4.1 (1)**
123:10
**9th (2)**
37:5;157:21

Case: 23-40523    Doc# 2094-9    Filed: 06/25/25    Entered: 06/25/25 15:09:50    Page
194 of 194