# <u>Exhibit 2</u>

## Declaration of Denise Martin, Ph.D

**FOLEY & LARDNER LLP**
Eileen R. Ridley (CA Bar No. 151735)
Tel: (415) 438-6469; eridley@foley.com
Shane J. Moses (CA Bar No. 250533)
Tel: (415) 438-6404; smoses@foley.com
Ann Marie Uetz (admitted *pro hac vice*)
Tel: (313) 234-7114; auetz@foley.com
Matthew D. Lee (admitted *pro hac vice*)
Tel: (608) 258-4203; mdlee@foley.com
Geoffrey S. Goodman (admitted *pro hac vice*)
Tel: (312) 832-4515; ggoodman@foley.com
David B. Goroff (admitted *pro hac vice*)
Tel: (312) 832-5160; dgoroff@foley.com
Mark C. Moore (admitted *pro hac vice*)
Tel: (214) 999-4150; mmoore@foley.com
555 California Street, Suite 1700
San Francisco, CA 94104-1520

*Counsel for the Debtor*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation sole,<br><br>Debtor. | Case No. 23-40523 WJL<br><br>Chapter 11<br><br>**DECLARATION OF DENISE MARTIN, PH. D IN SUPPORT OF CONFIRMATION OF DEBTOR'S MODIFIED FOURTH AMENDED PLAN OF REORGANIZATION**<br><br>Judge: Hon. William J. Lafferty<br><br>Date: 9:00 am<br>Time: June 15, 2026<br>Place: United States Bankruptcy Court<br>1300 Clay Street, Courtroom 220<br>Oakland, CA 94612 |

I, Denise Martin, Ph.D., hereby declare as follows:

## I. **Background and Qualifications**

1. I submit this declaration in support of confirmation of the *Debtor's Modified Fourth Amended Plan of Reorganization* [Docket No. 2758] (the "Plan"). I am an Affiliated Consultant with NERA Economic Consulting ("NERA"). I was previously a Senior Managing Director and have been with NERA since 1991.

2. Before joining NERA, I earned a B.A. in Economics from Wellesley College and an M.A. and Ph.D., also in Economics, from Harvard University. My undergraduate and graduate education included coursework in microeconomics, labor economics, statistics and econometrics. Prior to attending Harvard, I served as an Assistant Economist at the Federal Reserve Bank of New York. While at Harvard, I taught classes in microeconomics, industrial organization, and statistics to undergraduate and graduate students, and was awarded the Danforth Prize for Teaching.

3. At NERA, I have been retained as an economic and statistical expert on dozens of matters in which I have needed to collect and review personal injury settlement data, as well as investigate the statistical drivers of settlements and perform claim valuations. To do so, I have identified relevant data sources, developed search algorithms, created data capture templates, overseen data collection and conducted statistical analyses of the coded data.

4. I provided testimony in an adversary proceeding within the bankruptcy case for the Diocese of Rochester. I am also currently working or have worked on several other diocesan matters in which I have been asked to provide empirical evidence about the settlement values of sexual abuse cases in which my involvement has not been made public. I was retained as a statistical expert in the Boy Scouts of America bankruptcy, as well as in a matter involving alleged sexual harassment and sexual abuse claims against Signet Jewelers.

5. I am personally familiar with the facts and opinions set forth in this declaration. If called as a witness, I could and would testify competently thereto. My opinions and conclusions are set forth in my Updated Expert Report of May 8, 2026 (the "2026 Martin Report") and my Rebuttal Report of May 21, 2026 (the "2026 Martin Rebuttal Report"). I previously issued an Expert Report on July 1, 2025 (the

"2025 Martin Report") in connection with confirmation of the Debtor's Third Amended Plan of Reorganization.

**II. Assignment**

6. I was first contacted in this matter in April 2025 by counsel for the Debtor, Foley & Lardner LLP. My retention agreement was signed in June 2025. I have not previously worked with the Roman Catholic Bishop of Oakland. I was retained by attorneys at Foley & Lardner in two prior unrelated employment matters in 1998 and 2007.

7. I was asked by counsel to assess whether RCBO's Diocesan Contribution and Contribution per Claim in the Plan would provide economically reasonable compensation to survivors. As an economist, I determined that the most reliable way to make that assessment was to compare the proposed contribution to contributions in the 30 confirmed and pending joint plans of reorganization in other diocesan and religious-order bankruptcy cases across the country. These 30 plans represent the universe of comparable situations, i.e., situations in which dioceses or religious orders were facing a mounting number of similar sex-abuse claims, had determined that they could not continue in the tort system so sought bankruptcy protection, and then negotiated and agreed to contributions that, in 28 of the 30 cases to date, were confirmed by bankruptcy courts. I chose this benchmark because principles from economics tell us that the most reliable way to assess claim value — and therefore the economic reasonableness of the claim values in the Plan — is to observe how comparable claims in comparable settings have been negotiated and resolved historically.

8. I was subsequently asked to review and rebut the Expert Report of Katheryn McNally, which proposes a tort-based valuation of the abuse claims pending against the Debtor. Her approach is fundamentally different than the bankruptcy-based approach that I used. It relies on a benchmark that I explicitly considered and rejected as a means of assessing whether the RCBO Diocesan Contribution and Contribution per Claim under the Plan are economically reasonable. In my opinion, Ms. McNally's reliance on a tort-based valuation in the bankruptcy context is misplaced. It is evident (and acknowledged by Ms. McNally) that the remaining diocesan assets are insufficient to pay the 345 bankruptcy claims at tort-system values. Indeed, one of the primary reasons dioceses choose to seek bankruptcy protection is

that they do not believe they can continue in the tort system given their dwindling assets. The recent $16 million verdict against the Debtor for a single claimant in California state court underscores this reality. If values at that level were paid to all 345 claimants, the total would exceed $5 billion. Even if insurance were to pay some fraction of this amount, the residual would bear no relationship to RCBO's — or any diocese's — actual capacity to pay. For the same reason, a return to the state-court system for all claimants through the dismissal of the bankruptcy could mean many survivors do not recover from the constrained assets of the Debtor. A tort-system benchmark is simply the wrong framework for evaluating the reasonableness of a contribution in bankruptcy. The right framework is an examination of what has actually been agreed, confirmed by courts and paid to comparable claims in comparable situations — which is precisely what my analysis does.

## III. Methodology — Updated Martin Report

9. To assess economic reasonableness, I compiled a comprehensive database of settlements for diocesan and religious-order bankruptcies in the United States and its territories. The database was drawn from publicly available legal filings from each bankruptcy — including plans of reorganization, disclosure statements, and confirmation hearings — as well as news stories reporting on the resolutions. This work was performed in collaboration with data maintained by Professor Marie Reilly at Pennsylvania State Law School's Catholic Dioceses in Bankruptcy project. This database was captured in Exhibit 3 to my 2026 Martin Report, which is attached hereto as **Exhibit A**.

10. In total, I identified 28 dioceses and religious orders that have emerged from bankruptcy, along with 13 others (excluding the Diocese of Oakland) at various stages of the process. Of the 41 total bankruptcy cases, 30 have either confirmed plans or pending joint plans where the debtor and committee have agreed to proposed contributions. These 30 confirmed and pending joint plans form the comparison set for my analysis (the "Comparable Plans").

11. For my 2026 Martin Report, I supplemented the data previously collected in my 2025 Martin Report to collect information on any new Comparable Plans since July 2025, capturing three additional confirmed plans and two new pending joint plans. These five cases are reflected in lines 26-30 of **Exhibit A**.

12. My analysis proceeds along two dimensions. First, I compare the absolute dollar amount of the Amended RCBO Diocesan Contribution ($180 million, consisting of $150 million from the Debtor and $30 million from RCWC) to the contributions in the 30 Comparable Plans. Second, I divide that contribution by the number of unique, timely-filed claims expected to receive distributions (345, per the Debtor's estimate) to calculate the per-claim contribution and compare that figure to per-claim contributions in the Comparable Plans. Since the Comparable Plans were approved between 2005 and 2026, I adjust for inflation using the Consumer Price Index for All Urban Consumers to bring all dollars to March 2026. I also perform sensitivity analyses using alternative claim counts.

## IV. <u>**Opinions—2026 Martin Report**</u>

13. Based on this analysis, I reached the following conclusions:

**CONCLUSION 1:** The RCBO Diocesan Contribution of $180 million is higher than the contributions in 28 of 30 Comparable Plans, placing it at the 93rd percentile in both nominal and inflation-adjusted terms. The average diocesan contribution across the 30 Comparable Plans was $44.2 million in nominal terms,

with a median of $18.8 million. The RCBO Diocesan Contribution is more than four times the average. **Figure 1** from my 2026 Martin Report reflects the analysis of *nominal* outcomes and is set forth below.




**Figure 2** from my 2026 Martin Report reflects *inflation-adjusted* outcomes and is set forth below:

**Figure 2**
**Diocesan Contribution (Inflation-Adjusted)**
**Comparable Plans (N = 30)**
**2005 to 2026**




The data set forth in each figure is contained in **Exhibit A**. The charts are included here for demonstrative purposes only.

**CONCLUSION 2**: The RCBO Diocesan Contribution per Claim of $522,000 (calculated as $180 million divided by 345 claims) is higher than the per-claim contribution in all 30 Comparable Plans in nominal terms, placing it at the 100th percentile. Not including this case, such per-claim contributions range from $14,000 to $488,000, with an average of $168,000 and a median of $128,000. **Figure 4** reflects *nominal* per-claim contributions and is set forth below.

**Figure 4**
**Diocesan Contribution per Claim (Nominal)**
**Comparable Plans (N = 30)**
**2005 to 2026**




On an inflation-adjusted basis, the Amended RCBO Diocesan Contribution per Claim again ranks in the 93rd percentile. Not including this case, such per-claim contributions range from $22,000 to $647,000, with an average of $202,000 and a median of $156,000. **Figure 5** reflects *inflation-adjusted* per-claim contributions and is set forth below:

**Figure 5**
**Diocesan Contribution per Claim (Inflation-Adjusted)**
**Comparable Plans (N = 30)**
**2005 to 2026**




**CONCLUSION 3**: When limited to the 12 most recent plans confirmed or agreed upon in the last five years (2021–2026), the RCBO per-claim contribution is at the 100th percentile in both nominal and inflation-adjusted terms. On a nominal basis, not including this case, such per-claim contributions range from $106,000 to $488,000, with an average of $241,000 and a median of $210,000. **Figure 6** reflects the *nominal* per-claim contributions in the 12 most recent plans and is set forth below.

**Figure 6**
**Diocesan Contribution per Claim (Nominal)**
**Recent Comparable Plans (N = 12)**
**2021 to 2026**




On an inflation-adjusted basis, not including this case, such per-claim contributions range from $118,000 to $498,000, with an average of $252,000 and a median of $221,000. **Figure 7** reflects the *inflation-adjusted* per-claim contributions in the 12 most recent plans and is set forth below.

**Figure 7**
**Diocesan Contribution per Claim (Inflation-Adjusted)**
**Recent Comparable Plans (N = 12)**
**2021 to 2026**




**CONCLUSION 4**: As an additional indication of economic reasonableness, the Debtor's $150 million contribution to the Survivors' Trust exceeds the approximately $112 million in assets that the Debtor has determined are available to fund the Survivors' Trust ("Recoverable Assets"), as estimated in the primary liquidation analysis authored by Charles M. Moore, CPA, restructuring advisor to RCBO.

14. My overall opinion is that both the $180 million aggregate contribution and the $522,000 average per-claim contribution will provide an economically reasonable distribution to claimants. The per-claim distribution is at the very high end of what claimants could receive from the diocesan contributions in Comparable Plans across the country. This outcome does not meaningfully change if the proposed RCWC contribution ($30 million) is not included in the calculation.

15. In addition to their recovery from the RCBO Diocesan Contribution, claimants will also receive any additional recovery obtained from non-settling insurers through the Litigation Option. My

analysis does not include any insurer contributions, meaning the total potential recovery to claimants under the Plan could be significantly higher than the diocesan contribution alone.

## V. Assignment—Rebuttal Report

16. I was subsequently asked to review and respond to the Expert Report of Katheryn McNally, filed on behalf of the Official Committee of Unsecured Creditors. Ms. McNally uses an average of sexual abuse settlements reached by RCBO in the tort system since 2003 to estimate the purported value of the 345 claims pending against RCBO. She arrives at an average alleged value of $1.2 million per claim (or approximately $1.3 million when inflation-adjusted to March 2026) and asserts this is a minimum. She references tort-based values as high as $2.7 million per claim.

17. Ms. McNally also opines that, in the tort system, claims filed within the statute of limitations or after a revival window has been opened that lifts the statute of limitations receive higher settlement values. She asserts that RCBO's bankruptcy claims should have a higher value because a revival window had been opened prior to the Debtor's petition date.

18. On May 21, 2026, I submitted the 2026 Martin Rebuttal Report responding to Ms. McNally, who I understand may testify at this confirmation hearing.

## VI. Opinions—Rebuttal Report

19. Based on my education and experience, as well as my review and analysis of the McNally Report, I reached the following additional conclusion:

**CONCLUSION 5:** Ms. McNally's valuation of RCBO's bankruptcy claims is inflated. It is based on tort system values that do not reflect the realities of the bankruptcy context and, in particular, the Debtor's asset constraints. It also presumes a "within statute of limitations" premium that does not exist in diocesan bankruptcies once assets are taken into account. Finally, it is not limited to the diocesan contribution, which is what the Court is being asked to assess here, and instead also includes the insurance contribution.

20. During her recent deposition, Ms. McNally acknowledged that she was estimating the "face value" of the claims, which I take to mean the tort-system value. She explicitly conceded, though, that the RCBO claims would not have that value in bankruptcy. She acknowledged that there would be a discount though did not attempt to estimate what that discount would be. In substance, then, she conceded that her

analysis does not answer the question before this Court: what is a reasonable contribution in the bankruptcy context? Instead, her analysis tells us what claims *might* be worth in a world in a tort system setting in which assets are effectively unlimited. We are not in that world, however. We are in a world where the Debtor's assets are constrained, and the question is whether the Debtor's proposed contribution — given those constraints — is economically reasonable. My analysis shows that it is.

21. Ms. McNally's tort-based estimate fails to consider that a primary reason that entities such as dioceses file for bankruptcy protection is that they do not believe they have sufficient assets to continue to litigate and pay a mounting number of claims in the tort system. This rationale is evident from contemporaneous statements made by many dioceses — including this one — when filing for bankruptcy protection. For example, an RCBO release on its Petition Date includes the statement from Bishop Michael Barber that "Given our current financial resources, RCBO could not shoulder the burden of litigating 330 cases filed under California Assembly Bill 218." Similarly, Charles M. Moore, the Debtor's Chief Restructuring Officer, stated in a declaration filed at Docket No. 19 that "The Debtor has neither the financial means nor the practical ability to litigate all current claims in state court." This is consistent with statements and reasoning described by other diocesan or similar entities.

22. Moreover, statistical analysis demonstrates that the primary driver of diocesan contributions in bankruptcy is the available — constrained — assets. Regression analysis, which allows estimation of the statistical relationship between variables, shows that for Comparable Plans, recoverable assets per claim explain nearly 50% of the variability in the ultimate diocesan contribution per claim. That figure rises to 70% if contributions by parties other than the debtors are excluded. The database compiled reporting recoverable assets per claim on a nominal and inflation-adjusted basis was captured in Exhibit 4 to my 2026 Martin Rebuttal Report, which is attached hereto as **Exhibit B**.

23. The outcomes in other cases where Ms. McNally served as a valuation expert confirm that the tort-based valuations she provided to those courts significantly overstated the actual bankruptcy outcomes. In the BSA case, Ms. McNally's proposed tort-based values were approximately 11 times the ultimately approved bankruptcy settlement values. In the Camden Diocese, her proposed values were more than three times the values approved by the bankruptcy court. Table 4 from the 2026 Martin Rebuttal

Report shows Ms. McNally's calculated per-claim values in the BSA and Camden cases as against the nominal total settlements per claim approved by the respective bankruptcy courts:

**Table 4: In Prior Matters, Ms. McNally's Proposed Tort-Based Values Exceeded the Values Ultimately Approved by the Bankruptcy Courts**

| Institution (1) | Midpoint of McNally Per Claim Value Estimate (2) | Nominal Total Settlement per Claim from Bankruptcy Settlement (3) | Ratio to Midpoint (4) (2) / (3) |
|---|---|---|---|
| Boy Scouts of America | $587,954 [1] | $52,434 [2] | 11.2 |
| Camden Diocese (NJ) | $1,826,253 [3] | $555,556 [4] | 3.3 |

**Notes and Sources:**

[1] McNally BSA Report, pp. 10, 31, 42. She assumes 46,916 Valued BSA Sexual Abuse Claims.

[2] Nominal aggregate settlement of $2.46 billion ("Judge approves $2.46 billion Boy Scouts reorganization plan in sex abuse suit," *Axios*, September 8, 2022, available at https://www.axios.com/2022/09/09/boy-scouts-bankruptcy-sexual-abuse-settlement) divided by the 46,916 Valued BSA Sexual Abuse Claims in the McNally BSA Report. McNally BSA Report, p. 42.

[3] McNally Camden Report, p. 49.

[4] See **Exhibit 3**.

24. Ms. McNally's assertion that values should be higher for claims filed after a revival window had been opened is also a tort-system observation that does not hold in the bankruptcy setting. After controlling for recoverable assets, I find no statistically significant difference between average diocesan contributions per claim in dioceses where a revival window had been opened prior to their petition and contributions in dioceses where a window had not been opened. Unsurprisingly, then, a comparison limited to the 15 Comparable Plans where a revival window *had* opened prior to the bankruptcy filing demonstrates that the RCBO Contribution per Claim is still at the high end on a nominal and inflation-adjusted basis. **Figure 1** from my 2026 Martin Rebuttal Report below demonstrates that the RCBO contribution per claim places it at the 100th percentile on a nominal basis among such cases.

**Figure 1**
**Diocesan Contribution per Claim (Nominal)**
**Comparable Plans**
**Where Revival Window Had Been Opened Before Filing (N = 15)**
**2005 to 2026**




On an inflation-adjusted basis, the RCBO contribution per claim places it in the 93rd percentile among cases where a revival window had been opened prior to the bankruptcy filing, as set forth in **Figure 2** from my 2026 Martin Rebuttal Report below.

**Figure 2**
**Diocesan Contribution per Claim (Inflation-Adjusted)**
**Comparable Plans**
**Where Revival Window Had Been Opened Before Filing (N = 15)**
**2005 to 2026**




25. Most fundamentally, Ms. McNally's $1.2 million per-claim estimate is also inflated because it is not limited to the diocesan contribution, which is the contribution the Court is being asked to assess here. Her estimate is derived in large part from the RCBO 2003 Revival Window Settlements, which I understand were 55% funded by insurance ($31.0 million of the $56.4 million total settlement). Adjusting for this known insurance portion to generate an estimate of the diocesan-only contribution to these settlements, her $1.2 million becomes approximately $590,000—remarkably close to the $522,000 per claim proposed in the Plan. In other words, Ms. McNally's own data, when properly analyzed, supports the Debtor's proposed contribution rather than undermining it.

26. Finally, using the same test of economic reasonableness applied in the 2026 Martin Report, Ms. McNally's proposed valuation is shown to be far above the diocesan contribution per claim and total settlement per claim in all other Comparable Plans. Her minimum valuation of $1.2 million per claim is 88% higher than the maximum inflation-adjusted diocesan contribution per claim among Comparable Plans. **Figure 3** from my 2026 Martin Rebuttal Report reflects a comparison of Ms. McNally's estimated values per-claim in this case against the RCBO Diocesan Contribution per Claim and outcomes in the Comparable Plans.

**Figure 3**
**Comparison of Inflation-Adjusted Diocesan Contribution per Claim for Comparable Plans (N=30) to Ms. McNally's Estimated Value per Claim**




27. With respect to Ms. McNally's analysis, then, my overarching conclusion is that it dramatically overstates the Debtor's potential liability for three primary reasons. First, it does not account for asset constraints that are typically the reason entities like the Debtor file for bankruptcy in the first place, a fact that Ms. McNally acknowledged at her deposition when she conceded that bankruptcy claims

are paid at a fraction of tort-system values. Second, it relies on another tort-system assumption — that the opening of a revival window drives claim values up — which my regression analysis demonstrates has no statistically significant effect on contributions in the bankruptcy context once diocesan assets are taken into account. Third, and most fundamentally, it is not limited to the diocesan contribution, which is what the Court is being asked to evaluate here. Fifty-five percent of the settlements that Ms. McNally uses as the primary basis for her opinion were paid by insurance, not by the Debtor. When that fact is accounted for, Ms. McNally's own data produces a per-claim figure ($590,000) that is quite similar to what the Debtor proposes ($522,000).

## VII. Conclusion

28. On the basis of the review and analysis conducted, including my analysis of Ms. McNally's tort-based valuation, I conclude that the Plan provides economically reasonable compensation to claimants. Specifically:

a. In attempting to determine a "face value" of abuse claims irrespective of the source of contemplated payments, Ms. McNally's tort-based analysis results in an inflated number that has no relationship to what this Court must actually determine: whether RCBO's Contribution under the Plan, either on an absolute or per-claim basis, constitutes reasonable compensation for survivors' abuse claims.

b. RCBO's Diocesan Contribution is near the top (93rd percentile) of diocesan contributions in Comparable Plans on both a nominal and inflation-adjusted basis.

c. RCBO's Diocesan Contribution per Claim under the Plan is at the 100th and 93rd percentile in nominal and inflation-adjusted terms, respectively, of diocesan contributions in Comparable Plans. It is at the 100th percentile in both nominal and inflation-adjusted terms of contributions per claim under Comparable Plans confirmed or agreed upon in the last five years.

d. The Debtor proposes to contribute to the Survivors' Trust an amount in excess of its estimated Recoverable Assets in a hypothetical liquidation.

29. All 30 Comparable Plans in my analysis have been deemed economically reasonable by virtue of agreement by the parties involved in those matters. The 28 Confirmed Plans have additionally been deemed economically reasonable via approval of the associated bankruptcy courts. The fact that my analysis shows that RCBO's Plan would provide compensation to claimants at the high end of these Comparable Plans supports my conclusion that it would provide economically reasonable compensation to claimants. Further, the Plan offers claimants a Litigation Option to seek additional compensation from non-settling insurers, which may increase this compensation further. Accordingly, I respectfully submit that the economic evidence supports confirmation of the Plan.

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on June 5, 2026, at Tampa, Florida.

Denise N. Martin

Denise Martin, Ph. D

**Exhibit A to Martin Declaration**

**Catholic Institutions that Filed for Bankruptcy from 2004 to 2026[1]**
**Ordered by Date Confirmed (Earliest to Latest)**

| Diocese (State) / Religious Order | Date Filed | Date Confirmed[2] | Count of Claims[3] | Diocesan Contribution[4] | Diocesan Contribution Per Claim | Inflation-Adjusted Diocesan Contribution Per Claim[5] | Status of Bankruptcy |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) = (5) / (4) | (7) | (8) |
| 1 Tucson Diocese (AZ) | 9/20/2004 | 8/1/2005 | 58 [6] | $7,500,000 | $129,310 | $217,413 | Confirmed |
| 2 Portland Archdiocese (OR) | 7/6/2004 | 4/17/2007 | 173 | $2,415,000 | $13,960 | $22,303 | Confirmed |
| 3 Spokane Diocese (WA) | 12/6/2004 | 4/24/2007 | 175 [7] | $28,185,710 | $161,061 | $257,320 | Confirmed |
| 4 Davenport Diocese (IA) | 10/10/2006 | 5/1/2008 | 156 | $17,500,000 | $112,179 | $170,996 | Confirmed |
| 5 Fairbanks Diocese (AK) | 3/1/2008 | 2/17/2010 | 290 | $8,400,000 | $28,966 | $44,130 | Confirmed |
| 6 Wilmington Diocese (DE) | 10/18/2009 | 7/28/2011 | 152 | $61,968,441 | $407,687 | $595,885 | Confirmed |
| 7 Oregon Province of the Jesuits (OR) | 2/17/2009 | 7/29/2011 | 535 | $48,100,000 | $89,907 | $131,410 | Confirmed |
| 8 Christian Brothers of Ireland (NY) | 4/28/2011 | 1/13/2014 | 426 | $13,442,000 | $31,554 | $44,544 | Confirmed |
| 9 Helena Diocese (MT) | 1/31/2014 | 3/5/2015 | 388 | $7,320,166 | $18,866 | $26,385 | Confirmed |
| 10 Milwaukee Archdiocese (WI) | 1/4/2011 | 11/13/2015 | 459 [8] | $10,544,202 | $22,972 | $31,962 | Confirmed |
| 11 Gallup Diocese (NM) | 11/12/2013 | 6/23/2016 | 57 | $5,850,000 | $102,632 | $140,613 | Confirmed |
| 12 Stockton Diocese (CA) | 1/15/2014 | 1/11/2017 | 29 | $13,795,000 | $475,690 | $646,844 | Confirmed |
| 13 Crosier Father & Brothers (MN) | 6/1/2017 | 3/26/2018 | 68 | $5,712,000 | $84,000 | $111,150 | Confirmed |
| 14 Great Falls-Billings Diocese (MT) | 3/31/2017 | 8/22/2018 | 86 | $12,000,000 | $139,535 | $182,736 | Confirmed |
| 15 St. Paul and Minneapolis Archdiocese (MN) | 1/16/2015 | 9/25/2018 | 453 | $40,290,724 | $88,942 | $116,344 | Confirmed |
| 16 Duluth Diocese (MN) | 12/7/2015 | 10/21/2019 | 125 | $8,500,000 | $68,000 | $87,254 | Confirmed |
| 17 New Ulm Diocese (MN) | 3/3/2017 | 3/10/2020 | 101 | $8,000,000 | $79,208 | $101,333 | Confirmed |
| 18 St. Cloud Diocese (MN) | 6/15/2020 | 12/3/2020 | 102 | $8,500,000 | $83,333 | $105,645 | Confirmed |
| 19 Winona-Rochester Diocese (MN) | 11/30/2018 | 10/14/2021 | 143 | $22,056,000 | $154,238 | $184,141 | Confirmed |
| 20 Agana Archdiocese (Guam) | 1/16/2019 | 10/20/2022 | 259 | $27,490,897 [9] | $106,142 | $117,611 | Confirmed |
| 21 Santa Fe Archdiocese (NM) | 12/3/2018 | 12/28/2022 | 404 | $83,475,000 | $206,621 | $229,885 | Confirmed |
| 22 Harrisburg Diocese (PA) | 2/19/2020 | 2/17/2023 [10] | 59 | $7,500,000 | $127,119 | $139,530 | Confirmed |
| 23 Camden Diocese (NJ) | 10/1/2020 | 3/15/2024 [11] | 324 | $87,500,000 [11] | $270,062 | $285,523 | Confirmed |
| 24 Rockville Centre Diocese (NY) | 10/1/2020 | 12/4/2024 | 500 [12] | $237,800,000 | $475,600 | $497,613 | Confirmed |
| 25 Norwich Diocese (CT) | 7/15/2021 | 5/21/2025 [13] | 141 | $25,700,000 [14] | $182,270 | $187,230 | Confirmed |
| 26 Diocese of Rochester (NY) | 9/12/2019 | 9/5/2025 | 425 [15] | $55,000,000 | $129,412 | $131,568 | Confirmed |
| 27 Syracuse Diocese (NY) | 6/19/2020 | 9/26/2025 | 345 [16] | $100,000,000 | $289,855 | $294,686 | Confirmed |
| 28 New Orleans Archdiocese (LA) | 5/1/2020 | 12/8/2025 | 410 [17] | $200,000,000 | $487,805 | $497,076 | Confirmed |
| 29 Buffalo Diocese (NY) | 2/28/2020 | 2/5/2026 [18] | 611 [19] | $150,000,000 [18] | $245,499 | $248,074 | Pending Joint Plan [18] |
| 30 Franciscan Friars of California (CA) | 12/31/2023 | 3/18/2026 [20] | 94 | $20,000,000 | $212,766 | $212,766 | Pending Joint Plan [20] |
| 31 Santa Rosa Diocese (CA) | 3/13/2023 | Pending | NA | NA | NA | NA | No Plan Filed |
| 32 Albany Diocese (NY) | 3/15/2023 | Pending | NA | NA | NA | NA | No Plan Filed |
| 33 Ogdensburg Diocese (NY) | 7/17/2023 | Pending | NA | NA | NA | NA | No Plan Filed |
| 34 Archdiocese of San Francisco (CA) | 8/21/2023 | Pending | NA | NA | NA | NA | No Plan Filed |
| 35 Archdiocese of Baltimore (MD) | 9/29/2023 | Pending | NA | NA | NA | NA | No Plan Filed |
| 36 Sacramento Diocese (CA) | 4/1/2024 | Pending | NA | NA | NA | NA | No Plan Filed |
| 37 San Diego Diocese (CA) | 6/17/2024 | Pending | NA | NA | NA | NA | No Plan Filed |
| 38 Burlington Diocese (VT) | 9/30/2024 | Pending | NA | NA | NA | NA | No Plan Filed |
| 39 Diocese of Fresno (CA) | 7/1/2025 | Pending | NA | NA | NA | NA | No Plan Filed |
| 40 Diocese of Alexandria (LA) | 10/31/2025 | Pending | NA | NA | NA | NA | No Plan Filed |
| 41 Diocese of El Paso (TX) | 3/6/2026 | Pending | NA | NA | NA | NA | No Plan Filed |



Case: 23-40523 Doc# 3103-2 Filed: 06/05/26 Entered: 06/05/26 18:22:35 Page 22 of 26

**Exhibit 3**
**Catholic Institutions that Filed for Bankruptcy from 2004 to 2026[1]**
**Ordered by Date Confirmed (Earliest to Latest)**

| Diocese (State) / Religious Order | Date Filed | Date Confirmed[2] | Count of Claims[3] | Diocesan Contribution[4] | Diocesan Contribution Per Claim | Inflation-Adjusted Diocesan Contribution Per Claim[5] | Status of Bankruptcy |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) = (5) / (4) | (7) | (8) |
| **All Bankruptcies** | | | | | | | |
| ***Confirmed + Pending Joint Plan (N=30)*** | | | | | | | |
| **Average** | | | 252 | $44,151,505 | $167,506 | $201,999 | |
| **Median** | | | 174 | $18,750,000 | $128,214 | $155,804 | |
| **Bankruptcies Confirmed in the Past 5 Years (Inclusive of 2021)** | | | | | | | |
| ***Confirmed + Pending Joint Plan (N=12)*** | | | | | | | |
| **Average** | | | 310 | $84,710,158 | $240,616 | $252,142 | |
| **Median** | | | 335 | $69,237,500 | $209,694 | $221,325 | |
| Oakland Diocese (CA) | **5/8/2023** | **Pending** | **345** [21] | **$180,000,000** [22] | **$521,739** | **$521,739** | **Pending** |

**Notes and Sources:**

Data are from disclosure statements, plans of reorganization, voluntary petitions, and other legal filings from the bankruptcy docket for each case. News articles were used to supplement missing or unclear information.

PennState Law's website dedicated to Catholic dioceses in bankruptcy (last accessed on May 6, 2026 at https://insight.dickinsonlaw.psu.edu/bankruptcy/) was used to generate a list of bankruptcies.

[1] The San Juan Archdiocese's (PR) bankruptcy case is not included because the claims in that case were not related to sexual abuse.

[2] Date Confirmed refers to the date of the court's confirmation order. The date of the latest plan/disclosure statement/settlement news is shown for the Buffalo Diocese and the Franciscan Friars of California.

[3] Count of Claims includes claims that are estimated to receive distributions, to the extent that this information could be identified from bankruptcy filings for each case. Otherwise, unique timely filed claims are used, as described more fully in the footnotes for each such case below.

[4] Diocesan Contribution represents the settlement funds from the diocese and other participating parties such as parishes, schools, and other Catholic organizations.

[5] Inflation-adjusted amounts are adjusted through March 2026 using the non-seasonally adjusted Consumer Price Index for All Urban Consumers: All Items in U.S. City Average, or CPIAUCNS ("CPI") data from the U.S. Bureau of Labor Statistics, retrieved from FRED, Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/CPIAUCNS. The CPI value observed for the month of the year for each settlement's confirmation date was used in the calculation.

[6] 108 proofs of claim were filed prior to the claims bar date, of which 5 were duplicates, accordingly there were 103 unique timely filed claims. Of the 103, 9 claims were filed by parents of the victim, and 36 claims contain abuse allegations that are subject to objections on various grounds. As such, this analysis uses 58 claims (103 - 9- 36) as the estimate of claims that would receive a distribution. (Third Amended and Restated Disclosure Statement Regarding Plan of Reorganization Dated May 25, 2005, *In re The Roman Catholic Church of the Diocese of Tucson, an Arizona corporation sole*, Case No. 4-bk-04-04721-JMM (Bankr. D. Arizona), filed May 26, 2005).

[7] 208 claims were filed, of which "24 duplicate, late filed and facially invalid Tort Claims have been disallowed," for a total of 184 timely filed unique claims. According to the disclosure statement, "[t]he proponents estimate that after pending claims objections are resolved, at least 175 individual tort claims and an unknown number of future tort claims remain to be dealt with under the Plan." This analysis uses 175 claims as the estimate of claims that would receive a distribution. (First Amended Disclosure Statement for Debtor's Second Amended Plan of Reorganization Jointly Proposed by Executive Committee of the Association of Parishes, Debtor, Future Claims Representative and Tort Claimants' Committee, *In re The Catholic Bishop of Spokane a/k/a The Catholic Diocese of Spokane*, Case No. 04-08822-PCW-11 (Bankr. E.D. Washington), filed March 7, 2007).

[8] Includes 355 Class 8 claims and 104 Class 9 claims, for a total of 459 claims estimated to receive distributions. According to the disclosure statement, Class 8 are "abuse survivor plan pool claims," defined as claims alleging abuse by "either (a) a priest on the List of Substantiated Abusers or (b) a member of a Religious Order or Lay Person working at a Catholic Entity." Class 9 are "unsubstantiated claims receiving a distribution at the creditors' committee's request", defined as claims alleging abuse by either (a) an Archdiocesan Priest who is not on List of Substantiated Abusers or (b) a member of a Religious Order or Lay Person working at an entity that is not a Catholic Entity." (Second Amended Chapter 11 Plan of Reorganization Dated September 25, 2015, Proposed by the Archdiocese of Milwaukee, *In re Archdiocese of Milwaukee*, Case No. 11-20059 (Bankr. E.D. Wis.), filed November 6, 2015 and Fourth Amended Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization Dated September 25, 2015, Proposed by the Archdiocese of Milwaukee, *In re Archdiocese of Milwaukee,* Case No. 11-20059 (Bankr. E.D. Wis.), filed September 25, 2015).

[9] The diocesan contribution is based on information from the Post-Confirmation report for the Archdiocese of Agana Settlement Trust, and is calculated as total settlement less the insurer contributions (Post-confirmation Report, *In re Archbishop of Agana, a corporation sole*, Case No. 19-00010 (Bankr. D. Guam), filed September 23, 2023).

[10] While the confirmation order is not available on the docket, the Notice of Filing Insurance Settlement Agreements filed 3/30/2023 indicates that the confirmation order was entered on 2/17/2023 (Notice of Filing Insurance Settlement Agreements, *In re Roman Catholic Diocese of Harrisburg*, Case No. 20-00599 (Bankr. M.D. Pa.), filed March 30, 2023).

[11] On March 15, 2024, the court filed its confirmation order of the Third Modified Eighth Amended Plan of Reorganization filed February 23, 2024 (Order Confirming Third Modified Eighth Amended Plan of Reorganization, *In re The Diocese of Camden, New Jersey*, Case No. 20-21257 (Bankr. D.N.J.), filed March 15, 2024). The Third Modified Eighth Amended Plan of Reorganization provided for an $87.5 million settlement, with no contributions from insurers. On February 17, 2026, a letter from the diocese announced that the "Official Committee of Tort Claimant Creditors [...] unanimously agreed to accept the terms of a final bankruptcy settlement with the Diocese of Camden" which provided for a $180 million trust funded by the diocese, parishes, and insurers ("Statement from Bishop Joseph Williams on Settlement with Sexual Abuse Survivors," Diocese of Camden, February 17, 2026). Details on insurer contributions are not publicly available. Therefore, it is assumed that the diocesan contribution is still $87.5 million.

[12] According to the disclosure statement, "it is the Debtor's position that there are approximately 500 facially valid Abuse Claims remaining on the claims register. However, even if the Debtor does not prevail on any additional claim objections and only 186 claims are disallowed or withdrawn, the number of remaining abuse claims is 565." This analysis uses 500 claims as the estimate of claims that would receive a distribution. (Fifth Modified Disclosure Statement, *In re The Roman Catholic Diocese of Rockville Centre, New York,* Case No. 20-12345 (MG) (Bankr.S.D.N.Y.), filed February 13, 2024.)

[13] While the confirmation order is not available on the docket, the docket entry on May 21, 2025 shows that Seventh Amended Chapter 11 Plan was confirmed (*In re The Norwich Roman Catholic Diocesan Corporation Bankr.D.Conn.*, Case No. 21-20687 (Bankr.D.Conn.)).

[14] The disclosure statement states that funding provided for in the plan shall ultimately exceed $31 million. Exact settlement amount is not yet known and depends on the final value of the transferred real estate owned by the diocese. (Seventh Amended Joint Disclosure Statement for Seventh Amended Joint Plan, *In re The Norwich Roman Catholic Diocesan Corporation,* Case No. 21-20687 (Bankr.D.Conn.), filed March 25, 2025).

[15] According to the disclosure statement, more than 554 proofs of claim were filed by the abuse claimants, of which the diocese believes at least 41 are duplicates or do not relate to abuse, and at least 42 were filed after the bar date, for a total estimate of 471 unique timely filed claims. Among the abuse claims filed before the bar date, the diocese believes at least 46 assert claims "based on upon the actions or omissions of individuals or entities that are not affiliated with the Diocese and for which the Diocese believes neither it nor the Participating Parties have any legal liability." This analysis uses 425 claims (471 unique timely filed claims - 46 claims not affiliated to debtor) as the estimate of claims that would receive a distribution. (Disclosure Statement in Support of Eighth Amended Joint Plan of


Case: 23-40523 Doc# 3103-2 Filed: 06/05/26 Entered: 06/05/26 18:22:35 Page 23 of 26

**Exhibit 3**
**Catholic Institutions that Filed for Bankruptcy from 2004 to 2026[1]**
**Ordered by Date Confirmed (Earliest to Latest)**

| Diocese (State) / Religious Order | Date Filed | Date Confirmed[2] | Count of Claims[3] | Diocesan Contribution[4] | Diocesan Contribution Per Claim | Inflation-Adjusted Diocesan Contribution Per Claim[5] | Status of Bankruptcy |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) = (5) / (4) | (7) | (8) |

Reorganization, *In re The Diocese of Rochester* , Case No 19-20905 (Bankr.W.D.N.Y.), filed March 14, 2025).

[16] According to the disclosure statement, more than 411 proofs of claim were filed by the abuse claimants, of which the diocese believes at least 18 are duplicates or do not relate to abuse, and at least 19 were filed after the bar date, for a total estimate of 374 unique timely filed claims. Among the abuse claims filed before the bar date, the diocese believes at least 29 assert claims "based on upon the actions or omissions of individuals or entities that are not affiliated with the Diocese and for which the Diocese believes neither it nor the Participating Parties have any legal liability." This analysis uses 345 claims (374 unique timely filed claims - 29 claims not affiliated to debtor) as the estimate of claims that would receive a distribution. (Disclosure Statement in Support of the Fifth Amended Plan, *In re The Roman Catholic Diocese of Syracuse, New York* , Case No. 20-30663 (WAK) (Bankr.N.D.N.Y.), filed on November 27, 2024).

[17] According to the Second Amended Modified Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization, "[a]s of July 1, 2025, approximately 660 non-duplicative Abuse Proofs of Claim were filed, including 250 claims filed after the Archdiocese's Abuse Claims Bar Date" (Second Amended Modified Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of August 6, 2025, *In re The Roman Catholic Church of the Archdiocese of New Orleans* , Case No. 20-10846 (Bankr. E.D. La.), filed August 8, 2025). This analysis uses 410 claims (660 non-duplicative claims - 250 late filed claims).

[18] A Joint Chapter 11 Plan of Reorganization was filed on October 1, 2025 and called for $150 million from the diocese and other participating parties (Joint Chapter 11 Plan of Reorganization for the Diocese of Buffalo, N.Y., *In re The Diocese of Buffalo, N.Y.* , Case No. 20-10322 (Bankr. W.D.N.Y.), filed October 1, 2025).

[19] According to the disclosure statement, more than 891 proofs of claim were filed by the abuse claimants, of which the diocese believes at least 121 are duplicates or do not relate to abuse, and at least 32 were filed after the bar date, for a total estimate of 738 unique timely filed claims. Among the abuse claims filed before the bar date, the diocese believes at least 127 assert claims "based upon the actions or omissions of individuals or entities that are not affiliated with the Diocese and for which the Diocese believes neither it nor the Participating Parties have any legal liability." This analysis uses 611 claims (738 unique timely filed claims - 127 claims not affiliated to debtor) as the estimate of claims that would receive a distribution. (Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization for the Diocese of Buffalo, N.Y., *In re The Diocese of Buffalo, N.Y.* , Case No 20-10322 (Bankr.W.D.N.Y.), filed October 1, 2025).

[20] A Joint Chapter 11 Plan of Reorganization was filed on March 18, 2026 and called for $20 million from the religious order and other participating parties (Joint Plan of Reorganization for the Franciscan Friars of California, Inc., *In re Franciscan Friars of California, Inc.* , Case No. 23-41723 (Bankr. N.D.Cal), filed March 18, 2026).

[21] The Amended RCBO Disclosure Statement assumes "approximately 345 unique Abuse Claims will ultimately receive distributions" (pp. 11-12). This is the count of claims used in the analysis.

[22] Includes $30 million contributed by RCWC. *Pro rata* distributions from the RCWC Escrow are contingent upon each respective holder of an abuse claim executing a RCWC Release, and "[i]f any amount remains in the RCWC Escrow as of the three and a half-year anniversary of the Effective Date and not all RCWC Abuse Claimants have executed RCWC Releases, the escrow agent shall return such amount to RCWC" (Amended RCBO Disclosure Statement, pp. 5-6).


Case: 23-40523 Doc# 3103-2 Filed: 06/05/26 Entered: 06/05/26 18:22:35 Page 24 of 26

**Exhibit B to Martin Declaration**

**Exhibit 4**
**Catholic Institutions that Filed for Bankruptcy from 2004 to 2026 with Confirmed Plans or Pending Joint Plans**
**Ordered by Date Confirmed (Earliest to Latest)**

| Diocese (State) / Religious Order | Diocesan Contribution | Diocesan Contribution Per Claim | Inflation-Adjusted Diocesan Contribution Per Claim[1] | Debtor Contribution[2] | Debtor Contribution Per Claim | Inflation-Adjusted Debtor Contribution Per Claim[1] | Recoverable Assets | Recoverable Assets Per Claim | Inflation-Adjusted Recoverable Assets Per Claim[1] | Revival Window Opened?[3] |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 1 Tucson Diocese (AZ) | $7,500,000 | $129,310 | $217,413 | $5,500,000 | $94,828 | $159,436 | $11,115,580 | $191,648 | $322,223 | No |
| 2 Portland Archdiocese (OR) | $2,415,000 | $13,960 | $22,303 | N/A | N/A | N/A | N/A | N/A | N/A | No |
| 3 Spokane Diocese (WA) | $28,185,710 | $161,061 | $257,320 | $25,443,210 | $145,390 | $232,283 | $26,499,166 | $151,424 | $241,923 | No |
| 4 Davenport Diocese (IA) | $17,500,000 | $112,179 | $170,996 | $11,600,000 | $74,359 | $113,346 | $8,302,858 | $53,223 | $81,129 | No |
| 5 Fairbanks Diocese (AK) | $8,400,000 | $28,966 | $44,130 | $7,600,000 | $26,207 | $39,927 | $7,910,403 | $27,277 | $41,558 | No |
| 6 Wilmington Diocese (DE) | $61,968,441 | $407,687 | $595,885 | $47,000,000 | $309,211 | $451,950 | $103,940,000 | $683,816 | $999,482 | Yes |
| 7 Oregon Province of the Jesuits (OR) | $48,100,000 | $89,907 | $131,410 | N/A | N/A | N/A | N/A | N/A | N/A | No |
| 8 Christian Brothers of Ireland (NY) | $13,442,000 | $31,554 | $44,544 | $13,442,000 | $31,554 | $44,544 | $33,525,000 | $78,697 | $111,095 | No |
| 9 Helena Diocese (MT) | $7,320,166 | $18,866 | $26,385 | $2,870,166 | $7,397 | $10,345 | $12,443,472 | $32,071 | $44,851 | No |
| 10 Milwaukee Archdiocese (WI) | $10,544,202 | $22,972 | $31,962 | $2,544,202 | $5,543 | $7,712 | $6,293,570 | $13,711 | $19,077 | No |
| 11 Gallup Diocese (NM) | $5,850,000 | $102,632 | $140,613 | $3,020,000 | $52,982 | $72,590 | $4,074,135 | $71,476 | $97,928 | No |
| 12 Stockton Diocese (CA) | $13,795,000 | $475,690 | $646,844 | $8,595,000 | $296,379 | $403,017 | $7,302,858 | $251,823 | $342,429 | No |
| 13 Crosier Father & Brothers (MN) | $5,712,000 | $84,000 | $111,150 | $5,712,000 | $84,000 | $111,150 | N/A | N/A | N/A | Yes |
| 14 Great Falls-Billings Diocese (MT) | $12,000,000 | $139,535 | $182,736 | $5,000,000 | $58,140 | $76,140 | $20,166,314 | $234,492 | $307,093 | No |
| 15 St. Paul and Minneapolis Archdiocese (MN) | $40,290,724 | $88,942 | $116,344 | $28,475,000 | $62,859 | $82,225 | $28,043,328 | $61,906 | $80,978 | Yes |
| 16 Duluth Diocese (MN) | $8,500,000 | $68,000 | $87,254 | N/A | N/A | N/A | $3,137,147 | $25,097 | $32,203 | Yes |
| 17 New Ulm Diocese (MN) | $8,000,000 | $79,208 | $101,333 | $7,000,000 | $69,307 | $88,666 | $10,744,550 | $106,382 | $136,097 | Yes |
| 18 St. Cloud Diocese (MN) | $8,500,000 | $83,333 | $105,645 | $6,650,000 | $65,196 | $82,652 | N/A | N/A | N/A | Yes |
| 19 Winona-Rochester Diocese (MN) | $22,056,000 | $154,238 | $184,141 | $14,310,000 | $100,070 | $119,471 | $16,546,988 | $115,713 | $138,147 | Yes |
| 20 Agana Archdiocese (Guam) | $27,490,897 | $106,142 | $117,611 | $27,490,897 | $106,142 | $117,611 | $84,040,750 | $324,482 | $359,543 | Yes |
| 21 Santa Fe Archdiocese (NM) | $83,475,000 | $206,621 | $229,885 | $40,600,000 | $100,495 | $111,810 | $33,145,442 | $82,043 | $91,280 | No |
| 22 Harrisburg Diocese (PA) | $7,500,000 | $127,119 | $139,530 | $5,500,000 | $93,220 | $102,322 | $10,494,479 | $177,873 | $195,239 | No |
| 23 Camden Diocese (NJ) | $87,500,000 | $270,062 | $285,523 | $77,250,000 | $238,426 | $252,076 | $41,001,085 | $126,547 | $133,791 | Yes |
| 24 Rockville Centre Diocese (NY) | $237,800,000 | $475,600 | $497,613 | $204,800,000 | $409,600 | $428,559 | $333,504,356 | $667,009 | $697,882 | Yes |
| 25 Norwich Diocese (CT) | $25,700,000 | $182,270 | $187,230 | $16,000,000 | $113,475 | $116,563 | $22,876,145 | $162,242 | $166,657 | No |
| 26 Diocese of Rochester (NY) | $55,000,000 | $129,412 | $131,568 | $25,000,000 | $58,824 | $59,804 | $40,425,363 | $95,119 | $96,704 | Yes |
| 27 Syracuse Diocese (NY) | $100,000,000 | $289,855 | $294,686 | $50,000,000 | $144,928 | $147,343 | $19,391,799 | $56,208 | $57,145 | Yes |
| 28 New Orleans Archdiocese (LA) | $200,000,000 | $487,805 | $497,076 | $200,000,000 | $487,805 | $497,076 | $649,242,615 | $1,583,519 | $1,613,615 | Yes |
| 29 Buffalo Diocese (NY) | $150,000,000 | $245,499 | $248,074 | $30,000,000 | $49,100 | $49,615 | $40,773,743 | $66,733 | $67,433 | Yes |
| 30 Franciscan Friars of California (CA) | $20,000,000 | $212,766 | $212,766 | $5,800,000 | $61,702 | $61,702 | $6,126,244 | $65,173 | $65,173 | Yes |

**Notes and Sources:**

Data on diocesan contribution are from **Exhibit 3**. Additional data on debtor contribution are from disclosure statements, plans of reorganization, and other legal filings from the bankruptcy docket for each case. News articles were used to supplement missing or unclear information. Recoverable assets data are from liquidation analyses to disclosure statements for each bankruptcy. This exhibit is limited to the dioceses or religious orders with Confirmed Plans or Pending Joint Plans for bankruptcy cases involving claims of sexual abuse. See **Exhibit 3**.

[1] Inflation-adjusted amounts are adjusted through March 2026 using the non-seasonally adjusted Consumer Price Index for All Urban Consumers: All Items in U.S. City Average, or CPIAUCNS ("CPI") data from the U.S. Bureau of Labor Statistics, retrieved from FRED, Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/CPIAUCNS. The CPI value observed for the month of the year for each settlement's confirmation date was used in the calculation. Values for the Franciscan Friars of California (CA) are not inflation-adjusted.

[2] Debtor contribution is limited to contributions made by the debtor alone (that is, excluding contributions from non-debtor religious entities).

[3] "Yes" represents bankruptcies that were filed after the opening of a revival window and where most claims were filed as a result of the revival window opening. This is based on a review of the bankruptcy documents, particularly disclosure statements and plans of reorganization, as well as a CHILD USA publication on revival laws (Alice Nasar Hanan, *Revival Laws for Child Sex Abuse Claims* , CHILD USA (last updated June 6, 2024), available at https://childusa.org/wp-content/uploads/2025/11/US-WindowsRevival-Laws-for-CSA-Since-2002-6.7.24-AH.pdf).