**Entered on Docket**
**October 15, 2026**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

FOR PUBLICATION

**The following constitutes the order of the Court.**
**Signed: October 15, 2026**

**William J. Lafferty, III**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In Re:<br>THE ROMAN CATHOLIC BISHOP OF OAKLAND, a California corporation,<br>Debtor. | CASE NO.: 23-40523 WJL<br>Chapter 11 |

**AMENDED MEMORANDUM DECISION AFTER HEARING ON CONFIRMATION OF DEBTOR'S MODIFIED FOURTH AMENDED PLAN OF REORGANIZATION**

## Table of Contents


**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**JURISDICTION AND VENUE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**UNCONTESTED PORTIONS OF THE PLAN** . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**CONTESTED PORTIONS OF THE PLAN** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**I. DEBTOR'S ARGUMENTS CONCERNING THE EFFECT OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION AND THE RELIGIOUS FREEDOM RESTORATION ACT ON ITS OBLIGATIONS UNDER CODE SECTION 1129** . . . . 39

**A. There is no Basis Under the Bankruptcy Code or Relevant Caselaw to Treat this Debtor Differently From Any Other Debtor Based on its Status as a Religious Entity.** 40

**B. The Debtor Has Not Articulated a Reason Why the Requirements for Confirmation of a Plan Would Infringe on Religious Freedoms.** . . . . . . . . . . . . . . . . . . . . . . . . 42

**C. The Provisions and Requirements of the First Amendment and RFRA Either Render Them Inapplicable to Plan Confirmation Issues or Make It Impossible to Assess the Effect of Those Laws on the Debtor's Requirements for Confirmation of Its Plan.** 44

1. Applicability of the First Amendment Free Exercise Clause. . . . . . . . . . . . . . 44

2. The Church Autonomy Doctrine and the Ministerial Exception. . . . . . . . . . . . 45

3. The Religious Freedom and Restoration Act. . . . . . . . . . . . . . . . . . . . . . . . 47

4. The Doctrine of Unconstitutional Conditions. . . . . . . . . . . . . . . . . . . . . . . 49

**II. THE PLAN DOES NOT SATISFY THE BEST INTERESTS TEST OF SECTION 1129(A)(7)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**A. The Plan Does Not Satisfy the Best Interests of Creditors Test, for Several Reasons.** 52

1. Structural Problems with the Debtor's Liquidation Analyses. . . . . . . . . . . . . . . 54

2. The Supplemental Liquidation Analysis Contains Material Errors. . . . . . . . . . 58

a. The Supplemental Liquidation Analysis fails to include at least one material asset and overstates the amount of debt that must be paid on liquidation. . . . . . . . . . . . . . 58

b. The Liquidation Analyses also wrongly include the full $30 Million of the RCWC Contribution as part of the consideration available through the Plan as if were equally available to all Class 4 Claimants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

3. The Debtor's Assumptions in the Liquidation Analyses are arbitrary and overbroad. 62

a. The accelerated timeline for property sales is not reasonable. . . . . . . . . . . . . . . 63

b. The Litigation and Liquidation Cost are not reasonable. . . . . . . . . . . . . . . . . 64

**III. THE PLAN SATISFIES SECTION 1129(A)(10)'S REQUIREMENT THAT AN IMPAIRED ASSENTING NON-INSIDER CLASS HAS ACCEPTED THE PLAN** . . . 66

**A. Class 5 (Unknown Abuse Claims) Cannot Qualify as an Impaired Assenting Class of Creditors.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**B. Classes 1 and 3 Qualify as Impaired Assenting Classes For Purposes of Satisfying the Requirements of Section 1129(a)10)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

1. Class 1 (RCC Secured Claim) is not an insider and is impaired in good faith. . . 69

2. Class 3 (General Unsecured Claims) is impaired in good faith. . . . . . . . . . . . . 74

**IV. THE PLAN SATISFIES SECTION 1129(A)(11)'S REQUIREMENT OF FEASIBILITY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

**A. The Plan is Feasible with Respect to the Debtor's Everyday Operations.** . . . . . . 76

**B. The Plan is Feasible with Respect to the Debtor's Obligations to the Survivors' Trust.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

**V. THE COURT'S DISPOSTION OF THE REMAINING COMMITTEE OBJECTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

**VI. THE OBJECTIONS FROM THE OFFICE OF THE UNITED STATES TRUSTEE** 83

**A. The Court Will Overrule the UST Objection Concerning the Channeling Injunction.** 84

**B. The Court Will Sustain in Part the UST's Objection to the Exculpation Clause.** 85

**C. The Court Will Overrule the UST's Objection Concerning the Filing of Post-Confirmation Quarterly Reports By the Survivors' Trust.** . . . . . . . . . . . . . . . . . . . . 86

**VII. THE COURT WILL OVERRULE THE COMMITTEE'S OBJECTIONS THAT THE DEBTOR HAS PROCEEDED IN BAD FAITH AND THE PLAN HAS BEEN PROPOSED IN BAD FAITH, BUT THE COURT CANNOT PRESENTLY DETERMINE THAT THE PLAN SATISFIES THE FAIR AND EQUITABLE REQUIREMENT OF SECTION 1129(B)(2)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

**A. The Debtor's Failure to Obtain the Acceptance of the Class of Abuse Claimants Does Not Establish That the Plan Has Not Been Proposed in Good Faith.** . . . . . . . . . . 87

**B. The Court Is Not Presently Able to Resolve Disputed Issues Concerning the Application of Section 1129(b) to the Plan.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

1. The Court will not presently determine whether the plan's disparate treatment of Classes 3 and 4 constitutes unfair discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . 89

2. The Court Cannot Presently Conclude that the Plan's Treatment of the Rejecting Class of Abuse Claimants Is "Fair and Equitable" Within the Meaning of Section 1129(b) 90

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

## INTRODUCTION

The confirmation trial of the Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 (the "Plan") filed by the Roman Catholic Bishop of Oakland, the debtor and debtor-in-possession in this chapter 11 bankruptcy case (the "Debtor" or the "Diocese" as the context warrants) came for hearing on June 15-16, June 22-25, and June 29 (the "Confirmation Hearing").[1] Appearances of counsel were as noted in the record of each day's proceedings.

The Debtor was the proponent of the Plan, and offered arguments and testimony in support of confirmation, as will be more fully described below. The Official Committee of Unsecured Creditors (the "Committee") appointed in this case opposed confirmation on numerous grounds and offered arguments and witnesses in support of its opposition and objections to confirmation. The Office of the United States Trustee ("UST") also opposed confirmation of the Plan, and filed objections thereto as will be more fully described below; although the UST appeared at the trial it did not proffer any witnesses. Several of the Debtor's insurers[2] filed objections to confirmation of the Plan and offered arguments opposing confirmation at the trial.[3] Although certain of these insurers cross-examined witnesses proffered

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] The insurers who have appeared in this case are identified on page 10 hereof and defined therein as "the Insurers".

[3] The United States Trustee filed its Objection and Reservation of Rights to Confirmation of Debtor's Plan of Reorganization on May 8, 2026 [Docket No. 2901]; the Committee filed its Objection to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization on May 8, 2026 [Docket No. 2912]; Federal Insurance Company, ACE American Insurance Company, Executive Risk Indemnity Inc., Westchester Surplus Lines Insurance Company, Pacific Indemnity Company and/or any of their respective U.S.-based affiliates and successors (collectively, and solely in their capacities as non-abuse insurers for the above-captioned debtor, the "Federal Companies") filed their Limited Objection to Debtor's Modified Fourth Amended Plan of Reorganization on May 13, 2026 [Docket No. 2942]; Travelers Casualty and Surety Company f/k/a The Aetna Casualty & Surety Company filed its Objection and Reservation of Rights to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization on May 13, 2026 [Docket No. 2946]; Certain Underwriters at Lloyd's, London, and Certain London Market Insurers (collectively, "LMI") filed its Objection to Debtor's Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 on May 13, 2026 [Docket No. 2951]; Westport Insurance Corporation f/k/a Employers Reinsurance Corporation ("Westport"); Continental Casualty Company ("Continental"); and Pacific Indemnity Company, Pacific Employers Insurance Company, Insurance Company of North America, and Westchester Fire Insurance Company (the "Pacific Insurers," and collectively with Westport and Continental, the "Certain Insurers") filed their Joint Objection to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 on May 13, 2026 [Docket No. 2958]; the Pacific Insurers filed their Objection to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization on May 13, 2026 [Docket No. 2961]; United States Fire Insurance Company filed its Joinder in Certain Insurers' Joint Objection to

by the Debtor and the Committee, they did not proffer any witnesses.

A more comprehensive description of the confirmation hearing and post-confirmation matters is provided in the Procedural Background Section of this Memorandum Decision.

For the reasons set forth in this Memorandum Decision, the Court finds and concludes that the Debtor has not satisfied its burden under Section 1129(a)(7), and the Plan may not be confirmed. Acknowledging that the parties also made extensive arguments with respect to confirmation pursuant to Section 1129(b), and in the hope that it would aid the parties to have some guidance from the Court concerning the relevance of those arguments and the sufficiency of the evidence presented in support of the parties' positions in the event that the parties either resume discussions concerning a possible consensual resolution of their disputes or the Debtor decides to propose an alternate plan of reorganization, the Court addresses those issues as well.

This Memorandum Decision is limited to consideration of the objections to confirmation raised by the Committee and the UST. The Court acknowledges the extensive objections and opposition to confirmation of the Plan filed by the Insurers, and notes as well that the Insurers, the Committee and the Debtor have engaged in ongoing, constructive discussions regarding changes to the language of the Plan proposed by the Insurers to address many of their objections. At the request of the Court, the Debtor filed its "Notice of Filing Redlines Regarding Insurer Proposed Revisions to Debtor's Modified Fourth Amended Plan of Reorganization" on September 28 [Dkt. No. 3526] which has attached to it two exhibits, reflecting modifications suggested by the Insurers and acceptable to the Debtor, the Committee, or both, and reflecting the modifications to the Plan originally suggested by the Insurers. In light of the breadth of the Insurers' objections to the complexity and fluidity of the status of discussions between and among the Debtor, the Committee and the Insurers, and the Court's desire to process the current "ask and get" to the Insurers' objections, the Court will address the Insurers' objections to

---

Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 on May 18, 2026 [Docket No. 2979]; LMI filed its Joinder to Objections of Pacific Insurers and Travelers to Debtor's Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 on May 20, 2026 [Docket No. 2985]; and LMI filed Supplemental Objection to the Debtor's Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 (the "LMI Supplemental Objection") on June 1, 2026 [Docket No. 3034].

confirmation of the Plan and related issues in a separate Memorandum to be issued as soon as practicable.

## JURISDICTION AND VENUE

This Court has jurisdiction of this chapter 11 bankruptcy case and of the contested proceeding regarding confirmation of the Plan by virtue of the provisions of 28 U.S.C. Section 1334 (a) and (b), and the General Order of Reference in effect in this District (GO-24 of the United States District Court for the Northern District of California). This proceeding both "arises under" title 11 and "arises in" a bankruptcy case, as provided in 28 U.S.C. Section 1334(b), and it is a core proceeding within the meaning of 28 U.S.C. Section 157(b)(L) (confirmation of plans).

Venue of this case and of this proceeding in this District are proper pursuant to the provisions of 28 U.S.C. Sections 1408 and 1409, respectively.

## FACTUAL BACKGROUND

### Background and History of the Oakland Diocese

Bishop Michael C. Barber, SJ ("Bishop Barber") was appointed as Bishop of Oakland on May 25, 2013. He leads the Diocese and reports directly to the Holy See regarding its religious and administrative duties. His canonical duties are carried out in accordance with the Code of Canon Law, the ecclesiastical law of the Roman Catholic Church . Bishop Barber plays a direct role in managing the Diocese and is assisted by clergy and administrators, including the Diocesan Chancellor, the Vicar General, the Chief Financial Officer, the College of Consultors of the Diocese of Oakland, the Diocese of Oakland Finance Council, and the Presbyteral Council of the Diocese of Oakland. As of the petition date, there are approximately 72 employees working at the Debtor's central office, known as the 'Chancery,' which is located in downtown Oakland.

The Debtor carries out its religious mission by providing resources, programming, spiritual leadership, and other services to the local Catholic and East Bay Community. It operates

churches, pastoral centers, schools, and cemeteries, among other institutions. The East Bay is one of the most ethnically and culturally diverse regions in the country, and the Diocese takes special care to offer religious services specific to each major community in the region.

The Debtor's primary sources of income include revenue received from parish assessments imposed by the Diocese and the Bishop's Ministries Appeal, an annual fundraising campaign supporting the Debtor's operations. The Debtor contends that these funds are specifically solicited and earmarked to fund ministries and programs. In the ordinary course of business, the Debtor receives revenue through rental income, programming and events, Catholic Telemedia Network, management fees, and unrestricted gifts, grants, and bequests.

**Non-Debtor Entities**

Additionally, through common missions, the Debtor has relationships with several separately incorporated Catholic entities that are not associated with the Debtor in this case ("Non-Debtor Entities"). The Non-Debtor Entities operate independently from the Debtor and carry out their own religious, educational, and charitable programming. The Non-Debtor Entities include but are not limited to: the Roman Catholic Welfare Corporation of Oakland ("RCWC"), which oversees several elementary and high schools in the region; the Roman Catholic Cemeteries of the Diocese of Oakland ("RCC"), which operates and administers all cemetery and mortuary services in the Diocese; and Adventus, a California nonprofit public benefit corporation used by the Debtor to hold title in certain real estate properties.

**History of Abuse**

The Catholic Church has been the subject of widespread accusations of wrongdoing committed by certain priests and members of the clergy, along with widespread accusations that the reaction by the Catholic Church to such conduct was inappropriate and insufficient. The prevailing and most common theory of liability with respect to the alleged conduct by the Catholic Church, which asserts that it did not itself participate in the bad acts and conduct, is its failure properly to manage the individuals alleged to have committed abuse.

Over the years, multiple states have enacted laws reopening the statute of limitations to allow survivors of abuse to bring claims against perpetrators and third party defendants. The

State of California has done this twice: once in 2002, with a one-year period starting in January 1, 2003, and again in 2019 through California Assembly Bill No. 218 ("AB 218"). AB 218 temporarily revived the statute of limitations for certain individuals to file civil lawsuits for child sexual abuse. These survivors were given two years to bring their claims, through and including December 31, 2022.

Any eligible plaintiff over the age of 40 at the time of filing was required to file a certificate of merit executed by a licensed mental health practitioner stating that they had found a reasonable basis to believe that the plaintiff had been subjected to childhood sexual abuse. In reaction to the high volume of childhood sexual abuse claims filed during this period, the California Supreme Court created three separate coordination proceedings to consolidate the cases under three different superior court judges. The Debtor was named as a defendant within Judicial Council Coordination Proceeding ("JCCP") 5108 or *In re Northern California Clergy Cases*,[4] over which Judge Somnath R. Chatterjee presides in the Superior Court of Alameda County. As of May 4, 2023, there were 332 separate, active lawsuits or mediation demands pending against Debtor filed by survivors in state court ("State Court Actions").

**Mission Alignment Process**

In November 2020, Bishop Barber initiated the formation of a task force to assess the various challenges faced by the Diocese concerning declining Mass attendance, underutilized parish facilities, and declining numbers of priest ordinations. In March 2021, the task force was created and named the Mission Alignment Process Commission (for convenience, "MAP" and "the Commission") comprised of 15 members representing the Diocese.

The Commission started meeting periodically to evaluate the status of parishes and other institutions under the Diocese.

The Commission used data to study and eventually formulate determinations concerning the future viability of the parishes, churches, and the Diocese overall. In 2022, Bishop Barber met with priests to deliberate a path forward for certain deaneries, which included clustering,

[4] As the coordination proceedings are organized based on geographical proximity, JCCP 5108 includes the Diocese of Oakland, Diocese of Monterey, Diocese of Fresno, Diocese of Santa Rosa, Diocese of Sacramento, and the Archdiocese of San Francisco.



Case: 23-40523 Doc# 3567 Filed: 10/15/26 Entered: 10/15/26 16:00:30 Page 9 of 109

merging, or closing parishes. The Debtor has provided testimony and documentary support for the history and the context of the MAP.

As will be described fully in connection with the Plan, using data collected from churches, parishioners, schools, priests, and diocesan demographics, Bishop Barber, along with the Commission, determined that thirteen properties were to be clustered, merged, or closed.

The work of the Commission continues to this day.

## PROCEDURAL BACKGROUND

### Commencement of Case

The Debtor filed its voluntary Chapter 11 petition on May 8, 2023 (the "Petition Date") [Dkt. No. 1]. Since then, the Debtor has continued to operate its ministry, continue its educational programs, and manage its properties as a debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

On May 23, 2023, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code. It is comprised of 9 members, and is represented by Lowenstein Sandler LLP and Keller Benvenutti Kim LLP as its counsel and by Burns Bair LLP as its special insurance counsel. Since the Committee was appointed, it has been actively working with the Debtor in overseeing and reviewing the Debtor's administration of the Chapter 11 case, operations, and business plans.

### First Day Motions

On the Petition Date, the Debtor filed a number of motions and pleadings to facilitate the smooth transition into its Chapter 11 case (the "First Day Motions"). The First Day Motions included: Motion for an Order Authorizing and Approving Special Noticing and Confidentiality Procedures [Dkt. No. 6]; Motion for Interim and Final Orders Authorizing the Debtor to (I) Pay Certain Prepetition Invoices for Abuse Survivors' Assistance and Safe Environment Programs, and (II) Continue its Prepetition Practice of Paying for Abuse Survivors' Assistance and Safe Environment Programs [Dkt. No. 8]; Motion for Interim and Final Orders Authorizing the

Debtor to (I) Pay Prepetition Employee Wages, Salaries, Benefits and Other Related Items; (II) Reimburse Prepetition Employee Business Expenses; (III) Continue Employee Benefit Programs; and (IV) Pay All Costs and Expenses Incident to the Foregoing [Dkt. No. 13]; Motion for an Order Establishing Adequate Assurance Procedures with Respect to Debtor's Utility Providers [Dkt. No. 14]; Motion for Interim and Final Orders Authorizing the Debtor to (I) Continue Existing Insurance Coverage and Satisfy Obligations Related Thereto, and (II) Renew, Amend, Supplement, Extend or Purchase Insurance Policies in the Ordinary Course of Business [Dkt. No. 15]; and Motion for Interim and Final Orders Authorizing the Debtor to (I)(A) Continue Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related to the Use Thereof, (C) Continue Intercompany Arrangements, (D) Maintain Existing Bank Accounts and Business Forms, and (E) Continue Use of Existing Credit Card Accounts; and (II) Waive Certain Requirements of 11 U.S.C. 345(b) [Dkt. No. 16]. After review by the Court, the U.S. Trustee, and other parties, the First Day Motions were granted after certain modifications.

The Debtor retained Foley & Lardner LLP as general bankruptcy counsel [Dkt. No. 145]; Alvarez & Marsal North America LLC as Debtor's restructuring advisor [Dkt. No. 191]; Kurtzman Carson Consultants LLC as Claims and Noticing Agent [Dkts. No. 40, No. 146] **;** Breall & Breall LLP as special insurance counsel [Dkt. No. 434]; and VeraCruz Advisory, LLC as financial consultant [Dkt. No. 1167].

**Claims Forms Process and Related Issues**

In an order entered on July 25, 2023 [Dkt. No. 293], the Court set September 11, 2023 as the general bar date ("General Bar Date") for all general claims to be filed and November 6, 2023 as the governmental bar date ("Governmental Bar Date") for all governmental units and entities to file their claims.

On the recommendation of several parties, the Court authorized an additional optional statement to be submitted by the Abuse Survivors with their Proof of Claim forms; such additional statements provided helpful context in assessing survivor claims and assisted in alleviating concerns concerning information becoming publicly available.

Accordingly, the vast majority of filed Abuse Claims (around 91%) included the optional

supplement along with the Proof of Claim form. Debtors reviewed the Abuse Claims to identify duplicative claims; claims predating the formation of the Debtor in 1962; claims assigning liability to a third party; claims without sufficient information to assess liability; claims previously settled; or claims that didn't have a corresponding State Court Action. After its review, the Debtor concluded that there were 345 Abuse Claims entitled to distributions from the Survivors' Trust.

**Mediation Efforts**

On January 22, 2024, on the recommendation of the major constituent parties in this case, the Court referred the Debtor, Committee, and other parties to mediation [Dkt. No. 810] (the "Mediation Order"). The Mediation Order appointed mediators Retired Judge Christopher Sontchi and Jeff Krivis to mediate specific issues between the Debtor and the Committee and the Debtor and its insurers. Retired Bankruptcy Judge Randall Newsome and Tim Gallagher were also appointed.

The Debtor commenced mediation in June 2024 with Judge Randall Newsome and Tim Gallagher. Mediation sessions were held June 18 and 19, 2024; October 22 and 31, 2024; and November 6, 2024. On February 23 and 24, 2025, the Debtor, Committee, and Insurers held a joint mediation with Judge Sontchi, Judge Newsome, and Mr. Gallagher, but the mediation failed to yield an agreement between the Debtor and Committee.

After the Court's ruling on the Debtor's Motion to Dismiss Case in November 2025, which will be discussed in a later section, the Debtor, Committee, Insurers, and Mediators continued mediation efforts to arrive at a consensual resolution to the case. The Motion to Dismiss was continued for several weeks, at the request of either the parties or the Mediators, and the Debtor filed its Non-Binding Term Sheet contemplating what would eventually become the Plan. Dkt. No. 2504.

On January 16, 2026, there was an additional mediation session between the Debtor, Committee, and Insurers, which did not reach a settlement between any of the Debtor and the Committee, the Debtor or Insurers.

**Pending Adversary Proceedings by Committee**

On November 20, 2024, the Committee initiated an adversary proceeding against the Debtor[5] ("Restricted Assets Adversary Proceeding"), seeking various forms of relief directed at the proper characterization of approximately $38 million in asserts that the Debtor alleged were restricted, held in trust, or otherwise unavailable for use to pay claimants through the Plan. *See First Amended Adversary Complaint*, AP No. 24-04051, Dkt No. 36. The Restricted Assets Adversary Proceeding has not been tried or resolved beyond a limited discovery stage. The Debtor answered the First Amended Adversary Complaint timely [AP No. 24-04051, Dkt. No. 63] and continued to defend the adversary proceeding. The Debtor and Committee agreed that the Restricted Assets Adversary Proceeding cannot be tried in the Bankruptcy Court before confirmation of the Plan.

On December 11, 2024, the Committee filed its second adversary proceeding against the Debtor, Adventus, RCWC, and RCC[6] ("Subcon Adversary Proceeding"), seeking declaratory relief confirming that all property of Adventus, RCWC, and RCC is property of the estate, and further seeking substantive consolidation of those parties within the Debtor's main bankruptcy case. *See* AP No. 24-04053, Dkts. No. 1, 32. After substantial briefing by the parties and extensive oral argument the Court dismissed the Subcon Adversary Proceeding with prejudice. AP No. 24-04053, Dkt. No. 55. The Committee sought reconsideration of the dismissal [AP No. 24-04053, Dkt. No. 57], which the Debtor and RCWC opposed. [AP No. 24-04053, Dkts. No. 67, 65] The Committee had filed an appeal with the District Court for the Northern District of California with respect to the dismissal order.[7] After conducting oral arguments on the matter, the Court denied the Motion to Reconsider through oral ruling [AP No. 24-04053, Dkt. No. 73.].

---

[5] *The Official Committee of Unsecured Creditors of the Roman Catholic Bishop of Oakland v. The Roman Catholic Bishop of Oakland and the Oakland Parochial Fund, Inc.*, Adversary Proceeding 24-04051.

[6] *The Official Committee of Unsecured Creditors of the Roman Catholic Bishop of Oakland v. The Roman Catholic Bishop of Oakland, The Roman Catholic Welfare Corporation of Oakland, The Roman Catholic Cemeteries of the Diocese of Oakland, and Adventus,* Adversary Proceeding 24-04053.

[7] The Committee's appeal of the Court's Order Dismissing the First Amended Adversary Complaint [AP No. 24-04053, Dkt. No. 55] was reviewed by Judge Jacqueline Scott Corely of the United States District Court of the Northern District of California. Case No. 25-cv-06836-JSC.

## Insurance Policies and Adversary Proceedings

The Debtor has maintained a portfolio of several insurance policies through multiple carriers over decades. The Debtor's right to insurance coverage is in the Debtor's opinion a valuable asset for the benefit of Abuse Claimants and is a central aspect of Debtor's Plan.

There are several insurance companies that have appeared in this case: Pacific Indemnity, a Delaware Corporation; Insurance Company of America, a Delaware Corporation; Aetna Insurance Company, a Delaware Corporation, Travelers Insurance Company, a Delaware Corporation; Certain Underwriters at Lloyd's of London Subscribing to Syndicates 2623 (AFB) and 623 (AFB), a foreign organization; Insurance Company of North America, a Delaware Corporation; Ace Limited, a foreign organization; United Stated Fire Insurance, a Delaware Corporation; Employers Reinsurance, a Delaware corporation; CNA insurance Company, a Delaware corporation; Pacific Employers Insurance, a Delaware corporation; Westchester Fire Insurance Company, a Pennsylvania corporation; and the California Insurance Guarantee Association, a state entity (collectively, the "Insurers"). The Debtor alleges that each of the Insurers provided some form of primary, excess, and/or umbrella insurance coverage to the Debtor from the early 1960s through the present year; in general, the Insurers were less certain about insurance coverage. Some Insurers did agree to reimburse the Debtor's defense costs, but the reimbursements did not match the Debtor's expectations under the policies.

Because the Debtor and the Insurers were unable to reach a consensus regarding the coverage, the Debtor initiated an adversary proceeding on June 22, 2023, entitled *The Roman Catholic Bishop of Oakland v. Pacific Indemnity, et al.*, Adv. Pro. 23-04028 and filed a complaint for declaratory relief and breach of contract, seeking to liquidate Debtor's claims against its past insurers. On August 30, 2022, Debtor initiated an additional adversary proceeding, captioned *The Roman Catholic Bishop of Oakland v. Am. Home Assurance Co., et al.*, Adv. Pro. 23-04037, and filed a complaint seeking declaratory relief and alleging breach of contract against two other insurers (AP No. 23-04028 and AP No. 23-04037 are collectively referred to as the "Coverage Litigation").

After this Court granted the first Motion to Dismiss with leave to amend, the parties

agreed to stipulate to have the reference of the Coverage Litigation withdrawn to the United States District Court for the Northern District of California, where it remains today. Both cases within the Coverage Litigation are now consolidated before Judge Jacqueline Scott Corley in the District Court, under District Court Case No. 3:24-cv-00709-JSC.

**Survivor Impact Statements**

After substantial discussions between the Debtor and the Committee regarding monetary and non-monetary terms of a plan of reorganization, the Committee filed the Motion to Schedule Status Conferences for the Presentation of Survivor Statements on October 7, 2024 ("Survivor Statement Motion") [Dkt. No. 1365]. The Committee sought to provide a space for the Survivors to address the Court, the Debtor, and other parties by providing statements about the abuse they suffered ("Survivor Impact Statements") and the subsequent impact on their lives. Dkt. No. 1356 at 2. The Survivor Statement Motion referenced similar relief granted in other Diocesan cases,[8] including the status conferences authorized in *In re Roman Catholic Bishop of San Francisco*, Case No. 23-30564; in *In re Roman Catholic Archbishop of Baltimore*, Case No. 23-126969; and in *In re Roman Catholic Diocese of Harrisburg*, Case No. 1:20-bk-00599. The Debtor supported the Committee's request and Bishop Barber pledged his commitment to attend the status conference in person [Dkt. No. 1380]. Following a hearing to consider the Survivor Statement Motion; the limited objection filed by the Certain Underwriters at Lloyd's [Dkt. No. 1381], London; and the objection filed by the Pacific Insurers [Dkt. No. 1382], the Court granted the Survivor Statement Motion [Dkt. No. 1436].

Pursuant to the Court's Order on the Survivor Statement Motion, two separate two-hour in-person status conferences (the "Survivor Conferences") were held in Court 220 in the Oakland Division of the United States Bankruptcy Court of the Northern District of California. Numerous Survivors provided impact statements at both sessions. The first session was held on November 4, 2024 and the second on December 13, 2024. Special care was taken to ensure that the Survivor Conferences would remain as confidential as practicable. Any statements made by parties during

[8] The Survivor Statement Motion also referenced the chapter 11 case of *In re Franciscan Friars of California, Inc.*, Case No. 23-41723, wherein this Court agreed to hear from survivors during a hearing on June 18, 2024.

the Survivor Conferences could not be considered evidence in any matter or proceeding, the statements were not transcribed by any court reporter and contra the Court's standard protocol for recording audio during a hearing, the Survivor Conferences were not recorded. Additionally, while the Court recorded the audio per standard protocol, this audio recording was not available for release or transcription without the entry of an order of the Court with such order being subject to notice and hearing.

**Debtor's Previous Plans and Debtor's Motion to Dismiss**

On November 8, 2024, the Debtor filed Debtor's Plan of Reorganization [Docket No. 1444] (the "Original Plan") and accompanying Disclosure Statement for the Debtor's Plan of Reorganization [Docket No. 1445] (the "Original Disclosure Statement").

On November 13, 2024, the Debtor filed its Motion for Order (I) Approving Disclosure Statement; and (II) Establishing Procedures for Plan Solicitation, Notice, and Balloting [Docket No. 1453] (the "DS Approval Motion"). The Committee objected to approval of the Disclosure Statement on the basis that it described a plan of reorganization that could not be confirmed as a matter of law, and that solicitation of acceptances was inappropriate.  Among other things, the Committee also requested that, should the Bankruptcy Court ultimately approve the Disclosure Statement, the confirmation hearing in this case be delayed significantly to allow certain alternatives that the Committee preferred to proceed.

On December 18, 2024, the Bankruptcy Court conducted an initial hearing on the DS Approval Motion and related matters. The Debtor filed an Amended Plan and Disclosure Statement on January 3, 2025, and the Bankruptcy Court held additional hearings on the Amended Plan and Disclosure Statement on January 16, 21, and 30, 2025. Following the hearing on January 30, 2025, the Bankruptcy Court, at the Debtor's request, set a further hearing for March 3, 2025, and directed the Debtor to file a further amended Plan and Disclosure Statement not later than February 18, 2025, which it did. The March 3, 2025 hearing was converted to a status conference, at which the Debtor informed the Bankruptcy Court it intended to file a further revised Plan and Disclosure Statement on March 17, 2025.

The Debtor filed the Third Amended Plan and Disclosure Statement on March 17, 2026

[Dkts. No. 1830 and 1831 respectively]. The deadline to vote on the Third Amended Plan was May 30, 2025, and the majority of Class 4 Abuse Claimants elected to vote against it. *See* Dkt. No. 2040.

The Debtor and the Committee engaged in extensive discovery in preparation for a contested hearing regarding confirmation of the Third Amended Plan. Due to escalating costs of discovery, the Debtor filed the Motion to Continue Confirmation Hearing and Reset Confirmation Schedule [Dkt. No. 2147]. The Debtor ultimately decided against proceeding with confirmation of the Third Amended Plan at that time, and a status conference was set for November 12, 2025 to discuss the plan confirmation process and the status of the case. *Id*.

The Debtor, asserting that it had determined that the cost of a contested confirmation hearing was excessive, and that the prospects of reaching an acceptable accommodation with the Insurers and Committee were not then favorable, filed its Motion to Dismiss Chapter 11 Case on September 9, 2025 [Dkt. No. 2293]. While the Committee did not oppose dismissal of the case, it argued that the case should be dismissed with prejudice, meaning that the Debtor's current debts could not be discharged in a subsequently filed bankruptcy case. [Dkt. No. 2329]. On October 29, 2025, the Motion to Dismiss was ultimately granted, without prejudice, and dismissal was to become effective on November 26, 2025 unless on or before that date the Debtor filed a settlement term sheet signed by parties in support of the terms of a plan of reorganization.

The dismissal date was extended several times while the Debtor, Committee, and Insurers continued to negotiate the terms of the settlement term sheet. A term sheet was filed on December 11, 2025 [Dkt. No. 2504] and subsequently updated with additional contributions on December 17, 2025 [Dkt. No. 2521]. The parties continued to negotiate a consensual resolution to the case.

On January 20, February 4, and February 17, 2026, the Bankruptcy Court convened status conferences regarding the Chapter 11 Case, the Motion to Dismiss Case, and the Plan process, generally. Prior to and during the February 4 status conference, the Debtor announced its intention to move forward with a Fourth Amended Plan rather than seek dismissal of the Chapter 11 Case at that time.

**The Committee's Motion for Relief from Stay and the State Court Action**

On November 20, 2024, the Committee filed its Motion to Lift the Automatic Stay to Permit Certain Plaintiffs' Personal Injury Claims to Proceed in State Court ("First Lift Stay Motion") [Dkt. No.1460], seeking relief from the automatic stay to permit six pending state court actions against the Debtor ("State Court Actions") to proceed in litigation in the Superior Court of Alameda through trial. The Debtor opposed this motion [Dkt. No. 1581], as did the Certain Insurers [Dkts. No. 1583, 1585, 1589, 1591]. Following several hearings on the matter, the Court denied the Committee's First Lift Stay Motion and also clarified that the stay does not apply to co-debtors who had not filed for bankruptcy relief [Dkt. No. 1721].

The Committee filed the Renewed Motion to Lift the Automatic Stay to Permit Certain Plaintiffs' Personal Injury Claims to Proceed in State Court ("Renewed Lift Stay Motion") [Dkt. No. 2093] on June 25, 2025, seeking to proceed with the same six cases in state court after the Abuse Survivors voted overwhelmingly to reject the Debtor's Third Amended Plan of Reorganization [Dkt. No. 1830]. Again, the Debtor opposed the Renewed Lift Stay Motion [Dkt. No. 2112], and so did the Certain Insurers [Dkt. No. 2115]. The Court granted the Renewed Lift Stay Motion, allowing certain of the State Court Actions to proceed.

Steven Woodall, who would later be appointed as the Chairperson of the Committee, filed his Complaint for Damages with a demand for jury trial on December 30, 2019 ("Woodall Trial"). Mr. Woodall's trial was the first to proceed in the Superior Court of Alameda County under Judge Chatterjee. On April 22, 2026, after trial and extensive deliberation, a jury awarded $16 million in damages to Mr. Woodall in the State Court Action.

**Committee Plan of Reorganization**

On March 27, 2026, the Committee filed a disclosure statement and plan of reorganization (the "Committee Plan") [Dkt. No. 2752]. On April 6, 2026, the Court entered a scheduling order permitting and outlining the timeline for a competing plan process [Dkt. No. 2753]. Shortly thereafter, the Debtor filed its Opposition to Committee's Disclosure Statement [Dkt. No. 2796].

The Committee Plan provided for contributions from the Debtor to the Survivors' Trust

for a total amount of $195.2 million over 3.5 years; contributions from RCWC in the amount of $118.9 million over 3.5 years; the use of the sale proceeds of the Livermore Property to satisfy Debtor's future contributions to the Survivors' Trust; modified insurance assignment; and proposed Child Protection Protocols. *See* Committee Plan at Dkt. No. 2705.

As described elsewhere, pursuant to the Order Granting Renewed Motion of the Official Committee of Unsecured Creditors to Lift the Automatic Stay to Permit Certain Plaintiffs' Personal Injury Claims to Proceed in State Court [Dkt. No. 2168], the Court granted relief from stay to allow JCCP 5108 to go forward as defined by Judge Chatterjee. On April 22, 2026, an Alameda County jury awarded $16 million in damages to survivor Steven Woodall.

Based upon their assessment of the verdict in favor of Mr. Woodall, the Committee elected to withdraw the Committee Plan and decided to instead prosecute a Motion to Dismiss the Chapter 11 case [Dkt. No. 2854].

**Debtor's Fourth Amended Plan of Reorganization**

The Debtor filed the Plan on March 29, 2026, along with its Disclosure Statement [Dkt. No. 2759]. The Court entered an Order approving the Disclosure Statement on May 8, 2026 [Dkt. No. 2910]. After the Committee voluntarily withdrew their plan, this Plan is the only plan pending approval before the Court at this moment.

Article IV of the Plan establishes seven classes of claims. *See* Plan, Article IV. The Plan specifies that the Claims in Class 2, which comprise of Priority Unsecured Claims, are the only unimpaired class in the plan. Accordingly, Class 2 is not entitled to vote on the Plan and is deemed to accept it.

There are five impaired classes in the Plan: Class 1, consisting of the allowed secured claim of RCC on account of its pre-petition secured loan to the Debtor; Class 3, which includes the allowed claims of general unsecured creditors, not including Abuse Claims or Unknown Abuse Claims or Non-Abuse Tort Claims; Class 4, which consists of Abuse Claims; Class 5, consisting of Unknown Abuse Claims; and Class 6, comprised of Non-Abuse Litigation Claims. Since these classes are impaired under the Plan, each claimant or holder of interest of these claims is entitled to vote to accept or reject the Plan.

The Plan also includes Class 7A, consisting of Abuse Related Contribution Claims Related to Class 4 Claims, and Class 7B, which includes Abuse Related Contribution Claims Related to Class 5 Claims; neither Class 7A nor Class 7B shall receive a distribution of the Plan and are therefore deemed to reject the plan.

The Plan also provides for the treatment of Unclassified Claims, which include Administrative Expense Claims, Priority Tax Claims, Fee Claims, U.S. Trustee Fee Claims, and Cure Claims). *See* Plan, section 2.2. To the extent any U.S. Trustee Fees have become due before the Effective Date, the fees will be paid pursuant to 11 U.S.C. § 1129(a)(12) and 28 U.S.C. § 1930. All professionals or entities requesting a fee claim will conform to the requirements set forth in the Order Appointing Fee Examiner and Establishing Procedures for Review of Interim and Final Fee Applications Filed by Estate Professionals [Dkt. No. 1122], and such claims shall be subject to final review by the Court. 11. U.S.C. § 330.

With the exception of an objection by the Committee that the allegedly disparate treatment of Class 3 and Class 4 constitutes unfair discrimination under Section 1129(b)(2), which the Court addresses at Section IV.B.1 of this Memorandum Decision, there are no current disputed issues concerning the treatment of Claims in Classes 1, 2, or 3, and given that there are no claimants present in Class 6, the Court will focus its attention on the treatment of Class 4 and Class 5 claimants.

**Proposed Treatment of Abuse Claims**

Class 4 consists of Abuse Claimants ("Abuse Claimants") asserting a claim against the Debtor. The Debtor and the Committee entered into a stipulation prior to the Confirmation Hearing pursuant to which they agreed to consider, for purposes of the Confirmation Hearing, that there are currently 345 Abuse Claimants.

The Plan creates the Survivors' Trust to fund payments to Class 4 Abuse Claimants entitled to Payments under the Plan. *See* Plan, section 4.4. Since the rights of the Abuse Claimants are impaired under the Plan, each Abuse Claimant is therefore entitled to vote to accept or reject the Plan. The Plan provides that Class 4 will receive $172.3 million in total contributions through the Survivors' Trust, with each of the unique Abuse Claimants ultimately

receiving $499,420.29. *See* Disclosure Statement at 10.

As will be discussed in a later section, RCWC commits to contribute $30 million to the Survivors' Trust ("RCWC Contribution"), for the benefit of RCWC Claimants.

Class 5 consists of Unknown Abuse Claimants ("Unknown Abuse Claimants") who may ultimately assert a claim against the Debtor. As the name suggests, this Class acts as a placeholder class for those with claims against the Debtor that may become known in the future. The Plan provides for the creation of an Unknown Abuse Claims Reserve that shall be funded with $7,700,000.00 from the Debtor and shall be available to holders of Class 5 Claimants within the first five years after the Effective Date. Thereafter, any remaining amount from this Reserve shall be absorbed into the Survivors' Trust and made available for distributions to Class 4 claimants. Joshua Hogan, the Court-approved Unknown Abuse Claims Representative, has worked closely with the Debtor and cast a ballot accepting the Plan on behalf of this Class.

The Plan provides for the creation and continuing operation of a Survivors' Trust that will  receive assets from the Debtor and shall assume liability for, as well as the responsibility to manage, assess and pay the Abuse Claims, as is more specifically set forth in the Section below discussing the Survivors' Trust and  in the Survivors' Trust Documents, and as will be described in great detail below.

**Survivors' Trust**

The rights, powers, duties and obligations of the Survivors' Trust are set forth primarily in Article IX of the Plan, and in the Survivors' Trust Documents as defined at section 1.1.156 thereof.

On the Effective of the Plan, the Survivors' Trust will be established and shall be governed in accordance with the Survivors' Trust Documents.  The Survivors' Trust shall receive administer, hold and distribute the for the benefit of Class 4 Abuse Claimants the Survivors' Trust Assets.  In addition, the Survivors' Trust will receive an assignment of all of the Debtor's rights under its policies of insurance, as well as the Debtor's rights, to be determined later by courts of competent jurisdiction, to any extra-contractual claims presently existing or arising later, against any of its insurers.  The Survivors' Trust will also assume all liability for

Abuse Claims, and Unknown Abuse Claims, against the Debtor, RCWC with respect to Released RCWC Claims, and Settling Insurers, if any.

The Plan provides that after the Effective Date, the Abuse Claims and Unknown Abuse Claims against the Debtor, the Released RCWC Claims, and Insurance Actions against any Settling Insurer in connection with such Claims, shall be channeled to the Survivors' Trust pursuant to the Channeling Injunction set forth in Plan section 13.11 and may be asserted only and exclusively against the Survivors' Trust, subject to the right of Litigation Claimants to name the Debtor and/or RCWC (but solely as to Released RCWC Claims) as a nominal defendant as provided in the Plan.

On the Confirmation Date, the Bankruptcy Court shall appoint the Survivors' Trustee to serve in accordance with, and who shall have the functions and rights provided in, the Survivors' Trust Documents.

The Survivors' Trustee may use the Trust Assets to prosecute Debtor Extracontractual Insurance Actions against the Non-Settling Insurers and to pursue Post-Effective Date Insurance Settlement Agreements. If the Survivors' Trust successfully resolves a Debtor Extracontractual Insurance Action or otherwise receives a recovery of insurance proceeds relating to any Abuse Claim from a Non-Settling Insurer, such proceeds shall become Trust Assets available to pay, and shall increase the amount available to pay, Abuse Claims, pursuant to the Survivors' Trust Distribution Plan.

The Survivors' Trust shall be funded with (i) aggregate Cash contributions from the Debtor and Reorganized Debtor (as applicable) of $150 million, (ii) any Cash contributions from RCWC pursuant to Section 9.3.2 hereof; (iii) any proceeds held by the Debtor or the Reorganized Debtor on account of Insurance Settlement Agreements as set forth in this Section 9.3, and (iv) the Assigned Insurance Interests. These contributions to the Survivors' Trust shall be made according to the schedule set forth in Plan section 9.3.1 with respect to the Debtor's Contributions, and section 9.3.2 with respect to the RCWC Contributions.

On the Effective Date of the Plan, the Restricted Assets Adversary Proceeding and all surviving claims asserted therein shall be assigned to the Survivors' Trust. The Survivors' Trust

shall succeed the Committee as plaintiff in the Restricted Assets Adversary Proceeding upon the Survivors' Trust filing a Notice of Substitution of Parties therein.

The Survivors' Trust may also be entitled receive the proceeds of any assets determined to be "Converted Assets" as defined in the Restricted Assets Adversary Proceeding (the "Adversary Proceeding Order") upon final disposition of that action.

The Plan also requires the Debtor to grant the Survivors' Trust a Lien on the real property listed on Schedule 9.3.1.6, of the Plan to secure the Debtor's obligations to make the Additional Debtor Contributions, as memorialized by deeds of trust to be executed and delivered on the Effective Date (such agreement being a "Debtor Contribution Deed of Trust"). Such real property shall have been valued by Hilco Real Estate, LLC in an amount of no less than one hundred percent (100%) of the Additional Debtor Contribution.

Any Claim held by an RCWC Claimant who executes an RCWC Release shall be channeled to the Survivors' Trust such that the Survivors' Trust shall have the sole obligation to pay such Claim in accordance with this Plan and the Survivors' Trust Documents.

If Adventus sells part or all of the Livermore Property such that funds from any such sale are received on or before the date that is three years and six months following the Effective Date (the "Livermore Option"), then Adventus agrees that the net proceeds of each such sale after costs of sale shall be distributed on behalf of the Debtor to the Survivors' Trust, to pay all remaining Debtor Contributions under the Plan.

After the Effective Date, any Non-Settling Insurer may enter into an Insurance Settlement Agreement with the Survivors' Trustee and shall become a Settling Insurer. No settlement (whether in the Plan or otherwise) as among any of the Debtor, its Estate, the Survivors' Trust, any Abuse Claimant, and the Settling Insurers, including Payment Obligations, shall bind a Non-Settling Insurer in any way without its consent.

The Survivors' Trust will be entitled to receive any Cash received by the Debtor on or before the Effective Date in connection with an Insurance Settlement Agreement

To the extent the Survivors' Trustee enters into an Insurance Settlement Agreement that covers the Abuse Claim of a Trust Claimant who elected the Litigation Option and commenced

an Abuse Claim Litigation as described in Section 9.8.4 of the Plan, (a "Settling Trust Claimant"), the rights of the Settling Insurer and the Settling Trust Claimant shall be adjusted as set forth therein.

The Non-Settling Insurers shall not be liable for or obligated to reimburse any contribution to the Plan made by the Debtor and its Estate, nor shall the Survivors' Trust be authorized to seek such recovery.

From and after the Effective Date, the Survivors' Trust shall segregate a total of $7,700,000.00 of the Debtor Cash Contributions into the Unknown Abuse Claims Reserve, pursuant to the schedule set forth in Plan section 9.4.1. The Unknown Abuse Claims Reserve shall be maintained for the greater of (a) five years after the Effective Date, and (b) resolution of all Unknown Abuse Claims submitted to the Survivors' Trustee within five years after the Effective Date. On that date, the remaining funds in the Unknown Abuse Claims Reserve will be de-segregated and returned to the Survivors' Trust's general accounts, and neither the Debtor, Reorganized Debtor, Survivors' Trust, nor any Settling Insurer shall have any more liability for any Unknown Abuse Claim.

The transfer to, vesting in and assumption by the Survivors' Trust of the Survivors' Trust Assets as contemplated by the Plan shall, as of the Effective Date, discharge all obligations and liabilities of and bar any recovery or action against the Released Parties for or in respect of all Abuse Claims (including Unknown Abuse Claims). The Confirmation Order shall provide for such discharge. Subject to Article VIII of the Plan and the rights of Abuse Claimants who elect the Litigation Option, the Survivors' Trust shall, as of the Effective Date, assume sole and exclusive responsibility and liability for all Abuse Claims against the Released Parties, and such Claims shall be paid by the Survivors' Trust from the Survivors' Trust Assets or as otherwise directed in the Survivors' Trust Documents and Articles VIII and IX of the Plan.

From and after the Effective Date, all Abuse Claims against the Released Parties shall be considered Channeled Claims subject to the Channeling Injunction under Section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order. Subject to the foregoing, from and after the Effective Date, the Released Parties shall not have any obligation



Case: 23-40523 Doc# 3567 Filed: 10/15/26 Entered: 10/15/26 16:00:30 Page 24 of 109

with respect to any liability of any nature or description arising out of, relating to, or in connection with any Abuse Claims.

Abuse Claims shall be dealt with by the Survivors' Trust as follows: not later than fourteen (14) days following the Effective Date, the Survivors' Trustee shall mail an "Immediate Payment Notice" to counsel for all Holders of Abuse Claims or to any Holder of an Abuse Claim that is not represented by counsel. Holders of Abuse Claims may elect to receive the Immediate Payment from the Survivors' Trust by timely signing and returning the Immediate Payment Notice. Only Abuse Claimants who timely return an Immediate Payment Notice affirmatively indicating their election to receive the Immediate Payment, shall be entitled to receive the Immediate Payment. Such Immediate Payments will be made within thirty (30) days after the Immediate Payment Election Deadline. Abuse Claimants receiving an Immediate Payment shall have no further rights to distributions from the Survivors' Trust and shall not be entitled to pursue any Abuse Claim against the Debtor, the Reorganized Debtor, the Survivor's Trust, the Released Parties, the Insurers, RCWC, and/or the RCWC Escrow. Plan, sections 9.7—9.9.2.

After the Effective Date, every Trust Claim held by an Abuse Claimant shall be reviewed and allocated a percentage of the Survivors' Trust Assets based on numerical scaling factors by the Abuse Claims Reviewer in order to determine the distribution to each such Holder in accordance with the terms of the Survivors' Trust Documents.

Based on the percentage allocation determined by the Abuse Claims Reviewer, the Survivors' Trustee shall provide a determination of the distribution to which each Holder of each Trust Claim is entitled (the "Initial Determination"), in accordance with the terms of the Survivors' Trust Documents. Plan, section 9.8.1.

Each Holder of a Trust Claim shall have the right to request an additional review of the Initial Determination by the Abuse Claims Reviewer and shall be allowed to submit additional documentation or information that such Claimant believes should be considered. The Abuse Claims Reviewer shall provide a subsequent determination (the "Review Determination"), as provided for in the Survivors' Trust Documents. If requested, the Review Determination shall be the "Final Determination" for purposes of such Holder's distributions from the Survivors' Trust.



Case: 23-40523 Doc# 3567 Filed: 10/15/26 Entered: 10/15/26 16:00:30 Page 25 of 109

If the Review Determination is not requested, the outcome of the Initial Determination shall be the Final Determination. Plan, sections, 9.8.2—9.8.4.4.

The Survivors' Trust Documents, including the Survivors' Trust Distribution Plan, describes the procedures will govern distributions to Trust Claimants from the Survivors' Trust, and reference is made to those documents for a complete description of those procedures.

**Funding of the Plan**

The Plan provides for up to $172.3 Million to be paid to the Survivors' Trust for the benefit of the holders of Allowed Class 4 Claims, $142.3 Million of which will be paid by the Debtor and up to $30 Million of which might be paid by RCWC.[9]

i. Cash and Deeds of Trust from Debtor

The Plan defines the "Debtor Cash Contribution" as the amounts payable to the Trust by the Debtor, consisting of (i) the Initial Debtor Contribution of $40 Million (plus amounts, if any, attributable to "remaining DIP Availability") that will be transferred to the Trust on the Effective Date and will be made available to the Debtor pursuant to the Exit Facility to be funded by RCC; and (ii) the Additional Debtor Contributions of up to $110 Million to be paid to the Trust on the following schedule: $6 Million within one year of the Effective Date, $5.9 Million within two years of the Effective Date, and the remaining balance of the $150 Million Debtor Cash Contribution, up to $98.1 Million, within three years and six months of the Effective Date. Plan, section 9.3.1—9.3.1.4

The Debtor may satisfy its Debtor Cash Contribution obligation via the contribution of its cash or the disposition of any of its assets. In addition, as will be described more fully below, the Debtor may also have access to significant funds from other not-yet-realized sources that may be used to fund the Debtor Cash Contributions. Nonetheless, it appears to be the current and mutually-accepted proposition (by the Debtor and the Committee) that the source of most if not all of the Debtor's direct contribution to the Debtor's Cash Contribution will be from the sale of the Debtor's real properties. Exhibit G to the Plan Supplement, adopted by the Debtor and the

[9] The Plan provides for $7.7 Million of the Debtor's Cash Contribution to be reserved for the benefit of Class 5 Claimants (Unknown Abuse Claims).

Committee via that certain Stipulation Regrading Plan Real Properties, and filed at Dkt. No. 3173, lists and groups into categories the various real property assets that the Debtor commits to making available either for sale to fund the post-Effective Date Debtor Cash Contributions, or to serve as collateral for the Debtor's satisfaction of any remaining unsatisfied portions of the post-Effective Date Debtor Cash Contributions.

More specifically, to secure the payment of the Additional Debtor Contribution, the Debtor shall grant the Trust liens on certain real property owned by the Debtor as identified in Exhibit "G" , and shall execute and deliver to the Trust on the Effective Date deeds of trust (each a Debtor Contribution Deed of Trust). Plan, section 9.3.1.6

ii. Livermore Property

In the Debtor's previously filed plans, the Debtor was required to transfer the title of a specific property owned by Adventus to the Survivors' Trust. The real property is located at 3658 Las Colinas Road, Livermore, California (the "Livermore Property") and consists of 122.5 acres of vacant land currently zoned solely for agricultural use. Debtors state that the Livermore Property is valued at $14 million in its current state but could be worth up to $100 million if rezoned for residential use. After negotiations with Adventus, the Livermore City Council approved a request to negotiate a housing development agreement with respect to the Livermore Property. Adventus is working with several professionals and the Livermore City Council to rezone the area to allow for housing development and increase the value of the Livermore Property.

The Plan also provides for two additional means of providing security for the prompt payment of the Debtor Additional Contribution. First, the Plan provides that should Adventus sell the Livermore Property such that funds from such sale are received before the conclusion of the three and a half year period from the Effective Date, Adventus shall, after satisfaction of any amounts due as costs of sale and payments to professionals associated with the sale, pay from additional sale proceeds an amount up to the amount then payable to the Trust under the Additional Debtor Contribution.

Second, the Plan also provides that upon the final disposition of the current disputes

between the Debtor and the Committee concerning the proper characterization of certain funds held by the Debtor and designated by the Debtor as Shielded Assets, as set forth in greater detail in the Restricted Assets Adversary Proceeding, whether by entry of a final order by a court of competent jurisdiction or via a consensual resolution, all cash declared to be "Converted Assets" under such disposition shall be transferred to the Trust as further satisfaction of the Additional Debtor Contribution. Per the Stipulation Regarding Real Property, the estimated amount of the Shielded Assets is between $29.5 Million and $33.0 Million.

iii. Non-Debtor Contribution

In addition to the Debtor Cash Contribution, the Trust may also receive the RCWC Cash Contribution, which will also be payable to the Trust over time, by means of the RCWC Escrow: the initial RCWC Contribution in the amount of $7.7 Million will be paid to the RCWC Escrow on the Effective Date; another $3 Million shall be paid to the RCWC Escrow no later than one year of the Effective Date; $6 Million will be transferred to the RCWC Escrow no later than two years of the Effective Date; and the balance of the RCWC Cash Contribution, up to $13.3 Million, will be paid to the RCWC Escrow no later than three years and six months after the Effective Date. Payment from the RCWC Escrow and eventually to the holders of claims assertable against RCWC is governed by additional provisions of the Plan. It is certainly correct that not every holder of an Allowed Class 4 claim will be eligible to receive a payment from the RCWC Escrow.

iv. Insurance Assignment

Pursuant to Article VIII of the Plan, the Debtor's and RCWC's rights and interests in the Non-Settling Policies for Abuse Claimants are transferred to the Survivors' Trust upon the Effective Date. The Insurance Assignment will be described more fully in a subsequent Memorandum Decision addressing the Insurers' Objections to Confirmation.

**Post-Confirmation Provisions**

i. Exculpation Provision

Plan section 13.6 contains provisions exculpating or limiting the liability of certain parties ("Exculpation Provision") involved in the formulation and confirmation of the Plan.

These parties include: (a) the Debtor, including the Churches, (b) the Reorganized Debtor, including the Churches, (c) the Committee, (d) the Committee's members, (e) the College of Consultors of the Diocese of Oakland and each of its members, (f) The Diocese of Oakland Finance Council and each of its members, (g) the Presbyteral Council of the Diocese of Oakland and each of its members, (h) the Mediators, (i) the Unknown Abuse Claims Representative, (j) the Exit Facility Lender, (k) RCWC (solely as to the Released RCWC Claims) and (l) for each of the foregoing, their respective officers, directors, agents, employees, equity holders, attorneys, financial advisors, accountants, and other duly authorized employed Professionals in this Chapter 11 Case. *See* Plan, section 1.1.65. In general, the rights to exculpation, including those parties who are eligible to receive exculpation and the proper scope thereof are governed by the holding in *Blixseth v. Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020).

ii. <u>Channeling Injunction</u>

Plan section 13.11 provides that Abuse Claims and Unknown Abuse Claims against the Debtor, Released RCWC Claims, and Insurance Actions against Settling Insurers in connection with such claims shall be channeled to the Survivors' Trust under the Channeling Injunction of the Plan. Any Channeled Claims may be asserted only against the Survivors' Trust subject to the right of Litigation Claimants to name the Debtor or RCWC as a defendant as is provided in the Plan. The Channeling Injunction is a permanent injunction that cannot be modified, dissolved, or terminated, and this does not bar claims against Non-Settling Insurers except to the extent a Non-Settling Insurer becomes a Settling Insurer.

**Objections to the Plan**

The deadline to cast a ballot to vote on the Plan was June 10, 2026 and the deadline to file objections to the Plan was May 8, 2026 for the Committee and May 13, 2026 for certain Insurers. Several objections were timely filed by the Committee, Insurers, and the Office of the United States Trustee.[10]

[10] The United States Trustee filed its Objection and Reservation of Rights to Confirmation of Debtor's Plan of Reorganization on May 8, 2026 [Docket No. 2901]; the Committee filed its Objection to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization on May 8, 2026 [Docket No. 2912]; Federal Insurance Company, ACE American Insurance Company, Executive Risk Indemnity Inc., Westchester Surplus Lines Insurance Company, Pacific Indemnity Company and/or any of their respective U.S.-based affiliates

The Committee's overall objections boil down to the following points: the Plan does not satisfy the requirements of Section 1129(a)(3) because it fails to maximize estate value for the benefit of the Abuse Claimants of class 4; the Plan does not satisfy the best interests of creditors test under Section 1129(a)(7); ; the Plan does not satisfy Section 1129(a)(10) because the accepting impaired classes are improperly constituted and their impairment is not made in good faith; the Plan does not satisfy Section 1129(a)(11) because it is not feasible; the Plan does not satisfy Section 1129(b) because it is not fair and equitable with respect to Class 4 Claimants.

The Insurers' arguments mainly state that: the Plan impermissibly alters insurance rights and obligations; the Insurance Assignment expands insurance liability or adjudicates coverage; the Plan creates or expands bad-faith claims; the Channeling Injunction, contribution provisions, and judgment reduction mechanisms impair Insurers' rights; and the Exculpation and Plan settlement findings are improper.

The UST's objection addresses the Channeling injunction, the exculpation provision, and provisions of the Plan concerning Debtor's post-confirmation reports.

**Voting Results**

Pursuant to Section 1126 of the Bankruptcy Code, only claimants in impaired classes receiving or retaining property on account of such claims were entitled to vote on the Plan. 11 U.S.C. § 1126(g). Additionally, claimants were not entitled to votes if their rights under the Plan

---

and successors (collectively, and solely in their capacities as non-abuse insurers for the above-captioned debtor, the "Federal Companies") filed their Limited Objection to Debtor's Modified Fourth Amended Plan of Reorganization on May 13, 2026 [Docket No. 2942]; Travelers Casualty and Surety Company f/k/a The Aetna Casualty & Surety Company filed its Objection and Reservation of Rights to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization on May 13, 2026 [Docket No. 2946]; Certain Underwriters at Lloyd's, London, and Certain London Market Insurers (collectively, "LMI") filed its Objection to Debtor's Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 on May 13, 2026 [Docket No. 2951]; Westport Insurance Corporation f/k/a Employers Reinsurance Corporation ("Westport"); Continental Casualty Company ("Continental"); and Pacific Indemnity Company, Pacific Employers Insurance Company, Insurance Company of North America, and Westchester Fire Insurance Company (the "Pacific Insurers," and collectively with Westport and Continental, the "Certain Insurers") filed their Joint Objection to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 on May 13, 2026 [Docket No. 2958]; the Pacific Insurers filed their Objection to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization on May 13, 2026 [Docket No. 2961]; United States Fire Insurance Company filed its Joinder in Certain Insurers' Joint Objection to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 on May 18, 2026 [Docket No. 2979]; LMI filed its Joinder to Objections of Pacific Insurers and Travelers to Debtor's Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 on May 20, 2026 [Docket No. 2985]; and LMI filed Supplemental Objection to the Debtor's Modified Fourth Amended Plan of Reorganization Dated March 27, 2026 (the "LMI Supplemental Objection") on June 1, 2026 [Docket No. 3034].

remain unimpaired. 11 U.S.C. § 1126(f). Therefore, the Debtor did not solicit votes from claimants within Class 2 (priority unsecured claims) of from Class 7a (contribution and indemnification claims related to Class 4 Abuse Claims), and Class 7b (contribution and indemnification claims related to Class 4 Unknown Abuse Claims), who were deemed to reject the Plan.

Pursuant to the Disclosure Statement Order [Dkt. No. 2910], Kurtzman Carson Consultants LLC dba Verita Global ("Verita"), the Debtor's claims and noticing agent, timely and properly transmitted solicitation packages to the claimants entitled to vote on the plan, namely claimants within: Class 1, Class 4, and Class 5. *See* Certificate of Service at Dkt. No. 3051; *see also* Dkt. No. 3207. The deadline for the ballots to be received by Verita was June 10, 2026. *See* Dkt. No. 2910.

The holders of claims in Class 1 and Class 3 voted to accept the Plan. *See* Exhibit A to Dkt. No. 3207. In Class 4, eight claimants voted to accept the Plan, 331 voted to reject the Plan, and three members did not have their votes tabulated. *Id*.

**Confirmation Hearing**

Pursuant to the Order Approving the Disclosure Statement and Establishing Procedures for Solicitation, Notice, and Balloting [Dkt. No. 2910], the hearing to consider confirmation of the Plan ("Confirmation Hearing") took place over seven court days from June 15 to June 29, 2026. In support of the Plan, the Debtor filed its Memorandum of Law in Support of Confirmation of Debtor's Modified Fourth Amended Plan of Reorganization [Dkt. No. 3100]. Prior to the Confirmation Hearing, the Debtor, Committee, and the Insurers all filed numerous Motions in Limine and Motions to Strike, seeking to redact, preclude, or prevent disclosure of specific pieces of information. The Court, at a hearing on June 12, 2026, addressed the Motions in Limine, the Motions to Strike, and their respective objections and responses. The Court disposed of the Motions to Strike and appropriately granted or denied the Motions in Limine at the June 12 hearing through an oral ruling. See Dkt. No. 3210.

Over seven days of trial, the Court heard testimony from 15 witnesses through live testimony, declaration, and a combination of the two. In support of the Plan, the Debtor put forth

the following witnesses: Charles Moore, the Debtor's financial expert working with Alvarez & Marsal; Bishop Michael J. Barber the Bishop of the Diocese of Oakland; Daniel Flanagan, principal with VeraCruz Advisory, LLC, a financial advisor for the Debtor; Attila Bardos Chief Financial Officer of the Debtor; Andrew Currier, president of the RCWC Board of Directors and superintendent of the Catholic Schools for the Diocese; Ronald Gies, the Chief Financial Officer of RCC, Joshua Hogan, the Unknown Abuse Claims Representative; Dr. Denise Martin, with NERA Economic Consulting; Adam Zimmerman, a member of Hilco Global's real estate advisory group; and John Satter, also from Hilco Global.

The Committee put forth the following witnesses to rebut the Debtor's affirmative case for confirmation: Randi Rosen, Managing Director at Stout Sisius Ross, LLC; Katheryn McNally, Managing Director at Stout; Paul Shields, Managing Director at Berkeley Research Group. Deposition testimony of Matthew Babcock, financial advisor to the Committee, was also offered in support of the Committee's position.

While the Insurers did not proffer their own witnesses, they cross-examined several of the Debtor's and Committee's witnesses.

Mr. Moore provided testimony on the Plan's best interests test, Plan feasibility, and Debtor's overall financial projections. 6/15 26 Tr. at 143:22-144:1. He testified as to the Primary Liquidation Analysis and the Supplemental Liquidation Analysis he prepared in support of the Plan's best interests test. Bishop Barber provided extensive and thorough testimony regarding his background, his role as the Bishop of the Diocese of Oakland, and his responsibilities at large since the commencement of this case. 06/22/26 Tr. at 10:1–3, 34:24–35:3. He testified about the Mission Alignment Process ("MAP") and the steps he took to determine how to restructure and reorganize religious activities and properties in the Diocese. 06/16/26 Tr. (Bishop) at 169:24–171:7. Mr. Flanagan, having worked extensively with the Debtor and its financial projections through the case, deemed the projections "directionally correct" and "reasonable," affirming that the Debtor could pay at most $150 million in contribution funds. 06/24/2026 Tr. at 20:1-3.

Mr. Bardos expressed his general confidence in the Plan and testified that the Debtor could "absolutely" make all scheduled Plan payments. 06/25/26 Tr. at 20:3-14. He provided

further testimony about the Survivors' Trust and confirmed that the Plan required funding above the Debtor's $150 million contribution. With respect to the Liquidation Analyses, he confirmed that the analysis omitted several Debtor-owned properties. Dr. Currier testified in support of the Plan and RCWC's $30 million contribution and confirmed that, if no eligible claimants execute a release, then the $30 million will not be released and the amount will be returned to the RCWC Escrow. 06/22/26 Tr. at 177:24–178:6; 188:18–24. Mr. Zimmerman also testified concerning Debtor's real property assets and their valuation in a liquidation analysis. 6/23 /26 Tr. at 104:24-105:3. He testified that a chapter 7 trustee – in a hypothetical liquidation – could realize $28.2 million to $38.15 million in potential recovery upon liquidation. *Id.* at 103:12-15. Mr. Satter testified regarding his appraisal of the market value of the forty properties earmarked by the Debtor to fund the Plan. 6/23/26 Tr. at 13:24-14:19.

Citing the guaranteed nature of the funds available under the Plan to each claimant, Mr. Hogan confirmed his vote in favor of the Plan on behalf of the Class 5 claimants. 6/24/26 Tr. at 98:1-3; see also Exhibit 4 to Dkt. No. 3103.

Dr. Martin provided testimony concerning the Plan's proposed contributions and whether it provides economically reasonable compensation to survivors. Exhibit 2 to Dkt. No. 3103; 6/22/26 Tr. at 154:22-155:2. She demonstrated how the Debtor's contribution ranked among the highest in the country – even when excluding the RCWC contribution from the calculation.

The Committee's witnesses provided their testimony during June 29. Ms. Rosen provided an analysis and valuation of eight-six properties owned by the Debtor. 06/29/26 Tr. at 14:3–6. She valued the properties at approximately $807.63 million, which included four properties owned by related entities. 06/29/26 Tr. at 19:18–22, 21:8–14. Ms. McNally provided valuation for the Class 4 Abuse Claims. 06/29/26 Tr. at 70:22–71:3. Using the inflation-adjusted average of the Debtor's historical settlements, she calculated a per-claim value of approximately $1.219 million and multiplied that number by 345 Class 4 Abuse Claims to yield a cumulative value for the Abuse Claims if not mess than $420,555,000.  06/29/26 Tr. at 70:22–71:3. Mr. Shields provided extensive testimony on the Debtor's ability to contribute additional funds to the Survivors' Trust under the Plan and the Debtor's liquidation analysis. 06/29/26 Tr. at 101:15–20.

He stated that the Debtor has additional assets that it could contribute to the Plan but apparently chose not to, and described potential sources of value that the Debtor could draw from for additional contributions. *Id*. at 108:2–9. He testified that while he was able to prepare a liquidation analysis, he did not do so because the information provided regarding the Debtor's assets was incomplete. *Id*. at 105:6–11, 106:11–23.

**Post Confirmation Briefing and Discussions**

At the close of the Debtor's evidentiary presentation in support of confirmation on June 25, the Committee made an oral motion for a directed verdict pursuant to Federal Rule of Bankruptcy Procedure 7052(c) (incorporating Federal Rule of Civil Procedure 52(c)). The Court took that motion under advisement and will dispose of that motion in a written order to be entered subsequently.

On July 7, 2026 the Court convened a Status Conference to discuss post-trial matters, at which the Debtor, the Committee and the Insurers attended. After discussion, the parties agreed to and the Court approved a schedule for post-trial briefing, with initial post-trial briefs to be filed on August 7[11] and reply briefs to be filed on August 19[12].

At a later hearing, with the approval of the Debtor, Committee, and other parties, the Court set September 16, 2026 as the date for final closing arguments in the Confirmation Hearing. In doing so, the Court issued its Memorandum Before Hearing, which posed a list of questions for the Debtor, the Committee, the Insurers, and to all parties globally that must be

[11] On August 7, 2026, the following post-trial briefs were filed: London Market Insurers' Post Trial Brief [Dkt. No. 3414]; Westport Insurance Corporation's Post Trial Brief in Opposition to Confirmation of Debtor's Modified Fourth Amended Plan of Reorganization [Dkt. No. 3415]; the Official Committee of Unsecured Creditors' Post Trial Brief in Opposition to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization [Dkt. No. 3416]; Pacific Insurers' Joinder to London Market Insurers' Posttrial Brief [Dkt. No. 3417]; and Debtor's Post-Trial Brief [Dkt. No. 3418].

[12] On August 19, 2026, the following briefs were filed in reply to the post-trial briefs filed on August 7, 2026: Westport Insurance Corporation's Post Trial Reply Brief in Opposition to Confirmation of Debtor's Modified Fourth Amended Plan of Reorganization [Dkt. No. 3450]; London Market Insurers' Reply to the Debtor's Post-Trial Brief in Support of Confirmation of Confirmation of Debtor's Modified Fourth Amended Plan of Reorganization [Dkt. No. 3451]; Debtor's Reply to the Committee's Post-Trial Brief in Opposition to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization [Dkt. No. 3452]; Debtor's Reply to the Insurers' Post-Trial Briefs in Opposition to Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization [Dkt. No. 3453]; Pacific Insurers' Reply to the Debtor's Post-Hearing Brief in Support of Confirmation of the Debtor's Modified Fourth Amended Plan of Reorganization [Dkt. No. 3453]; Pacific Insurers' Submission Regarding Revisions to the Debtor's Proposed Confirmation Order [Dkt. No. 3455]; and the Official Committee of Unsecured Creditors' Response in Opposition to the Debtor's Post Trial Brief [Dkt. No. 3456].

addressed during the Closing Arguments. *See* Dkt. No. 3486. The Closing Arguments were presented on September 16, 2026, and at that point the matter was submitted for decision.

## **DISCUSSION**

Section 1129(a)(1) et seq. of the Bankruptcy Code contains the requirements that a proponent of a plan must satisfy for the Court to confirm a plan; and the Court shall confirm a plan that meets those requirements. *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. Pshp*. (*In re Ambanc La Mesa Ltd. Pshp.*), 115 F.3d 650, 652 (9th Cir. 1997) As the plan proponent, the Debtor must establish by a preponderance of the evidence that each of the relevant confirmation requirements for section 1129 has been met. *Id*. The requirements vary depending on whether the plan is consensual, i.e., whether all impaired classes of claims have accepted the plan, or whether one or more impaired classes have rejected the plan. *Id*. For a non-consensual plan, confirmation may be sought under section 1129(b)- if the plan meets all of the other requirements of that subsection with respect to each impaired, non-accepting class and if the plan satisfies the applicable requirements of section 1129(a) other than section 1129(a)(8). *Id*. .

Because one impaired class has rejected the Plan (Class 4 (Abuse Claimants)), the Plan does not satisfy the requirements of Section 1129(a)(8), and it may be confirmed only if it meets all of the remaining relevant subparts of Section 1129(a) and meets the standards for confirmation under Section 1129(b).

As noted previously, this Memorandum Decision focuses on the objections to confirmation asserted by the Committee and the UST and will address the objections asserted by the Insurers in a separate Memorandum Decision.

## **UNCONTESTED PORTIONS OF THE PLAN**

The Court notes that subsections l 129(a)(6) (approval of rate changes), (14) (domestic support obligations), and (15) (individual debtors) are not pertinent to this Plan and are therefore not discussed below.

### A. Section 1129(a)(l)

Bankruptcy Code Section 1129(a)(l) requires that "[t]he plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(l).[13] Courts interpret this language to mean that a plan must meet the requirements of Bankruptcy Code sections 1122 and 1123. *See* generally *In re PG&E Corp.,* 617 B.R. 671, 675 (Bankr. N.D. Cal 2020) (stating that sections 1122 and 1123 are applicable provisions of the Bankruptcy Code for plan compliance purposes); *In re Claar Cellars, LLC*, 623 B.R. 578, 591 (Bankr. E.D. Wash. 2021) ("sections 1122 and 1123 are universally applicable" provisions with which a plan must comply). Sections 1122 and 1123 govern classification of claims and contents of a plan, respectively. *In re Claar Cellars, LLC*, 623 B.R. at 591.

#### i. Section 1122

Section 1122 requires that all claims which are classified together be substantially similar, which "insures that large claims of differing legal natures do not dictate other claims within a class." G-I Holdings, 420 B.R. at 258 (quoting *In re Resorts Int'l, Inc.,* 145 B.R. 412,447 (Bankr. D.N.J. 1990)); 7 Collier on Bankruptcy ¶ 1122.03 (16th Ed. 2026).

Article II of the Plan separately classifies eight classes of claims. There are no objections to the classification of claims and because the division of these claims is based on sound financial rationales, the Debtor has established by a preponderance of the evidence that the Plan's classification satisfies section 1122(a).

#### ii. Section 1123

Section 1123(a)(l) addresses the contents of a plan and requires that a plan designate classes of claims and interests. 11 U.S.C. § 1123(a)(l). As described above and consistent with this requirement, Article II of the Plan adequately classifies the claims and interests. Administrative claims and priority tax claims do not require designation under Section 1123(a)(l). 11 U.S.C. § 1123(a)(1) The Debtor has established by a preponderance of the evidence that the Plan satisfies the requirements of section 1123(a)(l ).

---

[13] The Court notes that the Committee to a great extent, and the UST to a more limited extent, each assert that particular provisions of the Plan do not comply with applicable provisions of the Bankruptcy Code. The Court will specifically address those particular objections below.

Section 1123(a)(2) and (3) require that a plan specify which classes are unimpaired and the treatment of any impaired classes under the plan. 11 U.S.C. § 1123(a)(2), (3). Here, Article II of the Plan designates which classes are impaired, and Article IV specifies their treatment, establishing by a preponderance of evidence that sections 1123(a)(2) and (3) are satisfied. Plan sections 2.3, 4.1-4.8.

Section 1123(a)(4) provides that a plan shall "provide the same treatment for each claim or interest of a particular class" unless the holder agrees to a less favorable treatment. Here, the Plan provides for the same treatment of each claim within a particular class, with a variant with respect to Class 4 (Abuse Claims) to which no party has objected. Class 4 Abuse Claimants are each treated the same with respect to their rights against the Debtor (via the creation and operation of the Survivors' Trust, as set forth in the Procedural Background Section of this Memorandum Decision). In addition, the members of Class 4 who are also RCWC Abuse Claimants are eligible to receive additional compensation from contributions that RCWC will make to the RCWC Escrow. Code section 1123(a)(4) is satisfied. Plan, sections 4.1-4.8, 9.3.2

Code Section 1123(a)(5) provides that a plan must provide adequate means for its implementation. 11 U.S.C. § 1123(a)(5); *In re Claar Cellars, LLC*, 623 B.R. at 592. Here, the Plan provides for the payment of Class 1, Class 2 (Priority Claims), and Class 3 from ongoing operations of the Debtor post Effective Date. Plan Article XII. With respect to the treatment of Class 4, the Plan provides for the establishment and funding of the Survivors' Trust, and procedures for making distributions to all holders of Allowed Abuse Claims and for such Claimants also to exercise additional rights as set forth in connection with the description of the Survivors' Trust. Plan sections 8.1-8.2, 9.1-9.10, 12.6. With respect to the treatment of Class 5 (Unknown Abuse Claims),in addition to the provisions described with respect to Class 4 Abuse Claims, the Survivors' Trust shall also create an Unknown Abuse Claims Reserve that will hold funds for the satisfaction of Class 5 Claims. Plan section 9.4

Code Section 1123(a)(6) requires a plan to provide for the inclusion in the charter of the debtor, if the debtor is a corporation, a provision prohibiting the issuance of non-voting equity securities. Section 1123(a)(6) of the Bankruptcy Code does not apply here because the Plan does

not propose to issue any non-voting equity securities.

Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan"11 U.S.C. § 1123(a)(7). This section requires that a plan provide for the manner of selection of any director, officer or trustee of the reorganized debtor, or any successor to such officer, director or trustee, and such selection be consistent with the interests of creditors and equity security holders and with public policy.

Here, the Plan provides that the Debtor's officers will not be changed and all officers and directors of the Debtor are mandated by state law and are consistent with the interests of creditors. Accordingly, the Plan Proponents established by a preponderance of the evidence that the Plan satisfies the requirements of Section 1123(a)(7).[14]

Finally, section 1123(a)(8) involves individual debtors, and so does not apply. See 11 U.S.C. § 1123(a)(8).

The Plan Proponents have substantially complied with the Bankruptcy Code and Rules regarding disclosure, notice, and solicitation with respect to the Plan, the Disclosure Statement, and other matters in connection with this Chapter 11 case.[15]

As permitted by section 1123(b)(2) of the Bankruptcy Code and as set forth in Article VII of the Plan, all prior Court-authorized assumptions or rejections of executory contracts and unexpired leases are ratified. Moreover, all Employee Benefits Plans are assumed as executory contracts on the Effective Date, and all Executory Contracts not previously rejected or subject to a pending motion to reject are assumed as of the Effective Date. Plan, sections 7.2.2-7.2.3. The

[14] The Insurers appear to object to confirmation of the Plan under this section. *See* Dkt. No. 2901. The Court notes that the substance of those arguments consider appointment of allegedly conflicted fiduciaries. This objection is overruled as the Insurers lack standing to object on these grounds. Moreover, there are no Directors or Officers being appointed, so this section does not appear to be applicable, as discussed below in related section 1129(a)(5).

[15] The Committee had previously filed a "Motion to Designate Certain Class 1, Class 3 and Class 6 Votes", pursuant to which it argued among other things that the Debtor had not conducted certain aspects of the solicitation process for the Plan in conformity with relevant Bankruptcy Code provisions. [Dkt. No. 3001]. However, the Committee subsequently entered into that certain "Stipulation re Resolution of The Official Committee of Unsecured Creditors Motion to Designate Certain Class 1, Class 3 and Class 6 Votes" [Dkt. No. 3205], pursuant to which the Court believes that such objections were resolved.

Debtor has exercised reasonable business judgment in determining to assume or reject these Executory Contracts and Unexpired Leases under the Plan. The assumption of each executory contract or unexpired lease assumed under the Plan shall be binding on the Debtor and each non-debtor party to each such executory contract or unexpired lease.

In addition, the Plan also provides for the rejection of the Unexpired Lease between the Debor and CCCEB as part of the CCCEB Settlement. Plan, section 7.3. As more fully explained below, the Court is essentially tabling consideration of the CCCEB Settlement pending the filing of another plan of reorganization, and the Court presently makes no findings or conclusions with respect to the CCCEB Settlement or the proposed rejection of the Unexpired Lease between the Debtor and CCCEB.

Under section 1123(b)(3) a plan may provide for "settlement of adjustment of any claim . . . . belonging to the debtor or to the estate, or the retention and enforcement by the debtor ... of any such claim." 11 U.S.C. § 1123(b). The Insurers have asserted several objections to the Plan, respecting the Debtor's retention of potential claims, the Debtor's transfer of certain claims or the right to assert such claims, and the Plan's and the Survivors' Trust Documents treatment of who may object to Abuse Claims, and the Debtor has responded to those objections. The Court expects to dispose of these issues in connection with its issuance of a separate Memorandum Decision with respect to the Insurers' Objection.

In addition, to the extent that Section 1123(b)(3) pertains to the CCCEB Settlement, to which the Committee has objected, and which the Court is tabling for the time being, any further or renewed objection to the CCCEB Settlement may be considered when appropriate.

Section 1123(b)(6) states that a plan may include any provision not inconsistent with applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1123(b)(6). In this case, the Plan provides for third-party releases, a Channeling Injunction and an Exculpation Provision. Plan sections 13.4-13.8. The UST has raised certain limited objections to the scope of the Releases, the Channeling Injunction and the Exculpation Provision; the Committee has joined in the objections to the Exculpation Provision. Those objections are specifically considered at Sections VI and VII of this Memorandum Decision. The Insurers raise numerous objections to the

Releases, the Channeling Injunction and the Exculpation Provision, which the Court also expects to address in the subsequent Memorandum Decision regarding Insurer Objections.

B. Section 1129(a)(2)

Section 1129(a)(2) requires that "the proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2); *In re Downtown Inv. Club, LLP*, 89 B.R. 59, 65 (9th Cir. BAP 1988). Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code sections 1125 and 1126. *Todeschi v. Juarez (In re Juarez)*, 603 B.R. 610, 626 (9th Cir. BAP 2019).

The Court notes again that the Committee had previously filed a "*Motion to Designate Certain Class 1, Class 3 and Class 6 Votes*", pursuant to which it argued among other things that the Debtor had not conducted certain aspects of the solicitation process for the Plan in conformity with relevant Bankruptcy Code provisions [Dkt. No. 3001]. However, the Committee subsequently entered into that certain "*Stipulation re Resolution of The Official Committee of Unsecured Creditors Motion to Designate Certain Class 1, Class 3 and Class 6 Votes*" [Dkt. No. 3205], pursuant to which the Court believes that such objections were resolved.

The Debtor has substantially complied with the Bankruptcy Code and Rules provisions regarding disclosure, notice, and solicitation with respect to the Plan, the Disclosure Statement, and other matters in connection with this Chapter 11 case.

As noted in connection with the Committee's objection concerning the requirements of Section 1129(a)(10), the Court entered its "*Order (I) Approving the Debtor's Disclosure Statement and (II) Establishing Procedures for Solicitation, Notice and Balloting for the Plan*" on May 8, 2026. [Dkt. No. 2910] (the "Solicitation Order"). Pursuant to the Solicitation Order, Kurtzman Carson Consultants LLC dba Verita Global ("Verita") the Debtor's duly appointed claims and noticing agent, sent Solicitation Packages including approved forms of Ballots for acceptance or rejection of the Plan, to claimants in Classes 1, 4, 5 and 6. "*Declaration of Andres A. Estrada with Respect to Solicitation and the Tabulation of Votes on the Debtor's Modified Fourth Amended Plan of Reorganization*" (the "Estrada Declaration") at 2-3 [Dkt. 3207]. The Estrada Declaration reported that Class 1 accepted the Plan, Class 4 rejected the Plan, and Class

5 accepted the Plan, and Class 3 had previously accepted an earlier version of the Plan and was not resolicited. The Estrada Declaration establishes that the Disclosure Statement and Plan were properly solicited. *See* Dkt. No. 2093.

C. Section 1129(a)(4)

Section 1129(a)(4) of the Bankruptcy Code requires that all payments made or to be made by the Debtor or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, have been approved by, or are subject to the approval of, the court as reasonable. 11 U.S.C. § 1129(a)(4); *In re W. Asbestos Co.*, 313 B.R. 832, 848 (Bankr. N.D. Cal. 2003).

In this case, all payments made by the Debtor or to be made to professionals retained by orders of the Court will be subject to review and approval by this Court under section 330 of the Code. Plan, section 3.3. Further, the Court will retain jurisdiction to determine all fee applications and any disputes regarding the reasonableness of fees. Plan, sections 15.1.4, 15.1.9 Accordingly, the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

E. Section 1129(a)(8)

Bankruptcy Code section 1129(a)(8) provides that "[w]ith respect to each class of claims or interests (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). There is no question but that Class 4 is impaired under the Plan and has not accepted the Plan. This Section has not been satisfied.

If an impaired class rejects the plan, then the Court must look to section 1129(b). *In re M. Long Arabians*, 103 B.R. 211, 217-18 (9th Cir. BAP 1989). Section 1129(b)(l) provides that, despite a plan not complying with section 1129(a)(8), the court shall confirm a plan if it does not discriminate unfairly" and "is fair and equitable" to that dissenting class. The Committee and the Debtor dispute whether the Plan satisfies the requirements of Section 1129(b), and the Court discusses this issue extensively at Section VII of this Memorandum Decision.

G. Section 1129(a)(12)

Section 1129(a)(12) requires the payment of all fees payable under 28 U.S.C. § 1930. 11

U.S.C. § 1129(a)(12); *In re PG&E Corp.*, 617 B.R. at 678. Here, the Plan provides that: "the Reorganized Debtor shall continue to pay all U.S. Trustee Fees accruing on or before the earlier of (i) the closing of the Chapter 11 Case, and (ii) December 31, 2027. Should the Chapter 11 Case remain open through January 1, 2028, or later, the Survivors' Trust shall pay all U.S. Trustee Fees accruing on or after that date until the Chapter 11 Case is closed." Plan, section 12.9.4.1. Therefore, the Debtor has met its burden and established that section 1129(a)(l2) is satisfied.

H. Section 1129(a)(13)

Section 1129(a)(13) of the Code requires that the Plan provide for continued, post-confirmation payments of all retiree benefits at the levels established in accordance with section 1114 of the Code. 11 U.S.C. § 1129(a)(13); *In re PG&E Corp.*, 617 B.R. at 678.

Here, the Plan provides for the assumption of all Employee Benefit Plans as Executory Contracts and the continued performance under all such agreements. Plan, section 7.2.2. As such, the Debtor has met its burden and satisfied section 1129(a)(13).

I. Section 1129(a)(l6)

Section 1129(a)(16) requires that all transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust. 11 U.S.C. § 1129(a)(16).

Here, all transfers of property under the Plan will be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust; accordingly, the Plan satisfies the requirements with section 1129(a)(16).

J. Section 1129(c)

Section l 129(c) provides that "[i]f the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). There is only one plan pending before the Court and so this section is not applicable.

K. Section 1129 (d)

Section 1129(d) of the Bankruptcy Code provides that, on request of a governmental unit, the court may not confirm a plan if its principal purpose is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, as amended. Here, no government entity has objected to confirmation on this basis, and the Debtor has demonstrated by a preponderance of the evidence that the primary purpose of the Plan is other than to avoid taxes or the application of the Securities Act.

## CONTESTED PORTIONS OF THE PLAN

### I.

### DEBTOR'S ARGUMENTS CONCERNING THE EFFECT OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION AND THE RELIGIOUS FREEDOM RESTORATION ACT ON ITS OBLIGATIONS UNDER CODE SECTION 1129

The Debtor argues that certain of the requirements for confirmation of its Plan infringe upon its rights and prerogatives as a religious entity and should be either modified or excused to avoid infringing on those rights or burdening the exercise of its religious freedoms.

These arguments, and the Committee's responses pervade the parties' disputes regarding confirmation of the Plan and potential cramdown on unwilling Abuse Survivors. To the extent that those disputes have particular salience with respect to specific requirements for confirmation, the Court will address those matters in detail in connection with those objections and responses.

However, the Debtor's assertions regarding the effect of its status as a religious entity seeking relief as a debtor in bankruptcy raise fundamental questions about the bankruptcy system that go beyond the precise and focused inquiries under Section 1129. The Court believes it necessary and appropriate to address and to resolve these issues at the outset of its analysis.

For three reasons, the Court does not believe that the Debtor has articulated a basis for application of the First Amendment to the Constitution and the Religious Freedom Restoration

Act ("RFRA"), 42 U.S.C. §2000bb et seq. to the requirements that the Debtor must satisfy to confirm their Plan.

First, the Court is unaware of any Code provision, or any case law interpreting the Code, that applies any of the requirements of the Code, including the requirements for confirmation of a plan, differently or more leniently, because the debtor is a religious entity. See Part "A" below.

Second, the Court does not believe that the Debtor has articulated any basis on which the actual requirements for confirmation of a plan of reorganization would implicate any of the protections provided under the First Amendment or RFRA. See Part "B" below.

Third, even if there were some theoretical basis to consider the application of the First Amendment or RFRA to this case, the actual provisions and requirements of those laws would either (a) render them inapplicable to plan confirmation issues or (b) make it impossible to assess the effect of those laws on the Debtor's requirements for confirmation. See Part "C" below.

**A. There is no Basis Under the Bankruptcy Code or Relevant Caselaw to Treat this Debtor Differently From Any Other Debtor Based on its Status as a Religious Entity.**

This Debtor has the same right as any individual or eligible entity to seek relief under the Bankruptcy Code and to obtain the significant benefits of Chapter 11, including the right to propose and confirm a plan of reorganization that will discharge its debts, including debts arising from claims of sexual abuse, and will allow the Debtor to continue its mission to serve the religious needs of the 500,000 Catholic faithful within the Oakland Diocese. And though the issue has apparently never been decided before, the resolution of such questions in all prior chapter 11 bankruptcy cases involving mass tort/sexual abuse claims against Catholic dioceses having been achieved via agreement between the parties, this Court does not believe that either the Debtor's status as a religious entity or the heinous nature of the claims asserted against it deprive this Debtor, as a matter of law, of the power under the Bankruptcy Code under appropriate circumstances and with appropriate protections to cram down a plan of reorganization on creditors who have rejected the Debtor's plan.

But by the same logic, the Court sees no reason to apply the Bankruptcy Code or any of

the provisions regarding plan confirmation differently or more leniently in this case based upon the Debtor's status as a religious entity. Neither the Code, nor any caselaw interpreting the Code, nor any other relevant federal statute expressly create a different standard for religious entities' participation in the bankruptcy system, and the Court is hard pressed to identify any implied basis for such treatment. To the contrary, it appears to the Court that the secular basis for relief under the Code, respect for the rights of creditors and other third parties, and fundamental fairness require that this Debtor comply fully with the requirements of the Bankruptcy Code.

And the Court believes that this result is especially compelled where, as here, the Plan proposes to pay creditors considerably less, from the Debtor's assets, than the claims would likely be worth were the claimants to proceed to judgment in the state courts, while the Debtor retains significant assets post-confirmation to continue its business, here its religious mission.

As the Debtor has candidly acknowledged, it freely chose to file for bankruptcy relief for the same reason that every defendant in a mass tort scenario choses that course, to avoid the ruinous costs of litigation, the entry of individual judgments likely exceeding their ability to pay, and the potential loss of assets as judgment creditors sought to collect. In bankruptcy, the Debtor also gets the benefit of a centralized forum in which to marshal all assets for the benefit of the Debtor and creditors, and a collective process whereby to resolve ratably, equitably and finally, all claims.

As the Bankruptcy Court stated aptly in the case *In re Catholic Bishop of Spokane*, 329 B.R. 304 (Bankr. E.D. Wa. 2005), *rev'd in part on other grounds*, 364 B.R. 81 (E.D. Wash. 2006),

> Religious organizations do not exist on some ethereal plane far removed from society. As institutions, they engage in many secular activities. . . . Commencing a bankruptcy proceeding is certainly a secular activity. The fundamental purpose of a bankruptcy proceeding is to provide equitable and fair treatment for creditors and to provide the debtor a financial "fresh start." It is not a burden on a religious organization which voluntarily seeks the protection of the bankruptcy laws to require it to treat its creditors in the same manner as any other debtor. It is not a burden on a religious organization to assess its rights vis-a-vis creditors on the same basis as any other debtor.

*In re Catholic Bishop of Spokane*, 329 B.R. at 325.

In summary, the Court sees no reason to create a different rule for a debtor that is a religious entity. No such debtor files a bankruptcy petition **because** it is a religious entity, or because bankruptcy will allow it more fully and vigorously to follow its doctrines or serve its congregants. Rather a religious entity files bankruptcy to manage and pay claims and continue its business. And the fact that, if successful, it may resolve those claims and retain assets sufficient to carry on its affairs, in this case a religious mission, doesn't make it a religious entity worthy of special protections, it makes it a debtor.

### B. The Debtor Has Not Articulated a Reason Why the Requirements for Confirmation of a Plan Would Infringe on Religious Freedoms.

The Debtor asserts that the Bankruptcy Code impermissibly constrains its religious rights in two instances. Neither example appears genuinely to implicate any aspects of the Debtor's religious freedoms.

First, the Debtor contends that the best interests of creditors test impermissibly violates the Debtor's religious rights by requiring it to describe a scenario that could never exist-- the liquidation of all of its assets--based on the Debtor's status as a non-profit entity. As the Court has observed several times, the Debtor is correct that, as a non-profit entity, it cannot be forced involuntarily into a chapter 7 bankruptcy case, and thus it could never actually be required to sell all its assets in a bankruptcy case. But as the Court has also observed, the Debtor is misstating the requirements of Section 1129(a)(7) and mischaracterizing the effect of those requirements on Debtor's religious rights. Nothing in Section 1129(a)(7) requires that the Debtor actually sell any of its assets, let alone all or even most. Section 1129(a)(7) merely requires the Debtor to prepare an analysis to inform its creditors what they would get in a hypothetical liquidation, to allow them to make a more intelligent and informed choice about the Plan.

The failure to satisfy this test simply leaves Debtor with a choice – improve the Plan or dismiss the case and return to litigation in state court. But that decision is Debtor's alone and does not require the commencement of a chapter 7 case or the sale of assets or violate religious freedoms.

The fair and equitable test of § 1129(b) similarly does not force Debtor to sell any assets. Instead, it requires Debtor to prove to creditors and the court that it is fair and equitable for it to dedicate some assets to the payment of creditors and to retain the property it wants to keep. *See* Section VII below.

And, as illustrated in *In re General Teamsters, Warehousemen and Helpers Union Local 890,* 225 B.R. 719 (Bankr. N.D. Cal. 1998)*, aff'd,* 265 F.3d 869 (9th Cir. 2001) ("*Teamsters I*"), the requirement that a plan be fair and equitable need not require the involuntary sale of assets in any event—the debtor in *Teamsters I* provided distributions to creditors not by selling its tangible assets but by borrowing against them to create a fund for the payment of creditors. Indeed, in this case, the Debtor is performing a more modest version of the same strategy: the Initial Debtor Cash Contribution of $40 Million payable to the Survivors' Trust shortly after confirmation is being funded by a loan from RCC collateralized by some of Debtor's real property. Plan at 61. And the Plan further provides that the remaining $110 Million to be paid into the Survivors' Trust need not be funded by further sales of Debtor's real property; the remaining amounts of the Debtor's Cash Contribution may be payable in part, and in significant part, from a portion of the Restricted Assets and from proceeds of the disposition of the Livermore Property. *Id* at 66. To the extent that the $110 Million of the Debtor's Cash Contribution is payable from additional parcels of Debtor's real property, those proceeds may be obtained by sale *or refinance* of such property. Various properties of the Debtor have been offered for sale and others have been offered as security. The Plan, strictly speaking, does not require that Churches are to be sold, it simply requires that the $110 million be paid into the Survivors' Trust. So, for example, nothing would prevent the Debtor from satisfying that obligation simply by refinancing or further borrowing against its own real property assets.

The Debtor's concerns about the Code's requirements concerning involuntary dispositions of property are misplaced.

//

//

//

### C. The Provisions and Requirements of the First Amendment and RFRA Either Render Them Inapplicable to Plan Confirmation Issues or Make It Impossible to Assess the Effect of Those Laws on the Debtor's Requirements for Confirmation of Its Plan.

The Free Exercise Clause of the First Amendment and RFRA severely limit courts' abilities to resolve disputes involving certain inter-church or intra-church disputes. *In re Catholic Bishop of Spokane,* 329 B.R. 304, 322 (Bankr. E.D. Wa. 2005), *rev'd* in part on other grounds, 364 B.R. 81 (E.D. Wash. 2006). For the most part, these disputes involve (1) congregations that have split into factions with each claiming to be the surviving church; (2) disputes over who has the power to appoint religious leaders or otherwise speak authoritatively about doctrinal matters; and (3) cases in which a religious institution asserts that its doctrinal obligations supersede requirements of secular laws (i.e., employment issues). *Id.* (describing cases); *Serbian Eastern Orthodox Diocese for U.S. of America and Canada v. Milivojevich,* 426 U.S. 696 (1976).

However, where the controversy is not about church doctrine or an intra-church dispute, but is simply a secular dispute between creditors and a religious bankrupt debtor, such as whether the plan of reorganization satisfies the requirements for confirmation, the legal analysis is different. In these cases, "the First Amendment does not prevent application of a law or body of law which is facially neutral and generally applied in the jurisdiction to a religious organization. This is true even though its application would have an incidental burden or effect on the exercise of religion. It is only if application of the law would have an undue or substantial burden on the exercise of religion that further inquiry is made." *In re Catholic Bishop of Spokane,* 329 B.R. 304, 323-24. "The existence of a substantial burden on the practice of religion becomes more difficult to demonstrate when the burden is alleged to exist in the context of secular activities. Commencing a bankruptcy is certainly a secular activity." *Id.* at 324-25.

1. Applicability of the First Amendment Free Exercise Clause.

The Free Exercise Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting



Case: 23-40523 Doc# 3567 Filed: 10/15/26 Entered: 10/15/26 16:00:30 Page 48 of 109

the free exercise thereof. . . . " The Free Exercise Clause protects and "embraces two concepts – freedom to believe and freedom to act." *Cantwell v. State of Connecticut*, 310 U.S. 296, 303(1940).

This Court is unable to discern any alleged violation of the Debtor's constitutional rights to exercise its religion on what one might define as a purely "doctrinal" basis, i.e., the disfavor or suppression of an article of belief, that is implicated in the Debtor's bankruptcy case, or in any of the requirements for confirmation of its Plan.

Rather, the Court believes that the Debtor's concerns focus more on what it would conceive of as questions of church governance, to the extent that the Debtor's own decisions concerning the means by which it will pay its creditors, including which assets to dedicate to that important goal, can fairly be characterized as questions of church governance. The Cout thus turns to examination of the related Church Autonomy Doctrine and the Ministerial Exception.

2. The Church Autonomy Doctrine and the Ministerial Exception.

The Church Autonomy Doctrine and the Ministerial Exception have arisen from judicial interpretation of the Free Exercise Clause and generally restrict the jurisdiction of the courts to resolve "church property disputes on the basis of religious doctrine and practice." *Jones v. Wolf*, 443 U.S. 595, 602 (1979). These restrictions permit religious entities to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). These restrictions do not mean, however, that courts may never adjudicate matters involving religious entities. Courts may apply "neutral principles of law" to resolve disputes regarding religious entities without violating the Free Exercise Clause. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969).

The Debtor argues that the Court would violate the Church Autonomy Doctrine, and by analogy, the Ministerial Exception,[16] if it were to "weigh in on a dispute between the Committee

[16] The Ministerial Exception is similar to the Church Autonomy Doctrine but limits the application of employment statutes where they interfere with "an internal decision that affects the faith and mission of the church itself." *Hosanna-Tabor Evangelical Lutheran Church*, 565 US 171, 186, 190, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012)). Debtor argues that the Ministerial Exception applies by analogy and demonstrates the broad scope of the

and Debtor regarding how many Churches the Debtor needs to fulfill its mission." Debtor's Post-Trial Brief at 58:71-21. Debtor mischaracterizes what the court is doing and what Debtor is required to do, as set forth in Section "B" above.

The Church Autonomy Doctrine,[17] originally articulated in *Watson v. Jones*, 80 U.S. 679 (1871), provides a shield against excessive government incursion on internal church management and protects the right of churches and other religious institutions to decide matters "of faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (citing *Hosanna-Tabor Evangelical Lutheran Church v. EEOC*, 565 US 171, 186 (2012)). "This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch.*, 591 U.S. at 747.

Here, the court is not resolving a dispute between the Committee and the Debtor about the number of churches to sell, nor is it requiring Debtor to sell anything. It is also not second guessing the decisions Debtor has, in good faith, made. The reality is that Class 4 Abuse Survivors have overwhelmingly rejected the Plan and the Committee has objected to confirmation of the Plan. In order for the court to cram this Plan down on the objecting creditors, the Debtor must satisfy the requirements of Sections 1129(a)(7) and (b). It has not done that.

Ultimately, the requirements that Debtor sustain its burden under Sections § 1129(a)(7) and 1129(b) are neither doctrinal in the sense of preventing or inhibiting a particular religious belief or practice, nor do they affect matters of internal church management in the manner prohibited under First Amendment case law. Rather they are simply requirements that every debtor who voluntarily enters bankruptcy must perform and a burden that each debtor must satisfy. There is no provision of the Bankruptcy Code that absolves Debtor from this exercise;

---

constitutional protections for internal church management. The court agrees that it does evidence an intent to provide broad protections for doctrinal decisions, but finds that it is not violated for the same reasons that there is no violation of the Church Autonomy Doctrine.

[17] Also known as the Ecclesiastical Abstention Doctrine.

religious organizations in chapter 11 cannot simply opt-out of its provisions.[18] For these reasons, the court finds that the Church Autonomy Doctrine and, by analogy, the Ministerial Doctrine, do not apply and/or are not violated by requiring Debtor to comply with § 1129(a)(7) and (b).

3. The Religious Freedom and Restoration Act.

Congress passed RFRA "to provide greater protection for religious exercise than is available" under the Free Exercise Clause. *Apache Stronghold v. U.S.*, 101 F.4th 1036, 1056 (9th Cir. 2024) (*en banc*), *cert. denied*, 145 S.Ct 1480 (2025); *see also*, *Holt v. Hobbs*, 574 U.S. 352, 357 (2015) (RFRA was intended "to provide very broad protection for religious liberty"). To that end, it provides, that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability...." 42 U.S.C. § 2000bb-1(a). RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" the date of its enactment. 42 USC § 2000bb-3(a).[19] But by its plain terms, RFRA only applies if: (1) the government; (2) substantially burdens the exercise of religion. The court will address each element in turn.

Initially, it is not clear whom the Debtor believes is the governmental actor in this context. It first argues that this Court is the government actor who is "forcing the sale" of churches, "ordering the sale" of churches, or "second-guessing and overriding Debtor's decisions" regarding which churches to sell. Debtor's Post-Trial Brief at 55-59. The Debtor essentially repeated this assertion during the Closing Arguments. However, the Debtor also argues that the Court is violating RFRA by "weigh[ing] in on a dispute between the Committee and the Debtor regarding how many Churches the Debtor needs to fulfill its mission." *Id.* at

---

[18] Debtor cites to *Union Gospel Mission of Yakima, Washington v. Brown*, 162 F.4th 1190 (9th Cir. 2026) for the proposition that the Church Autonomy Doctrine applies even to laws that have general and neutral application beyond an intra-Church dispute. Debtor's Post-Trial Brief at dkt. 3418, p. 58, lines 21-24. While the court believes this case is distinguishable on other grounds, it is more concerned that Debtor cited the case as binding or persuasive authority and failed to acknowledge that it has been vacated and rehearing *en banc* granted. *Union Gospel Mission of Yakima, Washington v. Brown*, 181 F.4th 1331 (Mem) (9th Cir. 2026).

[19] RFRA contains an exception that permits the government to substantially burden the exercise of religion where it demonstrates that application of the burden: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000bb-1(b). Because the court finds that Debtor's exercise of religion is not substantially burdened by the requirement to comply with the confirmation requirements found in § 1129, it is unnecessary to address the exception.

58:17-21. It goes without saying that if the dispute is between Debtor and the Committee, the Court is not involved in any manner that would constitute governmental action; indeed in that scenario there would be no government actor and RFRA not would apply. *See*, *Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826 (9th Cir.1999) (RFRA does not apply in suits where government is not a party).

But even if the Court could credibly be described as a governmental actor, RFRA would apply only if enforcement of the provisions of the Bankruptcy Code would substantially burden Debtor's exercise of religion. The court finds that it does not.

While RFRA does not define "substantial burden," it is well-established in the Ninth Circuit that preventing access to religious exercise is an example of a "substantial burden." *Apache Stronghold*, 101 F.4th at 1043. It is also well-established, however, that a government actor does not impose a substantial burden on religious exercise when its actions have "no tendency to coerce individuals into acting contrary to their religious beliefs, do not discriminate against religious adherents, do not penalize them, and do not deny them an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Apache Stronghold*, 101 F.4th at 1055 (quoting *Lyng v. NW Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449-50 (1988)).

Again, Debtor simply does not articulate a basis for the Court to conclude that the confirmation standards are imposing a substantial burden on Debtor 's exercise of religious rights. This is true in the first instance because Debtor continues to assert an incorrect and impossible scenario with respect to the application of the best interests test, i.e., an apocalyptic forced sale of all churches in the Oakland Diocese that can never be compelled in the bankruptcy system.

The Debtor has also failed to demonstrate a substantial burden with respect to the good faith and fair and equitable standards because, contra to the Debtor's assertions, those standards do not permit a third party to dictate a forced liquidation of church facilities. Even as proposed by the Debtor in this case, the good faith and fair and equitable tests merely require the Debtor to propose, and to explain the factual and bankruptcy ethical bases supporting, a plan that balances appropriately the goal of reorganization against the requirement of satisfying creditor claims.

The case *In re Roman Catholic Archbishop of Portland*, 335 B.R. 842 (Bankr. D. Or. 2005) does not compel a different result. Debtor argues that *Portland* stands, in relevant part, for the proposition that "the possible loss or sale of all parish churches could result in a substantial burden" for RFRA purposes. Debtor's Post-Trial Brief at 56:17-23. This court does not disagree with that general statement, but such agreement does not aid Debtor. First, the issue in *Portland* arose in the context of a motion for summary judgment. Thus, while the *Portland* court did envision an instance where loss or sale of churches could constitute a substantial burden, it only found that there was a question of fact as to whether a substantial burden existed in those specific circumstances. Second, and perhaps more importantly, the *Portland* court's analysis was in the context of § 544(a)(3), which actually has the potential to alter the property rights of the debtor and a third party by permitting a bankruptcy trustee or a party acting in the trustee's stead to avoid interests in real property. That is not the case here. Requiring Debtor to satisfy §§ 1129(a)(7) and (b) does not put any of Debtor's property at risk. As a result, *Portland* is inapposite.

For all of the foregoing reasons, the court finds that requiring Debtor to satisfy the confirmation requirements found in § 1129(a)(7) and (b) does not substantially burden Debtor's exercise of religion and therefore, does not violate RFRA.

4. The Doctrine of Unconstitutional Conditions.

Finally, Debtor argues that conditioning Debtor's emergence from bankruptcy upon the sale of all of its churches would violate the Doctrine of Unconstitutional Conditions, which prohibits the government from conditioning a party's receipt of a discretionary benefit on a basis that infringes the party's constitutional rights. *See generally, Girouard v. U.S.,* 328 U.S. 61 (1946) (government violated the Doctrine where it denied citizenship to a Canadian who sought naturalization because he would not agree to take up arms for the United States, based on his religious beliefs)*; Cantwell v. Connecticut,* 310 U.S. 296 (1940) (statute requiring religious organization to secure state approval to solicit funds violated Doctrine)*; New Hope Family Servs., Inc. v. Poole,* 966 F.3d 145 (2d Cir. 2020) (faith-based adoption agency had plausible

claim that rules requiring it to not discriminate on the basis of sexual orientation and marital status violated Doctrine).

The Court does not believe that the Debtors' fairly cursory treatment of this doctrine enables the Court fully and appropriately to assess the doctrine's potential applicability to this case. Nonetheless, because Debtor once again appears to misstate the factual predicate on which the doctrine's application would be based, and the Court finds that Debtor's constitutional rights are not being violated, the Court concludes that this argument likely fails.

Again, the Court is not conditioning Debtor's emergence from bankruptcy on the sale of all of its churches. It is simply requiring that Debtor establish that: (1) the Plan provides at least as good an outcome as liquidation would; and (2) it is fair and equitable for Debtor to retain the properties it wishes to keep. What, if anything, Debtor decides to sell, and ultimately, whether it decides to remain in this bankruptcy, is entirely up to it.

Further, this Court has found that requiring Debtor to sustain its burden with respect to Sections 1129(a)(7) and 1129(b) does not infringe on its constitutional rights under the First Amendment Free Exercise Clause or RFRA. Thus, Debtor's ability to remain in bankruptcy, confirm a plan and/or obtain a discharge is not conditioned upon requirements that violate its constitutional rights. It is simply conditioned on Debtor complying with the provisions of the Bankruptcy Code that are applicable to all Debtors who voluntarily seek bankruptcy relief.

## II.

## THE PLAN DOES NOT SATISFY THE BEST INTERESTS TEST OF SECTION 1129(A)(7)

Section 1129(a)(7) of the Bankruptcy Code requires in pertinent part that the proponent of a plan demonstrate that:

> (7) With respect to each impaired class of claims or interests--
>
> (A) each holder of a claim or interest of such class--
>
> (i) has accepted the plan; or

> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date;

11 U.S.C. Section 1129(a)(7).

Section 1129(a)(7) is one of the threshold requirements for the confirmation of a Chapter 11 plan. 11 U.S.C. Section 1129(a) ("The court shall confirm a plan only if all of the following requirements are met ....") and describes an important protection for creditors. Under this requirement, if a creditor belongs to an impaired class and does not vote to accept the plan, that creditor must receive at least as much in the proposed plan as it would in a liquidation. 11 U.S.C. Section 1129(a)(7); see also *In re Akorn, Inc.,* No. 20-11177 (KBO), 2021 WL 4306222, at *13 (D. Del. Sept. 22, 2021), aff'd sub nom. *In re Akorn Inc*., No. 21-2973, 2022 WL 17222417 (3d Cir. Nov. 25, 2022). This test is also known as the "best interests of creditors" test. The burden is on the debtor "to establish by a preponderance of the evidence that its Plan satisfied the best interests of creditors test." *In re Boteilho Haw. Enters., Inc.*, No. HI-23-1186-BSG, 2024 WL 4143933, at *5 (B.A.P. 9th Cir. Sept. 11, 2024); See also., *In re Tribune Co.,* 464 B.R. 126, 151-52 (Bankr. D. Del. 2011), *aff'd in part*, 587 B.R. 606 (D. Del. 2018).

In order to demonstrate satisfaction of this requirement, the plan proponent will include, typically in the approved disclosure statement accompanying the plan, a "liquidation analysis" that compares the recovery for objecting members of impaired creditor classes under the plan and the recovery that those creditors would receive in a hypothetical chapter 7 liquidation. If the recovery under the plan is not less than the recovery under chapter 7, the proponent has satisfied the best interest of creditors test. In formulating this comparison, the proponent may make reasonable assumptions that take account of the value of assets in a liquidation, which may differ from "book" or "market" value, and may take account also of the reasonable expenses and costs of a liquidation under chapter 7. *In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997)

Section 1129(a)(7) focuses on individual dissenting creditors within impaired classes of the Plan. In this case, there are five impaired classes, of which only Class 4 contains creditors who voted to reject the Plan, and they did so resoundingly—of the 345 claimants in Class 4, 331

voted to reject the Plan. The best interests test under Section 1129(a)(7) is directed to and is protective of these creditors  Therefore, the only relevant analysis here is whether the Debtor has demonstrated that it has satisfied the best interests test as to the Class 4 Claimants.

### A. The Plan Does Not Satisfy the Best Interests of Creditors Test, for Several Reasons.

The Court cannot conclude that the Debtor's Plan satisfies the best interest of creditors test, for a number of reasons, summarized as follows:

First, the Court is concerned that the Debtor's liquidation analyses[20] are structured in a manner that tilts the playing field, essentially ensuring that the Debtor will satisfy the best interests of creditors test in every instance.   This is so because the Debtor continues to argue that as a non-profit religious entity it cannot be forced to liquidate all of its assets in a chapter 7 bankruptcy, but may choose to liquidate a smaller subset of assets, such that the proceeds obtainable via liquidation are severely restricted and invariably "less" than what the Plan would pay. In addition, the Debtor's assumption that the value of abuse claims is equal to the amount to be distributed under the Plan causes the Plan invariably to satisfy the test.

Second, focusing on the Supplemental Liquidation Analysis, the Court is concerned that the Debtor has not accurately set forth all of the assets and the debts that should be included in the liquidation analysis.

Third, the Court is concerned that the Debtor has included in the amounts to be available under the Plan the amount of the RCWC Contribution, even though those funds will not be available to all members of Class 4.

Fourth, the Court is concerned that the assumptions relied upon by the Debtor (a) to arrive at the values of its real estate in a liquidation, and (b) to take account of the expenses of liquidation, are unsupported and unreasonable.

Accordingly, the Court cannot determine with the requisite certainty that the Debtor has

---

[20] The Debtor has prepared two liquidation analyses: the "Primary Liquidation Analysis" purports to include for hypothetical disposition only a small fraction of the Debtor's real property, based on the Debtor's arguments concerning the application of the First Amendment to the US Constitution, and the Religious Freedom Restoration Act; and the "Supplemental Liquidation Analysis" includes all of the Debtor's real property.

carried its burden to satisfy the test set forth by Section 1129(a)(7).

Before turning in greater detail to the Court's concerns with the Debtor's liquidation analysis the Court offers the following general background.

In support of the Plan, Charles Moore, the Debtor's financial and restructuring expert, prepared two separate liquidation analyses, the Primary Liquidation Analysis and the Secondary Liquidation Analysis (collectively the "Liquidation Analyses"), that each purport to satisfy the best interests test. The Primary Liquidation Analysis includes twelve vacant properties that the Debtor "would be willing to sell" in a hypothetical liquidation. This analysis excluded Churches and other sites of worship, based on the Debtor's position that the First Amendment's Free Exercise and Establishment Clauses and the Religious Freedom Restoration Act prohibit the Court from exercising its authority to compel the sale of church property notwithstanding Bishop Barber's determination, as the decisional authority for the Debtor, to restrict the assets to be liquidated and to retain church and worship site assets that are necessary to sustain the Debtor's religious mission.

Under the Primary Liquidation Analysis, Class 4 Claimants would putatively receive a total of $172,300,000 in liquidation proceeds, based on a projected midpoint recovery amount. *See* Exs. D-84, D-81.

The Supplemental Liquidation Analysis includes all of Debtor's real estate properties, including many churches and other properties used for worship purposes. 6/15/26 Tr. at 92:6-10. As an initial matter, the Committee disagrees that the Debtor has included all of its properties in the Supplemental Liquidation Analysis, arguing that this assumption is based exclusively on the opinion of Adam Zimmerman, who in their view did not include all Debtor-owned properties in his analysis. 06/23/26 Tr. at 161:13–19. The Committee instead argues that the Debtor should include in the Supplemental Liquidation Analysis certain other properties actually owned by the related entities, such as the Cathedral of Christ the Light, the Livermore property, Cooper's Mortuary, and All Saints House, on the theory that an accurate analysis would support the conclusion that these properties belong in the Debtor's estate.

The Supplemental Analysis was purportedly prepared to show that even if all issues

concerning Constitutional and statutory protections for the Debtor were set aside, the Claimants in Class 4 would receive $172,300,000, the same projected midpoint recovery amount as set forth in the Primary Analysis.

1. Structural Problems with the Debtor's Liquidation Analyses.

The Primary Liquidation Analysis includes only those assets that the Debtor would consent to have liquidated. The Debtor asserts that the Court should consult only that analysis in considering whether the Debtor has satisfied the best interests of creditors test. Debtor's Post Trial Brief at 24. This assertion is based on an argument that the Debtor has made early and often in this case, that as a non-profit entity, the Debtor cannot be liquidated in chapter 7, and the liquidation analysis necessary to determine if the Debtor satisfies the best interest test should accordingly be limited to the assets that the Debtor would consent to liquidate. The Court advised the Debtor, also early and often, that its assertions concerning the applicability of the best interest test to non-profit entities were erroneous, and that it would need to provide a liquidation analysis that included all of the Debtor's assets, as a necessary demonstration that the Plan satisfied the best interest test. The Debtor ultimately complied with this directive but Debtor continues to assert that it ought to be able to rely on the Primary Liquidation Analysis for purposes of satisfying Section 1129(a)(7). Debtor's Post Trial Brief at 24. Obviously, such an interpretation of Section 1129(a)(7)'s requirements would allow the Debtor to compare its Plan solely to a highly restricted pool of assets for liquidation, ensuring that the Plan "wins" every time.

And this assertion is flawed, for several reasons.

The Court stresses again the point made in the earlier discussion of the irrelevance of religious freedom issues to the Plan: the best interests test does not require that a debtor *actually sell* all of its assets in a liquidation – hypothetical or not. The test does, however, require that a debtor demonstrate to those impaired rejecting creditors what they are likely to receive in a hypothetical Chapter 7 case to establish what is ordinarily a minimum level of compensation against which creditors can compare the promised benefits of a plan. This test is an essential

protection for creditors in a Chapter 11 case.

More fundamentally, the Debtor does not advance any cogent argument to limit the assets available in a hypothetical chapter 7 liquidation. It is true, as Judge Weisbrodt observed in *Teamsters I* that a "traditional bankruptcy analysis is not always a comfortable fit" with non-profit entities and that courts are left with "the awkward process of fitting the square peg of a non-profit association into the round hole of the Absolute Priority Rule." *Teamsters I*, 225 B.R. at 737. But that observation does not support the Debtor's argument on this issue.

The Debtor frequently invokes *Teamsters I* for the proposition that a "debtor need only include in its liquidation analysis assets that could actually be liquidated under applicable law," and therefore, "churches should not be included as realizable in the liquidation analysis." Debtor Post Trial Brief at 44. While the Bankruptcy Court's analysis of this issue in *Teamsters I* might appear in general to support this proposition, that argument would ignore the very different context in which that court addressed the assets actually available to that debtor in liquidation. The debtor in *Teamsters I* was a nonprofit local labor union holding certain tangible assets (real and personal property) as well as valuable collective bargaining agreements and the right to collect future dues from members in exchange for representation and related services. 225 B.R. at 722–23, 733–35. The debtor's plan proposed to borrow the value of the debtor's tangible assets, at fair market value, and pay that amount, along with amounts representing any increases in the value of those assets realized during the five years after confirmation, to the unsecured creditors. A creditor objected to confirmation on the basis that the collective bargaining agreements and future rights to dues should be included in the hypothetical liquidation analysis. The Court held – and on appeal, the Ninth Circuit affirmed – that these two assets each had a liquidation value of zero because the National Labor Relations Act made the assets structurally non-transferrable and non-existent in a Chapter 7 liquidation. *Id*. at 734–35 .

Relying on the holding set forth in *Teamsters I*, the Debtor argues that the religious properties in its real estate portfolio cannot be sold by the Chapter 7 Trustee and the religious sites should thus not be included as realizable value in the liquidation analysis. There are several problems with this argument.

First, the Debtor cannot unilaterally decide which assets to make available for distribution to creditors for purposes of satisfying the best interest test, or even more generally. *See In re Roman Cath. Archbishop of Baltimore*, Case No. 23-16969-MMH, Dkt. No. 2813 at 11 (Bankr. D. Md. Aug. 4, 2026) ("Even if the Debtor does not believe an asset is available to creditors, the Debtor must still disclose the asset and its value. Any interest the Debtor has in property becomes property of the Debtor's estate upon the filing of the bankruptcy petition. 11 U.S.C. § 541(a). The Debtor does not get to decide unilaterally what assets it discloses or makes available for distribution to creditors.")

Second, and tellingly, in contrast to the situation in *Teamsters I*, the Debtor does not argue that the religious properties cannot be sold at all, but rather that a governmental actor should not and cannot compel the sale of the religious properties over the objections of Bishop Barber. This argument is addressed in Section I above.

Third, the Bankruptcy Court's decision in *Teamsters I* was based on a very different set of facts. In *Teamsters I*, the National Labor Relations Act made the assets that the creditor argued should be included in the liquidation analysis structurally non-transferrable for any purpose, and consequently non-existent in the context of a Chapter 7 liquidation. It is a very different thing to argue that religious freedom protections prevent the involuntary sale of a debtors' assets, let alone the involuntary inclusion of assets in a hypothetical test that is a bedrock protection of creditors in bankruptcy. As demonstrated above, that argument fails categorically, and nothing in the decision in *Teamsters I* can resurrect that argument.

And there are other structural problems with the Debtor's Liquidation Analyses. As an aside, and though it was not directly objected to by the Committee, the Court notes the curious fact that each of the Debtor's Liquidation Analyses arrives at the same conclusion regarding the proceeds available upon liquidation--$172,500,000—even though one analysis includes only twelve properties for liquidation, and the other includes Debtor's entire real estate portfolio. The Debtor achieves this extraordinary result by applying a large discount to the value of the properties to be liquidated in the Supplemental Liquidation Analysis, and applying a series of assumptions concerning the expenses of the liquidation that it simply does not apply to the more

modest Primary Liquidation Analysis; and the Debtor offers no plausible explanation for this anomalous result. It goes without saying that if the Debtor is going to provide alternative Liquidation Analyses, at the very least, absent a highly plausible explanation, they should be "apples to apples" in all material respects, and should be based on identical, or at least similar assumptions concerning property values and expenses of liquidation.

Most fundamentally, the Debtor's construction of the best interest test artificially tilts towards satisfaction in every scenario. This result may well have been arrived at somewhat inadvertently by the Debtor, but it is nonetheless problematic.

As the Committee points out in several contexts, the Debtor has not attempted actually to value the aggregate amount of the Abuse Claims in this case.[21] Rather, perhaps based upon the difficulties and uncertainties inherent in actually valuing the Abuse Claims, and perhaps conceding that in any event the value of those claims would likely exceed the value of the Debtor's assets, the Debtor simply inserted the value of the assets dedicated to the payment of Abuse Claims via the Plan, $172,300,000, as the aggregate claim amount in the amounts to be paid under the Plan and the amounts available on liquidation. In one sense this is probably fairly innocuous—the Debtor's position appears to be that as long as the total amount of the claims to be paid, the "denominator" in the fraction, if you will, is the same, one can compare accurately the amounts available under the Plan and on liquidation, the "numerators", if you will. This makes a certain sense with respect to that comparison. But the convention of equating the amount of the claims with the amount available under the Plan treatment does dictate that the Plan will satisfy the test in every instance: the best interests test requires merely that the amount received under the Plan be *not less than* the amount that would be received in a liquidation. If the Plan appears to pay all claims in full, it necessarily satisfies that test.

---

[21] The Committee reminds the Court that it proffered an expert at trial, Kathryn MacNally of the Stout Risius firm, who provided testimony that the aggregate value of the Abuse Claims in this case was "not less than $420 Million", based on an analysis that relied solely on the amounts of pre-petition settlements and ignored settlements in bankruptcy cases. In addition, Ms. MacNally's assessment did not take account of the fact that in many if not most of those settlements, insurers paid at least a material amount of the settlements, making the overall numbers of far less utility in gauging *the Debtor's* likely ultimate financial exposure for those claims. Though it is not terribly relevant to the analysis of the best interests test, for all of those reasons the Court is disinclined to give Ms. MacNally's testimony much weight

The Court believes it likely that this result is anomalous in every sense, including that the Debtor did not intend so to "game" the system. In any event there are other significant problems with the Debtor's Supplemental Liquidation Analysis that prevent a finding that the Debtor has satisfied the best interest test.

2. The Supplemental Liquidation Analysis Contains Material Errors.

The Supplemental Liquidation Analysis contains a number of errors that make it impossible to conclude that the Debtor has satisfied the best interest test.

a. The Supplemental Liquidation Analysis fails to include at least one material asset and overstates the amount of debt that must be paid on liquidation.

In general, the Supplemental Liquidation Analysis contains the sort of assets that should be included in a hypothetical liquidation in chapter 7: real property assets, cash and cash equivalents, investments, equipment, loan and loan interest receivables, and prepaid expenses.

The Committee asserts, incorrectly, that the Supplemental Liquidation Analysis fails to include several parcels of real property that the Committee asserts rightfully should be considered property of the Debtor and therefore this bankruptcy estate. Most prominent among these is the Cathedral of Christ the Light, which the Committee values at $265 Million. *See* Exhibit 1 to Declaration of Randi Rosen at Dkt. No. 3099. However, as the Debtor points out and as the Plan makes clear, the Cathedral is at present owned by the Catholic Cemeteries of the East Bay ("CCCEB"), a separate corporate entity. Debtor Post-Trial Brief at 30. Indeed, the Plan proposes to transfer ownership of the Cathedral to the Debtor in exchange for the forgiveness of debt, a transaction about which the Committee is not only fully aware but about which they are complaining. Committee Post Trial Brief at 67. And in any event, these assets would not presently be available to the Debtor in a liquidation. The Committee's assertions about including the Cathedral included in the Supplemental Liquidation Analysis are not well-founded.

The Committee is correct however that the Supplemental Liquidation Analysis fails accurately to account for the Debtor's interest in three properties that are owned by RCBO, but leased to RCC and are operated as cemeteries.

As background, in 2015, RCC made a $20 million loan to the Debtor to refinance debt incurred in connection with the construction of the Christ the Light Cathedral. By 2022, the Debtor had paid off approximately $14 million of the loan, and there was an estimated $6 million outstanding. In December 2022, RCC loaned the Debtor an additional $20 million, ("RCC Prepetition Loan"), and RCC holds a Class 1 claim based on the RCC Prepetition Loan in the amount of $25,872,322.

The RCC Prepetition Loan was collateralized by three properties owned by the Debtor and currently leased to RCC: (1) Queen of Heaven Cemetery; (2) Saint Joseph Cemetery; and (3) Holy Sepulchre ("Cemetery Properties").[22]

Debtor contends that the Cemetery Properties do not represent any meaningful distributable value under the Plan because they are fully encumbered by RCC's liens, that no buyer would pay more for the Cemetery Properties than the amount of the RCC Prepetition Claim and that on liquidation—or foreclosure--RCC would credit bid its debt and acquire those properties. *See* 06/23/26 Tr. at 200:5–7. In support of these assertions, during the confirmation trial Ronald Gies testified that the value of the Cemetery Properties as used by RCC is lessened by its sole possible use as Catholic cemeteries. 06/23/26 Tr. at 200:20-21. Debtor also points to RCC's substantial fund of $60 million in untrusted investment funds used for cemetery maintenance in perpetuity, arguing that any other potential buyer in a liquidation sale would not only have to outbid RCC's credit bid, but would have to maintain sufficient funds, here at least $60 Million, for perpetual care obligations, a serious disincentive for any proposed buyer other than RCC.

Accordingly, the Debtor assigned a $0 value to the RCC Collateral for liquidation purposes. Yet, oddly, the RCC Prepetition Loan was included as a general unsecured deficiency claim in the amount of $20 Million.

The Committee disagrees with Debtor's assertion that the Cemetery Properties lack value. In a previous valuation conducted by Cushman & Wakefield in 2022, the RCC Collateral

[22] RCC was also granted DIP liens on four properties as collateral for a separate $15 million DIP loan: (1) Lafayette Retreat Center; (2) Holy Sepulchre Funeral Home/Mortuary; (3) Holy Cross Cemetery; and (4) St. Michael Cemetery.

Properties were valued at approximately $47 million. *See* Ex. C-90. Mr. Moore testified that Hilco, the Debtor's appraiser for purposes of the liquidation analysis, did not use this valuation in the 06/15/26 Tr. at 239:4-253:13. It seems unusual to the Court that the Debtor elected to rely solely on the valuations calculated by Hilco and not the earlier appraisals from 2022, and therefore assigned a value of $0 to the Cemetery Properties.

And even if the Debtor's assumptions of a lack of equity in the Cemetery Properties over and above RCC's line, and a possible credit bid by RCC were appropriate, the Supplemental Liquidation Analysis also continues to include a $20 Million unsecured deficiency claim for RCC. That deficiency claim seems to assume that the value of the Cemetery Properties cannot exceed $6 Million (a total RCC claim of $26, and a deficiency claim of $20 Million equates to an actually secured claim of $6 Million), a proposition with no support whatsoever. In the event of a foreclosure, it is likelier that RCC would credit bid the amount of the debt, thereby effectively purchasing the Cemetery Properties for $26 Million, but also eliminating any debt associated with the claim, and eliminating any deficiency claim. Therefore, at the very least, the Supplemental Liquidation Analysis appears to contain a $20 Million error on the debt side of the ledger.

b. The Liquidation Analyses also wrongly include the full $30 Million of the RCWC Contribution as part of the consideration available through the Plan as if were equally available to all Class 4 Claimants.

The Bankruptcy Code requires that a hypothetical liquidation analysis must show that each *individual* dissenting creditor receives at least as much as they would in the plan of reorganization being proposed. 11 U.S.C. Section 1129(a)(7) (emphasis added).

Section 1129(a)(7) serves as a protection to each individual dissenting creditor of an impaired class, providing an individual guarantee to each creditor or interest holder that it will receive at least as much in a reorganization as it would in a liquidation. Because so many of the Class 4 Claimants voted to reject the Plan, the Court is obliged to recognize their rights under Section 1129(a)(7) on an individual basis. Accordingly, the Debtor must demonstrate that it has met the standards of 1129(a)7) as to each dissenting individual of the impaired class. To the

extent that, as here, some creditors are entitled to different distributions as compared to other creditors in Class 4, one cannot apply the extra benefits available only to the few as if they were available to all, by simply including the full amount of the extra benefits to the Plan consideration generally.

The Liquidation Analyses provided by the Debtor include a $30 million contribution from RCWC to the RCWC Escrow (the "RCWC Cash Contribution"), which under the Plan will be paid to the Survivor's Trust, which holds the funds available to Class 4 Claimants. However, the RCWC Escrow will release funds to the Survivor's Trust only under two conditions: (a) that the funds to be released be attributable only to the holders of Allowable RCWC Claims (i.e., Abuse Survivors who have asserted claims against RCWC), and (b) only as to those Allowable RCWC Claimants who execute a release as to those claims. Only approximately 100 Class 4 Claimants are potential holders of Allowable RCWC Claims and will even be eligible to receive any portion of the RCWC Cash Contribution. And although the Debtor had tried to assert that any portion of the RCWC Cash Contribution that was not directed to holders of Allowed RCWC Claims who had provided releases would remain in the Survivors' Trust for distribution generally to Abuse Claimants, the Plan does not so provide, and the testimony of Dr. Andrew Currier, president of RCWC's board of directors and superintendent of Catholic schools of the Diocese, during the trial contradicted the Debtor's assertions on this point. *See* 06/22/26 Tr. at 189:21–190:7.

Of course, even if the residual of the RCWC Cash Contribution were available generally to Abuse Claimants, that would not justify treating the entire $30 Million as if it were equally available to all Class 4 Claimants. Even under a highly unlikely scenario that all Class 4 Claimants could receive some portion of the RCWC Cash Contribution, there is no scenario in which they would all be entitled to the same amount—holders of Allowed RCWC Claims would first get a percentage the RCWC Cash Contribution based on their pro rata share of the aggregate claims of all Allowed RCWC Claims; Abuse Claimants would be entitled to a distribution of whatever's left over, as among 245 other claimants. It would be impossible for those claimants to receive the same distributions, and it is accordingly inappropriate for the Liquidation Analyses

as providing $172.3 Million to Class 4 Claimants. The correct total number for distributions under the Plan is therefore $142.3 Million, not $172.3 Million.

3. The Debtor's Assumptions in the Liquidation Analyses are arbitrary and overbroad.

The valuation of assets is not an exact science – it is an imprecise tool designed to reach a calculated decision based on various hypotheses and reasonable assumptions. *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990). It is true, as the Debtor often contends, that liquidation a hypothetical liquidation is necessarily based on assumptions and judgments. It is also true, however, that these judgments must be made on the basis of evidence, and that any assumptions utilized must be reasonable. *Id*. at 298.

The plain language of Section 1129(a)(7) does not prescribe specific factors to be considered in the hypothetical liquidation analysis or inform us if any particular standards or assumptions necessarily apply. In analyzing each assumption applied by the Debtor. If it appears that nothing in the statute dictates that a Chapter 7 Trustee would be compelled to act as the Debtor is asserting, the Court looks to whether the assumptions or conventions that the Debtor is applying are reasonable.

Section 704 of the Bankruptcy Code, which outlines the duties and responsibilities of a Chapter 7 Trustee, is a good place to begin this inquiry. 11 U.S.C. § 704(a). In a Chapter 7 liquidation, the trustee has an affirmative duty to "collect and reduce to money the property of the estate. . . and close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). The Code permits the Chapter 7 trustee to operate the business for a reasonable and limited time to achieve the goals that would optimize value from the estate for the benefit of parties in interest. *See* 11 U.S.C. § 704; *see also In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 292–93 (Bankr. S.D.N.Y. 1990). Nowhere in the section does it say that the trustee must act in a certain way, much less in the way proposed by the Debtor through its Liquidation Analyses.

And as a reminder, it is not the Court's duty to come up with the correct analysis or the

right number for the hypothetical liquidation analysis. The primary issue here is that the Debtor has applied substantive assumptions, which form the basis of the Liquidation Analyses, which the Court may find unsupported, or unreasonable, but which the Court is not empowered to adjust. If the Court is unconvinced of the accuracy or reasonableness of the assumptions on which a liquidation analysis is based, the Court can only conclude that the Debtor has not met its burden that the best interest test has been satisfied.

a. The accelerated timeline for property sales is not reasonable.

A Chapter 7 trustee must act expeditiously as is compatible with the best interests of the parties in interest during the liquidation process. 11 U.S.C. § 704(a)(1). This does not necessarily compel the Trustee to act within a particular unalterable timeline.

The Debtor used Hilco Real Estate's valuation of the properties in the Liquidation Analyses. This valuation, conducted by Adam Zimmerman, was based on liquidation values and not market values, as is generally customary in a Chapter 7 liquidation analysis. The large gap in liquidation value and market value in this particular instance, as Mr. Zimmerman explained in his testimony, results mainly from the assumed immense pressure on the seller to liquidate assets and the condensed timeline to execute a transaction. 06/23/26 Tr. at 109:21-111:15. Mr. Zimmerman valued the Debtor's assets after an in-depth analysis of the assets, assessor values and data, and market data. *Id.* at 112. Following the study of the Debtor's assets, Hilco applied a 25% liquidation discount across the Debtor's portfolio. Hilco ultimately concluded that Debtor's properties totaled approximately $173 million.

In this analysis, Mr. Zimmerman notably assumed that Debtor's property will be marketed and liquidated within sixty to ninety days. The Debtor argues this short time frame is "very reasonable," because the significant carrying costs associated with the properties would motivate the trustee to sell the property as soon as possible to save the holding costs and bring in additional assets to move the liquidation forward. Debtor Post-Trial Brief at 28. In support of his argument, Mr. Zimmerman identified several cases wherein a debtor's ability to pay carrying costs dictated the narrow timeline for the sale of properties.

The Committee critiques the Debtor's compressed timeline and argues that there was no appropriate basis for this assumption. This assumption was grounded in the Appraisal Institute's definition of 'liquidation value' and did not derive from guidance in the Bankruptcy Code or a comparative analysis of another Chapter 7 trustee's actions. 06/23/26 Tr. at 122:1–123:8, 153:13–155:24, 156:11–19.

The Committee also points out that, in justifying the compressed timeline of the liquidation, Mr. Zimmerman referenced the potentially burdensome carrying costs. But he failed to factor in carrying costs in the overall liquidation analysis at all. He did not "price" any carrying costs into his analysis and was unaware of whether there actually were mortgages on the properties he valued. As such, Mr. Zimmerman's reliance on the cases he cited to support the proposition that a rapid sale is required to avoid high carrying costs is of dubious assistance.

The Committee's critique of Mr. Zimmerman's approach is well taken in this regard. There is no guidance in the Bankruptcy Code, nor is there any direction from the Court requiring the Debtor to follow this highly compressed timeline for the liquidation. Furthermore, it is doubtful that Congress intended that the Chapter 7 Trustee act so expeditiously that all the properties would be simultaneously marketed and sold within sixty to ninety days in a fire sale atmosphere. There is no rational reason why the Debtor's entire real estate portfolio would be placed on the market at the same time, nor is there any rational way to assume that every property would actually be sold within this time period with the limited marketing proposed by the Debtor. And certainly, nothing would compel the trustee to follow this timeline. The Debtor's twenty-five percent (25%) discount to the values of its real estate for liquidation purposes appears overstated and unreasonable.

b. The Litigation and Liquidation Cost are not reasonable.

The analyses include Incremental Litigation Costs, which assumes $89 million to $98 million in costs associated with the review and liquidation of Abuse Claims.[23] The Debtor

---

[23] Separately, Debtor estimates liquidation costs at the following amounts: 3% of gross liquidation proceeds or between $3.1 million to $3.7 million in the Primary Liquidation Analysis and between $6.6 million to $8.5 million in the Supplemental Liquidation Analysis to be expended on Chapter 7 Trustee Fees. D-79, pg. 16. To the extent that might be based in part on the legal fees on counsel on the caliber of the Foley & Lardner firm, which it appears the

assumes that this process would have to be accomplished via the trial of twelve "bellwether" cases actually to be litigated in state court over four years with approximately $3 million expended defending each trial, with an additional 7% increase in costs yearly. 06/16/26 Tr. at 56:11–59:9. These estimated costs, according to the Report, are based on costs defending a recent trial and already account for potential insurance reimbursement. Expert Report of Charles Moore, D-79 at 16. In parallel, the analyses also account for an alternative dispute resolution process costing $52.8 million to administer, which would require $165,000 per case for the remaining 320 claims that did not get litigated in state court. *Id*.

These assumptions come from the Debtor, and do not appear to have support from any objective, third party source. Debtor's counsel suggested the number of trials in state court and no other objective evidence supports such a robust schedule. Similarly, there was no other metric that supported the ADR assumption.

These are unreasonable assumptions to apply to this analysis. It is hardly inevitable, and not reasonable to predict, that a chapter 7 trustee would adopt the litigation and arbitration strategies described by the Debtor, or that the process would take as long and cost the enormous amount that the Debtor assumes. And in any event, the Debtor also assumes unreasonably that it would have to bear the entire $89 Million to $98 Million Incremental Litigation Expense without any of that expense being borne by any of the numerous insurers who have issued policies to the Debtor covering these claims. Mr. Moore's assertion that he did not include any such reimbursement by insurers because they have not yet paid any such reimbursement is both factually incorrect (*see* Woodall Trial) and inherently unreasonable.

The Court cannot conclude that the Debtor has demonstrated that it has satisfied the best interest test.

//

//

//

---

liquidation analysis is using to calculate some of those expenses, and that the Trustee might be likely to hire a less expensive law firm, those expenses could be reduced at all and the Court does not think this is a terribly material issue at the moment.

## III.

## THE PLAN SATISFIES SECTION 1129(A)(10)'S REQUIREMENT THAT AN IMPAIRED ASSENTING NON-INSIDER CLASS HAS ACCEPTED THE PLAN

Section 1129(a)(10) of the Bankruptcy Code states that

> "If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider."

A claim is "impaired" if the plan alters any legal, equitable or contractual rights to which such claim entitles the holder. 11 USC Section 1124. The definition of insider for purposes of assessing relations between corporate entities includes, but is not limited to, the relationships set forth in Section 101(31)(b).

As background, the Court entered its "*Order (I) Approving the Debtor's Disclosure Statement and (II) Establishing Procedures for Solicitation, Notice and Balloting for the Plan on May 8, 2026*". [Dkt. No. 2910] (the "Solicitation Order"). Pursuant to the Solicitation Order, Kurtzman Carson Consultants LLC dba Verita Global ("Verita") the Debtor's duly appointed claims and noticing agent, sent Solicitation Packages including approved forms of Ballots for acceptance or rejection of the Plan, to claimants in Classes 1, 4, 5 and 6. "*Declaration of Andres A. Estrada with Respect to Solicitation and the Tabulation of Votes on the Debtor's Modified Fourth Amended Plan of Reorganization*" (the "Estrada Declaration") at 2-3 [Dkt. 3207]. The Estrada Declaration reported that Class 1 accepted the Plan, Class 4 rejected the Plan, and Class 5 accepted the Plan.

Claimants in Class 3 (General Unsecured Claims) had previously been solicited in connection with Debtor's efforts to confirm its Third Amended Plan of Reorganization and were not resolicited. Pursuant to a "*Stipulation Regarding Resolution of The Official Committee of Unsecured Creditors' Motion to Designate Certain Class 1, Class 3 and Class 6 Votes* [Dkt. No. 3001] ("Stipulation Resolving Designation Motion") [Dkt. No. 3205] the Committee and the Debtor agreed that subject to certain conditions contained therein, including the disallowance of

certain Class 3 Claims for voting purposes that Class 3 had accepted the Plan. [Dkt. 3205 at 5] The "*Amended Declaration of Andres A. Estrada with Respect to Solicitation and the Tabulation of Class 3 Votes on the Debtor's Third Amended Plan of Reorganization*" (the "Amended Estrada Declaration") [Dkt. No. 3287] confirmed that Class 3 Claimants who were not insiders voted to accept the plan.

The Stipulation also resolved the Committee's efforts to designate the Class 1 Claim (RCC Secured Claim), which voted to accept the Plan, for voting, but preserved the Committee's ability to argue in connection with confirmation that Class 1 could not be considered an impaired assenting class for Section 1129(a)(10) purposes based on RCC's alleged insider status. [Dkt. 3205 at 3].

Subject to further discussion below, the Plan impairs Classes 1, 3, 4 and 5, and Classes 1, 3 and 5 have accepted the Plan.

The Debtor contends that the acceptance of the Plan by Classes 1, 3 and 5 establishes that the Plan meets the requirements of Section 1129(a)(10). The Committee argues that none of these classes can serve as impaired assenting classes as required by Section 1129(a)(10).

**A. Class 5 (Unknown Abuse Claims) Cannot Qualify as an Impaired Assenting Class of Creditors.**

Beginning with the most straightforward of the issues presented, the Court agrees with the Committee that Class 5, which did at least nominally vote to accept the Plan, cannot satisfy the requirement of an impaired assenting class.

Class 5 accepted the Plan by virtue of one ballot cast by Joshua Hogan, the duly appointed Unknown Abuse Claims Representative; but the Court does not believe that the Unknown Abuse Claims Representative can cast a vote that would satisfy the requirements of Section 1129(a)(10).

As the parties well know, the concept of a Future Claims Representative has its origins on the amendments to the Bankruptcy Code that added Section 524(g), dealing with special provisions in chapter 11 plans addressing claims arising from exposure to asbestos. In such cases there was a well-known and highly reliably documented phenomenon of later manifesting

claims and Section 524(g) included provisions concerning the appointment of a Future Claims Representative to act as a fiduciary for those individuals who had not yet, but would eventually, contract diseases related to asbestos exposure. 11 U.S.C. § 524(g).

Future Claims Representatives are charged, generally, with the obligation to represent the interests of future claimants, which generally may include reviewing the plan and related materials concerning the creation and operation of a trust to receive assets from the Debtor and others, to evaluate claims and to make payments based thereon, and to ensure, to the greatest extent feasible, that the claims valuation and payment process will result in assets being available to the trust to pay claims based on later manifesting illness.

The Committee correctly points out that although in the asbestos related disease context years of study and a documented history of latency made the occurrence of future claims a virtual certainty, and the likely number of such claims predictable with at least some reliability, in this case it is not so clear that there will be *any* claims arising in the future based on past sexual abuse. Indeed, the Debtor does not seem to believe that any such claims are likely. That fact notwithstanding the appointment of an Unknown Abuse Claims Representative has unquestionably become a standard feature of confirmation plans in Catholic Diocese cases[24], and Mr. Hogan has been appointed to that role in this case.

And although it is not clear that there will be any Unknown Abuse Claims in this case. Mr. Hogan has vigorously engaged with the Debtor concerning the need to preserve some benefits in the event that such claims are asserted; Mr. Hogan estimates that there could be as many as fifteen such claims, and he has prevailed on the Debtor to reserve $7.7 Million of the amounts to be contributed into the Survivors' Trust for the benefit of such claimants.

Mr. Hogan has undoubtedly done his job well in this case and faithfully represented the interests of future claimants in this case, if any. And his involvement in this case is consistent with the role of Future Claims Representatives in asbestos-related cases—to review the plan, argue for safeguards for the benefit of future claimants and offer an opinion to the Court charged

---

[24] Unknown Abuse Claims Representatives have been appointed in numerous Diocesan cases, for example: *In re Diocese of Camden, New Jersey*, Case No. 20-21257; *In re The Roman Catholic Diocese of Rockville Centre, New York*, Case No. 20-12345; and *In re Roman Catholic Archbishop of Portland in Oregon*, Case No. 04-37154.

with ruling on confirmation concerning the sufficiency of the plan and the good faith of the proponents.

What is not so clear is whether the performance of those duties can or should empower the Unknown Abuse Claims Representative also to cast a ballot accepting or rejecting a plan. The Court believes that the better answer to that question is "No."

As the Committee points out, correctly, there are not only no claims presently in Class 5, it is not clear in this instance that there ever will be any such claims. That fact alone may be enough to distinguish this case from asbestos related cases, and to cast doubt on the precedential effect of allowing Future Claims Representatives to "vote" on plans in the Section 524(g) context in cases involving less reliable predictions of the likelihood of Unknown Future Claims. And even conceding that the Order appointing the Unknown Abuse Claims Representative may have contemplated him voting on a plan, such vote is more properly understood as a general acceptance of the overall sufficiency of the plan from a fiduciary's standpoint, but should not be entitled to the extremely significant effect of "green lighting" the confirmation of the Plan by, or on behalf of, non-existent claimants.

For this reason, the Court would not accept the Unknown Abuse Claims Representative's vote in favor of the plan as satisfying the requirements of Section 1129(a)(10).

**B. Classes 1 and 3 Qualify as Impaired Assenting Classes For Purposes of Satisfying the Requirements of Section 1129(a)10)**

The Debtor asserts that the holders of Class 1 and Class 3 claims are legitimately impaired and are not insiders, and thus qualify to establish that the Plan has satisfied the requirements of Section 1129(a)(1).

1. Class 1 (RCC Secured Claim) is not an insider and is impaired in good faith.

With respect to Class 1 (Roman Catholic Cemeteries), the Debtor states that the holder of this claim is impaired because that claimant will not receive under the Plan the full payment of default interest and late fees to which they would be entitled, and that the RCC is not an insider as defined by the conditions set forth in Sections 101(31)(B) (defining an "insider" for purposes

of corporate entities). The Debtor appears to be correct that Class 1 is impaired, as its legal rights have been altered. *See Connecticut Gen. Life Ins. Co. v. Hotel Assoc*s. (*In re Hotel Assocs*.), 165 B.R. 470, 474 (1994) (citing *In re L & J Anaheim Assocs.,* 995 F.2d 940). And the Debtor appears to be facially correct with respect to RCC's alleged insider status—none of the categories set forth in Section 101(31)(B) appear to describe the relationship between RCBO and RCC.

The Committee responds that although RCC might not fall within this statutory definition of an insider, it falls within the definitions set forth in Section 101(31)(C) and Section 101(2)(C) and (D), which describe "affiliate" relationship. The Committee also relies on its description of the relevant caselaw, which rely on an affiliate-type relationship, an "affinity" between the debtor and the claimant and other illegitimate or conflicting interests.

The Committee bases its "affiliate" relationship argument on the assertion that the lease agreements, whereby RCC leases from the Debtor the real property on which RCC operates cemeteries within the Diocese create an affiliate relationship within the meaning of Sections 101(31)(E)and 101(2)(C) and (D) of the Code.

Section 101(2)(C) defines an insider to include "[a] person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor." This section does not appear to pertain to the relationship between RCBO and RCC.

The Debtor in this case does not operate a business for RCC on any theory. Rather RCC operates cemeteries including, under a lease, not an operating agreement, properties that are at most a fraction of the real property owned by the Debtor. And although the Committee asserts that RCC's business consists exclusively of operating a business using assets of the Debtor's, that assertion does not appear to be correct. As counsel for the Debtor reiterated during Closing Arguments, the testimony of Mr. Gies during the Confirmation Hearing established that RCC operates at least one facility that is separate and apart from the Debtor's properties, i.e., its business is not "substantially all" operated under its agreement with the Debtor. 9/16 Tr. at 47:22-48:10; 6/23 Tr. at 186:21-22. Accordingly, the definition of affiliate in Section 101(2)(C)

does not appear to apply.

Section 101(2)(D) includes as an affiliate an "entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement." RCC does not operate the business or substantially all of the property of the Debtor, on any basis.

The Committee's further objection rests on an allegation that RCC has an impermissible "affinity" for the Debtor, or is otherwise improperly motivated to accept sub-optimal treatment and vote in favor of the Plan. *See, e.g. In re The Vill. at Lakeridge*, LLC, 814 F.3d 993, 999–1000 (9th Cir. 2016).

This aspect of the objection is more complex. As the Ninth Circuit has made clear, a creditor may be considered an insider for purposes of assessing the satisfaction of Section 1129(a)(10) on a statutory or non-statutory basis. *In re The Vill. at Lakeridge, LLC*, supra at 999. A creditor is not a non-statutory insider unless: (1) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in Section 101(31), and (2) the relevant transaction is negotiated at less than arm's length. *Id*. at 1001.

The Committee is correct that the Debtor has not provided a comprehensive response to the objection that RCC is a non-statutory insider. *See* Committee Post-Trial Reply Brief at 50. And while the Debtor's relative silence in this point is of concern, the Court cannot conclude that the Debtor has failed to satisfy the requirements of Section 1129(a)(10) based on the two-part standard set forth in *In re The Vill. at Lakeridge, LLC*.

Even assuming that the Committee has demonstrated that the Debtor and RCC have a relationship that is not only "close" but also comparable to enumerated insider classifications in Section 101(31), a proposition which the Debtor opposed vigorously during trial and Closing Arguments, based among other things on the Committee's failure to demonstrate that RCC and the Debtor were "affiliates" within the strict reading of Section 101(a)(2), it is not at all clear to the Court that the relevant transaction was negotiated at less than arm's length.

The relevant transaction here is the RCC Prepetition Loan, as more fully described in Section II.A.2.a of this Memorandum Decision (discussing the Debtor's attempts to satisfy the best interest of creditors test), which is the basis for the Class 1 Claim. The RCC Prepetition

Loan in effect "wrapped" a prior loan by RCC to the Debtor of $20 Million in 2015 which was made to refinance some obligations related to the construction of Christ the Light Cathedral. By late 2022, the amount outstanding on the 2015 obligation had been reduced to approximately $6 Million, and RCC made a further secured loan of $20 Million to the Debtor to provide funds for payment of the expenses of this Chapter 11 case. Repayment of the RCC Prepetition Loan is fully secured by interests in the Debtor's real property, and there is no sense, let alone any evidence, that any terms of this loan, or any aspects of this loan, were made at less than an arm's length basis. For example, during examination of Mr. Gies by the Debtor and the Committee, it was assumed that were the Debtor to default on its obligations under the RCC Prepetition Loan, RCC could, and would, foreclose on its collateral. 6/23 Tr. at 182:6-20.

And while the Committee critiques the Debtor's non-response on this issue in the briefing, there is no real dispute but that the RCC Prepetition Loan is due and owing, and that its terms, which no party has suggested are inherently suspect, are enforceable. And this brings up the question whether the Committee's assumption that if insider status is questioned, it is in all cases the Debtor's burden to disprove an allegation of insider status. The Ninth Circuit's analysis in *In re The Vill. at Lakeridge* would at least implicitly suggest the opposite: the court remarked, for example, that "U.S. Bank [objecting creditor] presents no evidence that [putative insider] had a relationship with Lakeridge comparable to those listed in [Section] 101(31). *In re The Vill. at Lakeridge, supra*, at 1000.

On the whole, the Court cannot conclude that the RCC Prepetition Loan was not made on an arm's length basis, sufficient to determine that RCC is a non-statutory insider for Section 1129(a)(10) purposes. However, should the Debtor propose an alternate plan in the future, the Court would be willing to consider additional facts and legal arguments by the Debtor and the Committee on this issue.

To the extent that the Committee asserts an "affinity" between RCC and the Debtor, that by itself does not appear to be an appropriate basis for a finding of non-statutory insider status in light of the standard set forth in *In re The Vill. at Lakeridge*. And any such "affinity" would be demonstrated only in the most general of senses: the Debtor and RCC no doubt share a common

religious purpose in tending generally to the spiritual needs of Catholics in the Oakland Diocese and ensuring the integrity and the maintenance of final resting places for the benefit of the deceased and their survivors, but that affinity is hardly cause for critique, not does it necessarily lead to or suggest any artificial or improper motivation. Rather, as a party engaged in business with the Debtor which depends on the Debtor's continued ownership of real property and uninterrupted operations, RCC is well and properly motivated to make financial accommodations to the Debtor to make possible the Debtor's financial performance under a Plan that calls for extraordinary contributions to a Survivors' Trust to compensate tort creditors of the Debor and avoid the Debtor's return to the world of endless state court litigation, and exhaustion of resources.

The Committee also argues that the impairment of Class 1 is not legitimate, based largely on the Committee's assertion that the Debtor could well afford to pay the default interest and late fees being waived under the Plan. As an initial matter, as the *Connecticut Gen. Life Ins. Co.* case points out, impairment is simply a function of the alteration of legal rights. *Id.* at 474. Moreover, the Committee's assertion that the impairment is illegitimate misstates the appropriate inquiry re impairment. As *Connecticut General* also stated:

> We do not believe it is the bankruptcy court's role to ask whether alternative payment structures could produce a different scenario in regard to impairment of classes. Denying confirmation on the basis that another type of plan would produce different results would impede desired flexibility for plan proponents and create additional complications [**12] in the already complex process of plan confirmation. Moreover, nowhere does the Code require a plan proponent to use all efforts to create unimpaired classes. *Id*.

Properly considered, the Committee's objection actually sounds in Section 1129(a)(3)'s requirement that the Plan be proposed in good faith, *id.* at 475, and the Court does not believe that the Plan's treatment of Class 1, eliminating significant amounts due as default interest and late fees, amounts to bad faith. Rather this impairment is a thoroughly understandable



Case: 23-40523 Doc# 3567 Filed: 10/15/26 Entered: 10/15/26 16:00:30 Page 77 of 109

concession by RCC to make more readily feasible a Plan that calls for substantial and immediate payments to a Survivors' Trust. And as counsel for the Debtor pointed out during Closing Arguments, the forgiveness of this element of RCC's claim prevents the Debtor from dipping impermissibly into its Reserved Cash soon after the Effective Date. The impairment of Class 1 is genuine and not evidence of bad faith.

2. Class 3 (General Unsecured Claims) is impaired in good faith.

Having found that Class 1's acceptance of the Plan would by itself satisfy the requirements of Section 1129(a)(10), the Court strictly speaking need not dispose of further objections based on the status of Class 3. However, because the parties may again be engaged in disputes about a subsequently proposed plan, confirmation of which may depend on a differently constituted series of impaired classes, the Court will also indicate its findings and conclusions concerning the impaired status of Class 3.

Class 3 (General Unsecured Claims) consists of claimants who hold in the aggregate approximately $1.2 million of unsecured claims against the Debtor. Although the Committee points out that at least some of these claims appear to be asserted by individuals or entities who are more clearly "insiders" of the Debtor (a whopping $300 claim by Bishop Barber does spring readily to mind), the Committee does not and cannot assert that every claim held by a claimant in Class 3 is disqualified as belonging to an insider. The Committee points out that it may well be the case that as little as $55,778.28 of the claims in Class 3 may be held by non-insiders (*see* Committee Post Trial Brief at 50:11) and understandably complains that that is an exceptionally small fulcrum upon which to move the world of this Plan, but the Court has no basis under Section 1129(a)(10) to disregard the accepting claims of non-insiders in Class 3.

And while the Committee makes the same argument as it made regarding Class 1's allegedly suspect impairment, the Court's conclusion is the same, the impairment is straightforward (delaying payment for a year) and understandable: delaying payment on $1.2 Million of claims otherwise payable on the Plan's Effective Date for a year provides the Debtor some flexibility reliably and feasibly to make a much larger payment to the Survivors' Trust, and

avoids the Debtor impermissibly dipping into its Cash Reserves. Class 3's acceptance of the Plan would also satisfy the requirements of Section 1129(a)(10).

The Court therefore finds and concludes that the Debtor has satisfied the requirements of Section 1129(a)(10).

## IV.

## THE PLAN SATISFIES SECTION 1129(A)(11)'S REQUIREMENT OF FEASIBILITY

Section 1129(a)(11) provides that the proponent must demonstrate that the plan is "feasible", or, in the words of the statute, that "confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or further reorganization is proposed in the plan."

The standard applied to this requirement is flexible, "confirmation is not *likely* to be followed by liquidation, etc.". Accordingly, courts applying this section of the Code acknowledge that the proponent is not required to show certainty of success; rather the proponent must demonstrate merely a reasonable likelihood that confirmation will not be followed by liquidation, or in other words that the plan has a fair chance of achieving the goals set forth for reorganization. *Acequia v. Clinton*, 787 F.2d 1352, 1364 (9th Cir. 1986). And, for similar reasons, the level of proof required to make such demonstration is relatively low. *In re Brotby*, 303 B.R.177, 191 (Bankr. 9th Cir. 2003).

Applying this standard to the Plan, the relevant question is whether the Debtor will be able to make the payments and complete and consummate the transactions necessary to fund transfers to the Survivors' Trust, while maintaining financial viability going forward. For purposes of this Plan, that question can be broken down into two components: (a) is it reasonably likely that can the Debtor make its every-day obligations on a go-forward basis, separate and apart from the significant obligations that it is undertaking to various classes of creditors under the Plan, and (b) is it reasonably likely that the Debtor will be able to perform its payment obligations under the Plan, including most significantly, paying, over three and a half years, the $150 Million that the plan requires the Debtor to contribute to the Survivors' Trust.

**A. The Plan is Feasible with Respect to the Debtor's Everyday Operations.**

With respect to the first inquiry, the Court does not believe it likely that the Debtor will be unable to operate in its ordinary course and pay its ongoing everyday obligations post-confirmation, such that it will likely liquidate or need further reorganization. Charles Moore testified that he had reviewed the Debtor's financial statements and projections, that the statements and projections appeared reasonable and reasonably based upon past performance, and that while no one can definitively predict in detail the level of support that a religious organization will receive going forward, there was no likely material drop off support to be feared, and if anything, the emergence from bankruptcy and resolution of the issues addressed thereby might well lead to a higher level of support. 6/15 Tr. at 143:22-144:1, 144:15-145:6; *see* Exs. D-165, D-86.

In addition, Daniel Flanagan of VeraCruz Advisory, the draftsperson of the cash-flow analysis found at Ex. D-165, and a financial advisor to the Debtor for many years, testified that he was very confident in the cash-flow projections, that the assumptions are "not aggressive", and that a projected two percent per year increase in growth rate for receipts and for expenses was quite reasonable. 6/24 Tr. at 19:18-20:11; 6/24 Tr. at 20:20-21.

The Court found Mr. Moore and Mr. Flanagan to be knowledgeable are credible with respect to these issues.

In performing the analysis of the feasibility of the Debtor's Plan, the Court is entitled to consider and to rely on reasonable premises and assumptions based upon the totality of the circumstances pertinent to the Debtor's financial condition, including, for example, past performance and historical practices, and the nature of the Debtor's "business". *In re Sagewood Manor Assocs., Ltd P'ship*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998).

Measured on those bases, the Court believes that the Committee's critiques of the Debtor's financial stability going forward are not persuasive for two other reasons.

First, the effect of any putative immediate future shortfall in the Debtor's financial support would be lessened by the Debtor's historical and ongoing retention of a $3 Million cash

"cushion", one purpose of which is to address unexpected and short-term shortfalls.

Second, while the Debtor is assuredly, and at least for bankruptcy purposes, a "business" it is one that can almost certainly count on an exceptionally high level of support and devotion, including additional financial support, going forward. Put differently, longtime and loyal customers of a beloved coffee shop might loudly bemoan its potential closure based on financial realities and regret the need to find another coffee shop; they are probably not as likely as concerned church goers to step into the financial breach and offer additional support.

For these reasons, the Court does not conclude that the Plan is infeasible with respect to the everyday ongoing obligations of the Debtor.

**B. The Plan is Feasible with Respect to the Debtor's Obligations to the Survivors' Trust.**

Turning to the particular obligations imposed by the Plan, the Court is similarly unconvinced that the Plan is infeasible.

Although the Committee makes reference to the Debtor's obligations to other Classes of claimholders under the Plan and attempts to argue that it is uncertain whether the Debtor will be able to satisfy its obligations to those claimholders, the focus of the Committee's critique is on the Debtor's ability to fulfill its commitments under the Plan to the Class 4 claimholders (Abuse Survivor Claims). Committee Post Trial Brief at 45.

The Plan provides for up to $172.3 Million to be paid to the Survivors' Trust for the benefit of the holders of Allowed Class 4 Claims, $142.3 Million of which will be paid by the Debtor and up to $30 Million of which might be paid by RCWC.[25]

The Plan defines the "Debtor Cash Contribution" as the amounts payable to the Trust by the Debtor, consisting of (i) the Initial Debtor Contribution of $40 Million (plus amounts, if any, attributable to "remaining DIP Availability") that will be transferred to the Trust on the Effective Date and will be made available to the Debtor pursuant to the Exit Facility to be funded by RCC; and (ii) the Additional Debtor Contributions of up to $110 Million to be paid to the Trust on the

[25] The Plan provides for $7.7 Million of the Debtor's Cash Contribution to be reserved for the benefit of Class 5 Claimants (Unknown Abuse Claims).

following schedule:  $6 Million within one year of the Effective Date, $5.9 Million within two years of the Effective Date, and the remaining balance of the $150 Million Debtor Cash Contribution, up to $98.1 Million, within three years and six months of the Effective Date.

The Debtor may satisfy its Debtor Cash Contribution obligation via the contribution of its cash or the disposition of any of its assets.  In addition, as the Court will describe more fully below, the Debtor may also have access to significant funds from other not-yet-realized sources that may be used to fund the Debtor Cash Contributions.  Having said that, it appears to be the current and mutually-accepted proposition (by the Debtor and the Committee) that the source of most if not all of the Debtor's direct contribution to the Debtor's Cash Contribution will be from the sale of the Debtor's real properties.  Exhibit G to the Plan Supplement, adopted by the Debtor and the Committee via that certain *Stipulation Regrading Plan Real Properties*, filed at Dkt. No. 3173, and admitted at trial as Exhibit D-30, lists and groups into categories the various real property assets that the Debtor commits to making available either for sale to fund the post-Effective Date Debtor Cash Contributions, or to serve as collateral for the Debtor's satisfaction of any remaining unsatisfied portions of the post-Effective Date Debtor Cash Contributions.

More specifically, to secure the payment of the Additional Debtor Contribution, the Debtor is granting the Trust liens on certain real property owned by the Debtor as identified on Exhibit "G" as "Trust Collateral" and shall execute and deliver to the Trust on the Effective Date deeds of trust (each a Debtor Contribution Deed of Trust).

The Plan also provides for two additional means of providing security for the prompt payment of the Debtor Additional Contribution.  First, the Plan provides that should Adventus sell the Livermore Property such that funds from such sale are received before the conclusion of the three and a half year period from the Effective Date, Adventus shall, after satisfaction of any amounts due as costs of sale and payments to professionals associated with the sale, pay from additional sale proceeds an amount up to the amount then payable to the Trust under the Additional Debtor Contribution.  Second, the Plan also provides that upon the final disposition of the current disputes between the Debtor and the Committee concerning the proper characterization of certain funds held by the Debtor and designated by the Debtor as Shielded

Assets, as set forth in greater detail in the Restricted Assets Adversary Proceeding, whether by entry of a final order by a court of competent jurisdiction or via a consensual resolution, all cash declared to be "Converted Assets" under such disposition shall be transferred to the Trust as further satisfaction of the Additional Debtor Contribution. Per the Stipulation Regarding Real Property, the estimated amount of the Shielded Assets is between $29.5 Million and $33.0 Million. The Court finds that these two alternate sources of funding of the Debtor's Cash Contributions support a finding that the Plan is feasible.

In addition to the Debtor Cash Contribution, the Trust may also receive the RCWC Cash Contribution, which will also be payable to the Trust over time, by means of the RCWC Escrow: the initial RCWC Contribution in the amount of $7.7 Million will be paid to the RCWC Escrow on the Effective Date; another $3 Million shall be paid to the RCWC Escrow no later than one year of the Effective Date; $6 Million will be transferred to the RCWC Escrow no later than two years of the Effective Date; and the balance of the RCWC Cash Contribution, up to $13.3 Million, will be paid to the RCWC Escrow no later than three years and six months after the Effective Date. Payment from the RCWC Escrow and eventually to the holders of claims assertable against RCWC is governed by additional provisions of the Plan. It is certainly correct that not every holder of an Allowed Class 4 claim will be eligible to receive a payment from the RCWC Escrow.

Although the Committee critiques the likelihood of both the Debtor's and RCWC's ability to satisfy their obligations under the Plan, the Court concludes that there is no genuine dispute with respect to two of the categories.

First, the Court does not believe that there is any genuine dispute concerning the Debtor's ability to perform the Initial Debtor Contribution. As previously noted, the source of funds for the Initial Debtor Contribution is the Exit Facility, to be funded by RCC, the Exit Facility Lender. Documentation for the Exit Facility has been filed, Ronald Gies of RCC testified credibly at trial that RCC is ready willing and able to fund the Exit Facility. There seems no real impediment to the consummation of the Exit Facility and the payment of the Initial Debtor Contribution. 06/23/2026 Tr. at 196:5-21, 201:12-2; *See also Declaration of Ron Gies in*

*Support of Confirmation of Debtor's Modified Fourth Amended Plan of Reorganization*, Exhibit 6 to Dkt. No. 3103.

Second, the Committee argues that there are feasibility issues with respect to the RCWC Cash Contribution. However, upon examination, the Committee's concerns about the RCWC Cash Contribution focus more on the question whether any amount of that contribution will ever be paid by the Trust for the benefit of the holders of RCWC Claimants. In light of the rejection of the Plan by Class 4, and the apparent unlikelihood that a significant number, if any of the potential RCWC Claimants will execute an RCWC Release, the Committee's real-world concern about the efficacy of the RCWC Contribution are probably well-taken. But such concerns do not support an argument that this portion of the Plan is infeasible. The inquiry concerning feasibility focuses on whether the proponent of a plan is *likely to be able* to perform its obligations, and the Committee has raised no genuine concerns in that regard. Andrew Currier, the President of the Board of Directors for RCWC testified that RCWC is ready and able to make the transfers contemplated by the Plan and fund the RCWC Escrow as proposed. 6/22/2026 Tr. at 195:23-196:6; *See also Declaration of Andrew Currier in Support of Confirmation of Debtor's Modified Fourth Amended Plan of Reorganization*, Exhibit 7 to Dkt. No. 3103. Whether the intended beneficiaries of the RCWC Escrow choose to satisfy the pre-conditions for the receipt of funds is up to them, and not to RCWC; and that decision by the holders of potential RCWC Claims does not affect feasibility.

Again, establishing feasibility for the purposes of Section 1129(a)(11) does not require certainty of performance; it merely requires a showing that confirmation is not likely to be followed by an unplanned liquidation or need for further reorganization. In other words, is it reasonably likely that the Debtor will be able to perform its obligations under the Plan? *Acequia,* supra, at 1364. This standard is necessarily flexible, precisely because it necessarily relies on matters that are inherently uncertain, future events and financial performance. And the Court notes in this regard the Committee's query of Charles Moore, one of the Debtor's expert witnesses in connection with feasibility issues and the best interests of creditors test concerning his statement in a deposition that "All forecasts are inherently incorrect". As Mr. Moore further

commented, and as this Court agrees, that doesn't make such forecasts unreasonable, nor does it dictate that the Court cannot assess such forecasts and promises of future performance, and deem them reasonable and reasonably likely to occur, within the requirements of a finding of feasibility under Section 1129(a)(11).

Second, the structure and timing of the Debtor's obligations under the Additional Debtor Contributions also include a level of flexibility that makes it appear more likely that the Debtor will be able to make the payments required. In this vein, the Court notes first that much to the completely understandable consternation of the Committee, the Debtor's obligations under the Additional Debtor Contributions are severely "back-loaded": the Debtor is required to contribute $6 Million in the first year after the Effective Date, $5.9 Million in the next year, and $98.1 Million no sooner than three and a half years after the Effective Date. There is little question but that delaying the payment schedule in this manner provides significant flexibility to the Debtor, and increases the likelihood that the Debtor will perform its obligations, if for no other reason than that delaying the obligations allows the Debtor to take advantage of favorable conditions as they occur over a longer period of time. In addition, the delay in the payment schedule also makes it more likely that the Debtor will be able to access one or both of the alternative sources of cash, i.e., via the Livermore Option or Payment of cash attributable to the Converted Assets upon the resolution of the Restricted Assets Adversary Proceedings.

Returning to the "basics" of the Plan and the Additional Debtor Contributions, the Debtor and the Committee agree that the main source of the Debtor's post-Effective Date payments to the Trust will be the sale or other exploitation of the Debtor's real property assets; and to secure its obligations to pay an additional $110 Million to the Trust over three and a half years, the Debtor has agreed to deliver Deeds of Trust to certain of its real property upon which the Trust may foreclose if the Debtor does not timely perform its obligations. The Debtor has identified the real property assets to be used for liquidation or collateralization purposes in Exhibit "G", Ex. D-30.

Attached as Exhibit "A" to the Stipulation Regarding Plan Real Properties are a series of charts that list , respectively, "Non-Debtor Real Estate for Disposition/ Collateralization" (three

properties), "Cemetery Properties for RCC Loan Collateral" (five properties), "Potential Parish Vacant Land Property Disposition/Collateralization (Vacant Portions Only)" (twenty-nine properties), "Potential Parish House Disposition/Collateralization" (seven properties), and "Potential Whole Parish Site Property Disposition/Collateralization" (13 properties).

Although the Committee asserts that review of the properties proposed to be sold to fund the Additional Debtor Contributions reveals that the value of those parcels falls significantly below the $110 Million committed under the Additional Debtor Contributions, the Debtor counters that, in any event, the cumulative value of the Debtor Contribution Deeds of Trust, as valued by Hilco Real Estate, LLC, and as supported by the testimony of Mr. Satter, is approximately $112 Million as of the Effective Date of the Plan. i.e., an amount in excess of the Additional Debtor Contribution as of the Effective Date. Under these circumstances, and in light of the flexibility of the relevant standard, the Court cannot conclude that confirmation of the Plan is likely to be followed by a liquidation or further reorganization respecting the Debtor's Cash Contributions.

## V.

## THE COURT'S DISPOSTION OF THE REMAINING COMMITTEE OBJECTIONS

The Debtor has also requested two additional items of relief in connection with confirmation of the Plan: (i) approval, as a compromise of controversy pursuant to FRBP 9019, the "CCCEB Settlement", described below, and (ii) waiver of the 14 day stay of the Order of Confirmation imposed by FRBP 3020(e).

Taking the second matter first, FRBP 3020(e) provides "Staying a Confirmation Order." Unless the Court orders otherwise a confirmation order is stayed for 14 days after its entry." The Debtor had requested waiver of this automatic 14 day stay in its Confirmation Order. Numerous parties had objected to this request, including the UST. Dkt. No. 2901 at 16-17.

In light of the Court's present disposition of the Plan, this issue is moot, for now, and need not be addressed further in connection with this Plan.

The CCCEB Settlement is described in the Plan at section 12.3. Briefly summarized, the

CCCEB Settlement provides for CCCEB to transfer all of its right title and interest in the Cathedral Property, together with all improvements thereon and tangible personal property owned by CCCEB and located on or used in connection with the operation of the Cathedral Property to the Debtor in exchange for full and complete satisfaction of all obligations under the CCCEB Note, in the amount of approximately $40 Million.

The Committee has opposed the approval of the CCCEB Settlement on a number of grounds, including that the Debtor has failed to carry its burden under Code Section 363 or FRBP 9019 that the proposed transaction is a reasonable settlement of an actual controversy. Committee Post-Trial Reply to Debtor at 52.

The Debtor's Post-Trial Brief defends the CCCEB Settlement on the basis that it is the "only rational outcome" of the present status, based on the Debtor's assertion that the CCCEB Note is essentially uncollectible. Debtor Post-Trial Brief at 62-63.

The Court is inclined also to defer this issue pending the proposal of another plan. The CCCEB Settlement appears to the Court to be primarily an issue that can be "cleaned up" as part of a more significant reorganization of the Debtor's assets and obligations and does not appear to have any great independent utility. And the Court agrees with the Committee that the evidentiary support for the proposition that CCCEB would be unable to make any payments of the CCCEB Note is meager.

Accordingly, the Court will deny approval of the CCCEB Settlement, without prejudice to the Debtor renewing the request in connection with another plan of reorganization or a separately filed and notice for hearing motion under Section 363.

## VI.

## THE OBJECTIONS FROM THE OFFICE OF THE UNITED STATES TRUSTEE

The UST filed an Objection to Confirmation of Debtor's Fourth Amended Plan of Reorganization (the "UST Objections") on May 8, 2026 [Dkt. No. 2901]. The Debtor's Post-Trial Brief addressed the UST Objections.

The UST Objections focused on three issues, the scope of the Channeling Injunction, the

scope of the Exculpation Clause, and the Plan's requirement that only the Reorganized Debtor need file reports post-Confirmation.[26]

**A. The Court Will Overrule the UST Objection Concerning the Channeling Injunction.**

First, the UST objects that the scope of the Channeling Injunction is "overbroad", apparently both with regard to the scope of claims released as well as to the scope of parties released. Dkt. No. 2901 at 12. The Court notes that the Debtor has modified the Plan to clarify that the proposed Release and the accompanying Channeling Injunction do not cover claims not arising under the Debtor's insurance policies or Abuse Claims asserted against the Debtor (i.e., the Plan does not propose to release direct claims against the Insurers) [Debtor Post-Trial Brief at 76], and that objection is accordingly moot.

To the extent that this objection addressed issues that might arise between and among Settling Insurers and Non-Settling Insurers, the Court agrees with the Debtor that, so long as the Plan provides for an adequate means to resolve and to pay any such claims by the Non-Settling Insurers, it does not violate the prohibitions on involuntary releases set forth in *Harrington v. Purdue Pharma l.P.,* 603 U.S. 204 (2024), and may be confirmed. The Court expects to address this aspect of this objection more fully in its upcoming Memorandum Decision Regarding Insurers' Objections to Debtor's Fourth Amended Plan of Reorganization and, subject to the inclusion of some further clarifying language in the Plan concerning the Survivors' Trust's liability for a number of claims that may be asserted by Non-Settling Insurers, the Court will overrule this objection.

To the extent that this objection addresses the scope of parties included as "Released Parties", the Court will overrule the objection. So long as the subject matter of such Release is limited appropriately, as the Court now believes it to be, the Court does not believe that the Release should not be extended to the Released Parties as identified in the Plan. Plan, section 1.1.141.

[26] The Court also notes that the UST had objected as well to the Plan's request to avoid any automatic stay of the Confirmation Order pursuant to Federal Rule of Bankruptcy Procedure 3020(e). In light of the Court's determination re confirmation of the Plan, that objection appears to be at least temporarily moot.



Case: 23-40523 Doc# 3567 Filed: 10/15/26 Entered: 10/15/26 16:00:30 Page 88 of 109

### B. The Court Will Sustain in Part the UST's Objection to the Exculpation Clause.

Second, the UST objects to the scope of the Exculpation Clause, both with respect to temporal issues, i.e., the Exculpation Clause may have been read to apply to claims outside of the relatively narrow scope for which such exculpations are authorized under Ninth Circuit law, and with respect to the scope of parties exculpated. Dkt. 2901 at 13-15.

In *Blixseth*, the Ninth Circuit clarified that exculpation clauses, while permissible in chapter 11 plans, need to be limited to activities undertaken in connection with activities during the bankruptcy case that related to the Debtor's performance of its duties, up to and including confirmation of a plan and the occurrence of the effective date (i.e., it may not cover pre-petition claims or claims that arise post-effective date), and need to be limited to those individuals who had actually participated in such activities. *In re Yellowstone Mountain Club, LLC,* 460 B.R. 254, 271 (Bankr. D. Mont. 2011) ("Acts falling outside of the foregoing dates are not protected"); *see also Blixseth*, 961 F.3d at 1082 (holding that Section 524(e) does not bar a narrow exculpation clause that is "focused on actions of various participants in the [p]lan approval process and relating only to that process").

The Court notes again that the Debtor has amended the Exculpation Clause in the Plan temporally so that it now pertains solely to actions taken in connection with the reorganization effort, [Debtor Post-Trial Brief at 76] and does not apply to pre-petition or post-Effective Date matters, and the objection is now moot as to that issue.

However, it appears that the Exculpation Clause does still appear to pertain to several individuals or groups who do not appear to have participated actively in the bankruptcy case in the manner contemplated under *Blixseth* More specifically, the College of Consultors of the Diocese of Oakland, the Diocese of Oakland Finance Council, and the Presbyterial Council of the Diocese of Oakland did not appear to play any meaningful role in the plan approval process. To that extent, the objection is sustained. The Debtor may further amend the Exculpation Clause to address this objection.

### C. The Court Will Overrule the UST's Objection Concerning the Filing of Post-Confirmation Quarterly Reports By the Survivors' Trust.

Lastly, the UST objects to the Plan to the extent that it does not require the Reorganized Debtor and the Survivors' Trust separately to file Post-Confirmation Quarterly Reports, and presumably to pay post-confirmation fees to the UST. Dkt. No. 2901 at 16. The UST relies on Code Section 1106(a)(7), FRBP 2015(a)(5) and 28 C.F.R. section 58.8 for the proposition that such reports (and presumably fees) are required both from the Reorganized Debtor and the Survivors' Trust.

The Debtor disagrees, and points out that Code section 1106 references the "trustee" (and presumably a debtor in possession, and that FRBP 2015 similarly references the "trustee or debtor in possession") Debtor Post-Trial Brief at 77. Even granting that trustee or debtor in possession ought to include the reorganized debtor in connection with post-effective date duties, no section of the Code or Bankruptcy Rule requires a trustee of a trust established for the payment of claims separately to file post-confirmation reports or pay any UST fees. Indeed, such payment by the Trust would appear inappropriate to the extent that the Reorganized Debtor will report, and pay UST fees post-confirmation, on all moneys paid from the Reorganized Debtor to the Trust, which the Court understands will be the case. Plan, sections 12.9.4.1—12.9.5.

## VII.

## THE COURT WILL OVERRULE THE COMMITTEE'S OBJECTIONS THAT THE DEBTOR HAS PROCEEDED IN BAD FAITH AND THE PLAN HAS BEEN PROPOSED IN BAD FAITH, BUT THE COURT CANNOT PRESENTLY DETERMINE THAT THE PLAN SATISFIES THE FAIR AND EQUITABLE REQUIREMENT OF SECTION 1129(B)(2)

The Committee objects to confirmation of the Plan on the grounds that the Plan has not been proposed in good faith and the Debtor is not acting in good faith. The thrust of the Committee's objection is that the Plan does not deal fairly with the Class 4 Abuse Survivors, not

only because it provides them a distribution that is insufficient and unfair in amount, but also that the Debtor can, in the Committee's estimation, clearly provide more but simply chooses not to do so. 06/29/26 Tr. at 108:2–9; Dkt. No. 2912 at 2; Committee Post Trial Brief at 53:9. In the Committee's description, the Plan does not provide what the Debtor can actually do, but merely what the Debtor chooses to do. Dkt. No. 2912 at 2.

This objection is pervasive throughout the Committee's papers and pertains to the requirement that the Plan be proposed in good faith and not by any means forbidden by law (Section 1129(a)(3)), and that the Plan deal fairly and equitably with Abuse Claimants in Class 4 who have rejected the Plan (Section 1129)(b)).

**A. The Debtor's Failure to Obtain the Acceptance of the Class of Abuse Claimants Does Not Establish That the Plan Has Not Been Proposed in Good Faith.**

As to the Committee's objection under 1129(a)(3), under applicable Ninth Circuit case law, that section requires good faith in the proposal of a plan, and in the means that the proponent pursues confirmation, not in the particular provisions of a proposed plan, so long as the plan does not contain provisions forbidden by law. Certainly, "bad faith" is not established under Section 1129)(a)(3) based on the plan's failure to satisfy the economic demands of an impaired class. *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1034-35 (9th Cir. 2019). Stated differently, plan objections to the effect that the payments are insufficient, or even, the debtor can/should do more, are not cognizable under 1129(a)(3).

To the extent that the Committee's objection based on Section 1129(a)(3) turns on this dissatisfaction with the Plan's treatment of Class 4 Abuse Claimants, the objection is not well-taken, and it is overruled.

Nor in the Court's view do the Debtor or the Plan demonstrate bad faith because the Plan depends on propositions concerning the applicability of religious freedom principles to the confirmation process, or because it advocates for a limited applicability of the best interest of creditors test. Although the Committee critiques the positions that the Debtor has advocated in the Plan, and in its efforts to confirm the Plan, and the Court is largely agreeing with the

Committee's positions on those issues, the Court does not doubt that the Debtor has advanced those positions in good faith. Though unsuccessful, the positions for which the Debtor advocates have not previously been decided in a manner that would foreclose their consideration here and are not so frivolous that the Court would conclude that they are advanced merely for purposes of delay, or do not represent the Debtor's genuine and nonfrivolous belief that those positions could support confirmation of the Plan. Debtor Post-Trial Brief at 15.

**B. The Court Is Not Presently Able to Resolve Disputed Issues Concerning the Application of Section 1129(b) to the Plan.**

Initially, the Court notes that a discussion about whether the Plan may be confirmed under Section 1129(b) is superfluous—having found that the Plan does not satisfy Section 1129(a)(7), this Plan may not be confirmed. And consideration of this issue is made more challenging in light of the apparent inapplicability of the creditor protections of Section 1129A(b)(2)(B) in cases where the proponent of a plan is a non-profit entity, as discussed in greater detail below. But in the hope that, armed with the Court's decisions about numerous contested issues with respect to this Plan, and with the possibility of the Debtor modifying the Plan either to achieve a consensual resolution or a plan that satisfies all of the requisite standards for confirmation under Section 1129(a), the Court wishes to provide responses to the arguments advanced by the Debtor and the Committee regarding Section 1129(b).

Section 1129(b)(1) provides:

> "Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent under the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class that is impaired under and has not accepted, the plan.

Section 1129(b)(2) provides:

> For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(B) With respect to a class of unsecured claims—

> (i) the plan provides that each holder of a claim of such class receive on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property. (Emphasis added)

1. The Court will not presently determine whether the plan's disparate treatment of Classes 3 and 4 constitutes unfair discrimination.

Section 1129(b) first sets a requirement that the plan not discriminate unfairly. The Committee asserts that this requirement has not been demonstrated because other classes of creditors are apparently being paid in full, but delayed (Class 3), or paid in full after an assented to waiver of some interest and other charges (Class 1), while Class 4 Abuse Claimants will almost certainly receive less than the value of their claims from the Debtor's assets (other than rights under insurance policies). Committee Post Trial Brief at 41:3-42:4. The Committee also points out that the Debtor has not even attempted to value Class 4 Abuse Claims, which in the Committee's view is further evidence of discriminatory treatment of Class 4 Abuse Claimants. Committee Post Trial Brief at 40:16-41:2.

The Debtor counters that unequal pay or treatment between classes of creditors in a plan does not by itself make a plan unfairly discriminatory. A plan discriminates unfairly if it unreasonably singles out the holder of some claim or interest for particular treatment; widely disparate treatment of similarly situated creditors may well establish that the plan discriminates unfairly. *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994).

The Court believes that there is legitimate grounds for disagreement here, albeit less likely between Class I and Class 4. To the extent that unfair discrimination occurs when similar claims are treated differently, the Court acknowledges that Class 1, as a claim secured by certain of the Debtor's real property, is different enough in character and reasonable expectations from Class 4, unsecured and unliquidated claims, so as not to raise a legitimate complaint regarding

unfair discrimination.

But the similarities and contrasts between Classes 3 and 4 raise other concerns. On the one hand, one could argue that the different treatment between Classes 3 and 4 is based on objective factors, i.e., a difference in legal rights against the Debtor and a difference in sources of payment, the plan does not discriminate unfairly. Plan, section 31:7-32:9.

More specifically, Abuse Claims in Class 4 are arguably not similarly situated to the Claims in Class 3. The Claims in Class 3 are contract-based claims, and they are liquidated. The Class 4 Claims are tort-based claims and they are unliquidated; they are also vastly larger in size than the claims in Class 3. Further, the Plan is making special arrangements to pay Class 4 Claims via a Survivors' Trust, a vehicle that would never be available or appropriate for the payment of the Class 3 Claims. Lastly, the Plan also provides for Class 4 Claims potentially to be paid from sources not available to the Class 1 and Class 3 Claims, i.e., the proceeds from insurance policies and proceeds from the potential sale of the Livermore Property.

But the fact remains that both classes of claims are unsecured, and Class 3 Claims are being paid in full while the ultimate distribution to Class 4 Abuse Claims is at present uncertain, but is highly unlikely to result in full satisfaction from the Debtor's direct assets (i.e., not including rights under insurance policies). One could certainly argue, equitably, that it would be fairer to pay Class 3 Claims an amount less that one hundred cents on their Allowed Claims until it became clearer what the percentage dividend to Class 4 Abuse Claims would be and attempt to equalize the treatment.

The Court will reserve this issue for further consideration in the context of another plan of reorganization, if needed.

2. The Court Cannot Presently Conclude that the Plan's Treatment of the Rejecting Class of Abuse Claimants Is "Fair and Equitable" Within the Meaning of Section 1129(b)

Addressing of the requirements of Section 1129(b)(2)(B)'s "fair and equitable" standard to this case is also not straightforward.

The requirement that with respect to impaired objecting unsecured creditors a plan may

not be confirmed ("crammed down") unless *no junior class of claims or interests* will receive or retain any property under the plan based on that junior claim or interest unless all senior dissenting claims are paid in full, is commonly referred to as the "absolute priority rule."

Before analyzing the particular aspects of this Plan and the requirements of Section 1129(b)(2)(B), it is worth noting certain aspects of the Bankruptcy Code's protections to unsecured creditors in an attempted cramdown and focusing on the limits of the absolute priority rule.

First, as noted previously, the best interests of creditors test requires that the debtor demonstrate that the amount to be received under the plan at least equals what a creditor  would receive were the debtors assets liquidated under chapter 7.  In the case of for-profit debtors, for which the "value" of the company as a go-forward entity is typically considerably greater than the value of fixed assets sold via liquidation, the creditor protections supplied by this test are in practice fairly minimal.  But they are nonetheless important, assuring creditors that the debtor may neither divert value away from creditors nor force creditors to accept returns that are speculative and uncertain, and possibly less than the liquidation value of the assets.  One may refer to this as the Code's "downside" creditor protections.

In the case of a non-profit entity as debtor, however, that characterization is frequently not accurate—where a debtor by definition does not have an ongoing business that generates profits, the value of the debtor's assets would not be based on an in-place synergistic value that is greater than the value of the debtor's liquidatable assets when sold in their entirety.  For this reason, the best interest of creditors test is almost certainly a much more significant protection for the unsecured creditors of a non-profit debtor than it would be for the creditors of a for-profit debtor.

Second, the requirements of the absolute priority rule of Section 1129(b)(2)(B) that any senior dissenting class of creditors must be paid in full prior to a junior class receiving or retaining any property in the debtor under the plan provide a more "upside" protection to unsecured creditors.  These protections effectively either ensure that creditors will be made whole, or that equity holders must pay for the property that they receive or retain via the plan.

The difference between the creditor protections of Sections 1129(a)(7) and (b)(2)(B), is the difference between liquidation value of the debtor's assets (i.e., including appropriate discounts and deductions for the costs of liquidation) and a market or enterprise value, without discounts or reductions.

The restrictions in Section 1129(b)(2)(B) protect senior classes of claims against benefits impermissibly provided to a class of junior debt (not present here) or equity interests; these restrictions do not address a scenario in which there is no junior class of equity interests receiving property, but *the debtor* nonetheless retains property under the plan.

Accordingly, the Debtor argues that either (a) absolute priority rule is inapplicable to it or (b) that it has "satisfied" any pertinent requirements under Section 1129(b)(2)(B) by a sort of negative inference—there being no relevant requirements under the language of the statute restricting cram down, the Debtor necessarily satisfies the standard; or there being no standard that pertains to this Debtor, there is no restriction on fair and equitable grounds preventing cramdown. Debtor Post-Trial Brief at 43:22-48:6.

Although the caselaw on this point is sparse, the Ninth Circuit's decision in *In re General Teamsters, Warehousemen and Helpers Union, Local 890*, 265 F.3d 869 (9th Cir. 2001) (for convenience, "*Teamsters II*") stands clearly for the proposition that in the absence of an equity holder who had a right to profits or property in a debtor that was a non-profit entity, the protections of Section 1129(b)(2)(B) do not apply to such entities. *Id*. at 876. The context in that case was an argument by an objecting creditor that either the members of the local chapter or some other regional or national office of the union could be considered an equity interest holder with rights in the debtor, and the ability to control the debtor, sufficient to invoke Section 1129(b)(2)(B) and the requirement that the interest holders contribute "new value" to the debtor in order to maintain their putative interest post-confirmation. *Id*. In affirming the Bankruptcy Court's decision to confirm the plan of reorganization in that case, [27] the Circuit agreed that there was no such junior class of equity interests. *Id*.

---

[27] Reported at *In re General Teamsters, Warehousemen and Helpers Local Union Local 890*, 225 B.R. 719 (Bankr. N.D. Cal. 1998) (and for convenience, "*Teamsters I*")

Similarly in this case, involving a non-profit Catholic diocese as a debtor, there is no junior class of claims or interests which can or would receive or retain property under the Plan. Accordingly, the Debtor asserts, and the Committee does not strongly dispute, that the protections of Section 1129(b)(2)(B) do not apply to this Plan. Debtor Post-Trial Brief at 43-48; Committee Post-Trial Reply to Debtor at 29.

The Bankruptcy Court's underlying decision in *Teamsters I* noted that a "traditional bankruptcy analysis is not always a comfortable fit" with non-profit entities and that courts are left with "the awkward process of fitting the square peg of a non-profit association into the round hole of the Absolute Priority Rule." *Teamsters I*, 225 B.R. at 737.

More specifically, the Bankruptcy Court in *Teamsters I* expressly acknowledged the "failure of the Absolute Priority Rule to account for non-profit [debtors]". *Id*. at 737. That court specifically opined:

> "Creditors [sic] argue that the Absolute Priority Rule is not met here because Debtor will continue in existence and in possession of its property, even though Creditor and other unsecured creditors will not be paid in full. However, the Absolute Priority Rule does not provide that a debtor entity may not receive or retain property unless all creditors have been paid in full, it provides that "the holder of any . . . interest" in a debtor may not receive or retain property on account of such interest unless all creditors have been paid in full."

The failure of the absolute priority rule to apply to non-profit debtors, permitting those debtors to retain and enjoy significant assets while not paying creditors in full, creates the central bankruptcy challenge of this case: Given that the best interests of creditors test guarantees the Abuse Survivors receive under a plan at least the post-discount, post-expense liquidation value of the Debtor's assets, and given that the absolute priority rule does not apply to cramdown plans proposed by a non-profit entity, what additional compensation, if any, should the Abuse Survivors who have rejected the Plan be entitled to receive? If they are entitled to receive a greater than liquidation value when they have rejected the plan, how shall we determine how much greater value, and how much property the Debtor should be permitted to retain?

It is clear that Congress intended to provide meaningful protection to creditors in a

scenario involving debtors proposing plans in which a junior class of claims or equity would receive or retain property. And as Bankruptcy Judge Weissbrodt observed in *Teamsters I* in connection with a plan confirmation dispute not governed by Section 1129(b)(2)(B), the protection contained in that Code Section assuring "fair and equitable" treatment is not "a vague exhortation to bankruptcy judges that they do the right thing"; rather the protections of the absolute priority rule are precise, and exacting. *Teamsters I* at 735.[28]

The Debtor acknowledges that "no prior court has definitively addressed the proper application of the fair-and-equitable standard in a nonconsensual diocesan (or mass tort) cramdown case." Debtor Post-Trial Brief at 43.

Accordingly, the Court suggests that there are three possible answers to the question what additional protections or compensation unsecured creditors are entitled absent the protections of Section 1129(b)(2)(B):

First, it may be that in the absence of the protections of the absolute priority rule, unsecured creditors who have rejected a plan proposed by a non-profit entity are due no additional protections or compensation beyond the protections of the best interest test. This answer *may* be plausible if one assumed that Congress also considered the more robust protections that the best interest of creditors test would likely provide to dissenting creditors of a non-profit debtor and concluded that no further compensation to unsecured creditors would be appropriate.

Second, it may be that in the absence of the protections of 1129(b)(2)(B) parties should

---

[28] And Judge Weissbrodt made one other observation concerning the treatment provided creditors in *Teamsters I* that is somewhat ironic in light of the creditors' objection in that case that the debtor had failed to satisfy the best interests of creditors test, or to provide treatment for the unsecureds that was fair and equitable. In *Teamsters I*, the debtor provided creditors, via borrowing, amounts equal to the fair market value—not the lesser liquidation value--of the debtor's assets, as well as future distributions should the debtor's assets increase in value at any time during the five years post-conformation. *Teamsters I* at 733, and footnote 9.
In the case of a non-profit debtor, not constrained by the absolute priority rule and without a for-profit enterprise value available, payment of the fair market value of the debtor's assets, including increases in value and appreciation, would likely capture all of the available value that could be paid to dissenting creditors, and would be the "indubitable equivalence", to coin a phrase, of the protections provided to such creditors under the absolute priority rule.
However, no court has purported to rule that payment of the fair market value of the debtor's assets is *required* for cram down of a plan by a non-profit debtor.



Case: 23-40523 Doc# 3567 Filed: 10/15/26 Entered: 10/15/26 16:00:30 Page 98 of 109

intuit and courts should enforce some alternative protections and entitlements under the rubric "fair and equitable". This alternative is not only plausible, it has support in cases that have opined that the requirement that a plan be fair and equitable encompasses considerations that go beyond satisfaction of the absolute priority rule. This observation finds added force in the non-exclusive language of Section 1129(b)(2)(B), i.e., that "the condition that a plan be fair and equitable with respect to a class *includes* the following requirements" (emphasis added).

Third, it may be that in the absence of explicit protections set forth in 1129(b)(2)(B)'s fair and equitable test, parties and the courts should rely on standards that, while perhaps somewhat nebulous, are articulated within the rubric of the Code's requirement that a plan be proposed in good faith.

It is clear to the Court that the requirements for a finding that a plan provides treatment that is "fair and equitable" extends beyond satisfaction of the absolute priority rule. In the words of an esteemed former Bankruptcy Judge from this district, "The absolute priority rule is only a minimum requirement for confirmation." *In re Dollar Assocs.,* 172 B.R. 945, 949 (Bankr. N.D. Cal. 1994).

It is equally clear to the Court that the parties agree with this basic principle, but they appear to articulate it differently. Review of the parties' post-trial briefs indicates that while the Committee conceives of the proper inquiry as what further requirements ought to be imposed under the fair and equitable rubric, and thus they would advocate for the second alternative described by the Court above, the Debtor appears to rely on a test that references a more general good faith requirement, or the third alternative.

The Committee asserts that a finding of fair and equitable treatment requires more than satisfaction of the absolute priority rule, and that the Court must consider the particular facts and circumstances of the case when determining whether a plan is fair and equitable. *In re D&F Constr. Inc*. 865 F.2d 945, 952-53 (5th Cir. 1989). The Committee's assertion of this requirement underlies one of their fundamental criticisms of the Debtor's presentation concerning the fairness and equity of its treatment of creditors, i.e., that it is the Debtor's burden to demonstrate the fairness and equity of its proposal with facts showing what the Debor *must retain* to continue its

business post-confirmation and what the Debtor conversely *may provide* to its creditors without endangering its reorganization prospects. The Committee asserts that the Debtor has failed to make the necessary showing that it is appropriately balancing what it must keep and what it can pay. Committee Post Trial Brief at 54-56. As the Court observes in connection with its review of the Debtor's articulation of the appropriate standard for fair and equitable *or* good faith, the Court largely agrees with this evidentiary point.

The Committee also suggests an alternate test for a plan proposed by a non-profit entity, referencing standards for confirmation taken from Chapter 9 cases involving municipal entities. Committee Post Trial Brief at 55-56. The Court believes that this analogy is helpful; similar to this case, Chapter 9 debtors are non-profit entities for whom a reorganization is only possible if they are may retain some level of assets or resources (i.e, future revenue or use of tangible assets) that will permit them to continue to operate, maintain facilities and provide necessary goods or services post-confirmation. *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 29, 239 (Bankr. N.D. Tex. 2015) This formulation allows a court to assess the reasonable needs of the post-confirmation non-profit debtor and therefore the reasonable expectations of creditors. *Id.*

Similarly, this Debtor will rely, at least to some reasonable extent, on substantial assets, real property and facilities thereon, that it will need to retain to continue offering unique and necessary services post-confirmation.

The Court will neither accept in full nor reject this standard, though it has much to recommend it. This standard describes a balance between the debtor's requirements to continue its business activities post-confirmation, while limiting the amount of assets that it will retain, against the goal of paying creditors as much as possible in a cramdown scenario. As such, this test is at least in some fashion similar to the "honest efforts" test endorsed by the Ninth Circuit in *Teamsters II,* as offered by the Debtor in the discussion immediately below.

But the Court has some concerns that analogizing to a municipal entity's need to retain significant capital assets and revenue produced therefrom to provide essential services, requirements that for such an entity are fixed and relatively easily described (supplying water to citizens, funding police and fire departments) may not be as apt a tool to describe the likely more

ephemeral "requirements" of a Catholic Diocese to provide religious and charitable services to the faithful. But the Court is keeping a completely open mind on this score.

The Debtor also states that courts in the Ninth Circuit have relied on a totality of the circumstances test to determine if the plan provided fundamental fairness to creditors. Debtor Post-Trial Brief at 46. In particular the Debtor points to the Ninth Circuits consideration in *Teamsters II* whether the plan represented the Debtor's honest efforts to put forth a plan in good faith. Debtor Post-Trial Brief at 47. Stated differently, did the debtor commit its reasonably available financial capacity to the plan in good faith, and did the debtor genuinely attempt to balance its obligations to creditors (Abuse Survivors) against the constraints of its religious mission, its finances and the law? *Id.*; see also *Teamsters II* at 877.

Even accepting for the sake of argument that the "honest efforts" standard is appropriate for determining whether to confirm this Plan, the Court cannot conclude that the Debtor has satisfied that test on the present showing.

Does the Plan represent the Debor's "honest effort" to use its reasonably available financial capacity to pay creditor's claims and does it represent an appropriate balance between its obligations to its creditors and its obligations to provide religious services to the half a million practicing Catholics in the Oakland Diocese? The most honest answer to that question is that the Court cannot be sure based on the information provided by the Debtor.

The Debtor asserts that Bishop Barber's testimony provided not only the necessary background for the Debtor's decision to provide thirteen religious sites, and no more, for disposition to contribute proceeds to the Survivors' Trust for payment of Abuse Claims, but also that in making that decision the Bishop appropriately and reasonably and fairly balanced the need to retain sufficient assets and facilities to provide religious services to the faithful with the requirement that the Debtor maximize compensation to Abuse Survivors to the greatest extent practicable. Debtor Post-Trial Reply to Committee at 5. However, the Court's view of Bishop Barber's testimony and the support for the Debtor's decisions concerning retention of assets and payments to creditors differs from the Debtor's description.

Bishop Barber testified extensively and with genuine sincerity and conviction. He

described his background, and his path to the priesthood and eventually to the Office of Bishop of the Diocese of Oakland. He testified as well about his duties as Bishop and his role as the ultimate decision maker for the Diocese; he also testified concerning the various individuals and the consultive bodies who advise and support him in his role. He testified also concerning the challenges inherent in his role as Bishop, including the responsibility for ensuring that the Catholic faithful have access to religious services and the sacraments and to the social and charitable services that the Diocese provides, and the current challenges of providing such services during a period of declining church attendance in some parishes and declining ordinations in general. He recounted his efforts with the assistance of numerous advisors to address those challenges in the years prior to the bankruptcy filing via the "Mission Alignment Project" ("MAP") a project designed to study and make recommendations concerning various steps that could be taken to address those challenges, including the closing of some parishes and the "merger" of some parishes with others.

Bishop Barber stated that he took several factors into account in considering which churches and worship facilities to close and dispose of to facilitate payments via the Plan, and that among those factors were the demographics of the parishes (aging vs. youthful congregations) as well as the need to serve congregations of certain cultural and linguistic needs, and issues of geographic proximity.

Bishop Barber also testified, movingly, about his sincere regret concerning the history of abuse perpetrated by Catholic priests, frequently against the youngest and most vulnerable victims, and his fervent desire to do all he could to provide fair compensation to the Abuse Survivors and to ensure that such abuse never occurs again, and to institute procedures to react immediately and forcefully to any such atrocities in the future. Bishop Barber also testified to the fact that prior to the commencement of this bankruptcy case he was aware of the filing of numerous claims against priests and the Oakland Diocese, and that he directed the filing of this case to halt the dissipation of assets in legal fees defending those claims and to seek a just and equitable outcome for all of the Abuse Survivors. Lastly, he testified that he attempted via the Plan to strike the appropriate balance between maintaining assets and facilities necessary to serve

the faithful and providing just compensation to Abuse Survivors.

The Court has no doubts respecting Bishop Barber's integrity and his genuine desire to do the right thing in this exceptionally challenging scenario. But the Court believes that Bishop Barber's testimony, and the supporting exhibits offered to provide some further explanation of MAP and the decision to file bankruptcy (Exs. 70, Holy See Letter; 71, Holy See Response Letter, 73, Mission Alignment Phase I Report; 75, "*Aligning Our Reality With Our Mission*"; and 76, The Mission Alignment Process) describe only in the most general terms the factors that he took into account in his decision making, and in only the most conclusory terms the decisions that resulted. What neither the Bishop nor any other of the Debtor's witnesses provided, was any more particularized background or factual support for the decision to close thirteen churches, and not fifteen, or thirty as MAP had at one time had contemplated.

For example, if the Diocese conducted a survey of parishioners to gauge how much farther they would be likely to travel to attend Mass were their "home church" closed, there was no reference to it. If the Diocese undertook a study of the experiences of other dioceses that had down-sized, and the effect of that process on the ability to deliver church services, that wasn't mentioned. And even though reference was made during the trial to more specific and quantitative research and analysis conducted in the years before the bankruptcy filing in connection with MAP, and the Committee stated that that such materials had been provided to them, no such materials were offered into evidence at trial.

Indeed, just prior to the close of Debtor's evidentiary presentation at trial the Court asked specifically whether the Debtor would offer any evidence to establish on a particular, quantified and testable basis the factual background describing the decision making process and explaining why, with whatever level of precision could be offered, the decision was made that the Debtor could close thirteen churches, but no more. And the answer then was the same as the Debtor's statement in its Post-Trial Reply Brief to the Committee: you have the testimony of Bishop Barber and that is sufficient. Debtor Post-Trial Reply Brief to Committee at 11.

The Court addresses elsewhere in a slightly different context the difficulties of attempting to discern the factual bases for the Debtor's decision that it can offer no more assets to

compensate Abuse Survivors and why, for example, the closing of any additional churches would create a substantial burden on the Diocese's ability to provide religious services. It is additionally frustrating and unhelpful for the Debtor to take the position, as they appeared to do in their post-trial briefing and during Closing Arguments, that even an inquiry about these subjects constitutes a burden and an impermissible intrusion on the Debtor's religious freedoms.

The Court rejected that position in the context of the Debtor's religious freedom arguments and it rejects it here for the additional reason that the bankruptcy system in general and the requirements for cramming down a plan on unwilling creditors in particular, demand full transparency and accountability. Absent a clear explanation of the background and basis for the debtor's critical decisions affecting creditors, the Court cannot even assess, let alone approve, such decisions.

The Debtor claims to be acting as the sole authority on what assets, including church assets, may be sold to pay creditors. But as pointed out elsewhere, a debtor in bankruptcy is not permitted to choose which confirmation requirements it will satisfy and which it won't. And as also remarked in connection with the religious freedom issues, the Bishop's conclusions about liquidating assets don't appear to be doctrinally based; rather as the pre-petition MAP exercise showed, the analysis was more secular and mundane—in light of demographic issues, and cultural issues, and declining church resources, the Bishop was forced to close some parishes and liquidate some real property assets. And, perhaps tellingly, the Bishop's inquiry seemed to be less the doctrinally based question 'What must I retain to service the flock?' than the more mundane 'What may I close and liquidate given economic constraints?' Most chapter 11 debtors, for-profit and non-profit, face the same challenges.

And even if these decisions fall under the perhaps more prosaic "church autonomy" protections, the fundamental questions remain untethered to doctrinal matters, and the decision is not whether to compel the Debtor to sell more assets, it is whether the Debtor can successfully navigate the Chapter 11 process in light of its desire not to make some assets available to creditors.

Turning to the Debtor's additional assertions that the Plan provides compensation to

Abuse Survivors that is "reasonable" the Debtor's principal argument in support of the assertion that the Plan represents an honest effort to deal with the creditors in this case is the Debtor's comparison of the results purportedly achieved in this Plan (on an average amount of payment per claimant) with those achieved in other chapter 11 cases in which plans had been confirmed—per the Debtor's comparative analysis, this Plan is at the very top end of favorable treatment to Abuse Survivors. Exhibit 2 to Dkt. No. 3103.

But that thesis is flawed. First, what is being compared is not comparable—the other plans referenced were all actually confirmed consensually, i.e., in each allegedly comparable case the Debtor and the Committee had *agreed* to the treatment described. There is no agreement in this case. Further, as has been remarked upon in several other bankruptcy cases, every such case is different—the claims are different, the debtor's assets and size are different, the risk assessments are different, the tolerances for continuing litigation are different, the insurance policies are different, and the decision of when to settle and for how much is necessarily different. In light of these differences, the issue of when any of the parties in these other cases came to their "angle of repose" and resolved their disputes is not similar to any other such decision, and is neither predictive of how other parties can or should act, or indicative of what is fair and equitable, or in good faith.

And fairness and equity and good faith based upon the average distributions to creditors is perilous—one can never be certain when another plan may come along and take the prize for highest average distribution, as appears to have happened to this Plan during the course of the confirmation trial in this case, with the Archdiocese of San Francisco having apparently settled with the Committee in its case on the economics of a plan that would pay on average per claimant almost half again as much as this Plan. It is in the nature of such benchmarks to be surpassed, and for the passage of time and the march of events to rob them of stature and permanence.

The Debtor sought to support its argument about its honest efforts and the reasonable outcome of this Plan through the testimony of Dr. Denise Martin, who performed the comparative analysis described above. In the course of her testimony in support of the Plan, Dr.

Martin opined that this plan was in the 93rd percentile of all plans that could readily be compared to it. *See* Ex. D-94. In addition to the "comparative" problems identified above, Dr. Martin's testimony, and the Debtor's assertions based thereon, made another assertion that concerns the Court: that Dr. Martin's comparison of this Plan to the others established not only the comparative superiority of this Plan, but did so precisely because the other plans described a "market" against which a reasonable payment to creditors could be established. Exhibit 2 to Dkt. No. 3103; 6/22 Tr. at 154:22-155:2.

Beyond the flaws inherent in purporting to compare not clearly comparable situations, the Court is concerned about the Debtor's thesis that one could readily define a "market" for reasonable outcomes in the case of tort claimants deciding consensually to resolve their objections and accept treatment under a plan of reorganization. To be sure, the requirements for confirmation of a plan of reorganization in a case involving a for profit debtor and commercial creditors appear to assume the existence of a "market"—such assumptions are inherent in the fundamental chapter 11 plan requirements that only similar claims be included in a class, that allow a majority of the class to bind dissenters (subject to objections to confirmation), and that permit the designation of votes where it appears that creditors are acting out of motivations that go beyond or are not consistent with their rational economic interests. In each of these instances the Code essentially assumes the existence of a "market" i.e. a collection of similarly situated creditors are presumed to reflect collectively the economic and rational wisdom of the group.

But those market assumptions are not relevant in this context. The market assumptions described above are relevant only in connection with the categorization of creditors for voting and the question whether a class has accepted the plan. The Abuse Survivors in Class 4 have rejected the Plan, by a very large majority; so in that sense, there is a market here and it has spoken. Nothing in the market assumptions described above would warrant ignoring such rejection on the ground that it was unreasonable.

The Court stresses, however, that it is not rejecting as a matter of principle the "honest effort" test as a measure of a plan's confirmability. Indeed, in the absence of any more precisely articulated circuit-level authority concerning the standard to apply when assessing good faith or

fairness and equity of a plan proposed by a non-profit entity in a cramdown scenario, the Court would be hard-pressed to reject out of hand any plausible and potentially reasonable standard. Stated differently, just as was the case with the Debtor's unsuccessful satisfaction of the best interest test, the problem with the Debtor's arguments concerning whether the Plan is fair and equitable are most importantly failures of disclosure and proof, not of concept.

And perhaps more to the ultimate point, in the absence of the protections of Section 1129(b)(2)(B) where the debtor is a non-profit entity, it is not clear that there is any absolute minimum amount of compensation due to dissenting and rejecting unsecured creditors, of any description, over and above amounts payable pursuant to the best interests test, which again, in the case of a non-profit debtor, could be substantial. And the confirmability of a debtor's plan in this scenario may well be, at best, dependent on the application of a test that attempted to determine a debtor's good faith, based on its honest efforts, a standard aspirational but imprecise.

Should the Debtor succeed in a subsequent plan in setting forth the background and the justification for its decisions re what assets to keep and which to dispose of the parties and the Court will be better able to judge the Debtor's good faith and the Plan's confirmability. And while the Court believes that the competing tests set forth by the Debtor and the Committee are not identical, they will, properly deployed, quite possibly converge to a point of greater agreement than is presently demonstrated. And that way lies accommodation, and resolution.

## **CONCLUSION**

For the reasons set forth in this Memorandum Decision, the Court concludes that the Debtor has not presently satisfied the requirements for confirmation of a plan of reorganization as set forth in Section 1129(a)(7) and, were it applicable, Section 1129(b)(2).

This is not a happy result, to be sure, for any of the parties, or their counsel who have been deeply—and as they might well occasionally have imagined, perpetually—immersed in this case for now over three and a half years. Not for the Debtor, certainly, who has prosecuted this case honorably and with great integrity, and who proposed a Fourth Amended Plan that, although it has fallen short of the requirements for confirmation, represents a significant effort to provide

meaningful compensation to Abuse Survivors while continuing its religious mission. And surely also not for the Committee, who may have won the day with respect to the issues adjudicated in this Decision, but who are also no doubt deeply aware that three and a half years of fighting the good fight in this case has not produced a single penny of recovery for the 345 Abuse Survivors who look to them not merely for advocacy, but also for leadership.

The Court stresses, again, that the insufficiencies of this Plan arise from failures of proof, not of conception. It may be that another plan would require a different or larger contribution from the Debtor, but it is far from clear to the Court that such a proposal is impossible—and some aspects of the current Plan, including the alternative sources of payment to the Survivors' Trust contained in this Plan, suggest that an alternative plan is realizable.

The Court cannot compel the parties to resolve these matters consensually; but it can make the following observations.

The plan confirmation disputes in this case have likely been present, if so far dormant and unexplored, in every chapter 11 case filed by a Catholic diocese. Every other such case that has been resolved up to now has come to that end as a result of a negotiated resolution, at least with respect to the financial aspects of the plan, rather than full on litigation of numerous complex and uncertain issues.

If anyone believed that litigating fully the plan confirmation issues raised in this case would yield a magic answer, or even an absolute, definitive one, to the incredibly complex and layered questions presented, this Decision, necessarily limited and qualified, is their answer. But the Court hopes that the answers it has provided and the guidance it has offered will assist the parties going forward.

Judges can provide definitive answers to factual and legal questions, to be sure, but such determinations do not always lead to resolution. The most definitive and positive resolutions to bankruptcy cases, and especially cases such as this one, that have their origins in such trauma and have been marked by such ongoing suspicions, emanate not from a judge's pen, but from the conviction of the parties that they have been heard, and they have been respected, and that they have reached an outcome that, if not optimal, is fair to them, and that is fair as well to those with

whom they have disputes. The way to such an outcome is continuing dialogue and relentless good faith. There is no guarantee of success in such endeavors, but also no reason not to begin again.

In that spirit, the Court hopes that this Decision may offer to these parties a version of what the Bankruptcy Code aspires to provide to all who enter our courts with good will and proceed in good faith—a ray of hope, though slender, lighting a path narrow, yet ascending.

**END OF AMENDED MEMORANDUM**